# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 19-1181,
19-1182 and 19-1960

No. 19-1181

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, SAN JUAN IN CASE NO. 3:17-BK-03283-LTS

**JOINT BRIEF ON BEHALF OF APPELLEES FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE COMMONWEALTH OF PUERTO RICO AND THE PUERTO RICO SALES TAX FINANCING CORPORATION, AND THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY**

TIMOTHY W. MUNGOVAN
JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600

MICHAEL A. FIRESTEIN
LARY A. RAPPAPORT
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 557-2900

PETER FRIEDMAN
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 383-5300

MARTIN J. BIENENSTOCK
STEPHEN L. RATNER
JEFFREY W. LEVITAN
BRIAN S. ROSEN
MARK D. HARRIS
LUCAS KOWALCZYK
SHILOH A. RAINWATER
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

JOHN J. RAPISARDI
SUZZANNE UHLAND
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Appellees*

Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power
Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax
Financing Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the
Employees Retirement System of the Government of the
Commonwealth of Puerto Rico,

*Debtors.*

RENE PINTO-LUGO; MOVIMIENTO DE CONCERTACION CIUDADANA
INC., (VAMOS); UNION DE EMPLEADOS DE OFICINA Y
PROFESIONALES DE LA AUTORIDAD DE EDIFICIOS PUBLICOS,
(UEOGAEP); UNION INSULAR DE TRABAJADORES INDUSTRIALES Y
CONSTRUCCIONES ELECTRICAS INC., (UITICE); UNION
INDEPENDIENTE DE EMPLEADOS DE LA AUTORIDAD DE
ACUEDUCTOS Y ALCANTARILLADOS, (UIA); UNION DE EMPLEADOS
DE OFICINA COMERCIO Y RAMAS ANEXAS, PUERTOS, (UEOCRA);
UNION DE EMPLEADOS PROFESIONALES INDEPENDIENTES, (UEPI);
UNION NACIONAL DE EDUCADORES Y TRABAJADORES DE LA
EDUCAION, (UNETE; ASOCIACION DE INSPECTORES DE JUEGOS DE
AZAR, (AIJA); MANUEL NATAL-ALBELO,

*Movants-Appellants,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation,
a/k/a Cofina,

*Debtors-Appellees,*

PUERTO RICO FISCAL AGENCY AND FINANCIAL
ADVISORY AUTHORITY,

*Movant-Appellee,*

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX
ADVISORS LLC,

*Intervenors.*

_____

No. 19-1182

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representaive for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico,

*Debtors.*

———————————————

MARK ELLIOTT; LAWRENCE B. DVORES; PETER C. HEIN,

*Movants-Appellants,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina,

*Debtors-Appellees,*

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY,

*Movant-Appellee,*

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP; SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.; TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC,

*Intervenors.*

———————————————

No. 19-1960

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico,

*Debtors.*

———————————————

PETER C. HEIN,

*Movant-Appellant,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation,
a/k/a Cofina,

*Debtors-Appellees,*

PUERTO RICO FISCAL AGENCY AND FINANCIAL
ADVISORY AUTHORITY,

*Movant-Appellee.*

_____

## CORPORATE DISCLOSURE STATEMENT

Debtors-Appellees are not required to file a corporate disclosure statement under Fed. R. App. P. 26.1 because none of them is a non-governmental corporate party.  Debtors-Appellees are all either natural persons or governmental entities.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

QUESTIONS PRESENTED...................................................................................5

FACTUAL BACKGROUND....................................................................................5

      A.    Puerto Rico's Fiscal Crisis and PROMESA ..............................5

      B.    COFINA ...................................................................................6

      C.    COFINA's Title III Case .........................................................7

      D.    The COFINA Plan of Adjustment .........................................12

      E.    Disclosure Statement .............................................................14

      F.    Voting on the Plan..................................................................15

      G.    New Bond Legislation ...........................................................15

      H.    Objections to the Plan ...........................................................16

      I.    Plan Confirmation .................................................................17

      J.    Plan Consummation ...............................................................19

      K.    Appeals of the Confirmation Order .......................................20

      L.    Thirteenth Omnibus Objection ..............................................21

SUMMARY OF ARGUMENT ...............................................................................23

STANDARD OF REVIEW .....................................................................................25

ARGUMENT ...........................................................................................................26

    I.    THE APPEALS CHALLENGING THE CONFIRMATION
         ORDER ARE EQUITABLY MOOT....................................................26

      A.    Appellants Did Not Seek a Stay .............................................28

      B.    The Plan Has Been Consummated for More Than a Year .......30

          1.    Pinto Lugo Appellants ..................................................32

          2.    Elliott Appellants ..........................................................34

      C.    Reversal Would Harm Innocent Third Parties.........................36

      D.    Appellants' Arguments against Equitable Mootness Fail ........38

    II.    PINTO LUGO APPELLANTS' OBJECTIONS WERE
         PROPERLY OVERRULED. ...............................................................39

A.      Appellants' Objections to the Plan Are Waived and
        Meritless. ....................................................................41

        1.      Any Objection that the New Bond Legislation Was
                Improperly Enacted Is Non-Justiciable .........................42

        2.      The COFINA Enabling Act and New Bond
                Legislation Do Not Violate Public-Debt Limits............46

B.      There Was No Due-Process Violation.......................................49

        1.      Due Process Did Not Require Resolving the
                Adversary Proceeding before Plan Confirmation ..........49

        2.      The District Court Did Not Improperly Adjudicate
                the Adversary Proceeding..............................................52

III.    THE OBJECTIONS OF ELLIOTT APPELLANTS WERE
        CORRECTLY OVERRULED..........................................................53

A.      PROMESA Applies to Appellants' Security Interests. ............54

B.      There Is No Takings Clause Violation. ...................................56

        1.      The Takings Clause Is Not Implicated Because
                Appellants Have No Cognizable Property Right. ..........57

        2.      There Was No Taking Even if Appellants Had a
                Cognizable Property Right. ...........................................59

                a.      The Takings Claim Must Be Analyzed
                        Under the Regulatory Takings Framework..........59

                b.      There Was No Taking under *Penn Central*. ........62

        3.      Even if There Were a Taking, Appellants Received
                Just Compensation. ........................................................65

        4.      Appellants' Cases Are Inapposite. .................................68

        5.      Appellants' Other Takings Arguments Are
                Meritless. ........................................................................70

C.      The New Bond Legislation Does Not Violate the
        Contract Clause. ....................................................................74

        1.      The New Bond Legislation Does Not Substantially
                Impair Contractual Rights. ............................................75

        2.      The New Bond Legislation Was Reasonable and
                Necessary to Address Puerto Rico's Fiscal
                Emergency. .....................................................................77

D.     The Plan Does Not Violate the Privileges and Immunities, Due Process, Equal Protection, and Dormant Commerce Clauses. .................................................................80

       1.     The Incentive Did Not Violate the Privileges and Immunities Clause. .........................................................81

       2.     The Incentive Did Not Violate the Equal Protection or Due Process Clauses. ................................84

       3.     The Plan Did Not Violate the Dormant Commerce Clause. ................................................................85

E.     The Plan-Confirmation Process Comported with Due Process and Was Fair by Any Yardstick. ..................................85

       1.     Appellants Were Not Deprived of Due Process. ............86

       2.     Appellants' Other Process Objections Fail. ...................88

F.     Appellants' Remaining Miscellaneous Arguments Are Unavailing. ...........................................................................94

IV.     HEIN'S INDIVIDUAL APPEAL FAILS. ...........................................96

A.     Hein's Proof of Claim Is Duplicative of the Master Proof of Claim. ..................................................................................97

B.     The District Court Lacked Subject-Matter Jurisdiction to Reconsider Hein's Objections to the Plan, and the Objections Were Not Properly before the District Court Anyway. ...............................................................................100

       1.     The District Court Lacked Jurisdiction to Reconsider Hein's Objections in September 2019. ......100

       2.     Hein's Objections to the Plan Were Irrelevant to the Thirteenth Omnibus Objection. ...............................103

C.     The District Court Did Not Abuse Its Discretion in Denying Hein's Motion to Compel Discovery. ......................103

CONCLUSION ....................................................................................................105

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
  761 F.3d 252 (2d Cir. 2014) ............................................................................ 61

*Ahmed v. Holder*,
  611 F.3d 90 (1st Cir. 2010) ............................................................................. 46

*Altair Glob. Credit Opportunities Fund, LLC v. Fin. Oversight &*
  *Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  914 F.3d 694 (1st Cir. 2019) ........................................................................... 55

*American United Mutual Life Ins. Co. v. City of Avon Park*,
  311 U.S. 138 (1940) ........................................................................................ 92

*Armstrong v. United States*,
  364 U.S. 40 (1960) .................................................................................... 67, 68

*Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.)*,
  382 F.3d 68 (1st Cir. 2004) ....................................................................... 73, 88

*Aurelius Invs. v. Puerto Rico*,
  915 F.3d 838 (1st Cir. 2019) ........................................................................... 94

*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
  95 F.3d 86 (1st Cir. 1996) ............................................................................. 103

*Baldwin v. Fish & Game Comm'n of Mont.*,
  436 U.S. 371 (1978) .................................................................................. 82, 83

*Bennett v. Jefferson Cty. (In re Jefferson Cty.)*,
  899 F.3d 1240 (11th Cir. 2018) ................................................... 27, 28, 38, 39

*Boddie v. Connecticut*,
  401 U.S. 371 (1971) ........................................................................................ 51

*Brown v. Hansen*,
  973 F.2d 1118 (3d Cir. 1992) .......................................................................... 44

v

*Buffalo Teachers Fed'n v. Tobe*,
    464 F.3d 362 (2d Cir. 2006) ..............................................................80

*Bullard v. Blue Hills Bank*,
    135 S. Ct. 1686 (2015)....................................................................53

*Caban Hernandez v. Philip Morris USA, Inc.*,
    486 F.3d 1 (1st Cir. 2007)..............................................................102

*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999)........................................................45

*City Sanitation, LLC, v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*,
    656 F.3d 82 (1st Cir. 2011)..............................................................72

*Clark v. Martinez*,
    543 U.S. 371 (2005).........................................................................55

*Cobb v. City of Stockton (In re City of Stockton)*,
    909 F.3d 1256 (9th Cir. 2018) ...................................................passim

*Comptroller of Treasury of Md. v. Wynne*,
    135 S. Ct. 1787 (2015).....................................................................85

*Connolly v. Pension Ben. Guar. Corp.*,
    475 U.S. 211 (1986).........................................................................65

*Consejo De Desarrollo Economico De Mexicali*,
    482 F.3d 1157 (9th Cir. 2007) .........................................................43

*Cramer v. Skinner*,
    931 F.2d 1020 (5th Cir. 1991) .........................................................81

*Curnin v. Town of Egremont*,
    510 F.3d 24 (1st Cir. 2007)..............................................................45

*Dandridge v. Williams*,
    397 U.S. 471 (1970).........................................................................84

*Del. Coalition for Open Gov't, Inc. v. Strine*,
    733 F.3d 510 (3d Cir. 2013) ............................................................93

*Duff v. Cent. Sleep Diagnostics, LLC*,
    801 F.3d 833 (7th Cir. 2015) ............................................................28

*E. Enterprises v. Apfel*,
    524 U.S. 498 (1998).........................................................................95

*EDP Med. Computer Sys., Inc. v. United States*,
    480 F.3d 621 (2d Cir. 2007) .............................................................53

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983).........................................................................75

*Fideicomiso de La Tierra del Caño Martin Peña v. Fortuño*,
    604 F.3d 7 (1st Cir. 2010)................................................................57

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated
    Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R. )*,
    No. 19-1699, 2020 WL 486163 (1st Cir. Jan. 30, 2020)............................passim

*First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*,
    18 B.R. 868 (Bankr. D. Colo. 1982)...........................................57, 59

*Gilbert v. City of Cambridge*,
    932 F.2d 51 (1st Cir. 1991)..............................................................62

*Grella v. Salem Five Cent Sav. Bank*,
    42 F.3d 26 (1st Cir. 1994)................................................................73

*Griggs v. Provident Consumer Disc. Co.*,
    459 U.S. 56 (1982).........................................................................101

*Haase v. Countrywide Home Loans, Inc.*,
    748 F.3d 624 (5th Cir. 2014) ..........................................................104

*Harris v. Rosario*,
    446 U.S. 651 (1980).........................................................................95

*Hawes v. Club Ecuestre El Comandante*,
    535 F.2d 140 (1st Cir. 1976)............................................................81

*Helvering v. Griffiths*,
    318 U.S. 371 (1943).........................................................................69

vii

*Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*,
  136 F.3d 45 (1st Cir. 1998) ................................................................73

*Hodel v. Va. Surface Mineral & Reclamation Ass'n*,
  452 U.S. 264 (1981) .........................................................................86

*In re Bate Land & Timber LLC*,
  877 F.3d 188 (4th Cir. 2017) ...........................................................28

*In re BGI, Inc.*,
  772 F.3d 102 (2d Cir. 2014) ..............................................28, 31, 34

*In re Bos. & Maine Corp.*,
  484 F.2d 369 (1st Cir. 1973) ............................................................64

*In re Chateaugay Corp.*,
  988 F.2d 322 (2d Cir. 1993) .......................................................28, 30

*In re CHC Grp. Ltd.*,
  No. 16-31854, 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex. Mar.
  3, 2017) ...........................................................................................88

*In re City of Detroit*,
  524 B.R. 147 (Bankr. E.D. Mich. 2014)...........................................70

*In re Diruzzo*,
  527 B.R. 800 (B.A.P. 1st Cir. 2015)..................................................53

*In re Mansaray-Ruffin*,
  530 F.3d 230 (3d Cir. 2008) .............................................................52

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) .......................................................30, 34

*In re Millennium Lab Holdings II, LLC*,
  945 F.3d 126 (3d Cir. 2019) ........................................28, 33, 35, 37

*In re Mortgages Ltd.*,
  771 F.3d 1211 (9th Cir. 2014) ..........................................................28

*In re One2One Commc'ns, LLC. v. Quad/Graphics, Inc.*,
  805 F.3d 428 (3d Cir. 2015) .............................................................32

*In re Pub. Serv. Co. of N.H.*,
  963 F.2d 469 (1st Cir. 1992).......................................................................passim

*In re Stephens*,
  704 F.3d 1279 (10th Cir. 2013) .........................................................................28

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ...................................................................88

*In re Tex. Grand Prairie Hotel Realty, LLC*,
  710 F.3d 324 (5th Cir. 2013) .............................................................................28

*In re Transwest Resort Props.*,
  801 F.3d 1161 (9th Cir. 2015) ...........................................................................36

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015) ...............................................................35, 37, 39

*Katz v. Pershing, LLC*,
  672 F.3d 64 (1st Cir. 2012)................................................................................20

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987)...........................................................................................62

*Kimball Laundry Co. v. United States*,
  338 U.S. 1 (1949)...............................................................................................70

*Knick v. Township of Scott*,
  139 S. Ct. 2162 (2019).......................................................................................71

*LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*,
  212 F.3d 632 (1st Cir. 2000)..............................................................................73

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005)...........................................................................................60

*Local Loan Co. v. Hunt*,
  292 U.S. 234 (1934)...........................................................................................57

*Louisville Joint Stock Land Bank v. Radford*,
  295 U.S. 555 (1935).............................................................................57, 59, 69

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992) ....................................................................59

*Mac Panel Co. v. Va. Panel Corp.*,
   283 F.3d 622 (4th Cir. 2002) ........................................................28

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ......................................................................50

*McAndrews v. Fleet Bank of Mass., N.A.*,
   989 F.2d 13 (1st Cir. 1993) ....................................................61, 65

*McBurney v. Young*,
   667 F.3d 454 (4th Cir. 2012) ........................................................82

*Metzenbaum v. Fed. Energy Reg. Comm'n*,
   675 F.2d 1282 (D.C. Cir. 1982) ...............................................43, 44

*Monongahela Navigation v. United States*,
   148 U.S. 312 (1893) ......................................................................71

*Nat'l Fed'n of the Blind v. Container Store, Inc.*,
   904 F.3d 70 (1st Cir. 2018) ...........................................................34

*Nev. Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) ......................................................................45

*Nevada v. Watkins*,
   914 F.2d 1545 (9th Cir. 1990) ......................................................81

*New Haven Inclusion Cases*,
   399 U.S. 392 (1970) ............................................................63, 66, 77

*Nordhoff Invs. Inc. v. Zenith Elecs. Corp.*,
   258 F.3d 180 (3d Cir. 2001) .........................................................36

*Noriega Rodriguez v. Jarabo*,
   136 D.P.R. 497 (P.R. 1994) .......................................................43, 44

*Ochadleus v. City of Detroit (In re City of Detroit)*,
   838 F.3d 792 (6th Cir. 2016) ..................................................passim

x

*Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*,
  164 F.3d 677 (1st Cir. 1999) ...............................................................61

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ...........................................................................62

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984) ...........................................................................76

*Petitioning Creditors of Melon Produce v. Braunstein*,
  112 F.3d 1232 (1st Cir. 1997) .........................................................48, 49

*Phillips v. Congelton, LLC (In re White Mountain Mining Co., LLC)*,
  403 F.3d 164 (4th Cir. 2005) .............................................................90

*Phillips v. Wash. Legal Found.*,
  524 U.S. 156 (1998) ...........................................................................58

*Poinsett Lumber & Mfg. Co. v. Drainage Dist. No. 7*,
  119 F.2d 270 (8th Cir. 1941) .............................................................71

*PPUC Pa. Pub. Util. Comm'n v. Gangi*,
  874 F.3d 33 (1st Cir. 2017) ...............................................................28

*Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re
  SW Boston Hotel Venture, LLC)*,
  748 F.3d 393 (1st Cir. 2014) .........................................................25, 26

*PruneYard Shopping Ctr. v. Robins*,
  447 U.S. 74 (1980) .............................................................................61

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  136 S. Ct. 1938 (2016) .........................................................................6

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...........................................................................45

*Redondo-Borges v. Dep't of Hous. & Urban Dev.*,
  421 F.3d 1 (1st Cir. 2005) .................................................................58

*Reoforce, Inc. v. United States*,
  853 F.3d 1249 (Fed. Cir. 2017) .........................................................62

*Rocafort v. IBM Corp.*,
  334 F.3d 115 (1st Cir. 2003) ...............................................................50

*Saenz v. Roe*,
  526 U.S. 489 (1999) ................................................................81, 83

*Shapiro v. Thompson*,
  394 U.S. 618 (1969) .........................................................................84

*Silva v. Hernandez Agosta*,
  118 D.P.R. 45, 18 P.R. Offic. Trans. 55 (P.R. 1986) ........................43

*Sims v. Jamison*,
  67 F.2d 409 (9th Cir. 1933) ............................................................57

*Supreme Court of Va. v. Friedman*,
  487 U.S. 59 (1988).............................................................................82

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018)......................................................................76

*Toomer v. Witsell*,
  334 U.S. 385 (1948)...........................................................................82

*Tower v. Leslie-Brown*,
  326 F.3d 290 (1st Cir. 2003).............................................................42

*Tri Cty. Paving, Inc. v. Ashe Cty.*,
  281 F.3d 430 (4th Cir. 2002) ...........................................................51

*Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*,
  652 F.2d 793 (9th Cir. 1981) ...........................................................37

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at
  Lakeridge, LLC*,
  138 S. Ct. 960 (2018).........................................................................25

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union
  v. Fortuño*,
  633 F.3d 37 (1st Cir. 2011).........................................................passim

*United States v. Brooks*,
  145 F.3d 446 (1st Cir. 1998)...........................................................101

*United States v. Commodities Trading Corp.*,
339 U.S. 121 (1950)............................................................65, 71

*United States v. George*,
841 F.3d 55 (1st Cir. 2016)...........................................101

*United States v. Kras*,
409 U.S. 434 (1973)...........................................................84

*United States v. Miller*,
317 U.S. 369 (1943)...........................................................70

*United States v. Norwood*,
602 F.3d 830 (7th Cir. 2010) ...........................................65

*United States v. Rodriguez-Rosado*,
909 F.3d 472 (1st Cir. 2018)...........................................101

*United States v. Rostenkowski*,
59 F.3d 1291 (D.C. Cir. 1995)...........................................43

*United States v. Sec. Indus. Bank*,
459 U.S. 70 (1982)........................................................55, 59

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990)...........................................34, 96

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010).............................................50, 52, 86

*Vlandis v. Kline*,
412 U.S. 441 (1973)...........................................................83

*Walters v. Nat'l Ass'n of Radiation Survivors*,
473 U.S. 305 (1985)...........................................................50

*Wright v. Union Cent. Ins. Co.*,
311 U.S. 273 (1940)...........................................................69

*Wright v. Vinton Branch of Mountain Trust Bank*,
300 U.S. 440 (1937)...........................................................69

*Yellin v. United States*,
374 U.S. 109 (1962)........................................................43

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012)........................................................42

**STATUTES, RULES, AND CONSTITUTIONS**

13 L.P.R.A. 13(d)............................................................47

11 U.S.C. § 101(5)..........................................................98

11 U.S.C. § 1101(2)........................................................30

11 U.S.C. § 1126(e)........................................................91

48 U.S.C. § 737.............................................................81

48 U.S.C. § 2121(a)........................................................83

48 U.S.C. § 2121(b)........................................................95

48 U.S.C. §§ 2141–2142....................................................6

48 U.S.C. §§ 2161–2177....................................................6

48 U.S.C. § 2161(a)........................................................89

48 U.S.C. § 2161(c)........................................................11

48 U.S.C. § 2164(a).........................................................6

48 U.S.C. § 2174...........................................................41

48 U.S.C. § 2174(b)........................................................72

48 U.S.C. § 2194(m).........................................................5

P.R. Act No. 241-2018......................................................47

P.R. Laws Ann. Title 13, §§ 11a–16........................................6

P.R. Laws Ann. Title 13, § 12..........................................7, 58

Fed. R. App. P. 4(a)(4)..................................................101

Fed. R. Bankr. P. 9019 ...................................................................11, 49

Fed. R. Evid. 408 ......................................................................................71

P.R. Const. art. III, § 9 ............................................................................42

P.R. Const. art. VI, § 2 ............................................................................47

P.R. Const. art. VI, § 7 ............................................................................46

P.R. Const. art. VI, § 8 ..............................................................................6

U.S. Const. amend. V...............................................................................57

U.S. Const. art. I, § 5, cl. 2 ......................................................................43

U.S. Const. art. I, § 10, cl. 1 ....................................................................74

U.S. Const. art. IV, § 2, cl. 1 ...................................................................81

## OTHER AUTHORITIES

Collier on Bankruptcy (Richard Levin & Henry J. Sommer eds. 16th
    ed. 2018) ................................................................................73, 91

## PRELIMINARY STATEMENT

After failing to request a stay pending appeal and an expedited appeal, Appellants ask this Court to overturn an $18-billion, fully-implemented restructuring plan relied on for over a year by the market, the debtor, and the Commonwealth.  Had Appellants requested a stay or an expedited appeal, the district court and this Court could have explored means of enabling appellate relief without gross unfairness to the Commonwealth and thousands of investors.  Having chosen not to act expeditiously, Appellants forfeited any defense to dismissal of their appeals for equitable mootness.

Appellants ask the Court for a legally unfounded and practically infeasible result:  an order overturning the comprehensive plan of adjustment (the "Plan") for the Puerto Rico Sales Tax Financing Corporation ("COFINA"), which settled a colossal dispute with the Commonwealth, was overwhelmingly endorsed by creditors and confirmed by the district court, and has been implemented for more than a year.  Their appeals are equitably moot because it would be impractical and inequitable for the Court to unwind the Plan, the settlement with the Commonwealth, and the tens of thousands of transactions conducted in reliance on the Plan.  The appeals lack merit in any event.

The Plan restructured nearly 25% of Puerto Rico's aggregate publicly-funded debt and is a critical step in the Commonwealth's fiscal recovery.

COFINA claimed to own an unlimited future stream of sales and use taxes to pay interest and principal on its $18-billion debt. The Commonwealth claimed it owned the taxes and revenue stream. Appellants ask for the Plan that settled that dispute to be scuttled. Moreover, under the Plan, billions of dollars of COFINA's bonds were canceled, new bonds were issued, and those new bonds (which are performing and paying interest) have been traded on the public market tens of thousands of times. Additionally, under the Plan's terms, billions of dollars were distributed to creditors and litigations were dismissed with prejudice. The Plan was the product of years of litigation and negotiations and received overwhelming support from every class of creditors, including institutional investors and individual retail bondholders.

Appellants were among the few parties who objected to the Plan. The district court correctly overruled all of their objections and confirmed the Plan. Appellants neither sought to stay the Plan's implementation nor requested an expedited appeal.

Appellants ask this Court to invalidate the Plan regardless of its consequences. But that train has left the station. Under the equitable-mootness doctrine, an appellate court will not unwind a confirmed and implemented reorganization plan if doing so would be impractical and inequitable to innocent third parties. Here, having failed to seek a stay, Appellants allowed the Plan to be

implemented to a point where it cannot be unwound. The relief sought would require the Court to rescind the new COFINA bonds (thereby invalidating all the trades made on those bonds and payments made thereunder); restore the old COFINA bonds; disgorge billions of dollars of distributions to creditors; and order the parties to revisit various Plan litigation settlements. Such relief is not only impossible, it would cripple the Commonwealth's recovery effort and harm innocent third parties who traded the new COFINA bonds in reliance on the Plan and have received interest payments. The equitable-mootness doctrine exists precisely to avoid such a result.

Putting aside equitable mootness, Appellants' arguments for reversal fail. René Pinto Lugo *et al.* ("Pinto Lugo Appellants") argue the procedures surrounding Plan confirmation violated their due-process rights. However, they received the opportunity to object to the Plan in writing (which they did) and to participate at the Plan-confirmation hearing (which they also did). The district court addressed their objections and overruled them in a written decision. That is all the process Appellants were due.

Appellants Mark Elliott, Peter C. Hein, and Lawrence B. Dvores ("Elliott Appellants") mount a "kitchen-sink" attack, arguing the Plan and the confirmation process violate more than a dozen constitutional and statutory provisions. Their primary argument—that their rights cannot be subject to a plan of adjustment

under PROMESA—was squarely rejected by this Court in *Financial Oversight & Management Board for Puerto Rico v. Andalusian Global Designated Activity Company (In re Financial Oversight & Management Board for Puerto Rico)*, No. 19-1699, 2020 WL 486163, at *12–13 (1st Cir. Jan. 30, 2020). The holding in *Andalusian* also defeats Elliott Appellants' takings argument because it confirms they have no property right subject to the Takings Clause. *Id.* at *6. That COFINA and the Commonwealth settled their competing claims to the same property does not mean there was a taking of COFINA's property pledged to secure bonds. Had COFINA litigated and lost, Elliott Appellants would have received nothing. They received more than just compensation in any event. As explained below, the remaining laundry list of arguments made by Elliott Appellants fares no better.

Appellant Peter C. Hein's individual appeal is likewise unavailing. Hein appeals from the district court's order disallowing a proof of claim he submitted in the Title III case. But both Hein's proof of claim and a master proof of claim submitted by the trustee for the COFINA bondholders sought a distribution on the same bonds. The trustee received a distribution under the Plan and paid Hein his pro rata share of that distribution. The district court was thus correct when it held that Hein's proof of claim was duplicative and improperly sought a second distribution on the same bonds.

4

## QUESTIONS PRESENTED

1) Are the appeals challenging the Plan equitably moot given that

   (a) Appellants never sought a stay or an expedited appeal; (b) the Plan has
   been fully implemented and the transactions conducted in reliance on it
   cannot practically be unwound; and (c) reversal would harm innocent third
   parties who relied on the Plan and the order confirming the Plan?

2) Did the district court properly overrule the Plan objections raised by Pinto
   Lugo Appellants without first adjudicating an adversary proceeding raising
   the same issues?

3) Did the district court properly overrule the Plan objections asserted by Elliott
   Appellants?

4) Did the district court properly disallow a claim brought under the Plan by
   appellant Peter C. Hein that sought a duplicative distribution on the same
   bonds as a master proof of claim brought on behalf of all bondholders by the
   bond trustee?

## FACTUAL BACKGROUND

### A.     Puerto Rico's Fiscal Crisis and PROMESA

Puerto Rico is in the midst of a "fiscal emergency."  48 U.S.C.

§ 2194(m)(1).  To address that emergency, Congress enacted the Puerto Rico

Oversight, Management, and Economic Stability Act ("PROMESA") in June 2016.

48 U.S.C. § 2101–2241.  Among other things, PROMESA created the Financial

Oversight and Management Board (the "Board") and provided that no fiscal plan

or budget can become effective without Board certification.  *Id.* §§ 2141–2142.

Unlike municipalities on the mainland, Puerto Rico and its instrumentalities

are currently ineligible to seek protection under Chapter 9 of the Bankruptcy Code

(although that has not always been the case).  *Puerto Rico v. Franklin Cal. Tax-*

*Free Tr.*, 136 S. Ct. 1938, 1942 (2016).  Accordingly, Title III of PROMESA

created a mechanism for the Commonwealth and its eligible instrumentalities to

restructure their debts.  48 U.S.C. §§ 2161–2177.  The Board can commence a

Title III debt-restructuring case on behalf of the Commonwealth and its eligible

instrumentalities, including COFINA.  *Id.* § 2164(a).

### B.    COFINA

COFINA is a public corporation whose purpose prior to its Title III petition,

among others, was to pay or refinance certain extraconstitutional debt of the

Commonwealth of Puerto Rico and certain operating expenses of the

Commonwealth Government.  P.R. Laws Ann. tit. 13, §§ 11a–16 (the "Enabling

Act").

Article VI, Section 8 of the Puerto Rico Constitution provides holders of

General Obligation bonds issued by the Commonwealth ("GO Bonds") a first-

priority claim to all "available revenues" (or "available resources") when there are

insufficient funds to pay all appropriations. To enable COFINA to raise funds, the Commonwealth, under the Enabling Act, transferred to COFINA a percentage of the sales and use taxes it levied and collected (the "SUT Revenues"). P.R. Laws Ann. tit. 13, § 12. The intent was to make those SUT Revenues property of COFINA and not "available revenues" of the Commonwealth. However, COFINA bondholders were warned of the risk that SUT Revenues would be treated as "available revenues." *See* page 64, *infra*.

Between 2007 and 2011, COFINA issued bonds secured by those SUT Revenues (the "COFINA Bonds"). Elliott-Br.-ADD-IV-002–010. When the Commonwealth and COFINA commenced their Title III cases, whether the SUT Revenues were "available revenues" of the Commonwealth became a contested issue in those cases.

### C.    COFINA's Title III Case

On May 5, 2017, the Board filed a Title III petition on behalf of COFINA. Dkt.-No.-5053-at-12. At the time, the aggregate principal and unpaid interest on the COFINA Bonds totaled $17.64 billion. Dkt.-No.-5053-at-62.

Several intractable issues had to be resolved before the Board could propose a confirmable plan of adjustment in COFINA's Title III case. Foremost was the dispute between the Commonwealth and COFINA over the SUT Revenues. GO Bondholders argued that the SUT Revenues were an "available resource" of the

Commonwealth under Article VI, § 8 of the Puerto Rico Constitution and therefore had to be used to pay debt service on the GO Bonds before being allocated to COFINA.  Dkt.-No.-5053-at-14–16.

COFINA bondholders disagreed, arguing that the SUT Revenues were COFINA's property and thus were not an "available resource" of the Commonwealth.  *Id.*

To resolve this dispute, the Board appointed one agent to represent the Commonwealth and another to represent COFINA (the "Agents").  Dkt.-No.-5053-at-19–20.  Each Agent was tasked with achieving the best result for its principal.  Dkt.-Nos.-5053-at-20; 996-at-5–6.

The Board worked with Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas "and any creditor party who sought to participate" to formulate a procedure for resolving the dispute over the SUT Revenues.  Dkt.-No.-5053-at-19–20.  Notice of the proposed procedure was given to all claimholders, and no Appellant objected.  Dkt.-Nos.-719-at-2; 996-at-4.  The district court approved the procedure.  Dkt.-No.-996-at-1–12.

Pursuant to the agreed-upon procedure, the Commonwealth Agent commenced an adversary proceeding to determine ownership and allocation of the SUT Revenues.  *Official Comm. of Unsecured Creditors v. Whyte*, No. 17-ap-257 (D.P.R.) (the "Adversary Proceeding").  The Adversary Proceeding was vigorously

8

litigated by all sides, including numerous intervenors, with multiple claims, counterclaims, a related interpleader action, competing summary-judgment motions, and discovery demands.[1]

The Adversary Proceeding presented an all-or-nothing proposition for both sides: All the disputed SUT Revenues would go either to the Commonwealth or to COFINA. To mitigate the risk on both sides, the Commonwealth and COFINA Agents and various other parties engaged in extensive mediation in an attempt to settle the Adversary Proceeding.

As the district court explained, the mediation was "open to all interested participants." Dkt.-No.-5053-at-43 n.13. Chief Judge Houser, who oversaw the mediation, appeared at a hearing in June 2017 to "explain the mediation process in further detail." Dkt.-No.-430-at-3; *see also* Dkt.-Nos.-472-at-2; 571-at-2. Chief Judge Houser announced that the "mediation process [would] be voluntary so that parties can choose to participate or not participate" and gave public notice of the first mediation session. Dkt.-No.-558-at-16, 18. A formal notice of the first mediation session and procedures for participating in the mediation were filed on

---

[1] The Adversary Proceeding was one of several litigations related to the COFINA restructuring. *See Whitebox Multi-Strategy Partners, L.P. v. Bank of N.Y. Mellon*, No. 17-ap-143 (D.P.R.); *Whitebox Multi-Strategy Partners, L.P. v. Bank of N.Y. Mellon*, No. 17-cv-1704 (D.P.R.); *Ambac Assurance Corp. v. Bank of N.Y. Mellon*, No. 17-cv-3804 (S.D.N.Y.); *Bank of N.Y. Mellon v. P.R. Sales Tax Fin. Corp.*, No. 17-ap-133 (D.P.R.) (the "Interpleader Action").

the Title III docket.  Dkt.-No.-560-at-1–2.  The court made clear that "all stakeholders with standing [would] have the opportunity to challenge in open adversarial proceedings before the Court any proposals developed in mediation for which judicial approval is sought."  Dkt.-No.-5053-at-43 n.13.[2]

In the mediation, the Commonwealth and COFINA agreed to a settlement pursuant to which 53.65% of the disputed SUT Revenues would be allocated to COFINA and 46.35% to the Commonwealth (the "Settlement").  Dkt.-No.-5053-at-21–22.  The Settlement was approved by the district court following extensive briefing and a hearing.  Dkt.-No.-5045-at-1–28.  All claimholders were given notice of the Settlement and an opportunity to object.  Dkt.-No.-5045-at-7–8, 13.

On February 4, 2019, the district court approved the Settlement, explaining that it "resolves extraordinarily complicated litigation" and "the complex and novel issues involved, the divergent positions of the parties, and the protracted history of the dispute . . . weigh[ed] in favor of approving the Settlement."  Dkt.-No.-5045-at-17–19.  The court noted that without a consensual resolution, "[c]ontinued litigation . . . [would] invite additional delay for both the Commonwealth and COFINA in progressing towards fiscal responsibility and access to the capital markets, significant expense, and further delay and inconvenience to the

_____

[2] Elliott Appellants thus were not excluded from the mediation.  Elliott Br. 8.  They had notice of the mediation but never asked to participate.

Commonwealth's and COFINA's stakeholders and ability of their creditors to receive any distribution." Dkt.-No.-5045-at-18. Indeed, the litigation "would likely have produced an 'all-or-nothing' result" for both sides, meaning that either the Commonwealth or COFINA could have ended up with none of the SUT Revenues. Dkt.-No.-5045-at-20.

The court also found terms of the Settlement "reasonable as a legal and factual matter in light of the complex issues and risks presented by the continued litigation of the Commonwealth-COFINA dispute, and . . . satisfy the requirements for approval under Bankruptcy Rule 9019."[3] Dkt.-No.-5045-at-19. The court determined that the Settlement was "fair and reasonable and in the best interests of all creditors" (Dkt.-No.-5053-at-39), and "was the product of a genuine adversarial negotiation . . . that was overseen by the Court-appointed mediation team of distinguished federal judges" (Dkt.-No.-5045-at-19–20).

The mediation also resulted in a settlement of a dispute between junior and senior bondholders concerning their relative rights in the SUT Revenues allocated to COFINA. Dkt.-No.-4757-at-8–9. Junior bondholders faced the prospect of a

_____

[3] Under Bankruptcy Rule 9019, on motion by the trustee (here, the Board, *see* 48 U.S.C. § 2161(c)(7)), the court can approve settlements. When the settlement is embedded in a plan of adjustment and accepted by the required amounts of creditors under Bankruptcy Code § 1126, it binds all creditors as long as they are given notice and the opportunity to object.

severe loss if the district court concluded an event of default under the COFINA bonds had occurred, or that the SUT revenues were insufficient to meet debt-service obligations to all bondholders. Dkt.-No.-4757-at-12–13. The court found in such scenarios "the senior bondholders may have had repayment of their bonds accelerated . . . requir[ing] the senior bondholders to be paid in full prior to the junior bondholders being able to declare an event of default and exercise remedies." Dkt.-No.-5053-at-18. Resolution of the dispute between senior and junior bondholders was necessary to avoid protracted litigation.

## D. The COFINA Plan of Adjustment

The Settlement regarding SUT Revenues and the settlement between junior and senior bondholders were incorporated into a comprehensive, seventy-six-page plan of adjustment that provided for a total restructuring of COFINA's debt (the "Plan"). Dkt.-No.-5055-1-at-A1–77. Under the Plan, holders of COFINA Bonds would receive cash distributions and new securities issued by COFINA on the Plan's Effective Date,[4] and COFINA's obligations under its existing bonds would be canceled. *Id.*-at-28–34. Some holders of insured COFINA Bonds could elect to receive trust certificates in lieu of cash and new securities. *Id.* Critically, the Plan provided that the transfer of COFINA's share of the SUT Revenues to COFINA

---

[4] The "Effective Date" is the first business day on which the conditions precedent to confirmation and effectiveness specified in the Plan are satisfied or waived. Dkt.-No.-5055-1-at-23.

would constitute a "true sale" of those revenues to COFINA thus eliminating a potential challenge from the Commonwealth's future bondholders that the SUT Revenues constituted "available resources." *Id.*-at-52, 70–71.

The Plan permitted Puerto Rico institutions and on-island investors to elect to receive taxable bonds and a supplemental 2% cash recovery in lieu of a mix of taxable and tax-exempt bonds. *Id.* Puerto Rico residents do not pay federal taxes. The Plan thus included the 2% cash incentive to encourage Puerto Rico residents to choose taxable bonds, making the possibly-limited number of tax-exempt bonds issued under the Plan more readily available to off-island residents. Dkt.-No.-5053-at-64. As the district court found, the cash incentive "enhanced" recoveries for mainland investors "by maximizing the amount of tax-exempt securities available for such investors." *Id.*

The Plan also authorized payment of approximately $332 million to creditors who supported the Settlement as consideration for their efforts in negotiating the Plan, participating in the Settlement, and agreeing to restrictions on bond trading (the "Consummation Costs"). Dkt.-Nos.-5055-1-at-27, 47; 5053-at-32–33.[5] The Plan further included various releases, injunctions, and exculpations,

---

[5] As the district court explained, the Consummation Costs were justified because the parties that helped negotiate the Plan had "agreed to various conditions and covenants set forth in" the plan support agreement and were "not being paid . . . on account of . . . Claims against COFINA." Dkt.-No.-5053-at-32–33. About $190 million of the $332 million in Consummation Costs would have been distributed to

including the release of all claims against COFINA, and it called for dismissal with prejudice of all litigation arising from the COFINA restructuring—including litigation over the SUT Revenues.  Dkt.-No.-5055-1-at-37, 66–68.

The Plan was designed to be consummated quickly so new bonds could be issued and traded in short order.  The Plan thus waived the 14-day stay period provided in Bankruptcy Rule 3020(e) and called for the immediate implementation of the Plan's core provisions.  *Id.*-at-74.  No party objected to the waiver of the 14-day stay or the provisions calling for the Plan's speedy consummation.

### E.    Disclosure Statement

Along with the proposed Plan, the Board filed a proposed Disclosure Statement.  Dkt.-Nos.-4075-at-1–37; 4382-at-1–19.  Following a hearing, the district court approved the adequacy of the information in the Disclosure Statement on November 29, 2018, and established procedures for claimholders to vote to accept or reject the Plan.  Dkt.-Nos.-4353-at-1–2; 4382-at-1–19.

The court set January 2, 2019, as the deadline for claimholders to object to the Plan, and January 8, 2019, as the deadline for claimholders to vote on whether

---

the same parties in any event on account of their substantial bond claims. Accordingly, only about $140 million represents additional Consummation Costs.

to approve the Plan.[6]  A hearing to consider Plan confirmation was slated for January 16, 2019 (the "Confirmation Hearing").

### F.    Voting on the Plan

Each claimholder entitled to vote on the Plan received by mail:  (i) a notice setting forth the time, date, and location of the Confirmation Hearing; (ii) a flash drive or hard copy containing the Disclosure Statement and the Plan; and (iii) a ballot with instructions and a preaddressed, pre-paid return envelope.  Dkt.-No.-5053-at-26.

All classes of claimholders entitled to a vote—including class 5, to which junior bondholders such as Elliott Appellants and certain Pinto Lugo Appellants belonged—voted overwhelmingly to accept the Plan.  Dkt.-No.-4794-at-1–7.

### G.    New Bond Legislation

To establish a legal framework for issuing the new COFINA bonds under the Plan, Puerto Rico enacted Act 241-2018 on November 15, 2018 (the "New Bond Legislation").  Consistent with the terms of the Plan, the New Bond Legislation canceled the old COFINA Bonds, amended aspects of COFINA's structure (creating "Reorganized COFINA"), and authorized Reorganized COFINA to issue new bonds secured by a statutory lien to provide enhanced protection for the new bonds.  Dkt.-No.-5053-at-48–51.  While the New Bond

---

[6] This deadline was extended to January 11.  Dkt.-No.-4583-at-1–2.

Legislation was necessary to effectuate the Plan, it was explicit that it would not take effect until the Plan was confirmed and the Effective Date occurred. *Id.*

## H. Objections to the Plan

Claimholders received the opportunity to object to the Plan before confirmation. Certain labor unions objected on the ground that the SUT Revenues supposedly belonged to the Commonwealth, not COFINA. Dkt.-No.-4592-at-i–33. According to the labor unions, the Plan was illegal and not in the Commonwealth's best interest because it allocated some of those disputed SUT Revenues to COFINA. *Id.*-at-18–27.

Pinto Lugo Appellants joined the labor unions' objection and additionally argued the New Bond Legislation violated the United States and Puerto Rico Constitutions. According to their objection, Manuel Natal-Albelo—a member of the Puerto Rico Legislature—was supposedly prevented from speaking while the New Bond Legislation was being debated. Dkt.-No.-4607-at-1–10. Pinto Lugo Appellants also objected on the ground that the New Bond Legislation and the COFINA Enabling Act supposedly authorize borrowing in excess of public-debt limits contained in the Puerto Rico Constitution. *Id.*-at-4.

Elliott Appellants also objected but took the opposite view from the labor unions and Pinto Lugo Appellants, arguing the SUT Revenues are the property of COFINA and no portion of them should have been allocated to the

Commonwealth.  Dkt.-Nos.-4585-at-i–36; 4595-at-i–16; 4597-at-1–16; 4598-at-1–15; 4613-at-1–7.  They also argued that the Plan violates various constitutional and statutory provisions.  *Id.*

The district court held a two-day hearing to consider all objections.  Each Elliott Appellant spoke at that hearing.  *See* Dkt.-No.-4850,-Jan.-17,-2019-Hr'g-Tr.-at-37–40; 41–58; 59–61.  A representative of Pinto Lugo Appellants spoke as well.  *See* Dkt.-No.-4850,-Jan.-17,-2019-Hr'g-Tr.-at-20–24.

## I.    Plan Confirmation

After considering and overruling the objections, the district court issued an order confirming the Plan (the "Confirmation Order") and factual findings in support of the Confirmation Order.  Dkt.-Nos.-5047-at-1–88; 5048-at-i–42; 5053-at-1–88; 5055-at-i–42.[7]  As provided by the Plan, the Confirmation Order waived the 14-day stay period under Bankruptcy Rule 3020(e) and called for the Plan's immediate implementation on the Effective Date.  Dkt.-No.-5055-at-9–10, 41.  Drafts of the proposed Confirmation Order were filed with the court, commented upon by claimholders (including Appellants), and revised before the Confirmation Order was entered.  Dkt.-Nos.-4770-at-1–3; 4846-at-1–3; 4853-at-1–6; 4911-at-1–

---

[7] The court issued the Confirmation Order and factual findings on February 4, 2019, and made amendments to them the next day.

4; 5041-at-i–5.  No party objected to the order's waiver of the 14-day stay or moved to stay the Plan's immediate implementation.

In confirming the Plan, the district court rejected the objections raised by Elliott Appellants, including those under the Takings and Contract Clauses.  Dkt.-No.-5053-at-51–55.  The court found that no taking occurred because the Plan provided Appellants with significant payments that were potentially more than what they would have received absent the Settlement and Plan.  Dkt.-No.-5053-at-53–54.  Moreover, the Plan and the New Bond Legislation passed muster under the Contract Clause because they represented a reasonable and necessary response to the Commonwealth's "unprecedented fiscal and economic crisis and the need to resolve litigation concerning the legality of the COFINA structure."  Dkt.-No.-5053-at-52.

The court further overruled the objections lodged by Pinto Lugo Appellants, holding that the supposed violation of Representative Natal-Albelo's right to speak on the Legislature floor constituted a non-justiciable political question over which the court had no jurisdiction.  *Id.*-at-50 n.14.  The court also held that the New Bond Legislation does not violate debt limits prescribed in the Puerto Rico Constitution.  *Id.*

Ultimately, the court found that the "Plan is a necessary and legally compliant component of Puerto Rico's recovery efforts and is essential to ensure

that Puerto Rico is on a path that will restore its access to financial markets as it builds a stronger economy." *Id.*-at-7.

### J.  Plan Consummation

On February 12, 2019, the Board informed the district court that the Plan's Effective Date had arrived.  Dkt.-No.-5104-at-1–4.  On that date, COFINA's obligations under the original bonds were canceled.  Doc. 00117426005 at 39, ¶ 6.[8] In their place, Reorganized COFINA issued approximately $12 billion in new bonds to its creditors.  *Id.* at 39, ¶ 7.  Those new bonds have been traded on the open market at least tens of thousands of times over the past year.  *Id.*  They are not in default and COFINA is making scheduled interest payments.

On the Effective Date, COFINA also distributed nearly $332 million in Consummation Costs and entered into trust agreements under which beneficial interests were distributed to certain bondholders holding approximately $1.3 billion in claims.  *Id.* at 39, ¶ 8.  In addition, more than $1 billion in disputed SUT Revenues was distributed to the Commonwealth and Reorganized COFINA.  *Id.* at 40, ¶ 10.

Since the Effective Date, insurers of COFINA's old bonds have made payments to bondholders pursuant to the terms of the Plan.  *Id.* at 40, ¶ 9; *see also* Dkt.-No.-5055-1-at-29–33.  Moreover, the litigations over the SUT Revenues and

---

[8] "Doc. __" refers to docket entries in these consolidated appeals.

other COFINA-related lawsuits have been dismissed by court order with prejudice, and COFINA and Reorganized COFINA have been discharged and released from all claims that arose prior to the Effective Date. *See Whyte*, No. 17-ap-257, Dkt. No. 596 (Feb. 21, 2019); *Whitebox Multi-Strategy Partners, L.P. v. Bank of N.Y. Mellon*, No. 17-ap-143, Dkt. No. 11 (D.P.R. Feb. 15, 2019); *Bank of N.Y. Mellon v. P.R. Sales Tax Fin. Corp.*, No. 17-ap-133, Dkt. No. 549 (D.P.R. Feb. 19, 2019). In short, every aspect of the Plan has been carried out, and the Plan has been fully consummated for nearly a year because no one moved to stay or delay its Effective Date.

### K.    Appeals of the Confirmation Order

Following consummation, Pinto Lugo and Elliott Appellants separately appealed the Confirmation Order and the supporting factual findings. Elliott Appellants also appealed from the orders approving the Settlement and the Disclosure Statement. Dkt.-No.-5166-at-2.[9]

Appellees moved to dismiss the two appeals as equitably moot. Doc. 00117426005. The Court denied the motion "without prejudice to reconsideration

---

[9] Elliott Appellants do not directly address the order approving the Settlement in their brief and thus have abandoned their appeal of this order. In any event, the order approving the Settlement was issued in the Commonwealth's Title III case, and Elliott Appellants (who are not appearing here as creditors of the Commonwealth) have no standing to challenge that order. *See Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012).

by the panel that decides the appeals." Doc. 00117473675. The two appeals were subsequently consolidated. Doc. 00117508083.

### L. Thirteenth Omnibus Objection

Shortly before Plan confirmation, the Board filed its "Thirteenth Omnibus Objection," which sought to disallow five hundred claims, including a Proof of Claim that Appellant Peter Hein submitted in the Title III case for $513,437.50 (the "Hein Proof of Claim"). Dkt.-No.-4417-at-1–9. As explained in the Thirteenth Omnibus Objection, each of the challenged claims asserted rights under the COFINA Bonds and thus were duplicative of a master proof of claim (the "Master Proof of Claim") filed by Bank of New York Mellon ("BNYM") as trustee for COFINA bondholders. Dkt.-No.-4417-at-4–6. In the Master Proof of Claim, BNYM asserted a claim on behalf of all COFINA bondholders, including Hein, seeking a distribution based on the face value of the outstanding bonds and unpaid interest. Dkt.-No.-4417-at-3–4, 5–6; 4417-1-at-60. BNYM received a distribution under the Plan for the Master Proof of Claim and paid Hein his pro rata share of that distribution.[10] In effect, Hein's Proof of Claim was seeking a second distribution for the same bonds. Dkt.-No.-4417-3-at-3.

---

[10] *See* Prime Clerk, Commonwealth of Puerto Rico, Docket, Case No. 17-03283, https://cases.primeclerk.com/puertorico/Home-DocketInfo?DocAttribute=4426 &DocAttrName=COFINANOTEHOLDERNOTICEOFDISTRIBUTION (last visited Feb. 14, 2020).

The district court asked Hein to identify any constitutional or statutory provisions that provided him with a right to payment independent of his right to payment under the COFINA Bonds. Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-46. In response, however, Hein simply rehashed the same challenges to Plan confirmation the district court had already considered—and rejected—when it confirmed the Plan. Dkt.-No.-7211-at-1–20.

The court thus disallowed Hein's Proof of Claim, finding it was "duplicative of [the] Master Proof of Claim because both seek to realize rights to payment under the same instruments, the subordinated bonds." Dkt.-No.-8691-Sept.-11,-2019-Hr'g-Tr.-at-47. The court noted that Hein's rehashed arguments against Plan confirmation were "not responsive to COFINA's pending objection based on the duplication of [BNYM's] Master Proof of Claim." *Id.*-at-48.

In conjunction with his Proof of Claim, Hein sought discovery into issues he argued concerned the accuracy of the Disclosure Statement. Dkt.-Nos.-8427-1-at-1–69; 8487-at-8. Having disallowed Hein's Proof of Claim, the court denied his request for discovery because there was "no litigation pending before the Court to which the discovery Mr. Hein seeks is relevant." Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-49.

Hein appealed from the orders disallowing his Proof of Claim and denying discovery. This Court consolidated that appeal with the consolidated appeals of Pinto Lugo and Elliott Appellants. Doc. 00117508083.

## SUMMARY OF ARGUMENT

**I.** Pinto Lugo and Elliott Appellants' appeals should be dismissed as equitably moot. An appeal is equitably moot when an appellant's failure to seek a stay allows a plan of adjustment to be implemented to the point where appellate relief would be impractical and unfair to innocent third parties who transacted business in reliance on the plan. *See In re Pub. Serv. Co. of N.H.*, 963 F.2d 469, 471–72 (1st Cir. 1992).

Here, Appellants did not try to stay the Plan's implementation or expedite their appeals. As a result, the Plan has been fully consummated: COFINA's bonds have been canceled; new bonds have been issued and interest has been paid on them; the new bonds have been traded on the public market tens of thousands of times; distributions have been paid to creditors; more than $1 billion of SUT Revenues have been transferred to COFINA and the Commonwealth; and lawsuits have been dismissed with prejudice, including the critical action concerning the SUT Revenues. No feasible means exists to unwind all those transactions. Unwinding the Plan (and all the trades and transactions conducted in reliance on the Plan) would also harm innocent third parties who have reasonably relied on the

unstayed Confirmation Order.  The appeals are thus equitably moot and should be dismissed.

**II.**  The appeal brought by Pinto Lugo Appellants also fails on the merits. Pinto Lugo Appellants argue that Plan confirmation did not comport with due process.  However, they received an opportunity to object to the Plan in writing and orally at the confirmation hearing.  That is all the process they were due.  To the extent that Pinto Lugo Appellants appeal the order overruling their objections to the Plan, those objections fail for the reasons cited by the district court.

**III.**  The district court also correctly overruled Elliott Appellants' scattershot objections to the Plan.

*First*, their contention that PROMESA Title III does not apply to their rights and security interests was definitively rejected in *Andalusian*, 2020 WL 486163, at *6.

*Second*, their contention that the Plan and its supporting legislation take their property without just compensation fails because (i) they had no property right that could be taken; (ii) no taking occurred; and (iii) the compensation paid to Elliott Appellants was more than just.

*Third*, their objection under the Contract Clause fails because the New Bond Legislation simply implemented the Plan, does not substantially impair contractual

rights, and was both reasonable and necessary to address Puerto Rico's fiscal emergency.

The remaining Plan objections asserted by Elliott Appellants are equally unavailing and are addressed in detail below.

**IV.** Hein's individual appeal is likewise meritless. That appeal only concerns whether Hein's Proof of Claim seeks a payment on the same bonds as BNYM's Master Proof of Claim. The record shows it does. *Compare* Hein-Br.-ADD-IV-02–ADD-IV-10 *with* Dkt.-Nos.-4417-at-3–4, 5–6; 4417-1-at-59. Hein's arguments against Plan confirmation are not separate "claims" and thus do not distinguish his Proof of Claim from the Master Proof of Claim.

## STANDARD OF REVIEW

When reviewing an order confirming a plan of adjustment, this Court reviews conclusions of law de novo and factual findings for clear error. *Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston Hotel Venture, LLC)*, 748 F.3d 393, 402 (1st Cir. 2014). The Court "will not reverse a factual finding under this 'formidable standard' unless, 'on the whole of the record, [it] form[s] a strong, unyielding belief that a mistake has been made.'" *Id.* Mixed questions of law and fact are reviewed for clear error when the fact issue dominates. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967–68 (2018).

# ARGUMENT

## I. THE APPEALS CHALLENGING THE CONFIRMATION ORDER ARE EQUITABLY MOOT.

The two appeals challenging the Confirmation Order (Nos. 19-1181 and 19-1182) should be dismissed as equitably moot. Under the equitable-mootness doctrine, an appellate court will not disturb a confirmed plan of adjustment if the appellant's failure to seek a stay has "enabled developments to evolve in reliance on the bankruptcy court order to the degree that their remediation has become impracticable or impossible." *SW Boston Hotel*, 748 F.3d at 402. In other words, where a plan has been implemented to the point where it would be impractical or unfair to unwind all the transactions that have been conducted in reliance on it, an appellate court cannot fashion "fair and effective judicial relief." *Pub. Serv. Co.*, 963 F.2d at 471. Equitable mootness ensures that third parties can rely on a court-approved reorganization plan without fear of an appellate reversal months or years later and thereby promotes the "important public policy favoring orderly reorganization and settlement of debtor estates 'by affording finality to the judgments of the bankruptcy court.'" *Id.* at 471–72.

These appeals are precisely why the equitable-mootness doctrine developed. Having never sought to stay the Confirmation Order or expedite their appeals, Appellants now ask this Court to unwind COFINA's $18-billion Plan, which has been consummated for more than a year. Under the Plan, COFINA's old bonds

have been canceled and new bonds have been issued (and interest paid to bondholders), and the new bonds have been traded on the public market tens of thousands of times. Moreover, distributions have been paid to creditors, claims have been discharged, and lawsuits concerning critical issues have been dismissed with prejudice. Under these circumstances, appellate relief would be virtually impossible. Equitable mootness is particularly appropriate in municipal-restructuring cases "precisely because of how many people will be affected by municipal bankruptcies." *Bennett v. Jefferson Cty. (In re Jefferson Cty.)*, 899 F.3d 1240, 1250 (11th Cir. 2018) (dismissing appeal in Chapter 9 bankruptcy as equitably moot); *see also Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256, 1264–66 (9th Cir. 2018) (same); *Ochadleus v. City of Detroit (In re City of Detroit)*, 838 F.3d 792, 803 (6th Cir. 2016) ("If the interests of finality and reliance are paramount to a Chapter 11 private business entity with investors, shareholders, and employees, thus justifying equitable mootness, then these interests surely apply with greater force to the City's Chapter 9 Plan, which affects thousands of creditors and residents." (brackets omitted)).

In determining whether an appeal is equitably moot, this Court considers (i) whether the appellant sought to stay the order confirming the plan of adjustment; (ii) whether consummation of the plan has "proceeded 'to a point well beyond any practicable appellate annulment'"; and (iii) whether the requested

relief would harm innocent third parties. *PPUC Pa. Pub. Util. Comm'n v. Gangi*, 874 F.3d 33, 37 (1st Cir. 2017) (quoting *Pub. Serv. Co.*, 963 F.2d at 473–75).[11]

Here, all three factors strongly favor dismissing the appeals as equitably moot.

## A. Appellants Did Not Seek a Stay.

An objector who seeks to appeal an order confirming a plan of adjustment must "pursue with diligence *all available remedies* to obtain a stay" of that order. *Pub. Serv. Co.*, 963 F.2d at 473. By seeking a stay, the objector alerts third parties that any transactions they may enter in reliance on the plan may later be undone. *In re Mortgages Ltd.*, 771 F.3d 1211, 1216 (9th Cir. 2014). Failure to seek a stay, by contrast, risks the "inequitable result" that third-party transactions might later be undone "without sufficient notice." *Id.* An objecting party who fails to seek a stay thus makes the "strategic choice" to permit the plan to go into effect, "taking the risks that attend[] such a decision." *Mac Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002); *see also In re Chateaugay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993) ("[T]he party who appeals without seeking to avail himself of that

---

[11] Other Circuits consider similar factors in assessing equitable mootness. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140–41 (3d Cir. 2019); *Stockton*, 909 F.3d at 1263; *Jefferson Cty.*, 899 F.3d at 1251–53; *In re Bate Land & Timber LLC*, 877 F.3d 188, 195 (4th Cir. 2017); *Detroit*, 838 F.3d at 798; *Duff v. Cent. Sleep Diagnostics, LLC*, 801 F.3d 833, 840 (7th Cir. 2015); *In re BGI, Inc.*, 772 F.3d 102, 108 (2d Cir. 2014); *In re Tex. Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 327–28 (5th Cir. 2013); *In re Stephens*, 704 F.3d 1279, 1282–83 (10th Cir. 2013).

[stay] protection does so at his own risk.").  As this Court has explained, a failure to seek a stay leaves interested parties "free to implement the confirmed reorganization plan according to its terms" and thereby take actions that "may moot the matter in dispute." *Pub. Serv. Co.*, 963 F.2d at 473.

Here, no Appellant (or any other party) asked the district court or this Court to stay the Confirmation Order to prevent the Plan from being implemented.  Nor did they seek expedited appeals.  Notably, Appellants participated in virtually every aspect of the Plan-confirmation process and thus were on notice that, absent a stay, the Plan would be promptly consummated.  The Confirmation Order and the Plan—drafts of which Appellants commented on—expressly waive any stay period and provide for the immediate cancellation of COFINA's old bonds, the issuance of new bonds, monetary distributions, and releases of claims.  Dkt.-Nos.-5055-at-9–10, 41; 5055-1-at-28–34, 47, 66–68, 74.  Appellants did not object to the waiver or ask to stay the Confirmation Order so that they could pursue an appeal.  Instead, they "play[ed] possum . . . while everyone else has materially changed positions in reliance on plan confirmation." *Stockton*, 909 F.3d at 1264.

Pinto Lugo Appellants have offered no excuse for their failure to seek a stay.  Elliott Appellants have blamed their inaction on a purported "disparity in litigation capacity" between them and the Plan's proponents, which they contend made a stay "unattainable."  Doc. 00117439790 at 5.  That argument is belied by the

voluminous briefing Elliott Appellants submitted at both the district court and this Court. If they are capable of submitting over 100 pages of briefing opposing Plan confirmation and dozens of pages of briefing in this appeal, they plainly could have submitted a short motion seeking a stay. *See* Dkt.-Nos.-4585-at-i–36; 4595-at-i–16; 4597-at-1–16; 4598-at-1–15; 4613-at-1–7; 4673-at-i–12; 4911-at-1–4; 5042-at-i–5. After all, a party seeking appellate reversal of a confirmation order must request a stay "even if it may seem highly unlikely" that it can get one. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005); *see also In re Chateaugay Corp.*, 988 F.2d at 325. Having offered no "adequate explanation" for their inaction, Appellants' failure to seek a stay "should result in dismissal" of their appeal. *Stockton*, 909 F.3d at 1264.

## B. The Plan Has Been Consummated for More Than a Year.

Because Appellants failed to seek a stay, the Plan has been fully consummated since February 2019. *See* 11 U.S.C. § 1101(2) (explaining that "substantial consummation" occurs when property has been transferred and distributions made under the plan, and the debtor's successor assumes management of its property). Accordingly, the relief sought by Appellants would be "inequitable or impracticable in light of the change in circumstances." *Pub. Serv.*, 963 F.2d at 473 (footnotes omitted).

The Plan was designed to be consummated promptly as Appellants knew. On the Effective Date—February 12, 2019—COFINA's old bonds were extinguished and, in exchange, Reorganized COFINA issued approximately $12 billion in new bonds to creditors. Doc. 00117426005 ¶¶ 6–7; Dkt.-No.-5055-1-at-47, 74. Those bonds are performing and paying interest to holders. COFINA also distributed about $332 million in Consummation Costs to creditors and beneficial interests in trusts to certain bondholders with nearly $1.3 billion in claims. Doc. 00117426005 ¶ 8; Dkt.-No.-5055-1-at-27, 47. In addition, BNYM—the trustee for holders of the old COFINA bonds—transferred to the Commonwealth and COFINA more than $1 billion in disputed SUT Revenues that had been held in escrow. Doc. 00117426005 ¶ 10; Dkt.-No.-5055-1-at-24–26. The Governor of Puerto Rico also appointed a new Board for Reorganized COFINA, which has assumed responsibility for administering COFINA's portion of the SUT Revenues. Doc. 00117426005 ¶ 11; Dkt.-No.-5055-1-at-63–64. And claims have been released and every litigation stemming from the restructuring has been dismissed with prejudice. *See* pages 19–20, *supra* (citing dismissal orders).

In fact, every aspect of the Plan was implemented a year ago. Doc. 00117426005 ¶ 12. Accordingly, there is a "'strong presumption' that an appellate court will not be able to fashion an equitable and effective remedy." *Pub. Serv.*, 963 F.2d at 473 n.13; *see also BGI*, 772 F.3d at 108 ("[A] bankruptcy appeal is

presumed equitably moot when the debtor's reorganization plan has been substantially consummated.").  Appellants cannot overcome that presumption because the relief they seek on appeal would unwind the Plan and all the transactions conducted under it.

### 1. *Pinto Lugo Appellants*

Pinto Lugo Appellants admit that they want a wholesale revocation of the Plan.  Pinto Lugo Br. 5.  The impossibility and inequity of such relief cannot be gainsaid.  To unwind the Plan, tens of thousands of trades involving the new COFINA bonds would need to be rescinded, the new bonds canceled (and interest paid on them disgorged and recaptured), and the old bonds reissued.  It is hard to imagine how such relief could be ordered.  *See Pub. Serv.*, 963 F.2d at 474 (holding that the issuance and public trading of securities "plainly represent so substantial a consummation of the reorganization plan as to render the requested appellate relief impracticable"); *see also Detroit*, 838 F.3d at 799 (dismissing appeal as equitably moot where debtor issued over $1 billion in new bonds and made transfers worth hundreds of millions of dollars); *In re One2One Commc'ns, LLC. v. Quad/Graphics, Inc.*, 805 F.3d 428, 436 (3d Cir. 2015) ("We have most

frequently found that a plan could not be retracted when the reorganized debtor issued publically traded debt or securities.").[12]

Furthermore, revoking the Plan would require disgorging hundreds of millions of dollars in distributions to creditors, recalling over a billion of dollars in SUT Revenues allocated to the Commonwealth and COFINA, and reinstating the Adversary Proceeding over those revenues. Claims releases would also have to be unwound—an impossibility. And the New Bond Legislation—which by its terms took effect upon the Plan's Effective Date—would need to be rescinded. The result would be "chaos," *Stockton*, 909 F.3d at 1265, and "a nightmarish situation for the bankruptcy court on remand," *Pub. Serv.*, 963 F.2d at 474. As this Court aptly stated in a similar case, unwinding the Plan and reconstructing the pre-confirmation status quo "would present a daunting assignment for the Humpty Dumpty repairman." *Id.* at 475.

Remarkably, Pinto Lugo Appellants concede that the relief they seek would cause an "apocalyptic outcome." Pinto Lugo Br. 27. They nevertheless blame the Board for consummating the Plan before appellate review. *Id.* at 27–30. That argument ignores that the district court rejected Pinto Lugo Appellants' objections

---

[12] Any doubt concerning the viability of the equitable-mootness doctrine in the Third Circuit has been resolved in recent cases. *See, e.g.*, *Millennium*, 945 F.3d at 140–41 (dismissing appeal as equitably moot).

as meritless. If they disagreed with that ruling, they could have sought a stay. They did not. The Board was not required to wait until this Court resolved their appeal before moving forward with the Plan.

### 2. *Elliott Appellants*

Elliott Appellants take a different tack, arguing that the appellate relief they seek would not require a wholesale revocation of the Plan, even though it would. Elliott Br. 67–68. Elliott Appellants ask the Court to (i) revoke the Settlement of the dispute between COFINA and the Commonwealth over the SUT Revenues; (ii) reduce what they call "the improper transfer" of SUT Revenues to the Commonwealth; and (iii) allot additional SUT Revenues to them. *Id.* at 67. Such relief is tantamount to unraveling the Plan because the entire Plan hinges on the Settlement. *See BGI*, 772 F.3d at 108 (noting that equitable mootness "requires a court to 'examine the actual effects of the requested relief'").[13]

---

[13] Elliott Appellants also ask the Court to rewrite the Plan's broad discharge provisions so they can pursue unspecified prepetition claims against COFINA. Elliott Br. 67. However, they did not request such relief at the district court and therefore cannot request it on appeal. *See Nat'l Fed'n of the Blind v. Container Store, Inc.*, 904 F.3d 70, 85 (1st Cir. 2018). In any event, they make no argument for why they are entitled to pursue prepetition claims or even what those claims are. Accordingly, any argument for such relief is waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Moreover, as the district court noted, a complete discharge "is a fundamental component of the Plan and of restructuring proceedings in general." Dkt.-No.-622-at-6-in-Case-No.-17-BK-3284. The discharge provisions are expressly "nonseverable and mutually dependent." Dkt.-No.-5055-at-39. Rewriting those provisions would therefore "unsettle the settlement" and do "violence to the overall arrangement." *Metromedia*, 416 F.3d

34

Elliott Appellants argue that the Commonwealth would need to "give up only a small portion" of what it received under the Settlement. Elliott Br. 67. In reality, though, Appellants seek a payment of $316 million. *Id.* at 68. Such a "multi-million dollar claim . . . on its face would have a considerable impact" on the Commonwealth and would "call[] into question the economic underpinnings of the Plan." *Stockton*, 909 F.3d at 1264–65. If the Commonwealth were required to disgorge $316 million of the SUT Revenues it received under the Settlement, it would unravel the Settlement and reignite the Adversary Proceeding over the SUT Revenues, thus collapsing the entire Plan.

The Settlement was an express "condition precedent" to the Plan because COFINA could not adjust its debt if uncertainty remained over whether it owned the SUT Revenues. Dkt.-No.-5055-1-at-56–57. For that reason, the Plan "incorporates and is expressly conditioned upon the approval and effectiveness of the compromise and settlement." *Id.*-at-24–26. The provisions regarding the Settlement were also made "nonseverable" from the Plan. Dkt.-No.-5055-at-39. Because the Plan depends on the Settlement, Appellants' requested relief of rescinding the Settlement would require rescinding the Plan. *See In re Tribune*

at 145; *see also Millennium*, 945 F.3d at 143 (holding that striking release provisions in a settlement "would certainly undermine the plan").

35

*Media Co.*, 799 F.3d 272, 280–81 (3d Cir. 2015) (concluding that revoking a settlement that was "central" to the plan would "recall the entire Plan for a redo").

## C. Reversal Would Harm Innocent Third Parties.

Additionally, the appeal is equitably moot because reversal at this late stage would harm third parties who have transacted business in good-faith reliance on the Plan. It is well settled that an appeal of a confirmation order is equitably moot where the "specific relief sought . . . bear[s] unduly on innocent third parties." *In re Transwest Resort Props.*, 801 F.3d 1161, 1169 (9th Cir. 2015). Here, the requested relief would be inequitable to innocent third parties who have traded the new COFINA bonds tens of thousands of times on the public market. *See* Doc. 00117426005, ¶ 7. An order unwinding the Plan would require the new COFINA bonds to be recalled (and interest payments made thereon disgorged) and all the trades involving those new bonds (and the profits and losses received on those trades) rescinded to the detriment of third-party traders. *See Nordhoff Invs. Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 184 (3d Cir. 2001) ("When transactions following court orders are unraveled, third parties . . . who purchased securities in reliance on those orders will likely suffer adverse effects.").

Pinto Lugo Appellants argue that the third-party traders are somehow not innocent because they were supposedly involved in drafting the Plan. Pinto Lugo Br. 30. But that is false on multiple fronts: The third-party trades are being made

on the public market, *see* Doc. 00117426005, ¶ 7, so most of the traders have no connection to this case, and involvement in Plan confirmation does not impugn a party's innocence in any event.[14]

The trades involving the new COFINA bonds are not the only third-party transactions that would need to be rescinded if Appellants received their requested relief. Other third parties have transferred property and released and settled claims according to the Plan's terms. *Id.* ¶¶ 8–10. Insurers, meanwhile, have made payments to holders of COFINA's old bonds in satisfaction and release of applicable policies. *Id.* ¶ 9. The requested relief—which would require revoking the Plan—"would knock the props out from under the authorization" for all these transactions. *Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 797 (9th Cir. 1981). Profits would be disgorged, property returned, and long-abandoned claims reinstated. Such relief "would work incalculable inequity to the

---

[14] Elliott Appellants argue the relief they seek—reducing transfers of SUT Revenues to the Commonwealth and compelling additional payments to bondholders—would not affect innocent third parties. Elliott Br. 67. However, as explained above, such relief would unravel the Plan and all third-party transactions made in reliance on it. *See* Point II.B, *supra*. And even if the Plan were not unraveled, rescinding the Settlement would reignite the dispute over the SUT Revenues, which would "drastically diminish the value" of the new COFINA bonds, which "no doubt [were purchased] in reliance on the Settlement." *Tribune Media*, 799 F.3d at 281; *see also Millennium*, 945 F.3d at 142.

many thousands of innocent third parties" who have acted "in legitimate reliance on the unstayed" Plan. *Pub. Serv.*, 963 F.2d at 475–76.

Appellate reversal would also harm another group of third parties: the residents of Puerto Rico. *See Stockton*, 909 F.3d at 1264 (dismissing appeal as equitably moot in part because reversal "would have a substantial effect on the citizens of Stockton, who depend upon the City for the provision of vital services"); *Detroit*, 838 F.3d at 799 ("[U]nravelling the entire Plan [would] adversely affect[] countless third parties, including . . . the entire City population."). The Plan is a critical first step in the Commonwealth's economic recovery. Dkt.-No.-5053-at-6–7. Rescinding the Plan would return the parties to the drawing board. Such a major setback would inevitably harm all Puerto Rico residents.

### D.    Appellants' Arguments against Equitable Mootness Fail.

In opposing Appellees' motion to dismiss, Appellants made several arguments for why the equitable-mootness doctrine does not apply in this appeal. Docs. 00117439897; 00117439790. Each argument fails.

*First*, contrary to Appellants' contention, equitable mootness is not limited to Chapter 11 bankruptcy cases but also applies in municipal-bankruptcy cases. *Stockton*, 909 F.3d at 1264–66; *Jefferson Cty.*, 899 F.3d at 1250; *Detroit*, 838 F.3d

at 805.  If anything, the doctrine applies "with even greater force" in municipal bankruptcies.  *Detroit*, 838 F.3d at 803.

*Second*, Pinto Lugo Appellants are wrong that the doctrine does not apply because their appeal is supposedly meritorious.  Obviously, equitable mootness does not require that the appeal first be decided on its merits.  Equitable mootness presupposes a meritorious appeal and asks whether equitable concerns nevertheless render the appeal moot.  *See Detroit*, 838 F.3d at 798 (equitable mootness applies "regardless of . . . the merits of the appellant's challenge"); *Tribune Media*, 799 F.3d at 281 ("When determining whether the case is equitably moot, we of course must assume [the appellant] will prevail on the merits . . . .").

*Third*, contrary to Appellants' contention, appeals raising constitutional challenges can be equitably moot.  *See, e.g.*, *Stockton*, 909 F.3d at 1266–68; *Jefferson Cty.*, 899 F.3d at 1251.

\*    \*    \*    \*    \*

For the above-stated reasons, Appeal Nos. 19-1181 and 19-1182 are equitably moot.  The appeals therefore should be dismissed.

## II.   PINTO LUGO APPELLANTS' OBJECTIONS WERE PROPERLY OVERRULED.

In addition to being equitably moot, the appeal brought by Pinto Lugo Appellants (No. 19-1181) fails on the merits.  Below, Pinto Lugo Appellants objected to Plan confirmation on two grounds.  First, they argued that the New

Bond Legislation upon which the Plan depends is invalid because Representative Manuel Natal-Albelo was allegedly prohibited from participating in the legislative debate surrounding the law in contravention of the Rules of the Puerto Rico House of Representatives. Dkt.-No.-4607-at-3–4. Second, they argued that the New Bond Legislation and COFINA's Enabling Act are invalid because they authorize borrowing in excess of debt limits prescribed in Puerto Rico's Constitution. *Id.*-at-4–5.

Appellants raised those two arguments below both as objections to the Plan and as claims for declaratory relief in a separate adversary proceeding.[15] On the basis of those arguments, they asked the district court to deny Plan confirmation or hold the Plan in abeyance until their adversary proceeding was resolved. *See id.*-at-5, 6.

At the Plan-confirmation stage, the district court overruled the two objections on their merits. Dkt.-No.-5053-at-50 n.14, 75–81. The court then stayed the adversary proceeding pending resolution of this appeal. Dkt. Nos. 32, 36, 59 in Case No. 19-AP-0003 (D.P.R.).

On appeal, Appellants argue that the district court violated their due-process rights by overruling their objections and confirming the Plan before adjudicating

---

[15] Appellants initially asserted these claims for declaratory relief in Commonwealth court, but the Board removed to the Title III court. *See* Dkt. 1 in Case No. 19-AP-0003 (D.P.R.).

their adversary proceeding.  Pinto Lugo Br. 9–16.  Like their objections, that due-process argument fails.

## A.  Appellants' Objections to the Plan Are Waived and Meritless.

The substantive objections to the Plan asserted by Pinto Lugo Appellants below were correctly overruled by the district court and are not properly before this Court on appeal in any event.

Under PROMESA, a plan can be confirmed only if the debtor is not "prohibited by law from taking any action necessary to carry out the plan." 48 U.S.C. § 2174.  Below, Appellants argued that the Plan does not satisfy § 2174 because the New Bond Legislation and the COFINA Enabling Act—both of which are necessary for the Plan's implementation—are supposedly invalid, and therefore the Plan cannot be implemented in accordance with the law.

On appeal, Appellants have abandoned those objections.  In their "Statement of Issues," they do not identify the merits of their objections below as an issue in the appeal.  Pinto Lugo Br. 2.  Nor does their brief contain any appellate argument for why their objections should have been sustained on their merits.  Instead, the brief focuses on *process*—specifically, the district court's process of confirming the Plan before adjudicating the adversary proceeding, which Appellants contend violated their due-process rights.  Pinto Lugo Br. 2; *see also* Point II.B, *infra* (addressing due-process argument).  Appellants have therefore abandoned any

challenge to the merits of the district court's decision overruling their objections. *See Tower v. Leslie-Brown*, 326 F.3d 290, 299 (1st Cir. 2003) ("[U]nbriefed arguments are abandoned.").

In all events, Appellants' objections were properly overruled.

### 1. *Any Objection that the New Bond Legislation Was Improperly Enacted Is Non-Justiciable.*

Pinto Lugo Appellants first contend that the New Bond Legislation is invalid because it was allegedly enacted in violation of Representative Manuel Natal-Albelo's right to participate in legislative debate under the Rules of the Puerto Rico House of Representatives. Pinto Lugo Br. 4, 14 n.4, 16.[16] According to Appellants, Representative Natal-Albelo was "ignored" when he tried to speak about the New Bond Legislation on the House floor and was "mocked" by members of the other party. Pinto Lugo Br. 4. The district court properly found this objection a non-justiciable political question best addressed in the Puerto Rico Legislature. Dkt.-No.-5053-at-50 n.14.

A controversy involves a non-justiciable political question "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department.'" *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). Commonwealth courts have found such a textual commitment in Article III, § 9 of

---

[16] Representative Natal-Albelo is one of the Pinto Lugo Appellants.

the Puerto Rico Constitution, which authorizes each House of the Legislative Assembly to "adopt rules for its own proceedings." That provision gives the Legislative Assembly the "absolute discretion to decide in which way it carries out its procedures." *Noriega Rodriguez v. Jarabo*, 136 D.P.R. 497, 520 (P.R. 1994); Dkt.-No.-4762-1-at-1–16 (certified translation). Accordingly, disputes over the application of internal legislative rules are non-justiciable. *Id.*; *see also Silva v. Hernandez Agosta*, 118 D.P.R. 45, 18 P.R. Offic. Trans. 55 (P.R. 1986).

Federal courts are in accord. Similar to the Puerto Rico Constitution, the federal Constitution provides that "[e]ach House may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. Federal courts construe that provision as "textually commit[ing] the question of legislative procedural rules to Congress." *Consejo De Desarrollo Economico De Mexicali*, 482 F.3d 1157, 1172 (9th Cir. 2007); *see also United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). Accordingly, a question about "whether the House observed the rules it had established for its own deliberations . . . is political in nature . . . and is therefore nonjusticiable." *Metzenbaum v. Fed. Energy Reg. Comm'n*, 675 F.2d 1282, 1287 (D.C. Cir. 1982); *see also Yellin v. United States*, 374 U.S. 109, 143 (1962) ("[T]he manner in which . . . Congress chooses to run its business ordinarily raises no justiciable controversy.").

Here, the essence of Appellants' objection is that the Puerto Rico House's Rules were "applied" incorrectly and "disregarded to violate Natal-Albelo's rights." Pinto Lugo Br. 14 n.4. A claim about the misapplication of internal legislative rules is non-justiciable. *See, e.g.*, *Rodriguez*, 136 D.P.R. at 533–34 (declining to resolve an "internal dispute[]" over the application of parliamentary procedures); *see also Brown v. Hansen*, 973 F.2d 1118, 1122 (3d Cir. 1992) (deeming non-justiciable allegations that Virgin Islands legislators had failed to comply with "internal rules and procedures"); *Metzenbaum*, 675 F.2d at 1286–87 (finding non-justiciable a claim that a statute was "invalid because it was passed in violation of . . . parliamentary rules").[17]

Appellants cite *Rodriguez* for the unremarkable proposition that disputes over internal legislative rules are justiciable if the rules themselves or the application of the rules are "contrary to the constitutional provisions" or "violate fundamental individual rights." 136 D.P.R. at 521; *see* Pinto Lugo Br. 14. However, Appellants fail to identify any manner in which the Puerto Rico House Rules were applied to violate constitutional rights.

---

[17] Representative Natal-Albelo's contention that the House Rules were not applied correctly is meritless as well as non-justiciable. He cites no Rule of the Puerto Rico House that supposedly was violated.

Appellants invoke Natal-Albelo's "right to free speech." But they proffer no facts showing that he was prohibited from speaking—just that he was "ignored" and "mocked" when he tried to speak. Pinto Lugo Br. 4. In any event, there was no "free speech" violation here. To the extent that Natal-Albelo asserts his "right to free speech" as a private citizen, a private citizen has no First Amendment right to speak on the floor of the legislature. *See Curnin v. Town of Egremont*, 510 F.3d 24, 29 (1st Cir. 2007) ("The Supreme Court has never extended First Amendment forum analysis to a deliberating legislative body or to the body's rules about who may speak."). And to the extent he is asserting his "free speech" right in his official capacity as a legislator, a legislator has no personal right to participate in the legislative process. *See Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999); *see also Raines v. Byrd*, 521 U.S. 811, 821 (1997) (explaining that individual legislators have standing to sue only when they have "been deprived of something to which [they] *personally* are entitled"). To the contrary, the legislative power "is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). A legislator therefore has no "right to use official powers

for expressive purposes" and cannot sue to vindicate any official right to speak on the legislative floor.  *See id.* at 127.[18]

### 2. The COFINA Enabling Act and New Bond Legislation Do Not Violate Public-Debt Limits.

Appellants' second objection below—an objection they do not press on appeal—was that two statutes underlying the Plan—the COFINA Enabling Act and the New Bond Legislation—are invalid because they supposedly authorize borrowing in excess of the limits on public debt imposed by Article VI, §§ 2 and 7 of the Puerto Rico Constitution.  Pinto Lugo Br. 5, 7–8, 16–23.  Neither statute, however, violates those constitutional provisions, and, in any event, the validity of the two statutes was resolved in a binding settlement of litigation over them.

As an initial matter, Article VI, § 7 has nothing to do with public-debt limits. That section merely provides that appropriations shall not exceed "total estimated revenues" for a fiscal year without imposing commensurate taxes to cover the shortfall.  P.R. Const. art. VI, § 7.  Appellants offer no argument for how this provision applies in this case, and therefore any argument that the New Bond Legislation or Enabling Act violates the provision is waived.  *See Ahmed v. Holder*, 611 F.3d 90, 98 (1st Cir. 2010) ("[A]ppellate arguments advanced in a

---

[18] Nor was Natal-Albelo denied his "right to . . . vote" on the New Bond Legislation.  Pinto Lugo Br. 4.  There is no evidence that Natal-Albelo's vote was not counted in the final tally.

perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived.").

Section 2 is likewise inapposite. That provision limits the amount of "direct obligations" issued "for money . . . borrowed . . . by bonds or notes for the payment of which the full, faith, credit and taxing power of the Commonwealth shall be pledged." P.R. Const. art. VI, § 2. By its terms, then, § 2 applies only to obligations guaranteed by the Commonwealth's full faith and credit. *Id.* The COFINA bonds are not guaranteed by the Commonwealth, however, and are thus not subject to § 2. *See* 13 L.P.R.A. 13(d) ("Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such [COFINA] bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."). As the district court explained, Dkt.-No.-5053-at-50 n.14, the New Bond Legislation provides that COFINA is an entity "independent and separate from the Government of Puerto Rico," Act 241 § 2.1, that its "[r]evenues do not constitute . . . 'available revenues' of the Government of Puerto Rico," *id.* § 2.2(e), that the new bonds under the Plan shall be payable solely from COFINA revenues, *id.* § 3.1(c), and that the new COFINA bonds do not constitute public debt, *id.* § 3.1(e); *see also* Dkt.-No.-5053-at-78 (COFINA bonds are not "available resources" for public-debt service). For these reasons, the new COFINA bonds are

not Commonwealth debt and therefore cannot violate the debt limits prescribed in Article VI, Section 2 of Puerto Rico's Constitution.

Further, any dispute over whether the old COFINA bonds violated debt limits is moot and was resolved in the Settlement, as the district court recognized. Dkt.-No.-5053-at-50 n.14; *see also* Dkt.-No.-4067-at-69 (discussing a pre-Settlement dispute over whether COFINA's structure resulted in "evasion" of constitutional debt limits); *id.*-at-75–76 (releasing those claims). Although Appellants argue that they cannot be bound by the Settlement because they did not sign onto it (Pinto Lugo Br. 23–27), that argument ignores that the settled issue was common to all creditors who voted on the plan. Thus, the creditors' overwhelming acceptance of their treatment under the Plan binds the entire class, including Appellants who owned COFINA bonds.[19]

Moreover, Appellants do not contest that, in addition to having the right to vote to reject the Plan (for those Appellants who are COFINA creditors), they also had a separate opportunity to object to the Settlement. Dkt.-No.-4607-at-5. They are thus bound by the Settlement's terms. *See Petitioning Creditors of Melon Produce v. Braunstein*, 112 F.3d 1232, 1239 (1st Cir. 1997) (deeming a Rule 9019 settlement binding on creditors who "had notice of and did in fact appear and

---

[19] To the extent there are Appellants who did not own COFINA bonds, they lack standing to oppose the Plan on that basis.

object to the proposed settlement"). Moreover, they did not appeal the order

approving the Settlement, so they cannot challenge that order in this appeal. *See*

*id.* Under Rule 9019, they are bound by the Settlement's terms, including the

agreement that the old COFINA bonds do not violate the public-debt limits in the

Puerto Rico Constitution.

## B. There Was No Due-Process Violation.

The due-process argument asserted by Pinto Lugo Appellants on appeal

likewise fails. They identify two actions taken by the district court that supposedly

violated their due-process rights: (i) confirming the Plan before resolving their

adversary proceeding; and (ii) adjudicating the merits of the adversary proceeding

by overruling their objections. Pinto Lugo Br. 9–16. The first theory fails as a

matter of law because due process did not require the district court to resolve the

adversary proceeding before confirming the Plan. The second fails as a factual

matter because the court did not adjudicate the merits of the claims brought in the

adversary proceeding.

### 1. Due Process Did Not Require Resolving the Adversary Proceeding before Plan Confirmation.

Appellants first argue that due process required the district court to resolve

their adversary proceeding before confirming the Plan. Pinto Lugo Br. 9–16.

Appellants repeatedly invoke the Fifth Amendment to support this argument, but

they cite no authority finding a due-process violation under remotely similar facts. No such authority exists.[20]

As a threshold matter, Appellants' due-process argument is forfeited. Below, Appellants did not assert a due-process right to have their adversary proceeding resolved before Plan confirmation. Instead, they argued that confirming the Plan first would be *futile* in the event that they prevailed in their adversary proceeding. *See* Dkt.-No.-4607-at-5. Appellants thus forfeited their due-process argument by failing to raise it below. *See Rocafort v. IBM Corp.*, 334 F.3d 115, 121 (1st Cir. 2003).

The due-process argument is meritless in any event. Due process requires only "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted). In the context of confirming a restructuring plan, due process only requires giving adequate notice to interested parties and affording them an opportunity to object to the plan. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).

---

[20] Appellants also argue the district court's failure to adjudicate their adversary proceeding before confirmation violated their First Amendment right to access courts. Pinto Lugo Br. 10. Since the First Amendment claim is based on the same theory as the Fifth Amendment claim, they both fail for the same reason. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 335 (1985) (treating as "inseparable" First and Fifth Amendment access-to-courts claims).

Here, Appellants indisputably had notice of the Plan-confirmation proceedings and an opportunity to object to the Plan. Appellants submitted written objections to the court, Dkt.-No.-4607-at-2–6, and participated in the Plan-confirmation hearing, Dkt.-No.-4850-at-20–24, 66–69. Only after their objections were briefed and argued did the court reject them and confirm the Plan. Dkt.-No.-5053-at-50 n.14. Due Process requires nothing more.[21]

It is of no moment that the district court overruled Appellants' objections in a footnote. *Contra* Pinto Lugo Br. 13. Due process guarantees only an opportunity to be heard, not a right to have one's arguments addressed in the body of a written decision. *See Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002) ("[P]rocedural due process does not require certain results—it requires only fair and adequate procedural protections.").

Appellants' contention that their adversary proceeding raises additional arguments that were not raised in their objections to Plan confirmation is beside the point. Pinto Lugo Br. 7. Appellants had the opportunity to object to the Plan on any ground, and any alleged failure to take advantage of that opportunity was an oversight on their part, not a due-process violation. *See Boddie v. Connecticut*, 401

---

[21] Appellants argue that Appellees bear the burden of proving that a due-process violation served a substantial government interest, Pinto Lugo Br. 10–11, but that argument is irrelevant because there was no due-process violation in the first place.

U.S. 371, 378–79 (1971) ("[T]he hearing required by due process is subject to waiver[.]").[22]

### 2. The District Court Did Not Improperly Adjudicate the Adversary Proceeding.

Appellants further argue that the district court violated their due-process rights by adjudicating the merits of the claims in their adversary proceeding when overruling their Plan objections. Pinto Lugo Br. 6–8, 13–15. That argument makes little sense. Below, Appellants recast the claims asserted in their adversary complaint as objections to the Plan. In deciding whether to confirm the Plan, the district court had to consider and resolve those objections. The court overruled the objections only "insofar as they are raised as objections to the Plan." Dkt.-No.-5053-at-50 n.14. It did not dismiss the claims in the adversary proceeding. Instead, it stayed the adversary proceeding pending the outcome of this appeal. Dkt. Nos. 32, 36, 59 in Case No. 19-AP-0003 (D.P.R.).

---

[22] Some courts have held that, where the Bankruptcy Rules expressly require an adversary proceeding to resolve a given issue, a party has a "due process right not to have that issue resolved without one." *In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008). However, no Bankruptcy Rule required Appellants' plan objections to be resolved in an adversary proceeding. In any event, the Supreme Court has abrogated *Mansaray-Ruffin* and its kin, holding that depriving an interested party of a procedural right to an adversary proceeding does not violate due process. *Espinosa*, 559 U.S. at 272. Instead, the inquiry remains whether an interested party had notice and an opportunity to object to a proposed restructuring plan, *id.*, both of which Appellants had here.

To the extent that the Confirmation Order may have a preclusive effect on the claims asserted in the adversary proceeding, that does not constitute a due-process violation (and Appellants cite no case suggesting that it does).  Ordinary preclusion rules apply with "full force" to confirmed reorganization plans and foreclose interested parties from re-litigating matters raised before confirmation. *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007); *see also Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015).  Due Process limits the preclusive force of a confirmed plan only if an interested party was not afforded adequate notice and an opportunity to be heard in the confirmation proceedings.  *See In re Diruzzo*, 527 B.R. 800, 806 (B.A.P. 1st Cir. 2015).  Here, Appellants were fully heard on their objections before confirmation.  Accordingly, even if the Confirmation Order ultimately has a preclusive effect on their claims in the adversary proceeding, it would not present a due-process issue.

## III.  THE OBJECTIONS OF ELLIOTT APPELLANTS WERE CORRECTLY OVERRULED.

Unlike Pinto Lugo Appellants, Elliott Appellants pursue a "kitchen-sink" strategy in their effort to overturn the Plan.  In their opening brief, they argue that the Plan and/or PROMESA violate no less than nine provisions of the United States Constitution—including the Ex Post Facto, Bankruptcy, and dormant Commerce Clauses.  Elliott Br. 29–50, 60–61.  They further contend that the Plan does not comply with at least eight different statutory requirements.  *Id.* at 61–64.

They challenge not only myriad Plan provisions but also the process by which the Plan was developed and confirmed.  *Id.* at 54–60.

The quantity of arguments raised by Elliott Appellants is inversely proportional to their merit.  The district court's decision overruling the objections should be affirmed.  Dkt.-No.-5053-at-1–88.

### A.    PROMESA Applies to Appellants' Security Interests.

Elliott Appellants first argue that, as a matter of constitutional avoidance, PROMESA should be construed not to apply retroactively to their rights, which existed before PROMESA's 2016 enactment.  Elliott Br. 28–29.  That argument is foreclosed by *Andalusian*, which squarely held that PROMESA applies to security interests and rights created before its enactment.  2020 WL 486163, at *12–13.

As the *Andalusian* Court recognized, § 2(b)(2) of PROMESA provides: "Subchapters III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of Title 11) created *before*, on, or after [PROMESA's effective date]."  2020 WL 486163, at *12 (citing 48 U.S.C. § 2101(b)(2)) (emphasis added).[23]  Section 2(b)(2) thus "provide[s] an explicit [congressional] command . . . to apply PROMESA retroactively."  *Id.* at *13.

---

[23] "Subchapter III" refers to Title III of PROMESA, under which the Plan was promulgated and confirmed.

Because Congress expressly directed PROMESA's retroactive application, the doctrine of constitutional avoidance has no application here. *Id.* at *12. Constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). A court cannot in the name of constitutional avoidance adopt a statutory reading that is contrary to the express language of the statute or what Congress plainly intended. *See id.* at 382. Here, as the *Andalusian* Court recognized, PROMESA's text is clear and susceptible to only one construction: The statute by its terms applies retroactively to security interests and other rights created before its 2016 enactment. 2020 WL 486163, at *12.

The authority cited by Elliott Appellants does not change the analysis. As the *Andalusian* Court held, *United States v. Security Industrial Bank*, 459 U.S. 70 (1982), is inapposite, because the statute there had no provision comparable to 48 U.S.C. § 2101(b)(2) mandating retroactive application. *See Andalusian*, 2020 WL 486163, at *13.

This Court's decision in *Altair* has no bearing on whether PROMESA applies retroactively to security interests created before PROMESA's enactment. *Altair Glob. Credit Opportunities Fund, LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 914 F.3d 694 (1st Cir. 2019)

(cited in Elliott Br. 29). *Altair* held only that the security interest at issue was perfected. *Id.* at 719.

Appellants cite 48 U.S.C §§ 2141(b)(1)(N) and 2174(b)(7) for the proposition that "no Plan may be confirmed unless it respects 'lawful liens.'" Elliott Br. 28. However, as this Court explained, those provisions apply only to fiscal plans certified by the Board and have no relevance to a Title III plan of adjustment. *Andalusian*, 2020 WL 486163, at *13. To the extent Appellants are complaining that the fiscal plan does not respect lawful liens, that argument is foreclosed by 48 U.S.C. § 2126(e) and is irrelevant to Plan confirmation in any event.

Appellants' constitutional avoidance argument fails for an additional reason, too: Applying PROMESA to Appellants' pre-PROMESA security interest does not raise any constitutional concerns, as explained below.

## B. There Is No Takings Clause Violation.

Elliott Appellants argue that the Plan and the New Bond Legislation effectuate a taking of their security interest without just compensation. Elliott Br. 29. That argument fails for three independent reasons: (i) they lack a property right under the Takings Clause; (ii) even if they had a property right, it has not been taken; and (iii) even if they had suffered a taking, they have received just compensation.

56

### 1. The Takings Clause Is Not Implicated Because Appellants Have No Cognizable Property Right.

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to Puerto Rico through the Fourteenth Amendment. *Fideicomiso de La Tierra del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 12 (1st Cir. 2010).

There can be no taking without a cognizable property right. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935); *Stockton*, 909 F.3d at 1266 ("The Takings Clause is only implicated in bankruptcy if the creditor has actual property rights."). "It is impossible" to have a cognizable right in property that has not yet come into existence, however, "because, by definition, [such] property is a mere contingency." *First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*, 18 B.R. 868, 870 (Bankr. D. Colo. 1982); *see also Local Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934) (there can be no "enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt"); *Sims v. Jamison*, 67 F.2d 409, 410 (9th Cir. 1933) ("[T]here can be no lien upon something which does not exist at the time of the adjudication [in bankruptcy]."). When the creditor has only an "expectancy," there is no "right" and no present "property." *Andalusian*, 2020 WL 486163, at *6.

57

Puerto Rico law recognizes the distinction between a "mere expectancy of property" and a cognizable "property interest." *Andalusian*, 2020 WL 486163, at *6 n. 7; *see also Redondo-Borges v. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 9 (1st Cir. 2005) (distinguishing between a "unilateral expectation" and a vested property interest under Puerto Rico law). That carries great weight because "the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998). Nor is Puerto Rico unique in drawing the distinction: Treating "expectancies" as something less than property "is generally accepted." *Andalusian*, 2020 WL 486163, at *6 n.7 (citing Restatement (Third) of Trusts § 41 cmt. a (2003)).

Here, Appellants had only an "expectancy" in the SUT Revenues, not a property right. Appellants' security interest attached to SUT Revenues only when they came into existence and were collected. P.R. Laws Ann. tit. 13, § 12. Historically, if the SUT Revenues were not collected or if the Puerto Rico Legislature amended the Enabling Act to eliminate SUT Revenues, Appellants would have no rights to those revenues whatsoever. *See Andalusian*, 2020 WL 486163, at *7 (where subsequent legislatures can eliminate collection of pledged revenues, bondholders have no property right in those revenues). As one court explained, because "after-acquired property is not in existence at the time of the

agreement," the most a creditor "could have acquired . . . was a vested interest, which, had the property ever come into existence, would have become a vested property right." *In re Hamilton*, 18 B.R. at 870.

Appellants' security interest in future SUT Revenues is thus not a property right cognizable under the Takings Clause but rather is akin to an unsecured contractual right to receive payments in the future—the sort of interest that is routinely compromised in bankruptcy without constitutional difficulty. *See Radford*, 295 U.S. at 589. Only traditional, vested security interests constitute "property" under the Takings Clause. *See Sec. Indus.*, 459 U.S. at 71 (lien on debtor's household goods); *Radford*, 295 U.S. at 555 (mortgage on real property); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029, 1031 (1992) (defining "property" based on "background principles of the State's law of property" and "common-law principles"). Appellants advance no authority extending Takings Clause protections to the novel and contingent interest they hold.

### 2. *There Was No Taking Even if Appellants Had a Cognizable Property Right.*

#### a. The Takings Claim Must Be Analyzed Under the Regulatory Takings Framework.

Even if Appellants had a cognizable property right, there was no taking here. The Supreme Court has identified two categories of takings that require just

compensation: (i) a per se taking, which occurs when there is a "direct government appropriation or physical invasion of private property," and (ii) a regulatory taking, which occurs when a "government regulation of private property . . . [is] so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citation omitted).

The per se taking framework has no application here. Per se takings are limited to cases where the "government requires an owner to suffer a permanent physical invasion of her property," or the government's regulations "completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* at 538. Neither scenario applies here. Simply put, the amount of collateral for Appellants' COFINA bonds was disputed, and once settled, Appellants obtained the full value of their collateral under the New Bond Legislation, which established the legal framework for cancelling the old COFINA bonds and issuing new ones, was based on the Settlement and did not require any "physical invasion" of Appellants' property, and, as Appellants acknowledge, did not completely deprive any bondholder of *all* economically beneficial use of their property. *See* Elliott Br. 34 ("[T]he entire amount of the lien was not taken—only part."). To the contrary, Appellants still hold a significant interest in the SUT Revenues through the new secured bonds. Dkt.-No.-5053-at-53–54. *See also* Point III.B.3, *infra*.

As the district court recognized (Dkt.-No.-5053-at-53), the takings challenge must be analyzed under the three-part *Penn Central* inquiry for regulatory takings because Appellants suffered no physical invasion and their security interest was settled, neither completely destroyed nor physically appropriated. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82–84 (1980) (applying the *Penn Central* framework because the challenged government action affected some but not all of the rights of the property at issue); *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 264 (2d Cir. 2014) (concluding that, because the regulatory action at issue did "not present the classic taking in which the government directly appropriates private property for its own use, any taking in [that] case would be regulatory in nature"); *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 685 (1st Cir. 1999) (finding *Penn Central* appropriate to analyze whether prospective avoidance of a lien under Bankruptcy Code § 522(f) violates the Takings Clause); *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 18–19 (1st Cir. 1993) (employing *Penn Central* to analyze whether applying a newly enacted statute to abrogate a preexisting termination-upon-insolvency clause in a lease constitutes a taking).

Under *Penn Central*, a court faced with a regulatory takings claim considers (i) "the economic impact of the regulation on the claimant," (ii) "the extent to which the regulation has interfered with distinct investment-backed expectations,"

and (iii) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The party alleging a regulatory taking bears a "heavy burden." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987).

> b.     <u>There Was No Taking under *Penn Central*.</u>

Appellants' takings claim fails under all three prongs of *Penn Central*, as the district court correctly held. Dkt.-No.-5053-at-53–55.

*First*, it is the Settlement Appellants do not like. The New Bond Legislation and the Plan had no economic impact on Appellants because the New Bond Legislation provided them new secured bonds in amounts commensurate to the value of their security interest in the settled amount of the SUT Revenues belonging to COFINA. *See Reoforce, Inc. v. United States*, 853 F.3d 1249, 1269 (Fed. Cir. 2017) (finding no taking where the complained-of governmental action "had no economic impact" on the plaintiff); *see also Gilbert v. City of Cambridge*, 932 F.2d 51, 56 (1st Cir. 1991) (rejecting a takings claim where the challenged regulation "preserve[d] an economically viable property use"). Any valuation of Appellants' pre-confirmation security interest must take into account the uncertainty surrounding the dispute over the SUT Revenues (as well as the dispute between senior and junior COFINA bondholders over allocation of those revenues). Appellants faced a significant risk that COFINA would lose all the

SUT Revenues to which their security interest could attach in the future. The Plan and the New Bond Legislation eliminated that risk by dividing the disputed SUT Revenues between COFINA and the Commonwealth, which, as the district court found, "provide[d] significant value to the bondholders," including Appellants. Dkt.-No.-5053-at-54. Had there been no Plan and thus no Settlement of the dispute over the SUT Revenues, there was a reasonable chance that Appellants' security interest in those revenues would have been worth nothing, as the district court recognized. Dkt.-No.-5053-at-54. *See also* Point III.B.3, *infra*. The Plan's settlement of the dispute between senior and junior bondholders likewise prevented worse possible outcomes for Appellants.

*Second*, the New Bond Legislation and the Plan did not interfere with investment-backed expectations. Regardless of whether Puerto Rico's instrumentalities were eligible for bankruptcy when Appellants purchased their bonds (Elliott Br. 32), Appellants still had notice that they were buying bonds from a public entity. And like all parties purchasing bonds from public entities, Appellants assumed the risk that in the event of a downturn, their interests would be balanced against those of the public. *See New Haven Inclusion Cases*, 399 U.S. 392, 491–92 (1970) (holding that investors in bonds sold by issuers with duties to the public always "assume[] the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs"); *Andalusian*,

2020 WL 486163, at *7 ("The Bondholders knew that if the Commonwealth experienced additional financial problems, such problems could adversely affect the Bondholders."); *In re Bos. & Maine Corp.*, 484 F.2d 369, 374 (1st Cir. 1973) (no taking where secured creditors of railroad were "required to defer realizing on their security for a reasonable time to permit the trustees to make efforts to reorganize the railroad"). The Plan and the New Bond Legislation were thus foreseeable risks Appellants should have reasonably anticipated when they purchased the bonds. *See* Dkt.-No.-5053-at-54.

Further, when they purchased COFINA bonds, Appellants were warned that holders of GO Bonds could challenge COFINA's right to the SUT Revenues, which could render Appellants' security interest in those revenues worthless.[24] As the district court found, "bondholders' reasonable expectations must take account of the claims . . . that have been the subject of the substantial litigation that the [Settlement] and the Plan . . . resolve[d]." Dkt.-No.-5053-at-54.

*Third*, Puerto Rico's enactment of the New Bond Legislation was not self-serving but rather was a necessary step in the comprehensive effort to address the Commonwealth's fiscal crisis and thus promote the common good. Courts do not

---

[24] Supplement to Certain Official Statements of Puerto Rico Sales Tax Financing Corporation, Dec. 7, 2011 at 34–35, *available at* http://www.gdb-pur.com/spa/investors_resources/documents/PRCofina03a-OS-FIN-1006MM.pdf.

find a taking under those circumstances. *See Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225 (1986) ("[A] public program that adjusts the benefits and burdens of economic life to promote the common good [], under our cases, does not constitute a taking requiring Government compensation."); *see also McAndrews*, 989 F.2d at 19 (applying *Penn Central* and finding no taking because government was "not appropriating appellant's property for its own use" but instead intended "to reallocate economic pluses and minuses" and "restore public confidence in the nation's banking system").  As the district court found, the Plan and New Bond Legislation are a "quintessential example of a 'public program adjusting the benefits and burdens of economic life to promote the common good.'"  Dkt.-No.-5053-at-54 (quoting *Penn Cent.*, 438 U.S. at 124).

Accordingly, all three prongs of the *Penn Central* test point inexorably to the conclusion that there was no taking here.

### 3. *Even if There Were a Taking, Appellants Received Just Compensation.*

"Just compensation" does not mean "full compensation."  *United States v. Norwood*, 602 F.3d 830, 834 (7th Cir. 2010).  "Just compensation" requires consideration of "all circumstances," including whether the contemplated compensation "would result in manifest injustice to owner or public."  *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950) ("[T]he dominant consideration always remains the same:  What compensation is 'just' both to an

owner whose property is taken and to the public that must pay the bill?"). The need to balance one creditor's interest in compensation with fairness to other creditors and the public is nowhere more acute than in a municipal bankruptcy. *New Haven Inclusion Cases*, 399 U.S. at 491–92.

Here, Appellants not only received "just compensation," but they received the full value of the settled amount of their collateral. This is not a case where the SUT Revenues were used for anything other than paying the creditors secured by it. Although the Plan provides Appellants with less than 100% recovery on their bonds—specifically, Appellants received a recovery of approximately 56 cents on the dollar (Dkt.-No.-5053-at-35)—that consequence flows from the risk inherent in the dispute over the SUT Revenues. Had the COFINA Agent litigated and lost, the Plan would have provided Appellants with no recovery whatsoever because COFINA would not have had enough assets to pay junior bondholders like Appellants. Moreover, had the district court found that an event of default had occurred, or had the SUT Revenues been insufficient to meet debt-service obligations to *all* bondholders for any reason, junior bondholders like Appellants "would have borne the risk of not receiving any monies until holders of 'Senior' Existing Securities were paid in full." Dkt.-No.-4757-at-12–13; *see also* Dkt.-No.-4756-at-28.

Accordingly, the value of Appellants' claims reflects the resolution of these disputes—resolutions that provided significant value because Appellants still hold a significant interest in the SUT Revenues through the new COFINA bonds. *See* Dkt.-No.-4757-at-9–10. In fact, the new bonds are more valuable than the old bonds—which were mired in legal uncertainty and conveyed no property interest in the future revenue stream—because the new bonds are secured by a statutory lien on the SUT Revenue stream owned by COFINA free and clear of encumbrances and legal issues, and the New Bond Legislation specifically provided for additional "covenants to secure further the repayment of the [new] COFINA Bonds." Dkt.-Nos.-5053-at-49, 77–78; 5053-1-at-38. Thus, although the Plan provides Appellants with less than 100% recovery on their old bonds, they nevertheless received just compensation in exchange for those bonds.

As the district court found, the fact that Appellants "receive[d] consideration that is discounted by a settlement that recognizes significant litigation risks, the allocation of distributions was determined via a long mediation and settlement process among sophisticated parties, and creditors [similarly situated to Elliott Appellants] have ratified the result by voting in favor of the Plan" is "sufficient proof that the consideration . . . constitutes just compensation." Dkt.-No.-5053-at-54–55. Appellants have made no showing that the court's factual finding was clearly erroneous.

#### 4.    *Appellants' Cases Are Inapposite.*

This case is nothing like *Armstrong v. United States*, 364 U.S. 40 (1960). There, a federal contractor defaulted on its contractual obligations to the government, and, pursuant to a default provision in the contract, the government took possession of certain unused materials. *Id.* at 41. Because of sovereign immunity, materialmen who supplied the materials to the contractor were unable to enforce against the government their state-law liens against the materials. *Id.* at 46. The Supreme Court held that this constituted a Fifth Amendment taking. *Id.* at 48. The Court explained that the challenged action—the transfer of materials to the government, which made the liens unenforceable—amounted to a "total destruction by the Government of all value of [the] liens." *Id.* at 48–49.

Here, by contrast, the claimed interest was a mere expectancy, not a traditional lien on physical property, so there is no property right at all. In any event, neither the New Bond Legislation nor the Plan resulted in a total destruction of Appellants' expectancy. To the contrary, Appellants still hold a substantial, and more secure, interest in the SUT Revenues through the reissued bonds and received substantial value in exchange for their old bonds. Moreover, unlike *Armstrong*, this case involves a public program, not a commercial confiscation by the government "for its own advantage." *Id.* at 48.

Appellants' reliance on *Radford* is likewise misplaced. *Radford* held that the Frazier-Lemke Act—a Depression-era statute that granted farmers a five-year foreclosure moratorium and allowed them to redeem their farms from creditor-banks at the appraised value of the property, which was often less than the amount of secured debt—was unconstitutional because it took mortgages owned by banks without just compensation. 295 U.S. at 594–95. *Radford* was eroded by *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440 (1937) and *Wright v. Union Cent. Ins. Co.*, 311 U.S. 273 (1940). *Radford* articulated five rights of a secured claimholder, and the two *Wright* decisions eliminated four of them, leaving the secured claimholder entitled to only the value of its collateral. Rights to control the timing of a sale, to judicial public sales, to control the collateral during the default, and to credit bidding were discarded from the rights protected by the Fifth Amendment. *See Helvering v. Griffiths*, 318 U.S. 371, 401 n.52 (1943) (explaining the Supreme Court reexamined and corrected the "error" of *Radford*).

In addition, *Radford* is nothing like this case: It involved a traditional property interest (a real property mortgage), not a novel expectancy; it addressed a "secured claim held by a single creditor" and distinguished cases (like this one) where the security holder "is a member of a class" and "the composition is desired by the requisite majority and is approved by the court," 295 U.S. at 585–86; and it featured a deprivation of property, *see Vinton Branch*, 300 U.S. at 457.

69

Appellants argue that under *Radford* and *Security Industrial* "the bankruptcy power . . . is subject to the Fifth Amendment." Elliott Br. 29–30, 32. Appellees do not dispute that general principle. Nevertheless, in this case the Plan and New Bond Legislation do not violate the Fifth Amendment for the reasons stated above.[25]

### 5. *Appellants' Other Takings Arguments Are Meritless.*

Appellants' remaining laundry list of arguments in support of their takings claim is meritless. Elliott Br. 32–39. For instance, they argue that the Fifth Amendment guarantees them "a right to full compensation." *Id.* at 35–36. Appellees agree that Appellants are entitled to the value of their collateral, but that does not mean full payment of their debt if their collateral is worth less than their claim. "Just compensation" is defined as "fair market value." *United States v. Miller*, 317 U.S. 369, 374 (1943). The Supreme Court has repeatedly acknowledged that fair market value is not always full compensation, explaining that any shortfall "is properly treated as part of the burden of common citizenship." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5–6 (1949); *see also*

---

[25] *In re City of Detroit*, 524 B.R. 147 (Bankr. E.D. Mich. 2014) (cited in Elliott Br. 33), held that a plan of adjustment cannot discharge a takings claim. Putting aside that *Detroit* was not correctly decided on that point, *see Stockton*, 909 F.3d at 1268, that holding in *Detroit* is irrelevant because Appellants have no viable takings claim.

*Commodities Trading Corp.*, 339 U.S. at 123; *Poinsett Lumber & Mfg. Co. v. Drainage Dist. No. 7*, 119 F.2d 270, 272–73 (8th Cir. 1941).[26]

Appellants next argue that Federal Rule of Evidence 408 barred the district court from considering the Settlement when analyzing whether Appellants received just compensation. Elliott Br. 35. That is remarkable. Appellants' argument boils down to an assertion that when a creditor's collateral (and here it was not even collateral) is subject to dispute, a trial court cannot treat the creditor's claim based on a settlement of the dispute. What is the trial court supposed to do? Appellants' answer is to pay them in full, which is obviously as convenient as it is wrong. Rule 408 merely prohibits the admission into evidence of settlement discussion to prove or disprove the validity or amount of a claim. Here, the Settlement ended the litigation of Appellants' claim. The confirmation hearing was to determine whether the Plan's treatment of the settled claim satisfied requirements in PROMESA Title III, not whether the claim and claim amount were valid. The Settlement was not offered to impeach a witness or to disprove a claim.

---

[26] Appellants' cases do not hold that "just compensation" requires full recovery in bankruptcy. *Knick v. Township of Scott* simply removed a state-exhaustion requirement for bringing a federal takings claim. 139 S. Ct. 2162, 2167 (2019). And *Monongahela Navigation v. United States* held only that the determination of just compensation under the Fifth Amendment is a judicial function. 148 U.S. 312, 327–28 (1893).

Appellants also argue that the district court should have resolved the Commonwealth-COFINA dispute over SUT Revenues instead of permitting the Settlement. Elliott Br. 12, 36, 38, 39, 54. However, there is nothing improper about a restructuring court deferring judgment on an issue to allow parties to resolve that issue in a negotiated resolution (and Appellants cite no authority holding otherwise). As the district court explained, "[w]ithout a consensual resolution of the dispute, a litigated outcome present[ed] the Commonwealth and COFINA, and, as a result, their respective creditors and constituents, with an all-or-nothing result. In each instance, regardless of the winner or loser, the by-products would be significant delay, cost, and uncertainty to all of Puerto Rico's stakeholders." Dkt.-No.-4434-at-1. The court's decision to approve the Settlement's inclusion in the Plan (as well as the settlement of disputes between senior and junior COFINA creditors) was thus consistent with its mandate under PROMESA to confirm plans that are fair and in the best interest of both creditors and the Commonwealth. 48 U.S.C. § 2174(b).

Appellants also ignore myriad authorities holding that settlements are favored in bankruptcy cases and will not be overturned absent a clear showing that the bankruptcy court abused its discretion. *See, e.g.*, *City Sanitation, LLC, v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91–92 (1st Cir. 2011) (stating that "appellate review operates with the background understanding

that settlements are looked upon with favor in bankruptcy proceedings," and "[t]he task of both the bankruptcy court and any reviewing court is 'to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness'" (citations omitted)); *Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.)*, 382 F.3d 68, 71–72 (1st Cir. 2004); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir. 2000); *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.5 (1st Cir. 1998); *see also* Collier on Bankruptcy ¶ 9019.01 (Richard Levin & Henry J. Sommer eds. 16th ed. 2018) ("Collier") ("[C]ompromises are favored in bankruptcy.").

Finally, Appellants argue that because the Board once argued in a brief that the SUT Revenues belong to COFINA, it should be "estopped from contending otherwise."  Elliott Br. 39 (citing *Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd.*, 853 F.3d 548 (1st Cir. 2017)).  However, estoppel bars only "relitigation of any factual or legal issue that was *actually* decided in previous litigation."  *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994).  No court has ever decided whether the SUT Revenues belonged to COFINA or the Commonwealth. And in any event, the Board is not taking the position that the SUT Revenues do or do not belong to COFINA.  In fact, the Board retained two agents (one for COFINA and one for the Commonwealth) to take opposite positions on that issue

and to litigate or settle it.  The Board's position is that the issue is sufficiently uncertain that the Settlement prescribed a reasonable outcome for all concerned parties.

### C.    The New Bond Legislation Does Not Violate the Contract Clause.

Appellants' challenge to the New Bond Legislation under the Contract Clause likewise fails.  Elliott Br. 42–50.  The New Bond Legislation carries out the Plan:  while it was necessary to effectuate the Plan and obtain confirmation, it had no independent effect.  Accordingly, it is the Plan confirmed pursuant to a federal statute, PROMESA, that impaired Appellants' contracts, not the New Bond Legislation.  A federal court's confirmation of a reorganization plan under federal law cannot violate the Contract Clause because the Constitution expressly grants the bankruptcy power to Congress, which power includes impairment of contractual obligations.

In any event, there would be no Contract Clause violation even if the New Bond Legislation had impaired Appellants' contractual rights.  The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  Although that language appears "unequivocal," the Contract Clause "does not make unlawful every state law that conflicts with any contract."  *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño* ("*UAW*"), 633 F.3d 37, 41 (1st Cir. 2011).

Instead, its "prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983). To determine whether a state law violates the Contract Clause, a court must assess "whether the state law has . . . operated as a substantial impairment of a contractual relationship," and, if so, "whether the impairment was reasonable and necessary to serve an important government purpose." *UAW*, 633 F.3d at 41. Even when a government impairs its own contracts, the Legislature's choices are still entitled to "meaningful deference." *Id.* at 44.[27]

The New Bond Legislation passes muster under both prongs of the Contract Clause test.

### 1.    *The New Bond Legislation Does Not Substantially Impair Contractual Rights.*

The New Bond Legislation does not substantially impair Appellants' contractual rights because the statute itself has no effect independent of the Plan.

---

[27] Appellants are wrong that the Puerto Rico Legislature is owed no deference because the New Bond Legislation is supposedly "self-serving." Elliott Br. 43–44. "Although a state action impairing its own contracts is viewed less deferentially compared to a state action impairing private contracts, less deference does not imply no deference." *UAW*, 633 F.3d at 43. Moreover, this is not a typical case where a state impairs its own contracts for its own benefit; rather, the New Bond Legislation is part of a comprehensive plan of adjustment that was found to be in the best interests of all creditors and the people of Puerto Rico. Dkt.-No-5053-at-38.

*See* Dkt.-Nos.-5053-1-at-27 (defining the statute's "Effective Date" as "the date on which the [COFINA] Plan of Adjustment becomes effective"); 5053-at-73–74 ("The New Bond Legislation is . . . subject to the occurrence of the Effective Date of the Plan."). Thus, to the extent Appellants' contractual rights were impaired, they were impaired by the Plan, and the Plan is not subject to the Contract Clause. *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 732 n.9 (1984) (holding that the Contract Clause does not apply to non-legislative actions).

Moreover, the New Bond Legislation merely embodies the terms of the Settlement. *See* Dkt.-No.-5053-1-at-25 ("The Legislative Assembly is now called upon to implement the agreement by and among the parties of the Commonwealth-COFINA Dispute by amending the provisions of Act No. 91."). The Settlement of the Commonwealth-COFINA Dispute is also a non-legislative act not subject to the Contract Clause.

Even if the New Bond Legislation did impair Appellants' contractual rights, the impairment was not substantial. Whether legislation substantially impairs contractual rights depends on "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018). As discussed above, the New Bond Legislation and the Plan canceled the old COFINA bonds and provided Appellants with substantial,

commensurate value in new secured bonds.  *See* pages 62–63, *supra*.  That is not a

substantial impairment because the value given to Appellants was that which the

district court concluded represented a fair assessment of Appellants' prior rights.

And the New Bond Legislation did not interfere with Appellants' reasonable

expectations because, like all bondholders of public entities, they "assumed the risk

that in any depression or any reorganization the interests of the public would be

considered as well as theirs."  *New Haven Inclusion Cases*, 399 U.S. at 491–92.

### 2. *The New Bond Legislation Was Reasonable and Necessary to Address Puerto Rico's Fiscal Emergency.*

The New Bond Legislation does not violate the Contract Clause for the

additional reason that it represents a reasonable and necessary response to the

Commonwealth's unprecedented fiscal crisis, as the district court found.  Dkt.-No.-

5053-at-52.  "[T]he reasonableness inquiry asks whether the law is reasonable in

light of the surrounding circumstances, and the necessity inquiry focuses on

whether Puerto Rico imposed a drastic impairment when an evident and more

moderate course would serve its purposes equally well."  *UAW*, 633 F.3d at 45–46

(alterations and quotations omitted).  In analyzing these questions, courts consider

"whether the act (1) was an emergency measure; (2) was one to protect a basic

societal interest, rather than particular individuals; (3) was tailored appropriately to

its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration

of the emergency." *Id.* at 46.[28] Applying these factors, the New Bond Legislation was both reasonable and necessary.

*First*, the statue was eminently reasonable in light of the surrounding circumstances. The Legislature enacted the New Bond Legislation in the context of "an unprecedented fiscal and economic crisis" in Puerto Rico, and the law was designed to "enhance Puerto Rico's credibility" with the financial markets and other constituents. Dkt.-No.-5053-1-at-23–25. Without the New Bond Legislation, there could not have been a Plan for COFINA, which is a critical first step in the Commonwealth's overall recovery. Dkt.-Nos.-5053-at-48; 5053-1-at-25. Although Appellants argue that COFINA did not need to reorganize its debt (Elliott Br. 45), that argument presupposes that COFINA was entitled to all the disputed SUT Revenues—an issue that was hotly contested by the Commonwealth. If the Commonwealth had prevailed in the dispute over the SUT Revenues, COFINA would have been completely cash-strapped, and Appellants likely would have received nothing. It was thus reasonable for the Commonwealth to enact the

---

[28] Contrary to Appellants' assertion, *UAW* held that the burden of demonstrating reasonableness and necessity does *not* lie with the State. 633 F.3d at 44. Although Judges Howard and Boudin wrote separately, they agreed that the burden likely lies with the party bringing the Contract Clause challenge. *Id.* at 47–49 (Howard and Boudin, JJ., concurring). In any event, "the burden is unlikely to matter very much in most Contract Clause cases," *id.* at 45, and it does not matter here because the New Bond Legislation was plainly a reasonable and necessary response to the Commonwealth's fiscal crisis.

New Bond Legislation to enable a comprehensive Plan that restructured COFINA's debts and mitigated the risk to COFINA's creditors that all the SUT Revenues would be allocated to the Commonwealth.

*Second*, the New Bond Legislation was necessary because no more moderate course of action would have achieved the legislation's purpose of allowing the Plan to go forward. As the Puerto Rico Legislature explained, the legislation was "necessary to enable Puerto Rico's return to the capital markets" because it was an essential predicate to confirming COFINA's Plan. Dkt.-Nos.-5045-at-8; 5053-1-at-25; 5055-1-at-37.

None of Appellants' proposed "alternatives" to the New Bond Legislation would have addressed COFINA's debt problem. Those "alternatives" are generic arguments that the Commonwealth could have found other ways to raise money that did not involve the SUT Revenues—such as improving tax enforcement and the "business climate." Elliott Br. 46–47. None of those generic solutions would have permitted the COFINA Plan to be confirmed or otherwise resolved the fiscal risk facing COFINA if the Commonwealth prevailed in the dispute over the SUT Revenues, however. Accordingly, none of the "alternatives" undercut the district court's finding that the New Bond Legislation was a reasonable and necessary act to address COFINA's debt crisis. Dkt.-No.-5053-at-52; *see also UAW*, 633 F.3d at 47 (alleging that Puerto Rico can enlist "federal aid to help offset its deficit"

79

insufficient alternative under Contract Clause); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 372 (2d Cir. 2006) (rejecting argument that tax increases or cuts to other programs were "alternatives" to challenged contractual impairment).

> ### D.     The Plan Does Not Violate the Privileges and Immunities, Due Process, Equal Protection, and Dormant Commerce Clauses.

Appellants next argue that the "Plan discriminates against 50-states residents in violation of" the Privileges and Immunities, Equal Protection, Due Process, and dormant Commerce Clauses because it offered bondholders residing in Puerto Rico a cash incentive to elect to receive taxable bonds without offering off-island bondholders a similar incentive. Elliott Br. 50–54. In so arguing, Appellants mischaracterize the purpose and effect of the incentive.

Puerto Rico residents normally do not pay federal taxes. Dkt.-No-5053-at-64. The Plan therefore attempted to make the limited number of tax-exempt bonds more readily available to mainland bondholders by giving Puerto Rico bondholders an incentive to accept taxable bonds. *Id.* at 64–65. As the district court found, the incentive for Puerto Rico residents benefited mainland investors by enhancing the likelihood that they would receive the limited quantity of tax-exempt bonds issued under the Plan. *Id.*

The incentive provided to Puerto Rico residents in the Plan was thus eminently reasonable and beneficial to all claimholders. More importantly for purposes of this appeal, it did not run afoul of any constitutional provision.

### 1. The Incentive Did Not Violate the Privileges and Immunities Clause.

A plan of adjustment cannot violate Article IV's Privileges and Immunities Clause because the Clause applies only to state legislation. The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1; *see* 48 U.S.C. § 737 (extending the Clause to residents of Puerto Rico). Notably, "Article IV, § 2 is a limitation on powers of states and in no way affects the powers of a federal district court." *Hawes v. Club Ecuestre El Comandante*, 535 F.2d 140, 145 (1st Cir. 1976); *see also Cramer v. Skinner*, 931 F.2d 1020, 1029 n.7 (5th Cir. 1991); *Nevada v. Watkins*, 914 F.2d 1545, 1555 (9th Cir. 1990). The Plan was confirmed by a federal court pursuant to a federal statute. The Plan provision offering an incentive to Puerto Rico residents is therefore not subject to the Privileges and Immunities Clause of Article IV.[29]

In any event, the Plan provision at issue would not violate Article IV's Privileges and Immunities Clause even if that Clause were applicable. The Privileges and Immunities Clause "does not preclude disparity of treatment in the

---

[29] Appellants also invoke the Privileges and Immunities Clause of the Fourteenth Amendment. Elliott Br. 50 (citing U.S. Const. amend. XIV, § 1). The Fourteenth Amendment's Privileges and Immunities Clause, however, applies only to the right to travel and the right of citizens of one state who elect to become permanent residents in another state "to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500–03 (1999). It has no application to the facts here.

many situations where there are perfectly valid independent reasons for it."
*Toomer v. Witsell*, 334 U.S. 385, 396 (1948). The Supreme Court has developed a
two-step inquiry to determine whether "a citizenship or residency classification"
violates the Privileges and Immunities Clause. *Supreme Court of Va. v. Friedman*,
487 U.S. 59, 64 (1988). *First*, the classification must burden an activity that is
"sufficiently basic to the livelihood of the Nation" because "[o]nly with respect to
those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a
single entity must the State treat all citizens, resident and nonresident, equally."
*Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383, 388 (1978).
*Second*, the challenged restriction must not be "closely related to the advancement
of a substantial state interest." *Friedman*, 487 U.S. at 65. Neither prong is
satisfied here.

  *First*, the Plan's incentive for Puerto Rico residents to elect taxable bonds
affects only distributions under the Plan and does not affect any activity
fundamental to the vitality of the Nation. *McBurney v. Young*, 667 F.3d 454, 462–
63 (4th Cir. 2012) (noting that the "'fundamental rights' protected under the
Privileges and Immunities Clause . . . cover a much narrower range of activity"
"including the rights to: (1) practice a trade or profession; (2) access courts; (3)
transfer property; and (4) obtain medical services"), *aff'd*, 569 U.S. 221 (2013).

*Second*, the incentive is closely related to the advancement of the Commonwealth's substantial interest in restructuring its crippling debt. As the district court found, the "Plan is a necessary and legally compliant component of Puerto Rico's recovery efforts and is essential to ensure that Puerto Rico is on a path that will restore its access to financial markets as it builds a stronger economy." Dkt.-No.-5053-at-7. Regaining market access is a congressional mandate. 48 U.S.C. § 2121(a). Moreover, as the court explained, limiting the financial incentive to Puerto Rico residents benefitted both residents and non-residents alike. Dkt.-No.-5053-at-64. Because there was a substantial reason why the Plan treated residents of Puerto Rico differently from non-residents, there is no Privileges and Immunities violation. *See Baldwin*, 436 U.S. at 390–91 (no Privileges and Immunities violation where there was a substantial reason for requiring nonresident to pay more than resident for hunting license); *Vlandis v. Kline*, 412 U.S. 441, 445–46 (1973) (no Privileges and Immunities violation where there was a substantial reason for requiring nonresident to pay more than resident to enroll in university).[30]

---

[30] *Saenz* is inapposite because it involved state action that discriminated based on residence without any justification. 526 U.S. at 501 (cited in Elliott Br. 51). Here, the Plan merely recognized the different tax status that exists under federal law and attempted to help non-residents by giving Puerto Rico residents an incentive to elect to receive taxable bonds.

## 2. The Incentive Did Not Violate the Equal Protection or Due Process Clauses.

Appellants' contention that the Plan violated the Equal Protection and Due Process Clauses by including a financial incentive for Puerto Rico residents without giving non-residents a similar incentive is likewise unavailing.  Because the incentive provision does not impinge on any fundamental right, it need only be supported by a rational basis.  *Dandridge v. Williams*, 397 U.S. 471, 519–20 (1970).  Indeed, bankruptcy matters are "in the area of economics and social welfare" and, as such, are upheld if supported by a "rational justification."  *United States v. Kras*, 409 U.S. 434, 446 (1973).

Appellants are wrong that residency classifications always "must be judged by the stricter standard of whether [they] promote[] a compelling state interest."  Elliott Br. 51 (citing *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969), *overruled in part by Edelman v. Jordan*, 415 U.S. 651 (1974)).  The classification in *Shapiro* was evaluated under a "stricter" standard only because it "touche[d] on the fundamental right of interstate movement."  *Shapiro*, 394 U.S. at 638.  Appellants here fail to identify any fundamental right impaired by the challenged classification.  Where, as here, a classification does not touch upon a fundamental right, "equal protection is denied only if the classification is without any reasonable basis."  *Id.* at 638 n.20.

The Plan's incentive for Puerto Rico residents plainly had a rational basis: As the district court found, it "enhanced" recoveries for mainland investors "by maximizing the amount of tax-exempt securities available for such investors." Dkt.-No.-5053-at-64. In other words, to increase the availability of tax-exempt bonds for nonresidents, the Plan included an incentive to steer Commonwealth residents toward the taxable bonds. That rational basis satisfies the Equal Protection and Due Process Clauses.[31]

### 3. The Plan Did Not Violate the Dormant Commerce Clause.

The dormant Commerce Clause applies only to *state* action that burdens interstate commerce. *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015). Here, the Plan was confirmed by a federal court under a federal statute. Since it involves no state action, the Plan (or a Plan provision) cannot violate the dormant Commerce Clause.

### E. The Plan-Confirmation Process Comported with Due Process and Was Fair by Any Yardstick.

Appellants next argue that certain "procedures" surrounding the Plan's confirmation "violated rights of 50-states bondholders." Elliott Br. 54. It is

---

[31] Appellants argue Appellees' justification for the Plan's disparate treatment is "contrived" because mainland investors who do not pay federal taxes were not offered a similar incentive. Elliott Br. 53. But that does not negate the fact that the Plan's structure ultimately benefitted mainland bondholders by shifting taxable bonds to on-island holders and thus "maximizing the amount of tax-exempt securities available for" creditors like Elliott Appellants. Dkt.-No.-5053-at-64.

unclear what statutory or constitutional provision was supposedly violated by these procedures, but, presumably, Appellants are raising a procedural-due-process argument. Notably, they cite no case finding a due-process violation under facts remotely similar to those here.

### 1.      *Appellants Were Not Deprived of Due Process.*

Due process requires only "an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Hodel v. Va. Surface Mineral & Reclamation Ass'n*, 452 U.S. 264, 299 (1981). In the plan-confirmation context, due process is satisfied by affording interested parties notice and an opportunity to present their objections. *Espinosa*, 559 U.S. at 272. Here, Appellants had ample opportunity to object to the Plan below. For instance, Appellant Hein tendered six written submissions objecting to his treatment under the Plan. *See* Dkt.-Nos.-4585-at-i–36; 4595-at-i–16; 4606-at-1–3; 4673-at-i–12; 4911-at-1–4; 5042-at-i–5. The other Elliott Appellants joined those objections. *Id.* The Plan was confirmed only after a two-day hearing at which all three Elliott Appellants presented their objections and had the opportunity to cross-examine witnesses. *See* Dkt.-No.-4850,-Jan.-17,-2019-Hr'g-Tr.-at-37–40; 41–58; 59–61. Due Process required nothing further.

Appellants complain that they did not have enough time to read the Disclosure Statement before the deadlines to object and vote on the Plan. Elliott

Br. 19, 58–60. However, the district court approved the Disclosure Statement and procedures for voting and objecting on November 29, 2018. Dkt.-No.-4382-at-1–19. Claimholders were then given until January 2, 2019, to object to the Plan and until January 8, 2019, to vote on it. *Id.* That comported with court-approved procedures and, as the district court found, "provide[d] a fair and equitable notice and voting process and compl[ied] with [Bankruptcy Rule] 2002." Dkt.-No.-4382-at-5.

Although Appellants contend they were shut out of the mediation that led to the Settlement of the dispute over the SUT Revenues, the mediation was "open to all interested participants." Dkt.-No.-5053-at-43 n.13. Appellants could have participated in the mediation, but they never asked to participate. Moreover, Appellants could have objected to the Settlement before it was approved by the district court, but they declined to do so. Dkt.-No.-5053-at-43 n.13. Their failure to take advantage of the opportunity to participate in the mediation and to object to the Settlement does not constitute a due-process violation. Besides, when a settlement involves a claim common to hundreds or thousands of creditors, there is no requirement that every creditor participate or be consulted. Each side armed itself with sophisticated professionals and came to settlement. The requirement for approval of a settlement is that it be in the "range of reasonableness," not that it

involve or be to the liking of every affected creditor.  *See Jalbert*, 382 F.3d at 71–72.

### 2.     *Appellants' Other Process Objections Fail.*

Appellants make a number of other equally baseless arguments about the procedures that led to the Plan below.

a.     Appellants complain that the Plan paid approximately $332 million in Consummation Costs to creditors who agreed to support the Settlement.  Elliott Br. 55; *see also* Dkt.-Nos.-5055-1-at-27, 47; 5053-at-32–33.  As the district court found, however, the Consummation Costs were proper because they were paid as consideration for the creditors' efforts in negotiating the Plan, participating in the Settlement, and agreeing to restrictions on bond trading.  Dkt.-No.-5053-at-32–35.  There was nothing improper about this type of payment, which is made in many bankruptcy cases.  *See, e.g.*, *In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016, Dkt. No. 1794 (Bankr. N.D. Tex. Mar. 3, 2017) (approving a plan that provided members of a class with compensation for agreeing to backstop a rights offering under the plan); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (same).  As the court explained, "[w]hile it is true that all *claims* must be treated equally, the same is not true for all *claimants*."  Dkt.-No.-5053-at-34–35 (citing Collier ¶ 1123.01).  In any event, the creditors at issue

would have received approximately $190 million anyway, so $140 million represents a "net" incremental payment for such parties.  *See* note 5, *supra*.

b.      Appellants next argue that "mediation cannot bind non-participants who do not consent."  Elliott Br. 56.  That is a non sequitur.  The mediation did not bind *anyone*.  Rather, it led to a Settlement that, in turn, bound COFINA and the Commonwealth via one agreement, and COFINA and certain of its creditors via another.  Appellants are bound by *the Plan*, which incorporated the terms of the Settlement and to which Appellants had the opportunity to object.  Appellants could object to the Settlement, could vote to reject the Plan, and could object to Plan confirmation.  However, the essence of Bankruptcy Code § 1126, incorporated into Title III by 48 U.S.C. § 2161(a), is that creditors such as Appellants can be bound by a vote to accept a plan of adjustment.

c.      Appellants contend that the opportunity to "challenge mediation proposals" was "illusory in practice" because "the court was constrained by recognition that the Plan incorporates a complex series of interrelated compromises."  Elliott Br. 58.  It is unclear what that means.  The district court evaluated the non-binding proposals that came out of the mediation and were embodied in the Plan against the statutory requirements for plan confirmation under PROMESA and concluded, after reviewing evidence and legal arguments, that the Plan met those requirements and the settlements were reasonable.  Dkt.-

Nos.-5055-at-4–7; 5053-at-7.  Appellants had the opportunity to object to the Plan on any ground, including that the terms of the Settlement incorporated into the Plan were unfair or otherwise improper.  The record shows that the district court considered all objections thoroughly, and Appellants' suggestion otherwise is inconsistent with the facts.

d.    Appellants' complaint that individual claimholders were burdened by having to serve their objections on multiple law firms is likewise meritless.  Elliott Br. 59.  Appellants are not class representatives authorized to complain about the burdens supposedly experienced by other, unspecified individuals.  Appellants themselves were certainly not prevented from participating in the confirmation proceedings by the service requirement:  They filed and served multiple submissions objecting to their treatment under the Plan.  *See, e.g.*, Dkt.-Nos.-4585-at-i–36; 4595-at-i–15; 4598-at-1–15; 4613-at-1–7.

e.    Appellants are wrong that the Board was required to file an adversary proceeding "against each" of the thousands of bondholders.  Elliott Br. 58.  The purpose of a Title III case is to ensure that all claims are addressed holistically in one forum rather than in a piecemeal fashion.  *See Phillips v. Congelton, LLC (In re White Mountain Mining Co., LLC)*, 403 F.3d 164, 170 (4th Cir. 2005).  There is no requirement that each bondholder's claim be resolved in a separate adversary proceeding.

90

f.     Appellants also complain that their constitutional rights were "abrogated" by the vote accepting the Plan.  Elliott Br. 40.  Appellants' constitutional rights, however, have not been violated in any manner for the reasons already explained.

Moreover, Appellants' complaints about the voting process are baseless. Elliott Br. 41.  For instance, there is nothing improper about senior bondholders who also owned subordinate bonds voting on those subordinate bonds.  In any event, if Appellants believed certain votes should have been excluded, it was incumbent on them to file a motion seeking to designate those votes under the Bankruptcy Code.  *See* 11 U.S.C. § 1126(e); *see also* Collier ¶ 23.04 ("Vote designation is a term of art under the Bankruptcy Code, pursuant to which a creditor is stripped of its right to vote on a plan as a consequence of, among other factors, the voting party not voting in 'good faith.'").  Appellants did not file such a motion and thus waived the issue.

g.     Appellants' contention that the Disclosure Statement was inaccurate is simply false.  The Disclosure Statement was accurate at the time it was written, as Appellants admit.  Elliott Br. 20; *see also* Hein Br. 9–10.  Although precise information regarding the tax treatment of the new COFINA bonds was not available at the time of the Disclosure Statement—in part because a tax-exemption agreement was executed post-confirmation—the district court found that the

91

Disclosure Statement provided adequate information to enable creditors to make an informed judgment about the Plan. Dkt.-No.-4382-at-3. Appellants have made no showing the court's factual finding was clearly erroneous.[32]

This case is nothing like *American United Mutual Life Ins. Co. v. City of Avon Park*, 311 U.S. 138 (1940) (cited in Elliott Br. 41–42). There, the Supreme Court reversed a plan of adjustment because the city's fiscal agent—who administered the reorganization despite the fact that he held claims against the debtors—tried to reap exorbitant profits and realize unauthorized fees at the expense of the debtor and creditors and failed to disclose his conflict of interest when soliciting votes from bondholders. *Id.* at 141–43. Here, by contrast, there was no fraud or overreaching, and the record amply sustains the district court's findings that the Plan is fair, equitable, and in the creditors' best interest. *See* Dkt.-No-5053-at-38.

---

[32] Appellants contend the Disclosure Statement "misrepresented" the Bonistas as advocating for bondholders in the Commonwealth. According to Appellants, the "Bonistas had undisclosed conflicts and benefits," including a "$7 million payment." Elliott Br. 21–22. As the district court found in approving the Plan, however, Bonistas "actively participated" in the mediation process that led to the development of the Plan by "advocating for the interests of Puerto Rico resident bondholders." Dkt.-No.-5053-at-42–43. Further, Bonistas's decision to request payment for expenses incurred in supporting the Plan was fully disclosed (Dkt.-No.-5097-at-1–2), and, in any case, the request was ultimately withdrawn, (Dkt.-No.-8502-at-1–8).

h.     Appellants' contention that the use of a "confidential mediation-settlement process" and the unavailability of "hearing transcripts . . . by electronic means" deprived them of their First Amendment right to access courts has no merit.  Elliott Br. 56, 60.  As the district court held, the mediation process did not violate the First Amendment right to access courts because the mediation was "open to all interested participants on terms announced by the Mediation Team, the members of the Mediation Team d[id] not render binding decisions, and all stakeholders with standing ha[d] the opportunity to challenge in open adversarial proceedings before the [c]ourt any proposals developed in mediation for which judicial approval [was] sought."  Dkt.-No.-5053-at-43 n.13.[33]

Although Appellants argue the court "should" provide immediate access to hearing transcripts (Elliott Br. 60), they cite no case holding that due process requires it to do so.  Elliott Appellants could attend all proceedings in person or remotely via video, take notes, view transcripts at the court's public terminals, and request transcripts through the court's website.  See Dkt.-Nos.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-1–112; 9352-at-1–4.  There is no requirement they be given free electronic transcripts within any particular timeframe.

---

[33] This case is thus readily distinguishable from *Delaware Coalition for Open Government, Inc. v. Strine*, 733 F.3d 510 (3d Cir. 2013), which involved closed courthouse-based binding arbitration proceedings.

i.    Finally, Appellants complain that, as pro se parties—including Hein, Of Counsel at Wachtell, Lipton, Rosen & Katz—they "were not permitted to use CM/ECF electronic filing, impairing their ability to participate given the pace of the proceedings." Elliott Br. 59. Appellants, however, were permitted to (and did) submit voluminous briefing to the court on paper, argued at hearings, and could monitor the case on PACER and, at no cost, on Prime Clerk. Aside from mere inconvenience, Appellants fail to explain what prejudice they suffered by not being able to access the electronic docket. There is no due-process right to a PACER account.

**F.    Appellants' Remaining Miscellaneous Arguments Are Unavailing.**

Appellants' remaining arguments for why the Plan should be overturned are undeveloped and warrant no extensive response.

*First*, Appellants miss the mark when they argue the Confirmation Order should be vacated in light of this Court's holding that the Board was appointed in violation of the Appointments Clause. Elliott Br. 60 (citing *Aurelius Invs. v. Puerto Rico*, 915 F.3d 838 (1st Cir. 2019), *cert. granted*, No. 18-1334, 2019 WL 1790539 (U.S. June 20, 2019)). *Aurelius* held that, under the *de facto* officer doctrine, Board actions taken before the Court's decision were valid. 915 F.3d at 862. The Plan was confirmed before this Court declared the Board

unconstitutional, and there is thus no basis to disturb the confirmation under *Aurelius*.

*Second*, Appellants summarily argue that retroactive application of PROMESA violates the "Due Process, Ex Post Facto, and Bankruptcy Clauses." Elliott Br. 40. The Ex Post Facto Clause, however, applies only in criminal cases, not bankruptcy cases. *See E. Enterprises v. Apfel*, 524 U.S. 498, 538–39 (1998). Moreover, the Bankruptcy Clause is irrelevant because PROMESA was enacted under the Territories Clause and therefore does not need to be a "uniform" bankruptcy statute. *See* 48 U.S.C. § 2121(b)(2); *see also Harris v. Rosario*, 446 U.S. 651, 651 (1980) ("Congress, which is empowered under the Territory Clause of the Constitution, . . . may treat Puerto Rico differently from States."). And Appellants' reliance on a due-process theory put forth by Justice Kennedy in a concurrence in *Eastern Enterprises* is misguided because no other Justice has accepted Justice Kennedy's postulation that takings allegations can sometimes be analyzed under the Due Process Clause—and, in any event, there was no taking for the reasons stated above. 524 U.S. at 550 (Kennedy, J. concurring); *see also* Point III.B, *supra*.

*Third*, Appellants argue that the Plan failed to satisfy several statutory requirements for confirmation. Elliott Br. 61–64. Most of these arguments repeat Appellants' arguments concerning the Due Process, Equal Protection, Contracts,

and Takings Clauses and thus have already been addressed. Appellants' other statutory arguments are stated in a conclusory and perfunctory manner and thus are waived. *See Zannino*, 895 F.2d at 17.

## IV.  HEIN'S INDIVIDUAL APPEAL FAILS.

In addition to appealing the Confirmation Order, bondholder Peter Hein appeals from the district court's order disallowing his Proof of Claim. Dkt.-No.-8694-at-1. In May 2018, Hein submitted a Proof of Claim in COFINA's Title III case with a stated claim amount of $513,437.50. Hein-Br.-ADD-IV-04. In support, he maintained he was the owner of COFINA bonds with a principal claim of $500,000 and was owed unpaid interest of $13,437.50. Hein-Br.-ADD-IV-02– ADD-IV-08.

The district court disallowed Hein's Proof of Claim because it was duplicative of a Master Proof of Claim tendered by the bond trustee, BNYM. Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-47. In the Master Proof of Claim, BNYM asserted a claim on behalf of all COFINA bondholders, including Hein, seeking a distribution based on the total face value of the outstanding bonds and unpaid interest. Dkt.-No.-4417-at-3–4, 5–6; 4417-1-at-59. BNYM received a distribution under the Plan for the Master Proof of Claim and paid Hein his pro rata share of that distribution. *See* note 10, *supra*. Accordingly, if Hein were to receive a

further distribution on his Proof of Claim, he would be double-dipping, which is why his claim was disallowed. Dkt.-No.-4417-at-4–6.

On appeal, Hein argues that his Proof of Claim is not duplicative because it incorporates his arguments challenging Plan confirmation, which were not included in BNYM's Master Proof of Claim. Hein Br. 23–28. That makes no sense. Hein's challenges to Plan confirmation are not standalone "claims" but rather arguments contesting the Plan's treatment of his claim for payment on his bonds. The only "claim" asserted in Hein's Proof of Claim is his right to payment under the COFINA bonds, and that claim is duplicative of the Master Proof of Claim.

## A. Hein's Proof of Claim Is Duplicative of the Master Proof of Claim.

Hein's Proof of Claim asserted a right to payment arising from COFINA bonds bearing Committee on Uniform Securities Identification Procedures ("CUSIP") numbers 74529JLH6 and 74529JMB8. Hein-Br.-ADD-IV-09–ADD-IV-10. The Master Proof of Claim likewise asserted a claim for payment based on those same COFINA bonds with the same CUSIP numbers. Dkt.-Nos.-4417-at-3–4, 5–6; 4417-1-at-59. Since a distribution has already been made under the Master Proof of Claim on the bonds bearing CUSIP numbers 74529JLH6 and 74529JMB8, Hein was not entitled to any further distribution on those bonds.

Hein nevertheless argues that his Proof of Claim is not identical to the

Master Proof of Claim because it asserts additional "claims" stemming from his

constitutional, statutory, and procedural objections to the Plan. Hein Br. 25.

Those challenges to the Plan are not independent "claims," however, because they

do not provide Hein with an additional right to payment. *See* 11 U.S.C. § 101(5)

(defining "claim" as a "right to payment"). To the contrary, they are legal

arguments for why Hein should supposedly get a hundred cents on the dollar for

his bond claim instead of the discounted distribution provided by the Plan. Hein's

right to payment from COFINA arose solely by virtue of his ownership of the

COFINA bonds. Accordingly, the only "claim" asserted in his Proof of Claim is

identical to the claim asserted by BNYM in the Master Proof of Claim.

Hein mischaracterizes the procedural history when he contends that the

district court once held that his Proof of Claim was "*not* duplicative of the bond

trustee's claim." Hein Br. 23. In his Proof of Claim, Hein included a vague

reference to COFINA's "contractual, legal and Constitutional obligations." Hein-

Br.-ADD-IV-07. The court originally interpreted that language to mean Hein was

asserting "a broader set of rights than just payment of COFINA bonds" and thus

declined to disallow that portion of his claim. Dkt.-No.-6538,-Apr.-24,-2019-Hr'g-

Tr.-at-178. Appellees then asked Hein to put "meat on [those] bones" and explain

exactly what "contractual, legal and Constitutional obligations" gave him a right to

payment separate from his right to payment on the bonds. Dkt.-No.-6538,-Apr.-24,-2019-Hr'g-Tr.-at-179. In supplemental briefing, it became clear that Hein's right to payment arose solely from his COFINA bonds and that his constitutional and legal arguments concerned only how much he should be paid on his bonds under the Plan. At that point, the district court recognized that Hein's only claim for payment was duplicative of the claim asserted by BNYM in its Master Proof of Claim. Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-47.

Hein's attacks on BNYM are beside the point. Hein Br. 26–27. He asserts that "BNYM served as trustee for all COFINA bonds, both senior and subordinate," "BNYM was selected by [the Board] as the bond trustee for all new COFINA bonds," and "BNYM filed no substantive objection to Plan Confirmation." Hein Br. 26. Even if true, none of that matters to the issue on appeal. The fact remains that BNYM received a distribution under the Plan (paid to Hein) for COFINA bonds bearing CUSIP numbers 74529JLH6 and 74529JMB8, and Hein is therefore not entitled to receive an additional distribution on those same bonds.

The bottom line is that Hein's arguments against Plan confirmation were raised as objections, and he has the opportunity to pursue those arguments in this appeal. The arguments are not "claims," however, and therefore do not distinguish his Proof of Claim from the Master Proof of Claim.

99

## B. The District Court Lacked Subject-Matter Jurisdiction to Reconsider Hein's Objections to the Plan, and the Objections Were Not Properly before the District Court Anyway.

Hein complains that the district court should have reconsidered his objections to the Plan during the September 2019 hearing on the Board's Thirteenth Omnibus Objection. Hein Br. 17–23. In opposing the omnibus objection, Hein repeated the same arguments he made when opposing Plan confirmation. Dkt.-No.-4585-at-1–35. The district court held that those arguments were "not responsive" to the Thirteenth Omnibus Objection because they did not address whether Hein had a right to payment independent of his rights under the COFINA bonds. Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-48. The court also held that it lacked jurisdiction to reconsider Hein's Plan objections because those objections were the subject of an appeal pending at this Court. Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-47–48. Both holdings were correct, and each justified the court's refusal to revisit Hein's objections to the Plan in September 2019.

### 1. *The District Court Lacked Jurisdiction to Reconsider Hein's Objections in September 2019.*

By September 2019, Hein had filed a notice of appeal challenging the Confirmation Order to the extent it overruled his objections to the Plan. Dkt.-No.-5166-at-2. It is black-letter law that "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the

appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). That divestiture of jurisdiction extends to "any matter touching upon, or involved in, the appeal." *United States v. Brooks*, 145 F.3d 446, 455–56 (1st Cir. 1998). Accordingly, once Hein appealed the order overruling his objections to the Plan, the district court was powerless to revisit those objections.

Hein argues that *Griggs* was abrogated by a 1993 amendment to Federal Rule of Appellate Procedure 4. Hein Br. 22. However, the 1993 amendment concerns the effect of certain motions (not filed in this case) on the notice of appeal. Fed. R. App. P. 4(a)(4) Advisory Committee's note to the 1993 amendment. The 1993 amendment had no impact on the well-established rule that a notice of appeal divests the lower court of jurisdiction, as numerous cases decided after the 1993 amendment make plain. *See, e.g.*, *United States v. Rodriguez-Rosado*, 909 F.3d 472, 477 (1st Cir. 2018) ("This [*Griggs*] rule provides that filing a notice of appeal, for the most part, shifts 'jurisdiction' from the district court to the court of appeals.")[34]; *United States v. George*, 841 F.3d 55, 71 (1st Cir.

---

[34] Hein relies on *Rodriguez-Rosado* to argue that "there is no mandatory divestiture of a district court's jurisdiction when a notice of appeal is filed." Hein Br. 18. In that case, a defendant challenged the district court's jurisdiction to issue an order while the matter was on appeal. 909 F.3d at 477. This Court explained that the divestiture rule is "not a hard-and-fast jurisdictional rule"; rather, it "is rooted in concerns of judicial economy." *Id.* at 477–48. The Court declined to apply the divestiture rule to nullify the district court's order, explaining that doing so would have resulted in "needless paper shuffling" because the court would "undoubtedly" issue the same order on remand. *Id.* *Rodriguez-Rosado* says nothing about a

2016) ("[W]e start with the abecedarian principle that once a notice of appeal is filed, the district court is divested of 'authority to proceed with respect to any matter touching upon, or involved in, the appeal.'").

Hein contends the district court failed to consider 11 U.S.C. §§ 105, 945(a), 1142(b), which supposedly "militate in favor of jurisdiction." Hein Br. 20. However, those sections provide only that the district court retains jurisdiction to effectuate the Plan and say nothing about the district court's ability to reconsider issues in a pending appeal.

Hein also charges Appellees with taking "conflicting positions" regarding jurisdiction at different stages of the Title III case. Hein Br. 19. Even if that were true, it would be irrelevant because subject matter jurisdictional arguments cannot be waived. *See Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 5 (1st Cir. 2007). In any event, Appellees' positon has been consistent. At the April 24, 2019 hearing, Appellees correctly stated that the Thirteenth Omnibus Objection had no connection to Hein's appeal of the Confirmation Order. Dkt.-No.-6538,-Apr.-24,-2019-Hr'g-Tr.-at-177. It was only because Hein insisted on rehashing his objections to the Plan in the guise of responding to the Thirteenth Omnibus Objection that the jurisdictional issue arose.

_____

situation where, as here, the *district court* invoked the *Griggs* divestiture rule to avoid issuing an order touching on matters involved in a pending appeal.

### 2. *Hein's Objections to the Plan Were Irrelevant to the Thirteenth Omnibus Objection.*

A lack of jurisdiction was only one reason why the district court declined to reconsider Hein's objections to the Plan when resolving the Thirteenth Omnibus Objection. The court also explained: "In any event, Mr. Hein's arguments are not responsive to COFINA's pending objection based on the duplication of Bank of New York's Mellon's Master Proof of Claim." Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-48. In other words, the court found that Hein's attempt to re-litigate his objections to the Plan had nothing to do with the matter at hand, which concerned whether he had a right to payment separate and apart from his right to payment under the COFINA bonds. Hein does not challenge that holding, which fully supports the court's decision not to reconsider the objections.

### C. The District Court Did Not Abuse Its Discretion in Denying Hein's Motion to Compel Discovery.

Once the district court disallowed Hein's Proof of Claim, he had no more active matters before the court. Accordingly, the court denied Hein's motion to compel discovery because there was "no litigation pending before the [c]ourt to which the discovery Mr. Hein seeks is relevant." Dkt.-No.-8691,-Sept.-11,-2019-Hr'g-Tr.-at-49. That decision was not an abuse of discretion. *See Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 91 (1st Cir. 1996) (an appellate court

reviews a "district court's denial of discovery for abuse of its considerable discretion").

Notably, Hein's discovery requests had no connection to the only matter pending before the court in September 2019—namely, whether his Proof of Claim was duplicative of the Master Proof of Claim.  Instead, the requests sought information that Hein asserted would show the Plan was unfair.  Specifically, Hein contends the "discovery [was] relevant to whether distributions complied with Plan terms" and that "disclosure [was] necessary to ensure the integrity of the proceedings and to prevent an abuse of the process."  Hein Br. 30, 31, 35.  Even if that were true, Plan confirmation was no longer a live issue before the district court in September 2019, and the discovery requests had no relevance to the only issue remaining for the court to decide.  Accordingly, the district court acted well within its discretion in denying the motion to compel discovery on collateral matters not before the court.[35]  *See Haase v. Countrywide Home Loans, Inc.*, 748 F.3d 624,

---

[35] Hein argues that "discovery . . . should have been ordered, either under Bankruptcy Rule 9014 (coupled with Rules 7026, 7033 and 7034) or, in the alternative, under Rule 2004 and the court's inherent authority to order disclosure to ensure the integrity of proceedings (11 U.S.C. §105(a))."  Hein Br. 30.  The provisions invoked by Hein, however, merely stand for the general proposition that a bankruptcy court has discretionary power to order discovery, albeit not necessarily on its own motion when no matter is pending.  They do not mandate discovery where, as here, a party seeks discovery in the absence of a contested matter or adversary proceeding.

631 (5th Cir. 2014) (affirming a district court's denial of a motion to compel

production of documents that were "not relevant" to any issues before the court).

## CONCLUSION

For the foregoing reasons, the appeals of the order confirming the COFINA

Plan are equitably moot. To the extent the Court considers those appeals on their

merits, the Confirmation Order should be affirmed. The district court's decision

overruling Hein's May 3, 2018 Proof of Claim likewise should be affirmed.

Dated: February 14, 2020      Respectfully submitted,

*/s/ Timothy W. Mungovan*

<table>
<tr><td>

TIMOTHY W. MUNGOVAN
JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Tel: (617) 526-9600
tmungovan@proskauer.com
jroberts@proskauer.com


MICHAEL A. FIRESTEIN
LARY ALAN RAPPAPORT
PROSKAUER ROSE LLP
2029 Century Park East
Los Angeles, CA 90067
Tel: (310) 557-2900
mfirestein@proskauer.com
lrappaport@proskauer.com

</td><td>

MARTIN J. BIENENSTOCK
STEPHEN L. RATNER
BRIAN S. ROSEN
MARK D. HARRIS
JEFFREY W. LEVITAN
LUCAS KOWALCZYK
SHILOH A. RAINWATER
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
mbienenstock@proskauer.com
sratner@proskauer.com
brosen@proskauer.com
mharris@proskauer.com
jlevitan@proskauer.com
lkowalczyk@proskauer.com
srainwater@proskauer.com

</td></tr>
</table>

*Counsel to Debtor-Appellee Financial Oversight and Management Board for Puerto Rico as representative for the Commonwealth of Puerto Rico and the Puerto Rico Sales Tax Financing Corporation*

*/s/ Peter Friedman*

JOHN J. RAPISARDI
SUZZANNE UHLAND
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Tel: (212) 326-2000
jrapisardi@omm.com
suhland@omm.com

PETER FRIEDMAN
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
pfriedman@omm.com

*Counsel for Appellee the Puerto Rico Fiscal Agency and Financial Advisory Authority*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 23,951 words. The Court has allowed an oversized brief up to 24,000 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in a 14 point Times New Roman font.

Dated: February 14, 2020

/s/ Timothy W. Mungovan
Timothy W. Mungovan

## CERTIFICATE OF SERVICE

I hereby certify that, on February 14, 2020, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.


*/s/ Timothy W. Mungovan*
Timothy W. Mungovan