# United States Court of Appeals
# For the First Circuit

No. 19-1181

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

Debtors

RENE PINTO-LUGO; MOVIMIENTO DE CONCERTACION CIUDADANA INC., (VAMOS); UNION DE EMPLEADOS DE OFICINA Y PROFESIONALES DE LA AUTORIDAD DE EDIFICIOS PUBLICOS, (UEOGAEP); UNION INSULAR DE TRABAJADORES INDUSTRIALES Y CONSTRUCCIONES ELECTRICAS INC., (UITICE); UNION INDEPENDIENTE DE EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLAD OS, (UIA); UNION DE EMPLEADOS DE OFICINA COMERCIO Y RAMAS ANEXAS, PUERTOS, (UEOCRA); UNION DE EMPLEADOS PROFESIONALES INDEPENDIENTES, (UEPI); UNION NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACION, (UNETE); ASOCIACION DE INSPECTORES DE JUEGOS DE AZAR, (AIJA); MANUEL NATAL-ALBELO

[Caption continues on next page]

## BRIEF OF INDIVIDUAL BONDHOLDERS, MOVANTS-APPELLANTS IN 19-1182

_____

Movants - Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors - Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant - Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors
_____

No. 19-1182

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER
AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO

Debtors

_____

MARK ELLIOTT; LAWRENCE B. DVORES; PETER C. HEIN

Movants - Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors - Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant - Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors

# TABLE OF CONTENTS

Page

JURISDICTION..................................................................................1

STATEMENT OF ISSUES PRESENTED................................................1

STATEMENT OF CASE .....................................................................2

    A. Appellants' bonds were secured, with sufficient pledged revenues to pay them. ...............................................................................3

    B. The Plan resulted from a confidential process, with negotiators receiving special benefits. ..............................................................8

        1. Commonwealth takes pledged revenues and cash. ................9

        2. Negotiating bondholders received special payments. .........11

        3. Negotiating bondholders profit from post-PROMESA purchases. ..........................................................................12

        4. Skewed recoveries to senior bondholders despite same lien. .............13

        5. Special benefits to institutional subordinate holders who participated in the confidential process. ...............................14

        6. "Enhanced distributions" to Puerto Rico institutions and individuals. .........................................................................16

        7. Mainland retail subordinate investors were devastated. ......18

    C. Rights of individual bondholders were disregarded.................19

        1. No participation in confidential process. ............................19

        2. Insufficient time. ...............................................................21

        3. Misrepresentations.............................................................22

        4. Sandbag. ............................................................................25

        5. Unequal funding. ...............................................................26

6.  Objections...........................................................................26

D. PROMESA's voting process was abused...............................27

E. Plan is confirmed. ..............................................................29

SUMMARY OF ARGUMENT ....................................................29

STANDARD OF REVIEW .........................................................31

ARGUMENT ...............................................................................32

I.      PROMESA WOULD BE UNCONSTITUTIONAL IF CONSTRUED
        TO RETROACTIVELY ABROGATE PRE-PROMESA RIGHTS.............32

II.     UNCONSTITUTIONAL TAKING OF PROPERTY OF
        NONCONSENTING BONDHOLDERS AND ABROGATION OF
        THEIR RIGHTS. ........................................................................33

        A. Takings Clause. ................................................................33

        B. Due Process, Ex Post Facto and Bankruptcy Clauses..............44

III.    "VOTING" CANNOT OVERRIDE CONSTITUTIONAL RIGHTS,
        AND ABUSES HERE WARRANT REVERSAL.........................................45

IV.     NEW BOND LEGISLATION, ABROGATING LIENS AND
        OTHER RIGHTS OF COFINA BONDHOLDERS, VIOLATES
        CONTRACTS CLAUSE. ..............................................................46

V.      PLAN DISCRIMINATES AGAINST 50-STATES RESIDENTS IN
        VIOLATION OF LAW AND DUE PROCESS, EQUAL
        PROTECTION AND PRIVILEGES AND IMMUNITIES CLAUSES. ......55

VI.     PROCEDURES VIOLATED RIGHTS OF 50-STATES
        BONDHOLDERS...........................................................................59

VII.    APPOINTMENTS CLAUSE VIOLATIONS. .............................................65

VIII.   ADDITIONAL VIOLATIONS. ....................................................65

IX.     "EQUITABLE MOOTNESS"........................................................69

CONCLUSION – RELIEF REQUESTED...........................................72

ADDENDUM OF INDIVIDUAL BONDHOLDERS, MOVANTS-APPELLANTS IN 19-1182

[In light of the length of the orders appealed from, the Addendum is set out in an accompanying separate volume]

# TABLE OF CITATIONS

## Cases

*Altair Global Credit Opportunities Fund (A), LLC* v. *FOMB*,
914 F.3d 694 (1st Cir. 2019),
*cert. denied*, ___ U.S. ___, 2019 WL 4921326 (Oct. 7, 2019) ...........................33

*Alternative System Concepts, Inc.* v. *Synopsys, Inc.*,
374 F.3d 23 (1st Cir. 2004) ...................................................................44

*American United Mut. Life Ins. Co.* v. *City of Avon Park*,
311 U.S. 138 (1940) ............................................................... 46, 65, 66

*Armstrong* v. *United States*,
364 U.S. 40 (1960) ........................................................ 30, 34, 37, 38

*Aurelius Investment LLC* v. *Commonwealth of Puerto Rico*,
915 F.3d 838 (1st Cir. 2019), *cert. granted*, 139 S.Ct. 2735-38 (June 20,
2019), *oral argument held*, Oct. 15, 2019 ...........................................65

*Begier* v. *IRS*,
496 U.S. 53 (1990) ...............................................................................34

*Calder* v. *Bull*,
3 U.S. 386 (1798) ......................................................................... 35, 45

*Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*,
520 U.S. 564 (1997) .............................................................................56

*City of Avon Park* (*see American United Mut. Life*)

*Comptroller* v. *Wynne*,
135 S.Ct. 1787 (2015) ..........................................................................57

*Commercial Western Finance*,
(*see In re Commercial Western Finance*)

*Dakota Industries, Inc.* v. *Dakota Sportswear, Inc.*,
988 F.2d 61 (8th Cir. 1993)..................................................................70

*Delaware Coalition for Open Government, Inc.* v. *Strine*,
733 F.3d 510 (3d Cir. 2013) ................................................................61

*Dolan* v. *City of Tigard*,
512 U.S. 374 (1994) .............................................................................37

*Eastern Enterprises* v. *Appel*,
524 U.S. 498 (1998) ...............................................................32, 35, 44

*Gracia-Gracia* v. *FOMB*,
No. 18-1463 (1st Cir. Sept. 25, 2019) ......................................................... 35, 41

*Hicklin* v. *Orbeck*,
437 U.S. 518 (1978) ......................................................................................55

*Horne* v. *Department of Agriculture*,
576 U.S. ___, 135 S.Ct. 2419 (2015) ...............................................................37

*In Matter of Las Colinas, Inc.*,
426 F.2d 1005 (1st Cir. 1970) ........................................................................32

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ..........................................................37

*In re City of Stockton*,
478 B.R. 8 (E.D. Cal. Bankr. 2012) .................................................................54

*In re Commercial Western Finance Corp.* v. *Andrew*,
761 F.2d 1329 (9th Cir. 1985) .......................................................................63

*In re Mansaray-Ruffin*,
530 F.3d 230 (3d Cir. 2008) ..........................................................................63

*In re Peabody Energy Corp.*,
582 B.R. 771 (E.D. Mo. 2017),
*aff'd*, 933 F.3d 918 (8th Cir. 2019) ...............................................................66

*In re Weinstein*
(*see Patriot Portfolio, LLC* v. *Weinstein*)

*Keystone Driller Co.* v. *General Excavator Co.*,
290 U.S. 240 (1933) ......................................................................................70

*Knick* v. *Township of Scott*,
139 S.Ct. 2162 (2019) ...................................................................................40

*Koontz* v. *St. Johns River Water Mgt. Dist.*,
570 U.S. 595, 133 S.Ct. 2586 (2013) .........................................................34, 37

*Las Colinas, Inc.*,
(*see In Matter of Las Colinas, Inc.*)

*Lex Claims, LLC* v. *FOMB*,
853 F.3d 548 (1st Cir. 2017) ..................................................................... 43-44

*Louisville Joint Stock Land Bank* v. *Radford*,
295 U.S. 555 (1935) ..............................................................................33, 37, 38

*Lucia* v. *SEC*,
  585 U.S. ____, 138 S.Ct. 2044 (2018) ................................................................65

*Mansaray-Ruffin*,
  (*see In re Mansaray-Ruffin*)

*Matter of Valuation Proceedings under Sections 303(c) and 306 of the
  Regional Rail Reorganization Act of 1973*,
  445 F. Supp. 994 (Special Court, Regional Rail
  Reorganization Act 1973) (1977).......................................................................42

*Mennonite Board of Missions* v. *Adams*,
  462 U.S. 791 (1983) ...........................................................................................60

*Mission Product Holdings, Inc.* v. *Tempnology, LLC*,
  139 S.Ct. 1652 (2019) .........................................................................................69

*Monongahela Navigation Co.* v. *United States*,
  148 U.S. 312 (1893) ...........................................................................................40

*Mullaney* v. *Anderson*,
  342 U.S. 415 (1952) ...........................................................................................55

*New Hampshire* v. *Maine*,
  532 U.S. 742 (2001) ...........................................................................................44

*Nollan* v. *California Coastal Comm'n*,
  483 U.S. 825 (1987) ...........................................................................................37

*Patriot Portfolio, LLC* v. *Weinstein*,
  164 F.3d 677 (1st Cir. 1999) ....................................................................... 36, 38

*Peabody*
  (*see In re Peabody Energy Corp.*)

*Penn Central Transportation Co.* v. *New York City*,
  438 U.S. 104 (1978) ................................................................................... 37, 38

*Phillips* v. *Washington Legal Foundation*,
  524 U.S. 156 (1998) ...........................................................................................38

*Press-Enterprise Co.* v. *Superior Court*,
  478 U.S. 1 (1986) ...............................................................................................64

*Press-Enterprise Co.* v. *Superior Court*,
  464 U.S. 501 (1984) .................................................................................... 64-65

*Radford*,
  (*see Louisville Joint Stock Land Bank* v. *Radford*)

*Saenz* v. *Roe*,
  526 U.S. 489 (1999) ............................................................... 53-54, 56

*Security Industrial Bank*,
  (*see United States* v. *Security Industrial Bank*)

*Shapiro* v. *Thompson*,
  394 U.S. 618 (1969) ....................................................................56

*Slattery Co.* v. *United States*,
  231 F.2d 37 (5th Cir. 1956).........................................................39

*Sturges* v. *Crowninshield*,
  17 U.S. 122 (1819) .......................................................................54

*Taylor* v. *Sturgell*,
  553 U.S. 880 (2008) .............................................................. 60, 62

*Tennessee Wine and Spirits Retailers Assn.* v. *Thomas*,
  139 S.Ct. 2449 (2019) .................................................................57

*Toomer* v. *Witsell*,
  334 U.S. 385 (1948) ....................................................................55

*Tulsa Professional Collection Services, Inc.* v. *Pope*,
  485 U.S. 478 (1988) ...............................................................38, 60

*U.S. Bank National Ass'n* v. *Village at Lakeridge, LLC*,
  138 S.Ct. 960 (2018) ...................................................................31

*United Automobile, Aerospace, Agricultural*
*Implement Workers* v. *Fortuño*,
  633 F.3d 37 (1st Cir. 2011) ...................................... 47 n.171, 48 n.177

*United States* v. *Contra Costa County Water District*,
  678 F.2d 90 (9th Cir. 1982)........................................................39

*United States* v. *Security Industrial Bank*,
  459 U.S. 70 (1982) ........................................... 1, 30, 32, 33-34, 37, 38

*United States* v. *Smith*,
  787 F.2d 111 (3d Cir. 1986)........................................................65

*United States Trust Co.* v. *New Jersey*,
  431 U.S. 1 (1977) ........................................... 1, 30, 35, 37, 48, 49, 54

*Village at Lakeridge*
  (*see U.S. Bank Nationwide Ass'n* v. *Village at Lakeridge*)

## Constitution – U.S.

U.S. Const. Art. I, §8, cl. 4 (Bankruptcy clause) (Addendum-II-001) ..........1, 30, 44

U.S. Const. Art. I, §9, cl. 3 (prohibition of Bills of Attainder and Ex Post Facto laws) (Addendum-II-001)...........................................................................44

U.S. Const. Art. I, §10, cl. 1 (Contracts clause and prohibition of Bills of Attainder and Ex Post Facto laws) (Addendum-II-001) .....1, 30, 35, 46-48, 53-54

U.S. Const. Art. II, §2, cl. 2 (Appointments clause) (Addendum-II-001).....2, 31, 65

U.S. Const. Art. IV, §2, cl. 1 (Privileges and Immunities clause) (Addendum-II-002) ................................................................... 1, 55-56

U.S. Const. Amendment I ...............................................................................61, 64

U.S. Const. Amendment V (Due Process and Takings clauses) (Addendum-II-002) ...............................................1, 30, 33-44, 55-56, 60, 61, 63

U.S. Const. Amendment XIV, §1 (Privileges and Immunities, Due Process and Equal Protection clauses) (Addendum-II-002)...... 1, 30, 44, 55-56, 60, 61, 63

## Puerto Rico Constitution

Article II, Section 7 (Due Process, Equal Protection and Contract Clauses) (Addendum-II-003) ...............................................................................67

Article II, Section 9 (Takings Clause) (Addendum-II-003) ...................................67

Article II, Section 12, Clause 2 (prohibition on Ex Post Facto laws and Bills of Attainder) (Addendum-II-003)...................................................67

## Statutes and Rules – Federal

11 U.S.C. §1123(a)(4) (Addendum-III-001) ................................................... 65-66

11 U.S.C. §1125(a) (Addendum-III-001) ........................................................ 22, 66

11 U.S.C. §1129(a)(3) (Addendum-III-003) .........................................................67

11 U.S.C. §1129(a)(8) (Addendum-III-003) .........................................................59

11 U.S.C. §1129(b)(2)(A) (Addendum-III-003)....................................................59

28 U.S.C. §1291 .......................................................................................................1

48 U.S.C. §737 (Addendum-III-005)................................................................ 1, 55

48 U.S.C. §2101 (Addendum-III-005).................................................................32

48 U.S.C. §2141(b)(1)(N) (Addendum-III-005)............................................. 32, 69

48 U.S.C. §2161(a) (Addendum-III-006) .............................................................59

48 U.S.C. §2163 (Addendum-III-006)...................................................... 32, 47, 53, 67

48 U.S.C. §2166(a) ....................................................................................1

48 U.S.C. §2166(e)(2)................................................................................1

48 U.S.C. §2174(b)(3) (Addendum-III-007) ............................................ 47, 67

48 U.S.C. §2174(b)(6) (Addendum-III-007) ........................................ 41, 67-68

48 U.S.C. §2174(b)(7) (Addendum-III-007) ............................................ 32, 69

48 U.S.C. §2194(k) (Addendum-III-007)................................................. 33, 53

48 U.S.C. §2194(l) (Addendum-III-008)................................................. 33, 53

48 U.S.C. §2194(m)(5)(B) (Addendum-III-008)........................................ 33, 53

48 U.S.C. §2195(a) (Addendum-III-009) ............................................ 32, 53, 69

48 U.S.C. §2231(d)(3)(E) (Addendum-III-009) ................................... 57 n.203, 66

Bankruptcy Rule 7001(2) (Addendum-III-012) ........................................ 30, 63

F.R. Evid. 408 (Addendum-III-012).........................................................39

**Legislative Reports**

H.R. Report 114-602, to accompany
   H.R. 5278, "Puerto Rico Oversight, Management and Economic
   Stability Act" (June 3, 2016)...........................................................33, 53

**Statutes – Puerto Rico**

Act No. 18 (May 22, 2009),
   amending Act 91 of May 13, 2006 (Addendum-III-066-075) .............4, 5, 6, 8, 11

**Abbreviations**

| | |
|---|---|
| "Act-91" | COFINA Enabling Act |
| "Addendum" | Addendum of Individual Bondholders, Movants-Appellants in 19-1182 |
| "COFINA" | Puerto Rico Sales Tax Financing Corporation |
| "Commonwealth" | Commonwealth of Puerto Rico |

| | |
|---|---|
| "FF/CL" | [Proposed]  Findings of Fact and Conclusions of Law Regarding Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, Submitted by FOMB (dated Jan. 21, 2019, Docket#4846-1) |
| "FOMB" | Financial Oversight and Management Board for Puerto Rico, as Representative for the Commonwealth of Puerto Rico and as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a COFINA |
| "JA" | Appendix (The first digit following "JA" identifies the volume number, to facilitate direct reference to the pertinent joint appendix volume to locate any particular joint appendix page.) |
| "New Bond Legislation" | Act 241-2018, Nov. 15, 2018, Exhibit A to Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (Docket #5053-1) |
| 5/15/19-App. I | Appendix I to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439791) |
| 5/15/19-App. II | Appendix II to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439792) |

# JURISDICTION

The district court had jurisdiction. 48 U.S.C. §2166(a). This Court has jurisdiction. 48 U.S.C. §2166(e)(2); 28 U.S.C. §1291.

Judgment was entered February 5, 2019. (Addendum-293-Docket#5055). Appellants' notice of appeal was timely-filed February 19, 2019. (JA-14-2246-Docket#5166).

# STATEMENT OF ISSUES PRESENTED

1.    Per Supreme Court precedent—*e.g.*, *United States* v. *Security Industrial Bank*, 459 U.S. 70 (1982), not addressed by the court (Docket#5053)—did the court err in confirming a Plan that failed to respect lawful liens, retroactively abrogated pre-PROMESA rights, took nonconsenting bondholders' property, and failed to exclude nonconsenting bondholders' constitutional claims from Plan releases, in violation of PROMESA and the Takings, Due Process, Ex Post Facto and Bankruptcy Clauses?

2.    Per Supreme Court precedent (*e.g.*, *United States Trust* v. *New Jersey*, 431 U.S. 1 (1977))—also not addressed—did the court err in confirming a Plan predicated upon New Bond Legislation adopted by Commonwealth's legislature that "release[d] the lien that holders of COFINA bonds currently have," thereby violating the Contracts Clause?

3.    Per Privileges and Immunities, Equal Protection and Due Process Clauses and 48 U.S.C. §737—none addressed—did the court err in approving a Plan that discriminated against citizens based on residence?

4.    Did procedures used to develop and confirm the Plan—the "result" of a confidential mediation-settlement process through which negotiators received benefits not shared by nonparticipants—violate rights of non-consenting bondholders?

5.     Per the Appointments Clause, were FOMB's actions, and thus COFINA's Title III case and Plan, void?

6.     Did the court err in approving a Plan that does not comply with PROMESA and other law?

## STATEMENT OF CASE[1]

Appellants purchased COFINA subordinate bonds "secured by a statutory lien against pledged SUT revenue" which "does not constitute a resource 'available' to the Commonwealth" (to quote FOMB).  Commonwealth covenanted by statute not to impair the pledge.  Principal and interest could not be altered without *each* bondholder's consent.  (Section-A).

Pledged tax revenues exceeded debt service requirements.  No court ever invalidated the lien.  (Section-A).

Nevertheless, FOMB proposed a Plan, the "result" of a confidential mediation-settlement process[2], favoring participants in that process (Sections-B.1-to-B.6):

- Commonwealth took bondholders' property and released the lien on almost one-half of pledged revenues.

- Negotiating institutions shared $332 million in special payments.

- Although the lien was the same for senior and subordinate, negotiating senior bondholders received essentially a complete recovery, whereas individual 50-states subordinate bondholders received only about half or less.

---

[1] "Statement of Case" and "Argument" sections address facts and law pertinent to issues common to both 19-1182 and 19-1960 (consolidated for briefing and argument by the Court's 10/28/2019 order), and facts responsive to FOMB's equitable mootness argument previously advanced in 19-1182.  (Point-IX).

[2] Addendum-I-199,203-#5053-page-38,42-of-88.

- Negotiating institutions who bought subordinate COFINA bonds during the PROMESA Title III process, at distressed prices, voted these bonds for the Plan and the special benefits it granted them.
- "Enhanced distributions" were offered to Puerto Rico institutions and individuals, based on residency, incenting them to accept the Plan.

The court deferred ruling on the legality/validity of the lien, thus leaving unresolved an issue that was then "settled" in a confidential mediation-settlement process that did not include individual 50-states bondholders. Once "settled," the court then "blessed" substantially the same lien it had deferred ruling on. (Section-A;Point-II.A).

Individual 50-states bondholders—non-participants in the confidential process and lacking Plan proponents' debtor-funded legal representation—suffered devastating losses as PROMESA was applied retroactively to abrogate their property and other rights (Section-B.7).

## A.   Appellants' bonds were secured, with sufficient pledged revenues to pay them.

FOMB represented *to this Court* in a March 2017 merits brief, submitted before filing COFINA's Title III, that:

> COFINA bonds are non-recourse bonds *secured by a statutory lien against pledged SUT revenue.* Importantly, *the COFINA enabling act makes clear that SUT income does not constitute a resource "available" to the Commonwealth.*[3]

The "COFINA enabling act" (Act-91) provided:

- A statutory lien on pledged revenues—"in favor of COFINA bondholders"—which applied to "future" pledged revenues

---

[3] Addendum-IV-020;JA-6-1022-to-1023-Docket#4585-page-10-to-11-of-43;JA-11-1426,1428-#4606-7-page-33,78-of-447.

"subsequently received," and was "immediately" effective "without the need" for "any other act."[4]

- Commonwealth by statute "agree[d] and assure[d]" bondholders that, until bonds were paid with interest, Commonwealth would not limit or restrain rights or powers to levy or collect pledged taxes or meet COFINA's agreements with bondholders, and "no amendment" to Act-91 "shall undermine any obligation or commitment of COFINA."[5]

- Pledged revenues were "transferred to, and shall be the property of COFINA" and were *not* resources available to Commonwealth.[6]

Commonwealth's legislature, in New Bond Legislation, admitted that bondholders had a lien over pledged revenues, stating "[t]hese amendments will serve to release the *lien* that *holders of COFINA bonds currently have* ….".[7]

Official Statements and bond resolutions provided that no modification or amendment may permit a reduction in principal or rate of interest "without the consent of each Bondholder."[8]

---

[4] Addendum-III-067,068,071-072-Act-18-2009-p.1-*preamble*,p.2-carryover-¶,p.3-¶2,pp.4-5-(§2)[*amending*-(§3)],pp.6-7-(§3)[*amending*-(§4(b))];JA-10-1382,1385-to-1387,1388,1393-Docket#4606-6-page-153,171-to-172,178-(§103),180-(§201),195-(§501)-of-241;Addendum-IV-023,025-JA-11-1465,1474-#4606-8-page-1,63-of-180.

[5] Addendum-III-073-074-Act-18-2009-pp.8-9-(§4)[*amending*-(§5(c))];JA-7-1169-Docket#4606-3-page-5-of-13;Addendum-IV-007-#4606-4-page-57-of-173;JA-9-1288-#4606-5-page-30-of-155;Addendum-IV-023,025-JA-11-1465,1474-#4606-8-page-1,63-of-180.

[6] Addendum-III-069-070-Act-18-2009-pp.4-5(§2)[*amending*-(§3)];Addendum-IV-023,025-JA-11-1465,1474-Docket#4606-8-page-1,63-of-180.

[7] Addendum-I-274-Docket#5053-1-page-25-of-43(emphasis added);JA-6-1034-Docket#4585-page-22-of-43.

[8] JA-6-1018-to-1019-Docket#4585-page-6-to-7-of-43;JA-7-1169-#4606-3-page-5-of-13;JA-8-1256-to-1257-#4606-4-page-151-to-152-of-173;JA-9-1330-to-1331-#4606-5-page-134-to-135-of-155;Addendum-IV-011-012-JA-10-1382,1408-#4606-6-page-153,227-of-241.

Based on this security:

- Subordinate bonds, when sold by COFINA, were highly rated (A+/A1) investment-grade bonds with modest interest rates —rated higher than Commonwealth general obligation bonds.[9]

- Over $6.7 billion senior and $9.1 billion subordinate COFINA bonds were publicly offered and sold nationwide, from 2007 to 2011, in order to "provide funds to the Commonwealth."[10]

While bonds were being sold (and monies collected), no one—not Commonwealth, not general obligation bondholders—challenged the legality of the COFINA lien or structure. Commonwealth officials affirmed its legality:

- Dedicating and pledging specified tax revenues to pay particular bond issues was well-recognized and accepted by rating agencies and municipal market participants nationwide, as well as by courts, enabling governmental instrumentalities to offer secured bonds with ratings superior to that of the government's general obligation bonds.[11]

---

[9] Addendum-III-066-Act-18-2009-p.1;JA-6-1018-Docket#4585-page-6-of-43;JA-7-1169-#4606-3-page-5-of-13;Addendum-IV-002;JA-8-1207,1208,1243-#4606-4-page-30,31,76-of-173;JA-9-1264,1265,1307-#4606-5-page-1,2,52-of-155;JA-11-1433-#4606-7-page-182-of-447.

[10] JA-6-1019-Docket#4585-page-7-of-43;Addendum-IV-002,007-010;JA-8-1207,1228-to-1238-#4606-4-page-30,57-to-67-of-173;JA-9-1264,1288-to-1300-#4606-5-page-1,30-to-42-of-155;JA-10-1338,1342-#4606-6-page-1,9-of-241.

[11] Addendum-III-066,068-Act-18-2009-pp.1,3;Addendum-IV-014-018;JA-6-1019-to-1023,1029-to-1032-Docket#4585-page-7-to-11,17-to-20-of-43;JA-11-1413-to-1425-#4606-7-page-7-to-19-of-447;Addendum-19-1960-IV-0012-to-IV-0017,IV-0021-#4606-7-page-380-to-385,389-of-447;Addendum-IV-023,025-JA-11-1465,1474-#4606-8-page-1,63-of-180.

- Commonwealth's legislators recognized COFINA bonds as its "most cost-effective financing source" since payment was "backed" by sales tax collections.[12]

- Multiple Commonwealth Secretaries of Justice, of different administrations and parties, opined favorably on the legality/validity of the COFINA structure.[13]

- Bond counsel rendered opinions as to legality/validity,[14] and told investors:

  o "COFINA's act … was designed specifically to comply with the well-recognized Special Fund Doctrine.…."[15]

  o The COFINA structure was "substantially the same" as the NYC Municipal Assistance Corporation structure that had been upheld by New York courts, and the NYS Thruway bond structure.[16]

- Puerto Rico's "Investor Resources" website emphasized the "Pledged Sales Tax" provided "security" for COFINA bonds.[17]

---

[12] Addendum-III-066-Act-18-2009-p.1.

[13] JA-6-1019-to-1022-Docket#4585-page-7-to-10-of-43;#JA-7-1169-to-1170-4603-3-page-5-to-6-of-13;JA-8-1237-to-1238-#4606-4-page-66-to-67-of-173;JA-9-1299-to-1300-#4606-5-page-41-to-42-of-155;JA-11-1413-to-1416,1422-#4606-7-page-7-to-10,16-of-447;JA-11-1465,1474-#4606-8-page-1,63-of-180.

[14] JA-9-1332-to-1334-Docket#4606-5-page-143-to-145-of-155.

[15] Addendum-IV-016;JA-6-1021-Docket#4585-page-9-of-43;JA-11-1415-#4606-7-page-9-of-447.

[16] JA-6-1020-to-1022-Docket#4585-page-8-to-10-of-43;JA-11-1418-to-1419,1422-Docket#4606-7-page-12-to-13,16-of-447.

[17] Addendum-IV-013;JA-6-1022-Docket#4585-page-10-of-43;JA-7-1171-#4606-3-page-7-of-13;JA-11-1411-#4606-7-page-1-of-447.

COFINA was solvent: Prior to confirmation, pledged revenues continued to be deposited into the trustee's accounts; the trustee held over $1.818 billion for debt service.[18]

If the lien had not been abrogated, pledged revenues were sufficient to pay all COFINA bonds in full.[19]

There was *no* finding that pledged revenues were *in*sufficient to pay all original bonds.

No court ever ruled the original COFINA lien unlawful. The legality/validity question was briefed and argued, but the court deferred ruling.[20] The court declined to certify the legality/validity question to Commonwealth's Supreme Court.[21]

Professed uncertainty about legality/validity supposedly justified a settlement in which Commonwealth took almost one-half of pledged revenues.[22]

---

[18] Addendum-IV-022;JA-11-1444-to-1449-Docket#4606-7-page-393-to-398-of-447.

[19] Addendum-IV-022;JA-3-350-Docket#3859-page-35-of-37;JA-2-292-#3680-page-25-of-30;JA-4-462-#4244-page-2-of-3;JA-5-824-#4364-4-page-27-of-141;JA-6-1044-to-1051-#4585-page-32-to-39-of-43;JA-7-1126,1132-to-1133-#4598-page-2,8-to-9-of-15;JA-7-1160-Docket#4606-1-page-2-of-3;JA-7-1163-#4606-2-page-6-of-7;JA-12-1526-#4642-1-page-6-to-7-of-7;JA-7-1170,1173-to-1176-#4606-3-page-6,9-12-of-13;JA-8-1219-to-1220,1239-to-1240-#4606-4-page-46-to-47,70-to-71-of-173;JA-9-1279-to-1280,1302-to-1303-#4606-5-page-20-to-21,45-to-46-of-155;JA-11-1449-#4606-7-page-398-of-447;JA-11-1463-#4606-7-page-437-of-447;JA-13-1836-#4848-page-154:5-23;Document-00117439791-docket-page-7-to-10,37-to-41-internal-page-5/15/19-App.I-005-to-008,035-to-039.

[20] JA-7-1095-to-1096-Docket#4595-page-4-to-5-of-21(*citing*-Adv.Proc.17-257);JA-20-3404-to-3405,3412-to-3418-Adv.Proc.17-257-Docket#434;#492;#539;#543;#544.

[21] JA-20-3406-to-3411-Adv.Proc.17-257-Docket#483.

[22] Addendum-I-182,218-Docket#5053-page-21,57-of-88.

However, the new COFINA lien and structure are materially the same as the original[23]:

- FOMB described the new bonds as "secured by a statutory lien" in COFINA's Fiscal Plan[24]—just as FOMB described the original COFINA bonds in its 2017 brief to this Court.[25]

- New Bond Legislation describes the "pledged taxes" as "present and future revenues and collections."[26]  The original COFINA legislation was likewise express that pledged revenues included "future funds" and "those subsequently received by COFINA."[27]

- Both New Bond Legislation and the original COFINA legislation are express that pledged revenues are transferred to COFINA and do not constitute available resources of Commonwealth.[28]

## B.    The Plan resulted from a confidential process, with negotiators receiving special benefits.

The Plan was the "result" of a confidential mediation-settlement process.[29]

---

[23] JA-4-525,674-Docket#4364-page-26,175-of-263;JA-6-1030-Docket#4585-page-18-of-43;JA-9-1264,1266-to-1267,1279-to-1283,1288-to-1290,1298-to-1300,1317,1318,1326-to-1328-#4606-5-page-1,7-to-8,20-to-24,30-to-32,40-to-42,109,112,123-125;JA-14-2131-to-2133-#5041-2-page-4-to-6-of-22.

[24] JA-5-822-Docket#4364-4-page-11-of-141.

[25] Addendum-IV-020-JA-11-1428-Docket#4606-7-page-78-of-447.

[26] Addendum-I-277-#5053-1-page-28-of-43.

[27] Addendum-III-072-069-070-Act-18-2009-pp.4-5,(§2)[*amending*-(§3)],p.7,(§3)[*amending*-(§4(b))];Addendum-IV-002,006-¶2-JA-8-1207,1219-Docket#4606-4-page-30,46-of-173.

[28] *Compare*-Addendum-I-279-280-#5053-1-page-30-to-31-of-43-*with*-Addendum-III-069-70-Act-18-2009-p.4-5,(§2)[*amending*-(§3)].

[29] Addendum-I-169,183,199-200,203-#5053-page-8,22,38-to-39,42-of-88;Section-C;Point-VI.

The confidential process did *not* include appellants (or other modest-sized 50-states subordinated bondholders), and no one in the confidential process protected their interests.[30]

The confidential process produced a "settlement" in which Commonwealth took almost one-half (46.35%) of pledged taxes securing COFINA bonds.[31]  The remainder was allocated in confidential negotiations[32] that provided negotiating bondholders special benefits not provided to nonparticipating 50-states bondholders (Sections-B.1-to-B.6).  Negotiators were exculpated.[33]

There is no contemporaneous public record of what transpired in the confidential process and how special benefits were procured.[34]

## 1.     Commonwealth takes pledged revenues and cash.

FOMB, COFINA and Commonwealth shared a common interest in Commonwealth taking property from bondholders:

- COFINA is "an instrumentality of the Commonwealth."[35]

---

[30] Section-C;JA-2-293-to-295,297-Docket#3680-pages-26-to-28,30-of-30;JA-4-462-#4244-page-2-of-3;JA-6-956-#4564-page-10-of-22;JA-6-1028-to-1029-#4585-page-16-to-17-of-43;JA-7-1133-to-1136-#4598-page-9-to-12-of-15;JA-12-1520-#4613-page-5-of-7;JA-12-1664-to-1665-#4769-1-page-3-to-4-of-27;JA-13-1886-to-1887-#4848-pages-204-to-205-of-270;Document-00117439791-5/15/19-docket-page-20-to-22-internal-page-App.I-018-to-020.

[31] Addendum-I-274-Docket#5053-1-page-25-of-43.

[32] Addendum-I-203,215-216-Docket#5053-page-42,54-to-55-of-88;Section-C.

[33] Addendum-I-325-328,330,418-421-Docket#5055-page-33-to-36,38-of-45;#5055-1-page-81-to-84-of-91.

[34] JA-6-1028-Docket#4585-page-16-of-43.

[35] Addendum-IV-003;JA-8-1209,1241-Docket#4606-4-page-36,73-of-173;JA-9-1266,1305-#4606-5-page-7,49-of-155.

- Plan proponent FOMB serves as "representative of" *both* Commonwealth and COFINA.[36]
- COFINA and FOMB shared a "fundamental objective" to structure a settlement and avoid "winner-take-all" litigation.[37]
- The charge for the "COFINA Agent" was to "litigate and negotiate" "from the perspective of what result is best for the Debtor," as opposed to "any particular type of creditor of the Debtor."[38]

To "implement" the "settlement," Commonwealth's legislature enacted "New Bond Legislation" that amended the statute that created COFINA "to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues," making "[t]hese revenues"— "approximately $437.5 million per year"—"available for use by" Commonwealth.[39]

Commonwealth also took, for "expenses," $33 million held in trust for bondholders, and added amounts deposited post-6/30/18.[40]

Commonwealth was exculpated and released.[41]

---

[36] Addendum-I-293-Docket#5055-page-1-of-45-caption.

[37] Addendum-I-229-Docket#5053-page-68-of-88.

[38] Addendum-I-181-Docket#5053-page-20-of-88.

[39] Addendum-I-274-Docket#5053-1-page-25-of-43. By 2041, Commonwealth's "take" reaches $857,475,000/year. JA-5-815-Docket#4364-2-page-105-of-110.

[40] Addendum-I-373,384-Docket#5055-1-page-36-(§2(a)),47-(§15.2)-of-91;JA-11-1444-to-1449-Docket#4606-7-page-393-to-398-of-447;JA-4-605-to-606-#4364-page-106-to-107-of-263;JA-5-816-#4364-2-page-106-of-110;Document-00117439791-5/15/19-docket-page-20-internal-page-App.I-018.

[41] Addendum-I-417-421-Docket#5055-1-page-80-to-84-of-91.

Commonwealth had committed by statute to a nonimpairment covenant.[42] But Commonwealth's "negotiation" with its instrumentality COFINA to abrogate the lien, and Commonwealth's enactment of New Bond Legislation to take bondholders' property, did the opposite.

COFINA had committed to "defend, preserve and protect the pledge of the Pledged Property and all the rights of … Bondholders."[43] But its "negotiation" to abrogate the lien did the opposite.

### 2. Negotiating bondholders received special payments.

Negotiating bondholders—including institutional subordinate bondholders—were paid $332 million "consummation costs", effectively 3.32% of their $10 billion par, paid pro rata in accordance with bondholdings, and characterized as "administrative costs".[44]

Payment was *not* tied to any expenses (assertedly) incurred. These pro rata payments to negotiating bondholders far exceeded their $135 million "estimated" (but unsubstantiated) "fees and expenses."[45]

---

[42] Addendum-III-073-074-Act-18-2009-pp.8-9-(§4)-[*amending*-(§5(c))];JA-8-1228-Docket#4606-4-page-57-of-173;JA-9-1288-#4606-5-page-30-of-155;JA-10-1404-to-1405-#4606-6-page-211-to-212-(§706)-of-241.

[43] JA-10-1404-to-1405-Docket#4606-6-page-211-(§705),212-(§707)-of-241.

[44] JA-4-610-to-613-Docket#4364-page-111-to-114-of-263;JA-5-808-809,813-to-814-Docket#4364-2-page-74-to-75,103-to-104-of-110;JA-7-1135-to-1136-#4598-page-11-to-12-of-15;Document-00117439791-5/15/19-docket-page-14-to-15-internal-page-App.I-012-to-013;Addendum-I-216-217-#5053-page-55-to-56-of-88;Addendum-I-316-318-#5055-page-24-to-26-of-45;Addendum-I-359,371,376-#5055-1-page-22,34,39-of-91.

[45] JA-4-612-Docket#4364-page-113-of-263;Document-00117439792-5/15/19-App.II-211-Docket#6283-page-7-of-13.

Over $1.2 billion was held in trust for subordinate bondholders.[46] Yet instead of paying subordinate bondholders cash held in trust for them, almost all pre-7/1/2018 cash was distributed to favored parties: $332 million "consummation costs" to negotiating bondholders; most of the rest to senior bondholders.[47] Little went to modest-sized 50-states subordinate bondholders.[48]

Plan release, exculpation and injunction provisions were an additional "incentive" to negotiating bondholders.[49]

### 3. Negotiating bondholders profit from post-PROMESA purchases.

Subordinate COFINA bond prices dropped below 10% of par, as Commonwealth and FOMB sought to avoid payment.[50] Participants in the confidential process who acquired large positions, at distressed prices—depressed in part by their actions seeking to declare defaults[51]—enjoyed large profits at Plan recovery levels, even before their additional 3.32%-par (33.2% of cost for post-PROMESA purchases at 10%-par)[52]:

---

[46] JA-11-1449-Docket#4606-7-page-398-of-447;Document-00117439791-5/15/19-docket-page-20-internal-page-App.I-018.

[47] JA-5-816-Docket#4364-2-page-106-of-110.

[48] JA-5-816-Docket#4364-2-page-106-of-110;JA-6-1027-to-1028-#4585-page-15-to-16-of-43;JA-7-1131,1135-to-1136-#4598-page-7,11-12-of-15;Document-00117439791-5/15/19-docket-page-20-internal-page-App.I-018.

[49] Addendum-I-230-Docket#5053-page-69-of-88.

[50] JA-7-1166-to-1168-Docket#4606-3-page-2-to-4-of-13;JA-8-1178-to-1206-#4606-4-page-1-to-29-of-173;Document-00117439791-5/15/19-docket-page-10-to-11,42-App.I-008-009,040.

[51] JA-2-293-Docket#3680-page-26-of-30;JA-7-1134-4598-page-10-of-15;JA-20-3324-to-3329-Case-17-03284-Docket#87-16.

[52] JA-3-347-to-352-Docket#3859-page-32-to-37-of-37;JA-4-462-#4244-page-2-of-3;JA-7-1134-#4598-page-10-of-15;JA-12-1664-to-1665-#4769-1-page-3-to-4-of-27;Document-00117439791-5/15/19-docket-page-10-to-12-internal-page-App.I-008-010.

- Between 7/25/2017 and 11/16/2018 several *senior* bondholders purchased over $1.6 billion of *subordinate* bonds.[53]

- After 3/1/2018, other *senior* bondholders acquired over $120 million of *subordinates*.[54]

- From 8/8/2017 to 10/19/2018, several GO holders—with aggregate holdings of $1.72+ billion uninsured GO bonds—bought $416+ million COFINA subordinates and $184+ million COFINA seniors.[55]

Major institutions purchasing *post*-PROMESA at depressed prices enjoyed, in the aggregate, hundreds of millions of dollars—likely over a billion dollars—of profit at Plan recovery levels.[56]

Individual investors who bought *pre*-PROMESA—based on COFINA bonds' secured status—suffered devastating losses. (Section-B.7).

### 4.    Skewed recoveries to senior bondholders despite same lien.

A challenge (never decided) to the legality/validity of the COFINA lien supposedly justified COFINA giving up 46.35% of pledged revenues. (Section-A). But senior and subordinate were secured by the same lien.[57]

---

[53] *Compare*-JA-2-162-to-166-Docket#749-*with*-JA-4-473-to-478-Docket#4332.

[54] JA-3-312-to-316-Docket#3778.

[55] *Compare*-JA-2-300-Docket#3761-page-7-of-30-*with*-JA-3-438-to-439-Docket#4079-page-6-to-7-of-8.

[56] JA-2-162-to-166-Docket#749;JA-4-473-to-478-#4332;JA-3-312-to-316-#3778;JA-2-300-#3761-page-7-of-30;JA-3-438-to-439-#4079-page-6-to-7-of-8.

[57] JA-6-1017-to-1018,1029-to-1032-Docket#4585-page-5-to-6,17-to-20-of-43;JA-7-1168-to-1171-#4606-3-page-4-to-7-of-13;JA-8-1207,1209-to-1224,1228-to-1235-#4606-4-page-30,36-to-51,57-to-64-of-173;JA-10-1338,1340-to-1341,1344-to-1368,1382,1383,1385-to-1386-to-1393,1404-to-1405-#4606-6-page-1,7-to-8,11-to-25,28-to-37,153,161,171-to-172,178,180-to-184,195,211,212-of-241.

The court characterized the legality/validity issue as "all-or-nothing".[58]  If the lien was invalid, senior and subordinate bondholders would suffer alike; if the lien was valid, both senior and subordinate bondholders would be paid in full (Section-A).  Yet plan negotiators skewed recoveries toward senior bonds, which received substantially higher recoveries and most of the cash held in trust for subordinates.[59]

Furthermore, because substantial quantities of original senior bonds were taxable, senior bondholders benefitted from COFINA giving up revenues:  that give-up allowed all new bonds received by seniors to be tax-exempt (thus more valuable), providing seniors a greater-than-par recovery.[60]  Misrepresentations in the disclosure statement obscured this maneuver pre-confirmation.[61]

5.    **Special benefits to institutional subordinate holders who participated in the confidential process.**

Plan negotiators—who received special benefits not received by 50-states individual investors—had different interests than nonparticipating individuals:

---

[58] Addendum-I-218,219,235-#5053-page-57,58,74-of-88.

[59] Addendum-I-363,370-#5055-1-page-26,33-of-91;JA-4-543-to-544,548-Docket#4364-page-44-to-45,49-of-263;JA-5-816-#4364-2-page-106-of-110;JA-7-1126,1132-to-1133-#4598-page-2,8-to-9-of-15.

[60] JA-2-293-to-294-Docket#3680-page-26-to-27-of-30;JA-7-1130-to-1131-#4598-page-6-to-7-of-15;JA-12-1665-#4769-1-page-4-of-27;JA-16-2524-to-2525-#7211-1-page-13-to-14-of-146.

[61] Section-C.3;Document-00117439792-5/15/19-App.II-207-to-211,219,222-to-223,299-to-300,308-JA-15-2279-to-2283,2291,2293-to-2294,2370-to-2371,2379-Docket#6283-page-3-to-7-of-13;#6283-1-page-2-of-3;#6283-2-page-2-to-3-of-24;#6283-11-page-9-to-10,18-of-18;JA-16-2494-to-2498,2518-to-2526-Docket#7211-page-5-to-9-of-24;#7211-1-page-7-to-15-of-146.

- Assured—which was *not* in Class 5 or the "Junior Holders Group"[62]—received:

  o its share of "Consummation Costs."[63]

  o the ability to call insured bonds early, "rewrap" new bonds as insured, sell them on the market for a premium over uninsured bonds, at the expense of Commonwealth, and other benefits.[64]

  o enhancement of its position as insurer of other Puerto Rico bonds (Assured's overall Puerto Rico exposure, including GO bonds, was almost *20-fold greater* than its COFINA subordinate exposure).[65]

- Oppenheimer, Santander, UBS funds and Goldman:

  o had significant COFINA senior and GO positions (Oppenheimer: $300+ million senior uninsured, plus $1.092 billion GO; Santander: $144+ million senior uninsured; UBS: $394+ million senior; Goldman interests included senior and subordinate).[66]

---

[62] JA-4-512-to-513,541-to-542,548-to-549,619-to-621-Docket#4364-page-13,14,42-to-43,49-to-50,120-to-122-of-263;JA-5-763,764,806-to-807-#4364-2-pages-2,9,72-73-of-110.

[63] JA-4-602-to-603,611-to-613-Docket#4364-page-103-to-104,112-to-114-of-263;JA-5-763,778,808-to-809,813-to-814-#4364-2-page-2,44,74-to-75,103-to-104-of-110.

[64] JA-2-293-to-297-Docket#3680-page-26-of-30;JA-4-548-to-549-#4364-page-49-to-50-of-263;JA-14-2099-to-2102-#4990-page-45-to-48-of-225;JA-14-2160-to-2164-#5091-Ex.-M-page-1844-to-1848.

[65] JA-3-373-Docket#4033-page-75-¶1-of-81;Document-00117439791-5/15/19-docket-page-12-to-13,43-to-46-App.I-010-011,041-044;JA-16-2530,2588-to-2591-#7211-1-page-19,77-to-80.

[66] JA-2-293-to-294-Docket#3680-page-26-to-27-of-30;JA-3-310-to-311-#3776-page-41-to-42-of-42;JA-3-303-to-308-#3768-page-5-to-10-of-10;JA-4-510,550,622-to-623-#4364-page-11n.6,51,123-to-124-of-263;JA-5-804-to-807-#4364-2-page-70-to-73-of-110;Document-00117439791-5/15/19-docket-page-12-internal-page-App.I-010.

- o received "Consummation Cost" payments, including for subordinate holdings.[67]

- With larger positions, and (for Assured) *non*participation in Class 5 and ability to "re-wrap," Consummation Cost parties were not adversely impacted by splintering bonds into 14 fragments.[68]

### 6. "Enhanced distributions" to Puerto Rico institutions and individuals.

"On-island" investors were afforded "enhanced distributions"[69]—not available to 50-states bondholders—based on residence in Puerto Rico.[70] This included Santander and UBS Puerto Rico funds, who participated in the confidential process.[71] $60 million was "set aside" for Puerto Rico investors.[72]

"On-island" investors could elect 2%-of-par cash and a *single* tranche of shorter-maturity, current-interest-paying bonds (paid off by 2040)—affording more liquidity in modest-sized quantities.[73] Even a Puerto Rico institution that bought

---

[67] JA-4-602-to-603,611-to-613-Docket#4364-page-103-to-104,112-to-114-of-263;JA-5-763,804-to-809,813-to-814-#4364-2-page-2,70-to-75,103-to-104-of-110.

[68] Document-00117439791-5/15/19-docket-page-13-internal-page-App.I-011;Document-00117439792-5/15/19-App.II-296-98-JA-15-2367-to-2369-Docket#6283-11-page-6-to-8-of-18.

[69] JA-6-1004-Docket#4569-page-8-of-14.

[70] JA-4-516-to-523,541-to-542,611-Docket#4364-page-17-to-24,42-to-43,112-of-263;JA-6-1024-to-1029,1037-to-1038-#4585-page-12-to-17,25-to-26-of-43;JA-7-1097-to-1105-#4595-page-6-to-14-of-21;JA-7-1135-to-1136-#4598-page-11-to-12-of-15;JA-14-2133-to-2136-#5041-2-page-6-to-9-of-22.

[71] JA-2-179-to-187-Docket#1057;JA-3-309-to-311-#3776;JA-5-791,797-to-798,804-to-807,813-to-814-#4364-2-page-57,63-to-64,70-to-73,103-to-104-of-110.

[72] JA-4-516,611-Docket#4364-page-17,112-of-263;JA-6-1024-Docket#4585-page-12-of-43.

[73] JA-4-520-to-522-Docket#4364-page-21-to-23-of-263.

post-PROMESA, at depressed prices, and/or received 3.32%-of-par consummation costs, could elect the Puerto Rico preference.[74]

While bondholders electing the Puerto Rico preference were to receive federally taxable securities, "on-island" investors are generally not subject to federal taxation.[75] Some COFINA bonds were originally sold as taxable, largely to Puerto Rico residents.[76] A Puerto Rico resident who originally bought taxable bonds could still get the "enhanced distributions." And FOMB/COFINA-issued documents show those who opted for "enhanced distributions", and thus initially received taxable bonds, later were allowed to convert *all* bonds to tax-exempt status.[77]

Plan proponents used preferential "on-island" treatment to assuage Puerto Rico interests and remove thousands of potential "no" votes from Class 5.[78]

---

[74] JA-6-1024-to-1027-Docket#4585-page-12-to-15&n.6-of-43;JA-7-1099-to-1100-#4595-page-8-to-9-of-21;JA-14-2135-to-2136-#5041-2-page-8-to-9-of-22;JA-15-2283-#6283-page-7-of-13.

[75] JA-4-516,548;JA-5-747-Docket#4364-page-17,49,248-of-263;JA-6-1004-to-1005-#4569-page-8-to-9-of-14.

[76] JA-14-2134-to-2135-Docket#5041-2-page-7-to-8-of-22;Document-00117439792-5/15/19-App.II-299-300,308-JA-15-2370-to-2371,2379-Docket#6283-11-page-9-to-10,18-of-18.

[77] JA-16-2498,2518-to-2519,2563-to-2564-Docket#7211-page-9;#7211-1-page-7-to-8,52-to-53-of-146;JA-18-2811-to-2812,2824,2834-#8427-page-15-to-16-of-20;#8427-1-page-8,18-of-69.

[78] Section-D;JA-4-516-to-523,536-Docket#4364-page-17-to-24,37-of-263;JA-6-1024-to-1027-#4585-page-12-to-15;JA-7-1099-to-1100-#4595-page-8-to-9-of-21;JA-15-2283-#6283-page-7-of-13;JA-7-1135-to-1136-#4598-page-11-to-12-of-15;Document-00117439791-5/15/19-docket-page-16-to-17,internal-page-13-to-14-App.I-014-015.

Without pre-vote disclosure, Commonwealth sought to pay $7 million to "Bonistas del Patio", whose advocacy was instrumental in getting "on-island" investors to opt-out of Class 5.[79]

## 7.  Mainland retail subordinate investors were devastated.

Mainland retail subordinate investors—including pre-PROMESA purchasers—were told they would receive "estimated" and "projected" recoveries of 56.414%.[80]

This misleadingly overstated recoveries:  56.414% factored in only the face value of new bonds—not reduced coupon rates, longer maturities, less-saleable splintered lots, substitution of zero-coupon for coupon bonds, and potential loss of tax-exempt status.[81]

Furthermore:

- Payments to 50-states investors were back-loaded as far as 2058—long after the 2040 maturity for "on-island" bondholders.[82]
- Mainland retail investors received *no* cash fees and less-marketable, splintered, distributions of securities—single CUSIPs were mandatorily exchanged into many fragments.[83]

---

[79] JA-14-2170-Docket#5097-1-page-3-of-5;JA-16-2499-to-2501-#7211-page-10-to-12-of-24;JA-18-2812-#8427-page-16-of-20.

[80] JA-4-522,542,548,620-Docket#4364-page-23,43,49,121-of-263.

[81] JA-12-1665-Docket#4769-1-page-4-of-27;JA-12-1734-to-1740-#4838-page-6-to-12-of-140;JA-14-2103-to-2105-#4990-page-80,84-to-85-of-225.

[82] JA-4-520-to-522-Docket#4364-page-21-to-23-of-263;JA-6-1025-#4585-page-13-of-43;JA-12-1571-#4673-page-6-of-17.

[83] JA-4-522-Docket#4364-page-23-of-263;JA-6-1024-to-1029-#4585-page-12-to-17-of-43;JA-7-1100-Docket#4595-page-9-of-21;JA-7-1138-#4598-page-14-of-15;JA-12-1571-to-1572-#4673-page-6-to-7-of-17.

Losses to 50-states individuals turned out even higher in the chaotic exchange process:

- bonds were exchanged for 14 splintered fragments (not just 11) that lacked liquidity;

- fractional bonds were rounded down, forced sales of fractional bonds occurred at distressed prices, and "rounding cash" was not distributed to retail bondholders to make up that difference, but rather was distributed pro rata (further benefitting Plan negotiators);

- 50-states investors with originally tax-*exempt* bonds were issued 15%+ (by amount) and 20%+ (by number) *taxable* bonds (and later were required to accept lower coupons than disclosed in the Plan, and in some cases incur fees, to obtain tax-exempt bonds).[84]

## C. Rights of individual bondholders were disregarded.

## 1. No participation in confidential process.

Even individual COFINA bondholders who timely filed proofs of claims—specifying where notices to the creditor should be sent[85]—were *not* sent a notice inviting them to participate in the confidential process, providing them a practical and meaningful means to participate, and informing them in advance that the

---

[84] Document-00117439792-5/15/19-App.II-207-211,212-216,219-220,222,253-255,265-267,282-286,292-300-JA-15-2279-to-2288,2291-to-2292,2293,2324-to-2326,2336-to-2338,2353-to-2357,2363-to-2371-#6283-page-3-to-7,8-to-12-of-13;#6283-1-page-2-to-3-of-3;#6283-2-page-2-of-24;#6283-3-page-9-to-11-of-15;#6283-6-page-2-to-4-of-4;#6283-8,#6283-9;#6283-11-page-2-to-10-of-18;JA-16-2494-to-2498,2502,2518-to-2526,2538-to-2554,2563-to-2564,2566-to-2567-#7211-page-5-to-9,13-of-24;#7211-1-page-7-to-15,27-to-43,52-to-53,55-to-56-of-146;JA-18-2809-to-2811,2813-to-2814,2821-to-2822,2824-to-2825,2834-to-2835-#8427-page-13-to-15,17-to-18-of-20;#8427-1-page-5-to-6,8-to-9,18-to-19-of-69.

[85] JA-7-1173-Docket#4606-3-page-9-of-13;Document-00117527750-docket-page-107-Addendum-19-1960-page-IV-003-Item-3-#4606-7-page-371-Item-3-of-447.

confidential process could result in a plan providing special benefits to negotiators and be imposed on nonparticipants without consent.[86]

The court stated the mediation was "open to all interested participants on terms announced by the Mediation Team."[87]  But the court does not reference an actual advance notice sent to all COFINA bondholders inviting participation— there was none.  The court cites Docket#560—but #560 states mediation "will proceed on a confidential basis, and will not be open to the public or the media."  Multiple court orders emphasized mediation confidentiality.[88]  Individual bondholders thus had no means of following through media sources what was transpiring in the mediation.

No individual bondholders were represented in the confidential process.[89]

Senior COFINA bondholders' financial advisor told Appellant Elliott "there was nobody at the table representing junior interests."[90]

---

[86] JA-13-2093-to-2094-Docket#4911-page-4-to-5-of-8;JA-14-2113-to-2115,2144-to-2145;#5041-page-4-to-6-of-10;#5041-2-page-17-to-18-of-22;Document-00117439791-5/15/19-docket-page-27-to-28-internal-page-24-to-25-App.I-025-026;Document-00117439792-5/15/19-App.II-216-217-JA-15-2288-to-2289-#6283-page-12-to-13-of-13;JA-16-2560-to-2561-#7211-1-page-49-to-50-of-146.

[87] Addendum-19-1182-I-204-205-#5053-page-43-to-44&n.13-of-88.

[88] JA-1-001-to-003-Docket#329;JA-1-004-to-007-#430;JA-2-188-to-189-#1836;JA-2-190-to-191-#1841;JA-18-2961-to-2962-#8686.

[89] JA-2-293-to-295,297-Docket#3680-page-26-to-28,30-of-30;JA-4-462-#4244-page-2-of-3;JA-6-956,963-#4564-page-10,17-of-22;JA-6-1023-to-1024,1028-#4585-page-11-to-12,16-of-43;JA-7-1133-to-1136-#4598-page-9-to-12-of-15;JA-12-1520-#4613-page-5-of-7;JA-12-1664-to-1665-#4769-1-page-3-to-4-of-27;JA-14-2144-to-2145-#5041-2-page-17-to-18-of-22.

[90] JA-2-294-Docket#3680-page-27-of-30;JA-7-1136-#4598-page-12-of-15;JA-13-1887-#4848-page-205:lines:12-17;Document-00117439791-5/15/19-docket-page-20-to-22-internal-page-17-to-19-App.I-018-to-020.

Elliott inquired about participating in the confidential process, but was rebuffed.[91]  Individuals wrote to the court in response to reports of deals cut, complaining that individuals had not been represented in the process, but the court failed to include them.[92]

### 2.    Insufficient time.

Only after terms were agreed among participants in the confidential process was a disclosure statement made public on 10/19/18.[93]  Objections were made to the adequacy of the disclosure statement.[94]  A revised disclosure statement was filed on 11/16/18,[95] allowing no realistic opportunity for individuals to object before the 11/20/18 hearing on its adequacy.[96]

Following the 11/20/18 hearing, FOMB filed a 591-page disclosure statement[97] that was approved.[98]

---

[91] JA-2-293-to-294-Docket#3680-page-26-to-27-of-30;JA-7-1136-#4598-page-12-of-15;Document-00117439791-5/15/19-docket-page-20-to-22-internal-page-17-to-19-App.I-018-020.

[92] JA-2-280-to-297-Docket#3680-page-3-to-14,25-to-30;JA-3-317-to-324-#3847(denied-JA-3-353-to-354-#3873);JA-3-326-to-345,347-to-352-#3859-page-7-to-30,32-to-37;JA-3-355-to-372,375-to-378-#4033-page-3-to-9,11-to-13,37-to-46,53-to-54,61-to-64,73-to-74,78-to-81;JA-4-479-to-484,486-to-496-#4348-page-5-to-11,13-to-23;JA-6-887-to-888,890-to-897,906,913-#4438-page-5-to-6,8-to-15,24,31.

[93] JA-3-384-Docket#4073.

[94] JA-4-461-to-462-Docket#4244;JA-4-450-to-460-#4215.

[95] JA-4-472-Docket#4299.

[96] JA-12-1517-Docket#4613-page-2-of-7.

[97] JA-4-500-Docket#4364.

[98] Addendum-19-1182-I-001-Docket#4382.

The disclosure statement was first mailed to bondholders—on a flash drive with the Plan—on the eve of the Christmas-New Year's holidays, with objections due January 2.[99]

### 3. Misrepresentations.

Information was concealed and misrepresented in the disclosure statement.

*First*, there was never adequate disclosure of potential federal tax consequences—mandated by 11 U.S.C. §1125(a).[100]

What was said was affirmatively misleading. The flash-drive disclosure statement mailed to bondholders stated that "a private letter ruling has *not* been submitted to the Internal Revenue Service".[101] But post-deadline for objecting and voting, it was revealed that on *December 14, 2018*—while the notices for the confirmation hearing were in the mail to bondholders[102]—FOMB had (secretly) requested a private letter ruling or closing agreement with the IRS that would let *all* bonds be federally tax-exempt, including bonds distributable to recipients of the "on-island" preference.[103]

---

[99] Addendum-19-1182-I-010-Docket#4382-page-10-of-19;JA-6-1039-to-1040-#4585-page-27-to-28-of-43;JA-7-1106-to-1107-#4595-page-15-to-16-of-21&n.6.

[100] JA-5-729-Docket#4364-page-230-of-263 (tax treatment "is uncertain");JA-4-461-to-462-#4244;JA-6-1027-#4585-page-15-of-43;JA-12-1574-to-1575-#4673-page-9-to-10-of-17.

[101] JA-5-731-Docket#4364-page-232-of-263, emphasis added.

[102] JA-6-1039-to-1040-Docket#4585-page-27-to-28-of-43.

[103] JA-14-2203-to-2204-Docket#5123-page-5-to-6-of-26-Recital-"E";Document-00117439792-5/15/19-App.II-207-211,222-223;JA-15-2279-to-2283,2293-to-2294-#6283-page-3-to-7-of-13;#6283-2-page-2-to-3-of-24;JA-16-2496-#7211-page-7-of-24;JA-18-2809-to-2812-#8427-page-13-to-16-of-20.

The IRS requested an extension of time (required by the government shutdown), but—with the Court unaware of FOMB's secret request—the IRS was largely rebuffed.[104]

FOMB affirmatively addressed the subject of tax treatment at the hearing,[105] and in proposed findings,[106] but with*out*:

- disclosing its secret pending request to the IRS, or
- correcting disclosure statement misrepresentations.

If complete disclosure of federal tax consequences had been made, it would have been evident that the articulated rationale for the Puerto Rico preference—to maximize the amount of tax-exempt securities available to mainland investors and compensate "on-island" investors for taking taxable securities[107]—was contrived. (Point-V).

*Second*, the "Illustrative Example" of what Class 5 holders would receive showed 11 CUSIPs being issued, in round amounts for all CIBs and most CABs, and the disclosure statement referenced "estimated" or "projected" recoveries for subordinates of 56.414%.[108] This was misleading. The disclosure statement failed to include the "mandatory exchange distribution allocation"[109]—only released upon confirmation—and failed to disclose that 14 CUSIPs would be issued and the adverse impact of splinter bonds on modest-sized 50-states bondholders (including

---

[104] *Compare*-JA-6-1006-to-1007-Docket#4570-*with*-JA-6-1008-to-1009-#4574;JA-12-1574-to-1575-#4673-page-9-to-10-of-17.

[105] JA-13-1828-Docket#4848-Tr.139:lines:3-25.

[106] JA-13-1800-to-1801-Docket#4846-1-page-56¶142-to-57¶143-of-121.

[107] JA-13-1828-Docket#4848-Tr.139:lines:3-25.

[108] JA-4-522,524-to-525,548,620,667-to-668-Docket#4364-page-23,25-to-26,49,121,168-to-169-of-263.

[109] Document-00117439792-5/15/19-App.II-253-55-JA-15-2324-to-2326-Docket#6283-3-page-9-to-11-of-15.

that fractions would be rounded down and fractional bonds would be liquidated at distressed prices).[110]

*Third*, to persuade "on-island" bondholders to opt for the Puerto Rico preference, and thus impact the vote (Section-D), FOMB misrepresented "BONISTAS DEL PATIO" as "ADVOCATING FOR THE INTERESTS OF LOCAL BONDHOLDERS."[111] FOMB's proposed findings—which the Court adopted word-for-word[112]—similarly described Bonistas as "advocating for the interests of Puerto Rico resident bondholders."[113]

Bonistas had undisclosed conflicts and benefits:

- Bonistas was represented by counsel for a GO bondholder group which stood to benefit from both a diversion of COFINA revenues to Commonwealth and profits on COFINA subordinate bonds purchased at distressed prices.[114]

- Commonwealth sought to reward Bonistas with a $7 million payment, only revealed post-deadline for objection and voting, asserting "Bonistas played a critical role" in advancing the plan, which had "benefits" to Commonwealth.[115]

---

[110] Section-B.7;Document-00117439792-5/15/19-App.II-212-216,265-266,292-298-JA-15-2284-to-2288,2336-to-2337,2363-to-2369-Docket#6283-page-8-to-12-of-13;#6283-6-page-2-to-3-of-4;#6283-11-page-2-to-8-of-18;JA-16-2502,2538-to-2554-#7211-page-13-of-24;#7211-1-page-27-to-43-of-146;JA-18-2813-to-2814-#8427-page-17-to-18-of-20.

[111] JA-4-536-Docket#4364-page-37-of-263.

[112] Addendum-I-204-Docket#5053-page-43-of-88.

[113] JA-13-1785-Docket#4846-1-page-41-¶100-of-121.

[114] *Compare*-JA-14-2188-Docket#5117-1-page-1-of-10-*with*-JA-12-1583-#4742-page-1-of-3.

[115] JA-14-2170-Docket#5097-1-page-3-of-5;JA-14-2184-#5117-page-3-of-7;JA-14-2193-#5117-1-page-7-of-10.

- The "on-island" investors Bonistas supposedly advocated for were "evenly weighted" between senior and subordinate,[116] so Bonistas was not an advocate specifically for even "on-island" subordinate.

- Other interests of Bonistas' principals were also undisclosed.[117]

### 4. Sandbag.

Plan proponents held back factual and legal arguments for voluminous (4800+-pages) on-the-eve-of-confirmation-hearing supporting and reply memoranda, factual submissions, and related materials.[118]

FOMB's *supporting* memorandum was filed *after* its reply, 4 business days before the confirmation hearing.[119] Declarations and exhibits were filed 2 business days before the hearing.[120]

Proponents' belated filings were not served—even by email—on individual bondholders, not even those who filed proofs of claim and objections.[121]

Objectors were denied permission to respond in writing.[122]

---

[116] JA-14-2191-Docket#5117-1-page-5-of-10.

[117] JA-14-2231-to-2232,2235-2237-Docket#5136-page-9-to-10,13-of-18; #5136-2-page-2-to-3-of-3;JA-16-2500-to-2501,2515-to-2516,2636-#7211-page-11-to-12-of-24;#7211-1-page-4-5,142.

[118] JA-12-1558-Docket#4663,JA-12-1559-#4664,JA-12-1560-#4665,JA-12-1586-#4756,JA-12-1624-#4757,JA-12-1640-#4758,JA-12-1641-#4759,JA-12-1642-#4760;JA-21-3585-#4652,JA-12-1552-#4656, JA-12-1555-#4660,JA-12-1556-to-1557-#4662,JA-12-1561-#4666,JA-12-1562-to-1563-#4667,JA-12-1564-#4669,JA-12-1565-#4670.

[119] JA-12-1558-Docket#4663,JA-12-1559-#4664.

[120] JA-12-1586-Docket#4756,JA-12-1624-#4757,JA-12-1640-#4758,JA-12-1641-#4759,JA-12-1642-#4760.

[121] *Contrast*-JA-12-1680-to-1682-Docket#4780-page-1-to-2,43-of-43-Ex.-B.

[122] *Compare*-JA-12-1578-to-1579-Docket#4673-page-13-to-14-of-17-*with*-JA-12-1581-to-1582-#4686.

### 5. Unequal funding.

Government Plan proponents had effectively unlimited debtor-paid funding for their legal and "advisor" expenses.[123]  Negotiating institutions received fees—paid from cash held in trust for all bondholders—that more than offset their (unsubstantiated) "expenses."  (Section-B.2).

The Court was asked to designate individual 50-states bondholder representatives and provide for their counsel to also be compensated.[124]  But the Court did not.

### 6. Objections.

Objectors-Appellants proceeded *pro se*.[125]

---

[123] Addendum-19-1182-I-315-316-Docket#5055-page-23-to-24-of-45;JA-4-610-to-613-#4364-page-111-to-114-of-263;JA-18-3005-to-3011-#8753;#8753-1,#8753-2.

[124] JA-2-292-to-293,295-Docket#3680-page-25-to-26,28-of-30;JA-4-462-#4244-page-2-of-3;JA-6-1038-to-1039-#4585-page-26-to-27-of-43;Document-00117439791-5/15/19-docket-page-22-to-23-internal-page-19-to-20-App.I-020-to-21;JA-16-2557-#7211-1-page-46-of-146.

[125] JA-6-1013-to-1052-Docket#4585;JA-7-1092-to-1109-#4595;JA-7-1165-to-1177,JA-8-1178-to-1263,JA-9-1264-to-1337,JA-10-1338-to-1410,JA-11-1411-to-1505-#4606-3-to-4606-8;JA-12-1566-to-1579-#4673;JA-13-2090-to-2094-#4911;JA-14-2110-to-2149-#5041,#5041-2;JA-4-461-to-462-#4244;JA-12-1516-to-1522-#4613;JA-7-1125-to-1139-#4598.

Others objected.[126]  Dozens wrote to the Court to object.[127]  However, the Court refused to consider these letters.[128]

### D.   PROMESA's voting process was abused.

PROMESA's voting process—retroactively imposed to override the requirement that no reduction in principal or interest rate could occur without each bondholder's consent—was abused:

- Plan proponents, who predominantly held senior or GO bonds, purchased billions of dollars of *subordinated* bonds post-PROMESA at distressed prices and then voted these bonds for a plan that specially benefited them.[129]

---

[126] JA-4-450-to-460-Docket#4215,JA-6-933-to-940-#4481,JA-6-947-to-975-#4564.

[127] JA-2-280-to-297-Docket#3680-page-3-to-14,25-to-30;JA-3-325-to-352-#3859-page-6-to-37;JA-3-355-to-372,375-to-378-#4033-page-3-to-9,11-to-13,37-to-46,53-to-54,61-to-64,73-to-74,78-to-81;JA-4-479-to-496-#4348-page-5-to-23;JA-6-887-to-913-#4438-page-5-to-31;JA-6-914-to-928,931-to-932-#4460-page-3-to-4,6-to-13,64-to-73,85-to-86;JA-6-941-to-946-#4494-page-14-to-19;JA-6-999-to-1001-#4567-page-44-to-46-of-151;JA-6-1010-#4576-page-70;JA-12-1528-to-1551-#4650-page-9-10,13-to-26,28-to-33,37,40;JA-12-1718-to-1729-#4809-page-6-to-7,9-to-10,23-to-30,67-to-74;JA-12-1734-to-1744-#4838-page-6-to-12,134-to-137-of-140;JA-14-2097-to-2107-#4990-page-19,42,45-48,80,84-to-85,142-to-143;JA-14-2241-to-2245-#5145-page-4,10-to-12,19;JA-7-1105-to-1108-#4595-page-14-to-17-of-21;JA-12-1576-#4673-page-11-of-17;JA-14-2144-to-2145-#5041-2-page-17-to-18-of-22;Document-00117439791-#5/15/19-docket-page-22-to-28-internal-page-19-to-25-App.I-020-to-026;JA-16-2556-to-2561-#7211-1-page-45-to-50-of-146.

[128] Addendum-19-1182-I-117-Docket#4441.

[129] Section-B.3;JA-7-1134-Docket#4598-page-10-of-15;Document-00117439791-5/15/19-docket-page-10-to-12-internal-page-7-to-9-App.I-008-to-010.

-27-

- Plan proponents "bought" support by offering preferential consideration to Puerto Rico investors.[130] 5560 "on-island" subordinate bondholders, who may have voted "no" if left in Class 5 without preferential consideration, opted out of Class 5 for the "on-island" preference and were "deemed to accept" the Plan—far more than the 1940 vote difference between "yes" and "no" votes.[131]

- Misrepresentations about federal tax consequences, Bonistas and the rationale for the Puerto Rico preference, coupled with the inducement provided by that preference, affected the Class 5 vote results.[132]

- FOMB exploited the fact that "[t]here are no quorum requirements":[133]

  o Mainland investors were held to a short (1/8/2019) deadline to vote.[134] However, to accommodate the "Puerto Rico holiday season," the deadline for "on-island" investors to opt for the preference was extended.[135]

---

[130] Section-B.6;JA-7-1135-to-1136-Docket#4598-page-11-to-12-of-15;JA-16-2499-to-2501-#7211-page-10-to-12-of-24;Document-00117439791-5/15/19-docket-page-16-to-17-internal-page-13-to-14-App.I-014-015.

[131] JA-4-542-Docket#4364-page-43-of-263;JA-12-1698-#4794-page-9-of-28; Document-00117439791-5/15/19-docket-page-16-to-17-internal-page-13-to-14-App.I-014-015.

[132] JA-5-771-Docket#4364-2-page-27-of-110;JA-14-2184-to-2185,2190-to-2194-#5117-page-3-to-4-of-7;#5117-1-page-4-to-8-of-10;JA-14-2199-to-2200-#5118-page-3-to-4-of-6;Document-00117439791-5/15/19-docket-page-15-to-16-internal-page-12-to-13-App.I-013-014;JA-16-2499-to-2501-#7211-page-10-to-12-of-24.

[133] JA-4-555,662-Docket#4364-page-56,163-of-263.

[134] Addendum-I-013-Docket#4382-page-13-of-19.

[135] JA-6-1004-Docket#4569-page-8-of-14;JA-6-1011-to-1012-#4583;Document-00117439791-5/15/19-docket-page-17-to-18-internal-page-14-to-15-App.I-015-016.

- o Hundreds of mainland bondholders did not vote, one result of on-the-eve-of-the-holidays notice.[136]
- Many institutional Plan proponents acted for many different funds and accounts, each of which could be separately voted, further skewing the vote.[137]

**E.    Plan is confirmed.**

The Rule 3020(e) stay was waived.[138]  The Plan was consummated long before the 30-day time for appeal ran.[139]

## SUMMARY OF ARGUMENT

The Plan was the "result" of confidential negotiations that benefitted Plan negotiators, preferred local interests and abrogated rights of nonparticipating 50-states individual bondholders.  This "result" reflects FOMB's view that, for "financial creditors," "it's just about the money.  None of them…really care about vindicating a constitutional principle."[140]

This Court must vindicate constitutional principle and the rule of law:

- PROMESA should not be construed to retroactively abrogate pre-PROMESA rights of bondholders, which would render PROMESA unconstitutional.  Point-I.

---

[136] JA-12-1705-to-1715-Docket#4794-page-16-to-26-of-28;Document-00117439791-5/15/19-docket-page-17-to-18-internal-page-14-to-15-App.I-015-016.

[137] Document-00117439791-5/15/19-docket-page-18-to-19-internal-page-15-to-16-App-I-016-to-017.

[138] Addendum-19-1182-page-I-336-Docket#5055-page-44-of-45.

[139] JA-14-2178-Docket#5104.

[140] JA-18-2773-Docket#8266-Tr:66:lines-20-to-23.

- A result-oriented desire to transfer COFINA bondholders' property to Commonwealth cannot override Constitutional rights.
  - The court failed to address controlling Supreme Court decisions, including *Security Industrial*, *Armstrong* and *United States Trust.*
  - There was never an adjudication that the lien was invalid. It was simply "negotiated" away in a confidential process and abrogated by Commonwealth legislation.
  - Even cash held in trust was taken.
  - Multiple Constitutional provisions—including Takings, Due Process, Contract and Bankruptcy Clauses—preclude application of PROMESA and Commonwealth legislation to take property of nonconsenting bondholders and abrogate their rights.
  - "Voting" cannot "override" Constitutional rights.

Points-II,III,IV.

- Discrimination based on residence—used to assuage local interests and procure approval by "vote"—is unlawful. The court failed to address controlling Supreme Court decisions. Point-V.
- Procedures used were unlawful. Point-VI.
  - The Plan was the "result"[141] of a confidential "mediation-settlement" process in which participants received special benefits and nonparticipants were devastated.
  - No adversary proceeding was served on individual bondholders, as Rule 7001 and Due Process required.

---

[141] Addendum-19-1182-page-I-199-to-I-200,I-203-Docket#5053-page-38-39,42-of-88.

- o Individuals received plan documents just before the holidays, with a January 2 deadline.

- o Letter-objections were disregarded.

- o Objectors' request to respond in writing to proponents' eve-of-hearing papers was denied.

- o Proponents were well funded (directly from debtors or through promised payments). Individual bondholders had to fend for themselves.

The Appointments Clause violation is before the Supreme Court, whose ruling may require reversal. Point-VII.

Requirements of PROMESA and other laws were not met. Point-VIII.

## STANDARD OF REVIEW

Debtor bore the burden of proof.[142]

Review of legal issues is de novo—"without the slightest deference." *U.S. Bank* v. *Village at Lakeridge*, 138 S.Ct. 960, 965 (2018).

For "basic" or "historical" fact questions the standard of review generally is "clear error." However, where legal standards must be amplified and applied, review "of mixed questions" is *de novo*. *Id.* at 966-67.

Furthermore, "[i]n the constitutional realm" the role of appellate courts 'in marking out the limits of [a] standard'" "favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record." 138 S.Ct. 967n.4.

Here, *de novo* review of "mixed questions" is appropriate since legal error— including disregarding controlling Supreme Court authorities—"infect[ed]" the court's decision and review "entails primarily legal" work. 138 S.Ct. at 967&n.4,

---

[142] Addendum-19-1182-page-I-172-Docket#5053-page-11-of-88.

968n.7.  The need for such review is underscored by the court's repeated word-for-word adoption of Plan proponents' proposed findings.[143]  *Las Colinas*, 426 F.2d 1005, 1008-1010&n.4 (1st Cir. 1970) (adopting party's proposed findings disfavored).

## ARGUMENT

### I.  PROMESA WOULD BE UNCONSTITUTIONAL IF CONSTRUED TO RETROACTIVELY ABROGATE PRE-PROMESA RIGHTS.

*Security Industrial*, 459 U.S. at 78, 81, instructs that a court "'first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided,'" and that "[n]o bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress."

Further, "[r]etroactivity is generally disfavored in the law."  *Eastern Enterprises* v. *Appel*, 524 U.S. 498, 532-33 (1998).

Title III "shall apply" to debts, claims and liens created before or after 6/30/2016.  48 U.S.C. §2101.  However, no provision of PROMESA abrogates pre-6/30/2016 liens.  Rather, §2141(b)(1)(N) provides a fiscal plan "shall" "respect" "lawful liens" in effect prior to 6/30/2016, and §2174(b)(7) requires a plan be "consistent with the applicable Fiscal Plan."  Thus, no Plan may be confirmed unless it respects "lawful liens."  Other provisions also recognize creditor rights: 48 U.S.C. §2163 (territory law—here, New Bond Legislation—prescribing method of composition of indebtedness can*not* bind nonconsenting creditors); §2195(a)

---

[143] *Compare*-JA-13-1751-to-1820-Docket#4846-1-page-7-to-29(¶¶1-59),30-to-47(¶¶60-119),47-to-57(¶¶120-143),57-to-76(¶¶144-189)-of-121-*with*-Addendum-19-1182-page-I-162,I-169-to-I-191,I-192-to-I-210,I-216-to-I-226,I-227-to-I-248-Docket#5053-page-8-to-30(¶¶1-59),31-to-49(¶¶61-120-partial),55-to-65(¶¶123-to-146),66-to-87(¶¶149-196)-of-88.

(holding liable transferee of a transfer "in violation of applicable law" under which creditor has valid pledge or lien); §2194(k),(l),(m)(5)(B).

These specific provisions underscore that PROMESA does not abrogate pre-6/30/2016 liens.

The House report on PROMESA reiterated: "Fiscal Plans ensure the protection of the lawful priorities and liens as guaranteed by the territorial constitution and applicable laws, and prevent unlawful inter-debtor transfers of funds." H.R.Rep.114-602-*regarding*-§201-p.58/115.

This Court ruled that a perfected security interest "cannot be avoided" under PROMESA. *Altair* v. *FOMB*, 914 F.3d 694, 703, 719, 721 (1st Cir. 2019). *A fortiori*, PROMESA does not abrogate pre-PROMESA statutory liens and other rights of secured COFINA bondholders.

In any event, the Constitution precludes retroactive application of PROMESA to abrogate pre-PROMESA rights.

## II. UNCONSTITUTIONAL TAKING OF PROPERTY OF NONCONSENTING BONDHOLDERS AND ABROGATION OF THEIR RIGHTS.

### A. Takings Clause.

The Takings Clause precludes taking "private property" "for public use" "without just compensation."

*Security Industrial*, 459 U.S. at 75, ruled that "[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation."

*Security Industrial* discussed, with approval, *Louisville Joint Stock Land Bank* v. *Radford*, 295 U.S. 555, 589-90, 601-02 (1935), where the Court held a bankruptcy statute was "void because it effected a 'taking of substantive rights in

specific property acquired…prior to'" the statute's enactment (459 U.S. at 76-77, *citing*, 295 U.S. at 590).

*Armstrong* v. *United States*, 364 U.S. 40, 44-49 (1960), ruled a lien is property the taking of which requires just compensation. *Armstrong* concluded a taking occurred "because the Government for its own advantage destroyed the value of the liens" (*id.* at 48), emphasizing:

> The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation *was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole*. (*Id.* at 49, emphasis added).

*Accord Koontz* v. *St. Johns*, 570 U.S. 595, 613 (2013) ("government must pay just compensation when it takes a lien—a right to receive money that is secured").

The "New Bond Legislation"—which "established the legal framework" for "restructuring" COFINA bonds[144]—admits that property of COFINA bondholders was taken:

> These amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government…[A]pproximately $437.5 million per year…will now be available to the Government…[145]

In addition, cash held in trust for COFINA bondholders was taken. (Sections-B.1,B.2). This was not COFINA's money. Even if COFINA could claim it held legal title to funds in the bond trustee's account, the equitable interest belonged to bondholders. *Begier* v. *IRS*, 496 U.S. 53, 59 (1990) (property debtor holds in trust for another, and in which debtor has no equitable interest, is not

---

[144] Addendum-19-1182-page-I-170,209-#5053-page-9,48-of-88.
[145] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

property of the estate or debtor); *cf. Gracia-Gracia* v. *FOMB*, No.18-1463-page-13-to-18-of-25 (1st Cir. 9/25/19)).

The court applied PROMESA to retroactively abrogate pre-PROMESA liens in contravention of Supreme Court precedents notwithstanding that (Section-A):

- Funds to pay COFINA debt service continued to be deposited in trust.
- No court had invalidated the lien.
- If the lien was not released, pledged revenues were sufficient to pay both senior and subordinate bonds.
- There was no finding that pledged revenues were insufficient.

That Commonwealth took property "for itself" (459 U.S. at 77-78) underscores the Takings Clause violation. Allowing government to justify a taking by an asserted desire or need for money—("[t]hese revenues will now be available for use by the Government"[146])—would render the Takings Clause a dead letter. As the Supreme Court observed in the Contracts Clause context, "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised." *United States Trust*, 431 U.S. at 26. *A fortiori* here, where Puerto Rico *lowered* taxes by billions of dollars.[147]

The plurality opinion in *Eastern Enterprises*, applying a Takings Clause analysis, cited Justice Chase's opinion in *Calder* v. *Bull*, 3 U.S. 386, 388 (1798) to make the point that "'It is against all reason and justice' to presume that the legislature has been entrusted with the power to enact 'a law that takes *property*

---

[146] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[147] JA-6-1049-Docket#4585-page-37-of-43;JA-7-1176-#4606-3-page-12-of-13;JA-11-1492-to-1495-#4606-8-page-167-to-170-of-180;Document-00117439791-5/15/19-docket-page-19,47-to-56-internal-page-16,Ex.G-App.I-017,045-054;JA-16-2536-to-2537,2592-to-2601-#7211-1-page-25-to-26,81-to-90-of-146;JA-17-2689-to-2690,2731-to-2745-#7961-page-13-to-14-of-19;#7961-1-page-37-to-51-of-71.

from A. and gives it to B'" (524 U.S. at 523). That is fundamentally what happened here (Sections-B.1,B.2):

- Commonwealth released the lien and took pledged revenues.
- Cash held in trust for subordinated bondholders was distributed to Commonwealth and others.

The court's opinion[148] is flawed:

*First*, the court did not discuss Supreme Court cases that hold the bankruptcy power is subject to the Fifth Amendment, which precludes retroactive legislation taking property. *Patriot Portfolio*[149] is inapposite: the bankruptcy provision there was applied prospectively—not retroactively. 164 F.3d at 685.

The court's failure to appreciate the constitutional problems with retroactive legislation taking property infects its analysis:

- The court states that bondholder's "reasonable expectations" should have taken into account potential challenges to the COFINA structure.[150] However, the challenges began *post*-PROMESA, in 2016[151]—*after pre*-2016 purchases.
- PROMESA introduced a creditor-vote mechanism that opened the door to abuses. Use of a "vote" on a Plan to alter non-consenting bondholders' rights to principal and interest—contrary to the bond resolution requiring each bondholder's consent—is only possible *if* PROMESA is applied retroactively to abrogate rights, which the Constitution precludes.

---

[148] Addendum-19-1182-page-I-214-216-Docket#5053-pages-53-to-55-of-88.

[149] Addendum-19-1182-page-I-214-Docket#5053-page-53-of-88.

[150] Addendum-19-1182-page-I-215-Docket#5053-page-54-of-88.

[151] Addendum-19-1182-page-I-175-Docket#5053-page-14-of-88.

*In re City of Detroit*, 524 B.R. 147, 267-70 (Bankr. E.D. Mich. 2014)—citing *Security Industrial* and *Louisville*—ruled that a plan that impaired a constitutional claim for just compensation would violate the Fifth amendment. *Detroit* ruled Takings claims must be "excepted" from discharge—even claims by property owners with still-pending suits. *Detroit* was a Chapter 9 case; retroactive application of a new bankruptcy regime to abrogate prior rights was not presented. This case is *a fortiori* from *Detroit*.

*Second*, the court incorrectly concluded there was no physical taking, just a "restructuring" of "relationships" to be assessed as a "public program", like the landmark designation in *Penn Central*.[152]  Multiple Supreme Court cases show the court erred in applying a "public program" framework:

- *Armstrong* (taking lien subject to Fifth Amendment, 364 U.S. at 44-49); *Nollan* v. *California Coastal*, 483 U.S. 825, 831 (1987) (mandating easement is taking, not "mere restriction" on use); *Dolan* v. *City of Tigard*, 512 U.S. 374, 393 (1994) (deprivation of right to exclude others is taking of property).
- *Koontz* (*Penn Central* not applicable to taking "identifiable property interest such as a bank account"; characterizes taking lien as *per se* taking, 570 U.S. at 614-616).
- *Horne* v. *Department of Agriculture*, 135 S.Ct. 2419, 2425-31 (2015) (an "appropriation" of personal property or intangibles, or a partial interest therein, gives "rise to a *per se* taking," without regard to *Penn Central's* "regulatory taking" framework).
- "Contract rights," too, "are a form of property" (*United States Trust*, 431 U.S. at 19n.16), as is a "bank account" or "money" (*Koontz*, 570 U.S. at

---

[152] Addendum-19-1182-page-I-215-Docket#5053-page-54-of-88.

614-616); "interest income" (*Phillips* v. *Washington Legal*, 524 U.S. 156, 169-72 (1998)); and unsecured claim arising from unpaid bill (*Tulsa Professional* v. *Pope*, 485 U.S. 478, 485 (1988)).

*Third*, the court asserts *Patriot Portfolio* supports applying *Penn Central*'s "public program" framework here.[153]  *Patriot* cites *Security Industrial*'s statement that lien avoidance under §552(f) "fits but awkwardly into the analytic framework employed in Penn Central."  164 F.3d at 685.  *Security Industrial*—ruling Congress could *not* retroactively side-step the Takings Clause—does *not* support applying *Penn Central* here.  After its "fits but awkwardly" observation, *Security Industrial* goes on to underscore that—as per *Armstrong* and *Louisville*—the fact the "bundle of rights" accruing to secured parties is smaller than that of fee owners does not alter the status of liens as property.  459 U.S. at 76-78.

*Fourth*, in *Penn Central*, the regulation did "not interfere with…Penn Central's primary expectation concerning use" (438 U.S. at 136).  Here—as New Bond Legislation states—an existing lien is being "release[d]" so $17.5 billion of "previously pledged" SUT revenues "will now be available for use by the Government."[154]  The fact the entire amount of the lien was not taken—only part— cannot obscure that property was taken.  And cash held in trust was taken.  If Commonwealth passed a law confiscating one-half of bond accounts, would there be no taking because Commonwealth took only part?  Furthermore, the lien-property was taken by Commonwealth "for its own uses" (438 U.S. at 135)— unlike the landmarks regulation in *Penn Central*.

*Fifth*, the court asserted "just compensation" was provided because creditors received the value of their property "discounted by a settlement that recognizes

---

[153] Addendum-19-1182-page-I-214-Docket#5053-page-53-of-88.
[154] Addendum-19-1182-page-I-274-#5053-1-page-25-of-43.

significant litigation risks" with "the allocation of distributions" "determined via a long mediation and settlement process among sophisticated parties."[155]  However:

- The results of a settlement process should never have been considered by the court as evidence of validity or amount, much less relied upon to assess whether "just compensation" was provided to *non*participants. F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (*citing* 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").

- The court's invocation of "mediation-settlement" "determinations" as "sufficient proof" of just compensation[156] contravenes its own order that mediation and litigation be kept "entirely separate" and "not be conflated."[157]

- Reliance upon "mediation-settlement" "determinations" presents Constitutional violations (Point-VI):

  - There is no contemporaneous record of what occurred in the confidential process, thus no record support for the "discount" "determined" in that process.

  - Negotiators were not disinterested decision-makers; they received benefits that *non*participants did not, and were conflicted.

  - *Non*participants cannot be bound by "determinations" in a mediation-settlement process.

---

[155] Addendum-19-1182-page-I-215-216-Docket#5053-page-54-to-55-of-88.

[156] Addendum-19-1182-page-I-216-Docket#5053-page-55-of-88.

[157] JA-2-189-Docket#1836-page-2-of-2;JA-2-190-to-191-#1841.

- Commonwealth legislation admitted the property taken was a lien over $17.5 billion of pledged tax revenues.[158] The Fifth Amendment provides a "right to full compensation" that "arises at the time of the taking." *Knick* v. *Township of Scott*, 139 S.Ct. 2162, 2170 (2019). "[C]ompensation must be a full and perfect equivalent for the property taken." *Monongahela Navigation* v. *United States*, 148 U.S. 312, 326 (1893). A secretly-negotiated—by others—discounted amount is not "full" compensation.

- If one did attach a "value" to eliminating "litigation risks" to the validity of the lien, seniors and subordinates would be equally affected. Yet the "sophisticated parties" who "determined" the "allocation" chose an allocation to benefit themselves.

- The court asserted there was a "risk" that senior bondholders could declare "default" and be paid first.[159] That issue was never adjudicated and the "risk" is speculative. And even if that "risk" eventuated, if the lien was left in place, pledged revenues were sufficient to pay all bonds. (Section-A).

*Sixth*, the court asserted the "resolution of substantial legal challenges to the structure underlying the existing COFINA bonds provides significant value to the bondholders"[160] But the court's preference to avoid making legal rulings on the merits, and instead opt for confidential mediation-settlement, cannot justify taking over one-half the property of non-consenting bondholders. The court failed in its

---

[158] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[159] Addendum-19-1182-page-I-219-Docket#5053-page-58-of-88.

[160] Addendum-19-1182-page-I-215-Docket#5053-page-54-of-88.

duty to *first* decide the parties' respective property interests.  48 U.S.C.
§2174(b)(6).[161]  *Cf. Gracia-Gracia*, page-12-to-14-of-25.

- There *never* was any judicial invalidation of the COFINA lien or
  structure.

- The new bonds are "secured by a statutory lien"—just like the original
  COFINA bonds.  (Section-A)

- Both the court and Commonwealth's legislature effectively
  acknowledged the original lien and structure were legal/valid all along:

  o The legality/validity of the original COFINA lien was fully briefed
    and argued, but the Court deferred ruling (Section A).  Yet, at the
    behest of Plan proponents, the court issued confirmation orders
    declaring substantially the same COFINA lien and structure to be
    legal/valid.[162]

  o The court's opinion asserts that Commonwealth legislation "is
    presumed to be valid" and cites cases ruling "laws are presumed to be
    constitutional."[163]  But this is also what investors were told when the
    *original* COFINA bonds were sold.[164]  Because Commonwealth
    legislation is presumed valid and constitutional, Act-91 was equally
    valid and constitutional.

  o The court's orders conclude that COFINA revenues shall not
    constitute "available resources" or "available revenues" of

---

[161] JA-6-1029-to-1032-Docket#4585-page-17-to-20-of-43;JA-7-1095-to-1096-
#4595-page-4-to-5-of-21.

[162] Addendum-19-1182-page-I-209-212,237-242,300-302-Docket#5053-page-48-
to-51,76-to-81-of-88;Docket#5055-page-8-to-10-of-45.

[163] Addendum-19-1182-page-I-210-Docket#5053-page-49-of-88.

[164] JA-8-1237-to-1238-Docket#4606-4-page-66-to-67-of-173;JA-11-1416-#4606-
7-page-10-of-477.

Commonwealth.[165]  But this was equally true for the original COFINA pledged revenues (Section A).  There has been no change to the Puerto Rico Constitution.  The court's judicial blessing of the new bonds shows that any challenge to the original COFINA lien and bonds would fail.

- o New Bond Legislation recites that it "[made] clear the original legislative intent of Act 91-2006, as amended"[166]—underscoring the "new" lien is the same as the "original," just reduced by almost half.

- Since the new lien is materially identical to the original lien, and the court embraced the validity of the new lien, the "value" of reducing "litigation risks" to the original lien is subjective and speculative.  Such "value" is not the "sure and certain" compensation, "equivalent in value to the property taken," the Fifth Amendment required.  *Matter of Valuation Proceedings*, 445 F. Supp. 994, 1003-04 (Special Court, Regional Rail Reorganization Act) (1977).  Plus:  Puerto Rico's Constitution remains the same; if there was merit to challenges to the COFINA lien (there was not), the specter of a future challenge by someone not bound by the settlement remains.[167]

- The notion that the lien is valid and binding if reduced by almost half (a reduction borne largely by individual subordinate bondholders not represented in the confidential process)—but (supposedly) subject to dispute in its original amount—is illogical and does not comport with the

---

[165] Addendum-19-1182-page-I-239,300-#5053-page-78-of-88;#5055-page-8-of-45.
[166] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.
[167] JA-12-1568-to-1574-Docket#4673-page-3-to-9-of-17.

rule of law.  There was no legal justification for the settlement process, incorporated into the Plan, to give away almost one-half of the collateral.

*Seventh*, it is no answer to say that a settlement is preferable to what would otherwise be an "all-or-nothing" result.[168]  No settlement can abrogate constitutional rights of non-consenting bondholders.  *A fortiori* where parties negotiating settlement (Commonwealth and COFINA) were:

- acting contrary to their prior representations as to the validity of the lien and undertakings not to impair the lien (Section-B.1);

- self-interested in the result, whereby one Commonwealth instrumentality (COFINA) transferred property to Commonwealth itself (Section-B.1).

There is nothing inherently "bad" about judicial rulings resulting in an "all-or-nothing" outcome.  If the COFINA lien were valid—as Commonwealth representatives for years had said, and as FOMB and Commonwealth's legislature themselves recognized—an "all-or-nothing" result that upholds the legality/validity of the lien and results in bondholders getting paid respects the rule of law.  The results-oriented settlement from the confidential process does not.

The fact that without a settlement COFINA would be "embroiled in ongoing litigation" that could last "months or even years"[169] does not justify substituting a mediation-settlement process for adjudication.  Had the court adjudicated the dispute argued in April 2018 (Adv.Proc.17-257-Docket 434)—rather than defer to the confidential process—a decision likely could have been reviewed on appeal by now.

Finally, FOMB (representative of Commonwealth and COFINA) told this Court that the original COFINA bonds were secured by a statutory lien and SUT

---

[168] Addendum-19-1182-page-I-218-219-Docket#5053-page-57-to-58-of-88.
[169] Addendum-19-1182-page-I-226-Docket#5053-page-65-of-88.

income was not an available resource.[170]  This Court reversed, as FOMB urged.
853 F.3d 548.  FOMB should be estopped from contending otherwise.  *New
Hampshire* v. *Maine*, 532 U.S. 742, 749-52 (2001); *Alternative System* v. *Synopsys*,
374 F.3d 23, 32-36 (1st Cir. 2004).

### B.     Due Process, Ex Post Facto and Bankruptcy Clauses.

The plurality in *Eastern Enterprises* recognized that retroactive application
of legislation could violate substantive Due Process if plaintiff established that its
liability was "arbitrary and irrational."  524 U.S. at 537.  Having concluded that
retroactive application violated the Takings Clause, the plurality did not address the
Due Process claim.  *Id*. at 538.  However, Justice Kennedy, concurring, invoked
Due Process, reasoning:

> If retroactive laws change the legal consequences of transactions long
> closed, the change can destroy the reasonable certainty and security
> which are the very objects of property ownership.  As a consequence,
> due process protection for property must be understood to incorporate
> our settled tradition against retroactive laws of great severity.  (*Id*. at
> 548-49).

Justice Thomas concurred that the Takings Clause was violated, but wrote to
emphasize that the Ex Post Facto Clause "even more clearly reflects the principle
that '[r]etrospective laws are, indeed, generally unjust.'"  (524 U.S. at 538-39).

Justices Kennedy and Thomas' opinions point to application of substantive
Due Process and extension of Ex Post Facto jurisprudence as additional grounds to
preclude retroactive application of PROMESA to bonds long-ago issued, in the
2007-2011 time period.

---

[170] Section-A;Addendum-19-1182-page-IV-020-021;JA-6-1022-to-1023-
Docket#4585-page-10-to-11-of-43;JA-11-1426-to-1432-#4606-7-page-33,77-to-
81,101-of-447.

Furthermore, PROMESA is *not* a "uniform" law "on the subject of bankruptcies throughout the United States" (as Article I, §8, cl.4 requires). PROMESA was targeted to an existent situation involving Puerto Rico and does not apply "throughout the United States".

## III. "VOTING" CANNOT OVERRIDE CONSTITUTIONAL RIGHTS, AND ABUSES HERE WARRANT REVERSAL.

Constitutional rights cannot be abrogated by "vote."

Furthermore, bond covenants provided that rights to principal and interest rate could *not* be modified over *any* bondholder's objection. (Section-A). Prior to PROMESA, self-interested bondholders could not "vote" to abrogate the rights of others.

PROMESA's retroactively-imposed vote mechanism was abused to permit self-interested bondholders to vote to "take[] *property* from A. and give[] it to B."—as *Calder* v. *Bull*, 3 U.S. 386, 388 (1798) put it. As shown (Sections B.2-B.6,C,D):

- Special benefits to Plan negotiators placed them in a conflicted position versus 50-states individual bondholders.
- Senior COFINA and GO bondholders were additionally conflicted by purchases at depressed post-PROMESA prices of large quantities of subordinated bonds, which enabled them to control the vote of such bonds and profit at even low recovery levels.
- Puerto Rico investors were induced by "enhanced distributions"—available only to them—to "opt-out" of Class 5 and thereby "accept" the Plan.

- Notice (plus a flash drive containing the disclosure statement and Plan) was received by individuals on the eve of the holidays, creating an impediment to objection and voting for many.

- The disclosure statement affirmatively misrepresented facts bearing upon federal tax consequences, Bonistas' role and what 50-states individual investors would receive.

Abuses like these prompted the Supreme Court to reverse confirmation of a municipal debtor's plan in *American United* v. *City of Avon Park*, 311 U.S. 138 (1940). The Court:

- emphasized the court's responsibility to ensure a plan is "openly arrived at and devoid of overreaching, however subtle." *Id.* at 146.

- expressed concerns about "special benefits for the reorganizers." *Id.*

- addressed "the need for protection of investors against an inside few or of one class of investors from the encroachments of another" and "[t]he requirement of full, unequivocal disclosure." *Id.*

- admonished against "unfair discrimination," noting that "a composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others" and that "if a vote is influenced by the expectation of advantage … it cannot be considered an honest and unbiased vote." *Id.* at 147.

- reversed confirmation despite approval by "the vast majority of security holders" (*id.* at 148).

## IV. NEW BOND LEGISLATION, ABROGATING LIENS AND OTHER RIGHTS OF COFINA BONDHOLDERS, VIOLATES CONTRACTS CLAUSE.

The Contracts Clause provides "[n]o state shall… pass any… law impairing the obligation of contracts." Art.I, §10, cl.1. This prohibits states (or

Commonwealth) from enacting laws or exercising powers that would permit borrowers (including states or Commonwealth) to abrogate their debts.[171]

Commonwealth's New Bond Legislation was enacted, prior to confirmation, "to implement" the "plan support agreement" "settlement."[172]

Commonwealth's New Bond Legislation impairs contractual obligations: its "Statement of Motives" states that it amends Act 91 and "[t]hese amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government…"[173]

The New Bond Legislation directly contravenes Commonwealth's Act-91 statutory non-impairment covenant ("No amendment" to Act 91 "shall undermine any obligation or commitment of COFINA", Section-A), and representations and covenants in Official Statements and Bond Resolutions.[174]

A Plan premised on New Bond Legislation that violates the Constitution and Commonwealth's own contracts clause and statutory covenants could not properly be confirmed. 48 U.S.C. §2174(b)(3). Furthermore, §2163 precludes this legislation from binding nonconsenting creditors. If FOMB is ruled to be a territorial entity, FOMB's certification of the fiscal plan and other acts likewise violated the Contracts Clause.[175]

---

[171] The Contract Clause applies to Commonwealth (*cf. United Automobile* v. *Fortuño*, 633 F.3d 37 (1st Cir. 2011)).

[172] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43;JA-4-639-#4364-page-140&n.35-of-263.

[173] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[174] Addendum-19-1182-page-IV-002,007-JA-8-1207,1228,1256-to-1257-Docket#4606-4-page-30,57,151-to-152-of-173;Addendum-19-1182-page-IV-011-012-JA-10-1382,1408-#4606-6-page-153,227-of-241.

[175] JA-6-1034-to-1035-Docket#4585-page-22-to-23-of-43.

*United States Trust*, 431 U.S. 1, ruled that repeal of a statutory covenant that protected bondholders violated the Contracts Clause. The Court stated that the state's "self-interest" militated against "complete deference to a legislative assessment of reasonableness and necessity":

> A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all. (*Id.* at 26)

Here, Commonwealth is the self-interested beneficiary of impairment of bondholders' contracts. The supposed "compromise," negotiated by representatives of Commonwealth and its instrumentality COFINA, transferred property that secured the COFINA bonds to Commonwealth and abrogated the property and other rights of subordinate bondholders (including the covenant that principal and interest not be modified "without the consent of each Bondholder") in order to—as per Commonwealth's "Statement of Motives"—"allow for the restructuring of the COFINA debt."[176]

A modification of a state's financial obligations can be constitutional only if it is both "reasonable and necessary to serve an important public purpose." 431 U.S. at 25. Under *United States Trust*, Commonwealth—self-interested in taking the property—bears the burden of demonstrating that abrogation of liens and rights of subordinate bondholders is both reasonable and necessary. 431 U.S. at 31 ("the State has failed to demonstrate.").[177] The Constitutional violation here follows *a*

---

[176] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[177] Two judges, concurring in *United Automobile*, stated the Supreme Court suggested that the burden of establishing reasonableness and necessity lies with the government and whether a plaintiff asserting a Commerce Clause violation bore the burden of proof was "unsettled"; they emphasized the "outcome of *this* case

*fortiori* from *United States Trust*, where a covenant's abrogation did not directly jeopardize payments to bondholders. 431 U.S. at 18-19.

Chief Justice Burger, concurring in *United States Trust*, would have imposed an even more stringent standard, namely that "the State must demonstrate" "that the impairment was essential to the achievement of an important State purpose," and "that it did not know and could not have known the impact of the contract on that state interest at the time that the contract was made." 431 U.S. at 32. This standard should be applied here and also was not met.

COFINA failed to meet its burden to demonstrate impairment for its own "self interest" was "reasonable and necessary":

- COFINA had no necessity to reduce its debt. If the lien was left in place, pledged revenues were sufficient to pay senior *and* subordinate. Typically, COFINA debt service was covered in approximately six months—coverage was effectively 2-to-1. COFINA was not insolvent; there was no justification for filing COFINA's Title III, triggering a stay suspending interest payments.[178]

- There were no analyses in the Disclosure Statement showing that—if the pre-existing statutory lien on pledged revenues were honored—COFINA would be *un*able to pay its existing debt service.[179]

- COFINA's fiscal plan does not state that pledged revenues were inadequate to service COFINA's existing debt. Rather, COFINA's fiscal

---

need not turn on definitive resolution of the burden issue." 633 F.3d at 48-49 (Boudin & Howard, JJ., concurring).

[178] Section-A;JA-6-1044-to-1045-Docket#4585-page-32-to-33-of-43.

[179] *Compare*-JA-4-664-Docket#4364-page-165-of-263.

plan shows the New Bond Legislation and Plan would take away pledged revenues that otherwise would be adequate to service COFINA debt.[180]

Since no court ever ruled that Commonwealth—as distinct from COFINA—owned the pledged tax revenues, Commonwealth's asserted need for "extra money" (as the Supreme Court put it) is legally irrelevant. But, even if Commonwealth's asserted need for "extra money" could lawfully be considered, the Supreme Court's standard for when a state (or Commonwealth) can abrogate its own contracts is not met here[181]:

- Puerto Rico and its instrumentalities reported bank account balances of $12.1 *billion* (as of the hearing), including $3.6 *billion* in its TSA account.[182]

- Numerous expenditures—including hundreds of "PR" and consulting contracts costing hundreds of millions of dollars, hundreds of millions of dollars of Christmas bonuses, and payments to Government employees who do not report to work—are not "essential."[183]

- Puerto Rico's costs to avoid its debt are on track to exceed $2 *billion* in professional fees, FOMB expenses and Title III costs.[184] Spending less on debt-avoidance would free up funds for services.

---

[180] JA-5-824-to-826-Docket#4364-4-page-27-to-29-of-141.

[181] JA-6-1045-to-1051-Docket#4585-page-33-to-39-of-43;JA-7-1173-to-1176-#4606-3-page-9-to-12-of-13.

[182] JA-6-1049-to-1050-Docket#4585-page-37-to-38-of-43;JA-7-1174-#4606-3-page-10-of-13;JA-11-1451,1452-#4606-7-page-402,406-of-447; JA-11-1458-#4606-7-page-425-of-447.

[183] JA-6-1048-Docket#4585-page-36-of-43;JA-7-1175-#4606-3-page-11-of-13;JA-11-1479-to-1491-#4606-8-page-94,96,103-05,107-to-166-of-180.

[184] JA-6-1048-to-1049-Docket#4585-page-36-to-37-of-43;JA-12-1577-to-1578-#4673-page-12-to-13-of-17.

- Puerto Rico *told investors* that:

  o "any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt".

  o "If one factors in the federal debt load, PR would rank *last* in outstanding debt per capita among all US jurisdictions".

  o per capita state and local debt in Puerto Rico of $15,956 was dramatically *lower* than combined state, local and federal debt per capita of any state.[185]

- Most Puerto Rico taxpayers do not pay federal income taxes. In many states the overall state, local and federal tax burden far exceeds that of Commonwealth taxpayers.[186]

- Per KPMG (Puerto Rico's auditor)[187], Puerto Rico's revenues from taxes as a percent of GDP are much lower than the OECD country average (10.66% GDP in Puerto Rico, versus OECD average 33.19% GDP).[188]

- Puerto Rico has a significant informal economy not subject to effective taxation. As Commonwealth plans have noted, "[a]bout one quarter of Puerto Rican workers participate in the informal economy …., a portion

---

[185] JA-6-1046-Docket#4585-page-34-of-43;JA-7-1174-#4606-3-page-10-of-13;Addendum-19-1182-page-IV-023-024-JA-11-1465,1473-#4606-8-page-1,57-of-180(emphasis added).

[186] JA-6-1047-Docket#4585-page-35-of-43;JA-7-1174-to-1175-#4606-3-page-10-to-11-of-13.

[187] JA-5-829-Docket#4364-5-page-5-of-42.

[188] Addendum-19-1182-page-IV-026;JA-6-1047-Docket#4585-page-35-of-43;JA-7-1175-#4606-3-page-11-of-13;JA-11-1477-to-1478-#4606-8-page-83-to-84-of-180.

substantially higher than any mainland state."[189]  Effectively taxing these activities would increase revenue.

- In December 2018, Commonwealth *lowered* taxes (including sales taxes) by $2 *b*illion.[190]  Taxes were lowered again in 2019, and large tax credits and preferential rates exist.[191]  Had Commonwealth not enacted (politically popular) tax reductions, additional funds would be available.

- Puerto Rico could improve its business climate.  World Bank's "Doing Business" report ranks Puerto Rico #64, below Albania (#63) and Rwanda (#29).[192]

Underscoring the inequity of FOMB's efforts to evade review:  Violations of rights of secured creditors, and refusals to make debt payments, have led to accumulating cash balances.[193]  Large cash balances[194] have allowed officials to avoid deciding what spending is essential (versus politically popular), and enabled waste and corruption—amounting to hundreds of millions, likely billions, of dollars.[195]

---

[189] JA-2-259-to-260-Docket#3126-page-63-to-64-of-101;JA-2-275-#3126-1-page-43-of-145;JA-6-1047-#4585-page-35-of-43.

[190] JA-6-1049-Docket#4585-page-37-of-43;JA-7-1176-#4606-3-page-12-of-13;JA-11-1492-to-1495-#4606-8-page-167-to-170-of-180;JA-16-2536-to-2537,2592-to-2601-#7211-1-page-25-to-26,81-to-90-of-146.

[191] JA-17-2689-to-2690,2731-to-2745-Docket#7961-page-13-to-14-of-19;#7961-1-page-37-to-51-of-71.

[192] JA-6-1049-Docket#4585-page-37-of-43;JA-7-1176-#4606-3-page-12-of-13;JA-11-1496-to-1498-#4606-8-page-171-to-173-of-180.

[193] JA-11-1450-to-1464-Docket#4606-7-page-399-to-447-of-447;JA-16-2537-to-2538,2602-to-2624-#7211-1-page-26-to-27,91-to-130-of-146.

[194] Now about $15.5 billion overall and over $8 billion TSA (AAFAF.pr.gov/reports), despite the failure to control spending and multiple tax reductions.

[195] JA-6-1045-to-1051-Docket#4585-page-33-to-39-of-43;JA-7-1174-to-1176-#4606-3-page-10-to-12-of-13;JA-11-1479-to-1491,1496-to-1498-#4606-8-page-

FOMB itself bears significant responsibility for this: FOMB approved abusive contracts[196] and stands by while billions of dollars sit in accounts that do not earn interest for Commonwealth.[197]

PROMESA is being misused to turn what was intended by Congress to be a "temporary" stay into a sword to deprive bondholders of their rights. 48 U.S.C. §2194(k),(l),(m)(5)(B).[198]

The court asserts Congress can impair contracts through bankruptcy legislation.[199] But:

- PROMESA does not authorize *Commonwealth* to enact legislation impairing contracts and releasing liens. Rather, PROMESA precludes such impairment (48 U.S.C. §§2163, 2195(a)) and precludes confirmation premised on actions prohibited by law (here, U.S. and Commonwealth constitutional provisions and Commonwealth's statutory nonimpairment covenant, Point-VIII). The House Report reiterates the statute: lawful liens "guaranteed by the territorial constitution and applicable laws" are protected. (Point-I)

- There is no "Congress-authorized-violation" exception to the Contracts Clause. Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution." *Saenz* v. *Roe*,

---

94-to-166,171-to-173-of-180;JA-12-1577-to-1578-#4673-page-12-to-13-of-17;JA-17-2686-to-2690,2704-to-2730,2750-to-2765-#7961-page-10-to-14-of-19;#7961-1-page-9-to-31,33-to-36,56-to-71-of-71;JA-18-2786-to-2787,2791-to-2796-#8308-page-13-to-14-of-17;#8308-1-page-2-to-7-of-7.

[196] JA-18-2786-to-2787,2791-to-2796-Docket#8308-page-13-to-14-of-17;#8308-1-page-2-to-7-of-7.

[197] JA-17-2687-to-2688,2750-to-2765-Docket#7961-page-11-to-12-of-19&n.10;#7961-1-page-56-to-71-of-71.

[198] JA-6-1050-Docket#4585-page-38-of-43.

[199] Addendum-I-19-1182-page-I-212-Docket#5053-page-51-of-88.

526 U.S. 489, 508 (1999).  For example, "Congress has no affirmative power to authorize the states to violate the Fourteenth Amendment and is implicitly prohibited from passing legislation that purports to validate any such violations."  *Id.*  So, too, Congress cannot authorize states (or Commonwealth) to violate the Contracts Clause.

- Even if Congress could authorize *Commonwealth* to impair contracts and release liens, PROMESA should not be construed to apply retroactively to abrogate pre-PROMESA rights (Point-I).

- If construed to retroactively authorize Commonwealth to violate the Contracts Clause, PROMESA would violate other constitutional limitations (Point-II.A,II.B), and nonconsenting bondholders would be entitled to just compensation.

- The court relies upon the *City of Stockton* bankruptcy court[200], yet overlooks that that court quoted from the *argument of counsel preceding* Chief Justice Marshall's opinion in *Sturges* v. *Crowninshield—compare* 17 U.S. at 191 (in official reporter).  The court's actual opinion in *Sturges* underscores that state legislation impairing pre-existing contracts is unconstitutional (17 U.S. at 206-08).  Neither case supports impairing the rights of a secured creditor.

The court conclusorily asserts that "the legislation is reasonable and necessary" to "aid the effectuation of the settlement."[201]  But:

- The court does not discuss *United States Trust*, or specifically address the evidence Appellants proffered.

---

[200] Addendum-19-1182-page-I-212-Docket#5053-page-51-of-88.
[201] Addendum-19-1182-page-I-214-Docket#5053-page-53-of-88.

- "Effectuation of the settlement" underscores the pernicious consequences of the constitutional violations:  A deal struck in secret is then implemented through legislation to take property from, and impair contracts of, non-resident non-participants in the negotiations.

## V.     PLAN DISCRIMINATES AGAINST 50-STATES RESIDENTS IN VIOLATION OF LAW AND DUE PROCESS, EQUAL PROTECTION AND PRIVILEGES AND IMMUNITIES CLAUSES.

All subordinated bondholders bought bonds secured by the same COFINA lien, but only "on-island" investors could opt for the Puerto Rico preference (Section-B.6).  The discrimination against individual 50-states bondholders based on residence violates Article IV, §2, cl.1, Amendment V, Amendment XIV, §1 and 48 U.S.C. §737 ("rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico"):

1.     *Mullaney* v. *Anderson*, 342 U.S. 415, 419-420n.2 (1952), held an Alaska license fee that was lower for residents than non-residents violated Article IV §2, and noted that Congress had enacted §737 "'so as to leave no doubt that there may be no discrimination against citizens of the United States who are not residents of Puerto Rico.'"[202]

Article IV §2's "Privileges and Immunities" Clause precludes discrimination against non-residents in commercial endeavors.  *Hicklin* v. *Orbeck*, 437 U.S. 518 (1978) (striking down hiring preference for Alaska residents); *Toomer* v. *Witsell*, 334 U.S. 385, 396-397 (1948) ("one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial

---

[202] JA-7-1097-to-1098-Docket#4595-pages-6-to-7-of-21;JA-11-1499-to-1505-#4606-8-page-174-to-180-of-180.

equality with the citizens of that State"; the constitutional prohibition applies to prohibit discrimination whether based on status of a "citizen" or of a "resident").

2. The Plan's discrimination violates the Equal Protection Clause. *Shapiro* v. *Thompson*, 394 U.S. 618, 638 (1969), ruled that a state's distinction between welfare applicants according to whether they had lived in the state for one year violated the Equal Protection Clause, noting that such a distinction "must be judged by the stricter standard of whether it promotes a compelling state interest."

3. PROMESA does not, and cannot, authorize discrimination against individuals based on residence. *Saenz*' ruling that Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution …" (526 U.S. at 508) is applicable to the Privileges and Immunities Clause and the Equal Protection Clause (*id*. at 507-508 & n.21).

Similarly, *Shapiro* ruled "Congress may not authorize the States to violate the Equal Protection Clause" (394 U.S. at 641) and federal legislation discriminating based on residence violated the Due Process Clause because "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" 394 U.S. at 641-642.

4. The Plan's preference to "on-island" bondholders runs afoul of the dormant Commerce Clause.

*Camps Newfound/Owatonna* v. *Town of Harrison*, 520 U.S. 564 (1997), held that an otherwise generally applicable state property tax violates the Commerce Clause because its exemption for property owned by charitable institutions excluded organizations operated principally for the benefit of nonresidents:

- The dormant Commerce Clause prohibition on discrimination could not be side-stepped by artful phrasing: "To allow a State to avoid the strictures of the dormant Commerce Clause by the simple device of

labeling its discriminatory tax a levy on real estate would destroy the barrier against protectionism that the Constitution provides." *Id*. at 575.

- Preferences to residents were unconstitutional discrimination: "We have 'consistently…held that the Commerce Clause…precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom.'" *Id*. at 576.

*Accord Comptroller* v. *Wynne*, 135 S.Ct. 1787, 1794 (2015) ("Under our precedents, the dormant Commerce Clause precludes States from 'discriminat[ing] between transactions on the basis of some interstate element'"); *Tennessee Wine* v. *Thomas*, 139 S.Ct. 2449, 2461-62 (2019).[203]

The court conclusorily determined Puerto Rico residents who opted for the "on-island" preference were properly treated as a separate class even though they owned the same bonds as 50-states holders.[204] However, separate classes—based on residence—does not obviate the constitutional and statutory violations.

The court echoed Plan proponents' conclusory "justifications" for discrimination,[205] namely, that (i) it was "uncertain" whether all COFINA bonds would be tax exempt, and (ii) letting Puerto Rico residents—including those who originally bought taxable bonds—opt for 2% cash (and one, shorter maturity, interest-bearing CUSIP) benefitted 50-states investors by "maximizing the amount

---

[203] Congress has not expressly sanctioned the discrimination. Indeed, PROMESA Title VI, 48 U.S.C. §2231(d)(3)(E), states bonds "of the same Issuer that have identical rights in security or priority" are *not* to be placed into separate pools. JA-6-1024-Docket#4585-page-12-of-43.

[204] Addendum-19-1182-page-I-191-to-I-192-Docket#5053-pages-30-31-¶60.

[205] *Compare*-Addendum-19-1182-page-I225-to-I226-Docket#5053-page-64¶145-to-page-64-to-65¶146-of-88-*with*-JA-13-1800-to-1801-#4846-1-page-56¶142-to-page-57¶143-of-121.

of tax-exempt securities" available to them, so that both end up with "reasonably equivalent treatment."

But the court was unaware of FOMB's secret requests of the IRS that would let *all* bonds be federally tax-exempt. (Section-C.3)

Furthermore, FOMB's proffered justification[206] was contrived:

- 50-states investors who do not pay federal taxes (retirement accounts) were *not* offered preferential treatment.[207] If the true purpose of the Puerto Rico preference was to help mainland investors by enhancing their ability to receive tax-exempt bonds, the preference would have been extended to mainland retirement accounts not subject to federal tax.

- There was no justification for providing "on-island" residents shorter maturity (2040), coupon-paying bonds[208], whereas 50-states residents received up to 14 splintered fragments, most of which did not pay interest, maturing as late as 2058, with limited marketability, and suffered forced sales of fractional bonds at depressed prices.[209]

- Taxable securities were *originally* sold to Puerto Rico residents who do not pay federal income taxes. (Section-B.6) Yet "on-island" investors who *originally* bought taxable securities still received the preference.

- Based on FOMB's undisclosed request of the IRS, all COFINA bonds—including those issued to recipients of the Puerto Rico preference—could be tax-exempt and, post-confirmation, Puerto Rico preference recipients

---

[206] JA-13-1800-to-1801-Docket#4846-1-page-56¶142-to-page-57¶143-of-121.

[207] JA-4-523,540-to-543,548-Docket#4364-page-24,41-44,49-of-263;JA-6-890-to-897-#4438-page-8-to-15-of-31;JA-15-2282-to-2283-#6283-page-6-to-7-of-13.

[208] JA-4-520-to-521-Docket#4364-page-21-to-22-of-263.

[209] JA-4-522-Docket#4364-page-23-of-263;JA-15-2284-to-2288,2367-to-2369-#6283-page-8-to-12-of-13;#6283-11-page-6-to-8-of-18.

were given the same ability to exchange for tax-exempt bonds as 50-states investors.[210]

- The Plan's unconstitutional discrimination altered the outcome of the Class 5 vote (Section-D)—without which the lien could not have been impaired. (11 U.S.C. §§1129(a)(8),(b)(2)(A); 48 U.S.C. §2161(a)) The remedy for the constitutional violation must fully compensate nonconsenting bondholders for the impairment of the lien.

## VI. PROCEDURES VIOLATED RIGHTS OF 50-STATES BONDHOLDERS.

The court characterized the Plan as the "result" of a "consensual resolution" through a "court-sanctioned" mediation-settlement process, which "determined" distributions and "incorporates a complex series of interrelated compromises and settlements" that "are inextricably interwoven" and "all hinge on one another," thus "approval of all of these compromises and settlements is required."[211]

The court's desire to resolve a complex proceeding – and apparent concern about "all-or-nothing" results – cannot justify what occurred:

- Modest-sized 50-states bondholders were *not* participants in the confidential process (Section-C.1).

- Negotiators in the confidential process received special benefits not available to non-participants and had interests that conflicted with 50-states individual bondholders (Section-B.2,B.3,B.4,B.5,B.6).

---

[210] JA-16-2494-to-2498,2518-to-2526,2563-to-2564-Docket#7211-page-5-to-9-of-24;#7211-1-page-7-to-15,52-to-53-of-146;JA-18-2811-to-2812,2824,2834-#8427-page-15-to-16-of-20;#8427-1-page-8,18-of-69.

[211] Addendum-19-1182-page-I-169,183,199-200,203,215-216,219,230-Docket#5053-page-8,22,38-39,42,54-to-55,58,69-of-88.

- No actual advance notice was sent to modest-sized 50-states investors telling them that their rights could effectively be determined in the confidential process, and giving them a practical way to meaningfully participate—not even to known persons who had filed proofs of claim (Section-C.1), as due process requires. *Tulsa Professional*, 485 U.S. at 491; *Mennonite Board* v. *Adams*, 462 U.S. 791, 795-800 (1983).

- After-the-fact reports of settlements reached were no substitute for such actual advance notice *before* the confidential process took place. The only notices actually mailed to non-participating bondholders were sent after the confidential process was over and the negotiators' "deals" were incorporated in the Plan (Section-C.1,C.2).

- The failure to provide actual advance notice of the confidential process, and offer a practical opportunity to participate, was not "harmless". When the court *later* required notice to go to all *general obligation* bondholders, 1700+ bondholders elected to participate pro se in the GO case.[212]

- The court asserted that the mediation program was "open to all interested participants on terms announced by the Mediation Team."[213] This ignores the lack of actual advance notice and is contradicted by the court's repeated insistence on strict confidentiality (Section-C.1). Furthermore, even if (contrary to fact) there had been advance notice, mediation cannot bind non-participants who do not consent. *Cf. Taylor* v. *Sturgell*, 553 U.S. 880, 896-901 (2008) (rejecting "virtual representation" theory even for judicial proceedings).

---

[212] JA-16-2489-Docket#7154-page-3&n.6-of-14;JA-17-2645-to-2646-#7540-page-4-to-5&n.2-of-19.

[213] Addendum-19-1182-page-I-204-205-Docket#5053-page-43-to-44-&n.13-of-88.

- Even if an *adjudication* in a bankruptcy could—if other due process requirements were met—bind nonparticipants, a confidential mediation-settlement process involving some sub-set of parties cannot. Mediation was no substitute for *adjudication* of property interests *by the court*. Yet the court adopted a Plan that was the "result" of a confidential process, and provided distributions "determined" by that process—*not* by an adjudication of parties' property interests and rights.[214]

- There was no contemporaneous public record of what transpired in the confidential process. After-the-fact assertions of arm's-length negotiations[215] cannot be considered against nonparticipants.

- Since the confidential mediation-settlement process "determined" distributions[216], First Amendment rights of public access to court proceedings were violated. *Delaware Coalition* v. *Strine*, 733 F.3d 510 (3d Cir. 2013) (marshalling Supreme Court jurisprudence; holding First Amendment public right of access applied to "government-sponsored arbitrations" presided over by judges)[217]. The Third Circuit's cited rationales (*id.* at 519-21) apply here, where the court relied upon the "resolution" in a "court-sanctioned" mediation-settlement process "led" by a federal judge that determined distributions, and imposed the "result" on nonparticipants.[218]

---

[214] Addendum-19-1182-page-I-199,203,215-216,219-Docket#5053-page-38,42,54-to-55,58-of-88.

[215] Addendum-19-1182-page-I-169,230,242-Docket#5053-page-8,69,81-of-88.

[216] Addendum-19-1182-page-I-216-Docket#5053-page-55-of-88.

[217] JA-13-2093-to-2094-Docket#4911-page-4-to-5-of-8.

[218] Addendum-19-1182-page-I-169,183,199-200,203,215-216-Docket#5053-page-8,22,38-39,42,54-55-of-88.

The court asserted that all major classes of claims were represented in the mediation.[219]  However, *not one* individual 50-states subordinate bondholder is identified as a participant, and none participated.  (Section-C.1).

Representatives of other subordinate bondholders who participated—and received special benefits from the "settlement" (Section-B.5,B.6,C)—were not fiduciaries or adequate representatives of modest-sized 50-states bondholders. *Taylor*, 553 U.S. at 896-901.

- Assured (bond insurer) was not a member of Class 5.  Assured received multiples forms of added consideration, including enhancement of its 20-fold greater interest as insurer of other Puerto Rico bonds (Section-B.5).

- The unnamed "retail or mutual funds" had senior as well as junior positions; received the added Consummation Cost consideration—on account of subordinate as well as senior holdings; and (in light of much larger positions) were not adversely impacted by a distribution of splintered securities (Section-B.5).

- Bonistas—supposedly advocating for "on-island" bondholders—was represented by counsel for a major GO bondholder group.  Commonwealth sought to reward Bonistas with a $7 million payment, and Bonistas' principals had other undisclosed interests.  (Section-B.6,C.3).

The court asserted there was an opportunity to challenge mediation proposals before the court.[220]  But:

- This was illusory in practice:  the court was constrained by recognition that the "Plan incorporates a complex series of interrelated

---

[219] Addendum-19-1182-page-I-203-204-Docket#5053-page-42-to-43-of-88.

[220] Addendum-19-1182-page-I-204-205-Docket#5053-page-43-to-44-&n.13-of-88.

compromises," "[e]ach aspect of the settlement is interdependent," "approval of all" of the "inextricably interwoven" compromises "is required" and "modifications" or "failure to approve" may "set back" COFINA's Title III Case.[221]

- Confirmation is not the proper process for abrogating bondholder property rights. Due process and Rule 7001(2) required an adversary proceeding against each bondholder. *Mansaray-Ruffin*, 530 F.3d 230, 234-43 (3d Cir. 2008); *Commercial Western Finance*, 761 F.2d 1329, 1336-38 (9th Cir. 1985).

- The confirmation procedure was deficient (Section-C):
  o A flash drive with the 591-page Disclosure Statement and other dense legal documents was received by 50-states bondholders just days prior to the holidays (Section-C.2)—little time remained to study voluminous materials on the flash drive, perhaps consult with an attorney, and prepare and serve objections.

  o The disclosure statement contained significant misrepresentations (Section-C.3).

  o Procedures for objections required service on a multitude of law firms and parties,[222] which inhibited individuals from serving objections. Numerous objecting bondholders submitted "letter-objections" (Section-C.6)—which the court refused to consider,[223] despite the fact that, upon docketing, they were distributed through the CM/ECF

---

[221] Addendum-19-1182-page-I-199-200,230-Docket#5053-page-38-to-39-¶84,69-¶160-of-88-*repeating*-JA-13-1781,1804-Docket#4846-1-FF/CL-page-37-¶83,60-¶155-of-121.

[222] Addendum-19-1182-page-I-010-012,026-027-Docket#4382-page-10-to-12-of-19;#4382-2-page-6-to-7-of-14.

[223] Addendum-19-1182-page-I-117-118-Docket#4441.

system to Plan proponents. A less onerous objection process could have been used.[224] Letter-objections should have been considered.

o The court permitted Plan proponents to sandbag objectors by putting in proponents' supporting papers on the same day as their reply papers, followed by thousands of pages of factual submissions on the eve of the hearing (Section-C.4).

o Compounding the inequities, legal expenses were paid for multiple sets of FOMB and Commonwealth counsel. Other Plan proponents received payments that far exceeded any expenses. However, no provision was made for representation of, or payment of expenses for, modest-sized 50-states bondholders. (Sections-B.2,C.5)

o Pro se parties were not permitted to use CM/ECF electronic filing,[225] impairing their ability to participate given the pace of the proceedings. An individual bondholder should not have to hire Puerto Rico counsel (expensive and not easy)[226] to have access to the CM/ECF system.

o Court hearing transcripts are withheld from public access by electronic means for 90 days,[227] which impedes the ability of 50-state individual bondholders to follow proceedings. This violates First Amendment rights of public access which, with today's technology, should entail remote electronic access. *Cf. Press-Enterprise* v. *Superior Court*, 478 U.S. 1, 10-15 (1986); *Press-Enterprise* v.

---

[224] JA-7-1106-to-1107-Docket#4595-page-15-to-16&n.6-of-21.

[225] JA-14-2254-to-2266-Docket#6128;JA-15-2384-to-2393-#6487;JA-15-2394-to-2395-#6534;JA-17-2746-to-2749-#7961-1-page-52-to-55-of-71.

[226] JA-3-318-Docket#3847-page-3-of-36.

[227] *e.g.*, JA-13-1898-Docket#4850-docket entry.

> *Superior Court*, 464 U.S. 501, 510-13 (1984); *U.S.* v. *Smith*, 787 F.2d
> 111, 114-15 (3d Cir. 1986).

Even individual bondholders who submitted timely objections and ballots were prejudiced. The number of votes required for Plan acceptance is based on claims "actually voting to accept or reject"—"[t]here are no quorum requirements."[228] If 50-states individual bondholders—overwhelmed by the volume of material and short time frame (over the holidays)—failed to vote, Plan proponents benefit.

As the Supreme Court did in *American United* (Point III), confirmation must be reversed.

## VII.   APPOINTMENTS CLAUSE VIOLATIONS.

Objection to the Appointments clause violation was made, asserting FOMB's actions, this Title III case, and the COFINA Plan are void; and PROMESA is unconstitutional.[229]

The Appointments clause issue is before the Supreme Court in *Aurelius*. Appellants assert the judgment should be vacated and the Plan modified (as requested below). *Lucia* v. *SEC*, 138 S.Ct. 2044, 2055-56 (2018).

## VIII.   ADDITIONAL VIOLATIONS.

- **Noncompliance with 11 U.S.C. §1123(a)(4)**, requiring a plan "shall" "provide the same treatment for each claim or interest of a particular class."

---

[228] JA-4-555,662-Docket#4364-page-56,163-of-263.

[229] JA-6-1041-Docket#4585-page-29-of-43.

- The Supreme Court ruled in *American United*, 311 U.S. at 147-48, that "equality of treatment" precludes "special favor or inducement" or "expectation of advantage" to influence the vote.

- Informing construction of the "same treatment" requirement, 48 U.S.C. §2231(d)(3)(E) (Title VI), provides "[t]he Administrative Supervisor shall not place into separate Pools Bonds of the same Issuer that have identical rights in security or priority".

PROMESA does not sanction the disparate treatment that occurred (Section-B):

- Dividing holders of subordinate bonds with the same rights into separate "classes" (with the Puerto Rico preference only for Class 7).

- Giving some favored creditors substantial fees, prorated based on holdings.

- Providing added consideration to senior when subordinate had the same lien-security.

The court's view of §1123(a)(4) renders that requirement a dead letter. *Peabody*[230] is inapposite (those receiving added benefits agreed to invest new money; objectors were given notice and could also have contributed new money on preferential terms).

- **Noncompliance with 11 U.S.C. §1125(a)**. Disclosure was not "adequate" (Section-C.3,B.7):

- Statutorily required information on tax consequences was concealed and misrepresented.

- The premise for the Puerto Rico preference was misrepresented.

- Bonistas' role was misrepresented.

---

[230] Addendum-19-1182-page-I-196-Docket#5053-page-35-of-88.

- o   The adverse impact of the splinter bonds problem was not disclosed.
- **Noncompliance with 11 U.S.C. §1129(a)(3)**:  The Plan was not proposed in good faith, and the means by which the Plan was put forward, and the Plan and its implementation (including releases of Commonwealth), violate:
  - o   The U.S. Constitution and laws.
  - o   Commonwealth's own Due Process, Equal Protection, Contracts, Takings and Ex Post Facto Clauses (Addendum-II-003-Article II, §§7,9,12) and statutory nonimpairment covenant (Section-A). (Points-I,II.A,II.B,IV,V,VI,VII.)
- **Noncompliance with 48 U.S.C. §2163**:  New Bond Legislation— "implement[ing]" the "plan support agreement"[231]—constitutes a "composition of indebtedness" that cannot bind nonconsenting bondholders.
- **Noncompliance with 48 U.S.C. §2174(b)(3)**:  Actions to carry out the Plan violate U.S. and Commonwealth Constitutions and laws.  (Points-I,II.A,II.B,IV,V.)
- **Noncompliance with 48 U.S.C. §2174(b)(6)**, requiring that "the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors."
  - o   The court failed to decide whether the original COFINA lien was valid, in which event pledged revenues were sufficient (Section-A).  A decision on validity/legality was necessary to make the §2174(b)(6)

---

[231] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

finding because, if the lien was valid, COFINA bondholders could not be impaired.

o Instead, the court essentially relied upon the results of the confidential process to conclude §2174(b)(6) was met,[232] with findings[233] that largely track what FOMB proposed.[234] But the court cannot rely upon the confidential process—including its "determination" of allocation of distributions[235]—for this purpose. (Points-II.A,VI).

o It is no answer to say that litigation involves risks and that litigating the legality/validity of the COFINA structure and lien could take time.

▪ Any uncertainty as to legality/validity affected senior and subordinate alike, yet senior received a much greater recovery (Section-B.4).

▪ The "53.65%" for COFINA bondholders cannot be justified in light of Commonwealth, FOMB and other attestations as to legality/validity (Section-A).

▪ The legality/validity issue was ready to be decided by Spring 2018.[236] Had the issue been decided then, even appellate review could be complete by now.

▪ Plan proponents have no right to foist a settlement on nonconsenting bondholders who have a right to their principal and interest without reduction, and a statutory lien that no court has ruled to be invalid.

---

[232] Addendum-19-1182-page-I-217-227-Docket#5053-page-56-to-66-of-88.

[233] Addendum-19-1182-page-I-217-227-Docket#5053-¶¶129-to-146.

[234] JA-13-1793-to-1801-FF/CL-Docket#4846-1-¶¶126-to-143.

[235] Addendum-19-1182-page-I-216-Docket-#5053-page-55-of-88.

[236] JA-20-3404-to-3405-Adv.Proc.17-257-Docket#434;Section-A.

- **Noncompliance with 48 U.S.C. §2174(b)(7) and §2141(b)(1)(N)** (Point-I).

- **Noncompliance with 48 U.S.C. §2195(a)**, which imposes liability on Commonwealth for property transferred to it in violation of law. (Points-I,II,IV).

- **Releases:** The court justified releasing non-debtor Commonwealth on the theory Commonwealth committed substantial assets by funding negotiating expenses.[237] But Commonwealth *took* both the lien on $17.5 billion pledged revenues and $33 million in cash for "expenses" (Section-B.1) and is not entitled to a release.

  No authority is cited in the opinion to justify the Plan's exculpation and injunction provisions benefitting selected non-debtors.[238]

## IX. "EQUITABLE MOOTNESS".

This Court's 8/7/2019 order denied dismissal on equitable mootness grounds without prejudice to reconsideration.

- The Supreme Court's dispositive decision in *Mission Product* v. *Tempnology*, 139 S.Ct. 1652, 1660-61 (2019) (Appellants' 5/28/2019 28(j) letter), as well as Appellants' 5/15/2019 Opposition in 19-1182, demonstrate there is no ground for dismissal.

- If FOMB continues to seek dismissal, the Court should consider—in response to FOMB's 4/12/19 moving papers and declaration— Appellants' 5/15/19 Appendices I, II (Docket#6283-to-#6283-11) and V (Docket#5097,#5100,#5117,#5118,#5123, #5136), plus Docket#7211,#7961,#8308,#8427,#8487,#8626. This material—

---

[237] Addendum-19-1182-page-I-233-Docket#5053-page-72-of-88.

[238] Addendum-19-1182-page-I-233-234-Docket#5053-page-72-to-73-of-88.

including belated revelations of FOMB, COFINA and Commonwealth that can be judicially noticed[239]—underscores "equitable" considerations militate *against* dismissing this appeal.

o Dismissal would preclude review of constitutional and statutory violations.

o "He who comes into equity must come with clean hands". *Keystone Driller* v. *General Excavator*, 299 U.S. 240, 241 (1933). FOMB has not (Sections-A,B,C,D).

o FOMB withheld information from the district court and bondholders prior to confirmation (Section-C.3) and "sand-bagged" objectors with eve-of-hearing papers to which objectors were not allowed a written response (Section-C.4).

o Consideration of this material is within this Court's authority and appropriate where respondent has been less than forthcoming in the district court. *Dakota Industries* v. *Dakota Sportswear*, 988 F.2d 61, 63-64 (8th Cir. 1993).

o This material is in the record for Appeal 19-1960, consolidated for briefing and argument.

---

[239] JA-14-2165-to-2172-Docket#5097,#5097-1,JA-14-2182-to-2196-#5117,#5117-1,JA-14-2201-to-2224-#5123,JA-15-2293-to-2315,2322-to-2338-#6283-2,#6283-3-page-7-to-15-of-15;#6283-4,#6283-5,#6283-6,JA-16-2562-to-2581,2592-to-2631-#7211-1-page-51-to-70,81-to-137-of-146;JA-17-2701-to-2724,2727-to-2742,2750-to-2765-#7961-1-page-6-to-29,33-to-48,56-to-71-of-71;JA-18-2791-to-2796-#8308-1-page-2-to-7-of-7;JA-18-2821-to-2860,2869-to-2883-#8427-1-page-5-to-44,53-to-67-of-69;JA-18-2914-to-2928-#8487-2;JA-18-2957-to-2960-#8626-1; AAFAF.pr.gov/reports.

- FOMB's efforts to repeat its COFINA Plan gambit in its recent Commonwealth Plan[240] underscore that dismissal will invite repetition of the abuse that occurred.

---

[240] *Compare*-JA-19-3012-to-3016-Docket#8765,JA-19-3017-to-3053-#8766-page-1,262-to-297-of-410-*with*-JA-17-2643-to-2657-Docket#7540,JA-17-2658-to-2671-#7732,JA-17-2677-to-2765-#7961,JA-18-2774-to-2796-#8308,JA-19-3057-to-3059-#9038.

## CONCLUSION – RELIEF REQUESTED

The judgment and orders appealed from should be vacated:

- Plan release, exculpation and injunction provisions should be modified to exclude claims by nonconsenting bondholders.

- The court's ruling that the confidential process provided just compensation for nonconsenting bondholders should be vacated.

- The Plan should be modified to

  o reduce the improper transfer of revenues to Commonwealth so as to enable COFINA to pay all principal and interest due nonconsenting bondholders.

  o require added payments—in cash or additional COFINA bonds—to fully compensate nonconsenting bondholders, including all principal and interest due on their original bonds (less the realizable value of new bonds received, factoring in loss of marketability from splintered fragments and adverse tax consequences).

If such relief is granted:

- No security issuances would be unwound, and no "innocent" third parties would be affected.

- COFINA would not be materially affected (the amount of revenues that now flow to Commonwealth would be reduced, and those funds could compensate nonconsenting bondholders).

- Commonwealth—whose legislature "release[d] the lien that holders of COFINA bonds currently have"[241]—would give up only a small portion of what it unconstitutionally took.[242]  Commonwealth cannot complain:

---

[241] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[242] Document-00117439791-5/15/19-Docket-page-5-to-7-internal-page-2-to-4-App.I-0003-0005.

There was never an adjudication that the lien was invalid and that Commonwealth had an entitlement to the property it took.

- An estimated $316 million *one-time* payment could compensate nonconsenting bondholders. This is less than both the $332 million paid to favored parties[243] and Commonwealth's *ongoing* $437.5 million/*year* benefit.[244]

- Alternatively, an estimated $18-28 million/year could cover debt service and principal amortization for added COFINA bonds issued to compensate nonconsenting bondholders.[245]

/s/ Rafael A. González Valiente
Rafael A. González Valiente, Esq.
USDC-PR NO. 225209
Godreau & González Law, LLC
PO Box 9024176
San Juan, Puerto Rico  0092-4176
Tel:  (787) 726-0077
Email:  rgv@g-glawpr.com

/s/ Lawrence B. Dvores
Lawrence B. Dvores, *pro se*
28 Sherbrooke Parkway
Livingston, New Jersey  07039
Tel:  (973) 535-5000
Email:  LDvores@yahoo.com

---

[243] Document-00117439791-5/15/19-Docket-page-6-to-7-internal-page-3-to-4-App.I-004-005.

[244] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[245] Document-00117439791-5/15/19-Docket-page-5-to-7-internal-page-2-to-4-App.I-003-005.

/s/ Peter C. Hein
Peter C. Hein, *pro se*
101 Central Park West, Apt. 14E
New York, New York 10023
Tel: (212) 403-1237
Email: petercheinsr@gmail.com

Dated: November 7, 2019

[Final with "JA" references added: April 30, 2020]

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Fed. R. App.P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App.P. 32(f), this document contains 12,930 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  November 7, 2019

/s/ Peter C. Hein

[Final with "JA" references added:  April 30, 2020]

# CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing Brief of Individual Bondholders, Movant-Appellants in 19-1182 with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel and parties of record.

Dated: November 7, 2019

/s/ Rafael A. González Valiente

[Final with "JA" references added: April 30, 2020]

# United States Court of Appeals
## For the First Circuit

No. 19-1181

IN RE:  THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE
FINANCIAL OVERSIGHT AND0 MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER
AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO

Debtors

RENE PINTO-LUGO; MOVIMIENTO DE CONCERTACION CIUDADANA
INC., (VAMOS); UNION DE EMPLEADOS DE OFICINA Y PROFESIONALES
DE LA AUTORIDAD DE EDIFICIOS PUBLICOS, (UEOGAEP); UNION
INSULAR DE TRABAJADORES INDUSTRIALES Y CONSTRUCCIONES
ELECTRICAS INC., (UITICE); UNION INDEPENDIENTE DE EMPLEADOS
DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, (UIA);
UNION DE EMPLEADOS DE OFICINA COMERCIO Y RAMAS ANEXAS,
PUERTOS, (UEOCRA); UNION DE EMPLEADOS PROFESIONALES
INDEPENDIENTES, (UEPI); UNION NACIONAL DE EDUCADORES Y
TRABAJADORES DE LA EDUCACION, (UNETE); ASOCIACION DE
INSPECTORES DE JUEGOS DE AZAR, (AIJA); MANUEL NATAL-ALBELO

[Caption continues on next page]

**ADDENDUM OF INDIVIDUAL BONDHOLDERS,
MOVANTS-APPELLANTS IN 19-1182**

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors - Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY

Movant - Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP; SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.; TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors

No. 19-1182

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

Debtors

_____

MARK ELLIOTT; LAWRENCE B. DVORES; PETER C. HEIN

Movants - Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors - Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant - Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors

# CONTENTS OF ADDENDUM

## I. JUDGMENTS, DECISIONS, RULINGS AND ORDERS APPEALED FROM[1]

Addendum
Page

- Order Approving Disclosure Statement (entered Nov. 29, 2018, Docket#4382 in 17-03283 and Docket#375 in 17-3284) ......................... I-001

- Notice Regarding the Proper Method for Submission of Objections to the Proposed COFINA Plan of Adjustment (entered Dec. 10, 2018, Docket#4441 in 17-3283 and Docket#384 in 17-3284) ................ I-117

- Memorandum Opinion and Order Approving Settlement between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation (entered Feb. 4, 2019, Docket#5045 in 17-03283) ................................................................................................. I-119

- [Superseded by #5053] Memorandum of Findings of Fact and Conclusions of Law in Connection with the Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (entered Feb. 4, 2019, Docket#5047 in 17-03283 and Docket#558 in 17-3284)

- [Superseded by #5055] Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (entered Feb. 4, 2019, Docket#5048 in 17-03283 and Docket#559 in 17-3284)

- Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with the Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (entered Feb. 5, 2019, Docket#5053 in 17-03283 and Docket#560 in 17-3284) ..................................................................... I-162

---

[1] Listed in docket number order.

- Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (entered Feb. 5, 2019, Docket#5055 in 17-03283 and Docket#561 in 17-3284) ....................................................................... I-293

## II. CONSTITUTIONAL PROVISIONS

### A. U.S. Constitution – Federal

- U.S. Const. Art. I, §8, cl.4 (Bankruptcy Clause) ............... II-001

- U.S. Const. Art. I, §9, cl.3 (prohibition of Bills of Attainder and Ex Post Facto laws) .................................... II-001

- U.S. Const. Art. I, §10, cl.1 (Contracts Clause and prohibition of Bills of Attainder and Ex Post Facto laws) ............................................................................... II-001

- U.S. Const. Art. II, §2, cl.2 (Appointments Clause) .......... II-001

- U.S. Const. Art. IV, §2, cl.1 (Privileges and Immunities Clause) ........................................................... II-002

- U.S. Const. Art. IV, §3, cl.2 (Territory Clause) ................. II-002

- U.S. Const. Amendment V (Due Process and Takings Clauses) .......................................................................... II-002

- U.S. Const. Amendment XIV, §1 (Privileges and Immunities, Due Process and Equal Protection Clauses) ...................... II-002

### B. Constitution – Puerto Rico

- Article II, Section 7 (Due Process, Equal Protection and Contracts Clauses) .................................................... II-003

- Article II, Section 9 (Takings Clause) ............................... II-003

- Article II, Section 12, cl.2 (prohibition on Ex Post Facto laws and Bills of Attainder) .................................... II-003

- Article VI, Section 2 ........................................................ II-003

- Article VI, Section 6 ........................................................II-004

- Article VI, Section 7 ........................................................II-005

- Article VI, Section 8 ........................................................II-005

## III. STATUTES AND RULES

### A. Statutes and Rules – Federal

- 11 U.S.C. §1123(a)(4)...................................................III-001

- 11 U.S.C. §1125(a)-(e),(g) ............................................III-001

- 11 U.S.C. §1129(a)(3),(a)(8),(b)(1),
  (b)(2)(A) ....................................................................III-003

- 48 U.S.C. §737 ...........................................................III-005

- 48 U.S.C. §2101..........................................................III-005

- 48 U.S.C. §2141(b)(1)(N) .............................................III-005

- 48 U.S.C. §2161(a) ......................................................III-006

- 48 U.S.C. §2163...........................................................III-006

- 48 U.S.C. §2174 (b)(1),(2),(3),(6),(7) .............................III-007

- 48 U.S.C. §2194(k).......................................................III-007

- 48 U.S.C. §2194(l)........................................................III-008

- 48 U.S.C. §2194(m)(5) .................................................III-008

- 48 U.S.C. §2195...........................................................III-009

- 48 U.S.C. §2231(d) ......................................................III-009

- Bankruptcy Rule 7001(2)................................................III-012

- F.R. Evid. 408.............................................................III-012

**B.    Statutes – Puerto Rico**

- Act No. 91 (May 13, 2006) ............................................III-014

- Act No. 291 (Dec. 26, 2006),
  amending Act 91 .............................................................III-019

- Act No. 56 (July 5, 2007),
  amending Act 91 .............................................................III-030

- Act No. 1 (Jan. 14, 2009),
  amending Act 91 .............................................................III-042

- Act No. 7 (Mar. 9, 2009)
  (excepts), amending Act 91 ...........................................III-057

- Act No. 18 (May 22, 2009),
  amending Act 91 .............................................................III-066

## IV. OTHER ITEMS (not to exceed 25 pages)

- Declaration of Peter C. Hein, dated Jan. 2, 2019 (Docket#4606-3 through Docket#4606-8 (excerpts)

  – Exhibit D: COFINA series 2010C Official Statement (cover, 1-2, 4, 11, 22-23, 31-32) (Docket #4606-4-pages-30, 36-37, 39, 46, 57-58, 66-67-of-173) (excerpts) ............................................... IV-002

  – Exhibit G: COFINA Amended and Restated Sales Tax Revenue Bond Resolution (adopted 7/13/2007, amended 6/10/09) (cover and page 70) (Docket #4606-6-page-153,227-of-241) (excerpts) ......................................................... IV-011

  – Exhibit H: Webpage printed on 7/24/2015 from Government Development Bank of Puerto Rico "Investor Resources" website (excerpt) (Docket #4606-7-page-1-of-447) (excerpt) ........ IV-013

  – Exhibit J: Commonwealth of Puerto Rico "Conference call about COFINA legal opinions" (10/31/2013) (Docket #4606-7-page-7-to-11-of-447) (excerpts) ...................................... IV-014

  – Exhibit K: FOMB brief in the First Circuit in Case No. 17-1241 (Lex Claims, LLC, *et al.* v. Padilla, *et al.* (Docket #4606-7-page-33,78-to-79-of-447) (excerpts) ........................................... IV-019

  – Exhibit O: BNYM Notice to Holders of COFINA bonds listing amounts held in trust by BNYM in debt service accounts (Docket #4606-7-page-398-of-447) (excerpt) ................................ IV-022

  – Exhibit S: Commonwealth of Puerto Rico "Update on fiscal and economic progress," FY2014 Q1 Investor Webcast – October 15, 2013 (Docket #4606-8-pages-1,57,63-of-180) (excerpt)........................................................................................ IV-023

  – Exhibit U: KPMG, Commonwealth of Puerto Rico Tax Reform Assessment Project (10/31/2014), Table 2: Tax Collections as percent of GDP – Comparison of Puerto Rico to OECD Countries (Docket #4606-8-page-84-of-180) (excerpt) .................. IV-026

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                   Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) FIXING VOTING RECORD DATE, (III) APPROVING CONFIRMATION HEARING NOTICE, (IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES, (V) APPROVING FORMS OF BALLOTS AND ELECTION NOTICES, AND VOTING AND ELECTION PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING STATUS, (VII) FIXING VOTING AND ELECTION DEADLINES, AND (VIII) APPROVING VOTE TABULATION PROCEDURES

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Upon the motion (the "Motion"),[2] dated October 19, 2018, of the Puerto Rico Sales Tax Financing Corporation ("COFINA" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the debtor under PROMESA section 315(b), pursuant to sections 105, 502, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), and 1128 of title 11 of the United States Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 3016, 3017, 3018, 3020, 9013, 9014, and 9021, and Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Puerto Rico (the "Local Rules") 3016-2 and 9013-1 requesting an order: (i) approving the proposed Disclosure Statement, (ii) fixing a Voting Record Date for voting on the Plan (as defined below), (iii) approving the Confirmation Hearing Notice, (iv) approving the proposed contents of the Solicitation Package and procedures for distribution thereof, (v) approving the forms of ballots, election notices, and Class 6 Notice, and establishing solicitation, voting, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status – Class 10, (vii) fixing a Voting Deadline and Election Deadline, and (viii) approving procedures for tabulating creditor votes, all as more fully described in the Motion; and the Court having subject matter jurisdiction to consider the Motion and the relief requested therein pursuant to PROMESA section 306(a); and it appearing that venue in this district is proper pursuant to PROMESA section 307(a); and due and proper notice of the Motion having been provided and it appearing that no other or further notice need be provided; and the Court having determined the relief sought in the Motion is in the best interests of the Debtor, its creditors, and all parties in interest; and the Court

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Motion.

I-002

having determined the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, it is hereby found and determined that:[3]

      A.     The Debtor, by and through the Oversight Board, as the Debtor's representative in its Title III case pursuant to PROMESA section 315(b), has full authority to propose and prosecute the *Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 26, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. 4364 in Case No. 17-3283] and the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 26, 2018 (as the same may be amended or modified, including all exhibits and supplements thereto, the "Plan") [ECF No. 4363 in Case No. 17-3283].

      B.     The Disclosure Statement (including the Questions and Answers contained therein and exhibits attached thereto) contains adequate information within the meaning of section 1125 of the Bankruptcy Code, and no other or further information is necessary for purposes of soliciting acceptances and rejections of the Plan as set forth herein.

      C.     The Disclosure Statement (including the Questions and Answers contained therein and exhibits attached thereto) provides holders of Claims and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Sections 30.2(c), 30.2(d), 30.5, 30.6, 30.7, and 30.11 of the Plan in satisfaction of the requirements of Bankruptcy Rule 3016(c).

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

I-003

D.     The forms of ballots with respect to the Plan, substantially in the forms attached hereto as **Schedules 3A-3G** (each, a "Ballot"), are consistent with Official Bankruptcy Form No. B 314 and adequately address the particular needs of COFINA's Title III Case and are appropriate for the relevant Classes of Claims entitled under the Plan to vote to accept or reject the Plan.

E.     The forms of election notices with respect to the Plan and the notice of the treatment of Claims in Class 6 (Junior COFINA Bond Claims (Assured)), substantially in the forms attached hereto as **Schedules 4A-4C** (each, an "Election Notice") and **Schedule 5** (the "Class 6 Notice"), respectively, address the particular needs of COFINA's Title III Case and are appropriate for the relevant Classes of Claims entitled under the Plan to make an election of the form of distribution under the Plan or to receive notice of the treatment provided for under the Plan with respect to Claims in Class 6.

F.     With respect to Claims in Classes 2, 3, and 6, Ballots to vote to accept or reject the Plan should be provided to Ambac, National, or Assured, respectively, and such party should be entitled to vote the Claims in such Classes.  Beneficial holders of Claims in Classes 2 and 3 shall be entitled to receive Election Notices to make an election with respect to the form of distribution under the Plan.

G.     Ballots need not be provided to the holders of Claims in Classes 4 and 7, because the holders of these Claims are deemed to accept the Plan upon electing to be treated under such Class.

H.     Ballots need not be provided to the holders of Claims in Class 10, because such holders will receive no distributions pursuant to the Plan and are deemed to reject the Plan.

I.     The period set forth during which the Debtor may solicit acceptances and rejections to the Plan and elections with respect to the form of distribution thereunder is a reasonable period

4

I-004

of time for holders of Claims entitled to vote on the Plan or make elections regarding the form of distributions pursuant to the Plan.

J.      The procedures set forth below regarding notice to all parties in interest of the time, date, and place of the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), filing of objections to confirmation of the Plan ("Confirmation Objections"), and the distribution and contents of the solicitation packages (the "Solicitation Packages") provide a fair and equitable notice and voting process and comply with Bankruptcy Rules 2002, 3017, and 3018 and constitute sufficient notice to all interested parties of the Voting Record Date, the Voting Deadline, the Election Deadline, the Confirmation Objection Deadline, the Confirmation Hearing, and all related matters.

K.      Objections to the adequacy of the information contained in the Disclosure Statement having been interposed by (i) Lehman Brothers Holdings, Inc. [ECF No. 4213] (the "Lehman Objection"), (ii) the Bank of New York Mellon, as trustee [ECF No. 4210] (the "BNYM Objection"), (iii) Cooperativa de Ahorro y Crédito de Rincón, Cooperativa De Ahorro y Crédito Dr. Manuel Zeno Gandía, Cooperativa de Ahorro y Crédito del Valenciano, and Cooperativa de Ahorro y Crédito de Juana Díaz [ECF No. 4225] (the "Credit Unions Objection"), (iv) Stephen T. Mangiaracina, Esq. [ECF No. 4215] (the "Mangiaracina Objection"), and (v) Lawrence B. Dvores [ECF No. 4244] (the "Dvores Objection").

L.      The Court having held a hearing on November 20, 2018 to consider the adequacy of the information contained in the Disclosure Statement and the additional relief requested in the Motion (the "Disclosure Statement Hearing").

5

M.    Based upon the modifications made, or agreed to be made, to the Disclosure

Statement, the Lehman Objection, the BNYM Objection, and the Credit Unions Objection having

been withdrawn at the Disclosure Statement Hearing.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.    The Motion is granted as modified herein, and the Mangiaracina Objection, the

Dvores Objection, and all other objections to the Disclosure Statement are overruled.

2.    The Disclosure Statement is approved in its entirety, and the Debtor may

accordingly solicit acceptances and rejections of the Plan as set forth herein.

3.    The forms of Ballots, Election Notices, and the Class 6 Notice are approved.

4.    The record date for purposes of determining creditors entitled to vote on the Plan,

to receive the Class 6 Notice, or, in the case of the non-voting Class 10 to receive the Notice of

Non-Voting Status – Class 10, shall be November 20, 2018 (the "Voting Record Date").

5.    With respect to any transferred Claim, the transferee should be entitled to receive a

Solicitation Package and vote to accept or reject the Plan on account of the transferred Claim only

if: (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e)

have been completed by the Voting Record Date; or (b) the transferee files, no later than the Voting

Record Date, (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer,

and (ii) a sworn statement of the transferor supporting the validity of the transfer. In the event a

Claim is transferred after the transferor has completed, executed, and returned a Ballot, the

transferee of such Claim shall be bound by any vote (and the consequences thereof) made on the

Ballot by such transferor of such transferred Claim.

6

6.      For the purposes of voting to accept or reject the Plan, Ambac, National, or Assured shall have the sole right to cast the votes to accept or reject such Plan on account of Claims in Classes 2, 3, and 6, respectively.

7.      CEDE & Company and The Depository Trust Company shall provide the Debtor within five (5) Business Days of the date of this Order, or as soon as possible thereafter, a listing of the names and addresses of all Nominees that, as of the Voting Record Date, held, directly or indirectly, any of the Existing Securities.

8.      The Debtor shall cause the Balloting Agent to complete the mailing of the appropriate Solicitation Package to all known holders (as of the Voting Record Date) of Claims in Class 1 (Senior COFINA Bond Claims), Class 2 (Senior COFINA Bond Claims (Ambac)), Class 3 (Senior COFINA Bond Claims (National)), Class 5 (Junior COFINA Bond Claims), Class 6 (Junior COFINA Bond Claims (Assured)), Class 8 (GS Derivative Claim), and Class 9 (General Unsecured Claims) (collectively, the "Voting Classes") by no later than the date that is seven (7) Business Days following entry of this Order (the "Solicitation Mailing Date"). Solicitation Packages mailed to creditors holding Claims, or insurers of securities giving rise to such Claims, as applicable, in the Voting Classes will contain, in English and Spanish translation: (i) the Confirmation Hearing Notice; (ii) a flash drive (or hard copy, in the Debtor's discretion) containing this Disclosure Statement Order (without the exhibits hereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) the appropriate Election Notice, if any; (v) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax related

7

information relating to distributions under the Plan; and (vi) in the case of creditors in Class 6, the Class 6 Notice.

9.      If it is a Nominee's customary and accepted practice to forward the solicitation information to (and collect votes or elections from) Beneficial Owners by voter information form, email, telephone or other customary means of communications, as applicable, the Nominee may employ that method of communication in lieu of sending the paper Beneficial Ballot, Election Notice, and/or Solicitation Package.

10.     The Debtor is authorized, but not required, to distribute the Disclosure Statement (together with all exhibits thereto) and the Disclosure Statement Order to the Voting Classes in electronic format (flash drive), and Confirmation Hearing Notice, Ballots, and W-9 form or W-8 BEN form, as appropriate, shall only be provided in paper format.

11.     On or before the Solicitation Mailing Date, the Debtor shall provide (i) complete Solicitation Packages (excluding Ballots and Election Notices) to:

(a) the U.S. Trustee,

(b) counsel to AAFAF,

(c) the attorneys for Ambac, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, Attn: Dennis Dunne, Esq. and Atara Miller, Esq.;

(d) the attorneys for Assured, Cadwalader, Wickersham & Taft, 200 Liberty Street, New York, NY 10281, Attn: Mark Ellenberg, Esq., Lary Stromfeld, Esq., Ivan Loncar, Esq., and Casey Servais, Esq.;

(e) the attorneys for National, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Marcia L. Goldstein, Esq. and Gabriel Morgan, Esq.;

(f) the attorneys for the Senior Ad Hoc Holders, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, New York, NY 10010, Attn: Susheel Kirpalani, Esq. and Eric Kay, Esq.;

(g) the attorneys for Oppenheimer and the First Puerto Rico Family of Funds, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Mayer, Esq., Amy Caton, Esq., and Douglas Buckley, Esq.;

I-008

(h) the attorneys for GSAM, McDermott, Will & Emery LLP, 444 West Lake Street, Chicago, IL 60606, Attn: William P. Smith, Esq., David L. Taub, Esq., and Alexandra C. Scheibe, Esq.;

(i) the attorneys for the Puerto Rico Funds, White & Case LLP, 200 South Biscayne Boulevard, Miami, FL 33131, Attn: John K. Cunningham, Esq. and Fernando de la Hoz, Esq.;

(j) the attorneys for the Bonistas, Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Donald Bernstein, Esq. and Brian Resnick, Esq.;

(k) the attorneys to certain of the Insured Senior Holders, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Lawrence A. Larose, Esq. and Eric Daucher, Esq.;

(l) the attorneys to GoldenTree Asset Management LP, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.;

(m) the attorneys to Tilden Park Capital Management LP, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandy Qusba, Esq. and Nicholas Baker, Esq.;

(n) the attorneys to Whitebox Advisors LLC, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Daniel A. Fliman, Esq.;

(o) the attorneys for Aurelius and Six PRC, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Andrew N. Rosenberg, Esq.; and

(p) counsel to the statutory committees appointed in any of the Title III cases;

and (ii) the Disclosure Statement Order (excluding the exhibits thereto) and the Confirmation Hearing Notice to the Debtor's Bankruptcy Rule 2002 list as of the Voting Record Date.

12.    The Debtor shall complete, by no later than the Solicitation Mailing Date, the service of (i) the Confirmation Hearing Notice, and (ii) a Notice of Non-Voting Status – Class 10 to all known holders (as of the Voting Record Date) of Claims in Class 10.

13.    The Confirmation Hearing Notice setting forth the time, date, and place of the Confirmation Hearing, substantially in the form attached hereto as **Schedule 2,** is approved.

I-009

14.     The Debtor shall publish the Confirmation Hearing Notice, on one occasion, in each

of *El Nuevo Dia* in Spanish (primary circulation is in Puerto Rico), *Caribbean Business* in English

(primary circulation is in Puerto Rico), *El Diario* in Spanish (primary circulation is in New York),

*El Nuevo Herald* in Spanish (primary circulation is Miami), and *The Bond Buyer*, to the extent

possible, on a date not less than twenty-five (25) nor more than thirty-two (32) calendar days prior

to the Confirmation Hearing date, which notice is hereby approved and constitutes adequate and

sufficient notice and complies with Bankruptcy Rule 2002.

15.     The Debtor, through Prime Clerk LLC, shall cause no less than ten (10) radio

advertisements, to be aired during the period from December 7, 2018 up to and including

December 21, 2018, on (a) WMEG FM (contemporary hit radio) in Spanish and (b) WKAQ AM

(Spanish language talk radio) in Spanish, informing listeners of (a) the approval of the Disclosure

Statement and the scheduling to the Confirmation Hearing, (b) the date by which Confirmation

Objections must be filed and served, (c) the Voting Deadline and the Election Deadline and (d) an

information hotline to receive certain additional information.

16.     Any Confirmation Objections must (i) be in writing, (ii) state the name, address,

and nature of the Claim of the objecting or responding party, (iii) state with particularity the basis

and nature of any objection or response and include, where appropriate, proposed language to be

inserted in the Plan to resolve any such objection or response, and (iv) be filed, together with proof

of service, with the Court and served so as to be actually received, no later than **5:00 p.m. (Atlantic**

**Standard Time) on January 2, 2019** (the "Confirmation Objection Deadline"), by the following

parties: (a) the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa,

500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico); (b)

attorneys for the Oversight Board as representative of COFINA, Proskauer Rose LLP, 11 Times

Square, New York, New York 10036, Attn: Martin J. Bienenstock, Esq., and Brian S. Rosen, Esq.;

(c) co-attorneys for the Oversight Board as representative of COFINA, O'Neill & Borges LLC,

250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918- 1813, Attn: Hermann D. Bauer, Esq.; (d)

attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, O'Melveny &

Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi,

Esq., Suzzanne Uhland, Esq., and Diana M. Perez, Esq.; (e) the attorneys for the Puerto Ríco Fiscal

Agency and Financial Advisory Authority, Marini Pietrantoni Muniz, LLC, Luis C. Marini-Biaggi,

Esq., MCS Plaza, Suite 500, 255 Ponce de León Ave., San Juan P.R. 00917; (f) those creditors

holding the 20 largest unsecured claims against the Debtor (on a consolidated basis); (g) attorneys

for the Official Committee of Unsecured Creditors in the Commonwealth's Title III case, Paul

Hastings LLP, 200 Park Ave., New York, NY 10166, Attn: Luc A. Despins, Esq., Andrew V.

Tenzer, Esq., Michael E. Comerford, Esq., and G. Alexander Bongartz, Esq.; (h) attorneys for the

Official Committee of Unsecured Creditors in the Commonwealth's Title III case, Casillas,

Santiago & Torres LLC, El Caribe Office Building, 53 Palmeras Street, Ste. 1601, San Juan, PR

00901, Attn: Juan J. Casillas Ayala, Esq. and Alberto J.E. Añeses Negrón, Esq.; (i) attorneys for

the Official Committee of Retired Employees in the Commonwealth's Title III case, Jenner &

Block LLP, 919 Third Ave., New York, NY 10022, Attn: Robert Gordon, Esq. and Richard Levin,

Esq., and Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege,

Esq. and Melissa Root, Esq.; (j) attorneys for the Official Committee of Retired Employees in the

Commonwealth's Title III case, Bennazar, García & Milián, C.S.P., Edificio Union Plaza, PH-A,

416 Ave. Ponce de León, Hato Rey, PR 00918, Attn: A.J. Bennazar- Zequeira, Esq.; and (k) all

parties that have requested notice pursuant to Bankruptcy Rule 2002.

17.     Confirmation Objections that are not timely filed, served, and actually received in the manner set forth above shall not be considered and shall be deemed overruled.

18.     The Debtor and other parties in interest are authorized to file replies or responses to any Confirmation Objections no later than **5:00 p.m. (Atlantic Standard Time) on January 9, 2019**, including any adjournments thereof.

19.     The Debtor shall not be required to send Solicitation Packages to (i) any holder of an unimpaired Claim under the Plan, (ii) any holder of a Claim in a Class deemed to reject the Plan, (iii) any party who holds a Claim, whether in the form of a filed proof of claim, or an amount listed on the list of creditors filed by the Debtor pursuant to sections 924 and 925 of the Bankruptcy Code (as amended or modified, the "List of Creditors") in an amount of $0.00, (iv) any holder of a Claim to which the Debtor has served an objection or request for estimation, or that has been expunged by order of the Court, and (v) a creditor that has a Claim that has already been paid in full; and it is further

20.     With respect to addresses from which notices of the Disclosure Statement hearing were returned as undeliverable by the United States Postal Service, the Debtor is excused from mailing Solicitation Packages or any other materials related to voting on or confirmation of the Plan to entities listed at such addresses unless and until the Debtor is provided with accurate addresses for such entities before the Voting Record Date.

21.     The form of Notice of Non-Voting Status – Class 10 (**Schedule 6**) is hereby approved.

22.     The Notice of Non-Voting Status – Class 10 is hereby deemed to satisfy the requirements of the Bankruptcy Code and the Bankruptcy Rules and the Debtor shall not be required to distribute copies of the Plan, Disclosure Statement, and/or Disclosure Statement Order

12

I-012

to any holder of a Claim in Class 10 (Section 510(b) Subordinated Claims), except as to parties

who request, in writing, copies of such documents.

       23.    Each Ballot or Master Ballot (as applicable) must be executed, completed, and

delivered to the Balloting Agent (i) by U.S. first-class mail, in the return envelope provided with

each Ballot (or otherwise by first-class mail); (ii) by overnight courier; (iii) by hand delivery, or

(iv) Prime Clerk's e-balloting platform (where permitted), so that executed and completed Ballots

are received by Prime Clerk, the Balloting Agent, by no later than **6:00 p.m. (Atlantic Standard**

**Time) on January 8, 2019, unless such time is extended** (the "Voting Deadline").

       24.    An election of the form of distribution under the Plan must be executed, completed,

and delivered to the Nominee in accordance with the instructions under the applicable Election

Notice so as to be effectuated through ATOP in accordance with the procedures of DTC by no

later than **6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended**

(the "Election Deadline"); provided, however, that any election of the form of distribution under

the Plan executed, completed, and delivered through ATOP in accordance with the procedures of

DTC on or before the Election Deadline shall be deemed to be made as of the Election Deadline;

provided, further, that any creditor who has executed, completed, and delivered through ATOP in

accordance with the procedures of DTC its election of the form of distribution under the Plan may

revoke such election and withdraw any securities that have been tendered with respect to an

election through ATOP in accordance with the procedures of DTC on or before the Election

Deadline.

       25.    All securities that are tendered with respect to an election of distributions under the

Plan shall be restricted from further trading or transfer until the Effective Date of the Plan;

provided, however, that, if (i) an order confirming the Plan is not entered within twenty-one (21)

days after the Election Deadline, or (ii) the Effective Date does not occur within fourteen (14) days

after the entry of an order confirming the Plan, then, upon the request of any PSA Creditor, the

Oversight Board shall work in good faith with such PSA Creditor to seek a new Election Deadline.

26.     Solely for purposes of voting to accept or reject the Plan and not for the purpose of

the allowance of, or distribution on account of, a Claim, and without prejudice to the rights of the

Debtor in any other context, each Claim within a Class of Claims entitled to vote is temporarily

allowed in an amount equal to the amount of such Claim as set forth in the claims register;

provided:

   a.   If a Claim is deemed allowed under the Plan, such Claim is allowed for voting
        purposes in the deemed allowed amount set forth in the Plan;

   b.   If a Claim for which a proof of claim has been timely filed is wholly contingent,
        unliquidated, or disputed, undetermined, or unknown in amount, such Claim
        shall be temporarily allowed for voting purposes only, and not for purposes of
        allowance or distribution, at $1.00, and the Ballot mailed to the holder of such
        Claim shall be marked as voting at $1.00, unless such Claim is disputed as set
        forth in subparagraph "h" below;

   c.   If a proof of claim was timely filed in an amount that is liquidated,
        noncontingent, and undisputed, such Claim is temporarily allowed in the
        amount set forth on the proof of claim, unless such Claim is disputed as set forth
        in subparagraph "h" below;

   d.   If a Claim is listed on a timely filed proof of claim as contingent, unliquidated,
        or disputed in part, such Claim is temporarily allowed in the amount that is
        liquidated, non-contingent, and undisputed for voting purposes only, and not
        for purposes of allowance or distribution;

   e.   If a Claim has been estimated or otherwise allowed for voting purposes by order
        of the Court, such Claim is temporarily allowed in the amount so estimated or
        allowed by the Court for voting purposes only, and not for purposes of
        allowance or distribution;

   f.   If a Claim is listed in the List of Creditors as contingent, unliquidated, or
        disputed and a proof of claim was not (i) filed by the applicable bar date for the
        filing of proofs of claim established by the Court; or (ii) deemed timely filed by
        an order of the Court prior to the Voting Deadline, such Claim shall not be
        entitled to vote to accept or reject the Plan;

14

I-014

g. Proofs of claim filed for $0.00 or Claims that have been expunged by order of the Court are not entitled to vote;

h. If the Debtor has served an objection or request for estimation as to a Claim at least twenty (20) days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the Voting Deadline;

i. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code separate Claims held by a single creditor in a particular Class shall be aggregated based on the reasonable efforts of the Debtor and Balloting Agent as if such creditor held one Claim against the Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

j. Notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class may be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtor has objected to such duplicate Claims;

k. If a proof of claim has been amended by a later filed proof of claim, only the later filed amending Claim will be entitled to vote, regardless of whether the Debtor has objected to such earlier filed Claim;

l. Notwithstanding anything contained herein to the contrary, the Balloting Agent, in its discretion, may contact voters to cure any defects in the Ballots and is authorized to so cure any defects;

m. There shall be a rebuttable presumption that any claimant who submits a properly completed, superseding Ballot, or withdraws a Ballot on or before the Voting Deadline has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's acceptance or rejection of the Plan, such that the earlier submitted Ballot shall be deemed superseded or withdrawn, as applicable; and

n. Any Class that contains claims entitled to vote but no votes are returned for such Class shall be deemed to have accepted the Plan; and it is further

27. The following additional procedures shall apply with respect to tabulating the Master Ballots:

15

a. Votes cast by holders of public securities through Nominees will be applied to the applicable positions held by such Nominees as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee shall not be counted in excess of the amount of public securities held by such Nominee as of the Voting Record Date;

b. If conflicting votes or "over-votes" are submitted by a Nominee, the Balloting Agent shall use reasonable efforts to reconcile discrepancies with the Nominee;

c. If over-votes are submitted by a Nominee that are not reconciled prior to the preparation of the certification of vote results, the votes to accept and to reject the Plan shall be approved in the same proportion as the votes to accept and to reject the Plan submitted by the Nominee, but only to the extent of the Nominee's Voting Record Date position in the public securities; and

d. For the purposes of tabulating votes, each Beneficial Owner or Insurer shall be deemed (regardless of whether such holder includes interest in the amount voted on its Beneficial Ballot) to have voted only the principal amount of its public securities; any principal amounts thus voted will be thereafter adjusted by the Balloting Agent, on a proportionate basis with a view to the amount of securities actually voted, to reflect the corresponding claim amount with respect to the securities thus voted, including any accrued but unpaid prepetition interest or accreted principal, as applicable.

28. If any claimant seeks to challenge the allowance or disallowance of its Claim for voting purposes in accordance with the above procedures, such claimant shall serve upon counsel for the Debtor, counsel for AAFAF, and counsel for the statutory committees appointed in any of the Title III cases, and file with the Court (with a copy to Chambers) a motion for an order, pursuant to Bankruptcy Rule 3018(a) (a "3018(a) Motion"), temporarily allowing such Claim in a different amount for purposes of voting to accept or reject the Plan, on or before the tenth (10th) day after the later of (i) service of the Confirmation Hearing Notice, and (ii) service of notice of an objection or request for estimation, if any, as to such Claim; provided, however, that, as to any claimant filing a 3018(a) Motion, such claimant's Ballot shall not be counted unless temporarily allowed by an order entered by the Court prior to the Voting Deadline.

29.     Each creditor that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

30.     In the event that a creditor casts more than one Ballot voting the same Claim(s)  or submits more than one election with respect to the same Claim(s) before the Voting Deadline or Election Deadline, as applicable, the last Ballot received or election made before the Voting Deadline or Election Deadline, as applicable, is hereby deemed to reflect such creditor's intent or election, as applicable, and, thus, to supersede any prior Ballot(s) or elections made, as applicable.

31.     Any entity that holds a Claim in more than one Class that is entitled to vote must use separate Ballots for each such Claim; provided, however, that creditors must vote all of their Claims within a particular Class under the Plan either to accept or reject the Plan and may not split their vote(s), and thus neither a Ballot that partially rejects and partially accepts the Plan, nor multiple Ballots casting conflicting votes in respect of the same Class under the Plan shall be counted.

32.     The following types of Ballots shall not be counted in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline unless the Debtor has granted an extension with respect to such Ballot; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot cast by a person or entity that does not hold a Claim in a Class entitled to vote to accept or reject the Plan; (iv) any unsigned Ballot; (v) any Ballot transmitted to the Balloting Agent by facsimile, electronic mail, or other means not specifically approved herein; (vi) any Ballot that is properly completed, executed, and timely returned to the Balloting Agent, but does not indicate either an acceptance or rejection of the Plan; (vii) any Ballot that is properly completed, executed, and timely returned to the Balloting Agent, but indicates both an acceptance and rejection of the Plan shall be counted as an

I-017

acceptance of the Plan; and (viii) any Ballot without an original signature; provided, however, that

any Ballot cast via the Balloting Agent's E-Ballot platform shall be deemed to contain an original

signature.

33.     Except as otherwise set forth herein, and subject to the entry of an order of the

Court, the Debtor may waive any defects or irregularities as to any particular Ballot at any time,

either before or after the Voting Deadline, and any such waivers shall be documented (a) by an

attorney's certification stating the terms, if any, associated with any such waiver, and (b) in the

vote tabulation certification prepared by the Ballot Agent.

34.     In the event that a Class 2 creditor (A) fails to timely elect to receive the Ambac

Certificates referred to in Sections 6.3 and 17.1 of the Plan, or (B) submits an election for less than

all of its Class 2 Claims (in which case, such election shall be void and of no force and effect),

such creditor shall be deemed to have elected to release, discharge and commute Ambac's

obligations and the Ambac Insurance Policy and to receive distributions in accordance with

Section 6.1(a) of the Plan.

35.     In the event that a Class 3 creditor (A) fails to timely elect to receive the National

Certificates referred to in Sections 7.3 and 17.2 of the Plan, or (B) submits an election for less than

all of its Claims (in which case, such election shall be void and of no force and effect), such creditor

shall be deemed to have elected to release, discharge and commute National's obligations and the

National Insurance Policy and to receive distributions in accordance with Section 7.1(a) of the

Plan.

36.     In accordance with the modification provisions of the Plan and Local Rule 3016-2,

the Debtor is authorized to make non-substantive changes to the Disclosure Statement, the Plan,

the Ballots, the Election Notices, the Class 6 Notice, the Notice of Non-Voting Status – Class 10,

I-018

and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages as may be necessary, prior to mailing.

37.    All notices to be provided pursuant to the procedures set forth herein are deemed good and sufficient notice to all parties in interest of all matters pertinent hereto and of all matters pertinent to the Confirmation Hearing and no other or further notice need be provided.

38.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

39.    The Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Order, including, without limitation, disputes with respect to the validity of an election of the form of distributions to be made under the Plan.

40.    This Order resolves Docket Entry Nos. 4075 and 4365 in Case No. 17-3283 and Docket Entry Nos. 307 and 369 in Case No. 17-3284.

Dated: November 29, 2018
    New York, New York            /s/ Laura Taylor Swain
                                   Laura Taylor Swain
                                   United States District Court Judge

I-019

## Schedule 1

### Disclosure Statement[1]

---

[1]   In the interest of economy, a hard copy of the Disclosure Statement will not be included as a schedule to the proposed Disclosure Statement Order. A copy of the Disclosure Statement was filed on November 16, 2018, and is available on the Court's docket, as well as on the website of the Debtor's Claims and Noticing Agent, Prime Clerk, at https://cases.primeclerk.com/puertorico/. A flash drive containing the Disclosure Statement and all exhibits thereto will be included in the Solicitation Packages. Hard copies of the Disclosure Statement are available on request by contacting Prime Clerk by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com. Please do not direct any inquiries to the Court.

### Schedule 2

**Confirmation Hearing Notice**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                   Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## NOTICE OF (I) APPROVAL OF DISCLOSURE STATEMENT, (II) ESTABLISHMENT OF RECORD DATES, (III) HEARING ON CONFIRMATION OF THE PLAN OF ADJUSTMENT AND PROCEDURES FOR OBJECTION TO CONFIRMATION OF THE PLAN OF ADJUSTMENT, (IV) PROCEDURES AND DEADLINE FOR VOTING ON THE PLAN OF ADJUSTMENT AND MAKING CERTAIN ELECTIONS THEREUNDER

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. ***Approval of Disclosure Statement.*** By order, dated November ___, 2018 (the "Disclosure Statement Order"), the United States District Court for the District of Puerto Rico (the "Court") approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement"), filed by the Financial Oversight and Management Board on behalf of the Debtor, and authorized the Debtor to solicit votes with respect to the approval or rejection of the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and supplements thereto, the "Plan"),[2] attached as **Exhibit A** to the Disclosure Statement. Pursuant to the Disclosure Statement Order, the Debtor will mail to holders of Claims in Class 1 (Senior COFINA Bond Claims), Class 2 (Senior COFINA Bond Claims (Ambac)), Class 3 (Senior COFINA Bond Claims (National)), Class 5 (Junior COFINA Bond Claims), Class 8 (GS Derivative Claim) and Class 9 (General Unsecured Claims) (collectively, the "Voting Classes") materials needed for voting on the Plan or making elections on distributions thereunder (the "Solicitation Package"); provided that only Election Notices will be sent to holders of claims in Classes 1, 2, 3, and 5.

2. ***Confirmation Hearing.*** A hearing to consider confirmation of the Plan (the "Confirmation Hearing") shall be held before The Honorable Laura Taylor Swain, in Courtroom _____ of the United States District Court for the District of Puerto Rico, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 on January 16, 2019 at 9:30 a.m. (Atlantic Standard Time), and continued, if necessary, on January 17, 2019 at 9:30

---

[2] All capitalized terms used but not otherwise defined shall have the meanings given to such terms in the Plan.

a.m. (Atlantic Standard Time). The Confirmation Hearing may be continued from time to time by the Court or the Oversight Board, without further notice or through adjournments announced in open court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Court, and the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, in accordance with the modification provisions of the Plan and Local Rule 3016-2, without further notice to interested parties.

3.       ***Voting Record Date.*** The voting record date is **November 20, 2018** (the "Voting Record Date"), which is the date for determining which holders of Claims in Voting Classes are entitled to vote on the Plan. Therefore, only those creditors in a Class entitled to vote on the Plan and holding Claims against the Debtor as of the Voting Record Date are entitled to vote on the Plan.

4.       ***Voting Deadline.*** The deadline for voting on the Plan is **January 8, 2019, at 6:00 p.m. (Atlantic Standard Time)**, unless such time is extended (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan, you ***must***: (a) follow the instructions carefully; (b) complete ***all*** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions included in the Solicitation Package so that your Ballot is ***actually received*** by the Debtor's solicitation agent, Prime Clerk LLC (the "Balloting Agent") on or before the Voting Deadline. ***Failure to follow such instructions may disqualify your vote.***

5.       ***Election Deadline***. The deadline for holders of eligible Claims that have the right to make an election of the form of distributions under the Plan to make such election is **January 8, 2019, at 6:00 p.m. (Atlantic Standard Time)**, unless such time is extended (the "Election Deadline"). If you received an Election Notice, you ***must***: (a) follow the instructions carefully;

3

(b) complete *all* of the required information on the Election Form; and (c) deliver *all* of the required

information according to and as set forth in detail in the election instructions so that is received by

your Nominee in sufficient time for your Nominee to *actually effectuate* your election through

The Depository Trust Company's Automated Tender Offer Program on or before the Election

Deadline. *A failure to follow such instructions may result in your election to be deemed to*

*constitute an election to (a) in the case of holders of Claims in Class 2, receive distributions in*

*accordance with the provisions of section 6.1(a) of the Plan (which includes, among other*

*things, the holder's full and complete satisfaction, release, and discharge of any further*

*obligation of Ambac with respect to the Ambac Insurance Policy and the holder's agreement to*

*commute the Ambac Insurance Policy), or (b) in the case of holders of Claims in Class 3, receive*

*distributions in accordance with the provisions of section 7.1(a) of the Plan (which includes,*

*among other things, the holder's full and complete satisfaction, release, and discharge of any*

*further obligation of National with respect to the National Insurance Policy and the holder's*

*agreement to commute the National Insurance Policy).*

6.     *Parties in Interest Not Entitled to Vote.* Creditors in Class 10 (Section 510(b)

Subordinated Claims) are deemed to reject the Plan and not entitled to vote. If a Claim is listed

on the Debtor's list of creditors [Case No. 17-3283, ECF No. 1216] as contingent, unliquidated,

or disputed and a proof of claim was not (i) filed by the applicable bar date for filing proofs of

claims established by the Court; or (ii) deemed timely filed by an order of the Court prior to the

Voting Deadline, such Claim shall not be entitled to vote to accept or reject the Plan. Proofs of

claim filed for $0.00 or Claims that have been expunged by order of the Court are also not entitled

to vote.

4

7.      If you are in Class 10 or have timely filed a proof of claim and disagree with the

Debtor's classification of, objection to, or request for estimation of your Claim and believe you

should be entitled to vote on the Plan, you must serve the Debtor and the parties listed in paragraph

8(e) below and file with the Court (with a copy to Chambers) a motion (a "Rule 3018(a) Motion")

for an order pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") temporarily allowing your Claim in a different amount or in a different Class for purposes

of voting to accept or reject the Plan.  All Rule 3018(a) Motions must be filed on or before the

tenth (10th) day after the later of (i) service of this Confirmation Hearing Notice and (ii) service

of notice of an objection or request for estimation, if any, as to such Claim.  In accordance with

Bankruptcy Rule 3018(a), as to any to any creditor filing a Rule 3018(a) Motion, such creditor's

Ballot will not be counted except as may be otherwise ordered by the Court prior to January 8,

2019.  Creditors may contact the Balloting Agent (i) via first class mail or via overnight courier,

at Puerto Rico Sales Tax Financing Corporation Ballot Processing, C/O Prime Clerk LLC, 830

Third Avenue, 3rd Floor, New York, NY 10022, (ii) by telephone at (844) 822-9231 (toll free for

U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00

p.m.    (Atlantic    Standard    Time)    (Spanish    available),    or    (iii)    by    email    at

puertoricoballots@primeclerk.com, to receive an appropriate Ballot for any Claim for which a

proof of claim has been timely filed and a Rule 3018(a) Motion has been granted.  Rule 3018(a)

Motions that are not timely filed and served in the manner set forth herein shall not be considered.

8.      ***Objections and Responses to Confirmation.***    Objections and responses to

confirmation of the Plan must:

      a.  Be in writing;

      b.  State the name, address, and nature of the Claim of the objecting or responding
         party;

c.  State with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be inserted in the Plan to resolve any such objection or response;

d.  Be filed, together with proof of service, with the Court, so as to be ***actually received*** on or before **5:00 p.m. (Atlantic Standard Time) on January 2, 2019**; and

e.  Be served in accordance with the Disclosure Statement Order, so as to be ***actually received*** on or before **5:00 p.m. (Atlantic Standard Time) on January 2, 2019** upon (a) the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico); (b) attorneys for the Oversight Board as representative of the Debtor, Proskauer Rose LLP, 11 Times Square, New York, New York 10036, Attn: Martin J. Bienenstock, Esq., and Brian S. Rosen, Esq.; (c) co-attorneys for the Oversight Board as representative of the Debtor, O'Neill & Borges LLC, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918- 1813, Attn: Hermann D. Bauer, Esq.; (d) the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi, Esq., Suzzanne Uhland, Esq., and Diana M. Perez, Esq.; (e) attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, Marini Pietrantoni Muniz, LLC, Luis C. Marini-Biaggi, Esq., MCS Plaza, Suite 500, 255 Ponce de León Ave., San Juan P.R. 00917; (f) those creditors holding the 20 largest unsecured claims against the Debtor (on a consolidated basis); (g) attorneys for the Official Committee of Unsecured Creditors in the Commonwealth's Title III case, Paul Hastings LLP, 200 Park Ave., New York, NY 10166, Attn: Luc A. Despins, Esq., Andrew V. Tenzer, Esq., Michael E. Comerford, Esq., and G. Alexander Bongartz, Esq.; (h) attorneys for the Official Committee of Unsecured Creditors in the Commonwealth's Title III case, Casillas, Santiago & Torres LLC, El Caribe Office Building, 53 Palmeras Street, Ste. 1601, San Juan, PR 00901, Attn: Juan J. Casillas Ayala, Esq. and Alberto J.E. Añeses Negrón, Esq.; (i) attorneys for the Official Committee of Retired Employees in the Commonwealth's Title III case, Jenner & Block LLP, 919 Third Ave., New York, NY 10022, Attn: Robert Gordon, Esq. and Richard Levin, Esq., and Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege, Esq. and Melissa Root, Esq.; (j) attorneys for the Official Committee of Retired Employees in the Commonwealth's Title III case, Bennazar, García & Milián, C.S.P., Edificio Union Plaza, PH-A, 416 Ave. Ponce de León, Hato Rey, PR 00918, Attn: A.J. Bennazar- Zequeira, Esq.; and (k) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

9.  ***Parties Who Will Not Be Treated as Creditors***.  Any holder of a Claim that (i) is

scheduled in the List of Creditors at $0.00 and is not the subject of a timely filed proof of Claim

I-027

or a proof of claim deemed timely filed with the Court pursuant to either the Bankruptcy Code or

any order of the Court, or otherwise deemed timely filed under applicable law, or (ii) is not

scheduled and is not the subject of a timely filed proof of claim or a proof of claim deemed timely

filed with the Court pursuant to either the Bankruptcy Code or any order of the Court, or otherwise

deemed timely filed under applicable law, shall not be treated as a creditor with respect to such

Claim for purposes of (a) receiving notices regarding the Plan, and (b) voting on the Plan.

*10.* ***Additional Information.*** Any party in interest wishing to obtain information about

the solicitation procedures or copies of the Disclosure Statement or the Plan, including Spanish

translations thereof, should contact the Balloting Agent, Prime Clerk LLC, by telephone at (844)

822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers),

available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at

puertoricoballots@primeclerk.com, or may view such documents by accessing either

https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/.

Please note that a Public Access to Court Electronic Records ("PACER")

(http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the

Court's website.

*11.* ***Bankruptcy Rules 2002(c)(3 and 3016(c)).*** **In accordance with Bankruptcy**

**Rules 2002(c)(3) and 3016(c), set forth below are the release, exculpation, and injunction**

**provisions contained in the Plan:**

### 30.2 Discharge and Release of Claims and Causes of Action:

(c) Notwithstanding the foregoing provisions of Section 30.2 of the Plan, in accordance
with the provisions of the Plan Support Agreement, each of the PSA Creditors and their
respective Related Persons shall (i) be deemed to have released and covenanted not to sue
or otherwise pursue or seek to recover damages or to seek any other type of relief against

7

any of the Government Releasees[3] based upon, arising from or relating to the Government Released Claims[4] or any of the claims or causes of action asserted or which could have been asserted in the Actions, and (i) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by Section 30.2(c) of the Plan.

(d) On the Effective Date, and in consideration of the Commonwealth-COFINA Dispute Settlement and the compromise and settlement of Bond Claims pursuant to the terms and provisions of the Plan (including, without limitation, the distributions to be made on account of "Senior" and "First Subordinate" Existing Securities), the resolution of the Interpleader Action and the terms and provisions of Section 19.5 of the Plan regarding the Ambac Action and the Whitebox Actions, to the fullest extent permissible under applicable law, each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns shall be released from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest.

**30.3 Injunction on Claims:** Except as otherwise expressly provided in Section 30.11 of the Plan, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities[5] who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 30.2 hereof or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 30.2 hereof are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged

---

[3] "Government Releasees" under the Plan means "[c]ollectively, the Government Parties and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case."

[4] "Government Released Claims" under the Plan means "[c]ollectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to the Plan or the securities to be issued pursuant to the Plan or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct."

[5] "Entity" under the Plan means "[a] Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity." Plan § 1.103.

8

pursuant to the Plan against any of the Released Parties[6] or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

**30.5   Releases by COFINA and Reorganized COFINA:**   Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Settlement Agreement, on the Effective Date, and for good and valuable consideration, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that COFINA, Reorganized COFINA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to COFINA taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Actions, the Related Actions, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees; provided, however, that the foregoing release shall not extend, nor shall it be construed to extend, to acts of gross negligence, intentional fraud, or willful misconduct of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted, in the Ambac Action and the Whitebox Actions.

**30.6 Injunction Related to Releases**:  As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Section 30.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:  (i) commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial,

---

[6] "Released Parties" under the Plan means "[c]ollectively, the Government Parties, the Commonwealth, the PSA Creditors and each their Related Persons." Plan § 1.163.

arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 30.5 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the Plan or the Confirmation Order.

**30.7 <u>Exculpation</u>:**

(a) **<u>Government Parties</u>:** The Oversight Board, the Commonwealth, AAFAF, COFINA and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Settlement Agreement; <u>provided, however,</u> that the foregoing provisions of this Section 30.7 shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct. Nothing in the foregoing provisions of this Section 30.7(a) shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b) **<u>Monoline Insurers</u>:** Each of Ambac, Assured and National and their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan, including, without limitation, in connection with the structure of the Trusts, commutation, the treatment of Senior COFINA Bond Claims (Ambac), the treatment of Junior COFINA Bond Claims (Assured), the National Election, the voting procedures, the election procedures, and any release of obligations under the applicable Insurance Policies; <u>provided, however,</u> that, notwithstanding anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall not be construed to, release or exculpate: (1) with respect to any beneficial holder of the Ambac Insured Bonds that receives Ambac Certificates in accordance with the Plan, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy (which claim shall only be asserted by the trustee of the Ambac Trust), as adjusted to account for any distributions from the Ambac Trust (and any claims or defenses that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's

10

obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of National Insured Bonds that received National Certificates in accordance with the Plan, any claim against National with respect to National's obligations under the National Insurance Policies (which claim shall be asserted in accordance with the terms of the National Insurance Policies), as adjusted to account for any distributions from the National Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations to such beneficial holder under the National Insurance Policies); or (3) with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the applicable Acceleration Price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).

(c)   **PSA Creditors and Bonistas:**   Each of the PSA Creditors and Bonistas, solely in its capacity as a party to the Plan Support Agreement and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement; provided, however, that the foregoing provisions of this Section 30.7(c) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

**30.11   Supplemental Injunction:**   Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against COFINA, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)   Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

11

I-032

(b)      Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)      Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)      Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)      Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Confirmation Order, or the Settlement Agreement relating to such Released Claim; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

Dated: _____, 2018
       San Juan, Puerto Rico

Respectfully submitted,

/s/ _____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtor*

/s/ _____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181

12

I-033

Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

13

## Schedule 3A

**Form of Ballot for Beneficial Owners of Claims in Classes 1 and 5**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

**BALLOT FOR BENEFICIAL OWNERS OF CLAIMS IN [CLASS 1]/[CLASS 5]**

**THIS BALLOT IS TO BE USED BY BENEFICIAL OWNERS OF CLAIMS IN CLASS [1]/[5]. PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO YOUR BROKER, BANK, COMMERCIAL BANK, TRUST COMPANY, DEALER, OR OTHER AGENT OR NOMINEE (THE "NOMINEE") (OR OTHERWISE FOLLOW THE INSTRUCTIONS OF YOUR NOMINEE) TO PERMIT YOUR NOMINEE TO COMPLETE AND RETURN A MASTER BALLOT (A "MASTER BALLOT") TO PRIME CLERK LLC (THE "BALLOTING AGENT") SO THE MASTER BALLOT IS ACTUALLY RECEIVED BY PRIME CLERK**

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**ON OR BEFORE 6:00 P.M. (ATLANTIC STANDARD TIME) ON JANUARY 8, 2019, UNLESS SUCH TIME IS EXTENDED (THE "VOTING DEADLINE").**

**DO NOT MAIL OR RETURN BALLOTS DIRECTLY TO THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, THE PUERTO RICO SALES TAX FINANCING CORPORATION, AAFAF, THE DISTRICT COURT OR THE BALLOTING AGENT. PLEASE RETURN YOUR ORIGINAL BALLOT TO THE NOMINEE (OR OTHERWISE FOLLOW YOUR NOMINEE'S INSTRUCTIONS TO SUBMIT YOUR VOTE) SO THAT IT IS ACTUALLY RECEIVED BY THE DATE SET BY THE NOMINEE. PLEASE CONTACT YOUR NOMINEE WITH ANY QUESTIONS REGARDING THE DATE THE NOMINEE NEEDS TO RECEIVE YOUR BENEFICIAL BALLOT IN ORDER TO TIMELY SUBMIT THE MASTER BALLOT TO THE BALLOTING AGENT.**

**A NOMINEE MAY PRE-VALIDATE THIS BENEFICIAL BALLOT BY: (I) SIGNING THE APPLICABLE BENEFICIAL BALLOT AND INCLUDING ITS DTC PARTICIPANT NUMBER; (II) INDICATING ON THE BENEFICIAL BALLOT THE ACCOUNT NUMBER OF THE BENEFICIAL HOLDER, AND AMOUNT OF THE SECURITIES HELD BY THE NOMINEE FOR SUCH BENEFICIAL HOLDER; AND (III) FORWARDING SUCH BENEFICIAL BALLOT TOGETHER WITH THE SOLICITATION PACKAGE AND OTHER MATERIALS REQUESTED TO BE FORWARDED TO THE BENEFICIAL HOLDER FOR VOTING. THE BENEFICIAL HOLDER MAY THEN COMPLETE THE INFORMATION REQUESTED IN THE BENEFICIAL BALLOT, REVIEW THE CERTIFICATIONS CONTAINED THEREIN, AND RETURN THE BENEFICIAL BALLOT DIRECTLY TO THE BALLOTING AGENT IN THE PRE-ADDRESSED, POSTAGE PAID ENVELOPE INCLUDED WITH THE SOLICITATION PACKAGE SO THAT IT IS RECEIVED BY THE BALLOTING AGENT BEFORE THE VOTING DEADLINE.**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*], dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___ ], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of the Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___ ], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan. Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot. **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan. If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

> **PLEASE USE THIS BALLOT TO CAST YOUR VOTE TO ACCEPT OR REJECT THE PLAN.**
>
> **YOU WILL RECEIVE A SEPARATE ELECTION NOTICE IN CONNECTION WITH YOUR DISTRIBUTION UNDER THE PLAN AND ANY ELECTIONS YOU ARE ENTITLED TO MAKE THEREUNDER. IF YOU HAVE NOT RECEIVED A SEPARATE ELECTION NOTICE, PLEASE CONTACT YOUR NOMINEE IMMEDIATELY.**

PLEASE COMPLETE THE FOLLOWING:

<u>**Item 1.**</u>    **Amount of Claim**

The undersigned hereby certifies that as of November 20, 2018 (the "Voting Record Date"), the undersigned was the beneficial owner (the "Beneficial Owner") of **[Senior COFINA Bond / Junior COFINA Bond]** Claims in the following aggregate unpaid amount:

$$ \$_____ $$

** On **Exhibit 1** hereto, check the CUSIP number for the above-referenced notes. **

<u>**Item 2.**</u>    **Vote on Plan.**

The Beneficial Owner of the aggregate principal amount of Claims set forth above in Item 1 hereby votes with respect to his, her, or its Claims as follows (please check <u>one</u>):

☐   <u>**ACCEPT**</u> (vote FOR) the Plan      ☐   <u>**REJECT**</u> (vote AGAINST) the Plan

Please note that if you elect, pursuant to the instructions in the Election Notice, to receive your distribution under the Plan in the form of the [Senior Taxable Bond Distribution / Junior Taxable Bond Distribution] and be treated under **[Class 4 (Senior COFINA Bond Claim (Taxable Election)) / Class 7 (Junior COFINA Bond Claim (Taxable Election))]**, you will be deemed to accept the Plan and consent to certain injunction and release provisions in the Plan, but are entitled to cast a provisional vote under **[Class 1] / [Class 5]** to accept or reject the Plan. If it is later determined you are ineligible to be treated under **[Class 4] / [Class 7]** or all Taxable Bonds have been allocated (which determination may occur after the final voting results are reported to the Court), the [Class 1 / Class 5] vote in Item 2 will be deemed to reflect your vote on the Plan.

To ensure your vote on the Plan is counted in the event that you are ineligible to elect to receive a [Senior Taxable Bond Distribution / Junior Taxable Bond Distribution] or all Taxable Bonds have been allocated, you should vote on the Plan using this Beneficial Ballot.

3

> **As noted above, you will receive a separate Election Notice in connection with your distribution under the Plan and any elections you may are entitled to make thereunder.**

**Item 3.       Certification as to [Senior COFINA Bonds / Junior COFINA Bonds] Held in Additional Accounts.**

By signing this Ballot, the undersigned certifies that either (a) this Ballot is the only Ballot submitted by the undersigned for Claims in **[Class 1] / [Class 5]** or (b) in addition to this Ballot, one or more Ballots ("Additional Ballots") for Claims in **[Class 1] / [Class 5]** have been submitted to other Nominees as follows (please use additional sheets of paper if necessary).

**COMPLETE THIS SECTION ONLY IF YOU
HAVE VOTED OTHER BALLOTS IN THIS CLASS**

| Account Number of other Bond Claims | Name of Nominee or Other Registered Holder | CUSIP Number of Other Bonds | Principal Amount of Other Bond Claims Voted in Additional Ballot(s) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*If the space provided is not sufficient, please attach additional sheets in the same format

4

I-039

To have effect, a Beneficial Owner must vote all of its Claims in **[Class 1] / [Class 5]** to either accept or reject the Plan.  No split votes will be permitted.  Accordingly, if a Beneficial Owner casts conflicting votes on this Ballot and other Ballots in respect of Claims in **[Class 1] / [Class 5]**, all votes for Claims in **[Class 1] / [Class 5]** on all Ballots will be disregarded.

**Item 4.**       **Certification.**  By signing this Ballot, the Beneficial Owner of the Claims in **[Class 1] / [Class 5]** identified in **Item 1** above certifies that he, she, or it:

(a)       Is the holder of the Claims in **[Class 1] / [Class 5]**  to which this Ballot pertains or is an authorized signatory of such holder, and has full power and authority to vote to accept or reject the Plan;

(b)       Has been provided with a copy of the Plan, Disclosure Statement, and Disclosure Statement Order, and acknowledges that the vote set forth on this Ballot is subject to all the terms and conditions set forth in the Plan, Disclosure Statement, and Disclosure Statement Order;

(c)       Has not submitted any other Ballots relating to its Claims in **[Class 1] / [Class 5]** that are inconsistent with the votes as set forth in this Ballot or that, as limited by the terms of the Disclosure Statement Order and the instructions attached hereto, if such other Ballots were previously submitted, they either have been or are hereby revoked or changed to reflect the vote set forth herein; and

(d)       Is deemed to have consented to the submission of a Master Ballot by the Nominee to the Balloting Agent.

Name of Holder: _____

(Print or Type)

Signature:_____

Name of Signatory:_____

(If other than holder)

Title: _____

Address: _____

_____

_____

5

I-040

| Telephone Number: | |
|---|---|
| Email: | |
| Date Completed: | |

No fees, commissions, or other remuneration will be payable to any Nominee for soliciting votes on the Plan. This Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Ballot does not constitute and shall not be deemed to constitute (i) an assertion of a Claim, (ii) a proof of claim, or (iii) an admission by COFINA of the nature, validity, or amount of any Claim.

**THE VOTING DEADLINE IS 6:00 P.M. (ATLANTIC STANDARD TIME) ON JANUARY 8, 2019, UNLESS SUCH TIME IS EXTENDED. PLEASE RETURN YOUR BALLOT TO THE NOMINEE (OR OTHERWISE FOLLOW THE INSTRUCTIONS OF YOUR NOMINEE) SO THAT IT IS RECEIVED BY THE NOMINEE NO LATER THAN THE DATE SET BY THE NOMINEE.**

6

I-041

## VOTING INSTRUCTIONS FOR COMPLETING THE
## BALLOT FOR BENEFICIAL OWNERS OF CLAIMS IN [CLASS 1] / [CLASS 5]

1.      This Ballot is submitted to you to (i) solicit your vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], and (ii) constitute your consent to the injunction and release provisions of the Plan if you vote to accept the Plan. The terms of the Plan are described in the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___]. All capitalized terms used but not otherwise defined herein or in the Ballot shall have the meanings given to such terms in the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.      The Plan will be accepted by a Class of Claims if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in a Class that have voted to accept or reject the Plan. In the event a Class rejects the Plan, the District Court may nevertheless confirm the Plan and thereby make it binding on holders of Claims in the Class if the District Court finds the Plan does not unfairly discriminate against and accords fair and equitable treatment to the holders of Claims in the Class and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of PROMESA section 314(b) and section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the District Court, all holders of Claims against COFINA (including those holders who abstain from voting on or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby, whether or not they vote and whether or not they accept the Plan.

3.      **To have your vote counted, you must properly complete and sign this Ballot, and return it in the enclosed envelope (or otherwise follow the instructions of your Nominee to submit your vote). If you are returning your Ballot to your broker, bank, commercial bank, trust company, dealer, or other agent or nominee (the "Nominee") please allow sufficient time to permit your Nominee to complete and return a master ballot (a "Master Ballot") to Prime Clerk LLC (the "Balloting Agent") so that the Master Ballot is received by the Balloting Agent no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline").**

4.      **If you vote to accept the Plan, you are voting to approve certain cancellation, discharge, exculpation, expungement, injunction and release provisions contained in the Plan. Such provisions include, but are not limited to, the provisions contained in Article XXX of the Plan. Such provisions may affect your rights and interests regarding certain non-debtor parties.**

5.      A Nominee may pre-validate a Beneficial Ballot by: (i) signing the applicable Beneficial Ballot and including their DTC participant number; (ii) indicating on the Beneficial Ballot the account number of the beneficial holder, and amount of the securities held by the

Nominee for such beneficial holder; and (iii) forwarding such Beneficial Ballot together with the Solicitation Package and other materials requested to be forwarded to the beneficial holder for voting. The beneficial holder may then complete the information requested in the Beneficial Ballot, review the certifications contained therein, and return the Beneficial Ballot directly to the Balloting Agent in the pre-addressed, postage paid envelope included with the Solicitation Package so that it is received by the Balloting Agent before the Voting Deadline.

6.    To properly complete the Ballot, you must follow the procedures described below:

a.   Ensure the information contained in Item 1 of the Ballot is correct;

b.   You may not split your vote on the Plan. You must vote all the Claims in **[Class 1]** / **[Class 5]** you hold to accept or reject the Plan;

c.   If you are completing this Ballot on behalf of another entity, indicate your relationship to such entity and the capacity in which you are signing and, if requested, you must submit satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

d.   If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims against COFINA only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot;

e.   If you believe you have received the wrong Ballot, please contact the Balloting Agent immediately;

f.   Provide your name and mailing address;

g.   Sign and date your Ballot; and

h.   Return your original Ballot using the enclosed pre-addressed return envelope (or otherwise follow the instructions to submit your vote to your Nominee).

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR THE PLAN, OR IF YOU RECEIVED SOLICITATION PACKAGE MATERIALS IN ELECTRONIC FORMAT AND DESIRE PAPER COPIES, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF, COFINA OR THE DISTRICT COURT.

I-043

**EXHIBIT 1**

Please indicate below the CUSIP / ISIN to which this Ballot pertains.

| [CLASS 1 - SENIOR COFINA BOND CLAIMS] / [CLASS 5 - JUNIOR COFINA BOND CLAIMS] | | |
|---|---|---|
| ☐ | [      ] | [      ] |
| ☐ | [      ] | [      ] |
| ☐ | [      ] | [      ] |

## Schedule 3B

**Form of Master Ballot for Holders of Claims in Classes 1 and 5**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## MASTER BALLOT FOR BENEFICIAL OWNERS OF CLAIMS IN [CLASS 1] / [CLASS 5]

PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT (THE "MASTER BALLOT") AND RETURN IT TO PRIME CLERK LLC (THE "BALLOTING AGENT") AT THE FOLLOWING ADDRESS: PUERTO RICO SALES TAX FINANCING CORPORATION BALLOT PROCESSING, C/O PRIME CLERK LLC, 830 THIRD AVENUE, 3RD FLOOR, NEW YORK, NY 10022 OR BY ELECTRONIC MAIL TO PUERTORICOBALLOTS@PRIMECLERK.COM. THIS MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT BY JANUARY 8, 2019 AT 6:00

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**P.M. (ATLANTIC STANDARD TIME), UNLESS SUCH TIME IS EXTENDED (THE "VOTING DEADLINE"), OR THE VOTES OF THE BENEFICIAL OWNERS (YOUR CUSTOMERS) FOR WHOM YOU ACT AS NOMINEE WILL NOT BE COUNTED. THEREFORE, YOU MUST ALLOW SUFFICIENT TIME TO BE SURE THAT THE MASTER BALLOT IS RECEIVED BY THE BALLOTING AGENT BEFORE THE VOTING DEADLINE.**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan. Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot. **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan. If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

This Master Ballot is to be used by you (as a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each of the foregoing, a "Nominee")) for the beneficial owners (each, a "Beneficial Owner") of Claims in **[Class 1] / [Class 5]** to transmit the votes of such holders in respect of their Claims in **[Class 1] / [Class 5]** to accept or reject the Plan.

This Master Ballot is being sent to Nominees to use to cast votes to accept or reject the Plan on behalf of and in accordance with the beneficial ballots (each, a "Beneficial Ballot") cast by the Beneficial Owners of Claims in **[Class 1] / [Class 5]**.

As a Nominee, you are required to deliver the solicitation materials, including a Beneficial Ballot, to each Beneficial Owner for whom you hold Claims in **[Class 1] / [Class 5]**, and take any action required to enable such Beneficial Owner to timely vote its Claim to accept or reject the Plan. You should include in each solicitation package a return envelope addressed to you (**DO NOT** include a return envelope addressed to the Balloting Agent) or otherwise provide your Beneficial Owners with instructions to submit their vote to you. With respect to any Beneficial Ballots returned to you, you must (i) execute this Master Ballot so as to reflect the voting instructions given to you in the Beneficial Ballots by the Beneficial Owners for whom you hold Claims in **[Class 1] / [Class 5]**, and (ii) return this Master Ballot to the Balloting Agent so that it is **actually received** by the Balloting Agent **on or before the Voting Deadline**. For each completed, executed Beneficial Ballot returned to you by a Beneficial Owner, you must retain a copy of such Beneficial Ballot in your files for at least one (1) year following the Voting Deadline.

2

**RETURN THE COMPLETED MASTER BALLOT TO THE FOLLOWING ADDRESS OR EMAIL ADDRESS:**

**PUERTO RICO SALES TAX FINANCING CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022
PUERTORICOBALLOTS@PRIMECLERK.COM**

**You must deliver the Master Ballot in the manner described above. Master Ballots must be delivered to the Voting Agent (i) at the address listed above (or in the enclosed envelope, which may have a different zip code) or (ii) via electronic mail to puertoricoballots@primeclerk.com. If you choose to submit your Ballot via electronic mail, you should NOT submit your paper copy Ballot as well. Please choose only one form of return of your Ballot.**

**Item 1.**  **Certification of Authority to Vote.**

The undersigned hereby certifies that as of November 20, 2018 (the "Voting Record Date"), the undersigned (please check the applicable box):

☐  Is a broker, bank, trust company, dealer or other agent or nominee for the Beneficial Owner of the aggregate principal amount of Claims in **[Class 1]** / **[Class 5]** as listed in **Item 2** below, and is the registered holder of such securities; or

☐  Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, trust company, dealer or other agent or nominee that is the registered holder of the aggregate principal amount of Claims in **[Class 1]** / **[Class 5]** listed in **Item 2** below; or

☐  Has been granted a proxy (an original of which is attached hereto) from a broker, bank, trust company, dealer or other agent or nominee, or a Beneficial Owner that is the registered holder of the aggregate principal amount of Claims in **[Class 1]** / **[Class 5]** listed in **Items 2** and **3** below, and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Owner of the Claims in **[Class 1]** / **[Class 5]** listed in **Item 2** below.

**Item 2.**  **Transmittal of Votes from Individual Beneficial Ballots of Holders of Claims in [Class 1] / [Class 5].**

The undersigned transmits the following votes of Beneficial Owners of the Claims in **[Class 1]** / **[Class 5]** below and certifies that the following are Beneficial Owners, as of the Voting Record Date, and have delivered to the undersigned, as Nominee, Beneficial Ballots casting such votes (indicate in each column the aggregate principal amount voted for each account – please note

3

that each Beneficial Owner must vote all of his, her, or its Claims in **[Class 1] / [Class 5]** to accept or reject the Plan and may not split such vote):

| Your Account Number for Each Beneficial Owner Voting on the Plan | Principal Amount of Claims Voted to ACCEPT the Plan* | OR | Principal Amount of Claims Voted to REJECT the Plan* |
|---|---|---|---|
| 1. | $ | OR | $ |
| 2. | $ | OR | $ |
| 3. | $ | OR | $ |
| 4. | $ | OR | $ |
| 5. | $ | OR | $ |
| 6. | $ | OR | $ |
| 7. | $ | OR | $ |
| 8. | $ | OR | $ |
| 9. | $ | OR | $ |
| 10. | $ | OR | $ |
| TOTALS | $ | OR | $ |

\* If space provided is insufficient, attach additional sheets in same format.

**Item 3.**          **Additional Ballots Submitted by Beneficial Owners.**

The undersigned certifies that the following information is a true and accurate schedule on which the undersigned has transcribed the information, if any, provided in **Item 3** of each Beneficial Ballot received from a Beneficial Owner. Please use additional sheets of paper if necessary.

**Information to be transcribed from Item 3 of Beneficial Ballots regarding other Beneficial Ballots cast by the undersigned's Beneficial Owners in respect of Claims in [Class 1] / [Class 5].**

**COMPLETE THIS SECTION ONLY IF BENEFICIAL OWNERS INDICATED THEY HAVE VOTED OTHER BALLOTS THROUGH OTHER NOMINEES IN THIS CLASS**

| Your Account Number for Each Beneficial Owner Who Completed Item 3 of Their Beneficial Ballot | Transcribe from Item 3 of Beneficial Ballot* | | | |
|---|---|---|---|---|
| | Account Number of Notes | Name of Registered Holder of Nominee of Notes | CUSIP | Principal Amount |
| | | | | |
| | | | | |
| | | | | |

4

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

\* If space provided is insufficient, attach additional sheets in same format.

**Item 4.**     **Certification.** By signing this Master Ballot, the undersigned certifies that:

(a)     each Beneficial Owner whose votes are being transmitted by this Master Ballot has been provided with a copy of the Plan, Disclosure Statement, Disclosure Statement Order, and a Beneficial Ballot for voting their Claims in **[Class 1] / [Class 5]**;

(b)     it has received a completed and signed Beneficial Ballot from each Beneficial Owner listed in **Item 2** of this Master Ballot or from an intermediary nominee, as applicable;

(c)     it is the registered holder of the Claims in **[Class 1] / [Class 5]** to which this Master Ballot pertains and/or has full power and authority to vote to accept or reject the Plan;

(d)     it has properly disclosed:

     i.     the number of Beneficial Owners who completed Beneficial Ballots;

     ii.     the respective amounts of the Claims in **[Class 1] / [Class 5]** held by each Beneficial Owner who completed a Beneficial Ballot;

     iii.     each such Beneficial Owner's respective vote concerning the Plan;

     iv.     each such Beneficial Owner's certification as to its other Claims in **[Class 1] / [Class 5]** voted; and

     v.     the customer account or other identification number for each such Beneficial Owner;

(e)     each such Beneficial Owner has certified to the undersigned or to an intermediary nominee, as applicable, that it is eligible to vote on the Plan; and

(f)     this solicitation of votes to accept or reject the Plan is subject to all the terms and conditions set forth in the Disclosure Statement Order, dated November ___, 2018.

Name of
Nominee _____ ___

5

I-050

Participant Number: _____

Signature: _____

If by Authorized
Agent,
Name and Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

6

## VOTING INSTRUCTIONS FOR COMPLETING THE
## MASTER BALLOT FOR BENEFICIAL OWNERS OF CLAIMS IN [CLASS 1] / [CLASS 5]

1.    The Financial Oversight And Management Board For Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting your customers' (i) vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], and (ii) consent to the injunction and release provisions of the Plan if you vote to accept the Plan.  The master ballot (the "Master Ballot") is to be used by brokers, banks, commercial banks, trust companies, dealers, or other agents or nominees (each of the foregoing, a "Nominee") of the beneficial owners (each, a "Beneficial Owner") of the Claims in **[Class 1] / [Class 5]**.  The Master Ballot must summarize votes cast by Beneficial Owners to accept or reject the Plan pursuant to the beneficial ballots (the "Beneficial Ballots").  **The Master Ballot does not constitute and shall not be deemed to constitute (i) an assertion of a Claim, (ii) a proof of claim, or (iii) an admission by COFINA of the nature, validity, or amount of any Claim.**

2.    You must immediately deliver (i) the Beneficial Ballots; (ii) a pre-addressed return envelope addressed to you; (iii) the Plan; and (iv) the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___], to each Beneficial Owner of Claims in **[Class 1] / [Class 5]** for whom you are the Nominee, and take any action required to enable each such Beneficial Owner to timely vote its Claims in **[Class 1] / [Class 5]** to accept or reject the Plan.

You are authorized to collect votes to accept or to reject the Plan from Beneficial Owners in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) the Beneficial Ballot (as defined below), and collecting votes from beneficial Owners through online voting, by phone, facsimile, or other electronic means.

3.    With regard to any Beneficial Ballots provided to you, you must (i) forward to the Beneficial Owners the applicable unsigned Beneficial Ballot, together with the solicitation materials, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Beneficial Owner may then indicate his, her, or its vote to accept or reject the Plan on the Beneficial Ballot, complete the information requested in the Beneficial Ballot, review the certifications contained therein, execute the Beneficial Ballot, and return such Beneficial Ballot to the Nominee.  After collecting the Beneficial Ballots, the Nominee shall (i) complete the applicable Master Ballot by compiling and validating the votes and other relevant information from the Beneficial Ballot, (ii) execute the Master Ballot, and (iii) deliver the Master Ballot to the Balloting Agent so that it is **actually received** by Prime Clerk LLC (the "Balloting Agent") **on or before 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline")**.  All Beneficial Ballots returned by Beneficial Owners must be retained by Nominees for inspection for at least one (1) year following the Voting Deadline.

I-052

4.     If you are both the registered holder and the Beneficial Owner of Claims related to the Claims in **[Class 1] / [Class 5]**, and you wish to vote such, you may complete, execute, and return either an individual Beneficial Ballot or a Master Ballot to the Balloting Agent in accordance with these instructions.

5.     Multiple Master Ballots may be completed and delivered to the Balloting Agent. Votes reflected by multiple Master Ballots will be counted except to the extent that the votes thereon are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the latest Master Ballots received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior Master Ballot. If more than one Master Ballot is submitted and the later Master Ballot(s) supplements rather than supersedes earlier Master Ballot(s), please mark the subsequent Master Ballot(s) with the words "Additional Vote" or such other language as you customarily use to indicate an additional vote that is not meant to revoke an earlier vote.

6.     **To have your customers' votes counted, you must complete, sign, and return this Master Ballot so that it is received by the Balloting Agent no later than the Voting Deadline.**

7.     To properly complete the Master Ballot, you must follow the procedures described below:

a.  Check the appropriate box in **<u>Item 1</u>** of the Master Ballot;

b.  To transmit the votes of Beneficial Owners of Claims in **[Class 1]/[Class 5]** for whom you are the Nominee, indicate in **<u>Item 2</u>** of the Master Ballot the votes to accept or reject the Plan. To identify such Beneficial Owners without disclosing their names, please use the customer account number assigned by you to each such Beneficial Owner, or if no such customer account number exists, please assign a number to each account (making sure to retain a separate list of each Beneficial Owner and the assigned number). **IMPORTANT: EACH BENEFICIAL OWNER MUST VOTE ALL OF ITS CLAIMS IN [CLASS 1] / [CLASS 5] *EITHER* TO ACCEPT *OR* REJECT THE PLAN, AND <u>MAY NOT SPLIT ITS VOTE</u>. IF ANY BENEFICIAL OWNER HAS ATTEMPTED TO SPLIT SUCH VOTE, PLEASE CONTACT THE BALLOTING AGENT IMMEDIATELY.** Any Beneficial Ballot or Master Ballot that is signed, dated, and timely received, but does not indicate acceptance or rejection of the Plan or both accepts and rejects the Plan, will not be counted for purposes of voting on the Plan;

c.  Please note that **<u>Item 3</u>** of the Master Ballot requests that you transcribe the information provided by each Beneficial Owner in **<u>Item 3</u>** of the Beneficial Ballot relating to other Claims in **[Class 1] / [Class 5]** voted;

d.  Review the certification in **<u>Item 4</u>** of the Beneficial Ballot;

e.  Sign and date the Master Ballot and provide the remaining information requested;

f.  If additional space is required to respond to any item on the Master Ballot, please use additional sheets of paper clearly marked to indicate the applicable items on the Master Ballot to which you are responding;

g.  Contact the Balloting Agent if you need any additional information; and

h.  Deliver the completed, executed Master Ballot so as to be received by the Balloting Agent before the Voting Deadline. For each completed, executed Beneficial Ballot returned to you by a Beneficial Owner, either forward such Beneficial Ballot (along with your Master Ballot) to the Balloting Agent or retain such Beneficial Ballot in your files for one (1) year following the Voting Deadline.

IF YOU HAVE ANY QUESTIONS REGARDING THE MASTER BALLOT OR THE INSTRUCTIONS ABOVE, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF, COFINA, OR THE DISTRICT COURT.

## Schedule 3C

**Form of Ballot for Ambac on Behalf of Holders of Claims in Class 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

### BALLOT FOR HOLDERS
### OF CLAIMS IN CLASS 2 (SENIOR COFINA BOND CLAIMS (AMBAC))

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the District Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Disclosure Statement") [ECF No. ___], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan.  Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot.  **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan.  If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

This Ballot is to be used for voting by Ambac Assurance Corporation ("Ambac").  Pursuant to the Disclosure Statement Order, Ambac is entitled to accept or reject the Plan on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 2.  **To have your vote counted, you must complete, sign, and return this Ballot so that it its received by the Balloting Agent at the address listed below no later than the Voting Deadline, unless such time is extended by the Debtor.  Ballots must be delivered to the Balloting Agent (i) at the address listed below (or in the enclosed envelope, which may have a different zip code) or (ii) via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/puertorico, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website. Ambac is encouraged to submit its Ballots via the E-Ballot platform.  If you choose to submit your Ballot via the E-Ballot platform, you should NOT submit your paper copy Ballot as well.  Please choose only one form of return of your Ballot:**

### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**You must deliver the Ballot in the manner described above.  Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's E-Ballot platform).**

**The Ballot must actually be received by the Balloting Agent by no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline").**

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, any Claim, and without prejudice to COFINA's rights in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be in an amount as determined by the procedures set forth in the Disclosure Statement Order.

I-057

This Ballot does not and shall not be deemed to constitute (i) an assertion of a Claim, (ii) a proof of claim, or (iii) an admission by COFINA of the nature, validity, or amount of any Claim.

PLEASE COMPLETE THE FOLLOWING:

**Item 1.**         **Vote on Plan.**

The undersigned, voting on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 2, hereby votes to (please check <u>one</u>):

| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

**To submit your Ballot via the "E-Ballot" platform, please visit https://cases.primeclerk.com/puertorico. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

                    **Unique E-Ballot ID#:_____**

**Prime Clerk's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an E-Ballot for each E-Ballot ID# you receive, as applicable.**

Creditors who cast a Ballot using Prime Clerk's "E-Ballot" platform should <u>NOT</u> also submit a paper Ballot.

**Item 2.**         **Acknowledgements and Certification.**

By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Plan, Disclosure Statement, and Disclosure Statement Order. The undersigned certifies that, pursuant to the Disclosure Statement Order, it has full power and authority to vote to accept or reject the Plan on behalf of the beneficial holders of securities giving rise to Impaired Claims in Class 2. The undersigned further acknowledges that COFINA's solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement Order and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Name of Holder: _____

I-058

(Print or Type)

_____

Signature:_____

Name of Signatory:_____

(If other than holder)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

4

## VOTING INSTRUCTIONS FOR COMPLETING THE
## BALLOT FOR CLAIMS IN CLASS 2 (SENIOR COFINA BOND CLAIMS (AMBAC))

1.     This Ballot is submitted to you to solicit your vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___].   The terms of the Plan are described in the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___].  All capitalized terms used but not otherwise defined herein or in the Ballot shall have the meanings given to such terms in the Plan.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.     The Plan will be accepted by a Class of Claims if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted to accept or reject the Plan.  In the event a Class rejects the Plan, the District Court may nevertheless confirm the Plan and thereby make it binding on the holders of Claims in the rejecting Class if the District Court finds the Plan does not unfairly discriminate against and accords fair and equitable treatment to the holders of Claims in such Class and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of PROMESA section 314(b) and section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the District Court, all holders of Claims against the Debtor and its property (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the terms of the confirmed Plan and the transactions contemplated thereby.

3.     **To have your vote counted, you must properly complete, sign, and return this Ballot to Prime Clerk LLC (the "Balloting Agent") so that it is received by the Balloting Agent no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline"), at the following address:**

### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's "E-Ballot" platform in accordance with the instructions above).**

4.     To properly complete the Ballot, you must follow the procedures described below:

a.   Ensure the information contained in the Ballot is correct;

5

I-060

b.  You may not split your vote on the Plan. You must vote all the Claims on behalf of the holders of Class 2 Claims either to accept or to reject the Plan;

c.  If you are completing this Ballot on behalf of another entity, indicate your relationship to such entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

d.  If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot;

e.  If you believe you have received the wrong Ballot, please contact the Balloting Agent immediately;

f.  Provide your name and mailing address;

g.  Sign and date your Ballot; and

h.  Return your Ballot using an authorized method of return indicated herein.

5.   If more than one Ballot voting the same Claim is received by the Balloting Agent, the latest Ballot received prior to the Voting Deadline will, to the extent of any inconsistencies between the Ballots, supersede and revoke any prior Ballot.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR THE PLAN, OR IF YOU RECEIVED SOLICITATION PACKAGE MATERIALS IN ELECTRONIC FORMAT AND DESIRE PAPER COPIES, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF, COFINA, OR THE DISTRICT COURT.

I-061

## Schedule 3D

**Form of Ballot for National on Behalf of Holders of Claims in Class 3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                   Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## BALLOT FOR HOLDERS
## OF CLAIMS IN CLASS 3 (SENIOR COFINA BOND CLAIMS (NATIONAL))

The Financial Oversight And Management Board For Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the District Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. __ ], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan.  Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot.  **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan.  If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

This Ballot is to be used for voting by National Public Finance Guarantee Corporation ("National").  Pursuant to Disclosure Statement Order, National is entitled to accept or reject the Plan on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 3.  **To have your vote counted, you must complete, sign, and return this Ballot so that it its received by the Balloting Agent at the address listed below no later than the Voting Deadline, unless such time is extended by the Debtor.  Ballots must be delivered to the Balloting Agent (i) at the address listed below (or in the enclosed envelope, which may have a different zip code) or (ii) via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/puertorico, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website.  National is encouraged to submit its Ballots via the E-Ballot platform.  If you choose to submit your Ballot via the E-Ballot platform, you should NOT submit your paper copy Ballot as well.  Please choose only one form of return of your Ballot:**

**Via First Class Mail, Hand Delivery or Overnight Courier:**

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**You must deliver the Ballot in the manner described above.  Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's E-Ballot platform).**

**The Ballot must actually be received by the Balloting Agent by no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline").**

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, any Claim, and without prejudice to COFINA's rights in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be in an amount as determined by the procedures set forth in the Disclosure Statement Order.

I-064

PLEASE COMPLETE THE FOLLOWING:

**Item 1.**        **Vote on Plan.**

The undersigned, voting on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 3, hereby votes to (please check <u>one</u>):

| | | | |
|---|---|---|---|
| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

**To submit your Ballot via the "E-Ballot" platform, please visit https://cases.primeclerk.com/puertorico.  Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your ballot.**

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____ _____ \_\_\_**

**Prime Clerk's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot.  Please complete and submit an E-Ballot for each E-Ballot ID# you receive, as applicable.**

Creditors who cast a Ballot using Prime Clerk's "E-Ballot" platform should <u>NOT</u> also submit a paper Ballot.

**Item 2.**        **Acknowledgements and Certification.**

By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Plan, Disclosure Statement, and Disclosure Statement Order. The undersigned certifies that, pursuant to the Disclosure Statement Order, it has full power and authority to vote to accept or reject the Plan on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 3.  The undersigned further acknowledges that COFINA's solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the Disclosure Statement Order and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Name of Holder: _____
                                                (Print or Type)

3

I-065

Signature:_____

Name of Signatory:_____

(If other than holder)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

4

I-066

## VOTING INSTRUCTIONS FOR COMPLETING THE
## BALLOT FOR CLAIMS IN CLASS 3 (SENIOR COFINA BOND CLAIMS (NATIONAL INSURED))

1.      This Ballot is submitted to you to solicit your vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___]. The terms of the Plan are described in the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___]. All capitalized terms used but not otherwise defined herein or in the Ballot shall have the meanings given to such terms in the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.      The Plan will be accepted by a Class of Claims if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted to accept or reject the Plan. In the event a Class rejects the Plan, the District Court may nevertheless confirm the Plan and thereby make it binding on the holders of Claims in the rejecting Class if the District Court finds the Plan does not unfairly discriminate against and accords fair and equitable treatment to the holders of Claims in such Class and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of PROMESA section 314(b) and section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the District Court, all holders of Claims against the Debtor and its property (including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the terms of the confirmed Plan and the transactions contemplated thereby.

3.      **To have your vote counted, you must properly complete, sign, and return this Ballot to Prime Clerk LLC (the "Balloting Agent") so that it is received by the Balloting Agent no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline"), at the following address:**

#### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's "E-Ballot" platform in accordance with the instructions above).**

4.      To properly complete the Ballot, you must follow the procedures described below:

   a.  Ensure the information contained in the Ballot is correct;

5

b.   You may not split your vote on the Plan. You must vote all the Claims on behalf of the holders of Class 3 Claims either to accept or to reject the Plan;

c.   If you are completing this Ballot on behalf of another entity, indicate your relationship to such entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

d.   If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot;

e.   If you believe you have received the wrong Ballot, please contact the Balloting Agent immediately;

f.   Provide your name and mailing address;

g.   Sign and date your Ballot; and

h.   Return your Ballot using an authorized method of return indicated herein.

5.      If more than one Ballot voting the same Claim is received by the Balloting Agent, the latest Ballot received prior to the Voting Deadline will, to the extent of any inconsistencies between the Ballots, supersede and revoke any prior Ballot.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR IF YOU RECEIVED SOLICITATION PACKAGE MATERIALS IN ELECTRONIC FORMAT AND DESIRE PAPER COPIES, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF, COFINA, OR THE DISTRICT COURT.

I-068

## Schedule 3E

## Form of Ballot for Holders of Claims in Class 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                  Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## BALLOT FOR HOLDERS
## OF CLAIMS IN CLASS 6 (JUNIOR COFINA BOND CLAIMS (ASSURED))

The Financial Oversight And Management Board For Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the District Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___ ], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan.  Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot.  **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan.  If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

This Ballot is to be used for voting by Assured Guaranty Municipal Corp. ("Assured"). Pursuant to the Disclosure Statement Order, Assured is entitled to accept or reject the Plan on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 6.  **To have your vote counted, you must complete, sign, and return this Ballot so that it is received by the Balloting Agent at the address listed below no later than the Voting Deadline, unless such time is extended by the Debtor.  Ballots must be delivered to the Balloting Agent (i) at the address listed below (or in the enclosed envelope, which may have a different zip code) or (ii) via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/puertorico, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website. Assured is encouraged to submit its Ballots via the E-Ballot platform.  If you choose to submit your Ballot via the E-Ballot platform, you should NOT submit your paper copy Ballot as well.  Please choose only one form of return of your Ballot:**

**Via First Class Mail, Hand Delivery or Overnight Courier:**

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**You must deliver the Ballot in the manner described above.  Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's E-Ballot platform).**

**The Ballot must actually be received by the Balloting Agent by no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline").**

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, any Claim, and without prejudice to COFINA's rights in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be in an amount as determined by the procedures set forth in the Disclosure Statement Order.

This Ballot does not and shall not be deemed to constitute (i) an assertion of a Claim, (ii) a proof of claim, or (iii) an admission by COFINA of the nature, validity, or amount of any Claim.

PLEASE COMPLETE THE FOLLOWING:

<u>Item 1.</u>        **Vote on Plan.**

The undersigned, voting on behalf of beneficial holders of securities giving rise to Impaired Claims in Class 6, hereby votes to (please check <u>one</u>):

| | |
|---|---|
| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |

**To submit your Ballot via the "E-Ballot" platform, please visit https://cases.primeclerk.com/puertorico. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____ _____**

**Prime Clerk's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an E-Ballot for each E-Ballot ID# you receive, as applicable.**

Creditors who cast a Ballot using Prime Clerk's "E-Ballot" platform should <u>NOT</u> also submit a paper Ballot.

<u>Item 2.</u>        **Acknowledgements and Certification.**

By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Plan, Disclosure Statement, and Disclosure Statement Order. The undersigned certifies that, pursuant to the Disclosure Statement Order, it has full power and authority to vote to accept or reject the Plan on behalf of the beneficial holders of securities giving rise to Impaired Claims in Class 6. The undersigned further acknowledges that COFINA's solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement Order and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

3

Name of Holder: _____
                                          (Print or Type)

Signature:_____

Name of Signatory:_____
                                          (If other than holder)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

4

I-073

## VOTING INSTRUCTIONS FOR COMPLETING THE
## BALLOT FOR CLAIMS IN CLASS 6 (JUNIOR COFINA BOND CLAIMS (ASSURED))

1.      This Ballot is submitted to you to solicit your vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___].  The terms of the Plan are described in the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___].  All capitalized terms used but not otherwise defined herein or in the Ballot shall have the meanings given to such terms in the Plan. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.      The Plan will be accepted by a Class of Claims if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted to accept or reject the Plan.  In the event a Class rejects the Plan, the District Court may nevertheless confirm the Plan and thereby make it binding on the holders of Claims in the rejecting Class if the District Court finds the Plan does not unfairly discriminate against and accords fair and equitable treatment to the holders of Claims in such Class and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of PROMESA section 314(b) and section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the District Court, all holders of Claims against the Debtor and its property(including those holders who abstain from voting or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the terms of the confirmed Plan and the transactions contemplated thereby.

3.      **To have your vote counted, you must properly complete, sign, and return this Ballot to Prime Clerk LLC (the "Balloting Agent") so that it is received by the Balloting Agent no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019 (the "Voting Deadline"), at the following address:**

### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's "E-Ballot" platform in accordance with the instructions above).**

4.      To properly complete the Ballot, you must follow the procedures described below:

a.   Ensure the information contained in the Ballot is correct;

5

    b.   You may not split your vote on the Plan. You must vote all the Claims on behalf of the holders of Class 6 Claims either to accept or to reject the Plan;

    c.   If you are completing this Ballot on behalf of another entity, indicate your relationship to such entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

    d.   If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot;

    e.   If you believe you have received the wrong Ballot, please contact the Balloting Agent immediately;

    f.   Provide your name and mailing address;

    g.   Sign and date your Ballot; and

    h.   Return your Ballot using an authorized method of return indicated herein.

    5.    If more than one Ballot voting the same Claim is received by the Balloting Agent, the latest Ballot received prior to the Voting Deadline will, to the extent of any inconsistencies between the Ballots, supersede and revoke any prior Ballot.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR THE PLAN, OR IF YOU RECEIVED SOLICITATION PACKAGE MATERIALS IN ELECTRONIC FORMAT AND DESIRE PAPER COPIES, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF, COFINA, OR THE DISTRICT COURT.

## Schedule 3F

**Form of Ballot for Holders of Claims in Class 8**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                     Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## BALLOT FOR HOLDER
## OF CLAIM IN CLASS 8 (GS DERIVATIVE CLAIM)

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the District Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan. **IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE CONSENTING TO CERTAIN INJUNCTION AND RELEASE PROVISIONS.** Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot. **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan. If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

This Ballot is to be used for voting by the holders of the Claim in the Class listed below. **To have your vote counted, you must complete, sign, and return this Ballot so that it its received by the Balloting Agent at the address listed below no later than the Voting Deadline, unless such time is extended by the Debtor. Ballots must be delivered to the Balloting Agent (i) at the address listed below (or in the enclosed envelope, which may have a different zip code) or (ii) via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/puertorico, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website. Holders are encouraged to submit their Ballots via the E-Ballot platform. If you choose to submit your Ballot via the E-Ballot platform, you should NOT submit your paper copy Ballot as well. Please choose only one form of return of your Ballot:**

### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**You must deliver the Ballot in the manner described above. Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's E-Ballot platform).**

**The Ballot must actually be received by the Balloting Agent by no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline").**

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, any Claim, and without prejudice to COFINA's rights in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be in an amount as determined by the procedures set forth in the Disclosure Statement Order.

This Ballot does not and shall not be deemed to constitute (i) an assertion of a Claim, (ii) a proof of claim, or (iii) an admission by COFINA of the nature, validity, or amount of any Claim.

PLEASE COMPLETE THE FOLLOWING:

**Item 1.**       **Amount of Claim**

For purposes of voting to accept or reject the Plan, the undersigned holds the Claim in Class 8 set forth below in the following aggregate amount:

$\boxed{\text{\$_____}}$

**Item 2.**       **Vote on Plan.**

The undersigned holder of a Claim in the amount set forth in **Item 1** above hereby votes to (please check one):

| | | | |
|---|---|---|---|
| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |

**To submit your Ballot via the "E-Ballot" platform, please visit https://cases.primeclerk.com/puertorico. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**Prime Clerk's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only the Claim described in Item 1 of your electronic Ballot. Please complete and submit an E-Ballot for each E-Ballot ID# you receive, as applicable.**

Creditors who cast a Ballot using Prime Clerk's "E-Ballot" platform should NOT also submit a paper Ballot.

3

I-079

**Item 3.**          **Acknowledgements and Certification.**

By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Plan, Disclosure Statement, and Disclosure Statement Order. The undersigned certifies that (i) it is the holder of the Claim identified in **Item 1** above, or (ii) it has full power and authority to vote to accept or reject the Plan. The undersigned further acknowledges that COFINA's solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the District Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Name of Holder: _____

(Print or Type)

Signature:_____

Name of Signatory:_____

(If other than holder)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

4

## VOTING INSTRUCTIONS FOR COMPLETING THE
## BALLOT FOR THE CLAIM IN CLASS 8 (GS DERIVATIVE CLAIM)

1.      This Ballot is submitted to you to (i) solicit your vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], and (ii) constitute your consent to the injunction and release provisions of the Plan if you vote to accept the Plan.  The terms of the Plan are described in the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___].  All capitalized terms used but not otherwise defined herein or in the Ballot shall have the meanings given to such terms in the Plan.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.      The Plan will be accepted by a Class of Claims if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in a Class that have voted to accept or reject the Plan.  In the event a Class rejects the Plan, the District Court may nevertheless confirm the Plan and thereby make it binding on holders of Claims in the Class if the District Court finds the Plan does not unfairly discriminate against and accords fair and equitable treatment to the holders of Claims in the Class and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of PROMESA section 314(b) and section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the District Court, all holders of Claims against the Debtor (including those holders who abstain from voting on or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby, whether or not they vote and whether or not they accept the Plan.

3.      **To have your vote counted, you must properly complete, sign, and return this Ballot to Prime Clerk LLC (the "Balloting Agent") so that it is received by the Balloting Agent no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019 (the "Voting Deadline"), at the following address:**

### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's "E-Ballot" platform in accordance with the instructions above).**

I-081

4.    To properly complete the Ballot, you must follow the procedures described below:

    a.   Ensure the information contained in **Item 1** of the Ballot is correct;

    b.   You may not split your vote on the Plan. You must vote all the Claims you hold in a Class to accept or reject the Plan;

    c.   If you are completing this Ballot on behalf of another entity, indicate your relationship to such entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

    d.   If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot;

    e.   If you believe you have received the wrong Ballot, please contact the Balloting Agent immediately;

    f.   Provide your name and mailing address;

    g.   Sign and date your Ballot; and

    h.   Return your Ballot using an authorized method of return indicated herein.

5.    If more than one Ballot voting the same Claim is received by the Balloting Agent, the latest Ballot received prior to the Voting Deadline will, to the extent of any inconsistencies between the Ballots, supersede and revoke any prior Ballot.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR THE PLAN, OR IF YOU RECEIVED SOLICITATION PACKAGE MATERIALS IN ELECTRONIC FORMAT AND DESIRE PAPER COPIES, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF, COFINA, OR THE DISTRICT COURT.

I-082

<u>**Schedule 3G**</u>

**Form of Ballot for Holders of Claims in Class 9**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                  Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## BALLOT FOR HOLDERS
## OF CLAIMS IN CLASS 9 (GENERAL UNSECURED CLAIMS)

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA"), is soliciting votes with respect to the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of certain impaired Claims against COFINA. By order dated November ___, 2018 (the "Disclosure Statement Order"), the District Court approved the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___ ], and authorized COFINA to solicit votes with respect to the acceptance or rejection of the Plan. **IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE CONSENTING TO CERTAIN INJUNCTION AND RELEASE PROVISIONS.** Copies of the Plan and Disclosure Statement are enclosed in the package containing this Ballot. **All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan. If you have any questions regarding the proper completion of this Ballot, please contact the Balloting Agent by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com.**

This Ballot is to be used for voting by holders of Claims in the Class listed below. **To have your vote counted, you must complete, sign, and return this Ballot so that it its received by the Balloting Agent at the address listed below no later than the Voting Deadline, unless such time is extended by the Debtor. Ballots must be delivered to the Balloting Agent (i) at the address listed below (or in the enclosed envelope, which may have a different zip code) or (ii) via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/puertorico, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website. Holders are encouraged to submit their Ballots via the E-Ballot platform. If you choose to submit your Ballot via the E-Ballot platform, you should NOT submit your paper copy Ballot as well. Please choose only one form of return of your Ballot:**

**<u>Via First Class Mail, Hand Delivery or Overnight Courier:</u>**

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**You must deliver the Ballot in the manner described above. Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's E-Ballot platform).**

**The Ballot must actually be received by the Balloting Agent by no later 6:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended (the "Voting Deadline").**

**IN THE EVENT THAT CLASS 9 VOTES TO ACCEPT THE PLAN, EACH HOLDER OF AN ALLOWED GENERAL UNSECURED CLAIM SHALL BE ENTITLED TO RECEIVE ITS PRO RATA SHARE OF ONE HUNDRED THOUSAND DOLLARS ($100,000.00); <u>PROVIDED, HOWEVER,</u> THAT, IN THE EVENT THAT CLASS 9 VOTES TO REJECT THE PLAN, HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS SHALL NOT RECEIVE A DISTRIBUTION PURSUANT TO THE PLAN.**

I-085

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, any Claim, and without prejudice to COFINA's rights in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be in an amount as determined by the procedures set forth in the Disclosure Statement Order.

This Ballot does not and shall not be deemed to constitute (i) an assertion of a Claim, (ii) a proof of claim, or (iii) an admission by COFINA of the nature, validity, or amount of any Claim.

PLEASE COMPLETE THE FOLLOWING:

**Item 1.**        **Amount of Claim**

For purposes of voting to accept or reject the Plan, the undersigned holds the Claim(s) in Class 9 set forth below in the following aggregate amount:

$ _____

**Item 2.**        **Vote on Plan.**

The undersigned holder of a Claim in the amount set forth in **Item 1** above hereby votes to (please check <u>one</u>):

☐        <u>**ACCEPT**</u> (vote FOR) the Plan          ☐        <u>**REJECT**</u> (vote AGAINST) the Plan

**To submit your Ballot via the "E-Ballot" platform, please visit https://cases.primeclerk.com/puertorico. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**Prime Clerk's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an E-Ballot for each E-Ballot ID# you receive, as applicable.**

3

I-086

Creditors who cast a Ballot using Prime Clerk's "E-Ballot" platform should <u>NOT</u> also submit a paper Ballot.

**<u>Item 3.</u>**          **Acknowledgements and Certification.**

By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Plan, Disclosure Statement, and Disclosure Statement Order. The undersigned certifies that (i) it is the holder of the Claim(s) identified in <u>**Item 1**</u> above, or (ii) it has full power and authority to vote to accept or reject the Plan. The undersigned further acknowledges that COFINA's solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the District Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Name of Holder: _____ _____ ____

(Print or Type)

_____

Signature:____ _____ __ _____

Name of Signatory:_____ _____

(If other than holder)

Title: _____

Address: _____

_____

_____

Telephone
Number: _____

Email: _____

Date Completed: _____

4

## VOTING INSTRUCTIONS FOR COMPLETING THE
## BALLOT FOR CLAIMS IN CLASS 9 (GENERAL UNSECURED CLAIMS)

1.      This Ballot is submitted to you to (i) solicit your vote to accept or reject the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], and (ii) consent to the injunction and release provisions of the Plan if you vote to accept the Plan.  The terms of the Plan are described in the *Disclosure Statement for the Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___].  All capitalized terms used but not otherwise defined herein or in the Ballot shall have the meanings given to such terms in the Plan.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.      The Plan will be accepted by a Class of Claims if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in a Class that have voted to accept or reject the Plan.  In the event a Class rejects the Plan, the District Court may nevertheless confirm the Plan and thereby make it binding on holders of Claims in the Class if the District Court finds the Plan does not unfairly discriminate against and accords fair and equitable treatment to the holders of Claims in the Class and all other Classes of Claims rejecting the Plan, and otherwise satisfies the requirements of PROMESA section 314(b) and section 1129(b) of the Bankruptcy Code.  If the Plan is confirmed by the District Court, all holders of Claims against the Debtor (including those holders who abstain from voting on or reject the Plan, and those holders who are not entitled to vote on the Plan) will be bound by the confirmed Plan and the transactions contemplated thereby, whether or not they vote and whether or not they accept the Plan.

3.      **To have your vote counted, you must properly complete, sign, and return this Ballot to Prime Clerk LLC (the "Balloting Agent") so that it is received by the Balloting Agent no later than 6:00 p.m. (Atlantic Standard Time) on January 8, 2019 (the "Voting Deadline"), at the following address:**

### Via First Class Mail, Hand Delivery or Overnight Courier:

**PUERTO RICO SALES TAX FINANCING
CORPORATION BALLOT PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**Ballots will not be accepted by telecopy, facsimile, electronic mail, or other electronic means of transmission (except via Prime Clerk's "E-Ballot" platform in accordance with the instructions above).**

I-088

4.  To properly complete the Ballot, you must follow the procedures described below:

a.  Ensure the information contained in **Item 1** of the Ballot is correct;

b.  You may not split your vote on the Plan. You must vote all the Claims you hold in a Class to accept or reject the Plan;

c.  If you are completing this Ballot on behalf of another entity, indicate your relationship to such entity and the capacity in which you are signing and submit satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

d.  If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims against a particular Debtor only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot;

e.  If you believe you have received the wrong Ballot, please contact the Balloting Agent immediately;

f.  Provide your name and mailing address;

g.  Sign and date your Ballot; and

h.  Return your Ballot using an authorized method of return indicated herein.

5.  If more than one Ballot voting the same Claim is received by the Solicitation Agent, the latest Ballot received prior to the Voting Deadline will, to the extent of any inconsistencies between the Ballots, supersede and revoke any prior Ballot.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT, OR IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR THE PLAN, OR IF YOU RECEIVED SOLICITATION PACKAGE MATERIALS IN ELECTRONIC FORMAT AND DESIRE PAPER COPIES, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE BALLOTING AGENT BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS) OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE OVERSIGHT BOARD, AAFAF COFINA, OR THE DISTRICT COURT.

## Schedule 4A

**Form of Election Notice for Holders of Claims in Classes 1 and 5**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING<br>CORPORATION,<br><br>                     Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## [SENIOR] / [JUNIOR] TAXABLE BOND DISTRIBUTION ELECTION NOTICE
## FOR COFINA BOND HOLDERS WITH CLAIMS IN [CLASS 1] / [CLASS 5]

This **[Senior]** / **[Junior]** Taxable Bond Distribution Election Notice (the "**Notice**") is being sent to the beneficial holders of securities giving rise to claims under **[Class 1]** / **[Class 5]** of the Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

"**Plan**").[2] Pursuant to the Plan, holders of **[Senior] / [Junior]** COFINA Bond Claims are entitled to their Pro Rata Share of the [Senior] / [Junior] COFINA Bond Distribution.

On the Effective Date, each holder of an Allowed **[Senior] / [Junior]** COFINA Bond Claim against COFINA shall receive its Pro Rata Share of the **[Senior] / [Junior]** COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds, and (d) Rounding Amount Cash, if necessary.

If you are a beneficial holder of securities giving rise to Impaired Claims in **[Class 1 (Senior COFINA Bond Claims)] / [Class 5 (Junior COFINA Bond Claims)]**, you may be eligible to elect to receive your distribution under the Plan in the form of the **[Senior] / [Junior]** Taxable Bond Distribution and be treated under **[Class 4 (Senior COFINA Bond Claim (Taxable Election))] / [Class 7 (Junior COFINA Bond Claim (Taxable Election))]**, if you are a Puerto Rico Investor, or a Puerto Rico Institution.

To elect to receive the **[Senior] / [Junior]** Taxable Bond Distribution and be treated under **[Class 4] / [Class 7]**, you must certify in connection with your election that you are either:

- a **Puerto Rico Investor:** either,

  o A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

  o An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes); or

- a **Puerto Rico Institution:** any other entity that is not a Puerto Rico Investor that is a legal entity domiciled in Puerto Rico.

If you elect to receive your distribution under the Plan in the form of the **[Senior] / [Junior]** Taxable Bond Distribution and be treated under **[Class 4 (Senior COFINA Bond Claim (Taxable Election))] / [Class 7 (Junior COFINA Bond Claim (Taxable Election))]**, you are deemed to accept the Plan, notwithstanding how you may have voted on your Beneficial Ballot. If it is later determined that you are ineligible to be treated under **[Class 4] / [Class 7]** or all Taxable Bonds have been allocated, then your vote to accept or reject the Plan, if cast, will be treated as a vote in **[Class 1 / Class 5]**.

**IF YOU ELECT TO RECEIVE THE [SENIOR] / [JUNIOR] TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO [93.015% OF YOUR "SENIOR" EXISTING SECURITIES] / [56.414% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES] AND CASH IN AN AMOUNT APPROXIMATELY EQUAL TO 2% OF YOUR ["SENIOR" EXISTING SECURITIES] / ["FIRST SUBORDINATE" EXISTING SECURITIES]. IF YOU DO NOT ELECT TO RECEIVE THE [SENIOR] / [JUNIOR]**

---

[2] Unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the Plan.

I-092

**TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO [93.015% OF YOUR "SENIOR" EXISTING SECURITIES AND NO CASH] / [56.414% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES AND NO CASH].**

*You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in Sections XV and XVI of the Disclosure Statement, before electing to receive your distribution under the Plan in the form of the [Senior] / [Junior] Taxable Bond Distribution. Even if you qualify as a Puerto Rico investor or Puerto Rico Institution, you may not be exempt from paying U.S. federal income tax on the Taxable COFINA Bonds. The tax consequences described in the Disclosure Statement are not a substitute for careful tax planning and professional tax advice upon your individual circumstances and you should seek advice from your own tax advisor.*

Each holder of an Allowed **[Senior] / [Junior]** COFINA Bond Claim against COFINA will receive its Pro Rata Share of the **[Senior] / [Junior]** COFINA Bond Distribution. **IF YOU DO NOT WISH TO RECEIVE THE [SENIOR] / [JUNIOR] TAXABLE BOND DISTRIBUTION, YOU DO NOT NEED TO TAKE ANY FURTHER ACTION.**

**Each holder of Existing Securities described on <u>Exhibit A</u> attached hereto that is eligible and wishes to receive the [Senior] / [Junior] Taxable Bond Distribution must submit a valid election in the manner described herein.**

\* \* \* \* \*

3

### How to Submit a Valid Taxable Bond Distribution Election

If you wish to elect to receive the **[Senior] / [Junior]** Taxable Bond Distribution, you must:

1.  instruct your broker or nominee (each, a **"Nominee"**) to electronically deliver your Existing Securities via the Automated Tender Offer Program (**"ATOP"**) at The Depository Trust Company (**"DTC"**), and

2.  certify via DTC's ATOP system that you are either:

    ☐ a natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or an entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes) (a **"Puerto Rico Investor"**); or

    ☐ an entity that is domiciled in Puerto Rico that does not otherwise qualify as a Puerto Rico Investor above.

No paperwork is required to be delivered to Prime Clerk LLC to effectuate the election. The sole means of effectuating this election is to (i) validly tender your Existing Securities into the proper ATOP envelope at DTC, and (ii) make the required certification set forth above, each as described on DTC's ATOP system.

---

**THE TAXABLE BOND DISTRIBUTION ELECTION DEADLINE IS
6:00 P.M. (ATLANTIC STANDARD TIME) ON JANUARY 8, 2019.**

This date and time is referred to as the **"Election Expiration Deadline."**

---

**PLEASE TAKE NOTICE THAT IF YOU TENDER YOUR EXISTING SECURITIES THROUGH ATOP, YOU WILL BE RESTRICTED FROM TRANSFERRING YOUR EXISTING SECURITIES FROM THE ELECTION EXPIRATION DEADLINE UNTIL THE EFFECTIVE DATE OF THE PLAN. IF YOU DESIRE TO RETAIN THE ABILITY TO TRADE OR TRANSFER YOUR EXISTING SECURITIES PRIOR TO THE EFFECTIVE DATE, THEN YOU SHOULD NOT TENDER YOUR EXISTING SECURITIES THROUGH ATOP.**

**YOU MAY, HOWEVER, REVOKE YOUR ELECTION AT ANY TIME BEFORE THE ELECTION EXPIRATION DEADLINE AND WITHDRAW ANY TENDERED EXISTING SECURITIES.**

\* \* \* \* \*

### How to Revoke a Valid Taxable Bond Distribution Election

You may revoke an election to receive the **[Senior] / [Junior]** Taxable Bond Distribution and withdraw your Existing Securities tendered to through DTC's ATOP at any time on or before the Election Expiration Deadline.

4

If you wish to revoke your election, you must instruct your Nominee to revoke your election and withdraw your Existing Securities via ATOP at DTC (which withdrawal will be confirmed by Prime Clerk LLC once notified by DTC of the withdrawal request). No paperwork is required to be delivered to Prime Clerk LLC to effectuate the election.

If you revoke your election at any time before the Election Expiration Deadline, you may make an election to receive the [Senior] / [Junior] Taxable Bond Distribution at any time before the Election Expiration Deadline, in accordance with the instructions to submit a valid taxable bond distribution election above.

*   *   *   *   *

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK, LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM AND REFERENCE "COFINA DISTRIBUTION ELECTION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

This Taxable Bond Distribution Election is subject to the terms of the Plan. All questions as to the validity, form and eligibility (including time of receipt) of this Taxable Bond Distribution Election, including whether you qualify as a Puerto Rico Institution or Puerto Rico Investor, will be determined by the Oversight Board, whose determination shall be final and binding on all parties. The Oversight Board and COFINA reserve the absolute right to reject any or all Taxable Bond Distribution Elections that are not in proper form or the acceptance of which would, in its legal counsel's opinion, be unlawful. The Oversight Board and COFINA also reserve the right to waive any defects, irregularities or conditions as to this Taxable Bond Distribution Election. A waiver of any defect or irregularity in one instance shall not constitute a waiver of the same or any other defect or irregularity with respect to any other instance except to the extent the Oversight Board may otherwise so provide. Delivery of this Taxable Bond Distribution Election shall not be deemed to have been made until any defects or irregularities have been waived by us or cured. None of the Oversight Board, COFINA or the Balloting Agent, nor any other person will be under any duty to give notification of any defect or irregularity in this Taxable Bond Distribution Election, or will incur any liability to you for failure to give any such notification.

I-095

## Exhibit A

| Description | CUSIP |
|---|---|
| | |
| | |
| | |

I-096

## Schedule 4B

**Form of Election Notice for Holders of Claims in Class 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                  Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## AMBAC CERTIFICATE ELECTION NOTICE
## FOR COFINA BOND HOLDERS WITH CLAIMS IN CLASS 2

This Ambac Certificate Election Notice (the **"Notice"**) is being sent to the beneficial holders of Senior COFINA Bond Claims that were insured by Ambac Assurance Corporation (**"Ambac"**). These securities give rise to Claims in Class 2 of the Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the **"Plan"**).[2] Although Ambac has the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the Plan.

right to cast the vote on behalf of such holders to accept or reject the Plan, the holders are entitled to elect their form of distribution under the Plan.

Each holder of an Allowed Senior COFINA Bond Claim (Ambac) has the option to elect to receive on the Effective Date, in full satisfaction, release, and exchange of such holder's Allowed Senior COFINA Bond Claim (Ambac), its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of Ambac, in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election, the holder shall be deemed to have agreed to commute the Ambac Insurance Policy relating to such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust or the Ambac Certificates); or

(2) the Ambac Certificates described in Sections 6.3 and 17.1 of the Plan;

If a holder of a Senior COFINA Bond Claim (Ambac) (a) fails to elect to receive the Ambac Certificates referred to in Sections 6.3 and 17.1 of the Plan, or (b) submits an election for less than all of its Class 2 Claims (in which case, such election shall be void and of no force and effect), then, such holder shall be deemed to have elected to commute the Ambac Insurance Policy, to release and discharge Ambac's obligations under the Ambac Insurance Policy and to receive distributions in accordance with the provisions of clause (1) above.

*You are encouraged to review the entire Disclosure Statement and the Plan, including information concerning the Ambac Trusts, before making an election with respect to the form of distribution you will receive under the Plan in the form of the Ambac Certificates. The tax consequences described in the Disclosure Statement are not a substitute for careful tax planning and professional tax advice upon your individual circumstances and you should seek advice from your own tax advisor.*

> **Please take notice that you are not able to vote to accept or reject the Plan and will not receive a separate voting ballot for such purpose. Pursuant to the Disclosure Statement Order, Ambac is entitled to vote to accept or reject the Plan your behalf.**

**IF YOU DO NOT WISH TO RECEIVE THE AMBAC CERTIFICATES, YOU DO NOT NEED TO TAKE ANY FURTHER ACTION. HOWEVER, IN SUCH CASE, YOU WILL BE DEEMED TO HAVE ELECTED TO RELEASE, DISCHARGE AND COMMUTE AMBAC'S OBLIGATIONS AND THE AMBAC INSURANCE POLICY.**

**Each holder of Existing Securities described on Exhibit A attached hereto that wishes to receive the Ambac Certificates must submit a valid election in the manner described herein.**

I-099

\* \* \* \* \*

### How to Submit a Valid Ambac Certificate Election

If you wish to elect to receive the Ambac Certificates, you must instruct your broker or nominee (each, a **"Nominee"**) to electronically deliver your Existing Securities via the Automated Tender Offer Program (**"ATOP"**) at The Depository Trust Company (**"DTC"**), which will constitute an election via DTC's ATOP system to receive the Ambac Certificates representing an interest in the Ambac Trust Assets.

No paperwork is required to be delivered to Prime Clerk to effectuate the election. The sole means of effectuating this election is to (i) validly tender your Existing Securities into the proper ATOP envelope at DTC, and (ii) make the election to receive the Ambac Certificates, each as described on DTC's ATOP system.

---

**THE AMBAC CERTIFICATE ELECTION DEADLINE IS
6:00 P.M. (ATLANTIC STANDARD TIME) ON JANUARY 8, 2019.**

This date and time is referred to as the **"Election Expiration Deadline."**

---

**PLEASE TAKE NOTICE THAT IF YOU TENDER YOUR EXISTING SECURITIES THROUGH ATOP, YOU WILL BE RESTRICTED FROM TRANSFERRING YOUR EXISTING SECURITIES FROM THE ELECTION EXPIRATION DEADLINE UNTIL THE EFFECTIVE DATE OF THE PLAN. IF YOU DESIRE TO RETAIN THE ABILITY TO TRADE OR TRANSFER YOUR EXISTING SECURITIES PRIOR TO THE EFFECTIVE DATE, THEN YOU SHOULD NOT TENDER YOUR EXISTING SECURITIES THROUGH ATOP.**

**YOU MAY, HOWEVER, REVOKE YOUR ELECTION AT ANY TIME BEFORE THE ELECTION EXPIRATION DEADLINE AND WITHDRAW ANY TENDERED EXISTING SECURITIES.**

\* \* \* \* \*

### How to Revoke a Valid Ambac Certificate Election

You may revoke an election to receive the Ambac Certificates and withdraw your Existing Securities tendered to through DTC's ATOP at any time on or before the Election Expiration Deadline.

If you wish to revoke your election, you must instruct your Nominee to revoke your election and withdraw your Existing Securities via ATOP at DTC (which withdrawal will be confirmed by Prime Clerk LLC once notified by DTC of the withdrawal request). No paperwork is required to be delivered to Prime Clerk LLC to effectuate the election.

3

I-100

If you revoke your election at any time before the Election Expiration Deadline, you may make an election to receive the Ambac Certificates at any time before the Election Expiration Deadline, in accordance with the instructions to submit a valid taxable bond distribution election above.

*   *   *   *   *

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM AND REFERENCE "COFINA DISTRIBUTION ELECTION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK, LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

All questions as to the validity, form and eligibility (including time of receipt) of your election will be determined by the Oversight Board, whose determination shall be final and binding on all parties. The Oversight Board and COFINA reserve the absolute right to reject any or all elections that are not in proper form or the acceptance of which would, in its legal counsel's opinion, be unlawful. An election shall not be deemed to have been made until any defects or irregularities have been waived by us or cured. None of the Oversight Board, COFINA or the Balloting Agent, nor any other person will be under any duty to give notification of any defect or irregularity in an election, or will incur any liability to you for failure to give any such notification.

I-101

## Exhibit A

| Description | CUSIP |
|---|---|
|  |  |
|  |  |
|  |  |

5

## Schedule 4C

**Form of Election Notice for Holders of Claims in Class 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                        Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

**NATIONAL CERTIFICATE ELECTION NOTICE**
**FOR COFINA BOND HOLDERS WITH CLAIMS IN CLASS 3**

This National Certificate Election Notice (the "**Notice**") is being sent to the beneficial holders of Senior COFINA Bond Claims that were insured by National Public Finance Guarantee Corporation ("**National**"). These securities give rise to Claims in Class 3 of the Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the "**Plan**").[2]

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]  Unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the Plan.

Although National has the right to cast the vote on behalf of such holders to accept or reject the Plan, the holders are entitled to elect their form of distribution under the Plan.

Each holder of an Allowed Senior COFINA Bond Claim (National) has the option to elect to receive on the Effective Date, in full satisfaction, release, and exchange of such holder's Allowed Senior COFINA Bond Claim (National), its Pro Rata Share of:

> (1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, <u>plus</u> (b) Cash distributable by or at the direction of National, in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date, in full and complete satisfaction, release, and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall be deemed to have agreed to commute National Insurance Policies relating to such holder's Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust or the National Certificates); or

> (2) the National Certificates described in Sections 7.3 and 17.2 of the Plan;

If a holder of a Senior COFINA Bond Claim (National) (a) fails to timely elect to receive the National Certificates referred to in Sections 7.3 and 17.2 of the Plan, or (b) submits an election for less than all of its Class 3 Claims (in which case, such election shall be void and of no force and effect), then, such holder shall be deemed to have elected to commute the National Insurance Policies, to release and discharge National's obligations thereunder, and to receive distributions in accordance with the provisions of clause (1) above.

*You are encouraged to review the entire Disclosure Statement and the Plan, including information concerning the National Trust, before making an election with respect to the form of distribution you will receive under the Plan. The tax consequences described in the Disclosure Statement are not a substitute for careful tax planning and professional tax advice upon your individual circumstances and you should seek advice from your own tax advisor.*

**Please take notice that you are not able to vote to accept or reject the Plan and will not receive a separate voting ballot for such purpose. Pursuant to the Disclosure Statement Order, National is entitled to vote to accept or reject the Plan on your behalf.**

**<u>IF YOU DO NOT WISH TO RECEIVE THE NATIONAL CERTIFICATES, YOU DO NOT NEED TO TAKE ANY FURTHER ACTION.</u> HOWEVER, IN SUCH CASE, YOU WILL BE DEEMED TO HAVE ELECTED TO RELEASE, DISCHARGE AND COMMUTE NATIONAL'S OBLIGATIONS AND THE NATIONAL INSURANCE POLICY.**

**Each holder of Existing Securities described on <u>Exhibit A</u> attached hereto that wishes to receive the National Certificates must submit a valid election in the manner described herein.**

\*    \*    \*    \*    \*

### How to Submit a Valid National Certificate Election

If you wish to elect to receive the National Certificates, you must instruct your broker or nominee (each, a **"Nominee"**) to electronically deliver your Existing Securities via the Automated Tender Offer Program (**"ATOP"**) at The Depository Trust Company (**"DTC"**), which will constitute an election via DTC's ATOP system to receive the National Certificates representing an interest in the National Trust Assets.

No paperwork is required to be delivered to Prime Clerk to effectuate the election. The sole means of effectuating this election is to (i) validly tender your Existing Securities into the proper ATOP envelope at DTC, and (ii) make the election to receive the National Certificates, each as described on DTC's ATOP system.

> **THE NATIONAL CERTIFICATE ELECTION DEADLINE IS**
> **6:00 P.M. (ATLANTIC STANDARD TIME) ON JANUARY 8, 2019.**
>
> This date and time is referred to as the **"Election Expiration Deadline."**

**PLEASE TAKE NOTICE THAT IF YOU TENDER YOUR EXISTING SECURITIES THROUGH ATOP, YOU WILL BE RESTRICTED FROM TRANSFERRING YOUR EXISTING SECURITIES FROM THE ELECTION EXPIRATION DEADLINE UNTIL THE EFFECTIVE DATE OF THE PLAN. IF YOU DESIRE TO RETAIN THE ABILITY TO TRADE OR TRANSFER YOUR EXISTING SECURITIES PRIOR TO THE EFFECTIVE DATE, THEN YOU SHOULD NOT TENDER YOUR EXISTING SECURITIES THROUGH ATOP.**

**YOU MAY, HOWEVER, REVOKE YOUR ELECTION AT ANY TIME BEFORE THE ELECTION EXPIRATION DEADLINE AND WITHDRAW ANY TENDERED EXISTING SECURITIES.**

\*    \*    \*    \*    \*

### How to Revoke a Valid National Certificate Election

You may revoke an election to receive the National Certificates and withdraw your Existing Securities tendered to through DTC's ATOP at any time on or before the Election Expiration Deadline.

If you wish to revoke your election, you must instruct your Nominee to revoke your election and withdraw your Existing Securities via ATOP at DTC (which withdrawal will be confirmed by Prime Clerk LLC once notified by DTC of the withdrawal request). No paperwork is required to be delivered to Prime Clerk LLC to effectuate the election.

I-106

If you revoke your election at any time before the Election Expiration Deadline, you may make an election to receive the National Certificates at any time before the Election Expiration Deadline, in accordance with the instructions to submit a valid taxable bond distribution election above.

\*   \*   \*   \*   \*

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM AND REFERENCE "COFINA DISTRIBUTION ELECTION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK, LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

All questions as to the validity, form and eligibility (including time of receipt) of your election will be determined by the Oversight Board, whose determination shall be final and binding on all parties. The Oversight Board and COFINA reserve the absolute right to reject any or all elections that are not in proper form or the acceptance of which would, in its legal counsel's opinion, be unlawful.  An election shall not be deemed to have been made until any defects or irregularities have been waived by us or cured. None of the Oversight Board, COFINA or the Balloting Agent, nor any other person will be under any duty to give notification of any defect or irregularity in this election, or will incur any liability to you for failure to give any such notification.

## Exhibit A

| Description | CUSIP |
|---|---|
| | |
| | |
| | |

I-108

# Schedule 5

**Class 6 Notice**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## NOTICE OF TREATMENT OF CLAIMS IN
## CLASS 6 (JUNIOR COFINA BOND CLAIMS (ASSURED))

This Notice (the "**Notice**") is being sent to beneficial holders of securities giving rise to claims under Class 6 of the Title III Plan of Adjustment (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the "**Plan**") of the Puerto Rico Sales Tax Financing Corporation ("**COFINA**").[2]

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]   Unless otherwise defined herein, each capitalized term used herein shall have the meaning ascribed to it in the Plan.

Pursuant to Article X of the Plan, if the Plan is confirmed by the Title III Court, the principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Assured Insured Bonds giving rise to Claims in Class 6 will be deemed accelerated and immediately due and payable as of the Effective Date of the Plan in the currency in which the Assured Insured Bonds are payable, and holders of Assured Insured Bonds receiving this Notice will be receiving the applicable Acceleration Price on the Effective Date in complete satisfaction and discharge of (i) their claims against COFINA arising from the Assured Insured Bonds and (ii) all of Assured's obligations under the applicable Assured Insurance Policies. The Plan defines the "Acceleration Price" as "an amount equal to (a) with respect to current interest bonds (and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including the Effective Date), the outstanding principal amount of such accelerated bond plus the accrued and unpaid interest thereon, and (b) with respect to capital appreciation bonds (and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the Effective Date), the Compounded Amount for such accelerated bond, in each case, as of, up to, but not including the Effective Date." From and after the payment of the Acceleration Price on the Effective Date, interest on the Assured Insured Bonds held by holders receiving this Notice shall cease to accrue and be payable. The series, maturities, and interest rates of the Assured Insured Bonds giving rise to Claims in Class 6 are set forth in Attachment A hereto. The Disclosure Statement you are receiving together with this Notice contains additional information regarding the Plan and the treatment of your Class 6 Claims. **You are not required to vote on the Plan or take any other action in order to receive the Acceleration Price in full satisfaction of your claims.**

*   *   *   *   *

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM AND REFERENCE "COFINA DISTRIBUTION ELECTION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK, LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**

This Notice is subject in all respects to the terms of the Plan.

I-111

## Exhibit A

**Assured Insured Bonds Giving Rise to Claims in Class 6**

| CUSIP | Series | Maturity | Interest Rate |
|-------|--------|----------|---------------|
|       |        |          |               |
|       |        |          |               |
|       |        |          |               |

3

## Schedule 6

**Notice of Non-Voting Status – Class 10 (Section 510(b) Subordinated Claims)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>            Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING<br>CORPORATION,<br><br>            Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## NOTICE OF NON-VOTING STATUS
## CLASS 10 (SECTION 510(b) SUBORDINATED CLAIMS)

PLEASE TAKE NOTICE THAT on November ___, 2018, the United States District

Court for the District of Puerto Rico approved the *Disclosure Statement for the Amended Title III*

*Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation*, dated November

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

16, 2018 (as the same may be amended or modified, including all exhibits and attachments thereto, the "Disclosure Statement") [ECF No. ___], filed by the Debtor for use in soliciting acceptances or rejections of the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated November 16, 2018 (as the same may be amended or modified, the "Plan") [ECF No. ___], from the holders of impaired Claims who are (or may be) entitled to receive distributions under the Plan.

**UNDER THE TERMS OF THE PLAN, YOU ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY ON ACCOUNT OF YOUR CLAIM(S) AGAINST THE DEBTOR. THEREFORE, PURSUANT TO SECTION 1126(g) OF THE BANKRUPTCY CODE, YOU ARE (I) DEEMED TO HAVE REJECTED THE PLAN, AND (II) NOT ENTITLED TO VOTE ON THE PLAN.  IF YOU HAVE ANY QUESTIONS ABOUT THE STATUS OF YOUR CLAIM(S) OR WANT TO REQUEST A COPY OF THE PLAN AND/OR DISCLOSURE STATEMENT, PLEASE CONTACT THE DEBTOR'S BALLOTING AGENT, PRIME CLERK LLC BY (I) FIRST CLASS MAIL AT OR VIA OVERNIGHT COURIER AT PUERTO RICO SALES TAX FINANCING CORPORATION BALLOT PROCESSING, C/O PRIME CLERK LLC, 830 THIRD AVENUE, 3RD FLOOR, NEW YORK, NY 10022; (II) TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR (III) EMAIL AT PUERTORICOBALLOTS@PRIMECLERK.COM.**

Dated: _____  _____, 2018  
      San Juan, Puerto Rico

/s/ _____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)

I-115

Jeffrey W. Levitan (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

/s/ _____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

I-116

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

------------------------------------------------------------x

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO,<br>et al., | (Jointly Administered) |
| Debtors.[1] | |

------------------------------------------------------------x

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | No. 17 BK 3284-LTS |
| PUERTO RICO SALES TAX FINANCING<br>CORPORATION (COFINA), | |
| Debtor. | |

------------------------------------------------------------x

NOTICE REGARDING THE PROPER METHOD FOR SUBMISSION OF
OBJECTIONS TO THE PROPOSED COFINA PLAN OF ADJUSTMENT

The Court has learned that a financial advisor has disseminated incorrect

information regarding the submission of objections to the proposed plan of adjustment for the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Puerto Rico Sales Tax Financing Corporation ("COFINA").  Parties who wish to lodge

objections to the proposed plan of adjustment should refer to the Court's order approving, among

other things, the proper procedures for the submission of such objections (the "Order," Docket

Entry No. 375 in Case No. 17-3284).  Only objections that have been filed and served in

accordance with those procedures will be recognized in connection with the motion for

confirmation of the proposed plan of adjustment.  Communications sent to the Court by email or

made through any other method that does not comply with the procedures established in the

Order will not be recognized as objections to the confirmation motion.

    Although the Court reviews all materials submitted to its correspondence inbox,

as well as all physical letters received by chambers, such materials do not constitute formal

submissions in the proceedings that are before the Court.  As such, such email correspondence

and letters concerning the proposed plan of adjustment for COFINA will not be considered or

included in the Court's analysis of the legal issues associated with the motion for confirmation of

the proposed plan.  The Court will only consider legal submissions that are properly filed on the

docket and served on other parties in interest, as required by the Order.


  SO ORDERED.

Dated: December 10, 2018

         /s/ Laura Taylor Swain
         LAURA TAYLOR SWAIN
         United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

IN RE:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

         Debtors.[1]

-------------------------------------------------------------------x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF
PUERTO RICO,

     as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

     as representative of

THE COMMONWEALTH OF PUERTO RICO,

     Plaintiff,

v.

BETTINA WHYTE

     as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

     as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

     Defendant.

-------------------------------------------------------------------x

PROMESA

Title III

No. 17 BK 3283-LTS

(Jointly Administered)

Adv. Proc. No. 17-00257

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).  (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

MEMORANDUM OPINION AND ORDER APPROVING SETTLEMENT BETWEEN
COMMONWEALTH OF PUERTO RICO AND PUERTO RICO SALES TAX FINANCING CORPORATION

## LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4067 in Case No. 17-3283, the "Motion")[2] filed by the Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the debtor under PROMESA section 315(b). The Court received evidence and heard argument on the Motion on January 16, 2019 (the "Hearing").

This Court has exclusive jurisdiction of the Commonwealth Title III Case pursuant to PROMESA section 306(a). Venue is proper before this Court pursuant to PROMESA section 307(a). Pursuant to section 306(b) of PROMESA, upon commencement of the Commonwealth Title III Case (Case No. 17 BK 3283) and the COFINA Title III Case (Case No. 17 BK 3284), the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Commonwealth and COFINA, wherever located.

The Court has considered carefully the Motion, as well as the objections filed by various stakeholders, and the witness testimony, briefing, and written evidence submitted by the parties.[3] The Court has also reviewed and considered carefully hundreds of letters and email messages, including a petition, submitted by the members of the public and listened carefully to

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in that certain Settlement Agreement, dated October 19, 2018, attached to this Order as Schedule 1.

[3]     The written submissions related to the Motion are enumerated in paragraphs 18-26, infra.

I-120

the oral remarks made on the record of the Hearing by members of the public.  For the following

reasons, the Motion is hereby granted, and the objections are overruled.

## I.   INTRODUCTION

The Motion presents the Court with the question of whether to approve an

agreement embodying a settlement (the "Settlement Agreement") that divides rights to a

significant flow of tax revenues between two debtors—the Commonwealth of Puerto Rico and

COFINA—that have been involved in complex litigation concerning claims, on the one hand, that

the Commonwealth previously made a valid transfer of the disputed tax revenue stream to

COFINA to support the repayment of billions of dollars of bonds and, on the other hand, that the

Commonwealth did not have the power to transfer rights to the revenue stream to COFINA or did

not make the transfer in an effective way.  Hundreds of millions of dollars of projected annual

revenues over a period of decades are implicated in this dispute, which is commonly referred to as

the Commonwealth-COFINA Dispute.  The Commonwealth-COFINA Dispute itself arises in the

extraordinary circumstances of a sovereign restructuring under a special statute, PROMESA, that

was enacted in 2016 to enable Puerto Rico and other United States territories to seek bankruptcy-

type relief in federal court.  Thus, unlike in a typical commercial restructuring involving private

commercial entities, here one of the debtor parties is the Commonwealth of Puerto Rico—a public,

government entity upon which millions of people depend for essential services and economic and

physical infrastructure—and the other is a Commonwealth instrumentality that has issued bonds

to finance governmental obligations.

The Motion is brought by the Oversight Board, as representative of the

Commonwealth of Puerto Rico in the Commonwealth's PROMESA Title III case, pursuant to

Rule 9019 of the Federal Rules of Bankruptcy Procedure, which PROMESA makes applicable to these Title III proceedings.   The Oversight Board seeks approval of the Settlement Agreement from the perspective of the Commonwealth.   The Court reviews the propriety of the Settlement Agreement from COFINA's perspective as part of its consideration of the separate motion to confirm the proposed COFINA Plan of Adjustment, which will be addressed in a separate memorandum and confirmation order.   Accordingly, in this Memorandum Opinion and Order, the Court is only addressing whether the Settlement Agreement should be approved in the Commonwealth's Title III case.

Many of the formal and informal objections raised serious and considered concerns about the Commonwealth's future ability to provide properly for the citizens of Puerto Rico who depend upon it.   These objections argued that, if the Commonwealth does not have full access to the tax revenues that are the subject of the Commonwealth-COFINA Dispute, it will not be able to provide a sufficiently robust foundation for population retention and economic growth as it works to overcome its current crisis.   The concerns are logical, and reflect well-founded anxieties of citizens about issues that the Oversight Board and the elected government will have to address in responsible, meaningful ways in formulating a plan of adjustment for the Commonwealth.   They are not, however, concerns upon which the Court can properly act in making its decision on the current motion pursuant to Rule 9019.   The question now before the Court is much narrower— whether this particular Settlement Agreement should be approved as a resolution of the dispute between two Title III debtors over the stream of tax revenue.   In making this decision, the Court is not free to impose its own view of what the optimal resolution of the dispute could have been. Rather, as the Court explains at length in this Memorandum Opinion and Order, the question for the Court is whether the parties whom the U.S. Congress and the people of Puerto Rico have

empowered to make decisions for the Commonwealth (that is, the Oversight Board and Puerto Rico's governor and legislature) have reached a negotiated result that is within the range of reasonable results.

For the reasons explained below, the Court is satisfied that it should approve the Settlement Agreement because the Settlement Agreement represents a reasonable compromise of the Commonwealth-COFINA Dispute. The litigation concerning that underlying dispute has been complex and costly, and, absent approval of the Settlement Agreement, threatens to drag on for months or even years. Continuing that litigation would further deplete the resources available to the Commonwealth and its many stakeholders. Further litigation would also present a significant gamble for the Commonwealth: if litigated to its conclusion, an adverse judgment in the Commonwealth-COFINA dispute could deprive the Commonwealth of billions of dollars of sales tax revenue over the course of decades. The Settlement Agreement represents a well-reasoned choice to reject that risky gamble and to accept a compromise that is, admittedly, deeply disappointing to countless citizens of Puerto Rico and investors in Commonwealth bonds.

The Court is hopeful that, by settling the Commonwealth-COFINA dispute and ensuring the Commonwealth's access to a meaningful share of sales tax revenues that were previously pledged to COFINA, the Settlement Agreement can pave the way for the responsible officials to marshal resources, reach future agreements, and design a plan of adjustment for the Commonwealth that meets PROMESA's goals of achieving fiscal responsibility and access to capital markets for the benefit of the Commonwealth, its people, and its many other stakeholders.

II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW[4]

The Court makes the following Findings of Fact and Conclusions of Law:

1.   On July 20, 2016, prior to the commencement of the Commonwealth Title III Case, certain holders of Commonwealth general obligation bonds ("GO Bonds") filed a complaint in the United States District Court for the District of Puerto Rico against the Commonwealth Governor, Secretary of Treasury, and Office of Management and Budget Director seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act 21-2016 ("Act 21"), which authorized the Governor to, among other things, declare a temporary moratorium on debt service payments and stay creditor remedies, and an executive order issued pursuant to Act 21 announcing a moratorium on the Commonwealth's general obligation bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the government permitting transfers outside of the ordinary course. Lex Claims, LLC v. Garcia-Padilla; United States District Court, District of Puerto Rico, July 20, 2016, Case No. 16-2374-FAB (the "Lex Claims Litigation"). On November 4, 2016, the plaintiffs filed a second amended complaint, as further described below, adding new causes of action, including three causes of action relating to COFINA, and adding COFINA and other parties as defendants. On December 16, 2016, COFINA filed an answer to the second amended complaint generally denying the allegations and asserting various affirmative defenses. Certain COFINA bondholders who intervened in the Lex Claims Litigation also filed answers generally denying the allegations and asserting various defenses and counter- and cross-claims.

---

[4]   The findings and conclusions set forth herein constitute the Court's Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052, made applicable to this contested matter pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law or any of the conclusions of law constitute findings of fact, they are adopted as such.

2.     Plaintiffs in the Lex Claims Litigation, in their second amended complaint, argue, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. They claim that, pursuant to Article VI, Section 8 of the Puerto Rico Constitution, if Puerto Rico's "available resources" are insufficient to meet all of its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." They further allege that the tax revenues that the Commonwealth had committed to COFINA (the "Pledged Sales Taxes") are an "available resource" and that COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on "available resources" and related constitutional limitations on the amount of public debt the Commonwealth was permitted to issue. Plaintiffs request two declaratory judgments that challenge the legal validity of COFINA: (1) a declaration that the Pledged Sales Taxes constitute "available resources" and that such funds cannot be deposited with COFINA or its bondholders; and (2) a declaration that the Commonwealth is obligated to afford the GO Debt absolute priority, including priority over required deposits with COFINA and its bondholders.

3.     Certain holders and insurers of COFINA's outstanding bonds (the "Existing Securities"), who were permitted to intervene in the Lex Claims Litigation, asserted that the Pledged Sales Taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any possibility the taxes may be property or "available resources" of the Commonwealth. Such holders and insurers relied upon the section of Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246 et seq. (codified as amended at P.R. Laws Ann. tit. 13, § 12) (as amended, "Act 91") which explicitly provides that Pledged Sales Taxes "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the

Secretary." Act 91 § 2. They further assert that the question whether COFINA's property constitutes "available resources" should be certified to the Supreme Court of Puerto Rico because, in their view, its resolution would involve a pure and undecided issue of Puerto Rico constitutional law that would have long-lasting consequences for the Commonwealth. They assert that COFINA is essential in permitting Puerto Rico to access the capital markets on favorable terms, and that the plaintiffs in the Lex Claims Litigation had been able to obtain higher interest rates on the Commonwealth's general obligation bonds precisely because COFINA's property was not available to repay them.

4.      Promptly after certification of the Commonwealth's initial Fiscal Plan on March 13, 2017, the Oversight Board and AAFAF undertook a joint effort to formulate restructuring proposals for all major creditors based on the debt sustainability analysis in the Fiscal Plan. The Oversight Board and AAFAF requested that holders of GO Debt and COFINA's Existing Securities participate in mediation with the Oversight Board and AAFAF. The mediation began on April 13, 2017, under the auspices of retired Bankruptcy Judge Allan L. Gropper. Despite several mediation sessions and other private negotiations, no agreement was reached before the expiration of the pre-Title III stay provided in PROMESA section 405 on May 1, 2017.

5.      After competing bondholder groups commenced litigation against the Commonwealth and COFINA, the Oversight Board determined, in consultation with AAFAF and at the request of the Governor, and after consideration of creditor support for a Title III filing, that the best path forward for the Commonwealth and COFINA to resolve the Commonwealth-COFINA Dispute was to file the Commonwealth Title III Case and the COFINA Title III Case to afford the Commonwealth and COFINA additional time and breathing room to seek to resolve the impasse under the supervision of the Title III Court.

6.      Pursuant to PROMESA section 315(b), the Oversight Board is the representative of the Commonwealth and COFINA in their respective Title III cases.  The Oversight Board analyzed various options for resolving the dispute and determined that the best path forward was to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which process involved the appointment of independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute.

7.      On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (Docket Entry No. 303 in Case No. 17-3284, the "Commonwealth-COFINA Dispute Procedures Motion").

8.      On June 28, 2017, the Court denied the Commonwealth-COFINA Dispute Procedures Motion, without prejudice, but (a) requested that the Oversight Board seek agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Barbara J. Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.

9.      Consistent with the Court's request, the Oversight Board worked with Chief Bankruptcy Judge Houser and any creditor party who sought to participate in the discussions to formulate procedures agreeable to the interested parties.  On July 21, 2017, the Oversight Board filed a revised motion seeking approval of a stipulation establishing a protocol to address the Commonwealth-COFINA Dispute, including the appointment of respective agents with independence from the Oversight Board as debtor representatives for the Commonwealth and COFINA to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a

procedure and timeline for the Agents to consult with creditors of their respective debtors in carrying out their charge, but each at all times owing duties only to their respective debtor to act solely in such debtor's best interest.

10.     On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (Docket Entry No. 996 in Case No. 17-3283, the "Procedures Order"), which provides, among other things, that (a) the Oversight Board, as representative of the Commonwealth in its Title III case, authorized the Committee to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth; and (b) the Oversight Board, as representative of COFINA in its Title III case, authorized Bettina Whyte to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA.

11.     The Procedures Order directed that "[e]ach Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents.  In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents."). See Procedures Order ¶ 4(f).

12.     On September 8, 2017, the Commonwealth Agent commenced an adversary proceeding against the COFINA Agent seeking a resolution of the Commonwealth-COFINA Dispute and related issues (the "Adversary Proceeding").  Concurrently with the litigation of the Adversary Proceeding, the Agents and various parties to the Commonwealth-COFINA Dispute engaged in mediation led by Mediation Team leader Chief Bankruptcy Judge Barbara J. Houser to resolve the dispute.  At the time, such efforts were unsuccessful.

13.     During the intervening months, (a) the COFINA Agent answered the complaint and asserted counterclaims, (b) multiple parties intervened in the Adversary Proceeding, (c) discovery was undertaken and (d) the Agents and certain intervenors filed cross motions for summary judgment. Additionally, during this period, the Court clarified the scope of the Agents' authority to litigate and/or settle the issues raised in the Adversary Proceeding.

14.     Following oral argument regarding the respective motions for summary judgment filed in the Adversary Proceeding, the Mediation Team and the Agents rekindled their efforts to mediate a resolution. The Oversight Board was not a party to such mediation efforts, other than to be informed of their existence. Likewise, the Oversight Board was unaware of the parties which may have participated in such mediation.

15.     On June 7, 2018, the Agents announced the terms of an Agreement in Principle to resolve the Commonwealth-COFINA Dispute. The Agreement in Principle was the product of arm's-length negotiations between the Agents free from any influence or direct participation by the Oversight Board. At the time the Agreement in Principle was reached, both the COFINA Agent and the Commonwealth Agent agreed that it was the best possible outcome for each of their respective estates given the enormous stakes and uncertainty involved in litigating the Commonwealth-COFINA Dispute to conclusion.

16.     The Oversight Board asserted that certain aspects of the Agreement in Principle concerned matters beyond the scope of the Commonwealth-COFINA Dispute, as framed by the Procedures Order and the Scope Orders, including the design of new securities to be issued under a plan of adjustment for COFINA and a requirement on how the Oversight Board may use funds allocated to the Commonwealth. Moreover, the Oversight Board asserted that, among other things, the Agreement in Principle exceeded the scope of the Adversary Proceeding and the Procedures

Order by attempting to, among other things, dictate the terms of plans of adjustment in the Title III Cases and limit the availability and use of funds.  However, the Oversight Board determined, after reviewing the extensive litigation history and issues raised in the Adversary Proceeding and assessing the likelihood of success for the Commonwealth in the litigation, that the central component of the Agreement in Principle—the 53.65% / 46.35% allocation of the disputed sales and use tax revenue between COFINA and the Commonwealth, respectively—was a fair and reasonable settlement and compromise of the Commonwealth-COFINA Dispute given the substantial risks of litigation, and determined to build upon the central component of the Agreement in Principle to garner support for a confirmable COFINA plan of adjustment.

17.    Subsequently, due to the changes in the Commonwealth's then-certified fiscal plan, the Commonwealth Agent was unwilling to proceed to finalize any further documentation regarding the Agreement in Principle.  As such, the Oversight Board, as representative of the Commonwealth, began negotiation of the terms of the Settlement Agreement with the COFINA Agent, consistent with the economic terms of the Agreement in Principle.  The Settlement Agreement was the result of a good faith, arm's-length negotiation between the COFINA Agent and the Oversight Board.  The Oversight Board did not exert any influence on the COFINA Agent's decision to enter into the Settlement Agreement, nor did the COFINA Agent permit the Oversight Board to affect her judgment or ability to carry out her duty to act in the best interest of the debtor she was appointed to represent.  The Settlement Agreement is faithful to and consistent with the Agreement in Principle.  On October 19, 2018, after extensive discussion and deliberations, the Oversight Board, as representative of the Commonwealth, approved entry into the Settlement Agreement with the COFINA Agent.

18.     On October 19, 2018, the Oversight Board, acting on behalf of the Commonwealth,

filed the Motion.

19.     On November 5, 2018, the Commonwealth Agent entered into a stipulation with

the Oversight Board and the COFINA Agent withdrawing any objections to the Settlement

Agreement.  Pursuant to that stipulation, the Commonwealth Agent agreed, among other things,

not to object to the approval of the Settlement Agreement, approval of the Disclosure Statement,

or confirmation of the Plan, except in the circumstances set forth in paragraph 4 therein.  (Docket

Entry No. 4202 in Case No. 17-3283.)

20.     Objections to the Motion and the relief requested therein were interposed by (i)

Service Employees International Union and International Union, United Automobile, Aerospace

and Agricultural Implement Workers of America (Docket Entry No. 4233 in Case No. 17-3283),

and joined by certain plaintiffs in Adversary Proceeding No. 18-0041 (Docket Entry No. 4239 in

Case No. 17-3283), and Federación Central de Trabajadores, U.F.C.W., Local 481 (Docket Entry

No. 4248 in Case No. 17-3283) (collectively, the "UAW Objection"), (ii) Capítulo de Autoridad

de Carreteras, Capítulo Instituto de Cultura Puertorriqueña, Capítulo Oficina del Procurador del

Veterano, Capítulo de Oficina Desarrollo Socioeconomico y Comunitario, and Capítulo de

Jubilados (Docket Entry No. 4251 in Case No. 17-3283), and joined by Federación de Maestros

de Puerto Rico (Docket Entry No. 4258 in Case No. 17-3283) (collectively, the "PROSOL-UTIER

Objection"), (iii) the Official Committee of Retired Employees of the Commonwealth of Puerto

Rico (Docket Entry No. 4266 in Case No. 17-3283, the "Retiree Committee Objection"), and (iv)

Lawrence B. Dvores (Docket Entry No. 4244 in Case No. 17-3283, the "Dvores Objection" and,

together with the UAW Objection, the PROSOL-UTIER Objection, and the Retiree Committee

Objection, the "Objections").

21.     The Debtor filed the *Commonwealth of Puerto Rico's Omnibus Reply to Objections to Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4434 in Case No. 17-3283).

22.     The Court also considered public comment on the record of the Hearing and reviewed arguments presented in letters and email correspondence by individuals who had not filed formal objections to the relief requested in the Motion.

23.     The Debtor filed the *Declaration of Natalie A. Jaresko in Support of Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4758 in Case No. 17-3283), providing background and a summary regarding the Commonwealth-COFINA Dispute, steps the Oversight Board took to implement an independent process to resolve the dispute with a court-appointed mediation team, the complex and novel issues attendant to the Commonwealth-COFINA Dispute, and the considerations of the Oversight Board to arrive at the conclusion that the Settlement is fair and reasonable and in the best interest of the Commonwealth and its stakeholders.

24.     The COFINA Agent filed the *Statement of COFINA Agent in Support of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4656 in Case No. 17-3283) attaching the *Declaration of Matthew A. Feldman* (Docket Entry No. 4656-1 in Case No. 17-3283, the "Feldman Declaration"), summarizing the role of the COFINA Agent in negotiations with the Commonwealth Agent to resolve the Commonwealth-COFINA Dispute, the events leading to the Agents' announcement of the Agreement in Principle, negotiations with the Oversight Board following the announcement of the Agreement in Principle

and entry into the Agreement, and the considerations of the COFINA Agent in arriving at the conclusion that the Settlement is in the best interest of COFINA.

25.     At the Hearing, the Commonwealth Agent summarized the role of the Commonwealth Agent in litigating and negotiating a resolution of the Commonwealth-COFINA Dispute and the considerations that led to the Commonwealth Agent's conclusion that the Settlement is in the best interests of the Commonwealth.  In performing these duties and reaching this conclusion, the Commonwealth Agent acted as a fiduciary for the Commonwealth and solely considered the best interests of the Commonwealth.  (Jan. 16, 2019 Hr'g Tr. 60:19-62:11, Docket Entry No. 4848 in Case No. 17-3283.)

26.     The Retiree Committee Objection was ultimately withdrawn.  (Docket Entry No. 4704 in Case No. 17-3283).

27.     The COFINA Agent and its agents, attorneys, affiliates, advisors, and consultants, solely in such capacities (the "COFINA Agent Releasees"), have acted in good faith in connection with their evaluation of, and their conduct with respect to, the Adversary Proceeding, the Agreement in Principle, the Agreement, the Motion, and COFINA's Title III Case.

28.     The Commonwealth Agent and the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico (the "Committee"), its members, and each of their respective current and former officers, directors, agents, attorneys, employees affiliates, advisors, and consultants, solely in such capacities (collectively, the "Commonwealth Agent Releasees"), have acted in good faith in connection with their evaluation of, and their conduct with respect to, the Adversary Proceeding, the Agreement in Principle, the Agreement, the Motion, and COFINA's Title III Case.

I-133

29.     The issues raised in the Commonwealth-COFINA Dispute are novel, complex, and

of great importance to the people of Puerto Rico (as well as their fellow stakeholders) and present

a mixed question of federal and Puerto Rico law.

30.     The Commonwealth Agent has asserted a number of challenges to the

constitutionality of the transfer of the Pledged Sales Taxes to COFINA under the Commonwealth

Constitution's debt limit, debt priority, and balanced budget provisions.  Conversely, the COFINA

Agent has asserted its own claims, including that the Legislative Assembly properly exercised its

broad taxing and police powers to enact legislation transferring the disputed sales tax revenues to

COFINA, that the debt limit provisions of the Commonwealth Constitution do not prohibit the

transfer of the Pledged Sales Tax to COFINA, that the balanced budget provision of the

Commonwealth Constitution does not preclude the transfer of sales tax revenues to COFINA, nor

is it applicable to the COFINA Bonds, and that the plain language of Act 91 transferred ownership

of the Pledged Sales Taxes to COFINA.

31.     A motion to approve a compromise or settlement pursuant to Bankruptcy Rule 9019

requires a court to assess "whether the [proposed] settlement falls below the lowest point in the

range of reasonableness."  Ars Brook, LLC v. Jalbert (In re Servisense.com, Inc.), 382 F.3d 68,

71–72 (1st Cir. 2004).  In the context of commercial bankruptcies, courts in the First Circuit

consider four factors in assessing the reasonableness of a settlement: "(i) the probability of success

in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of

collection [of the disputed funds]; (iii) the complexity of the litigation involved, and the expense,

inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper

deference to their reasonable views . . . ."  Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995).

In evaluating the Settlement Agreement that is being presented for approval today, the Court is not

required to "decide the numerous questions of law and fact raised by [the objectors]." In re

Servisense.com, Inc., 382 F.3d at 71. Instead, the Court's role is more limited: it must "canvass

the issues and [determine] whether the settlement falls below the lowest point in the range of

reasonableness." Id. at 71-72.

32.     Given the complex and novel issues involved, the divergent positions of the parties,

and the protracted history of the dispute, the Commonwealth's likelihood of success in litigating

the Commonwealth-COFINA Dispute is uncertain, and even if the Commonwealth were initially

successful, the litigation would likely proceed to multiple appeals presenting their own risks and

challenges. Accordingly, issues surrounding the probability of success weigh in favor of

approving the Settlement.

33.     The complexity of the Commonwealth-COFINA Dispute is also evidenced by the

myriad of parties involved and the multiple suits already filed. The briefing in the Adversary

Proceeding is extensive, with no fewer than six summary judgment motions having been filed by

various parties that include, in addition to the Commonwealth Agent and the COFINA Agent, the

Official Committee of Retirees of the Commonwealth of Puerto Rico, the COFINA Senior

Bondholders' Coalition, the Ad Hoc Group of General Obligation Bondholders, the Mutual Fund

Group, and the Puerto Rico Funds. All parties in interest asserted equally divergent views

regarding, among other things, whether (a) Act 91 did or did not transfer to COFINA a present

property interest in potential future tax revenues, (b) there was or was no "true sale" of future tax

revenues by the Commonwealth to COFINA, (c) Act 91 did or did not transfer to COFINA the

Commonwealth's "right to receive" future tax revenues, and (d) the COFINA structure, Act 91

and the purported sales tax revenue transfer are or are not constitutional.

34.     Continued litigation of the Commonwealth-COFINA Dispute will invite additional delay for both the Commonwealth and COFINA in progressing towards fiscal responsibility and access to the capital markets, significant expense, and further delay and inconvenience to the Commonwealth's and COFINA's stakeholders and ability of their creditors to receive any distribution on their claims.  Accordingly, the complexity of litigation and expense, inconvenience, and delay attending the litigation weigh in favor of approving the Settlement.

35.     The Settlement resolving the Commonwealth-COFINA Dispute provides certainty about the amounts available for the Commonwealth's debt service and other uses and resolves billions of dollars of claims that have been asserted against the Commonwealth by the COFINA Agent and COFINA creditors.  This certainty will allow the Commonwealth to move forward with its Title III Case towards formulating a plan of adjustment that must make appropriate provisions for the needs of the people of Puerto Rico, revival of its economy, and distributions to its creditors. The interests of the Commonwealth's creditors and citizens are not served by protracted litigation that could delay payments on claims and the ability of the Commonwealth to move forward with its revitalization.   Moreover, there would be significant negative consequences for the Commonwealth and its stakeholders if the Commonwealth did not prevail in litigating the Commonwealth-COFINA Dispute, as the Commonwealth would be deprived of access to any portion of the approximately $783 million Pledged Sales Tax Base Amount, which annual amount increases over time.

36.     The conclusion that the interests of the Commonwealth's creditors are served by the Settlement Agreement is buttressed by the decision of significant Commonwealth creditor groups to not object or to withdraw their objection to the Settlement Agreement.  The interests of the Commonwealth and all of its stakeholders are served by a final resolution of the question of

Commonwealth access to the Pledged Sales Tax Base Amount and elimination of the chance of complete inaccessibility of such funds pending full payment of existing COFINA bonds.

37. Based upon the applicable factors relating to the Court's consideration and approval of a compromise and settlement, the Settlement falls above the lowest point in the range of reasonableness, and, therefore, is fair and reasonable and its approval is in the best interest of the Commonwealth and its stakeholders.

38. The Court is satisfied that terms of the Commonwealth-COFINA settlement are reasonable as a legal and factual matter in light of the complex issues and risks presented by the continued litigation of the Commonwealth-COFINA dispute, and that the terms of the Agreement satisfy the requirements for approval under Bankruptcy Rule 9019. That is not to say that the Settlement Agreement is perfect. It is a compromise, and the Court has heard the concerns of numerous creditors and other stakeholders who believe that the Settlement Agreement unfairly favors one side or the other of the Commonwealth-COFINA dispute. The passionate opposition from stakeholders exists because the Settlement Agreement resolves extraordinarily complicated litigation which, regardless of the result, would have had deeply significant consequences for COFINA, its creditors, the Commonwealth government, and the people of Puerto Rico. Judicial rulings on the issues presented in the Commonwealth-COFINA lawsuit also inevitably would have resulted in many months, if not years, of appeals and further litigation, along with the attendant litigation costs and delays to the restructuring efforts of the Commonwealth and COFINA, delaying still further the opportunities for Puerto Rico to set its economy on a firmer footing going forward and regain access to the capital markets. The compromise proposed in the Motion, which has been negotiated and proposed by the two entities that assert the claims to ownership of the sales tax revenues that are the subject of the Commonwealth-COFINA Dispute, will avoid those

costs and remove the substantial risk to the Commonwealth's economic prospects that COFINA and the COFINA bondholders ultimately would have prevailed in the Commonwealth-COFINA litigation.

39.    Additionally, the record demonstrates that the proposed resolution of the Commonwealth-COFINA dispute was the product of a genuine adversarial negotiation between agents who were properly authorized by the Oversight Board and the Court to negotiate as fiduciaries for the Commonwealth on one hand and COFINA on the other. Those negotiations resulted in the initial Agreement in Principle, which contained the basis for the Settlement Agreement that is now before the Court. Following the Agreement in Principle, negotiations were continued by the COFINA Agent on behalf of COFINA and the Oversight Board on behalf of the Commonwealth, ultimately resulting in the Settlement Agreement. Accordingly, objections based on an alleged lack of <u>bona fide</u> adversarial negotiations are unfounded and are overruled. The Court's review of the record shows that the Settlement Agreement is the product of a genuine negotiation process that was overseen by the Court-appointed mediation team of distinguished federal judges.

40.    The Court turns now to a deeper explanation of the factors prescribed by the Court of Appeals for the First Circuit in <u>Jeffrey v. Desmond</u>. The first factor considers the probability of success for the Commonwealth in the underlying Commonwealth-COFINA litigation. <u>See Jeffrey</u>, 70 F.3d at 185. In the absence of a consensual resolution of the Commonwealth-COFINA dispute, a litigated outcome would likely have produced an "all-or-nothing" result. If the litigation had proceeded, the result for the Commonwealth could have been significantly worse than the compromise presented in the Settlement Agreement that is now before the Court. Specifically, the worst case outcome for the Commonwealth would have been that none of the Pledged Sales Tax

revenue would be available to the Commonwealth for use toward essential services or debt service until all of the existing COFINA debt was paid off in accordance with the current terms of that debt.  Because this was a possibility, the suggestions of some objectors and commenters that the Commonwealth should simply refuse to pay anything to COFINA at all or hold out for a materially more favorable negotiated result for the Commonwealth are not realistic because the Commonwealth would not be guaranteed a win if the litigation were to continue.  Both sides presented strong arguments in the litigation, and success was far from certain for the Commonwealth.  This factor therefore indicates that it is reasonable for the Commonwealth to seek to settle the litigation and protect itself and its creditors against the worst possible outcome regarding rights to the disputed tax revenue.

41.     The second factor set forth in Jeffrey requires the Court to consider the difficulties, if any, to be encountered in the matter of collection.  70 F.3d at 185.  This is not a significant issue here, as the disputed revenue is sales taxes that are expected to continue to be collected on a steady basis.  The issue here is whether the settlement provides for a division of those revenues that is within the range of reasonable compromises.

42.     The third Jeffrey factor, which requires consideration of "the complexity of the litigation involved, and the expense, inconvenience[,] and delay attending it," 70 F.3d at 185, is quite significant here and favors a finding that the Settlement Agreement is reasonable.  The Interim Fee Applications that have been filed with the Court reflect the expense involved in litigating the Commonwealth-COFINA dispute, and the complexity of the dispute is apparent from the arguments presented in court and in the voluminous submissions that were filed in connection with the multiple cross-motions for summary judgment in the Commonwealth-COFINA lawsuit, Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Whyte, Adv.

Proc. No. 17-257.  Given the all-or-nothing nature of the most likely potential outcomes of the Commonwealth-COFINA dispute and the accompanying risk of an outcome adverse to the Commonwealth and, whatever the outcome, of appeals and petitions for Supreme Court review, it is both rational and reasonable for the Oversight Board to compromise as it has opted to do in the Settlement Agreement before the Court.  The compromise saves litigation expenses, eliminates delay, and, most important, provides the Commonwealth with access to a portion of the pledged sales tax revenues, which have not been available to the Commonwealth at all under the current COFINA structure.  The Court therefore concludes that the proposed Settlement Agreement is well within the range of reasonable alternatives that are beneficial to the Commonwealth.

43.    The Court also considers, as part of its analysis of the reasonableness of the Settlement Agreement, the paramount interest of the creditors and accords proper deference to their reasonable views.  Jeffrey, 70 F.3d at 185.  Here, the Court finds that the Settlement Agreement is in the best interests of the Commonwealth's creditors, including its employees, retirees, and recipients of public benefits and services, as it provides a certainty that the Commonwealth and its creditors will receive a substantial portion of the sales tax revenues that are the subject of the Commonwealth-COFINA Dispute, and wholly negates the risk of a judgment in that litigation that might have left the Commonwealth with none of the Pledged Sales Taxes for decades to come.  Creditors will also benefit from relief from the costly litigation that would otherwise continue and eat away at the financial resources available to service the Commonwealth's obligations.

44.    Although many objectors and commenters are deeply and sincerely concerned that the Commonwealth may not ultimately have enough resources to reorganize its own finances and provide for essential services and economic growth, these concerns are not pertinent to the one

question that is before the Court on this motion practice: the reasonableness of this settlement. The Court must decide whether the compromise with respect to this particular asset is reasonable in the context of the dispute about this asset. Its value and the relative strengths of the Commonwealth's and COFINA's legal claims to it are not measured by reference to the Commonwealth's other needs. The Jeffrey requirement that the Court give proper deference to the reasonable views of creditors does not require the Court to weigh concerns about the Commonwealth's overall financial prospects in the evaluation of the reasonableness of the settlement.

45.     The question of whether the Commonwealth can gather or generate sufficient additional resources to propose a feasible plan of adjustment is one to be addressed in the future and does not weigh in the evaluation of this Settlement. PROMESA and the Bankruptcy Rules do not impose a "feasibility" requirement for the approval of settlement agreements,[5] and section 201 of PROMESA, which has been cited by some objectors, concerns the content and certification of fiscal plans, not the approval of settlements.


### III.    DECRETAL PROVISIONS

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

46.     The Motion is GRANTED on the terms set forth in this Order, and the Objections (including those orally presented) not otherwise withdrawn and all other objections to the Motion are overruled in their entirety.

---

[5]     The question of feasibility is before the Court from COFINA's perspective in connection with the proposed COFINA Plan of Adjustment and is not properly raised from the Commonwealth's perspective in the objections to this Motion.

47. The compromise and settlement embodied in the Agreement attached hereto as Schedule 1 is APPROVED in all respects.

48. The Commonwealth is authorized take any action that is necessary or appropriate to give effect to this Order.

49. The COFINA Agent is authorized to enter into the Agreement on behalf of COFINA and take any action that is necessary or appropriate to give effect to this Order; and such actions taken by the COFINA Agent pursuant to such authority are hereby deemed a good faith exercise of her duties under the Procedures Order.

50. On the Effective Date, the Agreement fully, finally, and forever resolves and releases, except to the extent necessary to enforce the Agreement or the COFINA Plan, all claims against and ownership interests in the COFINA Pledged Taxes, the Pre-FY2019 BNYM Deposits and the FY2019 BNYM Deposits, including, without limitation, all claims, causes of action, and counterclaims (i) that were or could have been asserted consistent with the Stipulation and (ii) concerning or relating to the COFINA Pledged Taxes or the Commonwealth-COFINA Dispute (as expanded by the Mediation Scope Order); provided, however, that, except as otherwise provided in the COFINA Plan, nothing herein or in the Agreement shall affect any rights, claims, or interests that creditors of the Commonwealth may have with respect to the COFINA Pledged Taxes that are (x) not allocated to COFINA consistent with the Agreement in Principle and (y) received by the Commonwealth. Notwithstanding the foregoing proviso in this decretal paragraph of this Order, the Commonwealth, all creditors of the Commonwealth, and all insurers of debt of the Commonwealth shall be barred from bringing or pursuing any and all claims against the Commonwealth Agent Releasees (i) in the case of the creditors of the Commonwealth and the insurers of debt of the Commonwealth, arising out of their capacities as creditors of the

Commonwealth or insurers of debt of the Commonwealth, as applicable, in any way related to the

COFINA structure, the COFINA Pledged Taxes, or the Pre-FY2019 BNYM Deposits, and (ii) in

the case of the Commonwealth, in any way related to the COFINA structure, the COFINA Pledged

Taxes, or the Pre-FY2019 BNYM Deposits.

51.     Notwithstanding the proviso in Paragraph 50 of this Order, the Commonwealth, all

creditors of the Commonwealth, and all insurers of debt of the Commonwealth shall be barred

from bringing or pursuing any and all claims against the COFINA Agent, COFINA (including its

successor in interest), its current and former officers, directors, agents, attorneys, employees,

affiliates, advisors, consultants, and members, any creditors or insurers of debt of COFINA, and

the Commonwealth Agent Releasees (i) in the case of the creditors of the Commonwealth and the

insurers of debt of the Commonwealth, arising out of their capacities as creditors of the

Commonwealth or insurers of debt of the Commonwealth, as applicable, in any way related to the

COFINA structure (as it relates to the COFINA Pledged Taxes up to the COFINA Portion), the

COFINA Pledged Taxes up to the COFINA Portion, or the Pre-FY2019 BNYM Deposits, and (ii)

in the case of the Commonwealth, in any way related to the COFINA structure (as it relates to the

COFINA Pledged Taxes up to the COFINA Portion), the COFINA Pledged Taxes up to the

COFINA Portion, or the Pre-FY2019 BNYM Deposits.

52.     The releases in Paragraphs 50 and 51 of this Order shall not release any claims that

a beneficial holder of an insured COFINA Bond or BNYM, as trustee for the Existing Securities,

may have against the insurer of such Existing Securities (or any claims that such insurer may have

against the beneficial holder of such Existing Securities) under or relating to the policy of insurance

issued by such insurer except as the COFINA Plan may otherwise provide and there shall be no

release of any claims by any party against the insurers or underwriters of the Existing Securities

or the general obligation bonds issued by the Commonwealth, including their current and former officers, directors, agents, attorneys, employees, affiliates, advisors, consultants, and members.

53.     Any claims by COFINA, against any underwriter of the COFINA Bonds (such claims, the "COFINA Underwriter Claims") shall not cause the Commonwealth or any of its instrumentalities to incur any liability with respect to the COFINA Underwriter Claims in the nature of contribution, reimbursement, or indemnification, however denominated or described, in connection with, arising out of, or in any way related to such claims (the "Covered Claims"). Any underwriter of the COFINA Bonds against which a COFINA Underwriter Claim has been asserted shall be permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any Covered Claim based upon, related to, or arising out of the COFINA Underwriter Claims against that underwriter, whether such Covered Claim is asserted in a court, an arbitration, an administrative agency or forum, or in any other manner; provided, however, that COFINA, any insurer of Existing Securities, and any holder of Existing Securities, as applicable, shall reduce and credit against any judgment they may obtain against any underwriter of the Existing Securities the amount of any Covered Claim which is determined and awarded by a court of competent jurisdiction in any action involving the prosecution of the COFINA Underwriter Claims against such underwriter.

54.     On the Effective Date, to the fullest extent permissible under applicable law, (i) the COFINA Releasees and (ii) the Commonwealth Agent Releasees, shall be released from liability for all Claims and Causes of Action (both as defined in the COFINA Plan [Case No. 17-3283, ECF No. 4392]) (as if such Causes of Action were against the COFINA Agent Releasees or the Commonwealth Agent Releasees, as applicable) with respect to the Adversary Proceeding, the COFINA Plan, and the mediation related to the foregoing.

55.    On the Effective Date, to the fullest extent permissible under applicable law, the Commonwealth shall be released from all liability from all Claims and Causes of Action held by any Creditor (as defined in the COFINA Plan), solely in such capacity, arising from or relating to the relationship of the Commonwealth and COFINA, including, without limitation, any Claim or Cause of Action arising from or relating to the commencement of the Adversary Proceeding and pendency thereof, the compromise and settlement of Bank of New York Mellon v. COFINA, Adv. Proc. No. 17-00133, and the allocation of funds in accordance with Section 2.1 of the COFINA Plan.

56.    Except as otherwise provided by the COFINA Plan, no costs (including professional fees) incurred by COFINA or its stakeholders (including owners of Existing Securities and insurers of Existing Securities) with respect to COFINA (including the litigation of the Commonwealth-COFINA Dispute, the COFINA Plan, or the structuring of the COFINA Bonds) shall be borne by the Commonwealth and shall not in any way affect the Commonwealth Portion; provided, however, that nothing in this Order or the Agreement shall affect the right of the COFINA Agent and her professionals to be compensated or reimbursed in accordance with the terms and provisions of that certain *Second Amended Order Setting Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (Docket Entry No. 3269 in Case No. 17-3283) and other orders of the Court.

57.    To the extent necessary, pursuant to PROMESA section 305, the Oversight Board has granted consent to this Court to exercise jurisdiction over the property and revenues of the Commonwealth that are, pursuant to the Settlement of the Commonwealth-COFINA Dispute, necessary to the entry of this Order.  The transfer of the Commonwealth Portion pursuant to the COFINA Plan is appropriate and, subject to the occurrence of and upon the Effective Date of the

COFINA Plan, is binding and specifically enforceable against COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the COFINA Plan, including, without limitation, because the transfer of the Commonwealth Portion created in the Commonwealth an ownership interest in such property.

58.     Except as expressly set forth in the A&R Plan Support Agreement, certain parties thereto reserve their right, if any, to contest in the Title III Case the Commonwealth's (a) use, or direction of the use, of monies received by the Commonwealth or to be received by the Commonwealth and (b) deposit or other use, or direction of the use, of such monies.

59.     On the Effective Date, the releases provided in Section 5(b) of the Agreement shall be deemed to be granted in favor of the Commonwealth Agent Releasees.

60.     The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

61.     The Court retains exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Memorandum Opinion and Order.

SO ORDERED.


Dated:     February 4, 2019               /s/ Laura Taylor Swain
                                          HONORABLE LAURA TAYLOR SWAIN
                                          UNITED STATES DISTRICT JUDGE

Schedule 1

Settlement Agreement

EXECUTION VERSION

# SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT (the <u>"Agreement"</u>), dated October as of 19, 2018, between the Financial Oversight and Management Board for Puerto Rico (the <u>"Oversight Board"</u>), as representative of the Commonwealth of Puerto Rico (the <u>"Commonwealth"</u>), and (ii) Bettina M. Whyte, in her capacity as the court-appointed agent (the <u>"COFINA Agent"</u>) of the Oversight Board, as representative of the Puerto Rico Sales Tax Financing Corporation (<u>"COFINA"</u>).  The Oversight Board and the COFINA Agent are sometimes hereinafter referred to individually as a <u>"Party"</u> and collectively as the <u>"Parties"</u>.

## RECITALS

A.    On May 3, 2017, the Commonwealth commenced a proceeding in the United States District Court for the District of Puerto Rico (the <u>"Title III Court"</u>) under title III of the Puerto Rico Oversight, Management and Financial Stability Act (<u>"PROMESA"</u>), which proceeding was assigned Case No. 17-BK-3283 (the <u>"Commonwealth Title III Case"</u>).

B.    On May 5, 2017, COFINA commenced a proceeding in the Title III Court under title III of PROMESA, which proceeding was assigned Case No. 17-BK-3284 (the <u>"COFINA Title III Case"</u> and, collectively with the Commonwealth Title III Case and the other cases filed under title III of PROMESA by other instrumentalities of the Commonwealth as of the date of this Agreement, the <u>"Title III Cases"</u>).

C.    Prior to the commencement of the Title III Cases, certain parties asserted various claims relating to COFINA, including that (i) the formation and use of COFINA was unconstitutional under the Puerto Rico Constitution, and (ii) the present and future revenues and collections generated by the five and one-half percent (5.5%) of the sales and use taxes (<u>"SUT"</u>) imposed by the Commonwealth (the <u>"COFINA Pledged Taxes"</u>), purportedly pledged by COFINA to secure the various series of bonds issued pursuant to that certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009, and pursuant to certain supplemental resolutions (collectively, the <u>"Bond Resolutions"</u>), and set forth on <u>Schedule</u> 1 hereto (collectively, the <u>"Existing Securities"</u>) and other obligations of COFINA, constituted "available resources" of the Commonwealth pursuant to Article VI, Section 8 of the Puerto Rico Constitution and must be used for the payment of "public debt" as specified therein.  Such claims were stayed pursuant to PROMESA prior to any court issuing a ruling on the merits of such claims.

D.    Subsequent to the filing of the COFINA Title III Case, the Oversight Board sought an orderly process to resolve the disputes relating to COFINA and the ownership of the COFINA Pledged Taxes.  On August 10, 2017, the Title III Court entered that certain *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Docket No. 996][1] (the <u>"Stipulation"</u>), executed by various stakeholders of the Commonwealth and COFINA, pursuant to which, under certain circumstances, the Oversight Board delegated the authority to litigate to a determination or compromise and settle "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use

---

[1]    All docket references are to the Commonwealth Title III Case unless indicated otherwise.

102824080v4

EXECUTION VERSION

taxes purportedly pledged by COFINA to secure debt… are property of the Commonwealth or COFINA under applicable law" (the "Commonwealth-COFINA Dispute"), Stipulation ¶4, to the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico (the "Commonwealth Agent," and collectively with the COFINA Agent, the "Agents") and the COFINA Agent on behalf of the Commonwealth and COFINA, respectively.  The Stipulation envisioned the resolution of the Commonwealth-COFINA Dispute by December 15, 2017.

   E. On September 8, 2017, the Commonwealth Agent commenced an adversary proceeding styled The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of the Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS (the "Adversary Proceeding"), by filing a complaint against COFINA asserting various claims and causes of action, including seeking declarations that Act 91 did not transfer a present ownership in future SUT revenues to COFINA and that Act 91 is unconstitutional because the substantial result of the COFINA structure was evasion of Puerto Rico's Constitutional debt limit, Constitutional balanced budget provision, and Constitutional debt priority.

   F. On September 15, 2017, the COFINA Agent filed an answer and counterclaims against the Commonwealth asserting various claims and causes of action, including seeking declarations that Act 91 is constitutional and that the stream of COFINA Pledged Taxes and the Dedicated Sales Tax Fund, as defined in the Bond Resolutions, are property of COFINA. Additionally, various Permitted Intervenors, as defined in the Stipulation, asserted various claims and causes of action (all claims and causes of action filed in the Adversary Proceeding, the "Commonwealth-COFINA Claims").

   G. Pursuant to the Stipulation, mediation of the Commonwealth-COFINA Dispute, led by Mediation Team Leader Hon. Barbara J. Houser, began in September 2017 and included the participation of the Agents and the Permitted Intervenors.

   H. On September 20, 2017, Hurricane Maria made landfall on Puerto Rico devastating the island and suspending certain proceedings related to the Commonwealth-COFINA Dispute.  As a result, the Agents modified their litigation schedule with the consent and approval of the Title III Court, with dispositive motions due to be filed by January 31, 2018, and a trial, if necessary, to be held in early March 2018.

   I. On November 3, 2017, the Title III Court entered an order [Docket No. 1612] that granted the protections of 48 U.S.C. § 2125 (the "Immunity Protections") to the Agents and their respective professionals and employees with respect to all actions taken in good faith to carry out their duties under the Stipulation.

   J. On December 21, 2017, the Title III Court entered an order [Adv. Pro. No. 167][2] (the "Initial Scope Order") clarifying the scope of the Agents' authority and dismissing, without prejudice, certain of the Commonwealth-COFINA Claims.

---

[2] All references to "Adv. Pro. No." are docket references to the Adversary Proceeding.

102824080v4

EXECUTION VERSION

K.    On January 24, 2018, the Title III Court entered an order [Adv. Pro. No. 257] (the "Amended Scope Order") granting the Commonwealth Agent's motion to reconsider the Initial Scope Order and allowed the Commonwealth Agent to amend certain claims and causes of action that had been dismissed, without prejudice, pursuant to the Initial Scope Order (all claims and causes of action in the Adversary Proceeding that were dismissed, without prejudice, following the entry of the Amended Scope Order, the "Dismissed Commonwealth-COFINA Claims," and all claims and causes of action in the Adversary Proceeding that were not dismissed, without prejudice, following the entry of the Amended Scope Order, the "Surviving Commonwealth-COFINA Claims").

L.    On February 10, 2018, the Title III Court entered an order [Adv. Pro. No. 284] (the "Mediation Scope Order") (i) authorizing the Agents to mediate and attempt to compromise and settle the Commonwealth-COFINA Claims (except for any claim or cause of action that is owned by a creditor and not owned by the Commonwealth or COFINA, as applicable) pursuant to the terms and conditions of the Stipulation relating to the settlement of the Commonwealth-COFINA Dispute, and (ii) granting the Immunity Protections to the Agents, their professionals and employees with respect to any actions taken in good faith pursuant to the authority granted.

M.    On or around February 21, 2018, the Agents and certain Permitted Intervenors each filed competing motions for summary judgment on the Surviving Commonwealth-COFINA Claims (the "Motions for Summary Judgment").

N.    On February 26, 2018, the COFINA Agent, joined by certain COFINA stakeholders, filed a motion to certify the Surviving Commonwealth-COFINA Claims to the Puerto Rico Supreme Court (collectively, the "Certification Motions"), which were opposed by, among others, the Commonwealth Agent and the Oversight Board citing, among other things, the mixed questions of federal and Puerto Rico law and the need for an expeditious conclusion of the Commonwealth-COFINA Dispute.

O.    On April 10, 2018, the Title III Court heard argument with respect to the Motions for Summary Judgment.

P.    On May 14, 2018, certain of the Permitted Intervenors, consisting of significant holders and insurers of general obligations of the Commonwealth and significant holders and insurers of senior bonds of COFINA announced they had reached a tentative settlement of the Commonwealth-COFINA Dispute (the "GO-COFINA Senior Agreement"), which agreement had been presented to, but was not supported by, the Agents, the Oversight Board, or AAFAF, as defined below.

Q.    On May 14, 2018, the Oversight Board announced that it would not proceed with the GO-COFINA Senior Agreement, but that, consistent with its authority and the terms and provisions of paragraph 4(n) of the Stipulation, the Oversight Board would seek to negotiate with creditors on terms that were affordable, sustainable, and consistent with certified fiscal plans for the island and its instrumentalities.

R.    On May 24, 2018, the Title III Court entered an order [Adv. Pro. No. 483] denying the Certification Motions.

102824080v4

EXECUTION VERSION

S.     On June 5, 2018, the Agents filed a joint informative motion with the Title III Court [Adv. Pro. No. 484] (the "Joint Urgent Motion") (i) disclosing that, on June 5, 2018, the Agents had reached an agreement in principle (the "Agreement in Principle") to resolve the Commonwealth-COFINA Dispute and all other claims and causes of action that may be settled by the Agents pursuant to the Stipulation and the Mediation Scope Order, including, without limitation, by allocating one hundred percent (100%) of the cash held in trust by Bank of New York Mellon ("BNYM"), as trustee for the Existing Securities, to COFINA and the COFINA Pledged Taxes to COFINA and the Commonwealth in the amounts of fifty-three and sixty-five one hundredths percent (53.65%) and forty-six and thirty-five one hundredths percent (46.35%), respectively, of the existing pledged sales tax base amount with COFINA retaining its "first dollars" priority rights thereto and (ii) requesting that the Title III Court hold its ruling on the Motions for Summary Judgment in abeyance for sixty (60) days until August 4, 2018 (as such period may be extended or renewed, the "Abeyance Period"), to allow the Agents to document a formal settlement agreement and ensure that certain specified conditions to effectiveness of the Agreement in Principle would be satisfied. The Agreement in Principle was thereafter filed on the docket on June 7, 2018 [Adv. Pro. No. 486-1].

T.     The Agreement in Principle also provides that, unless otherwise extended in writing by the Agents, the understanding reached therein ("except for the section "Post-July 1, 2018 Collection of SUT") shall terminate automatically unless the Agents are able to agree on the terms of definitive documentation within sixty (60) days of execution of the Agreement in Principle. In connection with the serial extensions of the Abeyance Period, the Agents informally agreed not to terminate the Agreement in Principle.

U.     On June 12, 2018, the Title III Court entered an order [Adv. Pro No. 492] granting the Joint Urgent Motion and holding a ruling on the Motions for Summary Judgment in abeyance until August 4, 2018. Pursuant to subsequent consensual motions by the Agents, the Title III Court has entered orders [Adv. Pro. Nos. 539, 543] extending the Abeyance Period up to and including October 3, 2018.

V.     Pursuant to orders of the Title III Court, dated June 9, 2018 [Adv. Pro. No. 525] and July 24, 2018 [Adv. Pro. No. 534], and consistent with the Agreement in Principle, Bank of New York Mellon ("BNYM"), as trustee for the holders of Existing Securities, has placed into escrow funds received on deposit (i) prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon (the "Pre-FY2019 BNYM Deposits") and (ii) on or after July 1, 2018 to the debt service, reserve and such other accounts (the "FY2019 BNYM Deposits").

W.     On July 25, 2018, the Commonwealth Agent informed the Title III Court and parties in interest that it continued to support the settlement reached with the COFINA Agent, but the Commonwealth Agent had concerns about the feasibility of moving forward to further document the Agreement in Principle in light of the Oversight Board's then most recent fiscal plan, certified on Jun 29, 2018.

X.     On August 8, 2018, and following two weeks of mediation led by the Mediation Team, the Oversight Board announced that it had reached an agreement, predicated upon the allocation of ownership of the Pre-FY2019 BNYM Deposits and COFINA Pledged Taxes developed by the Agents and set forth in the Agreement in Principle, with holders and insurers of

4

EXECUTION VERSION

senior and junior bonds of COFINA, with respect to the terms of new securities to be issued pursuant to a consensual plan of adjustment for COFINA.

      Y.    On August 13, 2018, the Commonwealth Agent filed an Informative Motion with respect to the Oversight Board's announcement on August 8, 2018 [Adv. Pro. No. 540], wherein the Commonwealth Agent expressed continuing concerns about the feasibility of the agreement in Principle in light of the then most recent certified fiscal plan.

      Z.    By order, dated September 27, 2018 [Adv. Pro. No. 544], the Title III Court terminated the Motions for Summary Judgment, without prejudice to restoration of such motions on or after October 3, 2018, in light of the Agreement in Principle and ongoing discussions regarding a plan of adjustment for COFINA(the "SJ Termination Order").

      AA.    As of September 30, 2018, there is approximately $1,203,272,884.15 and $366,835,440.45 of COFINA Pledged Taxes in Pre-FY2019 BNYM Deposits and FY2019 BNYM Deposits, respectively.

      BB.    Paragraph 4(j) of the Stipulation provides that the Oversight Board may seek approval of a proposed settlement negotiated by the Agent that allocates the Pledged Sales Taxes between COFINA and the Commonwealth, but that does not provide for how the Commonwealth would distribute such assets to creditors, by filing a motion in the Commonwealth Title III Case provided that such motion would be heard on at least forty-five (45) days notice and contemporaneously with a Title III plan of adjustment for COFINA.

      CC.    Paragraph 4(n) of the Stipulation provides in pertinent part that the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment and, to carry out that power and duty, the Oversight Board may, at any time, propose title III plans of adjustment for the Commonwealth and COFINA that incorporate a settlement of the Commonwealth-COFINA Dispute, developed by the Agents, or developed by the Oversight Board, and the Oversight Board may negotiate and mediate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute.

      DD.    On August 29, 2018, the Oversight Board, the Commonwealth, COFINA, the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF") and various parties to the Commonwealth-COFINA Dispute executed that certain Plan Support Agreement, which agreement was amended and restated by that certain Amended and Restated Plan Support Agreement (the "Amended PSA"), dated as of September 20, 2018. Attached to the Amended PSA as Exhibit "C" is a term sheet the "Term Sheet"), and hereto as Exhibit "A", which term sheet incorporates the allocation of the COFINA Pledged Taxes developed by the Agents in the Agreement in Principle as a foundation and sets forth, among other things, the terms of the securities to be issued pursuant to a plan of adjustment for COFINA (the "COFINA Plan").[3]

      **NOW, THEREFORE,** after good faith, arm's-length negotiations between the Parties, and after consideration by the Parties of, among other things, the GO-COFINA Senior Agreement and the Agreement in Principle, together with the merits and likelihood of success of

---

[3]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Amended PSA and the Term Sheet.

102824080v4

EXECUTION VERSION

the various Commonwealth-COFINA Claims and the risk of further litigation, and in
consideration of the foregoing recitals and of the mutual agreements, covenants and releases set
forth herein, and after considering what result is best for the Commonwealth and COFINA, as
opposed to what result is best for any particular type of creditor of the Commonwealth or
COFINA, and after considering the standard for settlement set forth in Protective Committee of
Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968), and for
other good and valuable consideration, the sufficiency and adequacy of which is acknowledged
by the Parties, and by the authority granted to the Parties pursuant to the Stipulation, and in the
exercise of their respective judgment in accordance with the terms of the Stipulation, the Parties
hereto agree to settle the Commonwealth-COFINA Dispute and all other claims and causes of
action that may be settled by the Parties pursuant to the Stipulation and/or the Mediation Scope
Order as follows:

**AGREEMENT**

      **1.**    **Recitals.** The Recitals above are an integral part of this Agreement and are
incorporated herein by reference.

      **2.**    **Settlement Motion.** On or prior to October 19, 2018, the Oversight Board on
behalf of the Commonwealth, shall file the Settlement Motion in the Commonwealth Title III
Case in accordance with Bankruptcy Rule 9019 seeking the approval of the compromise and
settlement of the Commonwealth-COFINA Dispute set forth in the Agreement in Principle to the
extent incorporated in Section 3 hereof and in the Term Sheet. The Parties shall use
commercially reasonable efforts to promptly take any action, and negotiate in good faith
definitive documentation, in each case, that is required to effectuate the compromise and
settlement set forth in this Agreement, including to (a) support this Agreement and (as
applicable) make the filings with the Title III Court contemplated by this Agreement, including
the COFINA Plan and the Settlement Motion, and (b) not take any action that would interfere
with, delay, or postpone the Title III Court's consideration or approval of (x) this Agreement or
(y) the filings with the Title III Court contemplated by this Agreement, including, without
limitation, the COFINA Plan, the Settlement Motion, and the entry of orders of the Title III
Court approving this Agreement and confirming the COFINA Plan (collectively, the "Approval
Orders") Consideration and confirmation of the COFINA Plan in the COFINA Title III Case
shall be contemporaneous with consideration and approval of the Settlement Motion in the
Commonwealth Title III Case; provided, however, that, in all circumstances, the effective date of
the order granting the Settlement Motion shall be contemporaneous with, and its
contemporaneous occurrence shall be a condition to, the effective date of the COFINA Plan (the
"Effective Date").

      **3.**    **Settlement Terms.**

      (a)    The Commonwealth-COFINA Dispute shall be compromised and settled pursuant
to the Settlement Motion and the COFINA Plan, with (i) COFINA being granted ownership of
the COFINA Portion, and (ii) the Commonwealth being granted ownership of the
Commonwealth Portion; provided, however, that, except as expressly set forth in the Term Sheet
(a) one hundred percent (100%) of the Pre-FY2019 BNYM Deposits are held by BNYM, as the
COFINA bond trustee, for the benefit of the bondholders in accordance with the Adversary
Proceeding and such other orders entered in connection therewith; provided, however, that, (i) of

6

102824080v4

EXECUTION VERSION

Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven
Dollars and Sixty-Three Cents ($78,355,837.63) of the Pre-FY2019 BNYM Deposits, (x) Thirty-
Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and
Sixty-Three Cents ($33,355,837.63) shall be distributed to the Commonwealth, (y) Five Million
Dollars ($5,000,000.00) shall be allocated to fund an operating expense fund for COFINA, and
(z) Forty Million Dollars ($40,000,000.00) shall be allocated to the Taxable Election Cash
distributable under the COFINA Plan and if the Taxable Election Cash distributable under the
COFINA Plan is less than Sixty Million Dollars ($60,000,000.00), the Tax Election Remainder
Amount shall be distributed (I) *first*, to further fund the operating expense fund for COFINA up
to an additional Ten Million Dollars ($10,000,000.00), and (II) *second*, to the extent of any
further remainder, to be distributed evenly to COFINA, on the one hand, to increase the
COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders,
and the Commonwealth, on the other hand, (b) one hundred percent (100%) of the FY2019
BNYM Deposits, on a first dollars basis up to the amount of fifty-three and sixty-five one
hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (the "COFINA FY2019
BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding and such other
orders entered in connection therewith, will, on the Effective Date, be the exclusive property of
COFINA and will be distributed to COFINA for purposes of distribution in accordance with the
COFINA Plan of Adjustment and (c) any FY2019 BNYM Deposits net of the COFINA FY2019
BNYM Deposits, shall be distributed in its entirety to the Commonwealth.

(b)   Unless (i) approval of the Settlement Motion is denied by the Title III Court or
(ii) the Effective Date does not occur, the effective date of the compromise and settlement (the
"Compromise Date") shall be retroactive to July 1, 2018 and, in addition to receipt of the Pre-
FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of the Term Sheet,
and the COFINA FY2019 BNYM Deposits on the Effective Date, COFINA will own, and will
be entitled to receive, the COFINA Portion commencing as of FY2019.  Until the Effective Date,
all revenues attributable to the PSTBA, including, without limitation, the COFINA Portion and
the Commonwealth Portion, shall be maintained in accordance with orders of the Title III Court
entered in the COFINA Title III Case, the Commonwealth Title III Case, the Adversary
Proceeding and the Interpleader Action.

(c)   On the Effective Date, pursuant to the Settlement Order and the Confirmation
Order, which orders shall amend and supersede such orders of the Title III Court entered in the
COFINA Title III Case, the Commonwealth Title III Case, the Adversary Proceeding and the
Interpleader Action to the extent that such orders are inconsistent therewith, (1) BNYM shall
make distributions as set forth in the Term Sheet, (2) the Adversary Proceeding shall be
dismissed, with prejudice, and all other claims and causes of action asserted therein by the
Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the
Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Commonwealth
Agent and the COFINA Agent and their respective professionals shall be deemed to have
satisfied any and all of their respective obligations in connection with the Adversary Proceeding
and the COFINA Agent shall be deemed to have been released from any and all liabilities
associated therewith, (3) the Interpleader Action will be dismissed, with prejudice, and all other
claims and causes of action asserted therein shall be dismissed, with prejudice, and the funds
deposited in connection therewith shall be distributed in accordance with the terms and
provisions of this Term Sheet.

102824080v4

4.     **Conditions Precedent.**  This Agreement shall become effective upon the following conditions precedent having been satisfied or waived by the Parties:

(i)     The Approval Orders have each been entered, are unstayed, and as to which orders (A) the deadline to file a notice of appeal or petition for certiorari has lapsed (including any extension provided by Bankruptcy Rule 8002(b)(1)) and no appeal or petition is pending or, (B) if the subject of a timely appeal or petition, no stay, suspension, or injunction precluding effectiveness has been granted and is continuing;

(ii)     The Commonwealth will have provided protection of COFINA's property through legislation and covenants to be included for the benefit of COFINA and its creditors in the COFINA Plan and the Definitive Documentation.  Without in any way limiting the foregoing, but subject to the occurrence of the Effective Date, the Commonwealth will own and will be entitled to receive the Commonwealth Portion; and

(iii)     Entry of the Approval Order approving this Agreement in the Commonwealth Title III Case shall be a condition to confirmation of the COFINA Plan and entry of the Approval Order confirming the COFINA Plan in the COFINA Title III Case shall be a condition to entry of the Approval Order in the Commonwealth Title III Case.

5.     **Releases.**

(a)     On the Effective Date, this Agreement fully, finally, and forever resolves and releases, except to the extent necessary to enforce this Agreement or the COFINA Plan, all claims against and ownership interests in the COFINA Pledged Taxes, the Pre-FY2019 BNYM Deposits and the FY2019 BNYM Deposits, including, without limitation, all claims, causes of action, and counterclaims (i) that were or could have been asserted consistent with the Stipulation and (ii) concerning or relating to the COFINA Pledged Taxes or the Commonwealth-COFINA Dispute (as expanded by the Mediation Scope Order); provided, however, that nothing herein shall affect any rights, claims, or interests that creditors of the Commonwealth may have with respect to the COFINA Pledged Taxes that are (x) not allocated to COFINA consistent with the Agreement in Principle and (y) received by the Commonwealth.

(b)     Notwithstanding the proviso in Section 5(a) hereof, the Commonwealth, all creditors of the Commonwealth, and all insurers of debt of the Commonwealth shall be barred from bringing or pursuing any and all claims against the COFINA Agent, COFINA, and its current and former officers, directors, agents, attorneys, employees, affiliates, advisors, consultants, and members, and any creditors or insurers of debt of COFINA, (i) in the case of the creditors of the Commonwealth and the insurers of debt of the Commonwealth, arising out of their capacities as creditors of the Commonwealth or insurers of debt of the Commonwealth, as applicable, in any way related to the COFINA structure (as it relates to the COFINA Pledged Taxes up to the COFINA Portion), the COFINA Pledged Taxes up to the COFINA Portion, or the Pre-FY2019 BNYM Deposits, and (ii) in the case of the Commonwealth, in any way related to the COFINA structure (as it relates to the COFINA Pledged Taxes up to the COFINA Portion), the COFINA Pledged Taxes up to the COFINA Portion, or the Pre-FY2019 BNYM Deposits.

8

EXECUTION VERSION

(c)     For the avoidance of doubt, (a) the foregoing releases shall not release any claims that a beneficial holder of an insured COFINA Bond or BNYM, as trustee for the Existing Securities, may have against the insurer of such Existing Securities (or any claims that such insurer may have against the beneficial holder of such Existing Securities) under or relating to the policy of insurance issued by such insurer except as the COFINA Plan may otherwise provide and (b) there shall be no release of any claims by any party against the insurers or underwriters of the Existing Securities or the general obligation bonds issued by the Commonwealth, including their current and former officers, directors, agents, attorneys, employees, affiliates, advisors, consultants, and members.

(d)     Any claims by COFINA, against any underwriter of the COFINA Bonds (such claims, the "COFINA Underwriter Claims") shall not cause the Commonwealth or any of its instrumentalities to incur any liability with respect to the COFINA Underwriter Claims in the nature of contribution, reimbursement, or indemnification, however denominated or described, in connection with, arising out of, or in any way related to such claims (the "Covered Claims"). Any underwriter of the COFINA Bonds against which a COFINA Underwriter Claim has been asserted shall be permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any Covered Claim based upon, related to, or arising out of the COFINA Underwriter Claims against that underwriter, whether such Covered Claim is asserted in a court, an arbitration, an administrative agency or forum, or in any other manner; provided, however, that COFINA, any insurer of Existing Securities, and any holder of Existing Securities, as applicable, shall reduce and credit against any judgment they may obtain against any underwriter of the Existing Securities the amount of any Covered Claim which is determined and awarded by a court of competent jurisdiction in any action involving the prosecution of the COFINA Underwriter Claims against such underwriter.

(e)     The Title III Court's approval of this Agreement, including the order confirming the COFINA Plan, shall specifically grant releases and injunctions consistent with this Section 5.

6.     **COFINA Agent Support.**   The COFINA Agent shall support confirmation of the COFINA Plan properly embodying this Agreement.   In the event that the Title III Court reinstates one or both of the Motions for Summary Judgment as contemplated by the SJ Termination Order, the Parties shall jointly seek to extend the Abeyance Period until the earlier to occur of (a) the Effective Date and (b) the termination of this Agreement pursuant to the terms hereof.

7.     **Fees and Expenses**.   Except as otherwise authorized or permitted by the Term Sheet, no costs (including professional fees) incurred by COFINA or its stakeholders (including owners of Existing Securities and insurers of Existing Securities) with respect to COFINA (including the litigation of the Commonwealth-COFINA Dispute, the COFINA Plan, or the structuring of the COFINA Bonds) shall be borne by the Commonwealth and shall not in any way affect the Commonwealth Portion; provided, however, that nothing in this Agreement shall affect the right of the COFINA Agent and her professionals to be compensated or reimbursed in accordance with the terms and provisions of that certain *Second Amended Order Setting Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3269] and other orders of the Title III Court.

9

EXECUTION VERSION

**8.** **Termination.**

(a)     This Agreement shall terminate automatically if the effective date of the COFINA Plan incorporating this Agreement does not occur or the Settlement Motion is not approved, in each case, by March 1, 2019; provided, however, that, upon notice provided by the Oversight Board, such date shall be extended up to and including June 1, 2019.

(b)     The COFINA Agent may terminate this Agreement by providing written notice to the Oversight Board upon the occurrence of any of the following events, with termination being effective immediately upon receipt of such notice:

(i)     The Title III Court enters an order that no confirmable COFINA Plan can be proposed that is consistent with this Agreement.

(ii)    The Title III Court enters an order on the merits of the Motions for Summary Judgment (except for an order resolving the Motions for Summary Judgment on the basis that this Agreement has been approved and the Effective Date has occurred).

(iii)   The COFINA Title III Case is dismissed prior to confirmation of the COFINA Plan.

(iv)    The COFINA Plan is modified to be materially inconsistent with the Term Sheet in the COFINA Agent's reasonable discretion.

(c)     In the event that this Agreement is terminated by the COFINA Agent, then (i) except as set forth in the order entered by the Title III Court [Adv. Pro. No. 534] governing the COFINA Pledged Taxes collected as of June 30, 2018 (the "SUT Procedures Order"), which order shall survive any termination of this Agreement, this Agreement shall be null and void *ab initio* and of no force or effect and (ii) each of the Parties shall be returned to the Parties' position *status quo ante* (except as set forth in the SUT Procedures Order), and the Parties reserve all of their respective rights, claims, and defenses with respect to all of the matters set forth herein, and nothing herein shall be deemed an admission of any kind.

**9.** **Rules of Construction.** The headings of the sections of this Agreement are intended only as a guide and are not intended, and should not be construed, as controlling, enlarging, restricting, explaining or modifying, in any manner, the language or meaning of those sections or subsections. Each of the exhibits, annexes, signature pages, and schedules annexed hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (c) the words "include,"

10

"includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the Party drafting such agreement or document.

       **10.**   **No Admission.** Each Party expressly recognizes that neither this Agreement, nor any other action taken to comply with this Agreement represents an admission of liability or responsibility on the part of either Party. Neither this Agreement nor any action taken to comply with its provisions shall be construed as, or used as, an admission of any fault, wrongdoing, or liability whatsoever in this or any other matter.

       **11.**   **Entire Agreement.** The Parties acknowledge that no promise, inducement, or agreement not stated herein has been made to them in connection with this Agreement, and that this Agreement constitutes the entire agreement between them.

       **12.**   **No Oral Modifications.** This Agreement may be amended, modified or otherwise changed only in a writing signed by both Parties.

       **13.**   **Severability.** If any provision of this Agreement, or application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, then such provision shall be automatically reformed to embody the essence of that provision to the maximum extent permitted by law, and this Agreement shall be construed, performed, and enforced as if the reformed provision had been included in this Agreement at inception, and the invalidity of any provision of this Agreement shall not affect the remainder of this Agreement.

       **14.**   **Choice of Law; Jurisdiction.** This Agreement shall be governed by, and construed under and in accordance with, the laws of the State of New York, determined without reference to principles of conflicts of law (other than Section 5-1401 of the New York General Obligations Law). The Parties agree that the Title III Court shall have exclusive jurisdiction over any disputes relating to this Agreement until both the Commonwealth Title III Case and the COFINA Title III Case have been closed. The Parties irrevocably waive any objection on the grounds of venue, *forum non conveniens* or any similar grounds.

       **15.**   **Counterparts.** This Agreement may be executed in any number of counterparts by the Parties on different counterpart signature pages, all of which when taken together shall constitute one and the same agreement. Each of the Parties may execute this Agreement by signing any such counterpart, and each such counterpart, including a facsimile or other electronic copy of a signature, shall for all purposes be deemed to be an original. This Agreement shall not be binding until signed by both Parties.

       **16.**   **Inconsistencies.** To the extent that any of the terms and provisions set forth herein are inconsistent with the terms and provisions of the Term Sheet, the terms and provisions of the Term Sheet shall govern in all respects.

102824080v4

EXECUTION VERSION

**IN WITNESS WHEREOF**, this Agreement is executed as of the date first written above.

BETTINA M. WHYTE
IN HER CAPACITY AS COFINA AGENT

By: _____

Name: ___Bettina M Whyte___

Title: ___COFINA Agent___

THE FINANCIAL OVERSIGHT
AND MANAGEMENT BOARD FOR PUERTO
RICO

By: _____

Name: _____

Title: _____

12

102824080v4

EXECUTION VERSION

**IN WITNESS WHEREOF**, this Agreement is executed as of the date first written above.

**BETTINA M. WHYTE**
**IN HER CAPACITY AS COFINA AGENT**

By: _____
Name: _____
Title: _____


**THE FINANCIAL OVERSIGHT**
**AND MANAGEMENT BOARD FOR PUERTO**
**RICO**

By: _____
Name: Natalie A. Jaresko
Title: October 19, 2018

12

EXECUTION VERSION

**Schedule 1**

**COFINA Bond Issuances**

| COFINA Bond Series | Date of Issuance | Principal Amount of Issuance |
|---|---|---|
| Series 2007A | July 13, 2007 | $2,667,603,572.60 |
| Series 2007B | July 17, 2007 | $1,333,101,779.90 |
| Series 2007C | December 18, 2007 | $499,996,627.90 |
| Series 2008A | June 25, 2008 | $737,046,992.35 |
| Series 2009A | June 10, 2009 | $4,118,153,700.00 |
| Senior Series 2009C | June 10, 2009 | $237,875,000.00 |
| First Subordinate Series 2009B | June 19, 2009 | $1,217,915,799.20 |
| First Subordinate Series 2010A | January 28, 2010 | $1,823,757,271.30 |
| First Subordinate Series 2010C | June 24, 2010 | $1,619,404,596.60 |
| First Subordinate Series 2010D | June 24, 2010 | $89,435,000.00 |
| First Subordinate Series 2010E | June 24, 2010 | $92,755,000.00 |
| First Subordinate Series 2011A-1 | November 16, 2011 | $397,758,386.20 |
| First Subordinate Series 2011A-2 | November 16, 2011 | $337,037,187.75 |
| First Subordinate Series 2011B | November 16, 2011 | $45,620,000.00 |
| Senior Series 2011C | December 1, 2011 | $1,006,474,702.00 |
| Senior Series 2011D | December 1, 2011 | $91,155,000.00 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

AMENDED MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF
LAW IN CONNECTION WITH CONFIRMATION OF THE THIRD AMENDED
TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION*

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*    This Amended Memorandum corrects certain typographical errors, includes additional legal reasoning in footnote 14, and supersedes the *Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* filed as Docket Entry No. 5047 in Case No. 17-3283 and Docket Entry No. 558 in Case No. 17-3284.

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Exhibit A to Docket Entry No. 439 in Case No. 17-3284[2]) (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the Confirmation Order, including the Second Amended Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Plan")[3] filed by the Puerto Rico Sales Tax Financing Corporation ("COFINA" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Debtor under PROMESA section 315(b).[4] In connection with the Plan, the following documents have been filed by the Debtor, the COFINA Agent, or PSA Creditors in support of or in connection with confirmation of the Plan, including the Settlement of the Commonwealth-COFINA Dispute incorporated into the Plan:

(a) *Second Amended Plan Supplement and Plan Related Documents of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4956 in Case No. 17-3283, the "Second Amended Plan Supplement");

---

[2]   All docket entry references are to entries in Case No. 17-3284, unless otherwise noted.

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, or the Confirmation Brief (each as defined herein), as applicable; provided, however, that references herein to "COFINA Revenues" are used to maintain consistent terminology with the New Bond Legislation and shall have the same meaning as the term "COFINA Portion" as defined and used in the Plan, and shall include any collateral that may be substituted for the COFINA Revenues in accordance with the terms and provisions of the Plan and the New Bond Legislation.

[4]   The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated November 29, 2018 (Docket Entry No. 375, the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices used in connection therewith, and approving the form of notice of the Confirmation Hearing. Moreover, the Court previously entered the *Notice Regarding the Proper Method for Submission of Objections to the Proposed COFINA Plan of Adjustment* (Docket Entry No. 384).

(b) *Certificate of Service of Solicitation Materials* (Docket Entry No. 387, the "Mailing Affidavit");

(c) *Certificate of Publication* (Docket Entry No. 585, the "Publication Affidavit");

(d) *Certificate of Service* (Docket Entry No. 429, the "Garraway Affidavit", and together with the Mailing Affidavit and Publication Affidavit, the "Service Affidavits");

(e) *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment* (Docket Entry No. 4663 in Case No. 17-3283, the "Omnibus Reply");

(f) *Memorandum of Law in Support of Puerto Rico Sales Tax Financing Corporation's Third Amended Title III Plan of Adjustment* (Docket Entry No. 4664 in Case No. 17-3283, the "Confirmation Brief");

(g) *Declaration of Natalie A. Jaresko in Support of Confirmation of Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4756 in Case No. 17-3283, the "Jaresko Decl.");

(h) *Declaration of David M. Brownstein in Support of Confirmation of Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4757 in Case No. 17-3283, the "Brownstein Decl.");

(i) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4794 in Case No. 17-3283, the "Pullo Decl.");

(j) *Statement of COFINA Agent in Support of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4656 in Case No. 17-3283);

(k) *Declaration of Matthew A. Feldman* (Docket Entry No. 4656-1 in Case No. 17-3283, the "Feldman Decl.");

(l) *Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4665 in Case No. 17-3283, the "Senior Coalition Reply"), and the joinder filed thereto by the certain Puerto Rico based mutual funds (Docket Entry No. 4670 in Case No. 17-3283);

(m)*Declaration of Matthew Rodrigue in Support of Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation ("COFINA")* (Docket Entry No. 4665-1 in Case No. 17-3283, the "Rodrigue Decl.");

(n) *Declaration of Natalie A. Jaresko in Support of Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4758 in Case No. 17-3283, the "Jaresko (9019) Decl.");

(o) *Informative Motion of National Public Finance Guarantee Corporation in Support of COFINA Plan of Adjustment* (Docket Entry No. 4888 in Case No. 17-3283);

(p) *Ambac Assurance Corporation's Statement Concerning the Court's Authority to Determine and Declare the Validity of the New Bond Legislation* (Docket Entry No. 4889 in Case No. 17-3283);

(q) *Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4890 in Case No. 17-3283); and

(r) *Declaration of Susheel Kirpalani in Support of Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4892 in Case No. 17-3283).

Opposition submissions were filed by the following parties: (i) Stephen T. Mangiaracina (Docket Entry No. 4481 in Case No. 17-3283, the "Mangiaracina Objection"), (ii) the Service Employees International Union and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) (Docket Entry No. 4556 in Case No. 17-3283), (iii) Peter C. Hein (Docket Entry Nos. 4585, 4595, 4673, 4911, and 5041 in Case No. 17-3283), (iv) GMS Group, LLC (Docket Entry Nos. 4564, 4587, 4605, 4853, and 5002 in Case No. 17-3283), (v) PROSOL-UTIER[5] (Docket Entry No. 4592 in Case No. 17-3283), (vi) Mark Elliott (Docket Entry Nos. 4597, 4598, 4606, and 4641 in Case No. 17-3283), (vii) the

---

[5]   As used herein, the term "PROSOL-UTIER" refers collectively to (1) Capítulo Autoridad de Carreteras, (2) Capítulo Instituto de Cultura Puertorriqueña, (3) Capítulo Oficina del Procurador del Veterano, (4) Capítulo de Oficina Desarrollo Socioeconómico y Comunitario y (5) Capítulo de Jubilados.

VAMOS Group[6] (Docket Entry No. 4607 in Case No. 17-3283, the "VAMOS Objection"), (viii)

Lawrence B. Dvores (Docket Entry No. 4613 in Case No. 17-3283), and (ix) the Credit Union

Group[7] (Docket Entry No. 415).[8]  The Court heard argument and received evidence in connection

with the motion for confirmation of the Plan on January 16 and 17, 2019 (the "Confirmation

Hearing").[9]  The Court has considered carefully the Plan, as well as the above-referenced

supporting and opposition submissions, and the witness testimony and voluminous briefing and

written evidence submitted by the parties.  The Court has also reviewed and considered carefully

hundreds of letters and email messages, including a petition, submitted by members of the public

and has listened carefully to the oral remarks made on the record of the Confirmation Hearing by

---

[6]     As used herein, the term "VAMOS Group" refers collectively to René Pinto Lugo,
VAMOS, Movimiento de Concertación Ciudadana Inc., Unión de Empleados de Oficina y
Profesionales de la Autoridad de Edificios Públicos, Unión Insular de Trabajadores
Industriales y Construcciones Eléctricas Inc., Unión Independiente de Empleados de la
Autoridad de Acueductos y Alcantarillados,  Unión de Empleados de Oficina Comercio y
Ramas Anexas, Puertos, Unión de Empleados Profesionales Independientes, Unión
Nacional de Educadores y Trabajadores de la Educación, and la Asociación de Inspectores
de Juegos de Azar, and Manuel Natal-Albelo.

[7]     As used herein, the term "Credit Union Group" refers collectively to Cooperativa de
Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía,
Cooperativa de Ahorro y Crédito del Valenciano, and Cooperativa de Ahorro y Crédito de
Juana Díaz.

[8]     In addition to the briefing enumerated above, the *Legal Brief of Amicus Curiae Popular
Democratic Party Caucus of the Puerto Rico Senate (Against an Order of Plan
Confirmation Containing Findings of Fact and Law That Sanction Legislative
Entrenchment)* (Docket Entry No. 529, the "PDP Amicus Brief") was filed in opposition
to the Plan.  The *Response of Financial Oversight and Management Board to Amicus
Curiae Brief of Popular Democratic Party Caucus of the Puerto Rico Senate* (Docket Entry
No. 4887 in Case No. 17-3283) was filed in response to the PDP Amicus Brief as instructed
by the Court.

[9]     On January 16 and 17, 2019, the Court also heard argument on the (i) *Commonwealth's
Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between
Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket
Entry No. 4067 in Case No. 17-3283, the "9019 Motion"), and (ii) a dispute regarding
section 19.5 of the Plan (see Docket Entry No. 4067 in Case No. 17-3283, the "19.5
Dispute").

members of the public.  For the following reasons, the Plan is hereby confirmed and the objections are overruled.[10]

### INTRODUCTION

Nearly two years ago, the Commonwealth of Puerto Rico, through the Oversight Board, initiated unprecedented proceedings to restructure the debts of the Commonwealth of Puerto Rico and certain of its instrumentalities, including COFINA, under Title III of PROMESA. At the outset of these historic proceedings, the Court emphasized that the goal of Title III of PROMESA and the Court's goal in overseeing these cases would be to find a path forward for Puerto Rico, its citizens, and the others who hold stakes in its future, including the financial investors who held obligations or are otherwise dependent on Puerto Rico for their financial wellbeing.  The COFINA Plan represents a significant step on the path towards Puerto Rico's financial recovery, economic stability, and prosperity.

The Court is deeply mindful that the COFINA Plan, which is based on compromises of strongly contested positions, commits substantial portions of Puerto Rico's scarce revenues to bond payments over a period of decades while at the same time affording bondholders less value, on different terms, than they had expected when they invested in COFINA.  Citizens who live and work in Puerto Rico and institutions that serve them are concerned that the financial settlement

---

[10]    On January 29, 2019, the Court received and carefully reviewed *The Autonomous Municipality of San Juan's Motion for Leave to File Amicus Brief Regarding the COFINA Plan of Adjustment* (Docket Entry No. 4985 in Case No. 17-3283, the "San Juan Motion"). Because the arguments untimely raised in the proffered amicus brief will not provide "supplementing assistance" to existing counsel, and because the Autonomous Municipality of San Juan has not established that it has a "special interest in this case" that justifies the filing of an amicus brief at this juncture, the San Juan Motion is hereby denied.  See Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970).

that made the Plan possible will hinder the Commonwealth's ability to provide for its people,[11] even though the Settlement gives the Commonwealth access to a substantial amount of revenues that had previously been allocated to COFINA. However, after considering the applicable legal standards and the evidence, the Court is persuaded that the COFINA Plan is a necessary and legally compliant component of Puerto Rico's recovery efforts and is essential to ensure that Puerto Rico is on a path that will restore its access to financial markets as it builds a stronger economy. It is important for all to bear in mind that the Plan before the Court addresses only COFINA's assets and liabilities. It does not map the way forward for the Commonwealth of Puerto Rico. In formulating a separate plan for the Commonwealth, the Oversight Board and the elected Government will have to address the logical and well-founded concerns of citizens and creditors of the Commonwealth in responsible, meaningful ways.

The Court has also considered the argument raised by certain public participants at the Confirmation Hearing, as by well as citizens of Puerto Rico who have written numerous letters to the Court, that a comprehensive audit of Puerto Rico's financial circumstances should be conducted prior to confirmation of the COFINA Plan. (See, e.g., Docket Entry No. 4348 in Case No. 17-3283 (Notice of Correspondence dated November 20, 2018), at 17; Jan. 16, 2019 Hr'g Tr. 54:1-3, 83:19-23, 95:23-96:3, 98:8-99:13, Docket Entry No. 4848 in Case No. 17-3283; and Jan. 17, 2019 Hr'g Tr. 71:5-17, 73:11-76:22, Docket Entry No. 4850 in Case No. 17-3283; see also Docket Entry No. 4494 in Case No. 17-3283 (Notice of Correspondence dated December 18, 2018); Docket Entry No. 4576 in Case No. 17-3283 (Notice of Correspondence dated December 27, 2018); Docket Entry No. 4650 in Case No. 17-3283 (Notice of Correspondence dated January

---

[11]     The Settlement is addressed in the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation.* (See Docket Entry No. 5045 in Case No. 17-3283.)

9, 2019); Docket Entry No. 4809 in Case No. 17-3283 (Notice of Correspondence dated January 15, 2019).) The COFINA Plan represents a consensual resolution of complicated and expensive litigation that presented serious issues that had been raised well before the commencement of COFINA's Title III case. This resolution resulted from arm's length negotiations and is necessary to allow the Commonwealth to move forward while reducing certain of its existing obligations to COFINA, and to enable COFINA to fulfill reliably its reduced and restructured obligations. The timing of this Plan is therefore reasonable and appropriate. The Court notes that approval of the Settlement and the Plan does not foreclose further investigation, whether through regulatory, law enforcement, or civil litigation channels, into the origins of Puerto Rico's debt crisis and the application of the proceeds of the pre-PROMESA borrowings. The Court's decision on the motion for confirmation of the COFINA Plan, and the reasons for that decision, are explained in the further Findings of Fact and Conclusions of Law that follow.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. **Findings and Conclusions.** This Memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014, and PROMESA section 310. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Memorandum and the Plan.

2. **Jurisdiction.** This Court has exclusive jurisdiction of the Title III Case pursuant to PROMESA section 306(a). Venue is proper before this Court pursuant to PROMESA section

307(a). Pursuant to section 306(b) of PROMESA, upon commencement of the Commonwealth Title III Case and the COFINA Title III Case, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Commonwealth and COFINA, wherever located. To the extent necessary, pursuant to PROMESA section 305, the Oversight Board has granted consent to, and the Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtor as necessary to effectuate the Settlement Order and to approve and authorize the implementation of this Memorandum, the Confirmation Order, and the Plan.

3.      Judicial Notice.   The Court takes judicial notice of the New Bond Legislation, which the Governor of Puerto Rico signed into law on November 15, 2018, and, as explained in Paragraph 120 hereof, has been duly enacted. See Getty Petroleum Mktg., Inc. v. Capital Terminal Co., 391 F.3d 312, 320–21 (1st Cir. 2004) ("Generally, in the federal system, '[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice without plea or proof.'" (quoting Lamar v. Micou, 114 U.S. 218, 223 (1885))); In re Fin. Oversight & Mgmt. Bd. for P.R., 590 B.R. 577, 590 n.12 (D.P.R. 2018) (citing Getty and taking judicial notice of the laws of Puerto Rico). The New Bond Legislation, certified by the Puerto Rico Department of State, is attached hereto as **Exhibit A**.[12]   The Court also takes judicial notice of the dockets of the Title III Case, the Commonwealth Title III Case, the appellate court dockets of any and all appeals filed from any order entered or opinions issued by the Court in the Title III Case and the Commonwealth Title III Case, and the following litigations and adversary proceedings: (a) The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of the Commonwealth of

---

[12]      The New Bond Legislation was adopted in English and Spanish. Pursuant to Article 5.2 of the New Bond Legislation, the English text governs in the event of a conflict between the English and Spanish texts.

Puerto Rico v. Bettina Whyte, as agent of the Puerto Rico Sales Tax Financing Corporation, Adv.

Proc. No. 17-257-LTS, currently pending before the Court, (the "Adversary Proceeding"), and The

Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No.

17-133-LTS (the "Interpleader Action"), each of which is maintained by the Clerk of the Court,

including all pleadings and other documents filed, all orders entered, and all evidence and

arguments made, proffered, or adduced at the hearings held before the Court during the pendency

of the Title III Case and such adversary proceedings; (b) Ambac Assurance Corp. v. The Bank of

New York Mellon, Case No. 17-cv-3804-LTS, currently pending in the United States District

Court for the Southern District of New York (the "Ambac Action"); (c) In re Fin. Oversight &

Mgmt. Bd. for P.R., No. 18-1108, currently pending in the United States Court of Appeals for the

First Circuit, In re Fin. Oversight & Mgmt. Bd. for P.R., No. 18-1746, currently pending in the

United States Court of Appeals for the First Circuit, Union de Trabajadores de la Industria Electrica

y Riego (UTIER) v. P.R Elec. Power Auth., et al., Adv. Pro. No. 17-AP-228-LTS, currently

pending before the Court, René Pinto Lugo, et al. v. The Government of the United States of

America, et al., Adv. Pro. No. 18-041-LTS, currently pending before the Court, Hermanidad De

Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. Government of the United States of

America, et al., Adv. Pro. No. 18-066-LTS, currently pending before the Court, Hon. Rafael

Hernandez-Montanez, et al. v. The Fin. Oversight & Mgmt. Bd. for P.R., Adv. Pro. No. 18-090-

LTS, currently pending before the Court (collectively, the "Appointments Related Litigation"); (d)

(i) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Adv. Pro. No.

17-AP-143-LTS, currently pending before the Court, and (ii) Whitebox Multi-Strategy Partners,

L.P., et al. v. The Bank of New York Mellon, Case No. 17-CV-3750-LTS, currently pending before

the Court (collectively, the "Whitebox Actions"); and (e) Natal-Albelo et al v. Estado Libre

Asociado de Puerto Rico, et al, Adv. Proc. No. 19-AP-0003-LTS, currently pending before the

Court.

4.      Burden of Proof.  The Debtor has the burden of proving the elements of PROMESA

section 314 and, to the extent applicable to consideration of confirmation of the Plan, Rule 9019

of the Bankruptcy Rules by a preponderance of the evidence.  The Debtor has met its burden with

respect to each element of PROMESA section 314 and, to the extent applicable to consideration

of the confirmation of the Plan, Bankruptcy Rule 9019.

GENERAL BACKGROUND

5.      For more than a decade, Puerto Rico has been facing an unprecedented fiscal and

economic crisis.  The positions assumed and actions taken in the past caused Puerto Rico to lose

access to the capital markets and precipitated the collapse of Puerto Rico's public finance

system.  These actions accelerated the contraction of the Puerto Rico economy and increased the

outmigration of residents of Puerto Rico.  The situation was further exacerbated by the

devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017.

6.      On June 30, 2016, the United States of America enacted PROMESA and the

Oversight Board was established under PROMESA section 101(b).  (Jaresko Decl. ¶ 3.)  Pursuant

to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions

of territory law, State law, or regulation that is inconsistent therewith.

7.      On August 31, 2016, President Obama appointed the Oversight Board's seven

voting members.  (Jaresko Decl. ¶ 3.)

8.      On September 30, 2016, the Oversight Board designated COFINA as a "covered

entity" under PROMESA section 101(d).

9.      On May 3, 2017, the Oversight Board issued a restructuring certification, pursuant
to sections 104(j) and 206 of PROMESA and, at the request of the Governor of Puerto Rico, filed
a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA,
commencing a case under Title III thereof (the "Commonwealth Title III Case").  (Jaresko Decl. ¶
17.)

10.      On May 5, 2017, the Oversight Board issued a restructuring certification pursuant
to sections 104(j) and 206 of PROMESA and, at the Request of the Governor of Puerto Rico, filed
a voluntary petition for relief for COFINA pursuant to section 304(a) of PROMESA, commencing
a case under Title III thereof.  (Jaresko Decl. ¶ 17; Docket Entry No. 1.)

11.      On June 1, 2017, the Court entered an order granting the joint administration of the
Commonwealth Title III Case and the COFINA Title III Case, for procedural purposes only.
(Docket Entry No. 131.)

12.      On June 15, 2017, the United States Trustee for Region 21 (the "U.S. Trustee")
appointed the statutory creditors' committee in the Commonwealth's Title III Case (the
"Committee" or "UCC").  (Docket Entry No. 338 in Case No. 17-3283.)  That same day, on June
15, 2017, the U.S. Trustee filed a *Notice of No Appointment of Official Committee of Unsecured
Creditors for Puerto Rico Sales Tax Financing Corporation (COFINA)*, indicating that there is no
creditors' committee in the Title III Case.  (Docket Entry No. 339 in Case No. 17-3283.)

The Commonwealth-COFINA Dispute

13.      Prior to the commencement of the Commonwealth Title III Case, the Oversight
Board recognized that resolution of the Commonwealth-COFINA Dispute would be a critical
component to the restructuring of Puerto Rico's public debt.  (Jaresko Decl. ¶ 9; Jaresko (9019)
Decl. ¶ 8.)  Of the approximately $74 billion in aggregate Puerto Rico debt, the GO Debt and
COFINA's Existing Securities together account for approximately fifty-five percent (55%) of the

total funded indebtedness to be restructured.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)  The

determination of which funds are available to service COFINA's debt and the Commonwealth's

debt is dependent upon which entity, the Commonwealth or COFINA, owns the portion of the

Commonwealth's general sales and use tax (the "SUT") that was purportedly transferred to

COFINA pursuant to the Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246 et seq. (codified

as amended at P.R. Laws Ann. tit. 13, § 12) (as amended, "Act 91").  (Jaresko Decl. ¶ 9; Jaresko

(9019) Decl. ¶ 8.)  The Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended

and restated on June 10, 2009 (as amended and supplemented, the "Resolution"), states that a

portion of the SUT (the "Pledged Sales Tax Base Amount") was pledged by COFINA to secure

the repayment of COFINA's Existing Securities.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8;

Exhibit DX-K.)  The amount at issue in the Commonwealth-COFINA Dispute is significant—

approximately $783 million in the current fiscal year alone, which amount grows at four percent

(4%) annually until it reaches $1.85 billion in fiscal year 2041 and remains fixed at that amount

until COFINA's Existing Securities are repaid in full in accordance with their terms.  Under the

COFINA Fiscal Plan, this would result in billions of dollars over the next forty (40) years.  (Jaresko

Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8; Exhibit DX-SSS.)

14.    If the Pledged Sales Taxes were property of COFINA, the Commonwealth would

have $783 million less in fiscal year 2019 (which annual amount would increase over time) to pay

its liabilities and expenses, including addressing the essential services of the Commonwealth and

the needs of its citizens.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)  Conversely, if the Pledged

Sales Taxes were property of the Commonwealth, there would not be any funds available to

address and satisfy COFINA's outstanding indebtedness.  Unless and until a resolution were

reached on the Commonwealth-COFINA Dispute, the Oversight Board would not be able to begin

to formulate a Title III plan of adjustment for the Commonwealth, COFINA, or any of their other

debtor-affiliates.  (Jaresko Decl. ¶ 9; Jaresko (9019) Decl. ¶ 8.)

15.     Prior to the commencement of the Commonwealth Title III Case, on July 20, 2016,

certain holders of GO Bonds filed a complaint in the United States District Court for the District

of Puerto Rico against the Governor, Secretary of Treasury, and Office of Management and Budget

Director seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial

Rehabilitation Act, Act 21-2016 ("Act 21"), which authorized the Governor to, among other

things, declare a temporary moratorium on debt service payments and stay creditor remedies, and

an executive order issued pursuant to Act 21 announcing a moratorium on the Commonwealth's

general obligations bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction

to prevent certain measures taken by the government permitting transfers outside of the ordinary

course.  Lex Claims, LLC v. Garcia-Padilla; District Court, District of Puerto Rico, July 20, 2016,

Case No. 16-2374-FAB (the "Lex Claims Litigation"); (Exhibit DX-M; Jaresko Decl. ¶ 11; Jaresko

(9019) Decl. ¶ 10).  On November 4, 2016, the plaintiffs in that case filed a second amended

complaint, as further described below, adding new causes of action, including three causes of

action relating to COFINA, and adding COFINA and other parties as defendants.  On December

16, 2016, COFINA filed an answer to the second amended complaint generally denying the

allegations and asserting various affirmative defenses.  Certain COFINA bondholders who

intervened in the Lex Claims Litigation also filed answers generally denying the allegations and

asserting various defenses and counter- and cross-claims.  (Jaresko Decl. ¶ 10; Jaresko (9019)

Decl. ¶ 10; Exhibits DX-M, DX-N, and DX-O.)

16.     Plaintiffs in the Lex Claims Litigation, in their second amended complaint, argue,

among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO

Debt ahead of any other expenditure.  They claim that, pursuant to Article VI, Section 8 of the

Puerto Rico Constitution, if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." They further allege the Pledged Sales Taxes are an "available resource" and that COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on "available resources" and related constitutional limitations on the amount of public debt the Commonwealth was permitted to issue. Plaintiffs request two declaratory judgments that challenge the legal validity of COFINA: (1) a declaration that the Pledged Sales Taxes constitute "available resources" and that such funds cannot be deposited with COFINA or its bondholders; and (2) a declaration that the Commonwealth is obligated to afford the GO Debt absolute priority, including priority over required deposits with COFINA and its bondholders. (Jaresko Decl. ¶ 11; Exhibits DX-M and DX-O.)

17. Certain holders and insurers of COFINA's Existing Securities, permitted to intervene in the Lex Claims Litigation, asserted that the Pledged Sales Taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any possibility the taxes may be property or "available resources" of the Commonwealth. Such holders and insurers rely upon Act 91, which provides that the Pledged Sales Taxes "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary." Act 91 § 2. They further assert that the question whether COFINA's property constitutes "available resources" should be certified to the Supreme Court of Puerto Rico because, in their view, its resolution would involve a pure and undecided issue of Puerto Rico constitutional law that would have long-lasting consequences for the Commonwealth. They assert that COFINA is essential in permitting Puerto Rico to access the capital markets on favorable terms, and that the plaintiffs in the Lex Claims Litigation had been able to obtain higher interest rates on the Commonwealth's

general obligation bonds precisely because COFINA's property was not available to repay them. (Jaresko Decl. ¶ 12; Exhibit DX-P.)

18. On April 12 and May 2, 2017, in response to uncertainty surrounding the transfer of the SUT, and contending that an event of default had already occurred under the Existing Bond Resolution, Whitebox and Ambac, respectively, commenced separate litigations against BNYM, the trustee under the Existing Bond Resolution, alleging various causes of action, each premised upon allegations that an event of default occurred prior to April 29, 2017, and that BNYM breached its alleged duties by failing to declare such defaults and resign as trustee of the "Senior" or the "First Subordinate" (sometimes referred to herein as "junior") Existing Securities. If such creditors were correct, then, in their view, the subordination provisions attendant to the Existing Securities would apply and no payments to holders of "First Subordinate" Existing Securities would have been permissible until holders of "Senior" Existing Securities had been paid in full. (Jaresko Decl. ¶ 13; Exhibits DX-Q and DX-R.)

19. BNYM responded that the Ambac Action and Whitebox Actions, including any claims and causes of action for gross negligence, willful misconduct, or intentional fraud, lacked merit and should be dismissed with prejudice. BNYM claimed, and Whitebox and Ambac disagreed, that such actions should fail for a variety of reasons, including, without limitation: (i) there were no defaults or events of default under the Existing Bond Resolution prior to April 29, 2017; (ii) BNYM had no obligation to perform any act that would involve it in expense or liability, or to exercise any of the rights or powers vested in it by the Existing Bond Resolution at the request or direction of bond owners, unless the bond owners offered BNYM security or indemnity satisfactory to BNYM against the costs, expenses, and liabilities that might be incurred; and (iii) a failure to comply with the no-action clause contained in Section 1106.1 of the Existing Bond Resolution. (Jaresko Decl. ¶ 14.)

20.     Promptly after certification of the Commonwealth's initial Fiscal Plan on March 13, 2017, the Oversight Board and AAFAF undertook a joint effort to formulate restructuring proposals for all major creditors based on the debt sustainability analysis in such Fiscal Plan. The Oversight Board and AAFAF requested that holders of GO Debt and COFINA's Existing Securities participate in mediation with the Oversight Board and AAFAF. The mediation began on April 13, 2017, under the auspices of retired Bankruptcy Judge Allan L. Gropper. Despite several mediation sessions and other private negotiations, no agreement was reached before the expiration of the pre-Title III stay provided in PROMESA section 405 on May 1, 2017. (Jaresko Decl. ¶ 15.)

21.     After competing bondholder groups commenced litigation against the Commonwealth and COFINA, the Oversight Board determined, in consultation with AAFAF, and at the request of the Governor, and after consideration of creditor support for a Title III filing, that the best path forward for the Commonwealth and COFINA to resolve the Commonwealth-COFINA Dispute was to file the Commonwealth Title III Case and the Title III Case to afford the Commonwealth and COFINA additional time and breathing room to seek to resolve the impasse under the supervision of the Title III Court. (Jaresko Decl. ¶ 16.)

22.     Following the filing of the Title III Case, BNYM, as trustee for the Existing Securities, was in possession of hundreds of millions of dollars for the benefit of holders of both junior and senior Existing Securities, but without clarity about how and to whom the money should be distributed. On May 16, 2017, BNYM filed the Interpleader Action, seeking a determination of competing claims to the Disputed Funds by certain holders of beneficial interests in the Existing Securities (including Whitebox), insurers of the Existing Securities (including Ambac), and COFINA. On May 30, 2017, the Title III Court granted the interpleader request and ordered that

the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final ruling in the Interpleader Action. (Jaresko Decl. ¶ 18; Exhibits DX-S, DX-T, and DX-U.)

23. Significant holders of "Senior" and "First Subordinate" Existing Securities intervened in the Interpleader Action. From June to September 2017, several parties, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, the Government Development Bank for Puerto Rico, Rothschild (in its capacity as financial advisor to the Commonwealth), the Commonwealth, AAFAF, and the Oversight Board. The subpoenaed entities and individuals produced documents. In addition, depositions were taken of Banco Popular of Puerto Rico, a private financial services institution, in its capacity as the banking services institution of the Commonwealth, the Government Development Bank, and COFINA. AAFAF, COFINA, the Commonwealth, and the Oversight Board each stipulated to binding statements of facts in lieu of depositions. (Jaresko Decl. ¶ 19; Exhibits DX-U and DX-ZZZ.)

24. Based upon the parties' agreement, the Court stayed consideration of the Interpleader Action and did not render a determination as to whether an event of default under the Existing Bond Resolution had occurred. (Docket Entry No. 518 in Adv. Proc. No. 17-133.)

25. If an event of default under the Existing Bond Resolution had occurred, the senior bondholders may have had repayment of their bonds accelerated, to the detriment of the junior bondholders. Such acceleration might, in the senior bondholders' view, require the senior bondholders to be paid in full prior to junior bondholders being able to declare an event of default and exercise remedies. The Interpleader Action is in essence a dispute between junior and senior COFINA creditors about their payment rights and priorities vis-à-vis each other. The issues regarding such payment rights and priorities are being settled pursuant to the Plan.

26. Pursuant to PROMESA section 315(b), the Oversight Board is representative of the Commonwealth and COFINA in their respective Title III cases. The Oversight Board analyzed various options for resolving the dispute and determined that the best path forward was to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which process involved the appointment of independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute. (Jaresko Decl. ¶ 21.)

27. On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute*. (Docket Entry No. 303 in Case No. 17-3283, the "Commonwealth-COFINA Dispute Procedures Motion"; Jaresko Decl. ¶ 21; Jaresko (9019) Decl. ¶ 15; Exhibit DX-V.)

28. On June 28, 2017, the Court denied the Commonwealth-COFINA Dispute Procedures Motion, without prejudice, but (a) requested that the Oversight Board seek agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties. (Jaresko Decl. ¶ 21; Jaresko (9019) Decl. ¶ 15; Exhibit DX-W.)

29. Consistent with the Court's request, the Oversight Board worked with Chief Bankruptcy Judge Houser and any creditor party who sought to participate to formulate procedures agreeable to the interested parties. On July 21, 2017, the Oversight Board filed a revised motion seeking approval of a stipulation establishing a protocol to address the Commonwealth-COFINA Dispute, including the appointment of respective agents with independence from the Oversight Board as debtor representatives for the Commonwealth and COFINA to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the

Agents to consult with creditors of their respective debtor in carrying out their charge, but at all times owing duties only to their respective debtor and to act solely in such debtor's best interest. (Jaresko Decl. ¶ 22; Jaresko (9019) Decl. ¶ 16; Exhibit DX-X.)

30.    On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (Docket Entry No. 996 in Case No. 17-3283, the "Procedures Order"), which provides, among other things, that (a) the Oversight Board, as representative of the Commonwealth in its Title III case, authorized the Committee to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth; and (b) the Oversight Board, as representative of COFINA in its Title III case, authorized Bettina Whyte to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA. (Jaresko Decl. ¶ 23; Jaresko (9019) Decl. ¶ 17; Exhibit DX-B.)

31.    The Procedures Order directed that "[e]ach Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents.  In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents." See Procedures Order ¶ 4(f).

32.    On September 8, 2017, the Commonwealth Agent commenced the Adversary Proceeding against the COFINA Agent seeking a resolution of the Commonwealth-COFINA Dispute and related issues.  Concurrently with the litigation of the Adversary Proceeding, the Agents and various parties to the Commonwealth-COFINA Dispute engaged in mediation led by Mediation Team leader Chief Bankruptcy Judge Barbara J. Houser to resolve the dispute.  At the time, such efforts were unsuccessful.  (Jaresko Decl. ¶ 24; Exhibit DX-Y.)

33.　During the intervening months, (a) the COFINA Agent answered the complaint and asserted counterclaims, (b) multiple parties intervened in the Adversary Proceeding, (c) discovery was undertaken, and (d) the Agents and certain intervenors filed cross motions for summary judgment. Additionally, during this period, the Court clarified the scope of the Agents' authority to litigate and/or settle the issues raised in the Adversary Proceeding. (See Docket Entry Nos. 167, 257, and 284 in Adv. Proc. No. 17-257.)

34.　Following oral argument regarding the respective motions for summary judgment filed in the Adversary Proceeding, the Mediation Team and the Agents rekindled their efforts to mediate a resolution. The Oversight Board was not a party to such mediation efforts, other than to be informed of their existence. Likewise, the Oversight Board was unaware of the parties which may have participated in such mediation. (Jaresko Decl. ¶ 25; Jaresko (9019) Decl. ¶ 21.)

35.　On June 7, 2018, the Agents announced the terms of an Agreement in Principle to resolve the Commonwealth-COFINA Dispute. The Agreement in Principle was the product of arm's-length negotiations between the Agents free from any influence or direct participation by the Oversight Board. (Feldman Decl. ¶ 4; Jaresko (9019) Decl. ¶ 21.) At the time the Agreement in Principle was reached, both the COFINA Agent and the Commonwealth Agent agreed that it was the best possible outcome for each of their respective estates given the enormous stakes and uncertainty involved in litigating the Commonwealth-COFINA Dispute to conclusion. (Feldman Decl. ¶ 4.)

36.　The Oversight Board asserted that certain aspects of the Agreement in Principle concerned matters beyond the scope of the Commonwealth-COFINA Dispute, as framed by the Procedures Order and the Scope Orders, including the design of new securities to be issued under a plan of adjustment for COFINA and a constraint on the Oversight Board's use of funds allocated to the Commonwealth. Moreover, the Oversight Board asserted that, among other things, the

Agreement in Principle exceeded the scope of the Adversary Proceeding and the Procedures Order by attempting to, among other things, dictate the terms of plans of adjustment in the Title III Cases and limit the availability and use of funds. However, the Oversight Board determined, after reviewing the extensive litigation history and issues raised in the Adversary Proceeding and assessing the likelihood of success for the Commonwealth in the litigation, that the central component of the Agreement in Principle—the 53.65% / 46.35% allocation of the disputed sales and use tax revenue between COFINA and the Commonwealth, respectively—was a fair and reasonable settlement and compromise of the Commonwealth-COFINA Dispute given the substantial risks of litigation, and determined to build upon the central component of the Agreement in Principle to garner support for a confirmable COFINA plan of adjustment. (Jaresko Decl. ¶ 25; Jaresko (9019) Decl. ¶ 21.)

37.     Beginning in July 2018 and using the economic framework of the Agreement in Principle, the Oversight Board and its advisors engaged in over two weeks of court-sanctioned mediation among interested parties convened by the Mediation Team on a COFINA plan of adjustment, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action. (Jaresko Decl. ¶ 26; Jaresko (9019) Decl. ¶ 22.)

38.     On August 8, 2018, the Oversight Board announced that it had reached an agreement with certain holders and insurers of COFINA's Existing Securities and AAFAF on the economic treatment of COFINA's Existing Securities and the terms of new securities to be issued pursuant to a proposed COFINA plan of adjustment (the "Securities Terms"), which Securities Terms were developed by Citigroup Global Markets, Inc. ("Citi") at the request of the Oversight Board and included in a presentation, of which the Agreement in Principle was the foundation. (Jaresko Decl. ¶ 26; Jaresko (9019) Decl. ¶ 22; Exhibit DX-UU; Brownstein Decl. ¶ 12; Exhibit DX-YY.)

39.     The Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA

Bonds, Ambac, National, certain holders of Junior COFINA Bonds, Assured, and Bonistas del

Patio, Inc. (collectively, the "Settlement Parties") entered into that certain Plan Support

Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that sets forth,

among other things, (a) terms to the compromise and settlement of the Commonwealth-COFINA

Dispute implemented by the Oversight Board and Citi and consistent with the terms of the

Agreement in Principle developed by the Agents, which, among other things, allocates the first

collections of SUT revenues in an amount up to fifty-three and sixty five one-hundredths percent

(53.65%) of the annual Pledged Sales Tax Base Amount to COFINA, and confirms that COFINA

is the sole and exclusive owner of the amounts held at BNYM as of June 30, 2018, and (b) terms

of the relative treatment between junior and senior Existing Securities to resolve the dispute

between holders of junior and senior Existing Securities regarding whether or not a default and

acceleration had been triggered under the Resolution.  (Jaresko Decl. ¶ 27.)

40.     On September 20, 2018, the Settlement Parties amended and restated the Original

Plan Support Agreement (the "A&R Plan Support Agreement") to (a) include additional holders

of Existing Securities, who also hold significant amounts of GO Bonds and were among the

plaintiffs in the Lex Claims Litigation and (b) provide that Aurelius Capital Master, Ltd. and Six

PRC Investments LLC, and each of their applicable affiliates, who are significant holders of

Existing Securities, will request dismissal, with prejudice, of their claims and causes of action in

the Lex Claims Litigation premised on challenges to COFINA's constitutionality, COFINA's

entitlement to proceeds of the SUT revenues purportedly transferred by the Commonwealth to

COFINA, and any other claims and causes of action which may challenge the transactions

contemplated in the A&R Plan Support Agreement or the Plan, effective upon the entry of an order

approving the Settlement and confirmation of the Plan. (Jaresko Decl. ¶ 28; Exhibit DX-D (A&R
Plan Support Agreement), § 4.13.)

     41.    As of the date of the August 8, 2018, announcement, and due to the changes in the
Commonwealth's then-certified fiscal plan, the Commonwealth Agent was unwilling to proceed
to finalize any further documentation regarding the Agreement in Principle. (Feldman Decl. ¶ 5.)
As such, the Oversight Board, as representative of the Commonwealth, began negotiation of the
terms of the Settlement Agreement with the COFINA Agent, consistent with the economic terms
of the Agreement in Principle. (Feldman Decl. ¶ 6.) The Settlement Agreement was the result of
a good faith, arm's-length negotiation between the COFINA Agent and the Oversight Board.
(Feldman Decl. ¶ 7.) The Oversight Board did not exert any influence on the COFINA Agent's
decision to enter into the Settlement Agreement, nor did the COFINA Agent permit the Oversight
Board to affect her judgment or ability to carry out her duty to act in the best interest of the debtor
she was appointed to represent. (Feldman Decl. ¶ 7.) The Settlement Agreement is faithful to and
consistent with the Agreement in Principle. (Feldman Decl. ¶ 8.) On October 19, 2018, after
extensive discussion and deliberations, the Oversight Board, as representative of the
Commonwealth, approved entry into the Settlement Agreement with the COFINA Agent. (Jaresko
Decl. ¶ 29.)

     42.    Contemporaneously thereto, on October 19, 2018, the Debtor filed the Plan,
Disclosure Statement, and *Puerto Rico Sales Tax Financing Corporation's Motion for Order (I)
Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation
Hearing Notice, (IV) Approving Solicitation Packages and Distribution Procedures, (V)
Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (VI)
Approving Notice of Non-Voting Status, (VII) Fixing Voting and Election Deadlines, and (VIII)
Approving Vote Tabulation Procedures* (Docket Entry No. 307).

43.     On November 5, 2018, the Commonwealth Agent entered into a stipulation with the Oversight Board and the COFINA Agent withdrawing any objections to the Settlement Agreement.  Pursuant to such stipulation, the Commonwealth Agent agreed, among other things, not to object to the approval of the Settlement Agreement, approval of the Disclosure Statement, or confirmation of the Plan, except in the circumstances set forth in paragraph 4 therein.  (Docket Entry No. 4204 in Case No. 17-3283.)  On January 10, 2019, the Retiree Committee withdrew its objection to the Settlement Agreement.  (Docket Entry No. 4704 in Case No. 17-3283.)  In light of the foregoing, as of the date hereof, (a) each of the COFINA Agent, the GO Representative, and the Retiree Committee have agreed to or ratified the terms of the Settlement Agreement resolving the Commonwealth-COFINA Dispute in a manner consistent with the requirements of the Procedures Order, and (b) the Commonwealth Agent also does not object to the approval of the Settlement Agreement.  The Oversight Board's execution of the Settlement Agreement with the COFINA Agent was appropriate under the circumstances.

44.     On November 15, 2018, in furtherance of the Settlement and the Plan, the Government enacted Act 241-2018 ("Act 241"), amending Act 91, which originally created COFINA.

45.     On November 29, 2018, the Court entered an order (Exhibit DX-J, Docket Entry No. 375, the "Disclosure Statement Order") (a) approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) establishing (1) January 2, 2019, at 5:00 p.m. (Atlantic Standard Time), as the Confirmation Objection Deadline, (2) January 8, 2019, at 6:00 p.m. (Atlantic Standard Time), as the deadline by which (i) ballots to accept or reject the Plan were required to be received by Prime Clerk (the "Voting Deadline"), and (ii) elections regarding the form of distribution (including a determination regarding commutation with respect to certain insured claims) were required to be received by

Prime Clerk (the "Election Deadline"), which Election Deadline was subsequently extended to January 11, 2019, at 6:00 p.m. (Atlantic Standard Time) (Docket Entry No. 400), and (c) scheduling a hearing on January 16, 2019, at 9:30 a.m. (Atlantic Standard Time), to consider confirmation of the Plan (Docket Entry No. 302).

46.    Consistent with the Disclosure Statement Order, the Debtor caused Prime Clerk to distribute solicitation packages to all claim holders entitled to vote.  The solicitation packages contained, among other things: (i) the notice setting forth the time, date, and place of the Confirmation Hearing (the "Confirmation Hearing Notice"); (ii) a flash drive (or hard copy, in the Debtor's discretion) containing this Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax related information relating to distributions under the Plan; and (v) in the case of creditors in Class 6, the Class 6 Notice.  Prime Clerk also served election notices to holders of Claims in Classes 1 and 5, to permit the election into Classes 4 and 7, respectively, or, if in Class 2 or 3, to elect to receive the applicable trust certificates rather than the commutation alternative being offered by the respective monoline insurers. (Pullo Decl. ¶ 4.)

### COMPLIANCE WITH PROMESA SECTIONS 104(J) AND 313

47.    The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment. See PROMESA § 104(j)(1)–(2). The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified fiscal plan. See id. § 104(j)(3).  Further, the Oversight Board, after the issuance

of a certification pursuant to PROMESA section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.   See id. § 313.   After the Oversight Board files a modification, the plan as modified becomes the plan.

48.     The Oversight Board has complied with its obligations pursuant to PROMESA sections 104(j) and 313.  On October 18, 2018, the Oversight Board certified COFINA's current fiscal plan (the "COFINA Fiscal Plan").  (Exhibit DX-FFFF.)

49.     On October 19, 2018, the Oversight Board certified the submission of the *Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4072 in Case No. 17-3283, the "Original Plan") upon a determination, in the Oversight Board's sole discretion, that the Original Plan was consistent with the COFINA Fiscal Plan.   (Exhibit DX-BBBB.) Accordingly, the Oversight Board certified the submission of the Original Plan in accordance with PROMESA section 104(j).

50.     On November 16, 2018, the Oversight Board certified the modification of the Original Plan and the submission of the *Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4296 in Case No. 17-3283, the "First Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the First Amended Plan was consistent with the COFINA Fiscal Plan. (Exhibit DX-CCCC.) Accordingly, the Oversight Board certified the modification of the Original Plan and the submission of the First Amended Plan in accordance with PROMESA section 104(j).

51.     On November 26, 2018, the Oversight Board certified the modification of the First Amended Plan and the submission of the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4363 in Case No. 17-3283, as subsequently corrected pursuant to Docket Entry No. 4390, the "Second Amended Plan") upon a determination,

in the Oversight Board's sole discretion, that the Second Amended Plan was consistent with the COFINA Fiscal Plan. (Exhibit DX-DDDD.) Accordingly, the Oversight Board certified the modification of the First Amended Plan and the submission of the Second Amended Plan in accordance with PROMESA section 104(j).

52.     On January 9, 2019, the Oversight Board certified the modification of the Second Amended Plan and the submission of the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation* (Docket Entry No. 4652 in Case No. 17-3283, the "Third Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Third Amended Plan is consistent with the COFINA Fiscal Plan. (Exhibit DX-EEEE.) Accordingly, the Oversight Board certified the modification of the Second Amended Plan and the submission of the Third Amended Plan in accordance with PROMESA section 104(j).

53.     For the reasons explained herein, the Third Amended Plan meets the requirements of PROMESA; the First Amended Plan and Second Amended Plan met the requirements of PROMESA to the same extent that the Third Amended Plan meets the requirements of PROMESA; and the Oversight Board has complied with all applicable provisions of PROMESA. Accordingly, the Oversight Board modified the Original Plan, First Amended Plan, and Second Amended Plan in accordance with PROMESA section 313, and the Third Amended Plan has become the "Plan."

### COMPLIANCE WITH PROMESA SECTION 314(B)

**A. PROMESA § 314(b)(1)**: *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

54.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent. Plan at 1, 78. In addition, as detailed below, the Plan satisfies the requirements

of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d)

of the Bankruptcy Code:

### i.   Bankruptcy Code Section 1122(a)

55.    With the exception of Administrative Expense Claims and Professional Claims,

which need not be classified, Article IV of the Plan designates the classification of Claims.  Such

classification complies with section 1122(a) of the Bankruptcy Code because each Class contains

only claims that are substantially similar to each other.  The Plan designates the following ten (10)

Classes of Claims:

> Class 1 (Senior COFINA Bond Claims)
> Class 2 (Senior COFINA Bond Claims (Ambac))
> Class 3 (Senior COFINA Bond Claims (National))
> Class 4 (Senior COFINA Bond Claims (Taxable Election))
> Class 5 (Junior COFINA Bond Claims)
> Class 6 (Junior COFINA Bond Claims (Assured))
> Class 7 (Junior COFINA Bond Claims (Taxable Election))
> Class 8 (GS Derivative Claim)
> Class 9 (General Unsecured Claims)
> Class 10 (Section 510(b) Subordinated Claims)

(Exhibit DX-G.)

56.    The classification of Claims set forth in the Plan is reasonable and was not done to

control the outcome of voting to accept or reject the Plan, as the classification is based upon

differences in the legal nature and/or priority of such Claims in accordance with applicable law.

(Jaresko Decl. ¶ 36.)

57.    All holders of Claims in Classes 1, 2, and 3 hold substantially similar securities,

"Senior" Existing Securities, but are classified separately based on whether they are uninsured

(Class 1) or insured by Ambac (Class 2) or National (Class 3), as such insurance agreements

provide bondholders different rights thereunder.  Holders of Claims in Classes 5 and 6 hold substantially similar securities, "First Subordinate" Existing Securities, but are classified separately based on whether they are uninsured (Class 5) or insured by Assured (Class 6).  (Jaresko Decl. ¶ 36.)

58.     Senior COFINA Bond Claims and Junior COFINA Bond Claims are in different Classes because they have different underlying rights.  Specifically, in determining whether claims are "substantially similar" for the purpose of section 1122 of Title 11 of the United States Code, made applicable to the Title III Case pursuant to PROMESA section 301(a), the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims.  See PROMESA § 301(e).  Under the Resolution, in the event of default, payment to the Junior COFINA Bond Claims, such as those bonds issued under the Seventh Supplemental Sales Tax Revenue Bond Resolution, is subordinate in payment of the Senior COFINA Bond Claims.  (Jaresko Decl. ¶ 37; Exhibit DX-XX.)

59.     Based upon the elections offered pursuant to the Plan, holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims which are either Puerto Rico Institutions or Puerto Rico Individuals, to the extent elections were made, were shifted appropriately to other Classes (Class 4 and Class 7, respectively) to denote the election made and the alternative form of distribution elected to be received.  (Jaresko Decl. ¶ 38; Exhibit DX-G.)

60.     Numerous formal and informal objections contest the existence of the Taxable Election Class and the different treatment of holders of claims who elect to have their claims placed into Class 7, or the "Junior Taxable Election Class."  In particular, the objections note that the bonds issued to the Junior Taxable Election Class have different payment schedules and maturities, and holders of claims who elect to place their claims in the Junior Taxable Election Class will receive shares of Taxable Election Cash (equal to up to two percent of the aggregate amount of

I-191

Senior and Junior COFINA Bond Claims).  The total amount of such cash will not exceed $60 million.  The Junior Taxable Election Class is properly treated as a separate class of claims from the other classes of claims for holders of junior bonds and it therefore does not implicate Section 1122(a), which concerns whether claims may be classified together.

61.    The Claim in Class 8 arises from or relates to that certain ISDA Master Agreement, dated as of July 31, 2007, between Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, L.P.) and COFINA, as amended by that certain Amendment, dated September 24, 2014.  The treatment of the Claim in Class 8 is dependent on the termination value of such Claim and whether the rejection damages, if any, associated with such Claim constitute a Parity Obligation.  (Exhibit DX-G.)

62.    The Claims in Class 9 are for all other liabilities of COFINA other than an Administrative Expense Claim, a Professional Claim, a Senior COFINA Bond Claim, a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National), a Senior COFINA Bond Claim (Taxable Election), a Junior COFINA Bond Claim, a Junior COFINA Bond Claim (Assured), a Junior COFINA Bond Claim (Taxable Election), a GS Derivative Claim, or a Section 510(b) Subordinated Claim.  (Exhibit DX-G.)

**ii. Bankruptcy Code Section 1123(a)(1)**

63.    Section 4.1 of the Plan designates ten (10) separate Classes of Claims for the Debtor, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code. (Exhibit DX-G.)

64.    The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

**iii. Bankruptcy Code Section 1123(a)(2)**

65.    Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are impaired. (Exhibit DX-G.)  Existing holders of Allowed Junior COFINA Bond Claims (Assured) will receive

(through payment by Assured), on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus, be effectively rendered unimpaired; provided, however, Assured will be subrogated to the rights of such holders and will receive distributions pursuant to the Plan, thereby rendering Assured's claims impaired.  Therefore, there are no unimpaired Classes under the Plan.

66.    The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iv. Bankruptcy Code Section 1123(a)(3)

67.    Articles V through XIV of the Plan identify the treatment of all Classes of Claims that are impaired under the Plan.  (Exhibit DX-G.)

68.    The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### v. Bankruptcy Code Section 1123(a)(4)

69.    Articles V through XIV of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.  If a holder of a Claim in Class 1 or 5 elects out of such Class so as to receive all taxable bonds, rather than a mix of taxable and tax-exempt bonds, pursuant to the Plan, such holder is no longer in such Class, and, instead, is treated as a holder of a Claim in Class 4 or 7, respectively.  (Jaresko Decl. ¶ 42; Exhibit DX-G.)  Accordingly, all holders of Claims in each of Classes 1, 4, 5, and 7 receive the same treatment as other Claims in the same Class pursuant to the Plan.  Objections to the existence of the Taxable Election Class and the different treatment of holders of claims who elect to have their claims placed into the Junior Taxable Election Class do not implicate Section 1123(a)(4).

70.    Consummation Costs are being paid to the parties to the A&R Plan Support Agreement and are not being paid to the Consummation Cost Parties on account of their Claims against COFINA.  (Jaresko Decl. ¶ 43; Exhibit DX-G.)  During the lengthy and complex court-sanctioned mediation led by Chief Bankruptcy Judge Houser, the Consummation Cost Parties

agreed to various conditions and covenants set forth in the A&R Plan Support Agreement, including, among other things, a pledge to support the Plan, the imposition of restrictions on the transfer of their bonds, and a waiver of their right to seek reimbursement of expenses through other means, including through substantial contribution claims.  As consideration for their efforts in assisting in the formulation of the Plan that has garnered significant creditor support, continuing to assist in the finalization of definitive agreements and ancillary documents, and the costs incurred in those and other efforts (including the expenses of defending COFINA's property interests for which the PSA Creditors asserted a right to seek substantial contribution claims), the Oversight Board determined that it was fair and reasonable for the Consummation Cost Parties to be paid the Consummation Costs.  Based upon representations of counsel and, in some instances, pleadings filed with the Title III Court, the Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to be at least $135 million.  (Jaresko Decl. ¶ 43; Rodrigue Decl. ¶ 8.)

71.    The Consummation Cost Parties hold nearly $10 billion of the outstanding $17.6 billion in outstanding Bond Claims.  Thus, approximately $190 million ($10 billion / $17.6 billion * $332 million) of the Consummation Costs (approximately 2% of their collective $10 billion claim) would have been distributed to the Consummation Cost Parties in the absence of the Consummation Costs provision.  Accordingly, the Consummation Cost provision provides for a "net" incremental payment for the Consummation Cost Parties of approximately $140 million.  This amount equates to approximately 1.3% of the total Allowed Bond Claims of the Consummation Cost Parties.  The Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to exceed the "net" cost of the Consummation Costs of approximately $140 million.  (Jaresko Decl. ¶ 44.)

I-194

72. Unlike the Commonwealth and the other Title III debtors in these jointly-administered cases, COFINA does not have a statutory creditors' committee representing the interests of COFINA creditors. Under section 1103(c)(3) of the Bankruptcy Code, made applicable to COFINA's Title III Case under section 301 of PROMESA, participation in the formulation of a plan is a function of a statutory committee, the expenses of which are entirely borne by the debtor. Here, the PSA Creditors served as the counterparty to the Oversight Board and AAFAF in negotiating the Plan and in ensuring the Oversight Board that it had significant creditor support for the Plan.

73. The payment of the Consummation Costs was a critical component of the interlocking agreements set forth in the A&R Plan Support Agreement. The absence of the A&R Plan Support Agreement could have resulted in a costly, contentious, and lengthy confirmation process for COFINA. Under such a scenario, there would be no certainty that a confirmable plan could be presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than eighteen (18) months. In consideration of the benefits obtained for COFINA in entering into the A&R Plan Support Agreement, the benefits to COFINA creditors from the mediation and the costs to and burdens of intense mediation with the Consummation Cost Parties, the Oversight Board determined that it was an appropriate use of COFINA's property to pay the Consummation Costs and provide an opportunity for COFINA to emerge from Title III as expeditiously as possible. (Jaresko Decl. ¶ 45; see also Rodrigue Decl. ¶ 8.)

74. The payment of Consummation Costs to the PSA Creditors does not violate section 1123(a)(4) of the Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ." 11 U.S.C.A. § 1123(a)(4) (West 2016). While it is true that all *claims* must be treated equally, the same is not true for all *claimants*.

I-195

See 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2013) ("The equality addressed by section
1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and
not to the plan's overall treatment of the creditors holding such claims or interest . . . . Creditors
should not confuse equal treatment of claims with equal treatment of claimants."); see also In re
Peabody Energy Corp., 582 B.R. 771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns
Corp., 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not
require identical treatment for all class members in all respects under a plan, and that the
requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims*
or interests in a specific class—not the treatment that members of the class may separately receive
under a plan on account of the class members' other rights or contributions.") (emphasis in
original).

75.     The *claims* held by the PSA Creditors are treated the same as every other
bondholder pursuant to the Plan: holders of Senior COFINA Bond Claims will receive a 93.01%
recovery on their bonds while holders of Junior COFINA Bond Claims will receive a 56.41%
recovery, see Plan §§ 1.114, 1.168, irrespective of whether the holder is a retail investor, an
institutional investor, or a PSA Creditor. (See also Jaresko Decl. ¶ 42.) The payment of the
Consummation Costs is intended to compensate the PSA Creditors for: (i) the significant costs
and expenses expended by the PSA Creditors in order to achieve a confirmable plan in lieu of
seeking substantial contribution; (ii) agreeing to "lock up" their bonds until potentially June 1,
2019, and accepting the attendant risk of unfavorable market conditions; and (iii) agreeing to
support the Plan—another restriction not applicable to non-PSA Creditors. (Jaresko Decl. ¶¶ 43-
45.)

I-196

### vi. Bankruptcy Code Section 1123(a)(5)

76.   Various provisions of the Plan provide adequate and proper means for its implementation:

- Section 16.1 provides for the issuance of COFINA Bonds on the Effective Date;

- Section 19.1 provides for distributions to be made to holders of Allowed Claims under the Plan;

- Section 26.1 provides that, "[e]xcept as settled and released [in the Plan], from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA";

- Section 28.1 provides that, on the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan, as applicable, shall be authorized and approved in all respects in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, without further action by any Person or Entity under any other applicable law, regulation, order, or rule;

- Section 28.3 provides for the appointment of the board of directors of Reorganized COFINA, consisting of three (3) persons appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in the Definitive Documents;

- Section 28.5 provides that "[t]he COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a 'bankruptcy remote,' single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan and as reflected in the Term Sheet"; and

- Section 30.1 provides for the re-vesting of assets: "[e]xcept as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan."

(Jaresko Decl. ¶ 46; Exhibit DX-G.)

77.    The Amended Plan Supplement contains, among other things, substantially final forms of the (i) New Bond Indenture, (ii) the COFINA Bonds, (iii) the Reorganized COFINA By-Laws, and (iv) the new Banking Services Contract.  The Plan, together with the documents and arrangements set forth in the Amended Plan Supplement, provides adequate means for its implementation.  (Jaresko Decl. ¶ 47.)  On January 28, 2019, the Oversight Board filed the Second Amended Plan Supplement amending the Amended Plan Supplement to revise certain exhibits.

78.    The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**vii. Bankruptcy Code Section 1123(b)(1)**

79.    Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are all impaired.  (Jaresko Decl. ¶ 48; Exhibit DX-G.)

80.    The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

**viii.    Bankruptcy Code Section 1123(b)(2)**

81.    Article XVIII of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which COFINA is a party are rejected, "except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Amended Plan Supplement; provided, however, that COFINA reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date." Plan § 18.1; see also Second Amended Plan Supplement at Exhibit I.

82.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### ix. Bankruptcy Code Section 1123(b)(3)(A)

83.     The Plan incorporates the settlement and compromise of, among other things, (a) the Commonwealth-COFINA Dispute Settlement in Article II of the Plan, (b) issues regarding the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action, and (c) the treatment of holders of Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National).  The Plan is the result of extensive arms' length negotiations among the Governmental Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Governmental Parties and various PSA Creditors form the very foundation of the Plan.  In absence of such compromises and settlements, COFINA's emergence from Title III would likely be significantly delayed by currently stayed and other litigation and burdened by additional expense, which could impair the ability of COFINA to successfully adjust its debts, thereby prejudicing the recovery for all creditors and raising further uncertainties concerning the Commonwealth and COFINA's financial condition.  Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, is fair, equitable, and reasonable; (b) is in the best interests of COFINA, its creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law.

84.     Further, the Plan will fairly and consensually resolve six adversary proceedings pending in the Court, two appeals pending in the First Circuit Court of Appeals, and an additional

I-199

court action pending in the District of Puerto Rico but not before the Title III Court, each of which raises difficult and complex issues. The Plan thus incorporates a complex series of interrelated compromises and settlements that resolve the most significant potential obstacle to confirmation of a plan of adjustment. Moreover, since the compromises and settlements are inextricably interwoven, they all hinge on one another and the approval of all of these compromises and settlements is required in order to satisfy the conditions to the Effective Date set forth in the Plan.

85. Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

**x. Bankruptcy Code Section 1123(b)(3)(B)**

86. The Plan is premised upon the Settlement, which is integral to the Plan and settles and compromises the Commonwealth-COFINA Dispute. The Settlement has been determined to be fair and reasonable and in the best interests of all creditors and above the lowest rung in the range of reasonableness.

87. Section 26.1 of the Plan provides that, "[e]xcept as settled and released herein, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court." (Exhibit DX-G.)

88. The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

I-200

### xi. Bankruptcy Code Section 1123(b)(5)

89.     Articles V through XIV of the Plan modify the rights of holders of Claims in all

Classes.  There are no Classes whose holders' rights have been left unaffected pursuant to the Plan.

(Jaresko Decl. ¶ 52; Exhibit DX-G.)

90.     The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xii. Bankruptcy Code Section 1123(b)(6)

91.     The Plan provides for, among other things, (a) certain releases, injunctions, and

exculpations by COFINA and Reorganized COFINA, the Disbursing Agent, and each of

COFINA's and Reorganized COFINA's Related Persons, (b) releases by each of the PSA

Creditors and their respective Related Persons, (c) a release of BNYM, (d) a release of the

Commonwealth, (e) a release of the Commonwealth Agent Releasees, (f) consensual releases by

holders of Claims, (g) customary exculpation provisions for the Government Parties, PSA

Creditors and Bonistas, the COFINA Agent, the Commonwealth Agent, and each of Ambac,

Assured, and National and their respective Related Persons; (h) assumption of certain director and

officer indemnification and reimbursement obligations, and (i) an exemption from registration

pursuant to Bankruptcy Code section 1145 for the issuance and distribution of COFINA Bonds,

Ambac Certificates, and National Certificates.  (Exhibit DX-G; see also Jaresko Decl. ¶ 53.)

92.     Each of the foregoing is an integral part of the Plan and is essential to its

implementation.  (Jaresko Decl. ¶¶ 73-83.)

93.     The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xiii.     Bankruptcy Code Section 1123(d)

94.     Section 18.4 of the Plan provides for the payment of cure amounts required to be

paid to the counterparties of Executory Contracts that are assumed, or assumed and assigned under

the Plan.  All cure amounts will be determined in accordance with the underlying agreements and

applicable nonbankruptcy law, and pursuant to the procedures established by the Plan. (Exhibit DX-G.) The Debtor is not aware of any monetary defaults it must cure. (Jaresko Decl. ¶ 54.)

95. The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xiv.     Bankruptcy Code Section 1129(a)(2)**

96. COFINA (i) has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court, and (ii) has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan. (Jaresko Decl. ¶ 55.)

97. The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement, and sought and received input and comment thereon from all the parties to the A&R Plan Support Agreement, and all other parties in interest. This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code. (Jaresko Decl. ¶ 55.) Based upon the volume of ballots received and elections made, it is clear the Debtor has properly solicited with respect to the Plan, including with respect to each of the possible elections under the Plan. (See Pullo Decl. ¶¶ 7-8, Exh. A.)

98. The Debtor has complied with section 1129(a)(2) of the Bankruptcy Code.

**xv.     Bankruptcy Code Section 1129(a)(3)**

99. The Plan was proposed in good faith with the legitimate and honest purpose to provide a method for a covered territory to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA. The Oversight Board, as proponent of the Plan, is the duly-appointed representative of COFINA in its Title III Case as provided under

PROMESA and is in all respects consistent with applicable law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Case, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution. The Debtor's good faith is evident from the facts and records of the Title III Case, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Case, including related adversary proceedings. The Plan (including the settlements and compromises contained therein) is the result of extensive arm's-length negotiations among the Settlement Parties through mediation led by Chief Bankruptcy Judge Houser. The Agreement in Principle was the product of an independent process overseen by the court-appointed Mediation Team in which the Oversight Board did not participate nor did it have any control over the parties who could participate. (Jaresko Decl. ¶ 56.)

100. The Oversight Board built upon the Agreement in Principle and engaged in over two weeks of mediation among interested parties on a COFINA plan of adjustment and the attendant issues that needed to be resolved for a viable plan to be proposed, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action. (Jaresko Decl. ¶ 57.)

101. All major Classes of Claims were represented in such mediation. (Brownstein Decl. ¶¶ 18-20; Jaresko Decl. ¶ 58.) The Senior COFINA Bondholders' Coalition represented the interests of holders of Senior COFINA Bond Claims. Ambac and National, as monoline insurers of such Claims, in aggregate amounts in excess of $2 billion, participated on behalf of their respective interests and protected the interests of their insureds. Assured, an insurer of approximately $274 million in "First Subordinate" Existing Securities, is aligned with the

economic interest of the holders of Junior COFINA Bond Claims and has no exposure, either
through insurance coverage or beneficial ownership, to Senior COFINA Bonds.   Assured
participated in Plan mediation and was a party to the A&R Plan Support Agreement.   Additionally,
retail COFINA bondholders were represented throughout the process by retail or mutual funds,
representing the interests of mainland and "on-island" bondholders, and Bonistas, advocating for
the interests of Puerto Rico resident bondholders, actively participated.  All are signatories to the
A&R Plan Support Agreement that included terms for the treatment of senior and junior COFINA
bondholders to settle the issues of the relative rights between the senior and junior COFINA
bondholders. (Brownstein Decl. ¶ 19.)

102.    The Plan represents the culmination of months of intensive negotiations and
discussions among parties representing the interests of all COFINA and Commonwealth
stakeholders in an independently driven process facilitated by the court-appointed Mediation
Team.   Throughout the Plan negotiations, various constituencies were represented in the
negotiation of the Plan, as illustrated by the widespread creditor participation in and execution of
the A&R Plan Support Agreement.  Cumulatively, such parties hold, own, beneficially own, or
insure approximately an aggregate $5.6 billion in senior COFINA bonds, and $3.7 billion in junior
COFINA bonds.  (Brownstein Decl. ¶ 20.)  No entity or constituency was denied access to the
mediated settlement negotiation process.  (See Jaresko Decl. ¶ 22 (stating that the Oversight Board
worked with "any creditor party who sought to participate to formulate procedures agreeable to
the interested parties" as part of the mediation process); (see also Docket Entry No. 560 in Case
No. 17-3283, *Order and Notice of Meeting with Representatives of Mediation Team*).)[13]

---

[13]      In his *Response to Proposed Findings of Fact and Conclusions of Law Submitted by
Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at
the Original Offering Prices* (Docket Entry No. 4911 in Case No. 17-3283), Mr. Hein
contends that the confidentiality of the mediation process within which the Settlement and

103.    The Plan is designed to implement the settlement and compromise of, among other things, the Commonwealth-COFINA Dispute and the Interpleader Action, and maximize value for COFINA's creditors, while avoiding protracted litigation which could delay distributions to creditors, or worse, result in no recoveries for any COFINA creditors.  (Jaresko Decl. ¶ 57.)

104.    The Plan and the Disclosure Statement reflect the culmination of those efforts and the substantial input of each representative group.

105.    The Plan (including the Settlement Agreement and all other agreements, documents and instruments necessary to effectuate the Plan) achieves a rational adjustment of COFINA's debts, and properly distributes value to Creditors based upon their respective priorities, including through the implementation of parties' elections with respect to distributions.   The Plan was proposed with the legitimate and honest purpose of maximizing the value of COFINA's property, and to maximize distributions to all creditors.  (See Jaresko Decl. ¶ 57.)

106.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xvi.      Bankruptcy Code Section 1129(a)(6)**

107.    The Plan does not provide for any rate changes by COFINA, and, accordingly, such section of the Bankruptcy Code does not apply.

---

Plan proposals were developed ran afoul of the First Amendment right of access to judicial proceedings.  Mr. Hein's reliance on Delaware Coalition for Open Government, Inc. v. Strine, 733 F.3d 510 (3d Cir. 2013) is unavailing because, unlike the closed courthouse-based binding arbitration proceedings, presided over by judges, that were the subject of that case, the mediation program here is open to all interested participants on terms announced by the Mediation Team, the members of the Mediation Team do not render binding decisions, and all stakeholders with standing have the opportunity to challenge in open adversarial proceedings before the Court any proposals developed in mediation for which judicial approval is sought.  Given these circumstances, the experience and logic test does not support a finding of a First Amendment right of public access to the mediation proceedings.  The objection is therefore overruled.

xvii.    **Bankruptcy Code Section 1129(a)(8)**

108.    Pursuant to the Disclosure Statement Order, the Court approved the Disclosure Statement and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the Debtor to solicit acceptance and rejections of the Plan, as well as certain elections with respect thereto.  (Disclosure Statement Order ¶¶ B, 2.)  Prior to the transmission of the Disclosure Statement, the Debtor did not solicit acceptances of the Plan by any holder of Claims.

109.    The (i) Disclosure Statement Order, (ii) Confirmation Hearing Notice, (iii) Disclosure Statement (which includes as an exhibit a copy of the Plan), (iv) Ballots, (v) Election Notices, (vi) Class 6 Notice, and (vii) Notice of Non-Voting Status – Class 10 (collectively, the "Solicitation Packages") were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and the Disclosure Statement Order.  (Pullo Decl. ¶ 6; Mailing Affidavit.)

110.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing date, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Case; (ii) provided adequate and sufficient notice of the Voting Deadline, the Election Deadline, the Confirmation Objection Deadline, the method of voting or making an election of distribution under the Plan and the date, time and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure Statement

I-206

Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the COFINA Title III Case. (Pullo Decl. ¶¶ 4-6; Service Affidavits.)

111.    No other or further notice with respect to the Plan or the Confirmation Hearing is required. Based upon the foregoing, the Debtor and its successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with all its activities relating to the solicitation of acceptances to the Plan or elections thereunder and its participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 30.7 of the Plan. Plan § 30.7.

112.    Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules. (Pullo Decl. ¶¶ 7–8.)

I-207

113.     All classes of creditors entitled to vote to accept or reject the Plan have voted to accept the Plan in accordance with the requirements set forth in the Bankruptcy Code and as applicable in accordance with sections 301 and 314(b) of PROMESA.  (Pullo Decl. ¶ 8.)

114.     Holders of Claims in Classes 1, 2, 3, 5, 6, 8, and 9 voted, or are deemed to have voted, to accept the Plan.  (Pullo Decl. ¶ 8.)  Pursuant to the Plan, holders of Claims who have elected to be treated under Class 4 or Class 7 are deemed to have voted to accept of the Plan.  (Plan §§ 5.2, 9.2.)  The Plan therefore satisfies section 1129(a)(8) of the Bankruptcy Code with respect to Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9.  Holders of Claims in Class 10 are deemed to reject the Plan, so section 1129(a)(8) of the Bankruptcy Code is unsatisfied with respect to Class 10.  (Plan § 14.1.)

115.     Notwithstanding such deemed rejection, the Plan is confirmable because the Plan satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to Class 10.

### xviii.      Bankruptcy Code Section 1129(b)(1)

116.     The Debtor is unaware of any Section 510(b) Subordinated Claims other than assertions set forth in several proofs of claim, but the Debtor included such Claims and classification within the Plan.  The Plan's treatment of Claims in Class 10 is proper, because all similarly-situated holders of Claims will receive similar treatment.  All holders of subordinated claims in Class 10 will not be receiving distributions pursuant to the Plan, and Class 10 is deemed to reject the Plan.  (Jaresko Decl. ¶ 60; Exhibit DX-G.)  Accordingly, the Plan does not unfairly discriminate against holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

### xix.      Bankruptcy Code Section 1129(b)(2)

117.     The Plan's treatment of Claims in Class 10 is proper, because claims junior to the claims in Class 10 will receive no distributions under the Plan.  There is no Class that is junior to Class 10 and, thus, no holder of claims or interests junior to Claims in Class 10 will receive or

retain any property under the Plan on account of any such claim or interest. (Jaresko Decl. ¶ 61; Exhibit DX-G.) Accordingly, the Plan is fair and equitable to holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

**B. PROMESA § 314(b)(2)**: *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

118. Except as otherwise provided for or permitted by orders of the Court, the Debtor has complied with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Disclosure Statement Order in transmitting the Solicitation Packages and in tabulating the votes and elections with respect to the Plan. (See generally Jaresko Decl.)

119. The Plan complies with PROMESA section 314(b)(2).

**C. PROMESA § 314(b)(3)**: *The Debtor Is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan.*

120. The Plan contains no provisions which would require it to violate Commonwealth law. The Commonwealth's Legislative Assembly passed, and its Governor signed, the New Bond Legislation, which established the legal framework for the restructuring of COFINA's issued and outstanding bonds. The terms of the New Bond Legislation provide the legislative structure to carry out the terms of the Plan. Specifically, and among other things, the New Bond Legislation provides (a) confirmation that, on the Effective Date, Reorganized COFINA is and will be the sole and exclusive owner of the COFINA Revenues and incorporates such other terms as set forth in the Plan, see, e.g., New Bond Legislation art. 2.2, (b) that the modification of COFINA's corporate governance structure is consistent with its independence from the Commonwealth, see id. art. 2.7, (c) the authorization for Reorganized COFINA to issue COFINA Bonds and COFINA Parity Bonds pursuant to the New Bond Indenture and to provide for the terms of such bonds, see id. art. 3.1(a), (d) confirmation of Reorganized COFINA's ownership of the COFINA Revenues, see id.

I-209

art. 2.2, (e) the creation of a statutory lien to secure the COFINA Bonds and COFINA Parity

Bonds, see id. art. 3.2, and (f) covenants to secure further the repayment of the COFINA Bonds

and COFINA Parity Bonds, such as the COFINA Revenues being funded from first funds, a non-

impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales

Tax and substitute New Collateral only upon satisfaction of certain specific requirements, see id.

arts. 3.3, 4.1. (Jaresko Decl. ¶ 63; Exhibit DX-G.) Moreover, the New Bond Legislation provides

that the COFINA Revenues do not constitute "available resources" or "available revenues" of the

Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico Constitution or

as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or

English version of the Puerto Rico Constitution). See New Bond Legislation art. 2.2(e). Pursuant

to Puerto Rico case law, legislation of the Commonwealth is presumed to be valid if enacted by

the Legislative Assembly of Puerto Rico and signed into law by the Governor. E.g., Brau v. ELA,

2014 TSPR 26, 190 D.P.R. 315, 337, 2014 WL 997526 (P.R. Feb. 21, 2014); Partido Socialista

Puertorriqueño v. ELA, 107 D.P.R. 590, 7 P.R. Offic. Trans. 653, 727, 1978 WL 48833 (P.R. Oct.

5, 1978), holding modified by Partido Independentista Puertorriqueño v. CEE, 120 D.P.R. 580,

1988 JTS 23, 20 P.R. Offic. Trans. 607, 1988 WL 580845 (P.R. Mar. 7, 1988) ("To begin with,

laws are presumed to be constitutional and the movant [objector] should place the courts in a

position to decide by introducing evidence to sustain the facts alleged, and then stating the legal

arguments on which its assignment of unconstitutionality is based, specifically mentioning the

constitutional provisions involved and the legal precedents supporting its assignment."). In this

case, no objector presented persuasive evidence, either in their written opposition submission or

at the Confirmation Hearing, of any defect undermining the presumptively valid enactment of the

New Bond Legislation.[14]  Therefore, the presumption of validity has not been rebutted as required

by Puerto Rico case law.  Based on an analysis of the provisions of the New Bond Legislation and

the record before the Court, the Court finds that the enactment of the New Bond Legislation was

a proper exercise of the Legislative Assembly's constitutional power to designate revenues for a

---

[14]  The VAMOS objectors argue that a pending adversary proceeding challenging the
constitutionality of the New Bond Legislation must be resolved prior to confirmation of
the proposed COFINA Plan.  (See VAMOS Obj. at 2-6.)  These objectors contend that
the New Bond Legislation is unconstitutional under both the United States and Puerto
Rico Constitutions because Representative Natal-Albelo was prohibited, in violation of
the rules of the House of Representatives, from participating in the legislative process
leading up to the House of Representatives vote on the New Bond Legislation.  Plaintiffs
also assert that both the original COFINA legislation and the New Bond Legislation
violate the Constitution of Puerto Rico because borrowing authorized thereunder
allegedly exceeds the limits on "public debt" set forth in Sections 2 and 7 of Article VI of
the Constitution of Puerto Rico (which sections respectively limit the amount and
duration of direct obligations of the Commonwealth backed by a pledge of the full faith
and credit and taxing power of the Commonwealth, and provide that appropriations for a
fiscal year shall not exceed total estimated revenues for the year absent the imposition of
taxes to cover the shortfall).  Plaintiffs' arguments regarding an alleged violation of the
rules of the Commonwealth House of Representatives are nonjusticiable and are therefore
overruled insofar as they are raised as objections to the Plan.  See Noriega Rodríguez v.
Jarabo, 136 D.P.R. 497 (P.R. 1994); Silva v. Hernández Agosto, 118 D.P.R. 45, 18 P.R.
Offic. Trans. 55 (P.R. 1986).  Furthermore, arguments regarding the Commonwealth's
"public debt" limit have been resolved as part of the 9019 Settlement Agreement between
the Commonwealth and COFINA insofar as they relate to the statutory authorization of
the existing COFINA bonds.  The New Bond Legislation, which is presumptively valid
and not facially inconsistent with the cited Puerto Rico constitutional provisions, clearly
provides that Reorganized COFINA is a "corporate and political entity independent and
separate from the Government of Puerto Rico," that Plan of Adjustment Bonds shall be
payable solely from COFINA Revenues, and that the "COFINA Revenues do not
constitute 'available resources' or 'available revenues' of the Government of Puerto Rico
as used in Section 8 of Article VI of the Puerto Rico Constitution."  (Exhibit DX-QQQ
§§ 2.1, 2.2(e), 3.1(c).)  The VAMOS objectors' objections are overruled.  (See also infra
¶¶ 175-76.)  Additionally, in its amicus brief, the PDP argues that the New Bond
Legislation impermissibly restricts the ability of a successor Legislative Assembly to
exercise its exclusive taxing, spending, and police powers.  PDP's position is unfounded.
Although the New Bond Legislation sets forth procedures that must be met before any
amendments to the New Bond Legislation can become effective, the procedures do not
preclude the possibility of future alterations.  The New Bond Legislation merely clarifies
the means by which the Legislative Assembly's taxing power may be exercised in the
future without impairing COFINA's interests.  See New Bond Legislation § 3.3(b), (e).
The other arguments raised in the PDP Amicus Brief are similarly unavailing.

legitimate public purpose.   Specifically, the New Bond Legislation designates a portion of the

COFINA sales tax revenues to be transferred to COFINA in order for COFINA to fully satisfy and

discharge the potential judicial liabilities of the Commonwealth and COFINA by issuing new non-

recourse bonds.   Accordingly, the Court finds that the New Bond Legislation has been validly

enacted, is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and

enforceable.

121.    The Plan contains no provisions that would require it to violate the Contracts Clause

of the Constitution of the United States.   The Contracts Clause provides that no state shall pass

any law impairing the obligation of contracts.   U.S. Const. art. I, § 10, cl. 1.   While a state or

territory cannot make a law impairing the obligation of contracts, Congress is empowered to do so

pursuant to Article I, Section 8 of the Constitution, which provides that Congress shall have the

power to establish uniform laws on the subject of bankruptcies throughout the United States.   U.S.

Const. art. I, § 8, cl. 4.   It has long been recognized that one of the fundamental goals of bankruptcy

law is to adjust the debtor-creditor relationship, that is, to alter contract rights.   See In re City of

Stockton, Cal., 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012).   "While bankruptcy law endeavors to

provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired,

that does not change the starring role of contract impairment in bankruptcy." Id. at 16.   Congress

is, therefore, "expressly vested with the power of passing [bankruptcy] laws, and is not prohibited

from passing laws impairing the obligation of contracts."   Id. at 15 (citing Sturges v.

Crowninshield, 17 U.S. 122, 191 (1819)).   It follows that this Court may approve the Plan under

PROMESA, a federal law enacted by Congress with the express purpose of allowing Puerto Rico

to achieve fiscal responsibility and access to the capital markets through, inter alia, adjustment of

its debts and those of its instrumentalities, without offending the Constitution.   In this connection,

Mr. Hein has failed to demonstrate that the fiscal plans constitute territorial laws subject to the

restrictions of the Contracts Clause, and his objection with respect to the fiscal plans is therefore overruled.    To the extent that Mr. Hein argues that the New Bond Legislation is itself unconstitutional under the Contracts Clause, the Court concludes that the legislation is reasonable and necessary in light of the surrounding circumstances.  Although the language of the Contracts Clause is "unequivocal," it "does not make unlawful every state law that conflicts with any contract."  United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011).   In considering claims brought under the Contracts Clause, courts must "reconcile the strictures of the Contract[s] Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens."  Id.  In doing so, courts apply a two-pronged test: they examine first "whether the state law has . . . operated as a substantial impairment of a contractual relationship," and then, if the law has, "whether the impairment was reasonable and necessary to serve an important government purpose."   Id. Assuming arguendo that the New Bond Legislation will substantially impair contractual obligations, the Court examines the reasonableness and necessity of the New Bond Legislation. The First Circuit considers "the reasonableness inquiry" to "ask[] whether the law is reasonable in light of the surrounding circumstances," while "the necessity inquiry focuses on whether Puerto Rico imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well."  Id. at 45-46.  In analyzing these questions, courts may consider "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency."  Id. at 46.  The circumstances surrounding the enactment of the New Bond Legislation are clear: the Commonwealth Legislature enacted the New Bond Legislation in response to the Commonwealth's unprecedented fiscal and economic crisis and the need to resolve litigation concerning the legality of the COFINA structure.

Faced with the possibilities that, on the one hand, if COFINA were to prevail in the Commonwealth-COFINA dispute, <u>none</u> of the SUT Revenues that are the subject of that dispute would be available for the Commonwealth's use towards payment for essential services or for distribution to its creditors and, on the other, the purported dedication of SUT revenues to COFINA to support bond repayments could be invalidated if the Commonwealth were to prevail, the Legislature agreed to enact a law that would aid the effectuation of the settlement of that dispute. The Legislature's decision is a reasonable one under the surrounding circumstances. It is also necessary in light of the ongoing fiscal emergency in Puerto Rico. The Court therefore concludes that the Contracts Clause does not prohibit confirmation of the Plan, and Mr. Hein's objections invoking the Contracts Clause are therefore overruled.

122.    The Plan contains no provisions that would violate the Takings Clause of the Constitution of the United States. Several bondholders have argued that the Plan and Settlement Agreement take bondholder property—specifically, the lien on revenues dedicated to COFINA that secures repayment of the bonds issued by COFINA—without just compensation. The proper analytical framework for addressing the objectors' Takings Clause challenge is set forth in <u>Penn Central Transportation v. City of New York,</u> 438 U.S. 104, 124 (1978). <u>See Patriot Portfolio v. Weinstein (In re Weinstein),</u> 164 F.3d 677, 685 (1st Cir. 1999) (applying <u>Penn Central</u> analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code). Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action."    <u>Id.</u> Considering the first factor, the Court notes that the actions challenged by the objecting parties will not result in the total destruction of the value of the liens securing the existing bonds. Pursuant to the terms of the Plan, bondholders will receive substantial value in new secured bonds and, in

I-214

some cases, cash.  Furthermore, based upon the record before it, the Court finds that the resolution

of substantial legal challenges to the structure underlying the existing COFINA bonds provides

significant value to the bondholders.  Second, although the proposed treatment of bondholders'

claims may interfere with certain bondholders' subjective investment expectations, bondholders'

reasonable expectations must take account of the claims and potential claims that have been the

subject of the substantial litigation that the Settlement Agreement and the Plan, which were

negotiated with the assistance of the Mediation Team, propose to resolve.  Cf. New Haven

Inclusion Cases, 399 U.S. 392, 492 (1970) (noting that security holders "invested their capital in a

public utility that does owe an obligation to the public [and thereby] assumed the risk that in any

depression or any reorganization the interests of the public would be considered as well as theirs")

(quotation marks omitted)).  Third, the character of the governmental action strongly supports the

Court's conclusion that the Plan and Settlement Agreement do not result in an unconstitutional

taking.  The challenged proposals are not physical invasions of property by the government.

Rather, the restructuring of the relationships between the Commonwealth and COFINA, and

between COFINA and its bondholders, using the powers established by Congress in PROMESA

is a quintessential example of a "public program adjusting the benefits and burdens of economic

life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.  Furthermore, even

if the reduction of dedicated revenues and restructuring of bond terms under the Plan or Settlement

Agreement incorporated therein result in a Fifth Amendment "taking" of bondholder property, the

Court is satisfied that the value to be received by bondholders as a result of the settlement of the

Commonwealth-COFINA dispute and under the Plan constitutes just compensation.  The secured

creditors' Takings Clause claim is properly assessed based upon the value of the lien, not the face

amount of debt.  See In re Aegean Fare, Inc., 33 B.R. 745, 747-48 (Bankr. D. Mass. 1983) (citing

Wright v. Union Central Life Insurance Co., 311 U.S. 273, 278 (1940)).  Here, creditors will

receive consideration that is discounted by a settlement that recognizes significant litigation risks,

the allocation of distributions was determined via a long mediation and settlement process among

sophisticated parties, and creditors have ratified the result by voting in favor of the Plan.   These

characteristics of the settlement and the Plan and the circumstances under which they were

developed provide sufficient proof that the consideration to be received by bondholders under the

Plan constitutes just compensation within the meaning of the Takings Clause.   The objections to

the Plan and Settlement Agreement based upon the Takings Clause of the United States

Constitution are therefore overruled.

123.    The Plan complies with PROMESA section 314(b)(3).

**D. PROMESA § 314(b)(4)**: *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date*

124.    Section 3.1 of the Plan provides that, "[o]n the later to occur of (i) the Effective

Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim,

Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Claim, in Cash,

the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed

Administrative Expense Claim in accordance with such other terms no more favorable to the

claimant than as may be agreed upon by and between the holder thereof and Reorganized

COFINA; provided, however, that Allowed Administrative Expense Claims representing

indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by

Reorganized COFINA in accordance with the terms and subject to the conditions of any agreement

governing, investment evidencing, or other document relating to such transactions; and, provided,

further, that, if any such ordinary course expense is not billed, or a written request for payment is

not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be

barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan." (Exhibit DX-G.)

125. Consummation Costs are being paid in Cash on the Effective Date of the Plan. All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to the terms of Section 3.1 of the Plan.[15]

126. The Plan complies with PROMESA section 314(b)(4).

**E. PROMESA § 314(b)(5):** *The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals*

127. As discussed above, the Commonwealth has validly enacted the New Bond Legislation, which New Bond Legislation is valid, and, subject to the occurrence of the Effective Date of the Plan, is binding and enforceable, and there are no approvals left to obtain to effectuate the Plan. By approving and certifying the COFINA Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA section 207. (Jaresko Decl. ¶ 66.)

128. The Plan satisfies PROMESA section 314(b)(5).

**F. PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors*

129. The COFINA Fiscal Plan, certified on October 18, 2018, demonstrates that the Plan is feasible, because the COFINA Fiscal Plan provides for the incurrence of obligations contemplated by the Plan and shows that such obligations can be repaid. COFINA's Fiscal Plan projections (as set forth in greater detail in Section XVIII of the Disclosure Statement, entitled

---

[15] At least one opponent argues that the Consummation Costs are "intended as a payoff to buy the votes of institutional bondholders and insurers." Mangiaracina Obj. at 3. However, no evidence of any such "payoff" or other illicit conduct has been presented to the Court. To the contrary, as the Court has found above, there is ample evidence that the consummation cost payments have a sound basis in law and in fact. (See supra ¶¶ 70-74.) The objections to the Consummation Costs payments are therefore overruled.

"Financial Information and Projections" and Exhibit E thereto) demonstrate, as a result of COFINA's ownership of the COFINA Portion, COFINA's ability to fulfill its obligations under the Plan. COFINA's financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that COFINA will be able to satisfy its obligations under the Plan. (See Brownstein Decl. ¶¶ 29-34.)

130.    COFINA has no power to raise taxes. The alternative to the Plan is protracted litigation in the Adversary Proceeding, which could lead to an all-or-nothing recovery for either the Commonwealth or COFINA. For any individual class of COFINA creditors to do better than it will under the Plan, COFINA would have to prevail in the Adversary Proceeding, which result is at best uncertain. Even if one side to the litigation were to prevail in this Court, litigation costs would skyrocket, and it could be months, if not years, before a court issues a final, unappealable order resolving who is entitled to the SUT Revenues. (Jaresko Decl. ¶ 67.)

131.    Moreover, the Plan provides additional protections for COFINA and its creditors, such as a federal court order "quieting title" to COFINA's ownership of a majority of the Pledged Sales Tax Base Amount—and on a first-dollars basis—against all challenges, removing the cloud over title to COFINA's property interest that has existed since COFINA's creation in 2007, as well as enhanced non-impairment and substitution covenants. If the Plan were to be rejected, and the Commonwealth-COFINA Dispute were litigated to conclusion, even if COFINA were successful, it would not have these strong protections. Nor would successful litigation regarding COFINA's ownership rights necessarily have prevented the Commonwealth from attempting to enact other measures that could have reduced the sales tax transferred to COFINA, or even from outright repealing the sales tax, spurring rounds of litigation as to the appropriate remedies, if any. The Plan, and the Confirmation Order, will ensure COFINA's revitalization and will prevent any challenges to COFINA's ownership of, and any attempts by other parties to divert, COFINA's

portion of the Pledged Sales Tax Base Amount. Such outcome is unquestionably in the best interest of COFINA's creditors.

132.    Independent of the validity of the transfer of the SUT to COFINA, the holders of "First Subordinate" Existing Securities face the risk that an event of default will accelerate the bonds such that "First Subordinate" Existing Securities are not paid until holders of "Senior" Existing Securities are paid in full. The Existing Bond Resolution provides that, upon an event of default, the Trustee may, or upon the written request of owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and accrued interest on the "Senior" Existing Securities to be immediately due and payable. Upon such declaration, the principal of, and accrued interest on, the "Senior" Existing Securities becomes immediately due and payable. In addition, upon a declaration of an event of default, holders of "First Subordinate" (i.e., junior) Existing Securities may not declare a default, or cause the Trustee to take any remedial action thereunder until such time that the "Senior" Existing Securities are fully retired or are defeased in accordance with the provision of the Existing Bond Resolution. The senior bondholders have taken the view that, upon an event of default, the Existing Bond Resolution provides for the priority of payments in favor of the "Senior Existing Securities" if the funds held by the Trustee are insufficient for the payment of interest and principal or Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due. (Jaresko Decl. ¶ 68.)

133.    If the Plan were not confirmed, the parties would lose the benefit of the Court-sanctioned agreement resolving the Commonwealth-COFINA Dispute. Litigation would continue in an all-or-nothing fashion, leaving some creditors potentially much worse off and some creditors potentially better off. The Plan's provision for a distribution of approximately 93% of the aggregate value of claims held by the holders of "Senior" Existing Securities (see Plan § 1.168) and approximately 56% of the aggregate value of claims held by the "First Subordinate" Existing

Securities (see Plan § 1.114), in light of the risks attendant to the Commonwealth-COFINA

Dispute and the Interpleader Action, among others, is likely far superior to what both groups of

bondholders might receive outside of the Plan. The Plan avoids the pitfalls of delay, litigation

costs, and uncertainty by implementing the consensual agreement reached by the major

stakeholders in the Title III Case in a manner consistent with the Procedures Order. The robust

acceptance of the Plan by the various classes indicates such creditors believe the Plan to be in their

best interests. (Jaresko Decl. ¶ 69.)

134. The Oversight Board retained Citi to serve as investment banker and financial

advisor to the Oversight Board in connection with the Oversight Board's statutory duties under

PROMESA and its task of working with the Commonwealth to create the necessary foundation

for economic growth and to restore opportunity to the people of the Commonwealth. Citi

developed the Securities Terms to address the concerns of both COFINA and its bondholders and

were designed with two focal points in mind: (i) to ensure broad market access to Reorganized

COFINA on a go-forward basis; and (ii) to provide all existing COFINA creditors with as

increased a potential recovery as possible by ensuring as high a market value as possible for the

bonds issued pursuant to the Plan. In doing so, Citi had been informed by creditor representatives

that they were particularly concerned about a possible double "haircut" (i.e., first, a reduction to

the amount of their original claims through the Plan, and second, a subsequent reduction through

less-valuable replacement bonds they receive in exchange for their original bonds). (Brownstein

Decl. ¶¶ 12-13.)

135. The Securities Terms also provide that the COFINA Bonds to be issued pursuant

to the Plan will bear fixed interest rates, including Current Interest Bonds ("CIBs"), which pay

cash interest, and Capital Appreciation Bonds ("CABs"), which accrete non-cash interest until

maturity. All COFINA Bonds accrue interest beginning as of August 1, 2018. The CIBs mature

in 2034, 2040, 2053, and 2058 and have a par value in the aggregate of approximately $9 billion.

The CABs mature in 2024, 2027, 2029, 2031, 2033, 2046, and 2051 and have an initial value of

approximately $3 billion.  (Plan § 16.1(a)-(b); Brownstein Decl. ¶ 14.)

      136.    To provide protection to holders of the COFINA Bonds, the Securities Terms

provide that no parity debt may be issued by Reorganized COFINA other than refinancing bonds

("COFINA Parity Bonds") that produce debt savings in each year for Reorganized COFINA and

no maturity extensions.  (Brownstein Decl. ¶ 15.)  The Securities Terms also provide that

Reorganized COFINA may issue subordinate lien bonds for the benefit of the Commonwealth only

if the following requirements are satisfied (the "Additional Bonds Test"):  (i) the projected 5.5%

SUT equals or exceeds one and one-half times (1.5x), in any succeeding Fiscal Year, the annual

aggregate debt service due on the COFINA Bonds, the COFINA Parity Bonds and subordinated

lien bonds to remain outstanding after the issuance of such subordinated lien bonds (including the

subordinated lien bonds to be issued); (ii) the preceding Fiscal Year's collections from the 5.5%

SUT is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual

aggregate debt service due in any succeeding Fiscal Year on all COFINA Bonds, COFINA Parity

and subordinated lien bonds to remain outstanding after the issuance of such subordinated lien

bonds (including the subordinated lien bonds to be issued); and (iii) the subordinated lien bonds

have a maturity not later than Fiscal Year 2058; provided, however, that, subsequent to June 30,

2028, and subject to compliance with the foregoing Additional Bonds Test, final maturity beyond

Fiscal Year 2058 shall be permissible for future subordinated lien bonds.  (Brownstein Decl. ¶ 15;

Second Amended Plan Supplement at Exhibit A, § 2.04(b).)  In addition, the Securities Terms

provide that the repayment of such subordinated lien bonds shall be secured by a second lien that

is subordinated in all respects, including, without limitation, in respect of payment, funding and

remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of subordinated lien

bonds being secured by a subordinated second or more junior lien on the 5.5% SUT Taxes;
provided, however, that repayment of the Subordinated Lien Bonds shall not be payable from the
COFINA Revenues. To support the credit rating of the COFINA Bonds, the Securities Terms also
provide for (a) a non-impairment covenant of the Commonwealth, which provides, among other
things, that (i) the pledged SUT percentage shall not be reduced to a rate less than 5.5% unless, in
connection with such reduction, Reorganized COFINA shall have received a Rating Confirmation
from each of at least two of the rating services then providing a credit rating on the outstanding
COFINA Bonds and COFINA Parity Bonds, that the rating of such rating service on the COFINA
Bonds and COFINA Parity Bonds (without regard to bond insurance or other credit enhancement)
will not be downgraded and will be at least A2/A category or higher following such reduction;
provided, however, that, notwithstanding the foregoing, if the pledged SUT percentage is reduced
below 3%, then, in connection with such reduction, the Commonwealth shall comply with the
certain substitution requirements. Further, the Securities Terms provide that repayment of the
COFINA Bonds and COFINA Parity Bonds is to be secured by a statutory first lien on Reorganized
COFINA's interest in the 5.5% pledged SUT. (Brownstein Decl. ¶ 16.) The Securities Terms are
set forth in the Plan and Amended Plan Supplement and may be amended, restated, supplemented,
or otherwise modified in accordance with the terms and provisions hereof and thereof, as
applicable.

137. Each series of Existing Securities was issued pursuant to a supplemental resolution
providing for its issuance and the terms of such series, in each case adopted by the Board of
Directors of COFINA. The Resolution together with the supplemental resolutions issued pursuant
thereto is referred to as the "Existing Bond Resolution." The various supplemental resolutions
authorized the issuance of both "Subordinate Bonds" and "Senior Bonds" as defined in the
Resolution. (Brownstein Decl. ¶ 21.)

138.    As of the Petition Date, COFINA had outstanding $17.64 billion aggregate principal and unpaid interest amount of bonds issued under the Existing Bond Resolution, including approximately $7.76 billion of claims arising from "Senior" Existing Securities and approximately $9.88 billion of claims arising from "First Subordinate" Existing Securities. Approximately $1.33 billion of the "Senior" Existing Securities are insured by Ambac and $1.10 billion are insured by National.  Approximately $0.25 billion of the "First Subordinate" Existing Securities are insured by Assured.  (Brownstein Decl. ¶ 21.)

139.    The Existing Bond Resolution in respect of "Senior" Existing Securities provides for the issuance of additional bonds that are "subordinate to payment of the Senior Bonds and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds."  Many supplemental resolutions issued subsequent to the Resolution indicate that Bonds issued thereunder are "First Subordinate" Existing Securities.  For example, the Seventh Resolution provides that "[a]ll of the Series 2009A Bonds shall constitute "Subordinate Bonds" under the Resolution."  (Brownstein Decl. ¶ 22; DX-XX.)

140.    The "First Subordinate" Existing Securities cannot declare an event of default or control remedies until the "Senior" Existing Securities are satisfied in full.  If an event of default under the Existing Bond Resolution had occurred, the senior bondholders could have had repayment of their bonds accelerated, all to the detriment of the junior bondholders.  Furthermore, senior bondholders could have established an entitlement to the face value of their bonds and a "make-whole" provision before the junior bondholders received any distributions.  (Rodrigue Decl. ¶ 4.)  Independent of the validity of the transfer of certain sales and use taxes to COFINA, senior bondholders have taken the view that such acceleration would have required the senior bondholders to be paid in full before junior bondholders could declare an event of default and exercise remedies.  (Brownstein Decl. ¶ 23; Rodrigue Decl. ¶ 4; Exhibit DX-K.)  However, neither

I-223

the Ambac Insurance Policy nor the National Insurance Policies insures against loss of prepayment premiums, which include "make-whole" provisions.

141. The contractual subordination of the junior COFINA bondholders to the senior COFINA bondholders includes the risk that the amount of SUT available to bondholders is compromised. The original bargained-for agreement between junior and senior COFINA bondholders includes the possibility that, if monies available to COFINA bondholders are reduced, senior bondholders shall be satisfied first. This contractual subordination is not just related to the risk the SUT revenues are less than projected, but covers all possible reasons for a reduction in revenues. One risk was that an event of default occurred, and the acceleration provision in the Bond Resolution was triggered, such that only senior COFINA bondholders would be entitled to receive cash flows thereunder. In the senior bondholders' view, the senior-subordinate relationship and payment waterfall entitle seniors to payment in full before subordinate bondholders receive any recovery. Enforcement of strict priority following an event of default could result in senior bondholders receiving a par recovery plus post-petition interest and other entitlements under the Bond Resolution. In such a situation, subordinate bondholders would not receive any recovery for many years and the present value of any such recovery would be substantially less than the recovery subordinate bondholders will receive under the Plan. (Brownstein Decl. ¶ 24.)

142. A settlement regarding the validity of the COFINA structure and the ability of the SUT to flow into COFINA was also a potential risk to COFINA bondholders, even when the bondholders first purchased COFINA bonds. The Settlement relieves junior bondholders of these risks. (Brownstein Decl. ¶ 25.)

143. The senior COFINA bondholders are receiving less than par on their bonds (approximately 93% recovery is projected for Class 1), while the junior bondholders are receiving

a significant recovery. Had an event of default been recognized, or the SUT revenues been insufficient to satisfy all bondholders outside of this settlement, junior bondholders would bear the risk of not receiving any monies prior to senior bondholders being paid in full. (Brownstein Decl. ¶ 25.)

144. The Settlement and securities issued pursuant to the Plan appropriately do not reflect the varying interest rates and maturities on the Existing Securities. As provided in Bankruptcy Code section 502, made applicable to COFINA's Title III Case pursuant to PROMESA section 301, for the purposes of distribution pursuant to the Plan, claims arising from the Existing Securities are valued, based solely on the outstanding principal amount and accrued interest and/or accreted capital appreciation, as of the day before the commencement of COFINA's Title III Case. (Exhibit DX-G; Brownstein Decl. ¶ 26.) Any objections premised on the failure of the stated return percentage computations under the Plan to take into account future interest and maturity differentials are therefore overruled.

145. It is uncertain whether all of the COFINA Bonds issued to holders of Existing Securities under the Plan will be tax-exempt. The Plan recognizes that many mainland investors were concerned that their recovery would be artificially depressed if they received taxable bonds on account of their Existing Securities. Puerto Rico Investors and Puerto Rico Institutions, however, generally are not subject to federal taxation. Accordingly, to address this concern, the Plan contains provisions that permit Puerto Rico Investors and Puerto Rico Institutions to elect to receive taxable bonds as well as a supplemental 2% cash recovery rather than a mix of taxable and tax-exempt bonds. Recoveries for mainland investors are enhanced by this election by maximizing the amount of tax-exempt securities available for such investors. (Brownstein Decl. ¶ 27.)

146. Recoveries for all bondholders are enhanced if "on island" bondholders, who generally are not subject to U.S. federal income taxation, elect to be treated in Classes 4 or 7 and,

as a result receive taxable bonds. When "on island" bondholders elect taxable treatment, the ability of mainland bondholders to receive a higher proportion, and potentially even all, of their distribution in tax-exempt COFINA bonds is enhanced, thereby enhancing recoveries for mainland bondholders. Providing the taxable election only to on-island bondholders ensures that both local and mainland investors receive reasonably equivalent treatment in respect of their claims. (Brownstein Decl. ¶ 28.)

147. For all of these reasons, the Court finds that the Oversight Board has met its burden of demonstrating that the plan is in the best interests of creditors within the meaning of section 314(b)(6) of PROMESA. As in Chapter 9, PROMESA's "best interests" test differs substantially from the Chapter 11 "best interests" requirement. In Chapter 11, the test requires a court to determine whether an individual creditor would receive more if the Chapter 11 debtor were to liquidate its assets. Cf. In re City of Detroit, Mich., 524 B.R. 147, 212-13 (Bankr. E.D. Mich. 2014) (comparing the "best interests" tests in Chapter 9 and Chapter 11 of the Bankruptcy Code). In contrast, the "best interests" test under PROMESA requires the Court to consider "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan." 48 U.S.C.A. § 2174(b)(6) (West 2017).

148. The Oversight Board has demonstrated that, absent approval of the Plan and the Settlement Agreement, COFINA would be embroiled in ongoing litigation that would likely last months or even years. Beyond the costs associated with that litigation, COFINA's bondholders would also bear a substantial risk of an unfavorable outcome that would invalidate the Commonwealth's transfer of SUT revenues to COFINA. Furthermore, COFINA's subordinate bondholders would bear a further risk that, if an event of default occurred, their claims against COFINA would not be addressed until after satisfaction of the claims of senior bondholders.

I-226

Under these circumstances, the proposed plan of adjustment satisfies PROMESA's best interest of creditors test.

REORGANIZED COFINA'S REVENUES ARE SUFFICIENT TO SERVICE ITS DEBT OBLIGATIONS

149.   Citi reviewed the COFINA Fiscal Plan for accuracy and conformity to the Agreement in Principle. The COFINA Fiscal Plan contemplates that debt service on the COFINA Bonds equals 53.65% of the PSTBA. (Brownstein Decl. ¶ 30; Exhibit DX-SSS.)

150.   Citi helped negotiate the terms of the Plan so that the debt service on the COFINA Bonds is slightly below 53.65% of the PSTBA, virtually identical to the amount contemplated by the COFINA Fiscal Plan. (Brownstein Decl. ¶ 30.) Critically, the COFINA Revenues comprise the first collections of the 5.50% SUT in each Fiscal Year. Thus, the debt service on the COFINA Bonds is backed by the entire amount of the 5.50% SUT because a shortfall will only exist in the event that the entire amount of the 5.50% SUT generated in a Fiscal Year is less than 53.65% of the Pledged Sales Tax Base Amount. Accordingly, the debt service on the COFINA Bonds is consistent with the debt sustainability analysis contained in the COFINA Fiscal Plan.

151.   Citi's analysis of the COFINA Fiscal Plan showed that sound assumptions—that stimulus from disaster funds, structural and fiscal reforms to the Puerto Rico economy, and improvements in tax collection methods will maintain a robust amount of personal consumption in the Commonwealth—justify the COFINA Fiscal Plan's SUT projections. (Brownstein Decl. ¶ 31.)

152.   Citi's analysis further showed that, because the SUT is a tax of general application covering a broad range of goods and services with few exceptions, more spending and buying in the Commonwealth generates greater SUT revenues. Government and private disaster funding will stimulate spending and buying, and in turn, bolster SUT revenues. Altogether, over $82 billion in disaster relief funding is projected from 2018 to 2033. Among other things, this funding

will be distributed directly to individuals and families affected by Hurricane Maria and will support

reconstruction on the island. Such funds are reasonably projected to stimulate spending in the

Commonwealth and maintain robust SUT revenue projections. Government reforms including

labor, energy and corporate reforms are projected, to increase Puerto Rico's economic output by

0.95% by FY 2023. It is reasonable to assume that this economic growth will translate to growth

in SUT revenues and that better tax collection methods and increased compliance efforts will yield

a 5% increase in total SUT collected by 2021. (Brownstein Decl. ¶ 32.)

153. In FY 2019, the 5.5% SUT, from which COFINA collects "first dollars" pursuant

to Section 16.3 of the Plan, is projected to be approximately $1.4 billion. The SUT taxable base

from which Reorganized COFINA collects its revenue in "first dollars" should more than amply

cover the debt service on COFINA Bonds in FY 2019 of $420 million. COFINA has a significant

debt service coverage ratio of 3.33x (*i.e.*, $1.4 billion / $420 million) in FY 2019. While the debt

service coverage ratio is projected to decrease as the PSTBA increases by 4% each year, the 40-

year average coverage ratio is still a robust 2.46x. Further, the projected PSTBA reaches a plateau

in FY 2041 and never increases after that point, so any subsequent increase in the 5.5% SUT after

FY 2041 will necessarily improve the debt service coverage ratio. In fact, the 5.5% SUT could

remain exactly the same until the last stated maturity date of any of the COFINA Bonds in FY

2058, and Reorganized COFINA would have no issue servicing the debt obligations on the

COFINA Bonds. (Brownstein Decl. ¶ 33.)

     154.    The feasibility of the Plan is plainly established.[16]

## G. PROMESA § 314(b)(7): Fiscal Plan Compliance

     155.    On August 22, 2018, the Oversight Board requested a standalone fiscal plan for

COFINA for Fiscal Years 2019 to 2023. On August 27, 2018, COFINA submitted its fiscal plan

to the Oversight Board. On August 30, 2018, the Oversight Board delivered to COFINA a notice

of violation pursuant to section PROMESA 201(c)(3)(B) requiring certain changes and/or

explanations in a revised COFINA fiscal plan. On September 7, 2018, COFINA submitted a

revised fiscal plan to the Oversight Board. On October 18, 2018, the Oversight Board voted to

certify the COFINA Fiscal Plan, as amended.

     156.    The Plan is consistent in all respects with the COFINA Fiscal Plan, as amended.

     157.    The Plan complies with PROMESA section 314(b)(7).

### THE RELEASES, EXCULPATION, AND INJUNCTIONS PURSUANT TO THE PLAN

     158.    The Commonwealth-COFINA Dispute presented the potential for extended,

complex, expensive, and value-destructive litigation among competing interests and entities. A

fundamental objective of the Debtor and the Oversight Board throughout COFINA's Title III Case

has been to structure a transaction to fairly divide the SUT while avoiding the winner-take-all

nature of litigation related to the validity of the COFINA structure and related claims. The prompt,

---

[16]    The Court precluded the tender of an economist's declaration concerning future
Commonwealth finances because its proponent, PROSOL-UTIER, lacks standing as a non-
creditor of COFINA. (Docket Entry No. 4848 in Case No. 17-3283, January 16, 2019
Hearing Transcript, 130:8-132:11.) PROSOL-UTIER also argued that the Plan's
proponents had a burden to tender expert economic evidence. The Court finds the
declaration of Brownstein, an experienced municipal finance professional who participated
in the formulation of the COFINA Fiscal Plan, sufficient to carry the Plan proponents'
burden as to feasibility.

efficient conclusion of COFINA's Title III Case is premised on the proposed comprehensive resolution and settlement of this dispute.  (Jaresko Decl. ¶ 73.)

159.    None of these issues has been fully litigated in these cases.  However, cross-motions for summary judgment had been filed on the underlying constitutional questions, and significant resources had already been expended on the litigation.  In an effort to avoid disputes that could jeopardize a consensual resolution creating the highest value for all stakeholders, the Agents and then the PSA Creditors engaged in good faith negotiations over a period of many months, as discussed above.  The robust, arm's-length negotiations were successful and yielded substantial consensus and support for a consensual plan, as evidenced by the Agreement in Principle, culminating in the Settlement Agreement and the Plan that has garnered substantial creditor support from all impaired voting classes.  (Jaresko Decl. ¶ 74.)

160.    In order to incentivize the PSA Creditors to grant the concessions outlined above, and in consideration of the substantial benefits provided by the Released Parties, the Debtor agreed to prosecute and pursue the releases, exculpation, and injunction provisions set forth in the Plan. Each aspect of the Settlement is interdependent and relied upon by the Agents and, especially, the PSA Creditors, who made material concessions as to their respective positions to enable the expeditious confirmation of the Plan.  Such settlements take into account the legal and factual risks to the allowance of the claims.  Modifications to any aspect of the Settlement or the failure to approve the Settlement undoubtedly may result in events of termination under the A&R Plan Support Agreement, jeopardize settlement of the Commonwealth-COFINA Dispute, and set back the administration of COFINA's Title III Case for an extended period as holders of GO Debt and COFINA's Existing Securities get bogged down in the maze of litigation for prosecution of their claims.  (Jaresko Decl. ¶ 75.)

## A. Debtor Releases

161.    Pursuant to Section 30.5 of the Plan, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons proposed to release the Released Parties from Claims or Causes of Action they may have against such Released Parties. The Debtor's Release constitutes a sound exercise of the Debtor's judgment and meets the applicable legal standard:  the Debtor's Release is fair, reasonable, and in the best interests of the Debtor.   During the course of negotiations regarding the Plan and predecessor agreements, it was clear that the Debtor's Release would be a necessary condition to consummation of the Settlement embodied in the Plan.  In exchange for such releases, the Debtor secured the substantial concessions provided by the Settlement and the Plan.   Similarly, the Released Parties provided integral support throughout COFINA's Title III Case, and incurred significant costs in doing so.  (Jaresko Decl. ¶ 76.)

162.    Furthermore, with the exclusion of the Commonwealth-COFINA Dispute, which is being compromised pursuant to the Settlement and incorporated into the Plan, and acts relating to the Ambac Action and Whitebox Actions, which are being preserved pursuant to the Plan, see Section 30.2(c), the Debtor is not aware of any claims that could be asserted against the Released Parties and no creditor has informed the Debtor that it believes such an action should be brought, which the Debtor believes would be meritorious.  In addition, without the assurance of protection from liability, the Released Parties involved in the Plan process may not have participated in the negotiations that led to the development of the Settlement and Plan.  Had the Debtor's Release not been provided, the Debtor's chances of resolving the Commonwealth-COFINA Dispute, and proposing the Plan that was ultimately accepted by every voting Class, would have been diminished.  (Jaresko Decl. ¶ 77.)

## B. Consensual Releases

163. Section 30.2 of the Plan provides for the Consensual Releases of the Released Parties by the holders of Claims. The consensual releases seek only to release parties that made a significant contribution to the Plan:

  a. COFINA and Reorganized COFINA, from all Claims or Causes of Action, and from all Entities, see Plan § 30.2(a)–(b);

  b. the Government Releasees, from all Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, who are being released by each of the PSA Creditors and their respective Related Persons, see Plan § 30.2(c);

  c. BNYM and (a) each of its Related Persons, from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution by each of the PSA Creditors, see Plan § 30.2(c), excluding any and all Claims and Causes of Action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively, and (b) each holder and beneficial holder of Existing Securities and their transferees, successors or assigns, from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest, excluding acts of gross negligence, intentional fraud, or willful misconduct, of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions, see Plan § 30.2(d);

  d. the Commonwealth Agent Releasees, from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order, see Plan § 30.2(e); and

  e. the Commonwealth, from all Claims and Causes of Action held by any Creditor, solely in such capacity. See Plan § 30.2(f).

(Exhibit DX-G.)

164. The consensual releases are necessary and essential to the Plan. As mentioned above, the releases have been negotiated with COFINA's key creditor constituencies as part of the formulation of the Plan. Thus, it is clear that a substantial number of creditors have expressly

consented to the releases.  The two third-party releases included in the Plan—in favor of the Commonwealth and BNYM---can likewise be approved.  The Commonwealth has committed substantial assets to the reorganization, by funding the expenses of the Commonwealth Agent (and AAFAF) in negotiating the Plan, and in agreeing to the Settlement.  See In re Master Mortgage Investment Fund, Inc., 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994) (enumerating various factors to be considered in approving third-party releases, including whether the non-debtor has contributed substantial assets to the reorganization).  Without the release, the Commonwealth would not have agreed to the Settlement, which laid the groundwork for the formulation of this Plan.  (Jaresko Decl. ¶ 79.)

165.  Further, it is imperative to the Plan that BNYM be released.  Without a release, BNYM would attempt to withhold distributions to bondholders necessary to effectuate the Plan.  Additionally, the release is narrowly tailored so that it exempts acts of gross negligence, intentional fraud, or willful misconduct, solely in the context of the Ambac Action and Whitebox Actions.  (Jaresko Decl. ¶ 80.)  For these reasons, the Court finds that the third-party releases are reasonable, necessary and appropriate to implementation of the Plan and, therefore, the third-party releases are hereby approved.

### C. Exculpation

166.  Section 30.7 of the Plan contains a release and exculpation for certain parties for claims arising out of or relating to, among other things, any act taken or omitted to be taken consistent with the Plan in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan (the "Exculpation Provision"). (Exhibit DX-G.)

167.  Such parties greatly contributed to the Debtor's reorganization efforts and enabled the successful prosecution of the Plan in exchange, in part, for the Exculpation Provision.  Failing

to approve this provision would expose the parties to litigation after months of good faith negotiations. (Jaresko Decl. ¶ 82.)

### D. Injunction

168.    The injunction set forth in Sections 30.3, 30.6, and 30.11 of the Plan provides for an injunction (the "Injunction") against all Entities from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, both prior to and after the Effective Date. The Injunction is necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose. (Jaresko Decl. ¶ 83; Exhibit DX-G.)

169.    The releases, exculpation provisions and injunctions pursuant to the Plan are integral and critical parts of the Plan and the compromises and settlements implemented pursuant to the Plan. The approval of such releases is a condition to the occurrence of the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan. Accordingly, such provisions are justified and warranted based upon the circumstances of the Title III Case and the consideration being provided by all parties in connection with the Plan.

### VALIDITY OF COFINA BONDS

170.    On November 15, 2018, in furtherance of the Settlement, the Commonwealth validly enacted the New Bond Legislation, amending Act 91, which originally created COFINA. The New Bond Legislation is valid, and, subject to the occurrence of the Effective Date of the

I-234

Plan, is binding and enforceable.  The effectiveness of such legislation is subject only to the occurrence of the Effective Date.

171.    Confirmation of the Plan demonstrates that Puerto Rico is taking the steps necessary to enable its return to the capital markets.  The restructuring of the COFINA debt under Title III of PROMESA is expected to act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy and reducing costly litigation.

172.    The Plan demonstrates Puerto Rico's continued good faith commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital markets and achieve economic certainty and debt sustainability for Puerto Rico.  For their part, in exchange for the material concessions and releases provided through the Plan, COFINA's bondholders will benefit from the elimination of the previous uncertainty as to whether the property transferred to COFINA to secure their repayment nevertheless remained "available resources" or "available revenues" of the central government of Puerto Rico under the Puerto Rico Constitution.  The issues that previously cast a cloud on the structure are being resolved through the Plan, rather than through "all or nothing" litigation.

173.    The Plan will quiet title to the Pledged Sales Tax Base Amount and resolve all disputes of all parties relating thereto.  Moreover, the Court shall retain jurisdiction over all matters related to the COFINA Bonds to ensure compliance with the Plan.

174.    Confirmation of the Plan constitutes a judicial determination and, pursuant to section 4 of PROMESA and sections 944, 1123, and 1125 of the Bankruptcy Code as incorporated by section 301 of PROMESA, the terms of these Findings of Fact and Conclusions of Law shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith and be full, final, complete, conclusive, and binding and shall not be subject

to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

175.    COFINA is a separate covered territorial instrumentality that is legally distinct from the Commonwealth, with its own Title III case, its own certified fiscal plan, and its own plan of adjustment. See 13 L.P.R.A. § 11a(a) ("A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the Corporacion del Fondo de Interes Apremiante de Puerto Rico ('COFINA'), Spanish acronym), whose name in English shall be Puerto Rico Sales Tax Financing Corporation."); New Bond Legislation art. 2.1 (providing that Reorganized COFINA "shall be recognized for all purposes as an independent and separate legal entity from the Government of Puerto Rico and any other Government Entity."). The Court has previously held, in connection with the Commonwealth-COFINA Dispute, that the nature of each debtor's interest in the Pledged Sales Taxes, for purposes of PROMESA, is a mixed question of federal and Commonwealth law.[17]  The Plan, however, provides for an agreed upon allocation of the Pledged Sales Taxes premised upon this Court's approval of the Settlement and confirmation of the Plan, and, upon such approval, the COFINA Revenues shall be the sole and exclusive property of COFINA, and shall not be property of the Commonwealth or available to the Commonwealth.  The Settlement and the allocation of the Pledged Sales Taxes are necessary for the implementation of the Plan, and, pursuant to Bankruptcy Code section 1123(a)(5), made

---

[17]    Adversary Proceeding, Docket Entry No. 483, *Decision and Order*, dated May 24, 2018, at 5-6, Exhibit DX-TT ("the Court must decide what the relevant property rights are within the context of these Title III proceedings, under PROMESA and federal bankruptcy law provisions that Congress has incorporated into PROMESA. . . .  [T]he Commonwealth-COFINA Dispute presents a mixed question of federal and Puerto Rico law . . . ."); see also Abboud v. Ground Round, Inc. (In re Ground Round, Inc.), 482 F.3d 15, 17 (1st Cir. 2007) ("The label . . . that state law affixes to a particular interest in certain contexts is not always dispositive." (citing In re Nejberger, 934 F.2d 1300, 1302 (3d Cir. 1991)).

applicable to COFINA's Title III Case pursuant to PROMESA section 301(a), are self-executing and preemptive notwithstanding otherwise applicable nonbankruptcy law, including otherwise applicable Commonwealth law. See 11 U.S.C.A. § 1123(a)(5) (West 2016) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as (A) retention by the debtor of all or any part of the property of the estate . . . ."); 48 U.S.C.A. § 2161(c)(5) (West 2017) ("The term 'property of the estate', when used in a section of Title 11 made applicable in a case under this subsection by subsection (a), means property of the debtor."); see also Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.), 496 B.R. 644, 664 (B.A.P. 1st Cir. 2013) ("[O]nly those means may preempt state law that are sufficient for the implementation of the plan: they must be sufficient to implement the plan, equal to what is required, but also not more than is required.").  Furthermore, pursuant to the Settlement Order and the Plan, and subject to the terms of the plan, claims of COFINA's creditors are released as against the Commonwealth and the Commonwealth itself shall not be liable for the repayment of the COFINA Bonds, nor will the COFINA Bonds have any recourse to any property of the Commonwealth.  See New Bond Legislation art. 3.1(c).

176.    Pursuant to PROMESA, including section 4 thereof, as well as sections 944[18] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order, the Settlement, the

---

[18]    Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations.  11 U.S.C. § 944(b)(3).  See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . .  [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)).  As set forth in the

Plan, and Act 241, the Court determines that the COFINA Bonds are legal, valid, binding and

enforceable obligations of Reorganized COFINA benefitting from the following protections, each

of which is legal, valid, binding, and enforceable against Reorganized COFINA, the

Commonwealth, and other persons and entities, as applicable, under Puerto Rico and federal law:

a. The Confirmation Order is full, final, complete, conclusive, and binding and

shall not be subject to collateral attack or other challenge in any court or other

forum, except as permitted under applicable law.

b. Subject to the occurrence of and upon the Effective Date, Reorganized

COFINA shall be an independent public corporation and instrumentality of the

Commonwealth, separate from the Commonwealth and any other

instrumentality of the Commonwealth.

c. Subject to the occurrence of and upon the Effective Date, ownership of the

COFINA Revenues shall have been legally and validly transferred to

---

leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy § 944.03[1][b] (16th ed. 2013). See, e.g., *Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernadino, California*, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); *Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit*, dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . ."); *Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama*, dated November 6, 2013, ¶ 37, ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.").

Reorganized COFINA, and such transfer of ownership shall have been an absolute transfer of all legal and equitable right, title, and interest in the COFINA Revenues, free and clear of all liens, claims, encumbrances, and other interests of any party (except for the statutory lien that arises automatically, pursuant to the terms of the New Bond Legislation, to secure the COFINA Bonds);

d. Subject to the occurrence of and upon the Effective Date, the COFINA Revenues shall not constitute, and shall not be deemed to be, "available resources" or "available revenues" of the Commonwealth, as that term is used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution).

e. Subject to a "Quarterly Installment" funding construct, to the extent certain conditions are satisfied, each fiscal year until the COFINA Bonds are paid in full or otherwise satisfied in accordance with their terms, the first funds comprising the COFINA Pledged Taxes shall be transferred to and deposited with Reorganized COFINA until such time that Reorganized COFINA has received an amount equal to the COFINA Revenues for such fiscal year.

f. Reorganized COFINA's sole and exclusive ownership of the COFINA Revenues shall not be affected in any way by the manner of or control over collection, any person who collects or holds the COFINA Revenues shall do so on behalf of Reorganized COFINA, and no person or entity that collects or holds the COFINA Revenues shall have any legal or equitable right, title, or

interest to the COFINA Revenues other than Reorganized COFINA, for the benefit of holders of the COFINA Bonds.

g.  The statutory first lien against the COFINA Pledged Taxes (including any New Collateral substituted for the COFINA Pledged Taxes in accordance with the terms of the Plan and the New Bond Legislation) arising by operation of the New Bond Legislation in favor of holders of COFINA Bonds is legal, valid, binding and enforceable and shall remain in full force and effect and shall be "closed" until, in each case, the COFINA Bonds have been paid or satisfied in full in accordance with their terms.

h.  Pursuant to the New Bond Legislation, the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien as described in Section 16.2 of the Plan, which Lien shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

i.  The statutory lien on the COFINA Pledged Taxes as provided in the New Bond Legislation and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are legal, valid, binding, and enforceable, including, without limitation, covenants not to impair such property, and provide for the conditions regarding substitution of New

Collateral as adequate protection for the property rights conferred under the Plan and the Confirmation Order.

j. At the time of issuance and delivery of the COFINA Bonds, Reorganized COFINA is hereby authorized and directed to have stamped or written on each of the COFINA Bonds a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 5TH DAY OF FEBRUARY, 2019

k. Pursuant to the Settlement Order and the Confirmation Order, the transfer of the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan) pursuant to the Plan is appropriate and binding and specifically enforceable against Reorganized COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the Plan, including, without limitation, because the transfer of the COFINA Portion created in Reorganized COFINA an ownership interest in such property (and any substitution of New Collateral on the terms and conditions provided for in the Plan) and is a valid provision made to pay or secure payment of the COFINA Bonds.

l. The Commonwealth's agreement, on behalf of itself and its governmental entities, not to take any action that would, among other things, (a) impair COFINA's right to receive the COFINA Revenues, (b) limit or alter the rights vested in COFINA in accordance with the Plan to fulfill the terms of the COFINA Bonds, (c) materially adversely impair the collection of the COFINA Pledged Taxes in any fiscal year, or (d) impair the rights and remedies of the

holders of the COFINA Bonds or the statutory lien established pursuant to Article 3.2 of the New Bond Legislation, each as provided in the New Bond Legislation and the New Bond Indenture, serve as adequate protection for the property interests of Reorganized COFINA and the holders of the COFINA Bonds in the COFINA Pledged Taxes under all applicable law and constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized COFINA, and the Commonwealth, as applicable, and are an integral part of the settlements set forth in the Plan.

m. The covenants described in Sections 16.6 and 16.7 of the Plan (including, but not limited to, the rating agency covenant, the tax exemption covenant, the substitution covenant, the non-impairment covenant and the sales tax covenant), to be provided by Reorganized COFINA and the Commonwealth, as the case may be, to the holders of COFINA Bonds, shall constitute adequate protection for the property interests of Reorganized COFINA and the holders of COFINA Bonds in the COFINA Pledged Taxes under all applicable law.

177. The Plan, the Settlement, and the settlement and compromise of claims embodied in the Plan are the result of extensive arms' length negotiations among the Debtor, the Commonwealth Agent, the COFINA Agent, the Settlement Parties, and other significant Creditor constituencies, and, among other things, resolve the Commonwealth-COFINA Dispute. (Jaresko Decl. ¶¶ 15-29.)

178. Any attempt to confirm a Title III plan of adjustment without the compromises and settlements embodied in the Plan would have invited significant confirmation objections by various significant Creditor constituencies. (Jaresko Decl. ¶ 45.) Without addressing the Commonwealth-COFINA Dispute, among other issues settled and compromised pursuant to the

I-242

Plan, it is beyond doubt that such issues were likely to lead to further contested confirmation hearings, significant delays in confirmation of a plan, and erosion of Creditor distributions. Id.

179. The detrimental effects of further delay in confirmation and consummation of a plan of adjustment in the Title III Case cannot be underestimated. As delay in consummation of a plan would be accompanied by a continued depletion of COFINA's resources and increase in total Claims, further delay would have significantly eroded recoveries for COFINA's junior-most Creditors and stakeholders. (Jaresko Decl. ¶¶ 45, 57, 69.) Thus, it is a reasonable exercise of business judgment for the Debtor to conclude that the Plan is more likely to result in an expeditious exit from the Title III Case and prevent further deterioration of Creditors' recoveries than any alternative plan. The Court finds that the compromises and settlements embodied in the Plan are fair, reasonable, in the best interests of COFINA's stakeholders and above the lowest level of the range of reasonableness.[19]

**H. Bankruptcy Rule 3019**: *The Plan Does Not Adversely Change the Treatment of Claims of Creditors.*

180. After the Voting Deadline passed, the Oversight Board filed the "Third Amended Plan," containing minor revisions to address certain concerns raised by certain parties. (Exhibit DX-G.) None of the modifications adversely changes the treatment of the Claims of any creditor. In Article X, the Plan was amended to provide that COFINA will enter a remarketing agreement with Assured with respect to the COFINA Bonds allocable to the holders of Allowed Junior COFINA Bond Claims (Assured), and which will be received by Assured as subrogee of such holders. (Exhibit DX-G.) Assured was already responsible for the 100% cash payment of the Acceleration Price to holders of Allowed Junior COFINA Bond Claims (Assured) on the Effective

---

[19]     See also *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation.* (See Docket Entry No. 5045 in Case No. 17-3283.)

Date, so the holders of Claims in Class 6 are not impacted in any way by this change.  (Jaresko
Decl. ¶ 70.)

181.  The Plan was updated to ensure the releases provided thereunder are consistent with
the agreement reached in the A&R Plan Support Agreement, see Plan § 30.2, as well as other
technical changes to ensure that neither the Ambac Action nor Whitebox Actions interfere with
distributions to bondholders.  Specifically, the Plan has been modified to ensure that BNYM,
Whitebox, and Ambac can continue their litigation among themselves, see Plan § 2.1, but also to
ensure that COFINA or Reorganized COFINA, as the case may be, is not responsible for any of
BNYM's fees or expenses in connection with that litigation after the Effective Date.  (See Plan §
19.13.)

182.  The modifications do not materially or adversely modify the treatment to be
afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptances or
rejections thereto.

183.  Accordingly, the Plan can be confirmed without the filing of a new disclosure
statement and resolicitation with respect to the "Third Amended Plan".

184.  Elections made by holders of Claims pursuant to the Plan were solicited, tabulated,
and implemented fairly, in good faith, and in a manner consistent with the Plan, the Disclosure
Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.
(Pullo Decl. ¶ 9.)

185.  Any beneficial holder of Senior COFINA Bond Claims (Ambac) that chose to
commute the Ambac Insurance Policy pursuant to Article 6 of the Plan shall have no other or
further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust or Ambac
Certificates.  The Plan is a settlement with respect to the Ambac Insurance Policy for those

beneficial holders that elect to commute. The treatment of Senior COFINA Bond Claims (Ambac) under the Plan is not inconsistent with the Ambac Insurance Policy.

186.    Any beneficial holder of Senior COFINA Bond Claims (National) that chose to commute the National Insurance Policies pursuant to Article 7 of the Plan shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust or National Certificates. The Plan is a settlement with respect to the National Insurance Policies for those beneficial holders that elect to commute. The treatment of Senior COFINA Bond Claims (National) under the Plan is not inconsistent with the National Insurance Policies.

187.    Neither the Ambac Insurance Policy nor the National Insurance Policies shall insure the COFINA Bonds.

188.    Plan Supplement.    All materials contained in the Second Amended Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and no other or further notice is or shall be required. Service Affidavits; Amended Plan Supplement; Second Amended Plan Supplement.

189.    Satisfaction of Confirmation Requirements.    Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in PROMESA section 314.

190.    Implementation.    All documents necessary to implement the Plan, including those contained in the Amended Plan Supplement, the Second Amended Plan Supplement, and the Settlement Agreement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law. Without limiting the generality of the foregoing, the Debtor, prior to the Effective Date, and Reorganized COFINA, from and after the Effective Date, are authorized to consummate the

transactions contemplated in the Plan and Amended Plan Supplement(s). The execution, delivery, or performance by the Debtor or Reorganized COFINA, as the case may be, of any documents in connection with the Amended Plan Supplement(s), and compliance by the Debtor or Reorganized COFINA, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

191. <u>Good Faith.</u> The Debtor will be acting in good faith if it proceeds to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby, including, without limitation, the Settlement Agreement, and (ii) take the actions authorized and directed by the Confirmation Order. The COFINA Agent Releasees and the Commonwealth Agent Releasees have acted in good faith in connection with their evaluation of, and their conduct with respect to, the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion, and the Title III Case.

192. <u>Retention of Jurisdiction.</u> This Court may properly and, upon the Effective Date shall, to the extent consistent with Article XXIX of the Plan, retain exclusive jurisdiction over all matters arising out of, and related to, the COFINA Title III Case, including, without limitation, all Causes of Action not otherwise released pursuant to the Plan and the matters set forth in Section 29.1 of the Plan and section 1142(b) of the Bankruptcy Code. (Plan § 29.1.)

193. Without limiting the generality of the foregoing, the Court shall retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and the remedies of the COFINA Bonds under the New Bond Indenture, (ii) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any actions taken by any entity pursuant to or in furtherance of the Plan or this Confirmation Order, including, without limitation, issuance of the COFINA Bonds, and (iv) to enforce prohibitions

against any subsequent collateral attack on the validations contained in the Plan and this

Confirmation Order.

194.    Funds Flow.  In order to implement the Plan, the collection of the COFINA Portion

shall occur in accordance with the Instruction Agreement and the Banking Services Agreement,

which may not be changed except as provided in the Indenture.  The flow of funds set forth in the

Instruction Agreement and the Banking Services Agreement will be generally as follows:

A.      A financial institution, which currently is Banco Popular de Puerto Rico (the
        "Depositary") shall receive all tax revenues generated by the COFINA Pledged
        Taxes and, pursuant to the Sales Tax Financing Corporation Act of 2018 and the
        Plan, shall not have any legal or equitable right, title or interest to the COFINA
        Portion solely by virtue of the fact that it holds the COFINA Pledged Taxes;

B.      All revenues received on account of the COFINA Pledged Taxes shall be directly
        deposited to an account at the Depositary jointly held in the name of the Treasury
        Department and Reorganized COFINA (the "SUT Collection Account"); provided,
        however, that  the commingling of COFINA Pledged Taxes in the SUT Collection
        Account shall be solely for administrative convenience, shall not create any
        equitable interest in favor of the Commonwealth with respect to the COFINA
        Portion, shall not render the COFINA Portion property of the Commonwealth, and
        shall not have any impact on Reorganized COFINA's sole and exclusive ownership
        of the COFINA Portion; provided, further, that such commingling shall not create
        any equitable interest in favor of Reorganized COFINA with respect to revenues
        owned by the Commonwealth, such Commonwealth revenues shall not constitute
        property of Reorganized COFINA and shall not have any impact on the
        Commonwealth's sole and exclusive ownership of revenues other than the
        COFINA Portion;

C.      Promptly after deposit into the SUT Collection Account, on a daily basis with no
        more than a 2 business day delay, the Depositary, based on information provided
        by the Treasury Department's tax collection system, shall transfer the COFINA
        Portion to the Dedicated Sales Tax Fund Account at the Depositary which shall at
        all times be owned exclusively by Reorganized COFINA; provided, that transfer to
        the Dedicated Sales Tax Fund Account shall not be required to the extent the
        COFINA Portion is being transferred from the SUT Collection Account to the
        Revenue Account at The Bank of New York Mellon ("BNYM");

D.      All monies deposited in the Dedicated Sales Tax Fund shall be transferred on a
        daily basis to the Revenue Account at BNYM until 53.65% of the Pledged Sales
        Tax Base Amount (the "Adjusted PSTBA") has been deposited for that Fiscal Year

as calculated by the Trustee;

E.      All trustee accounts at BNYM shall be solely in the name of Reorganized COFINA; and

F.      After the Adjusted PSTBA has been deposited in the Revenue Account at BNYM, all subsequent collections of the COFINA Pledged Taxes shall be transferred to the Commonwealth's Treasury Department.

195.    Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

196.    Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law. The documents contained in the Second Amended Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date), including, without limitation, Reorganized COFINA By-Laws, the COFINA Bonds, the New Bond Indenture, the Instructions Agreement, the Ambac Trust Agreement, the National Trust Agreement, the Standard Terms to National Trust Agreement, the Remarketing Agreement, and the Continuing Disclosure Agreement, provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of COFINA and the Commonwealth, as applicable,

and valid provisions to pay or secure payment of the COFINA Bonds pursuant to section 944(b)(3)

of the Bankruptcy Code, and be enforceable in accordance with their terms.

CONCLUSION

For the foregoing reasons, the Court is concurrently entering its *Amended Order*

*Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax*

*Financing Corporation.*


Dated: February 5, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

I-249

<u>Exhibit A</u>

New Bond Legislation

(P. de la C. 1837)

ASAMBLEA ____ SESIÓN
LEGISLATIVA ORDINARIA
Ley Núm. _____ 241
(Aprobada en __ de __ de 2018)

## LEY

Para renumerar el Artículo 1 como Artículo 1.1 y enmendar el mismo; añadir un nuevo Artículo 1.2; renumerar el Artículo 2 como Artículo 2.1 y enmendar el mismo; añadir nuevos Artículos 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8 y 2.9; derogar el Artículo 3 y sustituirlo por un nuevo Artículo 3.1; añadir nuevos Artículos 3.2 y 3.3; derogar el Artículo 4 y sustituirlo por un nuevo Artículo 4.1, añadir un nuevo Artículo 4.2, derogar el Artículo 5 y sustituirlo por un nuevo Artículo 5.1, añadir un nuevo Artículo 5.2, derogar los Artículos 6, 7, 8, 9, 10 y 11 y dividir en capítulos la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", a los fines de permitir la reestructuración de la deuda de la Corporación del Fondo del Interés Apremiante (COFINA) bajo el Título III de la "Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico", mejor conocida como PROMESA; autorizar a COFINA a emitir bonos como parte de dicha reestructuración y establecer los términos de los mismos; establecer los poderes y facultades de COFINA y la composición y los poderes de su Junta de Directores; establecer la titularidad de COFINA sobre una porción de los recaudos sobre el impuesto sobre ventas y uso y disponer para la transferencia y uso de dichos recaudos; crear un gravamen estatutario en beneficio de los tenedores de bonos de COFINA; establecer ciertos acuerdos a nombre del Gobierno de Puerto Rico para beneficio de los tenedores de bonos de COFINA; disponer que el texto en inglés prevalecerá sobre el texto en español; derogar los Artículos 2 y 4 de la Ley 116-2013, según enmendada; enmendar el Artículo 25-A de la Ley 44 de 21 de junio de 1988, según enmendada; a los fines de permitir la venta de ciertos bonos de COFINA que tiene la Autoridad para el Financiamiento de la Infraestructura con la aprobación de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico; establecer que esta Ley será efectiva en la fecha de la consumación del plan de ajuste de deuda de COFINA bajo el Título III de PROMESA; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

Puerto Rico enfrenta una crisis fiscal y económica sin precedentes. Este proyecto, al igual que el acuerdo de reestructuración del Banco Gubernamental de Fomento, encamina a Puerto Rico en la ruta de la credibilidad. Con este acuerdo, hacemos ajustes significativos en el repago de la deuda gubernamental que otras administraciones tomaron prestado pero que nos toca a nosotros resolver. De esta forma, aseguramos que el Gobierno continúe operando y sirviendo a nuestro pueblo.

Las posiciones asumidas y acciones tomadas por la administración pasada causaron que Puerto Rico perdiera acceso a los mercados de capital y precipitaron el colapso de su sistema de financiamiento público. Estas acciones aceleraron la contracción de la economía de Puerto Rico y precipitaron la migración de puertorriqueños a los Estados Unidos continentales.

La administración pasada desarrolló una relación hostil con los participantes de los mercados financieros, incluyendo cientos de miles de puertorriqueños que invirtieron sus ahorros confiando en el buen nombre y crédito del Gobierno de Puerto Rico y sus corporaciones públicas. Este ambiente hostil hacia Puerto Rico también resonó en el Congreso de los Estados Unidos debido a la falta de transparencia y honestidad, generando consistentemente coberturas noticiosas negativas sobre Puerto Rico a nivel local, nacional e internacional.

Las decisiones equivocadas de la pasada administración llevaron al "Estado Libre Asociado de Puerto Rico" a la quiebra, lo que requirió el uso de sus recursos para atender y proveer servicios esenciales al pueblo de Puerto Rico. Esto, a su vez, actuó como catalítico para una controversia en la cual se cuestionó la estructura bajo la cual la Corporación del Fondo del Interés Apremiante (COFINA) emitió sus bonos. En particular, algunos acreedores radicaron reclamaciones argumentando, entre otras cosas, que (i) las emisiones de bonos de COFINA violaron la Constitución de Puerto Rico, y (ii) la porción de la contribución sobre ventas y uso impuesta por el Gobierno de Puerto Rico a la tasa de 5.5% (el IVU) y transferida a COFINA constituye "recursos disponibles" del Gobierno de Puerto Rico bajo el Artículo VI, Sección 8 de la Constitución de Puerto Rico y debe utilizarse para el pago de la "deuda pública". Algunos acreedores también presentaron argumentos sobre el alcance de la Constitución de Puerto Rico que giran en base a si utiliza el término "recursos disponibles", según la versión en español, o *available revenues, including surplus* según la versión en inglés. El 5 de mayo de 2017, la Junta de Supervisión y Administración Financiera (la Junta de Supervisión) creada bajo la "Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico" (PROMESA, por sus siglas en inglés), como representante de COFINA, comenzó un proceso de reestructuración para COFINA bajo el Título III de PROMESA.

Las partes interesadas del Gobierno de Puerto Rico y COFINA comenzaron un proceso ordenado para resolver las disputas relacionadas a COFINA y la titularidad sobre el IVU (colectivamente, la Disputa ELA-COFINA). A esos fines, el 10 de agosto de 2018, el tribunal del Título III aprobó una estipulación y orden designando al Comité Oficial de Acreedores no Asegurados del Gobierno para actuar como agente la de Junta de Supervisión en su capacidad como representante del Gobierno de Puerto Rico (el Agente del Gobierno) y a Bettina M. Whyte para actuar como agente de la Junta de Supervisión en su capacidad como representante de COFINA (el Agente de COFINA) en un esfuerzo para facilitar la transacción de la Disputa ELA-COFINA.

El 5 de junio de 2018, el Agente del Gobierno y el Agente de COFINA anunciaron que habían llegado a un acuerdo en principio para resolver la Disputa ELA-COFINA (el Acuerdo en Principio). El Acuerdo en Principio estaba fundamentado en dividir la cantidad fija del IVU transferida a COFINA cada año fiscal (la Renta Fija) entre el Gobierno y COFINA comenzando en el año fiscal 2019, donde COFINA recibiría el 53.65% de la cantidad anual de la Renta Fija y el Gobierno recibiría el 46.35% de la cantidad anual de la Renta Fija, además de todos los demás ingresos recaudados por concepto del IVU.

Consistente con la política pública implementada por el Gobernador de Puerto Rico, la Autoridad de Asesoría Financiera y Agencia Fiscal, la Junta de Supervisión y ciertos acreedores y aseguradores de los bonos de COFINA, llegaron a un acuerdo en apoyo a un plan de reestructuración para COFINA (según enmendado y reformulado el 21 de septiembre de 2018, el Acuerdo de Reestructuración), el cual incorpora la división de la Renta Fija conforme al Acuerdo en Principio y provee para la transacción de la Disputa ELA-COFINA conforme a un plan de ajuste de deuda para COFINA bajo el Título III de PROMESA (el Plan de COFINA).

Ahora le corresponde a la Asamblea Legislativa implementar el acuerdo entre las partes enmendando las disposiciones de la ley que creó a COFINA y que autorizó la emisión de sus bonos, la Ley 91-2006. Estas enmiendas liberarán el gravamen que tienen actualmente los tenedores de COFINA sobre $17.5 billones de ingresos del IVU. Estos ingresos ahora estarán disponibles para ser utilizados por el Gobierno de Puerto Rico para atender y brindar servicios a los puertorriqueños. Al implementar el Acuerdo de Reestructuración, esta legislación también pone fin al costoso litigio entre los agentes nombrados por la Junta de Supervisión y a las reclamaciones de los acreedores de COFINA mientras que, a la misma vez, clarifica la intención legislativa original de la Ley 91-2006, según enmendada. Además, como resultado de esta legislación, se ahorrará aproximadamente $437.5 millones por año al Gobierno de Puerto Rico para beneficio del pueblo de Puerto Rico.

Igualmente, esta legislación demuestra que la Asamblea Legislativa está comprometida con tomar los pasos necesarios para permitir el regreso de Puerto Rico a los mercados de capital. Como paso necesario para la implantación del Acuerdo de Reestructuración, esta legislación autorizará la restructuración de la deuda de COFINA bajo el Título III de PROMESA, actuará como catalítico para otras restructuraciones, sentará las bases para que Puerto Rico resurja de la bancarrota, reducirá los costos relacionados a los litigios y aligerará la terminación de la Junta de Supervisión bajo PROMESA.

Esta Ley demuestra el compromiso de política pública continuo de la Asamblea Legislativa para corregir la crisis fiscal de Puerto Rico, honrar las obligaciones financieras

de Puerto Rico, recuperar acceso a los mercados de capital, eliminar la incertidumbre económica y alcanzar un nivel de deuda sostenible para Puerto Rico.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

Sección 1.-Se añade un Capítulo I a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO I - TITULO Y DEFINICIONES"

Sección 2.-Se renumera el Artículo 1 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", como Artículo 1.1, y se enmienda el mismo para que lea como sigue:

"Artículo 1.1.-Título.

Esta Ley se conocerá como la "Ley de la Corporación del Fondo de Interés Apremiante".

Sección 3.-Se añade un Artículo 1.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 1.2.-Definiciones.

Los siguientes términos tendrán los significados que se expresan a continuación:

(a) "AAFAF"- significa la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico.

(b) "Ley"- significa la Ley 91-2006, según enmendada, también conocida como "Ley de la Corporación del Fondo del Interés Apremiante".

(c) "Acuerdos Complementarios"- significa el Plan de Ajuste de la Corporación, el Contrato de Bonos, el Acuerdo de Transacción y cualquier otro acuerdo o instrumento otorgado por la Corporación o el Fiduciario del Contrato de Bonos relacionado a, o en apoyo de, la Transacción de Reestructuración y relacionado a, o en apoyo de, el Plan de Ajuste de la Corporación.

(d) "Actividades Autorizadas"- significa las actividades que la Corporación está autorizada a llevar a cabo conforme al Artículo 2.4 de esta Ley.

(e) "Junta de Directores"– significa la Junta de Directores de la Corporación.

(f) "Contrato de Bonos"– significa uno o más contratos de fideicomiso, contratos de bonos y cualquier suplemento o enmienda a éstos, o cualquier contrato o acuerdo similar otorgado por la Corporación y el Fiduciario del Contrato de Bonos mediante el cual se emitan los Bonos del Plan de Ajuste y que establezca los derechos y responsabilidades de la Corporación y los tenedores de Bonos del Plan de Ajuste emitidos bajo el mismo.

(g) "Presidente" – significa el presidente de la Junta de Directores.

(h) "Ingresos de la Corporación" – significa los Primeros Ingresos hasta una cantidad igual al cincuenta y tres punto sesenta y cinco por ciento (53.65%) de la Renta Fija para cada Año Fiscal y todo derecho legal y en equidad, título e interés con respecto a los mismos, incluyendo el derecho a recibir los Primeros Ingresos según se dispone en el Artículo 4.1 de esta Ley.

(i) "Fondo de Ingresos de la Corporación " – significa el fondo o los fondos segregados propiedad de la Corporación en la(s) cual(es) se depositan los Ingresos de la Corporación, cuya cuenta (1) deberá estar a nombre del Fiduciario del Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste, (2) no puede ser propiedad de, ni estar controlada por, el Gobierno de Puerto Rico o una Entidad Gubernamental (excepto la Corporación) de ninguna manera, y (3) se mantendrá en uno o más bancos en los Estados Unidos continentales.

(j) "Corporación" – significa la Corporación del Fondo del Interés Apremiante creada por esta Ley.

(k) "Plan de Ajuste de la Corporación"– significa el plan de ajuste consumado con relación al caso de la Corporación bajo el Título III de PROMESA, incluyendo la orden del Tribunal de Distrito confirmando dicho plan de ajuste.

(l) "Tribunal de Distrito"– significa el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

(m) "Fecha de Efectividad" – significa la fecha en la cual el Plan de Ajuste de la Corporación advenga efectivo de acuerdo a sus términos.

(n) "Costos de Financiamiento"– significa todos los costos asociados con la Transacción de Reestructuración, incluyendo los costos, honorarios y gastos de: (1) emitir, dar servicio a, repagar o refinanciar los Bonos del Plan

de Ajuste, independientemente de si dichos costos se incurren en la emisión
de dichos Bonos del Plan de Ajuste o a través del término de los mismos,
(2) hacer pagos conforme a los Acuerdos Complementarios, (3) pagar
cualquier sello, impuesto de emisión, impuesto similar u otros cargos
relacionados a la Transacción de Reestructuración; disponiéndose, además,
que esta cláusula no limita de manera alguna la exención contributiva
provista en el Artículo 2.8 de esta Ley, (4) prepararse para y completar la
Transacción de Reestructuración y (5) llevar a cabo todas las actividades
relacionadas a la Transacción de Reestructuración. Es menester señalar,
que, los Costos de Financiamiento también incluyen honorarios y gastos
administrativos incurridos antes o después del cierre relacionado a los
Acuerdos Complementarios, pero no incluyen pagos de principal e
intereses bajo los Bonos del Plan de Ajuste.

(o)   "Primeros Ingresos" – significa los primeros ingresos que corresponden a
Contribuciones Pignoradas en cualquier Año Fiscal, según se describe en el
Artículo 4.1 de esta Ley.

(p)   "Año Fiscal" – significa el año fiscal del Gobierno de Puerto Rico, el cual
comienza el 1 de julio y termina el 30 de junio.

(q)   "Renta Fija" – significa, para el Año Fiscal 2018-2019, setecientos ochenta y
tres millones ciento noventa y siete mil doscientos cincuenta y un
(783,197,251.00) dólares y, para cada Año Fiscal subsiguiente, la Renta Fija
del Año Fiscal anterior más cuatro (4) por ciento de dicha Renta Fija, hasta
la Cantidad Máxima. La Renta Fija para cada año fiscal se pagará de los
primeros ingresos recaudados de las Contribuciones Pignoradas.

(r)   "Entidad Gubernamental"– significa cualquier agencia, departamento,
oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad,
subdivisión política, autoridad fiscal o municipio del Gobierno de Puerto
Rico.

(s)   "Gobierno de Puerto Rico"– significa el Estado Libre Asociado de Puerto
Rico y su gobierno.

(t)   "Fiduciario del Contrato de Bonos" – significa la Persona designada como
fiduciario o fiduciario del contrato de bonos bajo el Contrato de Bonos,
incluyendo cualquier sucesor de éstos bajo el Contrato de Bonos.

(u)   "Cantidad Máxima"– significa mil ochocientos cincuenta millones
(1,850,000,000.00) de dólares.

(v)   "Junta de Supervisión" – significa la Junta de Supervisión y Administración Financiera para Puerto Rico establecida conforme a la Sección 101 de PROMESA.

(w)   "Persona" – significa cualquier persona natural o entidad legal, incluyendo, pero sin limitarse a, el Gobierno de Puerto Rico, cualquier Entidad Gubernamental, o cualquier individuo, firma, sociedad, proyecto conjunto, fideicomiso, sucesión, compañía de responsabilidad limitada, corporación de individuos, asociación, corporación pública o privada, organizada o existente bajo las leyes de Puerto Rico, los Estados Unidos de América, o cualquier otra jurisdicción o de cualquier otro estado, municipalidad, subdivisión política, autoridad fiscal, agencia o instrumentalidad de Puerto Rico, de los Estados Unidos de América o cualquier otra jurisdicción, o cualquier combinación de éstas.

(x)   "Bonos del Plan de Ajuste" – significa cualquier Bono de Reestructuración y cualquier Bono de Refinanciamiento.

(y)   "Contribuciones Pignoradas" – significa, sujeto a las disposiciones del Artículo 3.3 de esta Ley, (1) los ingresos y recaudos presentes y futuros generados por la porción del IVU que corresponda a una tasa contributiva de cinco punto cinco (5.5) por ciento y (2) la Colateral Substituta, si alguna.

(z)   "PROMESA" – significa la "Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico", *Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.*

(aa)   "Bonos de Refinanciamiento" – significa los bonos emitidos por la Corporación conforme a la Ley y los Acuerdos Complementarios, con igualdad de prioridad que los Bonos de Reestructuración (pari passu), para retirar o refinanciar cualquier Bono del Plan de Ajuste.

(bb)   "Bonos de Reestructuración" – significa los bonos emitidos por la Corporación conforme a esta Ley, el Plan de Ajuste de la Corporación y los Acuerdos Complementarios, bajo términos consistentes con, y que estén autorizados, validados y distribuidos conforme a, el Plan de Ajuste de la Corporación.

(cc)   "Resolución de Reestructuración" – significa una o más resoluciones de la Junta de Directores autorizando: (1) la emisión de los Bonos del Plan de Ajuste y describiendo sus términos y (2) el pago de los Costos de Financiamiento, en cada caso de acuerdo a los términos del Plan de Ajuste de la Corporación.

(dd)   "Transacción de Reestructuración"– significa las transacciones contempladas por, o en apoyo de, el Plan de Ajuste de la Corporación.

(ee)   "IVU"– significa el impuesto de ventas y uso impuesto por el Gobierno de Puerto Rico bajo las Secciones 4020.01 y 4020.02 del Subcapítulo D de la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico".

(ff)   "Acuerdo de Transacción"– significa el Acuerdo de Transacción del 15 de octubre de 2018 entre la Junta de Supervisión, a nombre del Gobierno de Puerto Rico, y el agente de la Corporación designado por la Junta de Supervisión para transar o litigar la disputa entre el Gobierno de Puerto Rico y la Corporación con respecto a la titularidad sobre el IVU.

(gg)   "Colateral Sustituta"– significa todo o una porción de una contribución de aplicación general a través de Puerto Rico que se legisle en sustitución total de las Contribuciones Pignoradas o que de otra manera constituya colateral similar o comparable para los Bonos del Plan de Ajuste.

(hh)   "Requisitos de Sustitución" – significa (1) la aprobación de legislación disponiendo para Colateral Sustituta, que a su vez disponga (A) que la Colateral Sustituta en una cantidad igual a los Ingresos de la Corporación se ha transferido irrevocablemente y es propiedad única y exclusivamente de la Corporación en la misma medida en que se provee bajo el Artículo 2.2 de esta Ley, (B) que, luego de dicha transferencia, la Colateral Sustituta en una cantidad igual a los Ingresos de la Corporación no es, y no constituirá, "recursos disponibles" o "ingresos disponibles" del Gobierno de Puerto Rico según dicho término se utiliza en la Sección 8 del Artículo VI de la Constitución de Puerto Rico o de cualquier otra manera en la Constitución de Puerto Rico (independientemente de si se interpreta la versión en español o inglés de la Constitución de Puerto Rico), (C) para la creación de un gravamen sobre la Colateral Substituta a favor del Fiduciario del Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste en la misma medida que se establece en el Artículo 3.2 de esta Ley y (D) que el Gobierno de Puerto Rico y las Entidades Gubernamentales continuarán proveyendo las garantías establecidas en el Artículo 3.3 de esta Ley con respecto a dicha Colateral Sustituta, y (2) que, previo a la sustitución de la Colateral Sustituta, se hayan satisfecho los requisitos de calificación establecidos en los Acuerdos Complementarios con respecto a la Colateral Sustituta."

Sección 4.-Se añade un Capítulo II a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO II – LA CORPORACION DEL FONDO DE INTERÉS APREMIANTE"

Sección 5.-Se renumera el Artículo 2 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", como Artículo 2.1, y se enmienda el mismo para que lea como sigue:

"Artículo 2.1.-Creación y Existencia Legal Separada de la Corporación.

Se crea una corporación pública e instrumentalidad del Gobierno de Puerto Rico que constituye un cuerpo corporativo y político independiente y separado del Gobierno de Puerto Rico que se conocerá como la Corporación del Fondo de Interés Apremiante de Puerto Rico, cuyo nombre en inglés será *Puerto Rico Sales Tax Financing Corporation.* La Corporación que existe por virtud de esta Ley es y se reconocerá para todos los propósitos como una entidad legal independiente y separada del Gobierno de Puerto Rico y cualquier otra Entidad Gubernamental. Será operada independientemente y sus negocios y asuntos serán dirigidos por, o bajo la dirección de su Junta de Directores."

Sección 6.-Se añade un Artículo 2.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.2.-Titularidad sobre los Ingresos de la Corporación.

(a)     Cualquier y toda titularidad y derechos sobre los Ingresos de la Corporación, fueron o han sido transferidos o por la presente se transfieren a la Corporación.

(b)     La transferencia descrita en el inciso (a) arriba es una transferencia absoluta de todo derecho legal y en equidad, título e interés, y no una pignoración u otro financiamiento.

(c)     La Corporación es y será la única y exclusiva dueña de los Ingresos de la Corporación hasta que los Bonos del Plan de Ajuste, incluyendo los intereses que devenguen éstos, y todas las cantidades y obligaciones bajo los Acuerdos Complementarios se paguen en su totalidad en efectivo o hayan sido de otra manera satisfechas conforme a sus términos.

(d)     Las Personas designadas como agentes retenedores para propósitos de la imposición y recaudación del IVU conforme a la Ley 1-2011, según enmendada, también conocida como el "Código de Rentas Internas para un Nuevo Puerto Rico", se entenderá que recaudan a nombre de la Corporación cualquier porción del IVU en la cual la Corporación tiene un

interés propietario. Dichos agentes retenedores continuarán estando sujetos a toda y cualquier obligación y responsabilidad impuesta por el Código de Rentas Internas para un Nuevo Puerto Rico, a agentes retenedores con relación a la imposición y recaudación del IVU.

(e) Los Ingresos de la Corporación no constituyen "recursos disponibles" o "ingresos disponibles" del Gobierno de Puerto Rico según dicho término se utiliza en la Sección 8 del Artículo VI de la Constitución de Puerto Rico o de cualquier otra manera en la Constitución de Puerto Rico (independientemente de si se interpreta la versión en español o inglés de la Constitución de Puerto Rico)."

Sección 7.-Se añade un Artículo 2.3 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.3.-Propósito de la Corporación.

En y después de la Fecha de Efectividad, el propósito de la Corporación será (a) emitir los Bonos del Plan de Ajuste, (b) ser dueña de y administrar los Ingresos de la Corporación, y (c) emitir otros bonos, notas o evidencia de deuda de la Corporación según autorizado por el Plan de Ajuste de la Corporación y los Acuerdos Complementarios, los cuales serán pagaderos de aquellos ingresos que disponga la Asamblea Legislativa."

Sección 8.-Se añade un Artículo 2.4 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.4.-Actividades de la Corporación.

Las actividades de la Corporación se limitarán a las siguientes:

(a) recibir y ser dueña de los Ingresos de la Corporación y aquellos otros ingresos o propiedades que se le provean o transfieran a la Corporación;

(b) aprobar la Resolución de Reestructuración;

(c) emitir, de tiempo en tiempo, los Bonos del Plan de Ajuste y cualquier bono, nota o evidencia de deuda cuya emisión esté permitida por el Artículo 2.3 de esta Ley;

(d) otorgar y cumplir con los Acuerdos Complementarios;

(e)    para garantizar el pago de cualquier bono, nota o evidencia de deuda cuya emisión esté autorizada por el Artículo 2.3 de esta Ley, pignorar, de manera subordinada en todos los aspectos al gravamen establecido en el Artículo 3.2 de esta Ley, (1) cualquier cantidad remanente de los Ingresos de la Corporación después del pago de los Bonos del Plan de Ajuste o (2) cualquier otro fondo o propiedad que se asigne a la Corporación después de la Fecha de Efectividad.

(f)    tomar cualquier y toda otra acción que sea necesaria o apropiada para consumar la Transacción de Reestructuración y el Plan de Ajuste de la Corporación, incluyendo hacer enmiendas a, intercambiar y/o cancelar, los bonos emitidos por la Corporación previo a la Fecha de Efectividad y enmendar y reformular los acuerdos de la Corporación con respecto a los mismos."

Sección 9.-Se añade un Artículo 2.5 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.5.-Poderes Adicionales.

Para llevar a cabo las Actividades Autorizadas, la Corporación tendrá, sin limitación de lo anterior, los siguientes poderes:

(a)    demandar y ser demandada en cualquier tribunal de Puerto Rico o en el Tribunal de Distrito Federal;

(b)    adoptar, cambiar y usar un sello;

(c)    formular, adoptar, enmendar y derogar estatutos para la administración de sus asuntos y aquellas normas, reglas y reglamentos que sean necesarios o pertinentes para ejercer y desempeñar las Actividades Autorizadas;

(d)    abrir y mantener cuentas de banco, incluyendo el Fondo de Ingresos de la Corporación;

(e)    adquirir, arrendar, tener dominio sobre y vender propiedad;

(f)    tener completo dominio sobre todas sus propiedades (incluyendo los Ingresos de la Corporación), sujeto al gravamen estatutario establecido bajo el Artículo 3.2 de esta Ley;

(g)    negociar, otorgar y enmendar contratos y cualquier otro instrumento necesario o conveniente para desempeñar las Actividades Autorizadas;

(h) nombrar o destituir oficiales, agentes y empleados, establecer sus compensaciones, poderes y facultades, en cada caso, de conformidad con los Acuerdos Complementarios;

(i) pagar sus gastos operacionales y los Costos de Financiamiento;

(j) procurar seguros contra pérdidas con relación a sus actividades, propiedades o activos, incluyendo seguros que cubran a sus directores y oficiales;

(k) invertir fondos y establecer y mantener reservas según requerido por, y bajo los estándares establecidos en, los Acuerdos Complementarios;

(l) indemnizar a los miembros de la Junta de Directores, sus oficiales, agentes, empleados, contratistas y terceros por conducta que no constituya negligencia crasa, dolo o fraude;

(m) ejercer todos aquellos otros poderes no incompatibles con los aquí expresados que sean necesarios para llevar a cabo las Actividades Autorizadas;

(n) llevar a cabo todos los actos o medidas necesarias o convenientes para cumplir su propósito y llevar a cabo los poderes que se le confieren expresamente en esta Sección;

(o) delegar a sus oficiales, agentes, empleados o contratistas autoridad para tomar acciones para cumplir con esta Ley; y

(p) firmar, radicar y enmendar cualquier planilla, formulario, elecciones o declaraciones con cualquier autoridad gubernamental."

Sección 10.-Se añade un Artículo 2.6 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 2.6.-Actividades Prohibidas.

Mientras los Bonos del Plan de Ajuste estén en circulación, la Corporación no estará autorizada a:

(a) fusionarse o consolidarse, directa o indirectamente, con ninguna Persona;

(b) incurrir, garantizar o de alguna otra manera obligarse a pagar deuda alguna u otras obligaciones que no sean los Bonos del Plan de Ajuste, gastos

operacionales, los Costos de Financiamiento y cualquier bono, nota, o evidencia de deuda permitida bajo el Artículo 2.3 de esta Ley;

(c)     gravar, crear o registrar gravámenes sobre cualquier propiedad (incluyendo los Ingresos de la Corporación), excepto (1) por el gravamen para garantizar el pago de los Bonos del Plan de Ajuste creado por el Artículo 3.2 de esta Ley o (2) cualquier pignoración o gravamen para garantizar un bono, nota o evidencia de deuda permitida bajo el Artículo 2.3 de esta Ley, pero sólo en la medida en que dicha prenda o gravamen esté subordinado en todos los aspectos al gravamen establecido en el Artículo 3.2 de esta Ley;

(d)     llevar a cabo actividades de negocio que no sean las autorizadas expresamente en esta Ley;

(e)     disolver, liquidar, vender o, excepto según permitido por el Artículo 2.4(e), de otra manera transferir toda o una parte de su propiedad (incluyendo los Ingresos de la Corporación);

(f)     los directores de la Corporación no votarán para autorizar a la Corporación a comenzar un caso bajo el Título III de PROMESA o procesos judiciales de reestructuración similares bajo las leyes aplicables sujeto a las disposiciones de tales leyes; y

(g)     tomar cualquier otra acción que sea inconsistente con el propósito de la Corporación, según establecido por esta Ley o complementaria a ésta."

Sección 11.-Se añade un Artículo 2.7 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea en su totalidad como sigue:

"Artículo 2.7.-Junta de Directores

Los poderes de la Corporación se ejercerán a través de la Junta de Directores.

(a)     Composición de la Junta de Directores.

La Junta de Directores estará compuesta por tres (3) miembros, que cumplirán los requisitos establecidos en el Artículo 2.7(b)(iii) de esta Ley y quienes serán nombrados por el Gobernador de Puerto Rico; disponiéndose que, conforme a las disposiciones de los Acuerdos Complementarios, ciertos tenedores de Bonos del Plan de Ajuste podrán someter, para la consideración del Gobernador, hasta tres (3) recomendaciones para el

nombramiento inicial de los directores de la Corporación, pero el Gobernador no estará obligado a seleccionar a dichas personas.

(b) Disposiciones Generales con respecto a la Junta de Directores.

    (i) Cada director será nombrado por un término de tres (3) años y podrá servir términos consecutivos; disponiéndose, que el Gobernador podrá remover a cualquier director previo a la expiración de su término si dicho director incumple con las responsabilidades establecidas en esta Ley o por negligencia crasa, dolo o fraude;

    (ii) cada miembro de la Junta de Directores tendrá derecho a un (1) voto;

    (iii) cada miembro de la Junta de Directores deberá satisfacer los requisitos de independencia y cualificación esbozados en los Acuerdos Complementarios (incluyendo que ningún miembro de la Junta de Directores puede ser un oficial, empleado o director de cualquier Entidad Gubernamental que no sea la Corporación);

    (iv) todas las decisiones y acciones de la Junta de Directores requerirán el voto afirmativo de una mayoría de los miembros de la Junta de Directores que estén en funciones, disponiéndose que los estatutos corporativos de la Corporación podrán requerir la aprobación de una cantidad mayor de directores para ciertos propósitos; y

    (v) los miembros de la Junta de Directores seleccionarán entre sus miembros un Presidente.

(c) Vacantes.

En la medida que surja una vacante en el puesto de un miembro de la Junta de Directores por muerte, remoción, renuncia o de cualquier otra manera, el Gobernador nombrará un director sucesor que cumpla con los requisitos establecidos en el Artículo 2.7(b)(iii) de esta Ley conforme al Artículo 2.7(b)(i) de esta Ley.

(d) Compensación.

Los miembros de la Junta de Directores recibirán compensación conforme a lo permitido por los Acuerdos Complementarios.

(e) Aprobación y Enmienda de Reglas.

Tan pronto como sea factible luego del nombramiento de todos los directores y el nombramiento del Presidente, la Corporación adoptará reglas y procedimientos para gobernar sus actividades bajo esta Ley. La Junta de Directores podrá enmendar dichas reglas y procedimientos de tiempo en tiempo.

(f)   Quórum.

Una mayoría de los miembros de la Junta de Directores en funciones constituirán el quórum para tomar decisiones o ejercer cualquier poder o función de la Corporación. Uno o más miembros podrán participar de una reunión de la Junta de Directores mediante teleconferencia o equipo de comunicaciones similar. La participación por dichos medios constituirá participación presencial en la reunión. Cualquier acción necesaria o permitida en cualquier reunión de la Junta de Directores será autorizada sin necesidad de una reunión siempre y cuando todos los miembros de la Junta de Directores den su consentimiento por escrito a dicha acción.

(g)   Delegación.

La Junta de Directores podrá delegar a uno o más de los miembros o a los oficiales, agentes y empleados de la Corporación aquellos poderes y responsabilidades que la Junta de Directores determine sean apropiados."

Sección 12.-Se añade un Artículo 2.8 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 2.8.-Exención Contributiva.

(a)   Por la presente se determina y declara que las actividades de la Corporación tienen un propósito público. Por lo tanto, la Corporación estará totalmente exenta de, y no tendrá que pagar contribución, impuesto, licencia, sello, honorario u otro cargo similar alguno impuesto por el Gobierno de Puerto Rico o cualquier Entidad Gubernamental sobre cualquiera de las propiedades de las cuales es dueña, posee, custodia o usa o sobre sus actividades o sobre cualquier ingreso, pago o ganancia derivada de lo antes mencionado.

(b)   Los Bonos del Plan de Ajuste, incluyendo, pero sin limitarse a, cualquier pago o ingreso con relación a los Bonos del Plan de Ajuste y la transferencia de los Bonos del Plan de Ajuste, estará, en todo momento, exento de contribución, impuesto, licencia, sello, honorario u otro cargo impuesto por el Gobierno de Puerto Rico o cualquier Entidad Gubernamental. Los

tenedores y dueños beneficiarios de los Bonos del Plan de Ajuste no estarán sujetos a la obligación de radicar planilla, planilla informativa contributiva o cualquier otro requisito similar del Gobierno de Puerto Rico o cualquier Entidad Gubernamental por razón de tener, ser titular de o transferir los Bonos del Plan de Ajuste."

Sección 13.-Se añade un Artículo 2.9 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 2.9.-Inaplicabilidad de Ciertas Leyes.

Las siguientes leyes o disposiciones no serán aplicables a la Corporación:

(a) Capítulos 4 y 6 de la Ley 26-2017, según enmendada, conocida como "Ley para el Cumplimiento del Plan Fiscal";

(b) Ley 1-2012, según enmendada, conocida como la "Ley de Ética Gubernamental de Puerto Rico de 2011";

(c) Ley 103-2006, según enmendada, conocida como "Ley de Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006";

(d) Ley 8-2017, según enmendada, conocida como la "Ley para la Transformación de los Recursos Humanos en el Gobierno de Puerto Rico";

(e) Ley 237-2004, según enmendada, conocida como la "Ley para Establecer Parámetros Uniformes para la Contratación de Servicios Profesionales y Consultivos por las Agencias e Instrumentalidades del Gobierno de Puerto Rico";

(f) Ley 197-2002, según enmendada, conocida como la "Ley para Regular el Proceso de Transición del Gobierno de Puerto Rico";

(g) Ley 78-2011, según enmendada, conocida como el "Código Electoral de Puerto Rico para el Siglo XXI";

(h) Ley 38-2017, según enmendada, conocida como la "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico";

(i) Plan 3-2011, según enmendado, conocido como el "Plan de Reorganización de Administración de Servicios Generales";

(j) Ley 230 de 23 de julio de 1974, según enmendada, conocida como la "Ley de Contabilidad del Gobierno";

(k) Ley 3-2017, conocida como la "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico"; y

(l) Ley 14 de 17 de abril de 1972, según enmendada."

Sección 14.–Se añade un Capítulo III a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"Capítulo III - LA TRANSACCIÓN DE REESTRUCTURACIÓN"

Sección 15.–Se deroga el Artículo 3 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" y se sustituye por un nuevo Artículo 3.1, que leerá como sigue:

"Artículo 3.1-Emisión de los Bonos del Plan de Ajuste

(a) En y después de la Fecha de Efectividad, la Corporación estará autorizada a emitir los Bonos del Plan de Ajuste, de tiempo en tiempo, bajo los términos del Plan de Ajuste de la Corporación y los términos y condiciones autorizados por la Corporación y establecidos en la Resolución de Reestructuración y los Acuerdos Complementarios.

(b) Los Bonos del Plan de Ajuste estarán fechados, devengarán interés a las tasas y vencerán en la fecha o fechas, que determine la Corporación y así lo autorice en la Resolución de Reestructuración de acuerdo a, y consistente con, el Plan de Ajuste de la Corporación. La Corporación determinará la forma de los Bonos del Plan de Ajuste y la manera de otorgamiento de los Bonos del Plan de Ajuste, y fijará la denominación o denominaciones de los Bonos del Plan de Ajuste y el lugar o lugares de pago del principal y los intereses de los mismos, los términos para su redención y compra en lugar de redención y los otros términos de los mismos, todo conforme a, y consistente con, el Plan de Ajuste de la Corporación.

(c) Los Bonos del Plan de Ajuste serán pagaderos únicamente de los Ingresos de la Corporación conforme los términos del Contrato de Bonos y los Acuerdos Complementarios.

(d) La Corporación podrá adquirir bonos emitidos por la Corporación bajo los términos de, y conforme a, el Plan de Ajuste de la Corporación y los

Acuerdos Complementarios aplicables, a un precio que no exceda el precio de redención de los mismos. Todos los bonos así adquiridos serán cancelados.

(e) Los Bonos del Plan de Ajuste no constituirán deuda del Gobierno de Puerto Rico ni de ninguna Entidad Gubernamental excepto por la Corporación. Esta aseveración se incluirá en los Bonos del Plan de Ajuste, el Contrato de Bonos y los documentos de divulgación relacionados a dichos bonos."

Sección 16.-Se añade un Artículo 3.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 3.2.-Gravamen Estatutario.

Los Bonos del Plan de Ajuste estarán, automáticamente tras ser emitidos, garantizados por un primer gravamen estatutario sobre todos los derechos, título e interés de la Corporación sobre las Contribuciones Pignoradas, incluyendo cualquier dinero, ingreso, renta, cuenta, derecho contractual o intangible derivado de éstas, a favor del Fiduciario del Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste. Dicho primer gravamen estatutario será automático y se constituirá, perfeccionará, será válido y exigible automáticamente desde y después de la Fecha de Efectividad, sin necesidad acción por Persona alguna. Ningún instrumento tendrá que ser otorgado, registrado o inscrito en un récord oficial o registro gubernamental u oficina para perfeccionar o continuar el primer gravamen estatutario o para establecer o mantener la prioridad del mismo. Ningún contacto de las Contribuciones Pignoradas con cualquier propiedad del Gobierno de Puerto Rico, de cualquier otra Entidad Gubernamental o de cualquier Persona limitará, frustrará, menoscabará o interferirá con dicho gravamen estatutario. Dicho gravamen estatutario será válido, vinculante, estará perfeccionado y será ejecutable contra cualquier Persona que tenga una reclamación de cualquier tipo, extracontractual, contractual u otra, contra la Corporación y sus activos, independientemente de si dicha Persona fue notificada de dicho gravamen.

Sección 17.-Se añade un Artículo 3.3 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea en su totalidad como sigue:

"Artículo 3.3.-Convenios relacionados a los Bonos del Plan de Ajuste y la Transacción de Reestructuración.

El Gobierno de Puerto Rico, con la intención de estar contractualmente obligado, por la presente acuerda y se compromete con la Corporación y con cualquier tenedor de Bonos del Plan de Ajuste, y autoriza a la Corporación a

incluir dicho compromiso en el Contrato de Bonos para beneficio de los tenedores de Bonos del Plan de Ajuste, a no, y que ninguna Entidad Gubernamental estará autorizada a, hasta que los Bonos del Plan de Ajuste, incluyendo cualquier interés devengado por éstos y cualquier cantidad u obligación bajo los Acuerdos Complementarios, se paguen en su totalidad en efectivo o se satisfagan conforme a sus términos:

(a)  tomar cualquier acción que (A) menoscabe el derecho de la Corporación a recibir los Ingresos de la Corporación, (B) limite o altere los derechos de la Corporación conforme al Plan de Ajuste de la Corporación para cumplir con los términos de cualquier acuerdo con los tenedores de Bonos del Plan de Ajuste, (C) material y adversamente menoscabe el cobro de las Contribuciones Pignoradas en cualquier Año Fiscal, o (D) menoscabe los derechos y remedios de los tenedores de Bonos del Plan de Ajuste o la colateral establecida bajo el Artículo 3.2 de esta Ley;

(b)  reducir las Contribuciones Pignoradas a una tasa menor de cinco punto cinco por ciento (5.5%) a menos que, con relación a dicha reducción, se cumpla con la calificación crediticia y demás requisitos establecidos en los Acuerdos Complementarios; disponiéndose, sin embargo, que, no obstante lo anterior, hasta que todas las obligaciones con respecto a los Bonos del Plan de Ajuste se paguen o satisfagan en su totalidad conforme a sus términos, si la tasa de las Contribuciones Pignoradas se reduce por debajo de tres (3) por ciento, entonces, con relación a dicha reducción, el Gobierno de Puerto Rico deberá cumplir con los Requisitos de Sustitución;

(c)  menoscabar, limitar, restringir, rescindir, atrasar o modificar los derechos o poderes de la Corporación, el Fiduciario del Contrato de Bonos o los tenedores de Bonos del Plan de Ajuste bajo esta Ley o con relación a los Ingresos de la Corporación o la habilidad de la Corporación para cumplir con sus obligaciones a sus bonistas;

(d)  enmendar esta Ley para menoscabar, limitar, restringir, rescindir, atrasar o modificar cualquier obligación o convenio de la Corporación con los tenedores de Bonos del Plan de Ajuste; y

(e)  limitar o restringir los derechos y poderes de los oficiales pertinentes del Gobierno de Puerto Rico para imponer, mantener, cobrar o recaudar las Contribuciones Pignoradas, disponiéndose que lo anterior no impedirá que el Gobierno de Puerto Rico ejerza su poder, a través de un cambio en ley, de reemplazar la porción del IVU que corresponde a una tasa contributiva de cinco punto cinco (5.5) por ciento con la Colateral Substituta de acuerdo a los Requisitos de Sustitución."

Sección 18.-Se añade un Capítulo IV a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO IV - INGRESOS DE LA CORPORACIÓN, DEPÓSITOS Y DESEMBOLSOS."

Sección 19.-Se deroga el Artículo 4 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", y se sustituye por un nuevo Artículo 4.1, que leerá como sigue:

"Artículo 4.1.-Satisfacción de los Ingresos de la Corporación con los Primeros Ingresos.

(a) Cada Año Fiscal, los primeros ingresos correspondientes a las Contribuciones Pignoradas se transferirán a, y se depositarán con, la Corporación o en cualquier cuenta o fondo, incluyendo el Fondo de Ingresos de la Corporación o una cuenta o fondo controlado por el Fiduciario del Contrato de Bonos designada en el Contrato de Bonos bajo el cual dichas obligaciones fueron incurridas bajo esta Ley y los Acuerdos Complementarios, designada por la Corporación, hasta que la Corporación reciba una cantidad equivalente a los Ingresos de la Corporación para dicho Año Fiscal. El requisito de que los primeros ingresos correspondientes a las Contribuciones Pignoradas, hasta los Ingresos de la Corporación, se depositen con la Corporación o en cualquier cuenta o fondo, incluyendo el Fondo de Ingresos de la Corporación o una cuenta o fondo controlado por el Fiduciario del Contrato de Bonos designada en el Contrato de Bonos bajo el cual dichas obligaciones fueron incurridas bajo esta Ley y los Acuerdos Complementarios designada por la Corporación no podrá ser modificado; disponiéndose, que el Contrato de Bonos podrá contener disposiciones que permitan la distribución trimestral de las Contribuciones Pignoradas entre la Corporación y el Gobierno de Puerto Rico tras la satisfacción de los requisitos establecidos en el Contrato de Bonos y de manera consistente con el Plan de Ajuste de la Corporación. La Corporación tendrá los derechos establecidos en este Artículo 4.1, hasta que los Bonos del Plan de Ajuste, incluyendo cualquier interés devengado por éstos, y todas las obligaciones bajo los Acuerdos Complementarios, hayan sido pagadas en su totalidad en efectivo o de otra manera hayan sido satisfechas de conformidad con sus términos.

(b) Durante cada Año Fiscal, el Fiduciario del Contrato de Bonos o aquella otra Persona que sea designada en el Contrato de Bonos determinará, mensualmente, si la Corporación ha recibido los Ingresos de la Corporación. Una vez el Fiduciario del Contrato de Bonos o dicha otra

Persona determine que se han depositado los Ingresos de la Corporación con el Fiduciario del Contrato de Bonos, o aquella porción de los Ingresos de la Corporación que la Corporación tenga derecho a recibir si la distribución trimestral a la cual se hace referencia en este Artículo 4.1(a) está en efecto, todos los ingresos de las Contribuciones Pignoradas recibidos después de dicha determinación se transferirán al Gobierno de Puerto Rico.

(c)     Ninguna Persona que recaude o tenga posesión de las Contribuciones Pignoradas tendrá derecho legal o en equidad, título o interés alguno sobre dichas Contribuciones Pignoradas sólo por virtud del hecho que recaude o tenga posesión de las Contribuciones Pignoradas.

Sección 20.-Se añade un Artículo 4.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", para que lea como sigue:

"Artículo 4.2.-Exceso de Ingresos.

Las cantidades depositadas con la Corporación en cada Año Fiscal en exceso de las cantidades necesarias para pagar principal e intereses de los Bonos del Plan de Ajuste que venzan y sean pagaderos, incluyendo el principal y los intereses vencidos bajo cualquier Bono del Plan de Ajuste, satisfacer las obligaciones asumidas bajo el Contrato de Bonos u otros Acuerdos Complementarios que venzan o sean pagaderas, pagar los Costos de Financiamiento o gastos operacionales según se dispone en los Acuerdos Complementarios o hacer cualquier otro pago relacionado u otras obligaciones incurridas por la Corporación, se transferirá a la Corporación, libre del gravamen establecido en el Artículo 3.2 de esta Ley y cualquier otro gravamen establecido por el Contrato de Bonos u otro Acuerdo Complementario."

Sección 21.- Se añade un Capítulo V a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", cuyo título leerá como sigue:

"CAPÍTULO V – DISPOSICIONES MISCELANEAS"

Sección 22.-Se deroga el Artículo 5 de la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante", y se sustituye por un nuevo Artículo 5.1, que leerá en su totalidad como sigue:

"Artículo 5.1.-Separabilidad.

Esta Ley se interpretará de acuerdo a la Constitución de Puerto Rico y la Constitución de los Estados Unidos de América. Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección,

título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia."

Sección 23.-Se añade un Artículo 5.2 a la Ley 91-2006, según enmendada, conocida como "Ley del Fondo de Interés Apremiante" para que lea como sigue:

"Artículo 5.2.-Idioma que Prevalece.

Esta Ley se adoptará en español y en inglés. Si en la interpretación o aplicación de esta Ley surgiere algún conflicto entre el texto en inglés y el texto en español, prevalecerá el texto en inglés."

Sección 24.-Se derogan los Artículos 6 al 11 de la Ley 91-2006, según enmendada.

Sección 25.-Se añade el texto en inglés de la Ley 91-2006, según enmendado en esta Ley, inmediatamente después del final del texto en español, para que lea en su totalidad como sigue:

"ENGLISH VERSION OF THE PUERTO RICO SALES TAX FINANCING CORPORATION ACT:

## STATEMENT OF MOTIVES

Puerto Rico faces an unprecedented fiscal and economic crisis. This bill, as well as the restructuring agreement reached with the creditors of Government Development Bank for Puerto Rico, will enhance Puerto Rico's credibility. With this agreement, we will achieve significant adjustments in the repayment of the government's debts incurred by other administrations, but that it is now our responsibility to resolve. This way, we ensure that the Government is able to continue operating and serving the people of Puerto Rico.

The positions assumed and actions taken by the prior administration caused Puerto Rico to lose access to the capital markets and precipitated the collapse of our public finance system. These actions accelerated the contraction of the Puerto Rico economy and increased the outmigration of residents of Puerto Rico to the United States mainland.

The prior administration developed a hostile relationship with participants of the financial markets, including tens of thousands of residents of Puerto Rico that invested their savings trusting the good name and credit of the Commonwealth and that of its public corporations. This hostile environment towards Puerto Rico also pervaded the United States Congress due to the lack of transparency and honesty, while generating consistently negative news coverage for Puerto Rico at the local, national and global level.

Misguided decisions of the prior administration led to the bankruptcy of the Commonwealth of Puerto Rico and its need to gather its resources to address and provide essential services to the people of Puerto Rico. This, in turn, acted as a catalyst for a controversy that challenged the structure pursuant to which the Puerto Rico Sales Tax Financing Corporation (COFINA by its Spanish acronym) issued its bonds. In particular, certain parties asserted claims arguing, among other things, that (i) COFINA's issuance of its bonds violated the Puerto Rico Constitution and (ii) the portion of the sales and use tax imposed by the Commonwealth at a rate of 5.5% (the SUT) and transferred to COFINA constituted "available resources" of the Commonwealth pursuant to Article VI, Section 8, of the Puerto Rico Constitution and must be used for the payment of the Commonwealth's "public debt." Certain creditors also challenged the scope of the Puerto Rico Constitution based on the whether the Spanish term "recursos disponibles" or the English term "available revenues, plus surplus" was used. On May 5, 2017, the Financial Oversight and Management Board (Oversight Board) created pursuant to the provisions of the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA) commenced a proceeding as representative of COFINA under Title III.

The Commonwealth's and COFINA's various stakeholders sought an orderly process to resolve the disputes relating to COFINA and the ownership of the SUT (collectively, the Commonwealth-COFINA Dispute). To that end, on August 10, 2017, the Title III Court entered a stipulation and order appointing the Commonwealth's Official Committee of Unsecured Creditors to act as agent for the Oversight Board in its capacity as representative of the Commonwealth (the Commonwealth Agent) and Bettina M. Whyte to act as agent for the Oversight Board in its capacity as representative of COFINA (the COFINA Agent) in an effort to facilitate a settlement of the Commonwealth-COFINA Dispute.

On June 5, 2018, the Commonwealth Agent and the COFINA Agent announced that they had reached an agreement in principle to resolve the Commonwealth-COFINA Dispute (the Agreement in Principle). The Agreement in Principle was premised on

splitting the fixed amount of the SUT transferred to COFINA each fiscal year (the PSTBA) between the Commonwealth and COFINA beginning in fiscal year 2019, with COFINA receiving 53.65% of the yearly scheduled PSTBA and the Commonwealth receiving 46.35% of the yearly scheduled PSTBA plus all other revenues collected on account of the SUT.

Consistent with the public policy implemented by the Governor of Puerto Rico, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and various creditors and insurers of COFINA bonds executed a plan support agreement (as amended and restated on September 21, 2018, the Plan Support Agreement), which incorporates the Agreement in Principle's PSTBA split and provides for the settlement of the Commonwealth-COFINA Dispute pursuant to a plan of adjustment for COFINA under Title III of PROMESA (the COFINA Plan).

The Legislative Assembly is now called upon to implement the agreement by and among the parties of the Commonwealth-COFINA Dispute by amending the provisions of Act No. 91, which created COFINA and authorized it to issue bonds. These amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government of Puerto Rico to better serve and provide for its citizens. By implementing the Plan Support Agreement, this legislation also puts an end to the costly litigation between the agents appointed by the Oversight Board and settles the claims of COFINA's bondholders, while also making clear the original legislative intent of Act 91-2006, as amended. Moreover, as a result of this implementing legislation, we will be saving the Government of Puerto Rico approximately $437.5 million per year, which will now be available to the Government for the benefit of the people of Puerto Rico.

Equally important, this legislation shows that the Legislative Assembly is determined to take the steps necessary to enable Puerto Rico's return to the capital markets. As one of the steps required to implement the Plan Support Agreement, this legislation will allow for the restructuring of the COFINA debt under Title III of PROMESA, act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy, reduce costly litigation, and accelerate termination of the Oversight Board in accordance with PROMESA.

This Act demonstrates the Legislative Assembly's continued public policy commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital markets, and achieve economic certainty and debt sustainability for Puerto Rico.

## CHAPTER 1. – TITLE AND DEFINITIONS

Article 1.1.-Title.

This Act shall be known as the "Puerto Rico Sales Tax Financing Corporation Act."
Article 1.2.-Definitions.

The following terms shall have the meanings stated below:

(a) "AAFAF"– means the Puerto Rico Fiscal Agency and Financial Advisory
Authority.

(b) "Act"– means Act 91-2006, as amended, also known as the "Puerto Rico
Sales Tax Financing Corporation Act".

(c) "Ancillary Agreements"– means the Corporation Plan of Adjustment, the
Bond Indenture, the Settlement Agreement, and any other agreement or
instrument entered into by the Corporation or the Indenture Trustee in
connection with, or in furtherance of, the Restructuring Transaction and in
accordance with, or in furtherance of, the Corporation Plan of Adjustment.

(d) "Authorized Activities"– means the activities authorized to be carried out
by the Corporation under Article 2.4 of this Act.

(e) "Board of Directors"– means the Board of Directors of the Corporation.

(f) "Bond Indenture"– means one or more trust agreements, bond indentures
and any supplements or amendments thereto, or similar contracts or
agreements, entered into by the Corporation and the Indenture Trustee
pursuant to which Plan of Adjustment Bonds are issued, and establishing
the rights and responsibilities of the Corporation and of the holders of Plan
of Adjustment Bonds issued thereunder.

(g) "Chair" – means the chairperson of the Board of Directors.

(h) "COFINA Revenues" – means the First Funds up to an amount equal to
fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed
Income for each Fiscal Year and all legal and equitable rights, title and
interest thereto (including the right to receive the First Funds as set forth
under Article 4.1 of this Act).

(i)    "COFINA Revenues Fund" – means the segregated fund or funds owned by the Corporation into which the COFINA Revenues are deposited (1) which account shall be held in the name of the Indenture Trustee for the benefit of the holders of the Plan of Adjustment Bonds, (2) may not be owned or controlled in any way by the Government of Puerto Rico or any Government Entity other than the Corporation, and (3) is maintained in one or more mainland U.S. banks.

(j)    "Corporation" – means the Puerto Rico Sales Tax Financing Corporation created by this Act.

(k)    "Corporation Plan of Adjustment" – means the plan of adjustment consummated in connection with the Corporation's case under Title III of PROMESA, including the order of the District Court confirming such plan of adjustment.

(l)    "District Court" – means the United States District Court for the District of Puerto Rico.

(m)    "Effective Date" – means the date on which the Corporation Plan of Adjustment becomes effective in accordance with its terms.

(n)    "Financing Costs" – means all costs associated with the Restructuring Transaction, including the costs, fees and expenses to (1) issue, service, repay or refinance the Plan of Adjustment Bonds, whether such costs are incurred upon issuance of such Plan of Adjustment Bonds or over the term of the Plan of Adjustment Bonds, (2) make payments as required by the Ancillary Agreements, (3) pay any stamp, issuance or similar taxes and other charges related to the Restructuring Transaction; provided, however that this provision does not limit in any way the exemption from taxes set forth in Article 2.8 hereof, (4) prepare for and enter into the Restructuring Transaction, and (5) perform all ongoing activities relating to the Restructuring Transaction. It should be noted that, the Financing Costs also includes pre-closing and post-closing administrative fees and expenses incurred in connection with all Ancillary Agreements, but does not include payments of principal and interest on the Plan of Adjustment Bonds.

(o)    "First Funds" – means the first funds comprising the Pledged Taxes in any Fiscal Year as described in Article 4.1 of this Act.

(p)    "Fiscal Year" – means the fiscal year of the Government of Puerto Rico, which begins on July 1 and ends on June 30.

(q)     "Fixed Income" – means, for Fiscal Year 2018-2019, seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one (783,197,251) dollars and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four (4) percent of such Fixed Income, up to the Maximum Amount. The Fixed Income for each Fiscal Year shall be funded from the first revenues collected of the Pledged Taxes.

(r)     "Government Entity" – means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Government of Puerto Rico.

(s)     "Government of Puerto Rico"– means the Commonwealth of Puerto Rico and the government thereof.

(t)     "Indenture Trustee"– means the Person designated as trustee or indenture trustee under the Bond Indenture, including any successor trustee or indenture trustee under the Bond Indenture.

(u)     "Maximum Amount" – means One Billion Eight Hundred and Fifty Million (1,850,000,000.00) dollars.

(v)     "Oversight Board" – means the Financial Oversight and Management Board for Puerto Rico established pursuant to Article 1.1 of PROMESA.

(w)     "Person" – means any natural person or legal entity, including, but not limited to, the Government of Puerto Rico, any Government Entity, or any firm, partnership, joint venture, trust, estate, limited liability company, corporation of individuals, association, or public or private corporation, organized or existing under the laws of Puerto Rico, the United States of America, any state or any other jurisdiction, or any state, municipality, political subdivision, taxing authority, agency or instrumentality of the United States of America, any state or any other jurisdiction, or any combination thereof.

(x)     "Plan of Adjustment Bonds" – means any Restructuring Bonds and any Refunding Bonds.

(y)     "Pledged Taxes" – means, subject to the provisions of Article 3.3 hereof, (1) the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half (5.5) percent, and (2) the Substituted Collateral, if any.

(z)     "PROMESA" – means the "Puerto Rico Oversight, Management, and Economic Stability Act", Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.

(aa)    "Refunding Bonds" – means the bonds issued by the Corporation pursuant to the Act and the Ancillary Agreements, on a pari passu basis with the Restructuring Bonds, to retire, refinance or defease any Plan of Adjustment Bonds.

(bb)    "Restructuring Bonds" – means the bonds issued by the Corporation pursuant to this Act, the Corporation Plan of Adjustment, and the Ancillary Agreements, having terms that conform to, and that are authorized, determined to be valid, and distributed in accordance with, the Corporation Plan of Adjustment.

(cc)    "Restructuring Resolution" – means one or more resolutions of the Board of Directors authorizing: (1) the issuance of Plan of Adjustment Bonds and describing the terms thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the Corporation Plan of Adjustment.

(dd)    "Restructuring Transaction" – means the transactions contemplated by, or in furtherance of, the Corporation Plan of Adjustment.

(ee)    "Sales Tax" – means the sales and use taxes imposed by the Government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, known as the Internal Revenue Code for a New Puerto Rico.

(ff)    "Settlement Agreement" – means the Settlement Agreement, dated as of October [15], 2018, between the Oversight Board, on behalf of the Government of Puerto Rico, and the agent for the Corporation appointed by the Oversight Board to settle or litigate the dispute between the Government of Puerto Rico and the Corporation regarding the ownership of the Sales Tax.

(gg)    "Substituted Collateral" – means all or a portion of a tax of general applicability throughout Puerto Rico that is enacted in full substitution of the Pledged Taxes or otherwise constitutes like or comparable security for the Plan of Adjustment Bonds.

(hh)    "Substitution Requirements" – means (1) the enactment of legislation providing for Substituted Collateral that also provides (A) that the Substituted Collateral in an amount equal to the COFINA Revenues has

been irrevocably transferred to and is owned solely and exclusively by the Corporation to the full extent provided under Article 2.2 of this Act, (B) that, following such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not, and shall not constitute, "available resources" or "available revenues" of the Government of Puerto Rico as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution), (C) for a lien on such Substituted Collateral in favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds to the full extent provided for under Article 3.2 of this Act, and (D) that the Government of Puerto Rico and the Government Entities shall continue to provide the covenants set forth in Article 3.3 of this Act with respect to such Substituted Collateral, and (2) prior to the substitution of the Substituted Collateral, the ratings requirements set forth in the Ancillary Agreements are satisfied with respect to the Substituted Collateral.

## CHAPTER 2. - THE PUERTO RICO SALES TAX FINANCING CORPORATION

Article 2.1. - Creation and Separate Legal Existence of the Corporation.

There is created a public corporation and instrumentality of the Government of Puerto Rico, which constitutes a corporate and political entity independent and separate from the Government of Puerto Rico to be known as the Puerto Rico Sales Tax Financing Corporation. The Corporation, which was created pursuant to the provisions of this Act, is and shall be recognized for all purposes as an independent and separate legal entity from the Government of Puerto Rico and any other Government Entity. It shall be operated independently, and its business and affairs shall be governed by or under the direction of its Board of Directors.

Article 2.2. - Ownership of the COFINA Revenues.

(a)     Any and all ownership interests and rights to the COFINA Revenues were, have been or are hereby transferred to the Corporation.

(b)     The transfer described in (a) above is an absolute transfer of all legal and equitable right, title and interest, and not a pledge or other financing.

(c)     The Corporation is and will be the sole and exclusive owner of the COFINA Revenues until such time as the Plan of Adjustment Bonds, together with any interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

(d)     Persons designated as withholding agents for purposes of the imposition and collection of the Sales Tax pursuant to the Act 1-2011, as amended, also known as the "Internal Revenue Code for a New Puerto Rico", shall be deemed to collect any portion of the Sales Taxes in which the Corporation has an ownership interest on behalf of the Corporation. Any such withholding agent will continue to be subject to any and all obligations and responsibilities imposed by the Internal Revenue Code for a New Puerto Rico, on withholding agents in relation to the imposition and collection of the Sales Tax.

(e)     The COFINA Revenues do not constitute "available resources" or "available revenues" of the Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution).

Article 2.3.-Purpose of the Corporation.

On and after the Effective Date, the Corporation's purpose will be to (a) issue the Plan of Adjustment Bonds, (b) own and administer the COFINA Revenues, and (c) issue any other bonds, notes or evidence of indebtedness of the Corporation as may be permitted by the Corporation Plan of Adjustment and the Ancillary Agreements and which will be payable from such sources as may be provided for by the Legislative Assembly.

Article 2.4.-The Corporation's Activities.

The Corporation's activities shall be limited to the following:

(a)     receiving and owning the COFINA Revenues and such other revenues or property as may be provided or transferred to the Corporation;

(b)     adopting the Restructuring Resolution;

(c)     issuing, from time to time, Plan of Adjustment Bonds and any bonds, notes or evidences of indebtedness the issuance of which is authorized by Article 2.3 of this Act;

(d)     entering into and performing the Ancillary Agreements;

(e)     to pay any bonds, notes or evidences of indebtedness the issuance of which is authorized by Article 2.3 of this Act by pledging, on a basis subordinate in all respects to the lien established in Article 3.2 of this Act, (1) any

amounts remaining of the COFINA Revenues after the payment of principal and interest on the Plan of Adjustment Bonds or (2) any other funds or property that may be allocated to the Corporation after the Effective Date; and

(f)     taking any and all other actions as may be necessary or appropriate to effectuate the Restructuring Transaction and the Corporation Plan of Adjustment, including making amendments to, exchanging and/or canceling bonds issued by the Corporation prior to the Effective Date and amending and restating agreements of the Corporation relating thereto.

Article 2.5.-Ancillary Powers.

In order to carry out the Authorized Activities, without limiting the foregoing, the Corporation shall have the power to:

(a)     sue and be sued in any Commonwealth court or the Federal District Court;

(b)     adopt, alter and use a seal;

(c)     formulate, adopt, amend and revoke rules for the administration and management of its affairs, and such standards, rules and regulations that may be necessary or convenient to exercise and perform the Authorized Activities;

(d)     open and maintain bank accounts, including the COFINA Revenues Fund;

(e)     acquire, hold, lease, sell and otherwise transfer property;

(f)     have complete legal and equitable dominion over its properties (including the COFINA Revenues), subject to the statutory lien established under Article 3.2 of this Act;

(g)     make, execute and amend contracts and all other instruments necessary or convenient to perform the Authorized Activities;

(h)     appoint and remove officers, agents, employees and contractors, establish their compensations, powers and duties, in each case, in accordance with the Ancillary Agreements;

(i)     pay its operating expenses and the Financing Costs;

(j)  procure insurance, including insurance covering the Corporation's directors and officers, against loss in connection with its activities, properties or assets;

(k)  invest funds and establish and maintain reserves as required by, and pursuant to standards set forth in, the Ancillary Agreements;

(l)  indemnify the members of the Board of Directors, its officers, agents, employees, contractors and other third parties for conduct that does not constitute gross negligence, willful misconduct or fraud;

(m)  exercise such other powers, not inconsistent herewith, as may be necessary to carry out the Authorized Activities;

(n)  take any action or measure necessary or convenient to carry out its purposes and exercise the powers expressly granted in this Article;

(o)  delegate to its officers, agents, employees or contractors authority to take actions in furtherance of this Act; and

(p)  execute, file and amend any relevant returns, forms, elections or statements with any governmental authority.

Article 2.6.-Prohibited Activities.

While the Plan of Adjustment Bonds are outstanding, the Corporation shall not be authorized to:

(a)  merge or consolidate, directly or indirectly, with any Person;

(b)  incur, guarantee or otherwise become obligated to pay any debt or other obligations other than the Plan of Adjustment Bonds, operating costs, the Financing Costs and any bond, note or evidence of indebtedness permitted under Article 2.3 hereof;

(c)  pledge, create or record liens on any of its properties (including the COFINA Revenues), other than (1) the pledge to secure the payment of Plan of Adjustment Bonds created pursuant to Article 3.2 of this Act or (2) any pledge or lien to secure any bond, note or evidence of indebtedness permitted under Article 2.3 hereof but only to the extent such pledge or lien is subordinate in all respects to the lien established in Article 3.2 of this Act;

(d)     engage in business activities other than as expressly authorized in this Act;

(e)     dissolve, liquidate, sell or, except as permitted by Article 2.4(e), otherwise transfer any or all of its properties (including the COFINA Revenues);

(f)     the directors of the Corporation shall not vote to authorize the Corporation to commence a case under Title III of PROMESA or other similar judicial restructuring process under applicable law subject to the provisions thereof; and

(g)     take any other action that is inconsistent with the Corporation's purpose set forth in this Act or ancillary thereto.

Article 2.7.-Board of Directors.

The powers of the Corporation shall be exercised by the Board of Directors.

(a)     Composition of the Board of Directors.

The Board of Directors shall be composed of three (3) members, who shall meet the requirements set forth in Article 2.7 (b)(iii) of this Act and shall be appointed by the Governor of Puerto Rico; provided, that, pursuant to the provisions of the Ancillary Agreements, certain holders of Plan of Adjustment Bonds may submit up to three (3) recommendations for the Governor's consideration of the initial appointment of the Corporation's directors but the Governor shall be under no obligation to appoint any such recommended persons.

(b)     General Provisions regarding the Board of Directors.

(i)     Each member of the Board of Directors shall be appointed for a term of three (3) years and may serve consecutive terms as an appointed member; provided, that the Governor may remove any member prior to the expiration of their term if such member fails to uphold the responsibilities set forth in this Act or for gross negligence, willful misconduct or fraud;

(ii)    each member of the Board of Directors shall be entitled to one (1) vote;

(iii)   each member of the Board of Directors shall satisfy the independence and qualification standards (including that no member of the Board of Directors may be an officer, employee or director of any

Government Entity other than the Corporation) set forth in the Ancillary Agreements;

(iv)     all decisions and actions of the Board of Directors shall require the affirmative vote of the majority of the members of the Board of Directors at the time serving; provided, that, the Corporation's bylaws may require a higher approval threshold for particular matters described therein; and

(v)      the members of the Board of Directors shall select a Chair from among themselves.

(c)    Vacancies.

In the event of a vacancy in the office of a member of the Board of Directors by death, removal, resignation or otherwise, a successor member who meets the requirements set forth in Article 2.7 (b)(iii) of this Act shall be appointed by the Governor of Puerto Rico subject to Article 2.7(b)(i) hereof.

(d)    Compensation.

Members of the Board of Directors shall receive such compensation as is authorized pursuant to the Ancillary Agreements.

(e)    Adoption and Amendment of Rules.

As soon as practicable after the appointment of all members and appointment of the Chair, the Corporation shall adopt rules and procedures governing its activities under this Act. The Board of Directors shall be entitled to amend such rules and procedures from time to time.

(f)    Quorum.

A majority of the members of the Board of Directors at the time serving shall constitute a quorum to make decisions or exercise any power or function of the Corporation. Any one or more members may participate in a meeting of the Board of Directors by teleconference or similar communications equipment. Participation by such means shall constitute presence in person at the meeting. Any action necessary or allowed in any meeting of the Board of Directors shall be authorized with no need for a meeting, if all the members of the Board of Directors give their written consent concerning such action.

(g)     Delegation.

        The Board of Directors may delegate to one or more of the members, or to the Corporation's officers, agents and employees, such powers and duties as the Board of Directors may deem appropriate.

Article 2.8.-Tax Exemption.

(a)     It is hereby found and declared that the activities of the Corporation are for a public purpose. As a result, the Corporation shall be totally exempt from, and shall not be required to pay any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the Government of Puerto Rico or any Government Entity upon any of the property that the Corporation owns, possesses, holds or uses or on its activities, or upon any income, payment or gain derived therefrom.

(b)     The Plan of Adjustment Bonds, including, but not limited to, any payments or income with respect to the Plan of Adjustment Bonds and the transfer of the Plan of Adjustment Bonds, shall, at all times, be totally exempt from all kinds of taxes, assessments, licenses, stamps, fees and other charges levied by the Government of Puerto Rico or any Government Entity. Holders and beneficial owners of the Plan of Adjustment Bonds shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Government of Puerto Rico or any Government Entity by reason of holding, owning or transferring the Plan of Adjustment Bonds.

Article 2.9.-Inapplicability of Certain Laws.

The following laws or provisions shall not apply to the Corporation:

(a)     Chapters 4 and 6 of Act 26-2017, as amended, known as the "Fiscal Plan Compliance Act";

(b)     Act 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011";

(c)     Act 103 of May 25, 2006, as amended, known as the "Act for the Fiscal Reform of the Government of the Commonwealth of Puerto Rico of 2006";

(d)     Act 8-2017, as amended, known as the "Act for the Transformation of the Government's Human Resources";

(e) Act 237-2004, as amended, known as the "Act to Establish Uniform Parameters for Contracting Professional and Consulting Services by Agencies and Instrumentalities of the Government of Puerto Rico";

(f) Act 197-2002, as amended, known as the "Act to Regulate the Transition Process of the Government of Puerto Rico";

(g) Act 78-2011, as amended, known as the "Electoral Code of Puerto Rico for the XXI Century";

(h) Act 38-2017, known as the "Uniform Administrative Procedures Act of the Government of Puerto Rico";

(i) Plan 3-2011, as amended, known as "General Services Administration Reorganization Plan";

(j) Act 230 of July 23, 1974, as amended, known as the "Government Accounting Act";

(k) Act 3-2017, known as the "Law to Address the Economic, Fiscal and Budgetary Crisis and Ensure the Functioning of the Government of Puerto Rico"; and

(l) Act 14 of April 17, 1972, as amended.

CHAPTER 3.-THE RESTRUCTURING TRANSACTION

Article 3.1.-Issuance of Plan of Adjustment Bonds.

(a) From and after the Effective Date, the Corporation shall be authorized to issue Plan of Adjustment Bonds, from time to time, pursuant to the Corporation Plan of Adjustment and the terms and conditions authorized by the Corporation and set forth in the applicable Restructuring Resolution and the Ancillary Agreements.

(b) Plan of Adjustment Bonds shall be dated, shall bear interest at such rates and shall mature at such time or times as may be determined by the Corporation and authorized in the applicable Restructuring Resolution in accordance and consistent with the Corporation Plan of Adjustment. The Corporation shall determine the form of Plan of Adjustment Bonds and the manner of execution of Plan of Adjustment Bonds, and shall fix the denomination or denominations of Plan of Adjustment Bonds and the place or places of payment of principal thereof and interest thereon, the terms of

redemption and purchase in lieu of redemption and the other terms thereof, all in accordance and consistent with the Corporation Plan of Adjustment. Such Plan of Adjustment Bonds may be sold at public or private sale for such price or prices as the Corporation shall determine, or issued in exchange for existing bonds of the Corporation in accordance with the Plan of Adjustment.

(c)    Plan of Adjustment Bonds shall be payable solely from the COFINA Revenues in accordance with the terms of this Act and the Ancillary Agreements.

(d)    The Corporation may purchase bonds issued by the Corporation on the terms and in accordance with the Corporation Plan of Adjustment and applicable Ancillary Agreements at a price not exceeding the redemption price thereof. All bonds so purchased shall be cancelled.

(e)    Plan of Adjustment Bonds shall not constitute a debt of the Government of Puerto Rico or of any Government Entity other than the Corporation. This statement shall be included in the Plan of Adjustment Bonds, the Bond Indenture and the disclosure documentation relating to such bonds.

Article 3.2.-Statutory Lien.

Plan of Adjustment Bonds shall automatically, upon the issuance of such Plan of Adjustment Bonds, be secured by a statutory first lien on all of the Corporation's right, title and interest in and to the Pledged Taxes, including any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, in favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds. Such statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory first lien or to establish or maintain the priority thereof. No commingling of the Pledged Taxes with any property of the Government of Puerto Rico, any other Government Entity or any other Person shall limit, defeat, impair or interfere with such statutory lien. Such lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Corporation or its assets irrespective of whether such Persons have notice of such lien.

Article 3.3.-Covenants Regarding Plan of Adjustment Bonds and the Restructuring Transaction.

The Government of Puerto Rico, with the intent of being contractually bound, hereby agrees and covenants with the Corporation and each Person that holds Plan of Adjustment Bonds, and authorizes the Corporation to include such covenant in the Bond Indenture for the benefit of the holders of Plan of Adjustment Bonds, that it will not, and no Government Entity shall be authorized to, until the Plan of Adjustment Bonds, together with the interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or otherwise discharged in accordance with their terms:

(a)     take any action that would (A) impair the Corporation's right to receive the COFINA Revenues, (B) limit or alter the rights vested in the Corporation in accordance with the Corporation Plan of Adjustment to fulfill the terms of any agreements with the holders of Plan of Adjustment Bonds, (C) materially and adversely impair the collection of the Pledged Taxes in any Fiscal Year, or (D) impair the rights and remedies of the holders of the Plan of Adjustment Bonds or the collateral security established under Article 3.2 of this Act;

(b)     reduce the Pledged Taxes to a rate less than five and one-half percent (5.5%) unless, in connection with such reduction, the credit rating and other requirements set forth in the Ancillary Agreements are satisfied; provided, however, that, notwithstanding the foregoing, until all obligations with respect to the Plan of Adjustment Bonds have been paid or satisfied in full in accordance with their terms, if the rate of the Pledged Taxes is reduced below three (3) percent, then, in connection with such reduction, the Government of Puerto Rico must comply with the Substitution Requirements;

(c)     impair, limit, restrict, rescind, delay or modify the rights or powers of the Corporation, the Indenture Trustee or the holders of Plan of Adjustment Bonds under this Act or relating to the COFINA Revenues, or the Corporation's ability to meet its obligations to its bondholders;

(d)     amend this Act to impair, limit, restrict, rescind, delay or modify any obligation or commitment of the Corporation to the holders of Plan of Adjustment Bonds; and

(e)     limit or restrict the rights or powers of the appropriate officers of the Government of Puerto Rico to impose, maintain, charge or collect the Pledged Taxes, provided that the foregoing shall not preclude the Government of Puerto Rico from exercising its power, through a change in law, replace the portion of the Sales Tax that corresponds to a tax rate of

five and one half (5.5) percent with Substituted Collateral in accordance with the Substitution Requirements.

CHAPTER 4.-FUNDING OF THE CORPORATION; DEPOSITS AND DISBURSEMENTS.

Article 4.1.-First Dollars Funding of COFINA Revenues.

(a) Each Fiscal Year, the first funds comprising the Pledged Taxes shall be transferred to, and deposited with, the Corporation, or any account or fund, including the COFINA Revenues Fund or an account or fund controlled by the Indenture Trustee designated in the Bond Indenture pursuant to which obligations were incurred in accordance with this Act and the Ancillary Agreements, designated by the Corporation, until such time as the Corporation has received an amount equal to the COFINA Revenues for such Fiscal Year. The requirement that the first funds comprising the Pledged Taxes up to the COFINA Revenues be deposited with the Corporation or in any account or fund, including the COFINA Revenues Fund or an account or fund controlled by the Indenture Trustee designated in the Bond Indenture pursuant to which obligations were incurred in accordance with this Act and the Ancillary Agreements, designated by the Corporation may not be modified; provided, that the Bond Indenture may contain provisions allowing for the quarterly distribution of the Pledged Taxes between the Corporation and the Government of Puerto Rico upon satisfaction of the requirements set forth in the Bond Indenture and consistent with the Corporation Plan of Adjustment. The Corporation shall have the rights set forth in this Article 4.1 until such time as the Plan of Adjustment Bonds, together with any interest thereon, and all obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

(b) During each Fiscal Year, the Indenture Trustee or such other Person as may be designated in the Bond Indenture shall determine, on a monthly basis, if the Corporation has received the COFINA Revenues. Once the Indenture Trustee or such other Person determines that the COFINA Revenues have been deposited with the Indenture Trustee, or that portion of the COFINA Revenues as the Corporation may be entitled to the extent the quarterly distribution referenced in Article 4.1(a) above is in effect, all revenues of the Pledged Taxes received after such determination shall be transferred to the Government of Puerto Rico.

(c)     No Person who collects or holds the Pledged Taxes shall have any legal or equitable right, title or interest thereto solely by virtue of the fact that it collects or holds the Pledged Taxes.

Article 4.2.-Excess Funding.

The amounts deposited with the Corporation each Fiscal Year in excess of the amounts required to pay principal and interest on the Plan of Adjustment Bonds then due and payable (including the principal and interest due and payable on any past due Plan of Adjustment Bonds), satisfy obligations assumed pursuant to the Bond Indenture or other Ancillary Agreements then due and payable, pay its Financing Costs or operating expenses as provided in the Ancillary Agreement, or make any other payment related to other obligations incurred by the Corporation, will be transferred to the Corporation, free and clear of the lien established by Article 3.2 of this Act and any other lien established by the Bond Indenture or other Ancillary Agreement.

CHAPTER 5.-MISCELLANEOUS PROVISIONS.

Article 5.1.-Severability.

This Act shall be interpreted in accordance with the Puerto Rico Constitution and the U.S. Constitution. If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order to such effect will neither affect nor invalidate the remainder of this Act. The effect of such an order shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act so annulled or declared unconstitutional. If the application to a Person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order to such effect will neither affect nor invalidate the application of the remainder of this Act to such Persons or circumstances to which it may be validly applied. It is the express and unequivocal intent of this Legislative Assembly that the courts of law enforce the provisions and application of this Act even if any of its parts is annulled, invalidated, affected or declared unconstitutional, or even if the application thereof to any Person or circumstance is annulled, invalidated or declared unconstitutional.

Article 5.2.-Language Conflict.

This Act shall be adopted both in English and Spanish. If in the interpretation or application of this Act any conflict arises as between the English and Spanish texts, the English text shall govern."

Sección 26.-Se derogan los Artículos 2 y 4 de la Ley 116-2013, según enmendada.

Sección 27.-Se enmienda el Artículo 25-A de la Ley 44 del 21 de junio de 1988, según enmendada, para que lea en su totalidad como sigue:

"(a)    ...

...

(k)    Durante el período comprendido entre la fecha de aprobación de esta Ley y el 31 de diciembre de 2012, la Corporación habrá de disponer de los activos depositados en la Cuenta del Corpus de la siguiente manera:

(i)    ...

(ii)    el remanente, permanecerá en la Cuenta del Corpus y se utilizará para comprar un bono de apreciación de capital emitido por la Corporación para el Fondo de Interés Apremiante de Puerto Rico con un vencimiento no menor de 30 años ni mayor de 40 años y a una tasa de interés de no menos de 7.00%. El Sistema de Retiro de Empleados del Estado Libre Asociado de Puerto Rico y la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico no podrán disponer voluntariamente del bono de la Corporación del Fondo de Interés Apremiante de Puerto Rico, a menos que dicha disposición sea autorizada por la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico."

Sección 28.-Separabilidad.

Esta Ley se interpretará de acuerdo a la Constitución de Puerto Rico y la Constitución de los Estados Unidos de América. Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e

inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

Sección 29.-Supremacía.

Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición general o específica de cualquier otra ley o reglamento del Gobierno de Puerto Rico que sea inconsistente con esta Ley.

Sección 30.-Vigencia.

Esta Ley comenzará a regir en la fecha en que el plan de ajuste con relación al caso de la Corporación al amparo del Título III de PROMESA advenga efectivo de acuerdo a sus términos.

DEPARTAMENTO DE ESTADO
Certificaciones, Reglamentos, Registro
de Notarios y Venta de Leyes
Certifico que es copia fiel y exacta del original
Fecha: 3 de DICIEMBRE de 2018

Firma

Eduardo Arosemena Muñoz
Secretario Auxiliar
Departamento de Estado
Gobierno de Puerto Rico

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                   Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>                   Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

AMENDED ORDER AND JUDGMENT CONFIRMING THE
THIRD AMENDED TITLE III PLAN OF ADJUSTMENT
OF PUERTO RICO SALES TAX FINANCING CORPORATION*

[1]    The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*    This Amended Order and Judgment includes certain conforming changes and supersedes the *Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* filed as Docket Entry No. 5048 in Case No. 17-3283 and Docket Entry No. 559 in Case No. 17-3284.

# TABLE OF CONTENTS

Page

1.   Findings/Conclusions ................................................................................................... 4
2.   Objections ..................................................................................................................... 7
3.   Confirmation of the Plan .............................................................................................. 7
4.   Compromise of Commonwealth-COFINA Dispute .................................................... 7
5.   Settlement Agreement Approved .................................................................................. 8
6.   Plan Settlement Approved ............................................................................................ 8
7.   The Adversary Proceeding ............................................................................................ 8
8.   The Interpleader Action ................................................................................................ 9
9.   Implementation of the Plan .......................................................................................... 9
10.  No Action ..................................................................................................................... 10
11.  Binding Effect .............................................................................................................. 10
12.  Cancellation of Notes, Instruments, Certificates, and Other Documents ................... 11
13.  Rejection or Assumption of Remaining Executory Contracts and Unexpired
     Leases ........................................................................................................................... 12
14.  Insurance Policies ......................................................................................................... 13
15.  Objection to Cure Amounts; Rejection Damages Claims ............................................ 13
16.  Payment of Cure Amounts ........................................................................................... 14
17.  Setoff ............................................................................................................................ 14
18.  Delivery of Distributions ............................................................................................. 15
19.  Disbursing Agent .......................................................................................................... 18
20.  Securities Act Exemption. ............................................................................................ 18
21.  Deemed Acceleration (Ambac Insured Bonds) ........................................................... 18
22.  Deemed Acceleration (Assured Insured Bonds) .......................................................... 19
23.  Disputed Claims Holdback ........................................................................................... 19
24.  No Amendments to Proofs of Claim ............................................................................ 20
25.  Conditions to Effective Date ........................................................................................ 20
26.  Administrative Claim Bar Date .................................................................................... 20
27.  Professional Compensation and Reimbursement Claims ............................................ 21
28.  Consummation Costs .................................................................................................... 21
29.  Discharge and Release of Claims and Causes of Action ............................................. 23

i

| 30. | Releases by COFINA and Reorganized COFINA | 26 |
| 31. | Release and Exculpation Provisions | 27 |
| 32. | Preservation of Certain Claims and Causes of Action. | 28 |
| 33. | Injunction on Claims | 28 |
| 34. | Injunction Related to Releases | 29 |
| 35. | Exculpation | 30 |
| 36. | Appointments Related Litigation | 33 |
| 37. | Bar Order | 33 |
| 38. | Supplemental Injunction | 34 |
| 39. | COFINA Agent and Commonwealth Agent Releases and Exculpation | 35 |
| 40. | Term of Existing Injunctions or Stays | 35 |
| 41. | Prosecution of Claims | 36 |
| 42. | Indemnification and Reimbursement Obligations | 36 |
| 43. | Compliance with Tax Requirements | 36 |
| 44. | Documents and Instruments | 37 |
| 45. | Reversal/Stay/Modification/Vacatur of Order | 37 |
| 46. | Retention of Jurisdiction | 38 |
| 47. | Conflicts Among Order, Plan, and Settlement Order | 38 |
| 48. | Collective Action. | 38 |
| 49. | Modifications | 39 |
| 50. | Provisions of Plan and Order Nonseverable and Mutually Dependent | 39 |
| 51. | Governing Law | 39 |
| 52. | Applicable Nonbankruptcy Law | 40 |
| 53. | Non-Effect on Other Actions. | 40 |
| 54. | Use of Commonwealth Funds | 41 |
| 55. | Waiver of Filings | 41 |
| 56. | Notice of Order | 41 |
| 57. | Waiver of Stay | 41 |
| 58. | No Waiver | 42 |
| Exhibit A Plan | | A-1 |
| Exhibit B Form of Notice | | B-1 |

The Puerto Rico Sales Tax Financing Corporation ("COFINA" or the "Debtor"),

by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight

Board"), as representative of the debtor under PROMESA section 315(b), having proposed and

filed with the United States District Court for the District of Puerto Rico (the "Court") the *Third*

*Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated

January 9, 2019 (Docket Entry No. 439 in Case No. 17-3284[2]) (as modified pursuant to any

revisions made at or subsequent to the Confirmation Hearing as set forth in this Order, including

the Second Amended Plan Supplement, and as may be modified pursuant to section 313 of

PROMESA, the "Plan");[3] and the Court having entered, pursuant to, inter alia, section 1125 of the

Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated

November 29, 2018 (Docket Entry No. 375, the "Disclosure Statement Order"), approving the

Disclosure Statement, establishing procedures for the solicitation, voting, and tabulation of votes

on and elections with respect to the Plan, approving the forms of ballots, master ballots, and

election notices used in connection therewith, and approving the form of notice of the

Confirmation Hearing; and the Court having entered the *Notice Regarding the Proper Method for*

*Submission of Objections to the Proposed COFINA Plan of Adjustment* (Docket Entry No. 384);

---

[2]    All docket entry references are to entries in Case No. 17-3284, unless otherwise noted.

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in
the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein),
or the *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection
with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales
Tax Financing Corporation* (the "Findings of Fact and Conclusions of Law"), as
applicable; provided, however, that references herein to "COFINA Revenues" are used to
maintain consistent terminology with the New Bond Legislation and shall have the same
meaning as the term "COFINA Portion" as defined and used in the Plan, and shall include
any collateral that may be substituted for the COFINA Revenues in accordance with the
terms and provisions of the Plan and the New Bond Legislation. A copy of the Plan is
annexed hereto as Exhibit A.

and the following documents having been filed by the Debtor, the COFINA Agent, or PSA

Creditors in support of or in connection with confirmation of the Plan, including the Settlement of

the Commonwealth-COFINA Dispute incorporated into the Plan:

(a) *Second Amended Plan Supplement and Plan Related Documents of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4956 in Case No. 17-3283, the "Second Amended Plan Supplement");

(b) *Certificate of Service of Solicitation Materials* (Docket Entry No. 387, the "Mailing Affidavit");

(c) *Certificate of Publication* (Docket Entry No. 585, the "Publication Affidavit");

(d) *Certificate of Service* (Docket Entry No. 429, the "Garraway Affidavit", and together with the Mailing Affidavit and Publication Affidavit, the "Service Affidavits");

(e) *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment* (Docket Entry No. 4663 in Case No. 17-3283, the "Omnibus Reply");

(f) *Memorandum of Law in Support of Puerto Rico Sales Tax Financing Corporation's Third Amended Title III Plan of Adjustment* (Docket Entry No. 4664 in Case No. 17-3283, the "Confirmation Brief");

(g) *Declaration of Natalie A. Jaresko in Support of Confirmation of Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4756 in Case No. 17-3283, the "Jaresko Decl.");

(h) *Declaration of David M. Brownstein in Support of Confirmation of Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4757 in Case No. 17-3283, the "Brownstein Decl.");

(i) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4794 in Case No. 17-3283, the "Pullo Decl.");

(j) *Statement of COFINA Agent in Support of Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4656 in Case No. 17-3283);

(k) *Declaration of Matthew A. Feldman* (Docket Entry No. 4656-1 in Case No. 17-3283, the "Feldman Decl.");

(l) *Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4665 in Case No. 17-3283, the "Senior Coalition Reply"), and the joinder filed thereto by the certain Puerto Rico based mutual funds (Docket Entry No. 4670 in Case No. 17-3283);

(m) *Declaration of Matthew Rodrigue in Support of Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation ("COFINA")* (Docket Entry No. 4665-1 in Case No. 17-3283, the "Rodrigue Decl.");

(n) *Declaration of Natalie A. Jaresko in Support of Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4758 in Case No. 17-3283, the "Jaresko (9019) Decl.");

(o) *Informative Motion of National Public Finance Guarantee Corporation in Support of COFINA Plan of Adjustment* (Docket Entry No. 4888 in Case No. 17-3283);

(p) *Ambac Assurance Corporation's Statement Concerning the Court's Authority to Determine and Declare the Validity of the New Bond Legislation* (Docket Entry No. 4889 in Case No. 17-3283);

(q) *Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4890 in Case No. 17-3283);

(r) *Declaration of Susheel Kirpalani in Support of Supplemental Brief of Plan Support Parties in Support of Proposed Findings of Fact and Conclusions of Law and Order Confirming Third Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 4892 in Case No. 17-3283);

and objections to confirmation having been interposed by certain parties, as reflected on the docket of the Title III Cases and/or on the record of the Confirmation Hearing;[4] and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing; and the Court hereby overruling any remaining objections; and the Court having held the

---

[4]     All opposition submissions are also listed as part of the Court's *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 560).

Confirmation Hearing commencing on January 16, 2019; and the appearances of all interested

parties having been noted in the record of the Confirmation Hearing; and after full consideration

of the record of the COFINA Title III Case, including, without limitation, motions, applications

and orders in the COFINA Title III Case, the foregoing documents, and the evidence admitted and

arguments of counsel presented at the Confirmation Hearing; and the Court having entered the

*Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico*

*and Puerto Rico Sales Tax Financing Corporation* (Docket Entry No. 5045 in Case No. 17-3283)

in the Commonwealth Title III Case; and after due deliberation and good and sufficient cause

appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.  Findings/Conclusions.  The Findings of Fact and Conclusions of Law set forth in

the *Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with*

*Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax*

*Financing Corporation* are incorporated herein as though set forth in full.  Notwithstanding such

incorporation, the following summarizes certain of the Court's determinations:

> (A)   Pursuant to PROMESA, on May 3, 2017 and May 5, 2017, respectively, the
> Commonwealth and COFINA each commenced a federal case before the
> Court in accordance with the requirements of Title III of PROMESA. The
> commencement of these cases vested the Court with exclusive jurisdiction
> over the cases and all respective property of the Commonwealth of Puerto
> Rico and COFINA, wherever located.  As a result of the consensual
> agreement among the Commonwealth, COFINA, and their respective
> creditor representatives, the parties formulated, duly solicited, and now seek
> confirmation of a plan of adjustment in accordance with federal law. The
> Plan and this Order quiet title to the COFINA Pledged Taxes and resolve
> all disputes of all parties relating thereto.  Moreover, pursuant to
> PROMESA, and at the request of the Commonwealth and COFINA, the
> Court shall retain jurisdiction until the COFINA Bonds have been paid in
> full or otherwise satisfied in accordance with their terms to ensure
> compliance with the Plan and to adjudicate claims arising therefrom,
> including claims for specific performance.

(B)   As set forth more fully in the Findings of Fact and Conclusions of Law, the Court has made the following determinations pursuant to applicable law:

(ii)   This Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law. Confirmation of the Plan constitutes a judicial determination, pursuant to section 4 of PROMESA, that the terms of this Order shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

(iii)   The Court shall retain jurisdiction to enforce the terms hereof and of the Plan.

(iv)   Subject to the occurrence of and upon the Effective Date, Reorganized COFINA shall be an independent public corporation and instrumentality of the Commonwealth, separate from the Commonwealth and any other instrumentality of the Commonwealth.

(v)   Subject to the occurrence of and upon the Effective Date, ownership of the COFINA Revenues shall have been legally and validly transferred to Reorganized COFINA, and such transfer of ownership shall have been an absolute transfer of all legal and equitable right, title, and interest in the COFINA Revenues, free and clear of all liens, claims, encumbrances, and other interests of any party (except for the statutory lien that arises automatically, pursuant to the terms of the New Bond Legislation, to secure the COFINA Bonds).

(vi)   Subject to the occurrence of and upon the Effective Date, the COFINA Revenues shall not constitute, and shall not be deemed to be, "available resources" or "available revenues" of the Commonwealth, as that term is used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution).

(vii)   Subject to a "Quarterly Installment" funding construct to the extent certain conditions are satisfied, each fiscal year, until the COFINA Bonds are paid in full or otherwise satisfied in accordance with their terms, the first funds comprising the COFINA Pledged Taxes shall be transferred to and deposited with Reorganized COFINA until such time that Reorganized COFINA has received an amount equal to the COFINA Revenues for such fiscal year.

(viii)   Reorganized COFINA's sole and exclusive ownership of the COFINA Revenues shall not be affected in any way by the manner

of or control over collection, any person who collects or holds the COFINA Revenues shall do so on behalf of Reorganized COFINA, and no person or entity that collects or holds the COFINA Revenues shall have any legal or equitable right, title, or interest to the COFINA Revenues other than Reorganized COFINA, for the benefit of holders of the COFINA Bonds.

(ix)   The statutory first lien against the COFINA Pledged Taxes (including any New Collateral substituted for the COFINA Pledged Taxes in accordance with the terms of the Plan and the New Bond Legislation) arising by operation of the New Bond Legislation in favor of holders of COFINA Bonds is legal, valid, binding and enforceable and shall remain in full force and effect and shall be "closed" until, in each case, the COFINA Bonds have been paid or satisfied in full in accordance with their terms.

(x)   At the time of issuance and delivery of the COFINA Bonds, Reorganized COFINA is hereby directed to be stamped or written on each of the COFINA Bonds a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 5TH DAY OF FEBRUARY, 2019

(xi)   The Commonwealth's agreement, on behalf of itself and its governmental entities, not to take any action that would, among other things, (a) impair COFINA's right to receive the COFINA Revenues, (b) limit or alter the rights vested in COFINA in accordance with the Plan to fulfill the terms of the COFINA Bonds, (c) materially adversely impair the collection of the COFINA Pledged Taxes in any fiscal year, or (d) impair the rights and remedies of the holders of the COFINA Bonds or the statutory lien established under Article 3.2 of the New Bond Legislation, each as provided in the New Bond Legislation and the New Bond Indenture, serve as adequate protection for the property interests of Reorganized COFINA and the holders of the COFINA Bonds in the COFINA Pledged Taxes under all applicable law, and constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized COFINA, and the Commonwealth, as applicable, and an integral part of the settlements set forth in the Plan.

(xii)   The covenants described in Sections 16.6 and 16.7 of the Plan (including, but not limited to, the rating agency covenant, the tax

exemption covenant, the substitution covenant, the non-impairment covenant and the sales tax covenant), to be provided by Reorganized COFINA and the Commonwealth, as the case may be, to the holders of COFINA Bonds, shall constitute adequate protection for the property interests of Reorganized COFINA and the holders of COFINA Bonds in the COFINA Pledged Taxes under all applicable law.

2.    Objections.  All objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are, OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn with prejudice.

3.    Confirmation of the Plan.  The Plan and each of its provisions shall be, and hereby are, CONFIRMED pursuant to section 314(b) of PROMESA.  The documents contained in the Second Amended Plan Supplement are authorized and approved.  The terms of the Plan, as modified by the revisions made at or subsequent to the Confirmation Hearing, as set forth in this Order as well as in the revised composite copy attached hereto as Exhibit A, including the Second Amended Plan Supplement, as has and may be amended, are incorporated by reference into and are an integral part of this Order.

4.    Compromise of Commonwealth-COFINA Dispute.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan and the Settlement Agreement constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the Settlement Agreement and the compromise and settlement of the Commonwealth-COFINA Dispute incorporated into the Plan, and the entry of this Order constitutes approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code.  Pursuant to this Order and the Settlement Order, to the extent provided in the Plan and the Settlement Agreement, respectively, on the Effective Date, such compromises and settlements shall be binding upon COFINA, the Commonwealth, all Creditors

of COFINA and the Commonwealth, and all other Entities and, to the fullest extent permitted by applicable law, shall not be subject to collateral attack or other challenge in any court or other forum.

5. <u>Settlement Agreement Approved.</u> The Court (a) approves the Settlement Agreement as a good faith compromise that is fair and reasonable and in COFINA's best interests and integral to the Plan, and (b) upon the Effective Date, authorizes and directs the consummation of the Settlement Agreement by all parties thereto.

6. <u>Plan Settlement Approved.</u> The Court hereby approves the compromises and settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan, authorizes and directs the consummation thereof.

7. <u>The Adversary Proceeding.</u> As soon as practicable after entry of this Order, but in no event later than five (5) business days following the Effective Date, each of (a) the Commonwealth Agent, (b) the COFINA Agent, and (c) the Permitted Intervenors, as defined in prior orders of the Court in connection with the Adversary Proceeding, shall take any and all actions necessary to cause the dismissal, with prejudice, of the Adversary Proceeding and all other claims and causes of action asserted therein by the Commonwealth Agent, the COFINA Agent, and the Permitted Intervenors, including, without limitation, causing the entry of an order in the Adversary Proceeding evidencing such dismissal, with prejudice. Upon the dismissal, with prejudice, of the Adversary Proceeding, the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have satisfied any and all of their respective obligations in connection with the Adversary Proceeding, and the Commonwealth Agent and the COFINA Agent shall be deemed to have been released from any and all liabilities associated therewith.

8.     The Interpleader Action. As soon as practicable after entry of this Order, but in no event later than five (5) business days following the Effective Date, hereof and except with respect to (i) any Claims and causes of action asserted or that could have been asserted by BNYM against Ambac and Whitebox in the Interpleader Action and (ii) any non-released and non-dismissed counterclaims that may be asserted by either Ambac or Whitebox against BNYM therein for gross negligence, willful misconduct or intentional fraud, the parties to the Interpleader Action shall take any and all actions necessary to cause the dismissal, with prejudice, effective as of the Effective Date, of all other claims and causes of action asserted or that could have been asserted in the Interpleader Action, including, without limitation, filing a notice and obtaining an order of the Court with respect all such dismissed claims and causes of action.

9.     Implementation of the Plan. On and after the Effective Date, the Debtor, Reorganized COFINA, and each of their respective authorized agents and representatives are authorized to (i) execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, including, without limitation, those contained in the Second Amended Plan Supplement and the Settlement Agreement, (ii) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan, the Second Amended Plan Supplement, and the Settlement Agreement, (iii) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Settlement Agreement, including, among other things, all such actions delineated in Article XXVIII of the Plan, and (iv) direct or instruct BNYM, Depository Trust Company, or such other person or entity necessary to implement or effectuate the terms of the Trusts. On the Effective Date, the appropriate officers or representatives of the Debtor and Reorganized COFINA, as the case may be, and members of the boards of directors of the same, are authorized and empowered to issue, execute,

file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Second Amended Plan Supplement, contemplated by the Plan and the Settlement Agreement, and make, or cause to be made, any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan, the Second Amended Plan Supplement, and the Settlement Agreement, in the name of and on behalf of COFINA and Reorganized COFINA, as applicable.

10. No Action. Pursuant to section 1142(b) of the Bankruptcy Code, no further action of the directors or officers of COFINA shall be required to authorize COFINA to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and the Settlement Agreement, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and Settlement Agreement, including, without limitation, the Second Amended Plan Supplement.

11. Binding Effect. This Order is full, final, and complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law, by (i) COFINA, (ii) Reorganized COFINA, (iii) the Commonwealth, (iv) each person or entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan or this Order and, if impaired, whether or not such person or entity accepted or rejected the Plan, (v) any other person, and (vi) each of the foregoing's

respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians.

12.    Cancellation of Notes, Instruments, Certificates, and Other Documents. Pursuant to Section 19.6 of the Plan, and except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 18.1 of the Plan), on the Effective Date (and subject to the distribution of the COFINA Bonds in accordance with the terms and provisions of the Plan), the "Senior" and "First Subordinate" Existing Securities and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against COFINA without any further act or action under any applicable agreement, law, regulation, order or rule, with COFINA and BNYM having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to COFINA, as applicable, under the Existing Securities and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained in the Plan to the contrary, the "Senior" and "First Subordinate" Existing Securities and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, including BNYM, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other

provisions of such instruments and documents, as applicable, and all other related agreements, including, without limitation, the right to payment of the Trustee Claims and the Trustee Rights, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than COFINA, (v) to allow BNYM to appear in the Title III Case or any other proceeding in which BNYM is or becomes a party with respect to clauses (i) through (iv) above, as applicable or otherwise in connection with BNYM's role as trustee under the Bond Resolution, or (vi) subject to the terms of Sections 17.1, 17.2 and 30.7 of the Plan, as may be necessary to preserve any claims under the respective Insurance Policies by (1) the applicable holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elected to receive Ambac Certificates or (2) the applicable holders of Allowed Senior COFINA Bond Claims (National) that validly elected to receive National Certificates; and, provided, further, that, BNYM shall have no duties or responsibilities with respect to any Existing Securities that may be held by the Trusts from and after the Effective Date. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents as remain outstanding shall not form the basis for the assertion of any Claim against COFINA or Reorganized COFINA, as the case may be.

13. Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases. Pursuant to Section 18.1 of the Plan, except as otherwise provided herein, or in any contract instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, COFINA shall be deemed to have rejected each prepetition Executory Contract and Unexpired Lease to which it is a party, pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease (i) was assumed, assumed and assigned, or rejected pursuant to an order of the Court entered prior to the Effective Date, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties, (iii) is

the subject of a motion to assume or assume and assign filed by the Debtor on or before the

Confirmation Date, or (iv) is specifically designated as a contract or lease to be assumed or

assumed and assigned on the schedules to the Second Amended Plan Supplement.  This Order

shall constitute an order of the Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code

approving the contract and lease assumptions or rejections described above, as of the Effective

Date.

14.     Insurance Policies.  Subject to the terms and provisions of Section 18.7 of the Plan,

each of COFINA's Insurance Policies and any agreements, documents, or instruments relating

thereto, are treated as Executory Contracts under the Plan.  Except as otherwise provided in the

Plan, on the Effective Date, COFINA shall, or shall cause BNYM, as trustee for the Existing

Securities to, deposit or cause the deposit of all Insurance Policies and any agreements, documents

and instruments relating to coverage of all insured Bond Claims into any applicable Trusts.  To

the extent any Insurance Policy is rejected pursuant to the Plan, such rejection shall not, and shall

not be construed to, discharge or relieve any of Ambac or National with respect to their respective

obligations to holders of Allowed Senior COFINA Bond Claims (Ambac) and Allowed Senior

COFINA Bond Claims (National), respectively, that have elected to receive the relevant trust

certificates in accordance with the Plan pursuant to the applicable Insurance Policy. For the

avoidance of doubt, nothing contained in this Order or the Plan shall prejudice any subrogation,

reimbursement, or similar rights of an insured against the applicable Trust or the assets thereof.

15.     Objection to Cure Amounts; Rejection Damages Claims.  If the rejection of an

Executory Contract and Unexpired Lease by COFINA pursuant to the Plan results in damages to

the other party or parties to such contract or lease, any claim for such damages, if not heretofore

evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against

I-308

COFINA, or its properties or agents, successors, or assigns, including, without limitation, Reorganized COFINA, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized COFINA, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

16.    <u>Payment of Cure Amounts.</u>  Any monetary amount required as a cure payment with respect to each prepetition executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases and the Debtor, otherwise may agree.

17.    <u>Setoff.</u>  Except as otherwise provided in the Plan or in this Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and causes of action of any nature that COFINA or Reorganized COFINA hold against the holder of such Allowed Claim; <u>provided, however,</u> that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by COFINA or Reorganized COFINA of any such claims, rights, and causes of action that COFINA or the Reorganized COFINA may possess against such holder; and, <u>provided, further,</u> that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the non-bankruptcy or common law right of recoupment; and, <u>provided, further,</u> that nothing in

I-309

this paragraph shall affect the releases and injunctions provided in Article XXX of the Plan or herein.

18.      Delivery of Distributions. Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in Section 19.5 of the Plan and herein, distributions and deliveries to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if COFINA has been notified in writing of a change of address; provided, however, that initial distributions of Cash by the Disbursing Agent for the benefit of holders of Allowed Senior COFINA Bond Claims, Allowed Senior COFINA Bond Claims (Ambac), Allowed Senior COFINA Bond Claims (National), Allowed Bond Claims (Taxable Election), Allowed Junior COFINA Bond Claims, Allowed Junior COFINA Bond Claims (Assured) and Allowed Junior COFINA Bond Claims (Taxable Election), as applicable, shall be made to BNYM, as trustee for the Existing Securities (or BNYM's designee) for such obligations; and, provided, further, that, on the Effective Date, the Disbursing Agent may make distributions of Consummation Costs in Cash to a Consummation Cost Party in a manner mutually agreed upon between the Consummation Cost Party and the Disbursing Agent. BNYM (or BNYM's designee) shall, in turn, in accordance with the terms and provisions of the Plan, distribute and deliver Cash and COFINA Bonds, as applicable, to Bondowners, as of the Distribution Record Date, in the manner provided for in the applicable governing documents; provided, however, that, to the extent a holder of a Bond Claim elects to receive the trust certificate pursuant to the Plan, BNYM will deposit such holder's distribution into the applicable Trust; and, provided, further, that, in accordance with Section 10.1 of the Plan, BNYM shall deliver (i) the Section 103 Cash and Rounding Amount Cash, if any,

which, in each case, is allocable to Junior COFINA Bond Claims (Assured), and (ii) the Assured

New Bonds, to Assured in a manner mutually agreed upon between BNYM and Assured.  On or

prior to the Effective Date, BNYM and COFINA shall disclose to Assured the Acceleration Price

to be paid with respect to the Assured Insured Bonds in accordance with Section 10.1 of the Plan,

and, on the Effective Date, (i) BNYM shall, with respect Assured Insured Bonds insured in the

primary market, draw down on the applicable Assured Insurance Policies to pay the applicable

Acceleration Price to the holders of Assured Insured Bonds insured in the primary market in

accordance with Section 10.1 of the Plan, and (ii) with respect to Assured Insured Bonds insured

in the secondary market, Assured shall, or shall cause the applicable custodian (each, a

"Custodian") of custody receipts or similar certificates evidencing the beneficial ownership

interest of the holders thereof in such Assured Insured Bonds and the related Assured Insurance

Policies, to draw on the applicable Assured Insurance Policies in order to pay the applicable

Acceleration Price to the holders of Assured Insured Bonds insured in the secondary market in

accordance with Section 10.1 of the Plan.  BNYM may conclusively rely upon the distribution

instructions received from COFINA or its agents with respect to the delivery of distributions in

accordance with the terms and provisions of Section 19.5 of the Plan, including the contra-CUSIP

positions and escrow positions set up by COFINA or its agents with the Depository Trust

Company, and BNYM shall close and terminate the original CUSIPs after making initial

distributions of COFINA Bonds, COFINA Cash Available for Distribution, Section 103 Cash and

Rounding Cash Amount and shall have no further distribution obligations thereafter.  BNYM shall

not be required to give any bond or surety or other security for the performance of its duties, unless

otherwise ordered by the Court.  BNYM shall only be required to make the distributions and

deliveries described in this decretal paragraph and Section 19.5 of the Plan and shall only be

required to make such distributions and deliveries in accordance with the terms of this Order and

the Plan and shall have no liability for actions reasonably taken in accordance with this Order, the

Plan or in reasonable reliance upon information provided to BNYM by COFINA or its agents in

accordance with this Order, the Plan or in connection with distributions to be made hereunder and

thereunder, including to Lehman Brothers Special Financing Inc. under the Debt Service Deposit

Agreement, dated as of July 1, 2008, among BNYM, COFINA, and Lehman Brothers Special

Financing Inc., except for liabilities resulting from its own gross negligence or willful misconduct.

Neither BNYM nor any Custodian shall have any liability for (i) applying payments under the

Assured Insurance Policies to the payment of the applicable Acceleration Price with respect to the

Assured Insured Bonds in accordance with Section 10.1 of the Plan, or (ii) transferring Section

103 Cash, Rounding Amount Cash, or Assured New Bonds to Assured in accordance with Section

10.1 of the Plan.  Notwithstanding the foregoing, all distributions are subject to the Trustee Rights;

provided, however, that, notwithstanding the foregoing or anything contained in the Plan and

herein to the contrary, including, without limitation, Sections 19.6(iii) and 19.13 of the Plan,

BNYM shall not exercise Trustee Rights on account of Trustee Claims that may arise from and

after the Effective Date and no distribution to be made pursuant to the Plan, either through the

Disbursing Agent or BNYM as trustee of the Existing Securities, shall be withheld as a result of,

or on account of, or arising from or due to, the claims, causes of action and damages being asserted,

or which could have been asserted, by or against BNYM in the Ambac Action and the Whitebox

Actions; provided, further, that the foregoing shall be subject in all respects to the Title III Court's

determination at the Confirmation Hearing of BNYM's rights pursuant to Section 19.5 of the Plan

with regard to the payment of BNYM's fees and expenses and indemnification arising from or

relating to the Ambac Action and the Whitebox Actions. COFINA, its agents and servicers, the

Disbursing Agent and BNYM shall have no obligation to recognize any transfer of Bond Claims

after the Distribution Record Date; provided, however, that COFINA Bonds will be transferable

and recognized if made in accordance with the terms and conditions of the New Bond Indenture.

19.     Disbursing Agent.  Pursuant to Section 1.84 of the Plan, the Disbursing Agent shall

be, as applicable, COFINA or such other Entity designated by the Oversight Board and COFINA

on or prior to the Effective Date to make or to facilitate distributions in accordance with the

provisions of the Plan and this Order.

20.     Securities Act Exemption.  Pursuant to section 1145 of the Bankruptcy Code (other

than with respect to an entity that is an underwriter as defined in section 1145(b) of the Bankruptcy

Code) and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the

COFINA Bonds, Ambac Certificates and National Certificates pursuant to the terms hereof shall

be exempt from registration under the Securities Act and any state or local law requiring

registration for the offer, issuance or distribution of securities, including, but not limited to, the

registration requirements of Section 5 of the Securities Act and any other applicable state or federal

law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance,

distribution, or sale of securities.

21.     Deemed Acceleration (Ambac Insured Bonds).   The principal amount (or

Compounded Amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall

be deemed accelerated and immediately due and payable, as of the Effective Date; provided,

however, that such deemed acceleration shall not affect, nor shall it be construed to affect, any

issues regarding the existence of a "default" or an "event of default" with respect to the Existing

Securities which were pending prior to the Effective Date.

22.    Deemed Acceleration (Assured Insured Bonds).   The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Assured Insured Bonds shall be deemed accelerated and immediately due and payable, as of the Effective Date; provided, however, that such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

23.    Disputed Claims Holdback.  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Court, Reorganized COFINA shall retain, for the benefit of each holder of a Disputed Claim, COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds, and, to the extent elected by such holder, the applicable trust certificates, and any dividends, gains or income attributable in respect of any of the foregoing, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized COFINA; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above.   Any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds retained and held for the benefit of a holder of a Disputed Claim shall be treated as payment and reduction on account

of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash

distributed in COFINA Bonds in the event the Disputed Claim ultimately becomes an Allowed

Claim. Such Cash and any dividends, gains or income paid on account of the COFINA Bonds (if

any) retained for the benefit of holders of Disputed Claims shall be retained by Reorganized

COFINA for the benefit of such holders pending determination of their entitlement thereto under

the terms of the Plan. To the extent that Reorganized COFINA retains COFINA Bonds on behalf

of Disputed Claims holders, until such time as such COFINA Bonds are distributed, Reorganized

COFINA shall exercise voting or consent rights with respect to such bonds.

24. No Amendments to Proofs of Claim. As of the commencement of the Confirmation

Hearing, a proof of Claim may not be filed or amended without the authority of the Court.

25. Conditions to Effective Date. The Plan shall not become effective unless and until

the conditions set forth in Section 25.1 of the Plan have been satisfied or waived pursuant to

Section 25.2 of the Plan.

26. Administrative Claim Bar Date. The last day to file proof of Administrative

Expense Claims shall be sixty (60) days after the Effective Date, after which date, any

Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred,

and COFINA and Reorganized COFINA shall have no obligation with respect thereto; provided,

however, that no proof of Administrative Expense Claim shall be required to be filed if such

Administrative Expense Claim shall have been incurred (i) in accordance with an order of the

Court or (ii) with the written consent of COFINA; and, provided, further, that, in accordance with

section 503(b)(1)(D) of the Bankruptcy Code, applicable herein pursuant to section 301 of

PROMESA, no governmental unit, including, without limitation, the IRS, shall be required to file

a proof of Administrative Expense Claim by such date in order to be considered; and, provided,

I-315

<u>further,</u> that any such proof of Administrative Expense Claim by a governmental unit shall remain

subject to the rights and interests of COFINA and Reorganized COFINA, as the case may be, and

any other party in interest to interpose an objection or other defense to the allowance or payment

thereof.

27.     <u>Professional Compensation and Reimbursement Claims.</u>  All Entities awarded

compensation or reimbursement of expenses by the Court shall be paid in full, in Cash, in the

amounts allowed by the Court (a) as soon as reasonably practicable following the later to occur of

(i) the Effective Date and (ii) the date upon which the Court order allowing such Claims is deemed

to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be

mutually agreed upon between such claimant and the Government Parties; <u>provided, however,</u>

that, except as provided herein, each Professional must file its application for final allowance of

compensation for professional services rendered and reimbursement of expenses on or prior to one

hundred twenty (120) days following the Effective Date.  Reorganized COFINA is authorized to

pay compensation for professional services extended and reimbursement of expenses incurred after

the Effective Date in the ordinary course and without the need for Court approval.

28.     <u>Consummation Costs.</u>  Notwithstanding anything contained in the Plan or this

Order to the contrary, in order to compensate Consummation Cost Parties for the cost of

negotiation, confirmation and consummation of the Term Sheet and the Plan, and in consideration

of (a) the negotiation, execution and delivery of the Plan Support Agreement by each

Consummation Cost Party and (b) the obligations and covenants contained in the Plan Support

Agreement, each Consummation Cost Party, on the Effective Date, shall receive, based upon such

Entity's respective positions (insured or otherwise) as of 5:00 p.m. (EDT) on August 7, 2018, its

pro rata share of Cash in an amount equal to two percent (2.0%), truncated to two decimal points,

of (i) the aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (ii) One Billion Dollars ($1,000,000,000.00); provided, however, that, notwithstanding the foregoing provisions of this decretal paragraph and Section 3.3 of the Plan, amounts due to Aurelius Capital Master, Ltd. and Six PRC Investments LLC as a result of being a Consummation Cost Party (i) shall not be taken into account in connection with the above-referenced calculations solely with respect to payments to other Consummation Cost Parties, which payment to the other Consummation Cost Parties shall be made by COFINA or Reorganized COFINA, as the case may be, and (ii) with respect to payments to be made to Aurelius Capital Master, Ltd. and Six PRC Investments LLC shall be taken into account in connection with the above-referenced calculations for all Consummation Cost Parties, which payments to Aurelius Capital Master, Ltd. and Six PRC Investments LLC shall be made by the Commonwealth in accordance with the provisions of Section 15.2 of the Plan; and, provided, further, that, with respect to any Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National), unless otherwise agreed to, in writing, by Ambac and National, and subject to the terms and provisions of Article XVII of the Plan, Ambac or National, as the case may be, and not the beneficial holder of such Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National) regardless of whether such beneficial holder is also a Consummation Cost Party, shall receive the amount of Cash that would have otherwise been distributed to such other Consummation Cost Party in accordance with the provisions of Section 3.3 of the Plan; and, provided, further, that, with respect to the Junior COFINA Bond Claims (Assured), Assured, and not the beneficial holders of the Junior COFINA

Bond Claims (Assured), shall receive the amount of Cash distributable on account of the Junior

COFINA Bond Claims (Assured) in accordance with the provisions of Section 3.3 of the Plan.

    29.    <u>Discharge and Release of Claims and Causes of Action.</u>

    (a)    Except as expressly provided in the Plan or herein, all distributions and rights

afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete

satisfaction, settlement, discharge and release of, all Claims or Causes of Action against COFINA

that arose, in whole or in part, prior to the Effective Date, relating to COFINA or Reorganized

COFINA or any of its Assets, property, or interests of any nature whatsoever, including any interest

accrued on such Claims from and after the Petition Date, and regardless of whether any property

will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of

Action.  Upon the Effective Date, COFINA and Reorganized COFINA shall be deemed discharged

and released from any and all Claims, Causes of Action and any other debts that arose, in whole

or in part, prior to the Effective Date (including prior to the Petition Date), and all debts of the kind

specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof

of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code,

(b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is

otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan.

    (b)    Except as otherwise provided in Sections 1.151 and 30.11 of the Plan or herein, all

Entities shall be precluded from asserting any and all Claims against COFINA and Reorganized

COFINA, and each of their respective Assets, property and rights, remedies, Claims or Causes of

Action or liabilities of any nature whatsoever, relating to COFINA or Reorganized COFINA or

any of their respective Assets and property, including any interest accrued on such Claims from

and after the Petition Date, and regardless of whether any property will have been distributed or

retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or this Order, this Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against COFINA pursuant to sections 524(a)(1), 524(a)(2), and 944(b) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against COFINA or Reorganized COFINA and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  As of the Effective Date, and in consideration for the value provided under the Plan and the Settlement Agreement, each holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against COFINA and Reorganized COFINA, and their respective Assets and property and all such Claims.

(c)     Notwithstanding any other provisions of this decretal paragraph and Section 30.2 of the Plan, in accordance with the provisions of the Plan Support Agreement, each of the PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of COFINA, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releases based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this subparagraph and Section 30.2(c) of the Plan and (iii) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or seek any

other type of relief against BNYM and each of its Related Persons from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution; provided, however, that the release provided pursuant to clause (iii) above shall not extend to any and all claims and causes of action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively.

(d)     On the Effective Date, and in consideration of the Commonwealth-COFINA Dispute Settlement and the compromise and settlement of Bond Claims pursuant to the terms and provisions of the Plan (including, without limitation, the distributions to be made on account of "Senior" and "First Subordinate" Existing Securities), the resolution of the Interpleader Action and the terms and provisions of Section 19.5 of the Plan regarding the Ambac Action and the Whitebox Actions, to the fullest extent permissible under applicable law, BNYM and each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns shall be released from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest in respect thereof; provided, however, that the foregoing release of BNYM shall not extend, nor shall it be construed to extend, to acts of gross negligence, intentional fraud, or willful misconduct of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions.

(e)     On the Effective Date, (i) the COFINA Agent and its agents, attorneys, affiliates, advisors, consultants and attorneys, solely in such capacities (collectively, the "COFINA Agent Releasees"), and (ii) the Commonwealth Agent and the Creditors' Committee, its members and each of their respective current and former officers, directors, agents, attorneys, employees,

affiliates, advisors, and consultants, solely in such capacities (collectively, the "Commonwealth
Agent Releasees"), shall be released from liability for all Claims and Causes of Action (as if such
Causes of Action were against the Commonwealth Agent Releasees, or the COFINA Agent
Releasees, as applicable) with respect to the Adversary Proceeding, the Agreement in Principle,
the Settlement Agreement, the Settlement Motion and the Settlement Order.

(f)      On the Effective Date, and in consideration of the Commonwealth-COFINA
Dispute Settlement and the resolution of the Interpleader Action, to the fullest extent permissible
under applicable law, the Commonwealth shall be released from all liability from all Claims and
Causes of Action held by any Creditor, solely in such capacity, arising from or relating to the
relationship of the Commonwealth and COFINA, including, without limitation, any Claim or
Cause of Action arising from or relating to the commencement of the Adversary Proceeding and
pendency and the compromise and settlement of the Interpleader Action and the allocation of funds
in accordance with Section 2.1 of the Plan.

30.      <u>Releases by COFINA and Reorganized COFINA</u>. Except as otherwise expressly
provided in the Plan, this Order, or the Settlement Agreement, on the Effective Date, and for good
and valuable consideration, each of COFINA and Reorganized COFINA, the Disbursing Agent
and each of COFINA's and Reorganized COFINA's Related Persons (other than any former
elected or appointed officials, directors, or officers of any of the Government Parties and the
Commonwealth, in each case acting in his or her capacity as such prior to January 1, 2017)[5] shall
be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever
waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of

---

[5]      The date on which the current administration of the Government of Puerto Rico was
installed. Indemnification claims, if any, resulting from non-released Claims shall survive
confirmation and effectiveness of the Plan.

Action that COFINA, Reorganized COFINA, and the Disbursing Agent, or any of them, or anyone

claiming through them, on their behalf or for their benefit, have or may have or claim to have, now

or in the future, against any Released Party (other than any former elected or appointed officials,

directors, or officers of any of the Government Parties and the Commonwealth, in each case acting

in his or her capacity as such prior to January 1, 2017) that are Released Claims or otherwise are

based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission,

transaction, event or other circumstance relating to COFINA taking place or existing on or prior

to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission

in connection with or alleged or that could have been alleged in the Actions, the Related Actions,

including, without limitation, any such Claim, demand, right, liability, or cause of action for

indemnification, contribution, or any other basis in law or equity for damages, costs or fees;

provided, however, that, notwithstanding anything contained in the Plan to the contrary, "Related

Persons" shall not include any financial advisors, investment bankers, underwriters, attorneys,

accountants, agents and professionals of the Commonwealth and COFINA, solely to the extent of

services provided in connection with the issuance of the Existing Securities; and, provided, further,

that the plaintiffs in that certain adversary proceeding before the Title III Court, captioned

Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al.,

Adv. Proc. No. 18-00028, shall be entitled to continue pursuit of such litigation against all parties

other than COFINA and Reorganized COFINA, subject to all available rights and defenses with

respect to claims and causes of action asserted therein.

31.    Release and Exculpation Provisions.  Except as otherwise provided in this Order,

all release and exculpation provisions, including, but not limited to, those contained in Article

XXX of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided herein.

32.     Preservation of Certain Claims and Causes of Action.  Notwithstanding anything contained in this Order or the Plan to the contrary, including, without limitation, the provisions of Article XXX, Ambac and Whitebox shall retain, and shall not be enjoined or otherwise barred from pursuing, any and all claims and causes of action, whether sounding in contract or tort, solely for gross negligence, willful misconduct or intentional fraud that were asserted, or could have been asserted, against BNYM in the Ambac Action, the Whitebox Actions or the Interpleader Action, and BNYM shall retain and shall not be enjoined or otherwise barred from pursuing, any and all claims and causes of action and asserting any rights and defenses against Ambac and Whitebox arising from or related to the Bond Resolution.

33.     **Injunction on Claims**.  **Except as otherwise expressly provided in Section 30.11 of the Plan, this Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 30.2 of the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any**

I-323

encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

34.     **Injunction Related to Releases.**  As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Section 30.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 30.5 of the Plan; and (v) commencing or continuing in any

**manner, in any place of any judicial, arbitration or administrative proceeding in any forum,
that does not comply with or its inconsistent with the provisions of the Plan or this Order.**

35.    Exculpation.

(a)    Government Parties:    The Oversight Board, the Commonwealth, AAFAF,
COFINA, the Commonwealth Agent Releasees, and each of their respective Related Persons,
solely acting in its capacity as such at any time up to and including the Effective Date (or such
later date as necessary to implement any post-Effective Date transactions contemplated by the
Plan), shall not have or incur any liability to any Entity for any act taken or omitted to be taken in
connection with the Title III Case, the formulation, preparation, dissemination, implementation,
confirmation or approval of the Plan or any compromises or settlements contained therein, the
Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other
agreement or document provided for or contemplated in connection with the consummation of the
transactions set forth in the Plan and the Settlement Agreement; provided, however, that the
foregoing provisions of this subparagraph and Section 30.7(a) of the Plan shall not affect the
liability of any Entity that otherwise would result from any such act or omission to the extent that
such act or omission is determined in a Final Order to have constituted intentional fraud or willful
misconduct.  Nothing in the foregoing provisions of this subparagraph and Section 30.7(a) of the
Plan shall prejudice the right of any of the Government Parties, and the Government Parties'
officers and directors serving at any time up to and including the Effective Date (or such later date
as necessary to implement any post-Effective Date transactions contemplated by the Plan), and
each of their respective professionals to assert reliance upon advice of counsel as a defense with
respect to their duties and responsibilities under the Plan.  The Commonwealth Agent Releasees
shall be deemed to be a "Released Party" pursuant to the Plan and the release and exculpation

provisions contained in Section 30.7(a) of the Plan shall be deemed to apply to the Commonwealth

Agent Releasees.

(b)      Monoline Insurers:  Each of Ambac, Assured and National and their respective

Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to

be taken consistent with the Plan in connection with the formulation, preparation, dissemination,

implementation, acceptance, confirmation or approval of the Plan, including, without limitation,

in connection with the structure of the Trusts, commutation, the treatment of Senior COFINA Bond

Claims (Ambac), the treatment of Junior COFINA Bond Claims (Assured), the treatment of Senior

COFINA Bond Claims (National), the voting procedures, the election procedures, and any release

of obligations under the applicable Insurance Policies; provided, however, that, notwithstanding

anything contained herein or the Plan to the contrary, the terms and provisions of the Plan and this

Order shall not, and shall not be construed to, release or exculpate: (1) except as otherwise set forth

in the Ambac Trust agreement, with respect to any beneficial holder of the Ambac Insured Bonds

that receives Ambac Certificates in accordance with the Plan, any claim against Ambac with

respect to Ambac's payment obligations under the Ambac Insurance Policy (which claim shall

only be asserted by the trustee of the Ambac Trust), as adjusted to account for any distributions

from the Ambac Trust (and any subrogation claims that Ambac may have pursuant to the terms of

the Ambac Insurance Policy and any other claims or defenses that Ambac may have against a

beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the

Ambac Insurance Policy); (2) except as otherwise set forth in the National Trust agreement, with

respect to any beneficial holder of National Insured Bonds that received National Certificates in

accordance with the Plan, any claim against National with respect to National's obligations under

the National Insurance Policies (which claim shall be asserted in accordance with the terms of the

National Insurance Policies), as adjusted to account for any distributions from the National Trust (and any subrogation claims that National may have pursuant to the terms of the National Insurance Policies or other claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations to such beneficial holder under the National Insurance Policies); or (3) with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the applicable Acceleration Price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).

(c)    PSA Creditors and Bonistas:  Each of the PSA Creditors and Bonistas, solely in its capacity as a party to the Plan Support Agreement and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement; provided, however, that the foregoing provisions of this subparagraph and Section 30.7(c) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)    Agents:  Each of the COFINA Agent and the Commonwealth Agent, each solely in its capacity as agent of the Oversight Board to litigate and/or settle the Commonwealth-COFINA

Dispute, respectively, shall not have or incur any liability to any Entity for any act taken or omitted

to be taken in connection with the Title III Case, the Commonwealth-COFINA Dispute, including,

without limitation, the Commonwealth-COFINA Dispute Order, the Adversary Proceeding, the

Commonwealth-COFINA Dispute Settlement, the Settlement Agreement, the Settlement Motion

and the Settlement Order.

36.    Appointments Related Litigation.  Notwithstanding anything contained herein or

the Plan to the contrary, in the event that a Final Order is entered in connection with the

Appointments Related Litigation subsequent to entry of the Settlement Order and this Order, in

consideration of the distributions made, to be made, or deemed to be made in accordance with the

terms and provisions of the Plan and documents and instruments related hereto, and all Creditors

or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result

of the Plan or this Order having consented and agreed, such Final Order shall not in any way or

manner reverse, affect or otherwise modify the transactions contemplated in the Plan, the

Settlement Agreement, this Order and the Settlement Order, including, without limitation, the

compromise and settlement of the Commonwealth-COFINA Dispute and the releases,

exculpations and injunctions provided pursuant to Article XXX of the Plan and herein.

37.    **Bar Order**.  **To the limited extent provided in the Plan, each and every Entity**

**is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or**

**litigating in any manner any and all claims, demands, rights, liabilities, or causes of action**

**of any and every kind, character or nature whatsoever, in law or in equity, known or**

**unknown, direct or derivative, whether asserted or unasserted, against any of the Released**

**Parties, based upon, related to, or arising out of or in connection with any of the Released**

**Claims, confirmation and consummation of the Plan, the negotiation and consummation of**

I-328

the Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or

omission in connection with or alleged or that could have been alleged in the Related Actions,

including, without limitation, any such claim, demand, right, liability or cause of action for

indemnification, contribution, or any other basis in law or equity for damages, costs or fees

incurred arising directly or indirectly from or otherwise relating to the Related Actions,

either directly or indirectly by any Person for the direct or indirect benefit of any Released

Party arising from or related to the claims, acts, facts, transactions, occurrences, statements

or omissions that are, could have been or may be alleged in the Related Actions or any other

action brought or that might be brought by, through, on behalf of, or for the benefit of any

of the Released Parties (whether arising under federal, state or foreign law, and regardless

of where asserted).

38.   **Supplemental Injunction**.  Notwithstanding anything contained herein or in

the Plan to the contrary, except to the limited extent provided in the Plan,[6] all Entities,

including Entities acting on their behalf, who currently hold or assert, have held or asserted,

or may hold or assert, any Released Claims against any of the Released Parties based upon,

attributable to, arising out of or relating to any Claim against COFINA, whenever and

wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether

sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise,

shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking

any action against any of the Released Parties for the purpose of directly or indirectly

---

[6]   For the avoidance of doubt, no Claims or Causes of Action held by the Commonwealth with
respect to the issuance of the Existing Securities shall be discharged, released, or enjoined
pursuant to this Order or the Plan (except to the limited extent that such Claims or Causes of
Action are discharged or released pursuant to Paragraphs 7, 29, 30, 31, 35 of this Order or
Sections 2.1, 30.2, 30.5, 30.7 of the Plan).

collecting, recovering or receiving any payment or recovery with respect to any Released

Claims arising prior to the Effective Date (including prior to the Petition Date), including,

but not limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan, this Order, or the Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, this Order, or the Settlement Agreement relating to such Released Claim; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

39.     COFINA Agent and Commonwealth Agent Releases and Exculpation.  On the

Effective Date, to the fullest extent permissible under applicable law, the COFINA Agent

Releasees and the Commonwealth Agent Releasees shall be released from liability for all Claims

and Causes of Action (as if such Causes of Action were against the COFINA Agent Releasees or

the Commonwealth Agent Releasees, as applicable) with respect to the Adversary Proceeding and

the Plan.

40.     Term of Existing Injunctions or Stays.  Unless otherwise provided in the Plan or

this Order, all injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or

922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation

Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full

force and effect until the Effective Date. All injunctions or stays contained in the Plan or this

Order shall remain in full force and effect in accordance with their terms.

41. Prosecution of Claims. Except as settled and released herein, from and after the

Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any

Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any

Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending

on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final

Order, and may compromise and settle such claims, without approval of the Court.

42. Indemnification and Reimbursement Obligations. For purposes of the Plan, (i) to

the extent executory in nature, the obligations of COFINA, including, without limitation, directors

and officers insurance policies, to indemnify and reimburse its directors or officers that were

directors or officers, respectively, on or prior to the Petition Date shall be deemed assumed as of

the Effective Date and (ii) indemnification obligations of COFINA arising from conduct of officers

and directors during the period from and after the Petition Date shall be Administrative Expense

Claims.

43. Compliance with Tax Requirements. Any party issuing any instrument or making

any distribution under the Plan shall comply with all applicable withholding and reporting

requirements imposed by any United States federal, state or local tax law or Tax Authority, and all

distributions under the Plan shall be subject to any such withholding or reporting requirements.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under

the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any

Taxes imposed on such holder by any governmental unit, including income, withholding and other

tax obligations, on account of such distribution.  Any party issuing any instrument or making any

distribution under the Plan has the right, but not the obligation, to not make a distribution until

such holder has made arrangements satisfactory to such issuing or disbursing party for payment of

any such withholding tax obligations and, if any party issuing any instrument or making any

distribution under the Plan fails to withhold with respect to any such holder's distribution, and is

later held liable for the amount of such withholding, the holder shall reimburse such party.  The

Disbursing Agent or the trustee of the applicable Trust may require, as a condition to the receipt

of a distribution (including the applicable trust certificates), that the holder complete the

appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply

with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

44.    Documents and Instruments.  Each federal, state, commonwealth, local, foreign, or

other governmental agency is hereby authorized to accept any and all documents and instruments

necessary or appropriate to effectuate, implement or consummate the transactions contemplated

by the Plan, the Settlement Agreement, and this Order.

45.    Reversal/Stay/Modification/Vacatur of Order.  Except as otherwise provided in this

Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or

stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or

vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability,

priority, or lien incurred or undertaken by COFINA or Reorganized COFINA, as applicable, prior

to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such

reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or

undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal,

stay, modification, or vacatur shall be governed in all respect by the provisions of this Order, the

Settlement Agreement, and the Plan. To the extent not specifically reversed, modified, vacated,

or stayed by an order of this Court, all existing orders entered in this Title III Case remain in full

force and effect.

46.    Retention of Jurisdiction. Notwithstanding the entry of this Order or the occurrence

of the Effective Date, subject to the terms and provisions of Article XXIX of the Plan, and except

as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the

Bankruptcy Code, this Court shall retain exclusive jurisdiction over all matters arising out of, and

related to, the Title III Case to the fullest extent as is legally permissible, including, but not limited

to, jurisdiction over the matters set forth in Article XXIX of the Plan.

47.    Conflicts Among Order, Plan, and Settlement Order. The provisions of the Plan,

this Order, and the Settlement Order shall be construed in a manner consistent with each other so

as to effect the purpose of each; provided, however that, in the event of any inconsistency between

the Settlement Order, the Plan or this Order, the documents shall control in the following order of

priority: (i) the Settlement Order, (ii) this Order, and (iii) the Plan; and, provided, further, that, in

the event of any inconsistency between this Order and any other order in the COFINA Title III

Case, and Commonwealth Title III Case, the Adversary Proceeding, or the Interpleader Action,

the terms and provisions of this Order shall control; and, provided, further, that nothing contained

herein is intended, nor shall be construed, to modify the economic terms of the Plan.

48.    Collective Action. No "Holder" (as defined in the New Bond Indenture) of any of

the COFINA Bonds or COFINA Parity Bonds or both (solely in its capacity as a Holder of such

bonds) shall have any right to institute any suit, action or proceeding in equity or at law for the

execution of any trust under the New Bond Indenture or otherwise, or for any other remedy under

I-333

the New Bond Indenture or otherwise, in each case unless such Holder shall have complied with Section 11.07 of the New Bond Indenture (as may be amended from time to time in accordance with the terms and provisions thereof); provided, that, notwithstanding the foregoing, such Holder shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such COFINA Bond or COFINA Parity Bond on the stated maturity expressed in such bond (or, in the case of redemption, on the redemption date or, in the case of interest, on the interest payment date on which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

49. Modifications. Before substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after entry of this Order; provided, however, that the circumstances warrant such modification and the Court, after notice and a hearing, confirms such plan as under the applicable legal requirements. Provisions of Plan and Order Nonseverable and Mutually Dependent. The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

50. Governing Law. Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

51.    Applicable Nonbankruptcy Law.  Pursuant to section 1123(a) of the Bankruptcy

Code, as applicable to the COFINA Title III Case pursuant to PROMESA section 301(a), the

provisions of this Order and the Plan shall apply and be enforceable notwithstanding any otherwise

applicable nonbankruptcy law.    The documents contained in the Second Amended Plan

Supplement  (as such documents may be further modified and filed with the Court prior to the

Effective Date), including, without limitation, Reorganized COFINA By-Laws, the COFINA

Bonds, the New Bond Indenture, the Instructions Agreement, the Ambac Trust Agreement, the

National Trust Agreement, the Standard Terms to National Trust Agreement, the Remarketing

Agreement,  and  the  Continuing  Disclosure  Agreement  provide  adequate  means  for

implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, and, as of the

occurrence of the Effective Date, shall constitute valid legal obligations of COFINA and the

Commonwealth, as applicable, and valid provisions to pay to secure payment of the COFINA

Bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in accordance

with their terms.

52.    Non-Effect on Other Actions.  For the avoidance of doubt, nothing in the Plan  or

in this Order shall release, discharge, enjoin, provide exculpation with respect to, or otherwise

affect, any claim, cause of action, or litigation not directly related to COFINA, including, without

limitation, (i) Adversary Proceeding No. 18-0059-LTS in Case No. 17 BK 3283-LTS (D.P.R.), (ii)

Adversary Proceeding No. 17-155-LTS in Case No. 17 BK 3283-LTS (D.P.R.), (iii) Adversary

Proceeding No. 17-156-LTS in Case No. 17 BK-3567-LTS (D.P.R.), (iv) Adversary Proceeding

No. 18-87 in Case No. 17 BK 3283-LTS (D.P.R.), (v) Case No. 18-1165 (1st Cir.); (vi) Case No.

18-1166 (1st Cir.); (vii) Case No. 18-1746 (1st Cir.); and (viii) except as provided herein, the

Appointments Related Litigation.

53.    <u>Use of Commonwealth Funds</u>.  Except as expressly set forth in the Plan Support
Agreement, certain parties thereto reserve their right, if any, to contest in the Commonwealth Title
III Case the Commonwealth's (a) use, or direction of the use, of monies received by the
Commonwealth or to be received by the Commonwealth and (b) deposit or other use, or direction
of the use, of such monies.

54.    <u>Waiver of Filings</u>.  Any requirement pursuant to Bankruptcy Rule 1007 obligating
the Debtor to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee
is hereby waived as to any such list, schedule, or statement not filed as of the Effective Date.

55.    <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon
as reasonably practicable after the Effective Date, the Debtor shall serve notice of the entry of this
Order and the occurrence of the Effective Date, substantially in the form attached as <u>Exhibit B</u>
hereto, to all parties who hold a Claim in the COFINA Title III Case, as well as the Creditors'
Committee, the U.S. Trustee, any party filing a notice pursuant to Bankruptcy Rule 2002, the
Securities and Exchange Commission, the Internal Revenue Service, and the United States
Attorney for the District of Puerto Rico.  Such notice is hereby approved in all respects and shall
be deemed good and sufficient notice of entry of this Order.

56.    <u>Waiver of Stay</u>.  The stay of this Order otherwise imposed by Bankruptcy Rule
3020(e) is hereby waived as of the date hereof.

I-336

57.     No Waiver.  The failure to specifically include any particular provision of the Plan
in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof,
it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by
this reference.

Dated: February 5, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

**Exhibit A**

**Plan**

A-1

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone: (787) 764-8181<br>Facsimile: (787) 753-8944 |

*Attorneys for the Financial Oversight and Management Board
as Representative for COFINA in its Title III Case*

Dated: January 9, 2019

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS ...................................................................................1

1.1    AAFAF .........................................................................................1
1.2    Abeyance Stipulation...................................................................1
1.3    Acceleration Price........................................................................1
1.4    Actions..........................................................................................1
1.5    Additional Bonds Test .................................................................1
1.6    Administrative Claim Bar Date ...................................................1
1.7    Administrative Expense Claim ....................................................2
1.8    Adversary Proceeding...................................................................2
1.9    Affiliate.........................................................................................2
1.10   Agents ...........................................................................................2
1.11   Agreement in Principle ................................................................2
1.12   Allowed Administrative Expense Claim .....................................2
1.13   Allowed Claim...............................................................................2
1.14   Allowed General Unsecured Claim .............................................3
1.15   Allowed GS Derivative Claim......................................................3
1.16   Allowed Junior COFINA Bond Claim ........................................3
1.17   Allowed Junior COFINA Bond Claim (Assured) .......................3
1.18   Allowed Junior COFINA Bond Claim (Taxable Election) ..........3
1.19   Allowed Senior COFINA Bond Claim.........................................3
1.20   Allowed Senior COFINA Bond Claim (Ambac) .........................3
1.21   Allowed Senior COFINA Bond Claim (National) .......................3
1.22   Allowed Senior COFINA Bond Claim (Taxable Election)...........3
1.23   Ambac...........................................................................................3
1.24   Ambac Action...............................................................................4
1.25   Ambac Certificates.......................................................................4
1.26   Ambac Insurance Policy ..............................................................4
1.27   Ambac Insured Bonds ..................................................................4
1.28   Ambac Trust .................................................................................4
1.29   Ambac Trust Assets .....................................................................4
1.30   Appointments Related Litigation................................................4
1.31   Assets ...........................................................................................5
1.32   Assured .........................................................................................5
1.33   Assured Insurance Policies ..........................................................5
1.34   Assured Insured Bonds ................................................................5
1.35   Assured New Bonds .....................................................................5
1.36   Avoidance Actions .......................................................................5
1.37   Ballot Date ...................................................................................5
1.38   Ballot/Election Forms ..................................................................5
1.39   Bankruptcy Code .........................................................................5
1.40   Bankruptcy Rules .........................................................................5
1.41   Bar Date .......................................................................................5
1.42   Bar Date Order.............................................................................5

104749481v5

**Table of Contents**
**(Cont'd)**

Page

1.43   BNYM ....................................................................................6
1.44   Bond Claim ............................................................................6
1.45   Bondowner..............................................................................6
1.46   Bond Resolution .....................................................................6
1.47   Bonistas .................................................................................6
1.48   Business Day ..........................................................................6
1.49   CABs ......................................................................................6
1.50   Cash .......................................................................................6
1.51   Causes of Action ...................................................................6
1.52   CIBs .......................................................................................7
1.53   Claim .....................................................................................7
1.54   Class.......................................................................................7
1.55   COFINA .................................................................................7
1.56   COFINA Agent .......................................................................7
1.57   COFINA Bonds .......................................................................7
1.58   COFINA Cash Available for Distribution..............................7
1.59   COFINA Fiscal Plan...............................................................7
1.60   COFINA FY2019 BNYM Deposits ........................................7
1.61   COFINA Operating Expense Account .....................................8
1.62   COFINA Parity Bonds.............................................................8
1.63   COFINA Pledged Taxes ..........................................................8
1.64   COFINA Portion......................................................................8
1.65   COFINA Pre-FY2019 BNYM Deposits...................................8
1.66   Commonwealth.........................................................................8
1.67   Commonwealth Agent ..............................................................8
1.68   Commonwealth-COFINA Dispute...........................................9
1.69   Commonwealth-COFINA Dispute Order.................................9
1.70   Commonwealth-COFINA Dispute Settlement.........................9
1.71   Commonwealth Portion............................................................9
1.72   Commonwealth Title III Case ..................................................9
1.73   Compounded Amount................................................................9
1.74   Confirmation Date ...................................................................10
1.75   Confirmation Hearing..............................................................10
1.76   Confirmation Order .................................................................10
1.77   Consummation Costs................................................................10
1.78   Consummation Cost Party .......................................................10
1.79   Creditor....................................................................................10
1.80   Creditors' Committee ..............................................................10
1.81   Debt Service Fund ...................................................................10
1.82   Debt Service Savings...............................................................10
1.83   Definitive Documents..............................................................10
1.84   Disbursing Agent .....................................................................11
1.85   Disclosure Statement...............................................................11
1.86   Disclosure Statement Hearing .................................................11
1.87   Disclosure Statement Order.....................................................11
1.88   Disputed Claim........................................................................11

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.89 | Distribution Date | 11 |
| 1.90 | Distribution Record Date | 11 |
| 1.91 | Effective Date | 11 |
| 1.92 | Entity | 11 |
| 1.93 | Exculpated Party | 11 |
| 1.94 | Executory Contract | 12 |
| 1.95 | Existing Securities | 12 |
| 1.96 | Final Order | 12 |
| 1.97 | First Dollars Funding | 12 |
| 1.98 | Fiscal Plan | 12 |
| 1.99 | Fixed Amount | 12 |
| 1.100 | FY | 12 |
| 1.101 | FY2019 BNYM Deposits | 12 |
| 1.102 | General Unsecured Claim | 13 |
| 1.103 | Government Parties | 13 |
| 1.104 | Government Released Claims | 13 |
| 1.105 | Government Releasees | 13 |
| 1.106 | GS Derivative Claim | 13 |
| 1.107 | Insurance Policies | 13 |
| 1.108 | Interpleader Action | 13 |
| 1.109 | IRC | 13 |
| 1.110 | IRS | 13 |
| 1.111 | Junior COFINA Bond Claim | 14 |
| 1.112 | Junior COFINA Bond Claim (Assured) | 14 |
| 1.113 | Junior COFINA Bond Claim (Taxable Election) | 14 |
| 1.114 | Junior COFINA Bond Distribution | 14 |
| 1.115 | Junior Taxable Bond Distribution | 14 |
| 1.116 | Lex Claims Action | 14 |
| 1.117 | Lien | 15 |
| 1.118 | List of Creditors | 15 |
| 1.119 | Local Bankruptcy Rules | 15 |
| 1.120 | Maximum Taxable Bond Election Amount | 15 |
| 1.121 | Motion to Enforce | 15 |
| 1.122 | National | 15 |
| 1.123 | National Certificate Holder | 15 |
| 1.124 | National Certificates | 15 |
| 1.125 | National Election | 15 |
| 1.126 | National Insurance Policies | 16 |
| 1.127 | National Insured Bonds | 16 |
| 1.128 | National Trust | 16 |
| 1.129 | National Trust Assets | 16 |
| 1.130 | New Banking Services Agreement | 16 |
| 1.131 | New Bond Indenture | 16 |
| 1.132 | New Bond Legislation | 16 |
| 1.133 | New Collateral | 16 |
| 1.134 | Oversight Board | 16 |

iii

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.135 | Person | 17 |
| 1.136 | Petition Date | 17 |
| 1.137 | Plan | 17 |
| 1.138 | Plan Supplement | 17 |
| 1.139 | Plan Support Agreement | 17 |
| 1.140 | Pre-FY2019 BNYM Deposits | 17 |
| 1.141 | Professional | 17 |
| 1.142 | Professional Claim | 17 |
| 1.143 | PROMESA | 17 |
| 1.144 | Pro Rata Share | 17 |
| 1.145 | PSA Creditors | 18 |
| 1.146 | PSTBA | 18 |
| 1.147 | Puerto Rico Institution | 18 |
| 1.148 | Puerto Rico Investor | 18 |
| 1.149 | Related Actions | 18 |
| 1.150 | Related Persons | 18 |
| 1.151 | Released Claims | 18 |
| 1.152 | Released Parties | 19 |
| 1.153 | Releasing Parties | 19 |
| 1.154 | Reorganized COFINA | 19 |
| 1.155 | Reorganized COFINA By-Laws | 19 |
| 1.156 | Remainder Taxable Bond Election Amount | 19 |
| 1.157 | Rounding Amount Cash | 19 |
| 1.158 | Sale Notice | 19 |
| 1.159 | Sale Proceeds | 20 |
| 1.160 | Sales Tax | 20 |
| 1.161 | Section 103 Cash | 20 |
| 1.162 | Section 510(b) Subordinated Claim | 20 |
| 1.163 | Securities Act | 20 |
| 1.164 | Senior COFINA Bond Claim | 20 |
| 1.165 | Senior COFINA Bond Claim (Ambac) | 20 |
| 1.166 | Senior COFINA Bond Claim (National) | 20 |
| 1.167 | Senior COFINA Bond Claim (Taxable Election) | 20 |
| 1.168 | Senior COFINA Bond Distribution | 21 |
| 1.169 | Senior Taxable Bond Distribution | 21 |
| 1.170 | Settlement Agreement | 21 |
| 1.171 | Settlement Motion | 21 |
| 1.172 | Settlement Order | 21 |
| 1.173 | Solicitation Agent | 21 |
| 1.174 | Subordinated Lien Bonds | 21 |
| 1.175 | Taxable Bond Distribution | 21 |
| 1.176 | Taxable COFINA Bonds | 22 |
| 1.177 | Taxable Election Cash | 22 |
| 1.178 | Tax Election Remainder Amount | 22 |
| 1.179 | Tax-Exempt COFINA Bonds | 22 |
| 1.180 | Term Sheet | 22 |

Table of Contents
(Cont'd)

                                                                                    **Page**

    1.181   Title III ................................................................................22
    1.182   Title III Case ........................................................................22
    1.183   Title III Court .......................................................................22
    1.184   Trustee Claims ......................................................................22
    1.185   Trustee Rights .......................................................................22
    1.186   Trusts ...................................................................................22
    1.187   Unclaimed Distribution .........................................................22
    1.188   Unexpired Lease ...................................................................23
    1.189   Whitebox ..............................................................................23
    1.190   Whitebox Actions ..................................................................23
    1.191   Other Definitions ..................................................................23
    1.192   Rules of Interpretation ..........................................................23

ARTICLE II        COMPROMISE AND SETTLEMENT OF DISPUTES ............................24

    2.1   Commonwealth-COFINA Dispute ..........................................24

ARTICLE III       PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE
    CLAIMS ...........................................................................26

    3.1   Administrative Expense Claims ...............................................26
    3.2   Professional Compensation and Reimbursement Claims...............26
    3.3   Consummation Costs .............................................................27

ARTICLE IV        CLASSIFICATION OF CLAIMS ...............................................27

    4.1   Claims are classified as follows...............................................27

ARTICLE V         PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND
    CLAIMS (CLASS 1) ...........................................................28

    5.1   Treatment of Senior COFINA Bond Claims ...............................28
    5.2   Right of Election to Senior COFINA Bond Claims (Taxable
    Election)..............................................................................28

ARTICLE VI        PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND
    CLAIMS (AMBAC) (CLASS 2)...............................................29

    6.1   Treatment of Senior COFINA Bond Claims (Ambac)...............29
    6.2   Ambac Insurance Contribution................................................29
    6.3   Non-Commutation/Ambac Trust ..............................................30
    6.4   Deemed Acceleration ............................................................30
    6.5   Entitlement to Vote................................................................30

v

**Table of Contents**
**(Cont'd)**

| | | Page |
|---|---|---|

ARTICLE VII   PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND CLAIMS (NATIONAL) (CLASS 3)............................................30

7.1   Treatment of Senior COFINA Bond Claims (National)..............................30
7.2   National Insurance Contribution ..................................................31
7.3   Non-Commutation/National Trust...................................................31
7.4   Entitlement to Vote.............................................................31

ARTICLE VIII   PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND CLAIMS (TAXABLE ELECTION) (CLASS 4) ..........................................32

8.1   Provisions for Treatment of Senior COFINA Bond Claims (Taxable Election)..................................................................32

ARTICLE IX   PROVISIONS FOR TREATMENT FOR JUNIOR COFINA BOND CLAIMS (CLASS 5) ...............................................................32

9.1   Treatment of Junior COFINA Bond Claims...........................................32
9.2   Right of Election to Junior COFINA Bond Claims (Taxable Election)..................................................................32

ARTICLE X   PROVISIONS FOR TREATMENT FOR JUNIOR COFINA BOND CLAIMS (ASSURED) (CLASS 6) ..........................................................32

10.1   Treatment of Junior COFINA Bond Claims (Assured)...............................32
10.2   Deemed Acceleration ..........................................................33
10.3   Entitlement to Vote...........................................................33
10.4   Remarketing of Assured New Bonds .............................................33

ARTICLE XI   PROVISIONS FOR TREATMENT FOR JUNIOR COFINA BOND CLAIMS (TAXABLE ELECTION) (CLASS 7) .........................................34

11.1   Treatment for Junior COFINA Bond Claims (Taxable Election) ................34

ARTICLE XII   PROVISIONS FOR TREATMENT OF GS DERIVATIVE CLAIMS (CLASS 8) .........................................................................34

12.1   Treatment of GS Derivative Claims ...........................................34

ARTICLE XIII   PROVISIONS FOR TREATMENT OF GENERAL UNSECURED CLAIMS (CLASS 9) ....................................................................34

13.1   Treatment of General Unsecured Claims ......................................34

ARTICLE XIV   PROVISIONS FOR TREATMENT OF SECTION 510(B) SUBORDINATED CLAIMS (CLASS 10)....................................................34

14.1   Treatment of Section 510(b) Subordinated Claims ......................................34

vi

104749481v5

**Table of Contents**
**(Cont'd)**

| | | Page |
|---|---|---|

ARTICLE XV    PROVISIONS REGARDING ALLOCATION OF UNSUBSCRIBED
TAXABLE ELECTION CASH .................................................................35

15.1    Unsubscribed Taxable Election Cash Amount............................................35
15.2    Commonwealth/COFINA Expenses............................................................35

ARTICLE XVI    PROVISIONS REGARDING COFINA BONDS ......................................35

16.1    Issuance of COFINA Bonds .........................................................................35
16.2    Collateral for Repayment of COFINA Bonds ..............................................37
16.3    Additional Bonds Test for COFINA Parity Bonds.......................................37
16.4    Call Provisions/Optional Redemption ..........................................................38
16.5    First Dollars Funding....................................................................................39
16.6    Covenants for COFINA Bonds and COFINA Parity Bonds.........................39
16.7    Substitution of Collateral .............................................................................40
16.8    Debt Service Reserve Fund ..........................................................................41
16.9    Rights of Acceleration ..................................................................................41

ARTICLE XVII    THE TRUSTS ...........................................................................................41

17.1    Terms of Ambac Trust...................................................................................41
17.2    Terms of National Trusts...............................................................................43
17.3    Existing Securities/BNYM Obligations .......................................................44

ARTICLE XVIII    TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES...............................................................................45

18.1    Rejection or Assumption of Remaining Executory Contracts and
Unexpired Leases .....................................................................................45
18.2    Approval of Rejection or Assumption of Executory Contracts and
Unexpired Leases .....................................................................................45
18.3    Inclusiveness.................................................................................................45
18.4    Cure of Defaults............................................................................................45
18.5    Insurance Policies.........................................................................................46
18.6    Rejection Damage Claims.............................................................................46
18.7    Indemnification and Reimbursement Obligations.........................................46
18.8    Nonoccurrence of Effective Date .................................................................46
18.9    Reservation of Rights ...................................................................................47

ARTICLE XIX    PROVISIONS GOVERNING DISTRIBUTIONS....................................47

19.1    Time and Manner of Distribution..................................................................47
19.2    Timeliness of Payments.................................................................................48
19.3    Distributions by the Disbursing Agent..........................................................48
19.4    Manner of Payment under the Plan ...............................................................48
19.5    Delivery of Distributions...............................................................................48

vii

**Table of Contents**
**(Cont'd)**

Page

| | | |
|---|---|---|
| 19.6 | Cancellation of Notes, Instruments, Certificates, and Other Documents | 49 |
| 19.7 | Undeliverable/Reserved Distributions | 50 |
| 19.8 | Withholding and Reporting Requirements | 51 |
| 19.9 | Time Bar to Cash Payments | 51 |
| 19.10 | Distributions After Effective Date | 51 |
| 19.11 | Setoffs | 51 |
| 19.12 | Allocation of Plan Distributions Between Principal and Interest | 52 |
| 19.13 | Payment of Trustee Fees and Expenses | 52 |

ARTICLE XX      RIGHTS AND POWERS OF DISBURSING AGENT ............................. 52

| | | |
|---|---|---|
| 20.1 | Exculpation | 52 |
| 20.2 | Powers of the Disbursing Agent | 53 |
| 20.3 | Fees and Expenses Incurred From and After the Effective Date | 53 |

ARTICLE XXI     PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS .............. 53

| | | |
|---|---|---|
| 21.1 | Objections to Claims; Prosecution of Disputed Claims | 53 |
| 21.2 | Estimation of Claims | 53 |
| 21.3 | Payments and Distributions on Disputed Claims | 54 |
| 21.4 | Authority to Amend List of Creditors | 55 |
| 21.5 | Non-Accrual of Interest | 55 |
| 21.6 | Disallowance of Claims | 55 |

ARTICLE XXII    ACCEPTANCE OR REJECTION OF THE PLAN, EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS .................... 55

| | | |
|---|---|---|
| 22.1 | Impaired Classes to Vote | 55 |
| 22.2 | Acceptance by Class of Creditors | 55 |
| 22.3 | Cramdown | 56 |

ARTICLE XXIII   IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN AND NOT IMPAIRED BY THE PLAN ................................................................. 56

| | | |
|---|---|---|
| 23.1 | Impaired Classes | 56 |
| 23.2 | Impaired Classes to Vote | 56 |

ARTICLE XXIV   CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN ..... 56

| | | |
|---|---|---|
| 24.1 | Conditions Precedent to Confirmation of the Plan | 56 |
| 24.2 | Waiver of Conditions Precedent to Confirmation | 57 |

ARTICLE XXV    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.................... 58

| | | |
|---|---|---|
| 25.1 | Conditions Precedent to the Effective Date | 58 |
| 25.2 | Waiver of Conditions Precedent | 61 |

viii

**Table of Contents**
**(Cont'd)**

|  |  | **Page** |
|---|---|---|
| 25.3 | Effect of Non-Occurrence of Conditions to Effective Date | 61 |
| ARTICLE XXVI | PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY COFINA | 61 |
| 26.1 | Prosecution of Claims | 61 |
| ARTICLE XXVII | MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN | 61 |
| 27.1 | Modification of Plan | 61 |
| 27.2 | Revocation or Withdrawal | 62 |
| 27.3 | Amendment of Plan Documents | 62 |
| 27.4 | No Admission of Liability | 62 |
| ARTICLE XXVIII | CORPORATE GOVERNANCE AND  MANAGEMENT OF REORGANIZED COFINA | 62 |
| 28.1 | Corporate Action | 62 |
| 28.2 | Amendment of By-Laws | 63 |
| 28.3 | Directors of the Reorganized COFINA | 63 |
| 28.4 | Officers of Reorganized COFINA | 63 |
| 28.5 | Structure for Collection and Application of COFINA Pledged Taxes | 64 |
| ARTICLE XXIX | RETENTION OF JURISDICTION | 64 |
| 29.1 | Retention of Jurisdiction | 64 |
| ARTICLE XXX | MISCELLANEOUS PROVISIONS | 66 |
| 30.1 | Title to Assets | 66 |
| 30.2 | Discharge and Release of Claims and Causes of Action | 66 |
| 30.3 | Injunction on Claims | 68 |
| 30.4 | Integral to Plan | 68 |
| 30.5 | Releases by COFINA and Reorganized COFINA | 69 |
| 30.6 | Injunction Related to Releases | 69 |
| 30.7 | Exculpation | 69 |
| 30.8 | Appointments Related Litigation | 71 |
| 30.9 | Bar Order | 71 |
| 30.10 | No Waiver | 71 |
| 30.11 | Supplemental Injunction | 72 |
| 30.12 | Preservation of Certain Claims and Causes of Action | 72 |
| 30.13 | Post-Effective Date Fees and Expenses | 73 |
| 30.14 | Securities Act Exemption | 73 |
| 30.15 | Severability | 73 |
| 30.16 | Governing Law | 73 |
| 30.17 | Closing Case | 73 |

**Table of Contents**
**(Cont'd)**

Page

30.18   Section Headings ..........................................................................................73
30.19   Inconsistencies ............................................................................................73
30.20   Document Retention .....................................................................................74
30.21   Immediate Binding Effect ...........................................................................74
30.22   Additional Documents ..................................................................................74
30.23   Reservation of Rights ..................................................................................74
30.24   Termination of the Oversight Board ...........................................................74
30.25   Successors and Assigns ...............................................................................75
30.26   Notices .........................................................................................................75
30.27   Term of Injunctions or Stays ......................................................................76
30.28   Entire Agreement .........................................................................................76
30.29   Plan Supplement ..........................................................................................76

x

The Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following plan of adjustment.

## ARTICLE I

## DEFINITIONS

As used in the Plan, the following terms shall have the respective meanings set forth below and be equally applicable to the singular and plural of the terms defined:

1.1    **AAFAF:** Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.2    **Abeyance Stipulation:** That certain Stipulation and Agreed Order Related to Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation and Related Matters [Case No. 17-3283, ECF No. 4202], entered by the Title III Court in the Commonwealth Title III Case.

1.3    **Acceleration Price:** With respect to an Assured Insured Bond accelerated as of the Effective Date, an amount equal to (a) with respect to current interest bonds (and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including the Effective Date), the outstanding principal amount of such accelerated bond plus the accrued and unpaid interest thereon, and (b) with respect to capital appreciation bonds (and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the Effective Date), the Compounded Amount for such accelerated bond, in each case, as of, up to, but not including the Effective Date.

1.4    **Actions:** Collectively, the litigation styled (a) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Adv. Pro. No. 17-AP-143-LTS, currently pending in the Title III Court, (b) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Case No. 17-CV-3750-LTS, currently pending in the Title III Court, (c) Ambac Assurance Corp. v. The Bank of New York Mellon, Case No. 17-CV-3804-LTS, currently pending in the United States District Court for the Southern District of New York, (d) The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Pro. No. 17-133-LTS, currently pending in the Title III Court, (e) the Lex Claims Action, and (f) Rodriguez-Perelló et al. v. Rosselló-Nevares et al., No. 3:17-cv-01566-FAB (D.P.R. 2017), currently pending in the United States District Court for the District of Puerto Rico.

1.5    **Additional Bonds Test:** The criteria set forth in Section 16.3 hereof required to be satisfied prior to the issuance of Subordinated Lien Bonds for the benefit of, and with the consent of, the Commonwealth.

1.6    **Administrative Claim Bar Date:** Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than sixty

(60) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and COFINA and Reorganized COFINA shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of COFINA.

1.7   **Administrative Expense Claim:**  A Claim against COFINA or its Assets constituting a cost or expense of administration of the Title III Case asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the Effective Date, including, without limitation, (a) any actual and necessary cost and expense of preserving the Assets of COFINA, (b) any actual and necessary cost and expense of operating the business of the COFINA, (c) any cost and expense of COFINA for the management, maintenance, preservation, sale, or other disposition of any Assets, (d) any cost and expense associated with the administration and implementation of the Plan, (e) any cost and expense associated with the administration, prosecution, or defense of Claims by or against COFINA and for distributions under the Plan, (f) any Claim for compensation and reimbursement of expenses arising during the period from and after the Petition Date and prior to the Effective Date and awarded by the Title III Court or otherwise in accordance with the provisions of the Plan, whether fixed before or after the Effective Date and (g) subject to the occurrence of the Effective Date, Consummation Costs.

1.8   **Adversary Proceeding:**  The litigation styled The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico v. Bettina Whyte, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS, currently pending in the Title III Court.

1.9   **Affiliate:**  With respect to any specified Entity, any other Person or Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

1.10   **Agents:**  Collectively, the Commonwealth Agent and the COFINA Agent.

1.11   **Agreement in Principle:**  That certain Terms and Conditions of Agreement in Principle to Resolve Commonwealth-COFINA Dispute, attached as Exhibit "A" [Adv. Proc. No. 17-257 LTS, Dkt. No. 486-1] to the Joint Informative Motion of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle [Adv. Proc. No. 17-257 LTS, Dkt. No. 486-1].

1.12   **Allowed Administrative Expense Claim:**  An Administrative Expense Claim, to the extent it is or has become an Allowed Claim.

1.13   **Allowed Claim:**  A Claim against COFINA or COFINA's Assets (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by COFINA in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section

2

502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. For purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any Claim that COFINA may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law. Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Title III Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, "Allowed Claim" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.14    **Allowed General Unsecured Claim:** A General Unsecured Claim, to the extent it is or has become an Allowed Claim.

1.15    **Allowed GS Derivative Claim:** The GS Derivative Claim, to the extent it is or has become an Allowed Claim.

1.16    **Allowed Junior COFINA Bond Claim:** A Junior COFINA Bond Claim, to the extent it is or has become an Allowed Claim.

1.17    **Allowed Junior COFINA Bond Claim (Assured):** A Junior COFINA Bond Claim (Assured), to the extent it is or has become an Allowed Claim.

1.18    **Allowed Junior COFINA Bond Claim (Taxable Election):** A Junior COFINA Bond Claim (Taxable Election), to the extent it is or has become an Allowed Claim.

1.19    **Allowed Senior COFINA Bond Claim:** A Senior COFINA Bond Claim to the extent it is or has become an Allowed Claim.

1.20    **Allowed Senior COFINA Bond Claim (Ambac):** A Senior COFINA Bond Claim (Ambac), to the extent it is or has become an Allowed Claim.

1.21    **Allowed Senior COFINA Bond Claim (National):** A Senior COFINA Bond Claim (National), to the extent it is or has become an Allowed Claim.

1.22    **Allowed Senior COFINA Bond Claim (Taxable Election):** A Senior COFINA Bond Claim (Taxable Election) to the extent it is or has become an Allowed Claim.

1.23    **Ambac:** Ambac Assurance Corporation.

3

1.24   **Ambac Action**: The litigation styled <u>Ambac Assurance Corp. v. The Bank of New York Mellon,</u> Case No. 17-cv-3804-LTS, currently pending in the United States District Court for the Southern District of New York.

1.25   **Ambac Certificates:** The certificates to be issued by the Ambac Trust to beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) electing treatment pursuant to the terms and provisions of Section 6.1(b) hereof.

1.26   **Ambac Insurance Policy:** The existing insurance policy issued by Ambac relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.27   **Ambac Insured Bonds:** The "Senior" Existing Securities issued by COFINA and insured by Ambac.

1.28   **Ambac Trust:** The trust(s) formed by COFINA on or prior to the Effective Date, at the sole cost and expense of Ambac and/or from the Ambac Trust Assets, solely on behalf, and for the benefit of, beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elect, in accordance with the approved solicitation procedures, to receive Ambac Certificates, not to commute their Ambac Insurance Policy, and not to release and discharge all of Ambac's obligations pursuant to the Ambac Insurance Policy.

1.29   **Ambac Trust Assets:** Collectively, (a) the Ambac Insured Bonds of beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) electing treatment pursuant to Section 6.1(b) hereof, (b) the Senior COFINA Bond Distribution (comprised of Section 103 Cash, if applicable, COFINA Cash Available for Distribution, COFINA Bonds and Rounding Amount Cash, if necessary) allocable to such electing holders of an Allowed Senior COFINA Bond Claim (Ambac), and (c) the benefit of the Ambac Insurance Policy.

1.30   **Appointments Related Litigation:** Collectively, the litigation styled (a) <u>In Re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico,</u> No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico,</u> No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, (c) <u>Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority,</u> et al., Adv. Pro. No. 17-AP-228-LTS, currently pending in the Title III Court, (d) <u>René Pinto Lugo, et al. v. The Government of the United States of America, et al.,</u> Adv. Pro. No. 18-041-LTS, currently pending in the Title III Court, (e) <u>Hermanidad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al.</u> v. <u>Government of the United States of America, et al.,</u> Adv. Pro. No. 18-066-LTS, currently pending in the Title III Court, (f) <u>Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico,</u> Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (g) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the COFINA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.31   **Assets:**  With respect to COFINA, (i) all "property" of COFINA, including, without limitation, such property as it may be reflected on COFINA's books and records and the Confirmation Order as of the Effective Date and (ii) all Claims and Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by COFINA or other authorized representative for the benefit of COFINA and its Creditors, unless modified or released pursuant to the Plan or a Final Order, including, without limitation, any Avoidance Action.

1.32   **Assured:**  Assured Guaranty Municipal Corp.

1.33   **Assured Insurance Policies:**  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.34   **Assured Insured Bonds:**  The "First Subordinate" Existing Securities issued by COFINA and insured by Assured, including, without limitation, those securities insured by Assured through insurance issued in the secondary market.

1.35   **Assured New Bonds:**  The COFINA Bonds to be issued on the Effective Date, and insured by Assured in accordance with the terms and provisions of Article X hereof.

1.36   **Avoidance Actions:**  Any and all avoidance, recovery, subordination or other actions or remedies against any Entity that may be brought by or on behalf of COFINA under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, or applicable non-bankruptcy law.

1.37   **Ballot Date:**  The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the Plan.

1.38   **Ballot/Election Forms:**  The forms distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on the Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the Plan.

1.39   **Bankruptcy Code:**  The Bankruptcy Reform Act of 1978, as amended, to the extent codified in title 11, United States Code, as applicable to the Title III Case.

1.40   **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Title III case.

1.41   **Bar Date:**  The date established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims, pursuant to (a) the Bar Date Order, (b) a Final Order of the Title III Court, or (c) the Plan.

1.42   **Bar Date Order:**  The order of the Title III Court establishing the date by which proofs of Claim against COFINA or its Assets must have been filed, including, but not limited

5

to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], and (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof  [Case No. 17-3283-LTS, ECF No. 3160].

1.43    **BNYM:**  The Bank of New York Mellon, solely in its capacity as trustee and paying agent in connection with the Existing Securities.

1.44    **Bond Claim:**  A Claim on account of a "Senior" or "First Subordinate" Existing Security issued by COFINA, with the amount of such Claim being calculated as (a) with respect to current interest bonds and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including, the Petition Date, the outstanding principal amount of such bonds plus any accrued and unpaid interest thereon, in each case, as of, up to, but not including, the Petition Date, and (b) with respect to capital appreciation bonds and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the Petition Date, the Compounded Amount for such bonds, in each case, as of, up to, but not including, the Petition Date.

1.45    **Bondowner:**  Any Person which shall be the registered owner of any Existing Securities as set forth in BNYM's books and records.

1.46    **Bond Resolution:**  That certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted by COFINA on July 13, 2007, as amended and restated on June 19, 2009, and as supplemented pursuant to certain supplemental resolutions entered into thereunder or adopted pursuant thereto.

1.47    **Bonistas:**  Bonistas del Patio, Inc.

1.48    **Business Day:**  A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York are required to close by law or executive order.

1.49    **CABs:**  Collectively, the series of capital appreciation bonds to be issued pursuant to the Plan as components of the COFINA Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.50    **Cash:**  Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and other similar items.

1.51    **Causes of Action:**  All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) against COFINA or its Assets that are pending or may be asserted against any Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to

6

judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the Effective Date.

1.52 **CIBs:** Collectively, the series of current interest bonds to be issued pursuant to the Plan as components of the COFINA Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.53 **Claim:** Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.54 **Class:** A category of holders of Claims set forth in Article IV of the Plan.

1.55 **COFINA:** The Puerto Rico Sales Tax Financing Corporation, a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting a corporate and political entity independent and separate from the Commonwealth of Puerto Rico.

1.56 **COFINA Agent:** Bettina M. Whyte, in her capacity as the appointed agent of the Oversight Board, as representative of COFINA, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA pursuant to the Commonwealth-COFINA Dispute Order.

1.57 **COFINA Bonds:** The securities to be issued by Reorganized COFINA on the Effective Date pursuant to the Plan.

1.58 **COFINA Cash Available for Distribution:** The amount of Cash available for distribution on the Effective Date comprised of the COFINA Pre-FY2019 BNYM Deposits minus the sum of (a) Rounding Amount Cash plus (b) Section 103 Cash plus (c) Taxable Election Cash plus (d) Consummation Costs as required to be paid by COFINA pursuant to Section 3.3 of the Plan plus (e) the amount of Cash, if any, retained by COFINA for the COFINA Operating Expense Account or distributed to COFINA pursuant to Section 2.1(a)(I)(D)(III) of the Plan.

1.59 **COFINA Fiscal Plan:** That certain Fiscal Plan of COFINA, dated October 18, 2018, and as certified by the Oversight Board on October 18, 2018, as such Fiscal Plan may be amended, restated, supplemented or modified from time to time in accordance with Section 201 of PROMESA.

1.60 **COFINA FY2019 BNYM Deposits:** Fifty-three and sixty-five one hundredths percent (53.65%) of the FY2019 BNYM Deposits, plus any earnings thereon.

7

104749481v5

I-356

1.61   **COFINA Operating Expense Account:** The account to be established on or prior to the Effective Date in accordance with the New Bond Indenture and maintained for the purpose of satisfying the operating expenses of Reorganized COFINA in the ordinary course of business.

1.62   **COFINA Parity Bonds:** The securities which may be issued, on a *pari passu* basis with the COFINA Bonds issued on the Effective Date, by Reorganized COFINA from and after the Effective Date, for the purpose of refinancing, in whole or in part, COFINA Bonds or securities previously issued to refinance COFINA Bonds, provided that, (a) notwithstanding the terms of such securities, COFINA shall not be entitled to an increase of the COFINA Portion; (b) the principal and interest payment dates on any such securities shall be the same principal and interest payment dates on the COFINA Bonds; (c) the final maturity date on any such securities shall not be later than the original scheduled final maturity date of the COFINA Bonds; and (d) upon the issuance of any such securities (i) the annual debt service due in the then-current and each future fiscal year on all COFINA Bonds and COFINA Parity Bonds outstanding after the issuance of the COFINA Parity Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year, respectively, on all COFINA Bonds and COFINA Parity Bonds outstanding prior to such issuance; (ii) the Debt Service Savings shall only be realized in the same fiscal years in which principal of COFINA Bond and COFINA Parity Bonds was refunded and/or purchased; (iii) Debt Service Savings in any fiscal year shall be applied first, to the repayment of principal and interest on COFINA Bonds or COFINA Parity Bonds unpaid from any prior fiscal year; and second, at the option of COFINA, (x) to purchase COFINA Bonds and COFINA Parity Bonds in the open market (subject to the limitation in subsection (ii) above), (y) to transfer to the COFINA Operating Expense Account to pay operating expenses of COFINA or (z) transfer such savings to the Commonwealth; and (iv) any Debt Service Savings released to the Commonwealth as set forth in subsection (iii) above shall be available for any lawful purpose of the Commonwealth.

1.63   **COFINA Pledged Taxes:** The present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

1.64   **COFINA Portion:** The COFINA Pledged Taxes and all rights thereto, including the right to receive the COFINA Pledged Taxes pursuant to the First Dollars Funding, in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA in any given fiscal year until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

1.65   **COFINA Pre-FY2019 BNYM Deposits:** The Pre-FY2019 BNYM Deposits in excess of Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63).

1.66   **Commonwealth:** The Commonwealth of Puerto Rico.

1.67   **Commonwealth Agent:** The appointed agent of the Oversight Board, as representative of the Commonwealth, to litigate and/or settle the Commonwealth-COFINA

8

Dispute on behalf of the Commonwealth pursuant to the Commonwealth-COFINA Dispute Order.

1.68 **Commonwealth-COFINA Dispute:** The dispute between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA and pledged by COFINA to secure the repayment of certain indebtedness of COFINA, being litigated in the Adversary Proceeding, and to be compromised and settled pursuant to the Settlement Order and the Confirmation Order.

1.69 **Commonwealth-COFINA Dispute Order:** That certain Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute [Case No. 17-3283, ECF No. 996], as amended from time to time, entered by the Title III Court in the Commonwealth Title III Case.

1.70 **Commonwealth-COFINA Dispute Settlement:** The compromise and settlement of the Commonwealth-COFINA Dispute, based upon the Agreement in Principle, and set forth in that certain Settlement Agreement, dated as of October 19, 2018 between the COFINA Agent and the Oversight Board.

1.71 **Commonwealth Portion:** Collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms; provided, however, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion; and, provided, further, that (y) subject to the provisions regarding the Additional Bonds Test and the First Dollars Funding set forth in Sections 16.3 and 16.5 hereof, respectively, the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year unless and until COFINA has received the COFINA Portion and (z) the Commonwealth shall have no right to receive Debt Service Savings in any fiscal year unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such fiscal year, including any overdue debt service payments from all prior fiscal years, are made as required, in accordance with the provisions regarding the Additional Bonds Test set forth in Section 16.3 hereof; and, provided, further, that the COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and, in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, the COFINA Portion shall not be subject to the automatic stay in any such Commonwealth proceeding.

1.72 **Commonwealth Title III Case:** The Title III case under PROMESA pending for the Commonwealth in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of the Commonwealth of Puerto Rico, Case No. 17-3283-LTS (D.P.R.).

1.73 **Compounded Amount:** The "Compounded Amount" as defined in the Bond Resolution.

9

1.74    **Confirmation Date:**  The date on which the Clerk of the Title III Court enters the Confirmation Order on the docket.

1.75    **Confirmation Hearing:**  The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.76    **Confirmation Order:**  The order of the Title III Court confirming the Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code, applicable to the Title III Case pursuant to Sections 301 and 314(b)(1) of PROMESA.

1.77    **Consummation Costs:**  Collectively, the amounts to be paid, in Cash, on the Effective Date to Consummation Cost Parties in accordance with the terms and conditions of the Plan Support Agreement, the Term Sheet and Article III hereof.

1.78    **Consummation Cost Party:**  Each of the PSA Creditors set forth on Exhibit "B" to the Term Sheet.

1.79    **Creditor:**  Any Entity holding a Claim against COFINA or COFINA's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of COFINA, including, without limitation, a Claim against COFINA of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

1.80    **Creditors' Committee:**  The statutory committee of unsecured creditors appointed in, among other cases, the Commonwealth Title III Case, but not the Title III Case.

1.81    **Debt Service Fund:**  The account to be established pursuant to the New Bond Indenture in the name of the trustee for the COFINA Bonds, which account shall be for the purpose of receiving, holding and distributing funds for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds.

1.82    **Debt Service Savings:**  For each fiscal year, the difference between (a) principal and interest due on COFINA Bonds and COFINA Parity Bonds, then outstanding, prior to the issuance of COFINA Parity Bonds and/or Reorganized COFINA's purchase of COFINA Bonds and COFINA Parity Bonds in the open market and (b) principal and interest due on COFINA Bonds and COFINA Parity Bonds that will remain outstanding after the issuance of such COFINA Parity Bonds and/or Reorganized COFINA's purchase of such COFINA Bonds and COFINA Parity Bonds.

1.83    **Definitive Documents:**  Collectively, the definitive documents and agreements to which COFINA will be a party as contemplated by the Plan, including (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings in support of entry thereof, (c) the New Bond Indenture and documents or agreements related thereto, (d) the form of bonds for the COFINA Bonds, (e) the New Banking Services Agreement and (f) each other document that will comprise the Plan Supplement.  The form and substance of each document comprising the "Definitive Documents" shall be reasonably acceptable to the Government Parties and to the PSA Creditors and Bonistas.

10

1.84    **Disbursing Agent:**  As applicable, COFINA or such other Entity designated by the Oversight Board and COFINA on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan.

1.85    **Disclosure Statement:**  The disclosure statement relating to the Plan and approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.86    **Disclosure Statement Hearing:**  The hearing to be held by the Title III Court to consider the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.87    **Disclosure Statement Order:**  The order of the Title III Court approving the Disclosure Statement as containing adequate information in accordance with the provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

1.88    **Disputed Claim:**  A Claim against COFINA or its Assets, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed by COFINA in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.89    **Distribution Date:**  Except as otherwise set forth herein, the date or dates determined by COFINA, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

1.90    **Distribution Record Date:**  The Ballot Date or such other date as may be established by a separate order of the Title III Court, including the Confirmation Order; provided, however, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the Plan through The Depository Trust Company.

1.91    **Effective Date:**  The first (1st) Business Day on which (i) all of the conditions precedent to confirmation of the Plan specified in Section 24.1 of the Plan shall have been satisfied or waived, as provided in Section 24.2 of the Plan, and (ii) all the conditions precedent to the effectiveness of the Plan specified in Section 25.1 of the Plan shall have been satisfied or waived as provided in Section 25.2 of the Plan.

1.92    **Entity:**  A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.93    **Exculpated Party:**  Collectively, and in each case in its capacity as such:  (a) COFINA; (b) AAFAF, (c) the Oversight Board and each of its members; (d) each of the PSA

11

Creditors and Bonistas, solely in its capacity as a party to the Plan Support Agreement and a Creditor and not as a creditor of any other Entity, including, without limitation, the Commonwealth; and (e) with respect to each of the foregoing clauses (a) through (d), such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former Related Persons solely in the capacities referred to above.

1.94   **Executory Contract:**  A contract to which COFINA is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.95   **Existing Securities:**  Collectively, the existing "Senior" and "First Subordinate" bonds issued by COFINA prior to the Petition Date in accordance with the Bond Resolution.

1.96   **Final Order:**  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, (a) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order and (b) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.97   **First Dollars Funding:**  The allocation of "first dollars" collected from COFINA Pledged Taxes, including, without limitation, the criteria set forth in Section 16.5 hereof required to be satisfied in order to permit, among other things, quarterly deposits of "first dollars" collected from COFINA Pledged Taxes.

1.98   **Fiscal Plan:**  A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.99   **Fixed Amount:**  For FY ending June 30, 2019, Seven Hundred Eighty-Three Million One Hundred Ninety-Seven Thousand Two Hundred Fifty-One Dollars ($783,197,251.00) and, for each subsequent FY, the Fixed Amount for the prior FY plus four percent (4%) thereon, up to an aggregate FY amount of One Billion Eight Hundred Fifty Million Dollars ($1,850,000,000.00).

1.100   **FY:**  A fiscal year of the Commonwealth.

1.101   **FY2019 BNYM Deposits:**  Collectively, the funds deposited on or after July 1, 2018 (inclusive of the COFINA FY2019 BNYM Deposits) to the debt service, reserve and such other accounts and any earnings thereon held by BNYM, as the COFINA bond trustee.

104749481v5

1.102  **General Unsecured Claim:**  Any Claim other than an Administrative Expense Claim, a Senior COFINA Bond Claim, a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National), a Senior COFINA Bond Claim (Taxable Election), a Junior COFINA Bond Claim, a Junior COFINA Bond Claim (Assured), a Junior COFINA Bond Claim (Taxable Election), or a GS Derivative Claim.

1.103  **Government Parties:**  Collectively, the Oversight Board, COFINA and AAFAF.

1.104  **Government Released Claims:**  Collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to COFINA's obligations pursuant to the Plan or the securities to be issued pursuant to the Plan or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

1.105  **Government Releasees:**  Collectively, the Government Parties and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case.

1.106  **GS Derivative Claim:**  The Claim arising from or relating to that certain ISDA Master Agreement, dated as of July 31, 2007, between Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, L.P.) and COFINA, as amended by that certain Amendment, dated September 24, 2014.

1.107  **Insurance Policies:**  Collectively, the Ambac Insurance Policy, the Assured Insurance Policies and the National Insurance Policies.

1.108  **Interpleader Action:**  The litigation styled The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS, currently pending in the Title III Court.

1.109  **IRC:**  The United States Internal Revenue Code of 1986, as amended from time to time.

1.110  **IRS:**  The Internal Revenue Service, an agency of the United States Department of Treasury.

13

1.111  **Junior COFINA Bond Claim:**  A Bond Claim, other than a Junior COFINA Bond Claim (Assured) or a Junior COFINA Bond Claim (Taxable Election), on account of a "First Subordinate" Existing Security.

1.112  **Junior COFINA Bond Claim (Assured):**  A Bond Claim on account of a "First Subordinate" Existing Security, the scheduled repayment of which has been insured by Assured in accordance with the terms of the Assured Insurance Policies, including pursuant to a secondary market insurance policy.

1.113  **Junior COFINA Bond Claim (Taxable Election):**  A Bond Claim, other than a Junior COFINA Bond Claim (Assured), on account of a "First Subordinate" Existing Security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, is a Puerto Rico Institution; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

1.114  **Junior COFINA Bond Distribution:**  A distribution of COFINA Bonds, Section 103 Cash, if applicable, and Rounding Amount Cash, if necessary, allocable to holders of Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured) and Junior COFINA Bond Claims (Taxable Election) equal to fifty-six and forty-one one hundredths percent (56.41%) of such holders' aggregate Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured) and Junior COFINA Bond Claims (Taxable Election), plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution, but solely to the extent of any such increase provided as a result of an undersubscription of the Taxable Election Cash in accordance with the terms and provisions of Section 2.1(a) hereof; provided, however, that, in the event applicable United States law does not permit all COFINA Bonds to be issued on a federally tax-exempt basis, COFINA shall issue Taxable COFINA Bonds as a sub-series of COFINA Bonds, which bonds shall be distributed, first, in accordance with the provisions of Sections 8.1 and 11.1 hereof and, second, with respect to any remaining Taxable COFINA Bonds, ratably to all other recipients of COFINA Bonds in accordance with the Plan, including, without limitation, to applicable holders of Allowed Senior COFINA Bond Claims, Allowed Senior COFINA Bond Claims (Ambac), Allowed Senior COFINA Bond Claims (National), Allowed Junior COFINA Bond Claims and Allowed Junior COFINA Bond Claims (Assured).

1.115  **Junior Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed Junior COFINA Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 11.1 hereof.

1.116  **Lex Claims Action:**  The litigation styled Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 16-CV-02374-FAB(D.P.R. 2016), currently pending in the United States District Court for the District of Puerto Rico, solely with respect to Claims or

104749481v5

Causes of Action, or portions of Claims or Causes of Action, that plaintiffs have asserted, or were required, by applicable law, to assert, which are premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the Sales Taxes, if any, transferred by the Commonwealth to COFINA, and such other Claims or Causes of Action which may be interpreted reasonably to challenge the transactions contemplated by the Term Sheet, the Plan and the Settlement Motion.

1.117   **Lien:**  Any charge against or interest in property to secure payment of a debt or performance on an obligation.

1.118   **List of Creditors:**  The Creditor List (together with all summaries, notes, and schedules) attached as Exhibit A to the *Notice of Filing of Creditor List for Puerto Rico Sales Tax Financing Corporation ("COFINA")* [ECF No. 215] filed in the Title III Case pursuant to sections 924 and 925 of the Bankruptcy Code, as such list, summaries, notes, or schedules may be amended, restated, supplemented or otherwise modified by COFINA.

1.119   **Local Bankruptcy Rules:**  The Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.120   **Maximum Taxable Bond Election Amount:**  One Billion Dollars ($1,000,000,000.00), provided, however, that, if the amount of Taxable COFINA Bonds exceeds the aggregate amount of COFINA Bonds distributable in respect of Allowed Senior COFINA Bond Claims (Taxable Election) and Allowed Junior COFINA Bond Claims (Taxable Election) each as calculated, for purposes of this proviso, assuming a Maximum Taxable Bond Election Amount of One Billion Dollars ($1,000,000,000.00), the Maximum Taxable Bond Election Amount shall increase by the amount necessary to provide for the distribution of all Taxable COFINA Bonds pursuant to Taxable Bond Distributions; and, provided, further, that in no event shall the Maximum Taxable Bond Election Amount exceed Three Billion Dollars ($3,000,000,000.00).

1.121   **Motion to Enforce:**  The motion which may be filed by the Creditors' Committee and/or the Commonwealth Agent to enforce the Commonwealth-COFINA Dispute Order by challenging the Oversight Board's authority under the Commonwealth-COFINA Dispute Order to seek approval of the Settlement Agreement.

1.122   **National:**  National Public Finance Guarantee Corporation.

1.123   **National Certificate Holder:**  A holder of a National Certificate.

1.124   **National Certificates:**  The certificate(s) or receipt(s) to be issued by the National Trust to beneficial holders of COFINA Bonds which are deposited into the National Trust.

1.125   **National Election:**  The election to be exercised by National, in writing, prior to the commencement of the Disclosure Statement Hearing, pursuant to which National may elect, in its sole and absolute discretion, to pay off all National Insured Bonds in accordance with the

15

terms and provisions set forth in Section 7.5 hereof and satisfy and discharge all of its
obligations pursuant to the National Insurance Policies.

      1.126   **National Insurance Policies:**  The existing insurance policies initially issued by
(a) Financial Guaranty Insurance Company and subsequently novated to National or (b) MBIA
Insurance Corporation and relating to the National Insured Bonds, together with any and all
agreements and other documents related thereto.

      1.127   **National Insured Bonds:**  The "Senior" Existing Securities issued by COFINA
and insured by National, as successor to Financial Guaranty Insurance Company or MBIA
Insurance Corporation.

      1.128   **National Trust:**  The trust(s) which may be formed, on or prior to the Effective
Date, by COFINA, the sole cost and expense of which shall be borne by and satisfied by
National and/or from the National Trust Assets, and for the sole benefit of the holders of Senior
COFINA Bond Claims (National) that elect not to commute their National Insurance Policies
and satisfy and discharge all of National's obligations pursuant to the National Insurance
Policies.

      1.129   **National Trust Assets:**  Collectively, (a) the National Insured Bonds of a holder
of Senior COFINA Bond Claims (National) electing treatment pursuant to Section 7.1(b) hereof,
(b) the Senior COFINA Bond Distribution allocable to such electing holder of a Senior COFINA
Bond Claim (National), (c) the National Insurance Policies and (d) the Consummation Costs
allocable to National in accordance with the terms and provisions of Section 3.3 hereof.

      1.130   **New Banking Services Agreement:**  The agreement to be entered into by and
among, among other parties, Reorganized COFINA and the trustee for the COFINA Bonds
providing for, among other services, procedures for the collection and deposit of the COFINA
Pledged Taxes.

      1.131   **New Bond Indenture:**  The trust indenture to be executed as of the Effective
Date pursuant to which Reorganized COFINA shall issue the COFINA Bonds, as it may be
amended, supplemented or modified from time to time, which such agreement may be contained
within the New Bond Indenture or may be in a separate agreement by and between Reorganized
COFINA and the trustee for the COFINA Bonds.

      1.132   **New Bond Legislation:**  The legislation to be enacted on or prior to the Effective
Date authorizing the transactions contemplated by, and consistent with, the Plan, providing for
the ownership and collateralization of the COFINA Pledged Taxes and the granting of the New
Collateral and incorporating such other terms as set forth in Section 25.1(c)(viii) hereof.

      1.133   **New Collateral:**  The collateral which, pursuant to enacted legislation, may be
substituted by the Commonwealth to replace the COFINA Pledged Taxes, or already substituted
collateral, as security for the repayment of the COFINA Bonds, subject to satisfaction of the
requirements set forth in Section 16.7 hereof.

      1.134   **Oversight Board:**  The Financial Oversight and Management Board for Puerto
Rico established pursuant to Section 101 of PROMESA, as COFINA's representative in the Title
III Case pursuant to section 315(b) of PROMESA.

1.135   **Person:** An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.136   **Petition Date:** May 5, 2017, the date on which the Oversight Board filed a voluntary petition for relief for COFINA commencing the Title III Case.

1.137   **Plan:** This Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, including, without limitation, the exhibits and schedules hereto, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.138   **Plan Supplement:** A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, forms of the New Bond Indenture, the COFINA Bonds, the Reorganized COFINA By-Laws, the New Banking Services Agreement, and, if not previously enacted, the draft of the New Bond Legislation, which, in each case, shall be in form and substance reasonably satisfactory to the PSA Creditors. The Plan Supplement (containing draft or final versions of the foregoing documents shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

1.139   **Plan Support Agreement:** That certain Amended and Restated Plan Support Agreement, dated as of September 20, 2018, by and among the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas del Patio, Inc.

1.140   **Pre-FY2019 BNYM Deposits:** Collectively, the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts, and any earnings thereon held by BNYM as the COFINA bond trustee, for the benefit of holders of Existing Securities.

1.141   **Professional:** An Entity (a) to be compensated for services rendered prior to or on the Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Case by COFINA (in COFINA's and AAFAF's sole discretion); or (ii) employed in the Title III Case by the Oversight Board (in the Oversight Board's sole discretion); or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.142   **Professional Claim:** A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 316 and 317 of PROMESA.

1.143   **PROMESA:** The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

1.144   **Pro Rata Share:** With respect to Allowed Claims (i) within the same Class, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class, and (ii) among multiple Classes, the proportion that Allowed Claims in any such Class bears to the sum of the Allowed Claims in all such Classes.

17

1.145 **PSA Creditors:** Collectively, the parties to the Plan Support Agreement, other than the Government Parties and Bonistas del Patio, Inc.

1.146 **PSTBA:** The Pledged Sales Tax Base Amount, i.e., the annual dollar amount determined for each fiscal year of the Commonwealth in accordance with Section 3 of Act No. 91-2006 of the Commonwealth, as amended.

1.147 **Puerto Rico Institution:** A holder of a Bond Claim, other than a Puerto Rico Investor, that is domiciled in Puerto Rico (as determined by the Oversight Board, in its sole and absolute discretion); provided, however, that the criteria upon which such holder is determined to be a Puerto Rico Institution shall be developed jointly by the Oversight Board and AAFAF in their respective reasonable discretion.

1.148 **Puerto Rico Investor:** A holder of a Bond Claim that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board, in its sole and absolute discretion).

1.149 **Related Actions:** Collectively, the Adversary Proceeding and the Interpleader Action.

1.150 **Related Persons:** With respect to any Entity (including for the avoidance of doubt, the Commonwealth and the Government Parties), its predecessors, successors and assigns (whether by operation of law or otherwise) and their respective current and former Affiliates and such Entity's and its current and former Affiliate's current and former employees, managers, elected or appointed officials, directors, officers, board members, principals, members, equity holders (whether such interests are held directly or indirectly), partners, financial advisors, attorneys, accountants, consultants, agents and professionals (including, without limitation, any and all Professionals retained by COFINA and AAFAF), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), each in its capacity as such.

1.151 **Released Claims:** Collectively, (a) with respect to those Entities party to the Plan Support Agreement, Claims and Causes of Action released hereunder and in accordance with the Plan Support Agreement, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against COFINA or its Assets in the Title III Case, (c) Claims and Causes of Action that have been or could have been asserted by COFINA (with respect to releases given by COFINA) and by Creditors or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), and (d) Claims that otherwise arise from or relate to the Title III Case, the Actions, the Adversary Proceeding, the Interpleader Action, the Plan, the Plan Support Agreement and the compromises set forth in the Commonwealth-COFINA Dispute Settlement, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to COFINA or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort, against BNYM by Ambac or Whitebox in the Ambac Action and the Whitebox Actions,

18

respectively, or any rights, claims, causes of action or defenses that BNYM may have against
Ambac or Whitebox, as the case may be, in connection with such litigations; and, <u>provided,
further,</u> that "Released Claims" is not intended to release, nor shall it have the effect of releasing,
any party from the performance of its obligations in accordance with the Confirmation Order or
the Plan, including, without limitation, performance of obligations arising from or related to the
COFINA Bonds and the COFINA Parity Bonds.

1.152   **Released Parties:**  Collectively, solely to the extent provided in the Plan, (a) the
Government Parties, (b) the Commonwealth, (c) the COFINA Agent, (d) the PSA Creditors, (e)
BNYM, (f) upon satisfaction of the conditions set forth in decretal paragraph 3 of the Abeyance
Stipulation, the Creditors' Committee, its members, and the Commonwealth Agent, and (g) with
respect to the foregoing clauses (a) through (f), each of their respective Related Persons.

1.153   **Releasing Parties:**  Collectively, solely to the extent provided in the Plan, (a) all
holders of Claims against COFINA or its Assets; (b) such holders' current and former Affiliates
and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former
Related Persons; <u>provided, however,</u> that each Entity described in the foregoing clauses (a)
through (c) is providing releases pursuant to the Plan solely in such Entity's capacity as a
Creditor and not as a creditor of the Commonwealth or any Entity or Affiliate of the
Commonwealth.

1.154   **Reorganized COFINA:**  COFINA, from and after the Effective Date.

1.155   **Reorganized COFINA By-Laws:**  The by-laws adopted by Reorganized
COFINA's board of directors, which by-laws shall be in substantially the form included in the
Plan Supplement and shall be in form and substance reasonably satisfactory to the PSA
Creditors.

1.156   **Remainder Taxable Bond Election Amount:**  An amount equal to the
Maximum Taxable Bond Election Amount <u>minus</u> the aggregate amount of Bond Claims held by
Puerto Rico Investors and for which such holders have affirmatively elected a Taxable Bond
Distribution.

1.157   **Rounding Amount Cash:**  The amount of Cash necessary, up to a maximum
aggregate amount of Twenty-Five Million Dollars ($25,000,000.00), for distribution to holders
of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior
COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National) and Junior
COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA
Bond Claims (Assured) in the form of rounding amounts to ensure that all holders of Senior
COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA
Bond Claims (Ambac) and Senior COFINA Bond Claims (National) and Junior COFINA Bond
Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims
(Assured) receive their Pro Rata Share of CIBs, in the minimum bond par denomination of One
Thousand Dollars ($1,000.00) per COFINA Bond.

1.158   **Sale Notice:**  The notice which may be delivered by the trustee of the National
Custodial Trust to National Certificate Holders in accordance with Section 17.2(a) hereof and in
connection with the proposed sale of all or a portion of the COFINA Bonds held in the National
Custodial Trust.

1.159   **Sale Proceeds:**   The Cash proceeds of a sale by the trustee of the National Custodial Trust of all or a portion of the COFINA Bonds held by the National Custodial Trust.

1.160   **Sales Tax:**   The sales and use taxes imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

1.161   **Section 103 Cash:**   The amount of cash deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel and the PSA Parties, which amount of Cash (a) shall be no less than, and in payment of, the interest accrued and unpaid on the Existing Securities as of, and including May 4, 2017 and (b) shall not exceed the amount of Pre-FY2019 BNYM Deposits minus the amount of Rounding Amount Cash and Consummation Costs, to be applied to reduce the amount and number of Taxable COFINA Bonds solely to the extent that the COFINA Bonds cannot all be issued as tax-exempt bonds under applicable federal law.

1.162   **Section 510(b) Subordinated Claim:**   Any Claim, to the extent determined pursuant to a Final Order, against COFINA or its Assets arising from or relating to (a) rescission of a purchase or sale of an Existing Security, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.163   **Securities Act:**   The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.164   **Senior COFINA Bond Claim:**   A Bond Claim, other than a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National) or a Senior COFINA Bond Claim (Taxable Election), on account of a "Senior" Existing Security.

1.165   **Senior COFINA Bond Claim (Ambac):**   A Bond Claim on account of a "Senior" Existing Security, the repayment of which has been insured by Ambac.

1.166   **Senior COFINA Bond Claim (National):**   A Bond Claim on account of a "Senior" Existing Security, the repayment of which has been insured by National.

1.167   **Senior COFINA Bond Claim (Taxable Election):**   A Bond Claim, other than a Senior COFINA Bond Claim (Ambac) or a Senior COFINA Bond Claim (National), on account of a "Senior" Existing Security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, is a Puerto Rico Institution; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim.

104749481v5

1.168   **Senior COFINA Bond Distribution:**  A distribution of COFINA Bonds and Cash, in the aggregate, allocable to the holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National) and Senior COFINA Bond Claims (Taxable Election) equal to ninety-three and one one-hundredths percent (93.01%) of such holders' aggregate Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National) and Senior COFINA Bond Claims (Taxable Election), plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution; provided, however, that in the event that applicable United States law does not permit all COFINA Bonds to be issued on a federally tax-exempt basis, COFINA shall issue Taxable COFINA Bonds as a sub-series of COFINA Bonds, which bonds shall be distributed, first, in accordance with the provisions of Sections 8.1 and 11.1 hereof, and, second, with respect to any remaining Taxable COFINA Bonds, ratably to all other recipients of COFINA Bonds in accordance with the Plan, including, without limitation, to applicable holders of Allowed  Senior COFINA Bond Claims, Allowed Senior COFINA Bond Claims (Ambac), Allowed Senior COFINA Bond Claims (National), Allowed Junior COFINA Bond Claims and Allowed Junior COFINA Bond Claims (Assured).

1.169   **Senior Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed Senior COFINA Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 8.1 hereof.

1.170   **Settlement Agreement:**  That certain Settlement Agreement, dated as of October 19, 2018, between the Oversight Board, on behalf of the Commonwealth, and the COFINA Agent, on behalf of COFINA.

1.171   **Settlement Motion:**  The motion filed in the Commonwealth Title III Case pursuant to Bankruptcy Rule 9019 seeking entry of an order approving the compromise and settlement of the Commonwealth-COFINA Dispute in accordance with the terms and provisions of the Settlement Agreement and authorizing and directing the consummation of the transactions contemplated therein.

1.172   **Settlement Order:**  The order by the Title III Court in the Commonwealth Title III Case approving the Settlement Motion and the relief requested therein, including, without limitation, authorizing the Commonwealth's entry into the Settlement Agreement and directing the consummation of the transactions contemplated therein.

1.173   **Solicitation Agent:**  Prime Clerk LLC, the notice, claims, and solicitation agent retained by COFINA in the Title III Case by District Court order.

1.174   **Subordinated Lien Bonds:**  Collectively, the additional bonds that may be issued by Reorganized COFINA in accordance with the terms and provisions of Section 16.3 hereof, the repayment of which shall be secured by subordinated second or more junior Lien on the COFINA Pledged Taxes and which, in all respects, shall be subordinated in respect of priority, payment funding, and remedies to the COFINA Bonds and the COFINA Parity Bonds.

1.175   **Taxable Bond Distribution:**  A Senior Taxable Bond Distribution or a Junior Taxable Bond Distribution, as applicable.

21

1.176   **Taxable COFINA Bonds:**  Collectively, the portion of the COFINA Bonds in the aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel and the PSA Creditors, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the IRC, which COFINA Bonds shall be issued as CIBs with an interest rate of four and fifty-five one hundredths percent (4.55%) and having a maturity date of July 1, 2040.

1.177   **Taxable Election Cash:**  The amount of Cash equal to two percent (2.0%) (net of any administrative costs of the election process related to the applicable Bond Claims) of the aggregate amount of all Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election), which amount of Cash shall not exceed Sixty Million Dollars ($60,000,000.00).

1.178   **Tax Election Remainder Amount:**  The difference between Sixty Million Dollars ($60,000,000.00) and the Taxable Election Cash distributed pursuant to the Plan.

1.179   **Tax-Exempt COFINA Bonds:**  Collectively, the portion of the COFINA Bonds that are issued on the Effective Date as tax-exempt in accordance with Section 103 of the IRC.

1.180   **Term Sheet:**  The term sheet annexed as Exhibit "C" to the Plan Support Agreement and which sets forth, among other things, the terms and conditions of the COFINA Bonds.

1.181   **Title III:**  Title III of PROMESA.

1.182   **Title III Case:**  The Title III case under PROMESA pending for COFINA in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Sales Tax Financing Corporation, Case No. 17-3284-LTS (D.P.R.).

1.183   **Title III Court:**  The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Case.

1.184   **Trustee Claims:**  Collectively, the Claims, if any, of the trustee arising under Section 804 of the Bond Resolution, whether prior or subsequent to the Effective Date; provided, however, that, under no circumstances shall "Trustee Claims" include any fees and expenses incurred by BNYM from and after the Effective Date arising from or relating to the Ambac Action or the Whitebox Actions.

1.185   **Trustee Rights:**  The lien or other priority rights, if any, of the trustee arising under Sections 804 and 1103 of the Bond Resolution and applicable law, subject to the rights of any party in interest to contest the entitlement thereof.

1.186   **Trusts:**  Collectively, the Ambac Trust and the National Trust.

1.187   **Unclaimed Distribution:**  Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to COFINA of an intent to accept a particular distribution, (c) responded to COFINA's requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.188 **Unexpired Lease:** A lease of nonresidential real property to which COFINA is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.189 **Whitebox:** Whitebox Advisors, LLC and funds managed or affiliated with Whitebox Advisors, LLC, including, without limitation, Whitebox Multi-Strategy Partners, L.P.

1.190 **Whitebox Actions:** Collectively, the litigation styled (a) <u>Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon,</u> Adv. Pro. No. 17-AP-143-LTS, currently pending in the Title III Court, and (b) <u>Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon,</u> Case No. 17-CV-3750-LTS, currently pending in the Title III Court.

1.191 **Other Definitions:** Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in PROMESA or the Bankruptcy Code shall have the meaning assigned to that term in the PROMESA or Bankruptcy Code. Unless otherwise specified, (a) all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.192 **Rules of Interpretation:** For purposes of the Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents; (c) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (d) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (e) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (f) unless otherwise specified, references to docket numbers of documents filed in the Title III Case are references to the docket numbers under the Title III Court's CM/ECF system; (g) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (h) any immaterial effectuating provisions may be interpreted by the Oversight Board in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Title III Court or any other Entity.

104749481v5

I-372

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES

2.1     **Commonwealth-COFINA Dispute**:  Pursuant to sections 105(a), 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates and is expressly conditioned upon the approval and effectiveness of the compromise and settlement between the Oversight Board, on behalf of the Commonwealth, and the COFINA Agent, on behalf of COFINA, as set forth in the Settlement Agreement.  The Settlement Agreement is incorporated into this Plan by reference as if fully set forth herein and, subject to the occurrence of the Effective Date, represents a full, final and complete compromise, settlement and release of, among other matters, the claims and issues arising from and relating to the Commonwealth-COFINA Dispute, including, without limitation, the claims asserted in the Adversary Proceeding.  The Settlement Agreement will be considered contemporaneously for approval by the Title III Court in the Commonwealth Title III Case through submission of the Settlement Motion pursuant to Bankruptcy Rule 9019 and, in the Title III Case, through submission of the Plan, which full incorporates by reference the Settlement Agreement.  Without limiting the foregoing, subsections (a) through (e) below describe certain of the principal provisions of the Settlement Agreement, but, except with respect to the releases provided in Section 30.6 hereof, nothing in this Plan shall be construed to, or is intended to, limit or diminish the benefits to be received by, or rights of, the parties to the Settlement Agreement or the third party beneficiaries thereof.  In the event of any inconsistency between the Settlement Order, the Plan or the Confirmation Order, the documents shall control in the following order of priority: (i) the Settlement Order, (ii) the Confirmation Order, and (iii) the Plan.

(a)     **Compromise and Settlement/Allocation of Funds:**  The Commonwealth--COFINA Dispute shall be compromised and settled pursuant to the Settlement Motion and the Settlement Order, on the one hand, and pursuant to the Plan and the Confirmation Order, on the other hand, with (i) COFINA being granted ownership of the COFINA Portion, and (ii) the Commonwealth being granted ownership of the Commonwealth Portion; provided, however, that, except as expressly set forth in Sections 15.1 and 15.2 hereof, (A) one hundred percent (100%) of the Pre-FY2019 BNYM Deposits held by BNYM in accordance with the Adversary Proceeding and such other orders entered in connection therewith will, on the Effective Date, be the exclusive property of COFINA and be distributed to COFINA for purposes of distribution in accordance with the provisions of the Plan; provided, however, that, (i) of Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63) of the Pre-FY2019 BNYM Deposits, (x) Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) shall be distributed to the Commonwealth, (y) Five Million Dollars ($5,000,000.00) shall be allocated to the COFINA Operating Expense Account to fund an expense fund for COFINA, and (z) Forty Million Dollars ($40,000,000.00) shall be allocated to the Taxable Election Cash distributable under the Plan; provided, however, that, if the Taxable Election Cash actually distributed under the Plan is less than Sixty Million Dollars ($60,000,000.00), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash, shall be distributed (I) *first*, to further fund the COFINA Operating Expense Account up to an additional Ten Million Dollars ($10,000,000.00), and (II) *second*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash

24

Available for Distribution and increase recoveries to all holders of Bond Claims, and the Commonwealth, on the other hand, (B) one hundred percent (100%) of the COFINA FY2019 BNYM Deposits held by BNYM in accordance with the Adversary Proceeding and such other orders entered in connection therewith, will, on the Effective Date, be the exclusive property of COFINA and will be distributed to COFINA for purposes of distribution to holders of COFINA Bonds in accordance with the Plan, and (C) any FY2019 BNYM Deposits net of the COFINA FY2019 BNYM Deposits, shall be distributed in its entirety to the Commonwealth.

(b)   **Compromise Date:**   Unless (i) approval of the Settlement Motion is denied by the Title III Court or (ii) the Effective Date does not occur, the effective date of the compromise and settlement shall be retroactive to July 1, 2018 and, in addition to receipt of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section 2.1(a) hereof, and the COFINA FY2019 BNYM Deposits on the Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019.

(c)   **Litigation Dismissal:**   On the Effective Date, pursuant to the Settlement Order and the Confirmation Order, which orders shall amend and supersede such orders of the Title III Court entered in the Title III Case, the Commonwealth Title III Case, and the Related Actions to the extent that such orders are inconsistent therewith, (1) subject to the provisions of Section 19.5 hereof, BNYM shall distribute monies in accordance with the terms and provisions of Section 2.1(a) hereof, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other Claims and Causes of Action asserted, or that could have been asserted, therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Oversight Board, the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have no further obligations in connection with the Adversary Proceeding and the COFINA Agent and, upon satisfaction of the conditions set forth in decretal paragraph 3 of the Abeyance Stipulation, the Commonwealth Agent, the Creditors' Committee and its members, together with their respective professionals, shall be deemed to have been released from any and all liabilities associated therewith or that otherwise arise from or relate to the Title III Case, the Actions, the Adversary Proceeding, the Interpleader Action, the Plan, the Plan Support Agreement and the compromises set forth in the Commonwealth-COFINA Dispute Settlement, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations or property, (3) except with respect to (i) any Claims and causes of action asserted or that could have been asserted by BNYM against Ambac and Whitebox in the Interpleader Action and (ii) any non-released and non-dismissed counterclaims that may be asserted by either Ambac or Whitebox against BNYM therein, all other Claims and causes of action asserted, or that could have been asserted, in the Interpleader Action shall be deemed dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of the Plan, and (4) except with respect to Claims and causes of actions asserted, or that could have been asserted, by Ambac or Whitebox, whether sounding in contract or tort, against BNYM in the Ambac Action or the Whitebox Actions, respectively, for gross negligence, willful misconduct or intentional fraud, and any counterclaims that may be asserted by BNYM against Ambac or Whitebox in the Ambac Action or the Whitebox Actions, respectively, the Actions shall be dismissed, with prejudice, and Claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

25

(d)     **Allowance of Bond Claims:**  Solely for purposes of confirmation and
consummation of the Plan, on the Effective Date, (i) the Senior COFINA Bond Claims, Senior
COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac) and Senior
COFINA Bond Claims (National) shall be deemed allowed in the aggregate amount of
$7,760,871,398.36, (ii) the Junior COFINA Bond Claims, Junior COFINA Bond Claims
(Taxable Election) and the Junior COFINA Bond Claims (Assured) shall be deemed allowed in
the aggregate amount of $9,876,235,996.34; provided, however, that, in accordance with the
solicitation procedures attendant to the Plan, the foregoing amounts shall be deemed allowed for
voting purposes, and (iii) the holders of Existing Securities shall be deemed secured to the extent
of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of
Article II hereof, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

(e)     **Releases, Injunctions and Exculpation:**  The releases, injunctions and
exculpation provided in Article XXX herein (and, with respect to the COFINA Agent, this
Article II) are integral to obtaining the value provided under the Commonwealth-COFINA
Dispute Settlement and the releases, injunctions and exculpation under this Plan and the Plan
Support Agreement constitute an essential component of the compromises reached and are not
severable from the other provisions of this Plan.

## ARTICLE III

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the
Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and
Professional Claims have not been classified and thus are excluded from the Classes of Claims
set forth in Article IV of the Plan.

3.1     **Administrative Expense Claims:**  On the later to occur of (i) the Effective Date
and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim,
Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Expense Claim,
in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such
Allowed Administrative Expense Clam in accordance with such other terms no more favorable
to the claimant than as may be agreed upon by and between the holder thereof and Reorganized
COFINA; provided, however, that Allowed Administrative Expense Claims representing
indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by
Reorganized COFINA in accordance with the terms and subject to the conditions of any
agreement governing, investment evidencing, or other document relating to such transactions;
and, provided, further, that, if any such ordinary course expense is not billed, or a written request
for payment is not made, within ninety (90) days after the Effective Date, such ordinary course
expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution
pursuant to the Plan.

3.2     **Professional Compensation and Reimbursement Claims:**  All Entities awarded
compensation or reimbursement of expenses by the Title III Court shall be paid in full, in Cash,
in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the
later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order
allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more
favorable to the claimant than as may be mutually agreed upon between such claimant and the

26

Government Parties; provided, however, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. Reorganized COFINA is authorized to pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

3.3   **Consummation Costs**: Notwithstanding anything contained in the Plan to the contrary, in order to compensate Consummation Cost Parties for the cost of negotiation, confirmation and consummation of the Term Sheet and the Plan, and in consideration of (a) the negotiation, execution and delivery of the Plan Support Agreement by each Consummation Cost Party and (b) the obligations and covenants contained in the Plan Support Agreement, each Consummation Cost Party, on the Effective Date, shall receive, based upon such Entity's respective positions (insured or otherwise) as of 5:00 p.m. (EDT) on August 7, 2018, its pro rata share of Cash in an amount equal to two percent (2.0%), truncated to two decimal points, of (i) the aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (ii) One Billion Dollars ($1,000,000,000.00); provided, however, that, notwithstanding the foregoing provisions of this Section 3.3, amounts due to Aurelius Capital Master, Ltd. and Six PRC Investments LLC as a result of being a Consummation Cost Party (i) shall not be taken into account in connection with the above-referenced calculations solely with respect to payments to other Consummation Cost Parties, which payment to the other Consummation Cost Parties shall be made by COFINA or Reorganized COFINA, as the case may be, and (ii) with respect to payments to be made to Aurelius Capital Master, Ltd. and Six PRC Investments LLC shall be taken into account in connection with the above-referenced calculations for all Consummation Cost Parties, which payments to Aurelius Capital Master, Ltd. and Six PRC Investments LLC shall be made by the Commonwealth in accordance with the provisions of Section 15.2 hereof; and, provided, further, that, with respect to any Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National), unless otherwise agreed to, in writing, by Ambac and National, and subject to the terms and provisions of Article XVII hereof, Ambac or National, as the case may be, and not the beneficial holder of such Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National) regardless of whether such beneficial holder is also a Consummation Cost Party, shall receive the amount of Cash that would have otherwise been distributed to such other Consummation Cost Party in accordance with the provisions of this Section 3.3; and, provided, further, that, with respect to the Junior COFINA Bond Claims (Assured), Assured, and not the beneficial holders of the Junior COFINA Bond Claims (Assured), shall receive the amount of Cash distributable on account of the Junior COFINA Bond Claims (Assured) in accordance with the provisions of this Section 3.3.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1   **Claims are classified as follows:**

(a) **Class 1**:   Senior COFINA Bond Claims

27

(b) **Class 2**:  Senior COFINA Bond Claims (Ambac)

(c) **Class 3**:  Senior COFINA Bond Claims (National)

(d) **Class 4**:  Senior COFINA Bond Claims (Taxable Election)

(e) **Class 5**:  Junior COFINA Bond Claims

(f) **Class 6**:  Junior COFINA Bond Claims (Assured)

(g) **Class 7**:  Junior COFINA Bond Claims (Taxable Election)

(h) **Class 8**:  GS Derivative Claim

(i) **Class 9**:  General Unsecured Claims

(j) **Class 10**:  Section 510(b) Subordinated Claims

Notwithstanding the foregoing classification of Claims, but subject to the terms and provisions of the Plan Support Agreement, the Oversight Board reserves the right to amend or modify such classification, including, without limitation, supplement such classification with additional Classes or modify the treatment afforded the holders in Classes 8, 9 and 10, provided that such amendment or modification does not adversely impact the treatment afforded to the holders of Claims in Classes 1 through 7 above.

## ARTICLE V

## PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND CLAIMS (CLASS 1)

5.1     **Treatment of Senior COFINA Bond Claims:**  On the Effective Date, and subject to the right of election set forth in Section 5.2 hereof, each holder of an Allowed Senior COFINA Bond Claim shall be entitled to receive, in full satisfaction, release and exchange of such holder's Allowed Senior COFINA Bond Claim, such holder's Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds and (d) Rounding Amount Cash, if necessary.

5.2     **Right of Election to Senior COFINA Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 5.1 of the Plan, any holder of an Allowed Senior COFINA Bond Claim that is a Puerto Rico Investor or a Puerto Rico Institution, as applicable, shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 8.1 and 19.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board and COFINA, or their designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon COFINA unless the Ballot Date is expressly waived, in writing, by the Oversight Board and COFINA; provided, however, that, under no circumstance may such waiver by the Oversight Board and COFINA occur on or after the Effective Date.

28

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND
## CLAIMS (AMBAC) (CLASS 2)

6.1     **Treatment of Senior COFINA Bond Claims (Ambac):**  Subject to the terms
and provisions of Sections 6.2, 6.3 and 6.4 hereof, each holder of an Allowed Senior COFINA
Bond Claim (Ambac) shall have the option to elect on the Ballot/Election Form to receive, on the
Effective Date, in full satisfaction release and exchange of such holder's Allowed Senior
COFINA Bond Claim (Ambac), its Pro Rata Share of (a) (1) the Senior COFINA Bond
Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for
Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (2)
consideration, distributable by or at the direction of Ambac, in accordance with the provisions of
Section 6.2 hereof, in full and complete satisfaction, release and discharge of any further
obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election,
the holder shall be deemed to have agreed to commute the Ambac Insurance Policy relating to
such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no
other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust or the
Ambac Certificates), or (b) the Ambac Certificates referred to in Sections 6.3 and 17.1 hereof;
provided, however, that, in the event that a holder of an Allowed Senior COFINA Bond Claim
(Ambac) (1) fails to timely elect to receive the Ambac Certificates referred to in Sections 6.3 and
17.1 hereof or (2) submits an election for less than all of its Class 2 Claims (in which case, such
election shall be void and of no force or effect), such holder shall be deemed to have elected to
commute the Ambac Insurance Policy, to release and discharge Ambac's obligations thereunder,
and to receive distributions in accordance with the provisions of subsection (a) above.  For the
avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim
(Ambac) that elects (or is deemed to elect) to receive distributions in accordance with the
provisions of subsection (a) above, (i) such holder shall be deemed to have released Ambac from
its obligations and liabilities under or related to the Ambac Insurance Policy in respect of such
holder's Ambac Insured Bonds, (ii) such holder shall not be entitled to the benefit of the Ambac
Insurance Policy and shall have no right to make a claim under, or receive payment from, the
Ambac Insurance Policy, (iii) Ambac shall be released from its obligations under or related to the
Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, and (iv) the Ambac
Insurance Policy shall be terminated and commuted in full with respect to such holder's Ambac
Insured Bonds, no provision of the Ambac Insurance Policy with respect to such Ambac Insured
Bonds shall survive termination, and such Ambac Insured Bonds shall no longer have the benefit
of the Ambac Insurance Policy.

6.2     **Ambac Insurance Contribution:**  In consideration for the releases to be given to
Ambac, and in accordance with Section 6.1(a) hereof, on the Effective Date, a beneficial holder
of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive
Ambac Certificates shall receive, in addition to the Senior COFINA Bond Distribution,
consideration from Ambac in an amount equal to five and one quarter percent (5.25%) times the
amount of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date,
and the beneficial holder thereof shall have no other or further rights under or with respect to the
Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates.  A holder of an Allowed
Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates
shall be deemed to have had, on or after the Effective Date, the Ambac Insured Bonds, including

29

the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) cancelled.

6.3   **Non-Commutation/Ambac Trust:**   In the event that a holder of a Senior COFINA Bond Claim (Ambac) timely elects to receive the distributions set forth in Section 6.1(b) hereof, on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution and the Ambac Insured Bonds allocable to such electing holder into the Ambac Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of Ambac Certificates in consideration therefor.

6.4   **Deemed Acceleration:**   The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable, as of the Effective Date; provided, however, that such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

6.5   **Entitlement to Vote:**   Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Class 2 claims shall be made by the Oversight Board to Ambac but, (b) the elections described in Sections 6.1(a) and (b) hereof shall be made by the holders of Senior COFINA Bond Claims (Ambac).

## ARTICLE VII

## PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND
## CLAIMS (NATIONAL) (CLASS 3)

7.1   **Treatment of Senior COFINA Bond Claims (National):**   Subject to the terms and provisions of Sections 7.2, 7.3, 7.4 and 7.5 hereof, each holder of an Allowed Senior COFINA Bond Claim (National) shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, in full satisfaction, release and exchange of such holder's Allowed Senior COFINA Bond Claim (National) (a) (1) its Pro Rata Share of the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (2) Cash distributable by or at the direction of National, in accordance with the provisions of Section 7.2 hereof, in full and complete satisfaction, release and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall be deemed to have agreed to commute the National Insurance Policies relating to such holder's Allowed Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust or the National Certificates), or (b) the National Certificates referred to in Sections 7.3 and 17.2 hereof; provided, however, that, in the event that a holder of an Allowed Senior COFINA Bond Claim (National) (1) fails to timely elect to receive the National Certificates referred to in Sections 7.3 and 17.2 hereof or (2) submits an election for less than all of its Claims 3 Claims (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to commute the National Insurance Policies to release and discharge National obligations thereunder, and to receive distributions in accordance with

subsection (a) above.  For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (National) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (a) above, (i) such holder shall be deemed to have released National from its obligations and liabilities under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, (ii) such holder shall not be entitled to the benefit of the National Insurance Policies and shall have no right to make a claim under, or receive payment from, the National Insurance Policies, (iii) National shall be released from its obligations under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, and (iv) the National Insurance Policies shall be terminated and commuted in full with respect to such holder's National Insured Bonds, no provision of the National Insurance Policies with respect to such National Insured Bonds shall survive termination, and such National Insured Bonds shall no longer have the benefit of the National Insurance Policies.

7.2    **National Insurance Contribution:**  In consideration for the releases to be given to National, and in accordance with the provisions of Section 7.1 hereof, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall receive, in addition to its Pro Rata Share of the Senior COFINA Bond Distribution, Cash distributable by or at the direction of National, in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust, or the National Certificates.  The provisions set forth in this Section 7.2 apply only to Senior COFINA Bond Claims (National) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof is or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) cancelled.

7.3    **Non-Commutation/National Trust:**  In the event that a holder of a Senior COFINA Bond Claim (National) timely elects to receive the distributions set forth in Section 7.1(b) hereof, on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the National Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of National Certificates in consideration therefor.

7.4    **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Class 3 claims shall be made by the Oversight Board to National and (b) the elections described in Sections 7.1(a) and (b) hereof shall be made by the holders of Senior COFINA Bond Claims (National).

31

# ARTICLE VIII

## PROVISIONS FOR TREATMENT OF SENIOR COFINA BOND CLAIMS (TAXABLE ELECTION) (CLASS 4)

8.1 **Provisions for Treatment of Senior COFINA Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Taxable Election) shall be entitled to receive, in full satisfaction, release and exchange of such holder's Allowed Senior COFINA Bond Claim (Taxable Election), its Pro Rata Share of (a) the Senior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) the Taxable Election Cash.

# ARTICLE IX

## PROVISIONS FOR TREATMENT FOR JUNIOR COFINA BOND CLAIMS (CLASS 5)

9.1 **Treatment of Junior COFINA Bond Claims:** On the Effective Date and subject to the right of election set forth in Section 9.2 hereof, each holder of an Allowed Junior COFINA Bond Claim shall be entitled to receive, in full satisfaction, release and exchange of such holder's Allowed Junior COFINA Bond Claim, its Pro Rata Share of the Junior COFINA Bond Distribution consisting of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary.

9.2 **Right of Election to Junior COFINA Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 9.1 of the Plan, any holder of an Allowed Junior COFINA Bond Claim that is a Puerto Rico Investor or a Puerto Rico Institution, as applicable, shall, at such holder's option, be entitled to elect to receive distributions pursuant to Sections 11.1 and 19.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board and COFINA, or their designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon COFINA unless the Ballot Date is expressly waived, in writing, by the Oversight Board and COFINA; provided, however, that, under no circumstance may such waiver by the Oversight Board and COFINA occur on or after the Effective Date.

# ARTICLE X

## PROVISIONS FOR TREATMENT FOR JUNIOR COFINA BOND CLAIMS (ASSURED) (CLASS 6)

10.1 **Treatment of Junior COFINA Bond Claims (Assured):** On the Effective Date, (a) each holder of an Allowed Junior COFINA Bond Claim (Assured) shall be entitled to receive, in full satisfaction, release and exchange of such holder's Allowed Junior COFINA Bond Claim (Assured) and the Assured Insured Bonds giving rise to Junior COFINA Bond Claims (Assured), and Assured shall pay to such holder of an Allowed Junior COFINA Bond Claim (Assured), in full, the applicable Acceleration Price as of the Effective Date, and (b) Assured shall receive the Section 103 Cash and Rounding Amount Cash, if any, which, in each case, is allocable to Junior COFINA Bond Claims (Assured), and Assured New Bonds consisting of the COFINA Bonds

allocable to holders of Allowed Junior COFINA Bond Claims (Assured), which Assured New Bonds may, at Assured's option and discretion, be guaranteed in accordance with a new insurance policy issued by, and on terms acceptable to, Assured (collectively, the "Insured Bonds"). Payment of the applicable Acceleration Price with respect to any Assured Insured Bond in accordance with this Section 10.1 shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

10.2   **Deemed Acceleration**:   The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Assured Insured Bonds shall be deemed accelerated and immediately due and payable, as of the Effective Date; provided, however, that such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

10.3   **Entitlement to Vote**:   Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of Class 6 claims shall be made by the Oversight Board to Assured.

10.4   **Remarketing of Assured New Bonds**:   On or prior to the Effective Date, COFINA shall (a) enter into an agreement to remarket, which agreement to remarket shall be in form and substance acceptable to COFINA and Assured and be filed with the Title III Court on or prior to the commencement of the hearing to consider confirmation of the Plan and be incorporated into the Plan Supplement and (b) agree with Assured and the applicable underwriter(s) on a form of bond purchase agreement, subject to confirmation by Reorganized COFINA.  The agreement to remarket shall provide that, (1) no later than sixty (60) days after the Effective Date (unless such date is either (i) extended, in writing, by Reorganized COFINA and Assured or (ii) waived, in writing, by Assured), the Assured New Bonds, at the option of Assured, shall be subject to a mandatory tender for purchase by Reorganized COFINA, the tender price for which shall be paid from the proceeds of the remarketing of the Assured New Bonds and (2) Reorganized COFINA shall use commercially reasonable efforts to remarket the Assured New Bonds as Insured Bonds pursuant to an "offering" within the meaning, and in compliance with the requirements, of Rule 15c-12 adopted by the Securities and Exchange Commission under the Securities Exchange Act, as amended, by one or more underwriters on a "firm commitment basis".  The principal amounts, maturities and interest rates on the remarketed Assured New Bonds shall be determined by the applicable underwriter(s), such that the interest rates on the remarketed Assured New Bonds shall be the lowest interest rates necessary for such Assured New Bonds to be remarketed with adjusted par amounts and adjusted terms that otherwise result in the Assured New Bonds being remarketed at the lowest aggregate yield; provided, however, that (y) the debt service requirements on the remarketed Assured New Bonds due in any Fiscal Year shall not be greater than the debt service requirements due in such Fiscal Year on the Assured New Bonds prior to such remarketing and (z) the remarketed Assured New Bonds may mature later than the Assured New Bonds prior to the remarketing, but in no event later than FY2058; and, provided, further, that such remarketed Assured New Bonds shall be subject to optional redemption at the same times and at the same redemption prices as the Assured New Bonds prior to such remarketing.  If, at any time, Assured determines that the Assured New Bonds cannot be remarketed on terms acceptable to Assured, Assured may elect, in its sole discretion, to retain the Assured New Bonds for its own account.

33

## ARTICLE XI

### PROVISIONS FOR TREATMENT FOR JUNIOR COFINA BOND CLAIMS (TAXABLE ELECTION) (CLASS 7)

11.1    **Treatment for Junior COFINA Bond Claims (Taxable Election):**  On the Effective Date, each holder of an Allowed Junior COFINA Bond Claim (Taxable Election) shall be entitled to receive, in full satisfaction, release and exchange of such holder's Allowed Junior COFINA Bond Claim (Taxable Election), its Pro Rata Share of (a) the Junior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if, and to the extent that, a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary and (b) the Taxable Election Cash.

## ARTICLE XII

### PROVISIONS FOR TREATMENT OF GS DERIVATIVE CLAIMS (CLASS 8)

12.1    **Treatment of GS Derivative Claims:** On the Effective Date, the holder of the GS Derivative Claim shall, to the extent that the termination value of the GS Derivative Claim is (a) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and, with respect to the balance of the GS Derivative Claim, (1) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a Parity Obligation, as defined in the Bond Resolutions, such holder's Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (2) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a not a Parity Obligation, such holder shall not receive a distribution pursuant to the Plan, or (b) less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to Reorganized COFINA.

## ARTICLE XIII

### PROVISIONS FOR TREATMENT OF GENERAL UNSECURED CLAIMS (CLASS 9)

13.1    **Treatment of General Unsecured Claims:** In the event that Class 9 votes to accept the Plan, each holder of an Allowed General Unsecured Claim shall be entitled to receive its Pro Rata Share of One Hundred Thousand Dollars ($100,000.00); provided, however, that, in the event that Class 9 votes to reject the Plan, holders of Allowed General Unsecured Claim shall not receive a distribution pursuant to the Plan.

## ARTICLE XIV

### PROVISIONS FOR TREATMENT OF SECTION 510(B) SUBORDINATED CLAIMS (CLASS 10)

14.1    **Treatment of Section 510(b) Subordinated Claims:**  Allowed Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan.

104749481v5

## ARTICLE XV

### PROVISIONS REGARDING ALLOCATION OF UNSUBSCRIBED TAXABLE ELECTION CASH

15.1 **Unsubscribed Taxable Election Cash Amount**: On the Effective Date, the amount, up to Sixty Million Dollars ($60,000,000.00), allocated for distributions to holders of Allowed Senior COFINA Bond Claims (Taxable Election) and Allowed Junior COFINA Bond Claim (Taxable Election) in Classes 4 and 7, respectively, but not distributed based upon elections made or not made, as the case may be, then the Taxable Election Remainder Amount shall be reallocated and distributed as follows: if such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount shall be allocated (i) *first*, if the aggregate amount of Taxable Election Cash distributable under the Plan is greater than Twenty Million Dollars ($20,000,000.00), to be distributed as Taxable Election Cash in accordance with the Plan, (ii) *second*, to the extent of any remainder, to further fund the COFINA Operating Expense Account up to an additional Ten Million Dollars ($10,000,000.00), and (iii) *third*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and the Commonwealth, on the other hand, and (b) greater than Forty Million Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be allocated as described in subsection (a) above and such amounts above Forty Million Dollars ($40,000,000.00) shall be added to the COFINA Cash Available for Distribution and allocated to holders of all Allowed Bond Claims in accordance with the terms and provisions of the Plan.

15.2 **Commonwealth/COFINA Expenses:** Notwithstanding anything contained in the Plan to the contrary all expenses, including Allowed Administrative Expense Claims and Allowed Professional Claims, incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the Plan and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of Sections 2.1 and 15.1 hereof and otherwise by the Commonwealth.

## ARTICLE XVI

### PROVISIONS REGARDING COFINA BONDS

16.1 **Issuance of COFINA Bonds:** On the Effective Date, Reorganized COFINA shall issue the COFINA Bonds consisting of CIBs and CABs, as more particularly described herein. The maturities, interest rates and amortization schedules for COFINA Bonds are annexed hereto as Exhibit "A". All debt service on COFINA Bonds and COFINA Parity Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid, with accrued interest on the unpaid amount, first, in each FY from the balance, if any, of the COFINA Portion remaining after the payment of debt service on the COFINA Bonds and COFINA Parity Bonds then due and payable in such FY; second, in each fiscal year, from the Debt Service Savings, if any; and third, to the extent not paid pursuant to first or second, following the final scheduled maturity of all COFINA Bonds and COFINA Parity Bonds. Interest shall accrue on such overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until the applicable COFINA Bonds or COFINA Parity Bonds are paid or satisfied in full in accordance with their

35

terms. Interest on the COFINA Bonds shall be calculated on a 30/360 basis. The Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with a designee of the PSA Creditors, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings.

(a)   **CIBs:**   Subject to any adjustments provided for herein, CIBs shall have the original principal amount, interest rate and maturity date as follows: (a) Three Hundred Seventy-Five Million Ninety Thousand Dollars ($375,090,000.00), four and five-tenths percent (4.5%), and July 1, 2034; (b) Two Billion Nine Hundred Ninety-Six Million One Hundred Fifteen Thousand Dollars ($2,996,115,000.00), four and fifty-five one hundredths percent (4.55%), and July 1, 2040; (c) One Billion Four Hundred Fifty-One Million One Hundred Thirty-Five Thousand Dollars ($ 1,451,135,000.00), four and seventy-five one hundredths percent (4.75%), and July 1, 2053; and (d) Four Billion Two Hundred Ninety-Seven Million Eighty Thousand Dollars ($4,297,080,000.00), five percent (5.0%), and July 1, 2058. CIBs shall not carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate, compounding semiannually, until paid or satisfied in full in accordance with their terms.

(b)   **CABs:**   Subject to any adjustments provided for herein, CABs shall have the original principal amount, accretion rate and maturity date as follows: (a) One Hundred Sixty-Six Million Eight Hundred Eighteen Thousand Nine Hundred Fifty-Four Dollars and Fifty Cents ($166,818,954.50), four and one quarter percent (4.250%), and July 1, 2024, (b) Two Hundred Forty-Six Million Three Hundred Forty-Six Thousand Five Hundred Ninety-Seven Dollars and Ninety-Five Cents ($246,346,597.95), four and three eighths percent (4.375%), and July 1, 2027, (c) Two Hundred Twenty Million One Hundred Ninety Thousand Four Hundred Eighty-Five Dollars and Fifty Cents ($220,190,485.50), four and three eighths percent (4.375%), and July 1, 2029, (d) Two Hundred Fifty-Six Million One Hundred Sixty-Two Thousand Nine Hundred Seventy-One Dollars and Fifty Cents ($256,162,971.50), four and one-half percent (4.50%), and July 1, 2031, (e) Two Hundred Sixty-Three Million Seven Hundred Fifty-Two Thousand Four Hundred Twenty-Eight Dollars and Eighty Cents ($263,752,428.80), four and one-half percent (4.50%), and July 1, 2033, (f) One Billion One Hundred Eight Million Nine Hundred Ninety-One Thousand Three Hundred Fifteen Dollars and Ten Cents ($1,108,991,315.10), five and three eighths percent (5.375%), and July 1, 2046, and (g) Six Hundred Thirty-Nine Million Six Hundred Thirty-Nine Thousand Sixty-Four Dollars ($639,639,064.00), five and five eighths percent (5.625%), and July 1, 2051. CABs shall not carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular accretion rate, compounding semiannually, until paid or satisfied in full in accordance with their terms.

(c)   **Deemed Issuance Date:**   Notwithstanding the timing of the Effective Date, interest on the COFINA Bonds shall commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be designated as the "dated" date of the COFINA Bonds. On the Effective Date, COFINA FY2019 BNYM Deposits shall be deposited into the Debt Service Fund established in the New Bond Indenture for the benefit of holders of COFINA Bonds in accordance with the terms and provisions of the Plan.

104749481v5

16.2 **Collateral for Repayment of COFINA Bonds:** Subject to enactment of the New Bond Legislation, and to the extent set forth in such New Bond Legislation, repayment of the COFINA Bonds and COFINA Parity Bonds from the COFINA Portion will automatically, upon the issuance of such COFINA Bonds and COFINA Parity Bonds, be secured by a statutory first Lien on all of Reorganized COFINA's right, title and interest in and to the COFINA Pledged Taxes, including any monies, income, revenues, accounts, contract rights or general intangibles derived therefrom. Such Lien shall (a) remain in effect and (b) be closed until, in each case, the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms. Such Lien, as set forth in the New Bond Legislation, and pursuant to the Confirmation Order, will be judicially confirmed and the Reorganized COFINA Bonds shall be judicially determined to be legal, valid, binding and enforceable obligations of COFINA by the Title III Court. Notwithstanding anything contained herein to the contrary, repayment of the COFINA Bonds and COFINA Parity Bonds shall not be secured by, or have recourse to, any obligation or property of the Commonwealth.

16.3 **Additional Bonds Test for COFINA Parity Bonds:** Except with respect to the issuance of COFINA Parity Bonds upon the terms and conditions described herein, Reorganized COFINA may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued on the Effective Date. Notwithstanding the foregoing and subject to compliance with the provisions of the Additional Bonds Test set forth in this Section 16.3, Reorganized COFINA may issue Subordinated Lien Bonds for the benefit of, and with the consent of, the Commonwealth and for any lawful purpose of the Commonwealth, provided that (a) repayment of such additional bonds shall be secured by a second Lien that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior Lien on the COFINA Pledged Taxes; provided, however, that, notwithstanding anything contained in the Plan to the contrary, repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Portion and (b) prior to the issuance thereof, the Commonwealth and Reorganized COFINA shall deliver a jointly executed certificate to the New Bond Indenture trustee certifying that the following conditions are each satisfied: (i) (1) the projected COFINA Pledged Taxes ((y) which, in the event that Subordinated Lien Bonds are being issued prior to FY2024, are calculated assuming the preceding FY's collection of the COFINA Pledged Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Commonwealth's certified fiscal plan, dated April 18, 2018, or (z) in the event that Subordinated Lien Bonds are being issued during FY2024 or thereafter, are calculated assuming that preceding fiscal year's collection of the COFINA Pledged Taxes grow thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) fiscal years) equals or exceeds (2) one and one-half times (1.5x), in any succeeding fiscal year, of the annual aggregate debt service due on the COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); (ii) the preceding fiscal year's collections from the COFINA Pledged Taxes is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding fiscal year on all COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (iii) the Subordinated Lien Bonds have a maturity not later than FY2058; provided, however, that, subsequent to June 30, 2028, and subject to

37

compliance with the foregoing Additional Bonds Test, final maturity beyond FY2058 shall be permissible for future Subordinated Lien Bonds.

16.4 **Call Provisions/Optional Redemption:** The COFINA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon or accreted value, as applicable, upon thirty (30) day's prior written notice as follows:

2034 CIBs: Par-Call Commencing FY2025 (7 year call)
2040 CIBs: Par Call Commencing FY2028 (10 year call)
2053 CIBs: Par Call Commencing FY2028 (10 year call)
2058 CIBs: Par Call Commencing FY2028 (10 year call)

2024/2027 CABs: Non-Call
2029 CABs: Call Commencing FY 2028 at the following prices:

| Fiscal Year | Price |
|---|---|
| 2028 | 103% of Accreted Value |
| 2029 | 100% of Accreted Value |

2031 CABs: Call Commencing FY 2028 at the following prices:

| Fiscal Year | Price |
|---|---|
| 2028 | 105% of Accreted Value |
| 2029-2030 | 103% of Accreted Value |
| 2031 | 100% of Accreted Value |

2033 CABs: Call Commencing FY2028 at the following prices:

| Fiscal Year | Price |
|---|---|
| 2028-2030 | 107.5% of Accreted Value |
| 2031 | 105% of Accreted Value |
| 2032 | 103% of Accreted Value |
| 2033 | 100% of Accreted Value |

2046/2051 CABs: Call Commencing FY2028 at the following call prices:

| Fiscal Year | Price |
|---|---|
| 2028-2032 | 107.5% of Accreted Value |
| 2033-2037 | 105% of Accreted Value |
| 2038-2042 | 103% of Accreted Value |
| 2043-2051 | 100% of Accreted Value |

If less than all of the COFINA Bonds of a particular series are called for prior redemption, Reorganized COFINA will select the maturity or maturities of such series of the COFINA Bonds to be redeemed, and Depository Trust Company, on behalf of the trustee for the COFINA Bonds, will select the COFINA Bonds within the same maturity of such series to be redeemed by means of a random lottery.

38

16.5    **First Dollars Funding**:  Until the COFINA Bonds and COFINA Parity Bonds
have been paid or satisfied in full in accordance with their terms, and subsequent to the funding
of reasonable and necessary Reorganized COFINA operating expenses into the COFINA
Operating Expense Account, including, without limitation, Reorganized COFINA board member
fees and expenses, the COFINA Portion shall be funded annually from "first dollars" collected
from the COFINA Pledged Taxes; provided, however, that, notwithstanding the foregoing, from
and after FY2024, and solely in the event that (a) for any date of determination at which time the
Oversight Board or any successor to its budgetary function is in existence, (1) the prior and then-
current FY budgets are balanced, as determined by the Oversight Board (or its successor in
interest), and (2) the Commonwealth is current on its continuing disclosure requirements relating
to its audited financial statements, (b) quarterly bucketing of twenty-five percent (25%) of the
then-current FY's COFINA Portion is shown to be necessary to avoid intra-FY tax revenue
anticipation notes borrowing and (c) collection of prior fiscal year COFINA Pledged Taxes
provided a two times (2x) coverage of the COFINA Portion, then, in each quarter, until the
COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance
with their terms, (x) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-
five percent (25%) of the then-current FY's COFINA Portion shall be deposited into the "Debt
Service Fund" held by the New Bond Indenture trustee for the benefit and payment of debt
service with respect to the COFINA Bonds and the COFINA Parity Bonds, and (y) thereafter, the
remaining quarterly collection from the COFINA Pledged Taxes shall be deposited in
accordance with the "Flow of Funds" established in the New Bond Indenture; provided,
however, that, in any quarter in which there is a shortfall in the amounts required to be deposited
by the preceding clause (x), then such shortfall shall be added to the amount required to be paid
in accordance with clause (x) in the following quarter until the entire amount of the cumulative
shortfall has been deposited into the Debt Service Fund held by the trustee for the benefit and
payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds.

16.6    **Covenants for COFINA Bonds and COFINA Parity Bonds:**  On the Effective
Date, the Definitive Documents, including the New Bond Legislation, will contain customary
terms, conditions and covenants for similarly structured and supported bonds, including, without
limitation, the following covenants with respect to the COFINA Bonds and the COFINA Parity
Bonds:

(a)    **Sales Tax Covenant:**  Subject to the terms and provisions of Section 16.7
hereof, the Commonwealth will covenant for the benefit of all initial and subsequent holders of
the COFINA Bonds and COFINA Parity Bonds, that, until all obligations with respect thereto
have been paid or satisfied in full in accordance with their terms, the rate of the COFINA
Pledged Taxes from which the Fixed Amount is derived shall not be reduced to a rate less than
five and one-half percent (5.5%) unless, on each such occasion prior to such reduction, at least
two (2) of the following four (4) nationally recognized statistical rating organizations then in
existence and rating any of the COFINA Bonds or COFINA Parity Bonds: S&P Global Ratings,
Moody's Investor Service, Inc., Fitch Ratings and Kroll Bond Rating Agency Inc., or their
respective successors, with one (1) of such organizations being S&P Global Ratings or Moody's
Investor Service, Inc., or its respective successor, confirm that ratings of the COFINA Bonds and
the COFINA Parity Bonds will not be downgraded and (without regard to bond insurance or
other third party credit enhancement) will be rated at least A2/A category or higher following
such reduction; provided, however, that, notwithstanding the foregoing, until all obligations with

39

respect to the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, if the rate of the COFINA Pledged Taxes is reduced below three percent (3%), then such reduction shall constitute a "Substitution of Collateral" and shall be subject to the terms and provisions of Section 16.7 hereof.

(b)    **Non-Impairment Covenant:**  The Commonwealth will covenant for the benefit of all initial and subsequent holders of COFINA Bonds and COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair Reorganized COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA or Reorganized COFINA in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of COFINA Bonds and COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any FY, or (4) impair the rights and remedies of the holders of the COFINA Bonds or COFINA Parity Bonds or the collateral security thereof.

(c)    **Tax-Exemption Covenant:**  Reorganized COFINA will covenant for the benefit of all initial and subsequent holders of federally tax-exempt COFINA Bonds and federally tax-exempt COFINA Parity Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, Reorganized COFINA will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-exempt COFINA Bonds or federally tax-exempt COFINA Parity Bonds shall be and remain excludable from gross income for federal income tax purposes.

(d)    **Rating Agency Covenant:**  In connection with a "Substitution of Collateral" pursuant to the provisions of Section 16.7 hereof, Reorganized COFINA will covenant to use its reasonable best efforts and work in good faith to obtain the best rating possible on the then-outstanding COFINA Bonds and COFINA Parity Bonds, including, but not limited to, responding to requests for documents.

16.7    **Substitution of Collateral:**  Notwithstanding anything contained in the Plan or in the Definitive Documents to the contrary, the Commonwealth may enact legislation that permits a Commonwealth revenue stream to replace the COFINA Pledged Taxes as security for the repayment of the COFINA Bonds and COFINA Parity Bonds; provided, however, that the substitution of New Collateral may occur only upon, and on each such occasion, satisfaction of the following conditions: (a) such New Collateral is all or a portion of a tax of general applicability throughout the Commonwealth that is being enacted in full substitution of the then-existing island-wide sales and use tax or otherwise constitutes like or comparable security for the COFINA Bonds and COFINA Parity Bonds and such legislation provides (i) for the irrevocable transfer of, including ownership of, such New Collateral to Reorganized COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that, following such transfer, such New Collateral is not, and shall not constitute, "available resources" or "available revenues" of the Government of Puerto Rico, as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution), and is otherwise owned by Reorganized COFINA in the same manner and to the same extent as the COFINA Portion, (b) upon substitution of the New Collateral, that rating confirmations are received from at least two (2) of the following four (4)

40

nationally recognized statistical rating organizations then in existence and rating the COFINA Bonds: S&P Global Ratings, Moody's Investor Service, Inc., Fitch Ratings and Kroll Bond Rating Agency Inc., with one (1) of such organizations being either S&P Global Ratings or Moody's Investor Service, Inc., prior to such collateral substitution confirming that ratings for all COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other third party credit enhancement) will not be downgraded and will be at least A2/A category or higher following such collateral substitution, (c) the Commonwealth shall continue to provide the non-impairment covenant referred to in Section 16.6(b) hereof with respect to such New Collateral and (d) such other documents as may be required pursuant to applicable law and bond resolutions.

16.8    **Debt Service Reserve Fund**:  The COFINA Bonds and the COFINA Parity Bonds shall not have a debt service reserve fund.

16.9    **Rights of Acceleration**:  The COFINA Bonds, the COFINA Parity Bonds and Subordinated Lien Bonds, if any, shall not have rights of acceleration.

## ARTICLE XVII

## THE TRUSTS

17.1    **Terms of Ambac Trust:**

(a)    **General Terms:**  On or prior to the Effective Date, COFINA shall establish the Ambac Trust, solely on behalf, and for the benefit, of beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elect to receive the Ambac Certificates in accordance with the approved solicitation procedures pursuant to the Disclosure Statement Order and set forth on the Ballot/Election Form.  On the Effective Date, the following Ambac Trust Assets shall be deposited (or deemed deposited) into the Ambac Trust: (1) the Ambac Insured Bonds allocable to such electing holders of Allowed Senior COFINA Bond Claims (Ambac), (2) the Senior COFINA Bond Distribution (consisting of Section 103 Cash, if applicable, COFINA Cash Available for Distribution, COFINA Bonds and Rounding Amount Cash, if necessary) allocable to such electing holders of Allowed Senior COFINA Bond Claims (Ambac) and (3) the benefit of the Ambac Insurance Policy.  The COFINA Bonds shall consist of Taxable COFINA Bonds and Tax-Exempt COFINA Bonds.  Notwithstanding the deposit of such holders' Ambac Insured Bonds in the Ambac Trust, such Ambac Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with such Ambac Insured Bonds, the Bond Resolution (other than with respect to the payment and other obligations of COFINA and the Commonwealth thereunder) and the Ambac Insurance Policy shall be preserved and remain in full force and effect.  The Ambac Trust shall be the owner of any Ambac Insured Bonds deposited therein, provided that all rights with respect to such Ambac Insured Bonds shall be subject to the terms of the trust agreement.

Upon deposit of the Ambac Trust Assets, the trustee shall issue two series of Ambac Certificates, (i) a series with a mandatory redemption date of August 1, 2047, and (ii) a series with a mandatory redemption date of August 1, 2054 ("Series 2054"), to the holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elected to receive the Ambac Certificates.  The Ambac Certificates shall provide for payments in accordance with the scheduled sinking fund payments with respect to Series 2054 and the maturity date of such holder's Ambac Insured

41

Bonds.  The scheduled sinking fund payment dates for Series 2054 shall be August 1, 2048, August 1, 2049, August 1, 2050, August 1, 2051, August 1, 2052 and August 1, 2053.  Subject to the terms of the trust agreement, each series of Ambac Certificates shall bear unique CUSIPs and be freely tradeable and transferrable through The Depository Trust Company.  Each class of Ambac Certificates will have its own class accretion schedule that sets forth the accreted payment amounts as of any date.  Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the Ambac Insurance Policy as provided therein and in the trust agreement.  In addition, Ambac shall have the right, but not any obligation, to make payments in whole or in part under the Ambac Insurance Policy prior to the applicable mandatory redemption date for a class of Ambac Certificates.  To the extent Ambac determines, in its sole discretion, to make any earlier payment under the Ambac Insurance Policy, upon such payment, the remaining obligations of Ambac with respect to such Ambac Insurance Policy shall result in the recalibration of the related class accretion schedules.  Upon repayment or redemption of all Ambac Certificates, Ambac shall be entitled to receive all remaining assets in the Ambac Trust.

Other than with respect to their differing mandatory redemption dates and accretion schedules, each class of the Ambac Certificates shall have substantially the same terms and entitle the holder thereof to its pro rata share of distributions made by the Ambac Trust.  Each distribution on the Ambac Certificates (whether or not taxable to a holder or reduced by withholding or tax payments made by the Ambac Trust) shall reduce the related obligation of Ambac under the Ambac Insurance Policy, shall be deemed to reduce the amount outstanding on the Ambac Insured Bonds, and shall result in the recalibration of the related class accretion schedules.  The Ambac Trust will distribute all payments received on the Tax-Exempt COFINA Bonds to holders of the Ambac Certificates promptly following receipt thereof in accordance with the trust agreement.  Ambac may elect, in its sole discretion, to distribute from time to time payments received on account of the Taxable COFINA Bonds to holders of the Ambac Certificates or to reinvest such payments in investments permitted by the terms of the trust agreement; provided, however, that the Ambac Trust shall have no obligation to distribute such payments prior to the applicable mandatory redemption date for a series.  In addition, Ambac may, in its sole and absolute discretion, direct the Ambac Trust to sell all or any portion of the COFINA Bonds held by the Ambac Trust in accordance with the terms of the trust agreement and thereafter, if such COFINA Bonds are Tax-Exempt COFINA Bonds, direct the Ambac Trust to distribute the proceeds of such sale to the holders of the Ambac Certificates and, if such COFINA Bonds are Taxable COFINA Bonds, direct the Ambac Trust to distribute the proceeds of such sale to the holders of Ambac Certificates or retain the proceeds of such sale in the Ambac Trust.  Ambac may, in its sole and absolute discretion, distribute Ambac Trust Assets held by the Ambac Trust to the holders of the Ambac Certificates, at a market value calculated in accordance with the terms and provisions of the trust agreement, and, upon such distribution, the applicable portion of each holder's Ambac Certificates shall be cancelled.  Ambac shall be deemed the sole holder of the COFINA Bonds in the Ambac Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings.  Taxes on any investment earnings, shall be paid out of the Ambac Trust Assets.

The Ambac Trust agreement will provide that (a) all rights of a holder of COFINA Bonds held by the Ambac Trust (whether as to amendments and consents, direction of remedies or

42

otherwise) shall be exercisable solely by Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the COFINA Bonds and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying COFINA Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust. Such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment.

On the Effective Date, unless otherwise agreed to by Ambac, the position at the Depository Trust Company with respect to each Ambac Insured Bond deposited, or deemed deposited, into the Ambac Trust pursuant to the terms and provisions of the Plan shall become zero and the Ambac Trust shall be deemed the sole holder of such Ambac Insured Bonds.

(b)     **Costs and Expenses:** All fees, costs and expenses incurred in connection with transactions contemplated pursuant to Section 17.1 hereof, including, without limitation, fees and expenses associated with the formation and maintenance of the Ambac Trust and the fees and expenses incurred by the trustee of the Ambac Trust, shall be the sole obligation and responsibility of Ambac (solely with respect to the formation of the Ambac Trust) and the Ambac Trust, and not COFINA or Reorganized COFINA, as the case may be, and the failure of Ambac (solely with respect to the formation of the Ambac Trust) or the Ambac Trust to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the Ambac Trust.

17.2     **Terms of National Trusts:** In the event that National declines to exercise the National Election, on or prior to the Effective Date, the National Trust shall be formed on behalf of, and for the sole benefit of beneficial holders of, National Insured Bonds that (a) elect to receive National Certificates on the Ballot/Election Form distributed in connection with the solicitation of acceptances and rejections of the Plan and (b) have not otherwise agreed to commute the National Insurance Policies on or prior to the Effective Date. The trustee of the National Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market. On the Effective Date, the National Trust Assets, consisting of (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) in accordance with the terms of Section 7.1 (b) hereof, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with Section 3.3 hereof, shall be deposited into the National Trust. The costs, including fees and expenses and any obligation arising under the Term Sheet or the Plan, associated with the formation and operation of the National Trust shall be paid out of the National Trust Assets. Notwithstanding the deposit therein, the National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with National Insured Bonds, the Bond Resolution (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect. Upon deposit of the National Trust Assets, on a pro rata basis, the trust shall issue one or more series of National Certificates to the beneficial holders of Senior COFINA Bond Claims (National) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Trust.

The National Certificates shall entitle a National Certificate Holder to its pro rata share of value in and any distribution of Cash from the respective National Trust, which distribution shall (1) in

104749481v5

all cases, occur promptly upon receipt thereof by the National Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders in the amount of such distribution. For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Trust actually makes payment to the National Certificate Holders. Each series of National Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.

(a)     **Sale of COFINA Bonds:**  So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Trust, deliver or direct the trustee to deliver a Sale Notice to all National Certificate Holders, through Depository Trust Company or any similar means, setting forth its intention to sell, for Cash, all or a portion of the COFINA Bonds held in the National Trust. The Sale Proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; provided, however, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold. Documentation related to the National Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the Plan Support Agreement, and (iii) be included in a Plan Supplement.

To the extent that a holder of a Senior COFINA Bond Claim (National) agrees to commute the National Insurance Policies on or prior to the Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Trust or the National Certificates.

(b)     **Costs and Expenses:**  All fees, costs and expenses incurred in connection with transactions contemplated pursuant to Section 17.2 hereof, including, without limitation, fees and expenses associated with the formation and maintenance of the National Trust and the fees and expenses incurred by the trustee of the National Trust, shall be the sole obligation and responsibility of National and not COFINA or Reorganized COFINA, as the case may be, and failure of National or the National Trust to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the National Trust.

17.3   **Existing Securities/BNYM Obligations**:  Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the provisions of this Article XVII,

44

BNYM shall have no duties or responsibilities with respect to any Existing Securities that may be held by the Trusts from and after the Effective Date.

## ARTICLE XVIII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

18.1   **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases:**  Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Sections 18.5 and 18.7 hereof, all Executory Contracts and Unexpired Leases that exist between COFINA and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by COFINA as of the Effective Date, except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement; provided, however, that COFINA reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.  COFINA shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 18.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 18.1, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, COFINA shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by COFINA that such document is an Executory Contract and Unexpired Lease or that COFINA has any liability thereunder.

18.2   **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases:**  Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 18.1 of the Plan.

18.3   **Inclusiveness:**  Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

18.4   **Cure of Defaults:**  Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 18.1 of the Plan, COFINA shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to

45

the Confirmation Hearing, file with the Title III Court and serve by first class mail on each non-COFINA party to such Executory Contracts and Unexpired Leases to be assumed pursuant to Section 18.1 of the Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned.  The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by COFINA.  If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court.  Notwithstanding Section 18.1 of the Plan, COFINA shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

18.5 __Insurance Policies:__  Subject to the terms and provisions of Section 18.7 hereof, each of COFINA's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan and to the extent executory in nature, on the Effective Date, COFINA shall, first, deposit all Insurance Policies and any agreements, documents and instruments relating to coverage of all insured Bond Claims into the applicable Trusts and, second, be deemed to have rejected all such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims; provided, however, that, such rejection shall not, and shall not be construed to, discharge or relieve any of Ambac, Assured or National with respect to their respective obligations to holders of Allowed Senior COFINA Bond Claims (Ambac), Allowed Junior COFINA Bond Claims (Assured) and Allowed Senior COFINA Bond Claims (National), respectively, that have elected to receive the relevant trust certificates hereunder pursuant to the applicable Insurance Policy.  For the avoidance of doubt, nothing contained herein shall prejudice any subrogation, reimbursement, or similar rights of an insured against the applicable Trust or the assets thereof.

18.6 __Rejection Damage Claims:__  If the rejection of an Executory Contract and Unexpired Lease by COFINA hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against COFINA, or its properties or agents, successors, or assigns, including, without limitation, Reorganized COFINA, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized COFINA, as the case may be, on or before thirty (30) days after the late to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

18.7 __Indemnification and Reimbursement Obligations:__  For purposes of the Plan, (i) to the extent executory in nature, the obligations of COFINA, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of COFINA arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

18.8 __Nonoccurrence of Effective Date:__  In the event that the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

104749481v5

18.9    **Reservation of Rights:** Nothing contained in the Plan or the Plan Supplement shall constitute an admission by COFINA, Reorganized COFINA or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that COFINA has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, COFINA or Reorganized COFINA shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE XIX

## PROVISIONS GOVERNING DISTRIBUTIONS

19.1    **Time and Manner of Distribution:** Except as otherwise provided herein, including, without limitation, in Articles X and XVII hereof, distributions under the Plan shall be made to each holder of an Allowed Claim as follows:

(a)    **Distributions to Holders of Bond Claims:** Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, and subject to the terms and provisions of Section 19.5 hereof regarding distributions to Ambac and Whitebox on account of the pendency of the Ambac Action and the Whitebox Actions, respectively, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Senior COFINA Bond Claim, an Allowed Senior COFINA Bond Claim (Ambac), an Allowed Senior COFINA Bond Claim (National), an Allowed Senior COFINA Bond Claim (Taxable Election), an Allowed Junior COFINA Bond Claim, an Allowed Junior COFINA Bond Claim (Assured) and an Allowed Junior COFINA Bond Claim (Taxable Election), in each case consistent with the terms hereof, such Creditor's Pro Rata Share, if any, of Section 103 Cash, COFINA Cash Available for Distribution, Rounding Amount Cash, Taxable Election Cash, Consummation Costs, if applicable, and COFINA Bonds, together with, where applicable, the consideration described in Sections 6.1 and 7.1 hereof, or, in lieu of all of the foregoing, certificates in the applicable Trust.

(b)    **Distributions with Respect to GS Derivative Claim:** Within (10) Business Days following the Effective Date, and solely to the extent that the holder of the Allowed GS Derivative Claim is entitled to a distribution in excess of the value of the collateral retained by such holder, the Disbursing Agent shall distribute, or cause to be distributed, to the holder of the Allowed GS Derivative Claim, such Creditor's share, if any, of Section 103 Cash, COFINA Cash Available for Distribution, Rounding Amount Cash and COFINA Bonds.

(c)    **Distributions with Respect to General Unsecured Claims:** Within ten (10) Business Days following the Effective Date, and solely to the extent that Class 9 votes to accept the Plan, the Disbursing Agent shall distribute or cause to be distributed to each holder of an Allowed General Unsecured Claim such Creditor's Pro Rata Share, if any, of One Hundred Thousand Dollars ($100,000.00).

(d)    **Distribution of Cash to Holders of Certain Other Claims:** Except as otherwise provided herein, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

47

19.2   **Timeliness of Payments:**  Any payment or distribution to be made pursuant to
the Plan shall be deemed to be timely made if made within ten (10) days after the date specified
in the Plan.  Whenever any distribution to be made under this Plan shall be due on a day other
than a Business Day, such distribution shall instead be made, without interest, on the
immediately succeeding Business Day, but shall be deemed to have been made on the date due,
including, without limitation, deeming distributions made pursuant to Section 19.1(a) hereof to
have been made on the Effective Date.

19.3   **Distributions by the Disbursing Agent**:  Except as otherwise provided herein,
all distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent
shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to
receive the same.  The Disbursing Agent shall not hold an economic or beneficial interest in such
property.

19.4   **Manner of Payment under the Plan:**  Unless the Entity receiving a payment
agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the
election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic
bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim
until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars
($10.00).

19.5   **Delivery of Distributions:**  Subject to the provisions of Rule 9010 of the
Bankruptcy Rules, and except as provided herein, distributions and deliveries to holders of
Allowed Claims shall be made at the address of each such holder as set forth on the Schedules
filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such
holders, or at the last known address of such holder if no proof of Claim is filed or if COFINA
has been notified in writing of a change of address; provided, however, that initial distributions
of Cash by the Disbursing Agent for the benefit of holders of Allowed Senior COFINA Bond
Claims, Allowed Senior COFINA Bond Claims (Ambac), Allowed Senior COFINA Bond
Claims (National), Allowed Bond Claims (Taxable Election), Allowed Junior COFINA Bond
Claims, Allowed Junior COFINA Bond Claims (Assured) and Allowed Junior COFINA Bond
Claims (Taxable Election), as applicable, shall be made to BNYM, as trustee for the Existing
Securities (or BNYM's designee) under the respective governing documents for such
obligations; and, provided, further, that the Disbursing Agent may make distributions of
Consummation Costs in Cash to a Consummation Cost Party in a manner mutually agreed upon
between the Consummation Cost Party and the Disbursing Agent.  BNYM (or BNYM's
designee) shall, in turn, in accordance with the terms and provisions of the Plan, distribute and
deliver Cash and COFINA Bonds, as applicable, to Bondowners as of the Distribution Record
Date, in the manner provided for in the applicable governing documents; provided, however,
that, to the extent a holder of a Bond Claim elects to receive the trust certificate hereunder,
BNYM will deposit such holder's distribution into the applicable Trust.  BNYM may
conclusively rely upon the distribution instructions received from COFINA or its agents with
respect to the delivery of distributions in accordance with the terms and provisions of this
Section 19.5, including the contra-CUSIP positions and escrow positions set up by COFINA or
its agents with the Depository Trust Company, and BNYM shall close and terminate the original
CUSIPs after making initial distributions of COFINA Cash Available for Distribution,
Section 103 Cash and Rounding Cash Amount and shall have no further distribution obligations
thereafter.  BNYM shall not be required to give any bond or surety or other security for the

104749481v5

I-397

performance of its duties, unless otherwise ordered by the Title III Court.  BNYM shall only be required to make the distributions and deliveries described in this Section 19.5 and shall only be required to make such distributions and deliveries in accordance with the terms of the Confirmation Order and the Plan and shall have no liability for actions reasonably taken in accordance with the Confirmation Order, the Plan or in reasonable reliance upon information provided to BNYM by COFINA or its agents in accordance with the Confirmation Order, the Plan or in connection with distributions to be made hereunder and thereunder, except for liabilities resulting from its own gross negligence or willful misconduct.  Notwithstanding the foregoing, all distributions are subject to the Trustee Rights; provided, however, that, notwithstanding the foregoing or anything contained in the Plan to the contrary, including, without limitation, Sections 19.6(iii) and 19.13 hereof, except as set forth in the following proviso, BNYM shall not exercise Trustee Rights on account of Trustee Claims that may arise from and after the Effective Date and no distribution to be made pursuant to the Plan, either through the Disbursing Agent or BNYM as trustee of the Existing Securities, shall be withheld as a result of, or on account of, the claims, causes of action and damages being asserted, or which could have been asserted, in the Ambac Action and the Whitebox Actions; and provided, further, that, with respect to Trustee Claims that may arise from and after the Effective Date as a result of, or on account of, the Ambac Action and the Whitebox Actions, respectively, at the Confirmation Hearing, the Title III Court shall determine (a) what amount, if any, shall be either (i) withheld by the Disbursing Agent or BNYM as trustee for the Existing Securities from distributions to be made to Ambac and Whitebox or (ii) posted by Ambac and Whitebox as collateral for the reimbursement of fees and expenses which may be incurred by BNYM in connection with the defense of the Ambac Action and the Whitebox Actions, and (b) whether BNYM shall be reimbursed by Ambac and Whitebox for the incurrence of any such fees and expenses from either the holdback amount or collateral posted and referred to in the preceding subsection (a) on a current basis or upon entry of a Final Order in connection with the Ambac Action and the Whitebox Actions, in each case, such determination and the fulfillment of any obligations of Ambac and Whitebox as a result thereof shall satisfy in full any obligations of COFINA and any rights of BNYM under the Bond Resolution and applicable law with regard to the payment of BNYM's fees and expenses and indemnification arising from or relating to the Ambac Action or the Whitebox Actions.  COFINA, its agents and servicers, the Disbursing Agent and BNYM shall have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date; provided, however, that COFINA Bonds will be transferable and recognized if made in accordance with the terms and conditions of the New Bond Indenture.

19.6   **Cancellation of Notes, Instruments, Certificates, and Other Documents:**
Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 18.1 hereof), on the Effective Date, the "Senior" and "First Subordinate" Existing Securities and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against COFINA without any further act or action under any applicable agreement, law, regulation, order or rule, with COFINA and BNYM having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to COFINA, as applicable, under the Existing Securities and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the "Senior" and "First Subordinate" Existing Securities and such other

49

instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, including BNYM, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, including, without limitation, the right to payment of the Trustee Claims and the Trustee Rights, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than COFINA, (v) to allow BNYM to appear in the Title III Case or any other proceeding in which BNYM is or becomes a party with respect to clauses (i) through (iv) above, as applicable, or otherwise in connection with BNYM's role as trustee under the Bond Resolution, or (vi) as may be necessary to preserve any claims under the respective Insurance Policies by (1) the applicable holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elected to receive Ambac Certificates or (2) the applicable holders of Allowed Senior COFINA Bond Claims (National) that validly elected to receive National Certificates; and, provided, further, that BNYM shall have no duties or responsibilities with respect to any Existing Securities that may be held by the Trusts from and after the Effective Date. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents as remain outstanding shall not form the basis for the assertion of any Claim against COFINA or Reorganized COFINA, as the case may be.

### 19.7   Undeliverable/Reserved Distributions:

(a)   **Holding of Undeliverable Distributions by the Disbursing Agent:** If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Subject to the terms and provision of Section 19.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(b)   **Failure to Claim Undeliverable Distributions:** If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against Reorganized COFINA, the trustees, or their respective

50

professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to Existing Securities, as the case may be, shall be released to Reorganized COFINA for use to discharge operating expenses of Reorganized COFINA and (2) COFINA Bonds in the possession of the Disbursing Agent or trustee with respect to Existing Securities, as the case may be, shall be released to Reorganized COFINA for cancellation or deposit into the treasury of Reorganized COFINA, as determined by Reorganized COFINA in its sole and absolute discretion.

19.8    **Withholding and Reporting Requirements:**  Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

19.9    **Time Bar to Cash Payments:**  Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

19.10    **Distributions After Effective Date:**  Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XIX of the Plan.

19.11    **Setoffs:**  Except as otherwise provided in the Plan or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and causes of action of any nature that COFINA or Reorganized COFINA may hold against the holder of such Allowed Claim; provided, however, that neither the failure to

51

104749481v5

effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by COFINA or Reorganized COFINA of any such claims, rights, and causes of action that COFINA or the Reorganized COFINA may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that nothing in this Section 19.11 shall affect the releases and injunctions provided in Article XXX of the Plan.

19.12 **Allocation of Plan Distributions Between Principal and Interest:** To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; provided, however, that COFINA or Reorganized COFINA's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

19.13 **Payment of Trustee Fees and Expenses:** No later than five (5) days prior to the Effective Date, BNYM shall provide invoice summaries and supporting documentation (subject to redaction to preserve attorney-client privilege) to the Oversight Board and AAFAF, on behalf of COFINA, relating to all incurred and unpaid Trustee Claims as of such date, together with an estimate of Trustee Claims to be incurred from such date up to and including the Effective Date. Within three (3) Business Days thereof, COFINA shall notify BNYM, in writing, of any dispute relating to the reasonableness of any portion of the Trustee Claims. Any portion of the Trustee Claims that is not disputed by COFINA shall be paid by COFINA on the Effective Date without further application to, or approval of, the Title III Court; provided, however, that, upon notification of a dispute, BNYM (a) shall submit an application to the Title III Court seeking a resolution of such dispute by the Title III Court or (b) waive, in writing, payment of such disputed amount; and, provided, further, that, upon the entry of an order of the Title III Court authorizing payment of any disputed amount, upon notice and a hearing, unless otherwise stayed, COFINA shall pay such allowed portion of such Trustee Claims. To the extent any Trustee Claim is incurred from and after the Effective Date and does not relate to either the Ambac Action or the Whitebox Actions, Reorganized COFINA shall be responsible and, upon presentation of supporting documentation in form and substance satisfactory to Reorganized COFINA (subject to redaction to preserve attorney-client privilege), shall satisfy such post-Effective Date Trustee Claims; provided, however, that, under no circumstance shall the Disbursing Agent, COFINA or Reorganized COFINA be responsible for any indemnification obligation, cost, or expense of BNYM associated with the gross negligence, intentional fraud or willful misconduct of BNYM in making any distribution pursuant to the Plan.

## ARTICLE XX

### RIGHTS AND POWERS OF DISBURSING AGENT

20.1 **Exculpation:** From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any

104749481v5

order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

20.2   **Powers of the Disbursing Agent:** Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

20.3   **Fees and Expenses Incurred From and After the Effective Date:** Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## ARTICLE XXI

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS

21.1   **Objections to Claims; Prosecution of Disputed Claims:** Except with respect to Allowed Claims, Reorganized COFINA shall object to, and shall assume any pending objection filed by COFINA to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized COFINA shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by COFINA, Reorganized COFINA shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred twenty (120) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any Bond Claim filed by any Entity, other than the Bond Claims filed by BNYM, as trustee with respect to the Existing Securities, for amounts due under Existing Securities, shall be deemed disallowed and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court.

21.2   **Estimation of Claims:** Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, Reorganized COFINA may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether COFINA previously objected to or sought to estimate such Claim,

104749481v5

I-402

and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized COFINA may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

21.3    **Payments and Distributions on Disputed Claims:**

(a)    **Disputed Claims Holdback:**  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Title III Court, Reorganized COFINA shall retain, for the benefit of each holder of a Disputed Claim, COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds, and, to the extent elected by such holder, the applicable trust certificates, and any dividends, gains or income attributable in respect of any of the foregoing, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized COFINA; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above.  Any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds retained and held for the benefit of a holder of a Disputed Claim shall be treated as payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash distributed in COFINA Bonds in the event the Disputed Claim ultimately becomes an Allowed Claim.  Such Cash and any dividends, gains or income paid on account of the COFINA Bonds (if any) retained for the benefit of holders of Disputed Claims shall be retained by Reorganized COFINA for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.  To the extent that Reorganized COFINA retains COFINA Bonds on behalf of Disputed Claims holders, until such time as such COFINA Bonds are distributed, Reorganized COFINA shall exercise voting or consent rights with respect to such bonds.

(b)    **Allowance of Disputed Claims:**  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized COFINA shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that have accrued on the amount of COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds so retained (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon

54

as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter. The balance of any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds previously retained but not distributed to a Disputed Claim holder shall be included in future distributions with respect to COFINA Bonds.

21.4    **Authority to Amend List of Creditors:**  Except with respect to Bond Claims, COFINA shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court.  If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, COFINA will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court.  If no such objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

21.5    **Non-Accrual of Interest:**  Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

21.6    **Disallowance of Claims:**  All Claims of any Entity from which property is sought by COFINA under sections 550, or 553 of the Bankruptcy Code or that COFINA alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and COFINA, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE XXII

## ACCEPTANCE OR REJECTION OF THE PLAN, EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

22.1    **Impaired Classes to Vote:**  Except as otherwise provided pursuant to the Disclosure Statement Order, each holder, as of the voting record date established in the Disclosure Statement Order, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan shall be entitled to vote separately to accept or reject the Plan.

22.2    **Acceptance by Class of Creditors**:  An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have affirmatively voted to accept or reject the Plan.

104749481v5

I-404

22.3   **Cramdown:**   In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Oversight Board reserves the right to request that the Title III Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ARTICLE XXIII

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN AND NOT IMPAIRED BY THE PLAN

23.1   **Impaired Classes:**   Claims in Classes 1 through 10 are impaired under the Plan.

23.2   **Impaired Classes to Vote:**   The Claims in Classes 1 through 9 are impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Classes 4 and 7 are deemed to have accepted the Plan.  The Claims in Class 10 are impaired and not receiving a distribution pursuant to the Plan and, therefore, Class 10 is deemed to have rejected the Plan.

## ARTICLE XXIV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

24.1   **Conditions Precedent to Confirmation of the Plan:**   Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

(a)   **Fiscal Plan Certification:**   The Oversight Board shall have determined that the Plan is consistent with the COFINA Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(b)   **Required Orders:**   The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order, the Confirmation Order and the Settlement Order providing for the following:

(i)   Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)   Authorizing the solicitation of votes and elections with respect to the Plan;

(iii)   Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)   Confirming and giving effect to the terms and provision of the Plan, including the releases set forth in Article XXX of the Plan;

(v)   Approving the Settlement Agreement in accordance with its terms, including, but not limited to, the releases of the Agents and their respective representatives, professionals and advisors;

(vi)     Determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, COFINA and the Plan;

(vii)    Approving the documents in the Plan Supplement, other than the New Bond Legislation (to the extent included in the Plan Supplement) and the Reorganized COFINA By-Laws;

(viii)   Authorizing Reorganized COFINA to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, the documents in the Plan Supplement, and the Settlement Agreement;

(ix)     Determining that the compromises and settlements set forth in the Settlement Agreement and the Plan are appropriate, reasonable and approved; and

(x)      The deemed acceleration of the Existing Securities on the Effective Date (i) in connection with  the treatment of Junior COFINA Bond Claims (Assured) and (ii) if requested by Ambac and/or National prior to the commencement of the Disclosure Statement Hearing, in connection with the Senior COFINA Bond Claims (Ambac) and the National Election, respectively; provided, however, that, such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

(c)     **Form of Orders:**  The Confirmation Order, the Settlement Order and the Plan are each in form and substance reasonably acceptable to the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas.

(d)     **Confirmation Order:**  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan and the Settlement Agreement satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XXX of the Plan and (iii) the provisions set forth in Section 25.1(c) hereof.

24.2   **Waiver of Conditions Precedent to Confirmation:**  To the extent practicable and legally permissible, each of the conditions precedent in Section 24.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of AAFAF, COFINA, the PSA Creditors and Bonistas, which consent shall not be unreasonably withheld. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

## ARTICLE XXV

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

25.1    **Conditions Precedent to the Effective Date.**  The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)    **Satisfaction of Certain Settlement Agreement Conditions:**  The satisfaction of the "Conditions to Effective Date" set forth in Section 4 of the Settlement Agreement.

(b)    **Fiscal Plan Certification:**  The Oversight Board shall have determined that the Plan is consistent with COFINA Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(c)    **Entry of the Confirmation Order:**  The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas, and the Confirmation Order shall provide for the following:

(i)    Authorize COFINA and Reorganized COFINA, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)    Decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)    Authorize COFINA and Reorganized COFINA, as the case may be, to (1) make all distributions and issuances as required under the Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)    Authorize the implementation of the Plan in accordance with its terms.

(v)    The COFINA Bonds and the covenants by COFINA Reorganized COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the Sales Tax, non-impairment, substitution of collateral and tax-exemption covenants set forth in Article XVI hereof), as provided in the New Bond Legislation and the New Bond Indenture, constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for herein) is the property of Reorganized COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, Reorganized COFINA, the Commonwealth, or any instrumentality of the Commonwealth, other than liens and

58

claims afforded to holders of COFINA Bonds under the Plan and the Confirmation Order
and shall not be "available resources" or "available revenues" of the Government of
Puerto Rico, as used in Section 8 of Article VI of the Puerto Rico Constitution or as
otherwise used in the Puerto Rico Constitution (whether construed pursuant to the
Spanish or English version of the Puerto Rico Constitution);

(vi)     Pursuant to the New Bond Legislation, the COFINA Bonds and COFINA
Parity Bonds have been granted and are secured by a statutory first lien as described in
Section 16.2 hereof, which Lien shall remain in full force and effect until the COFINA
Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with
their terms;

(vii)     The statutory lien on the COFINA Pledged Taxes as provided in the New
Bond Legislation, as applicable, and all other provisions made to pay or secure payment
of the COFINA Bonds and COFINA Parity Bonds are valid, binding, legal, and
enforceable; including, without limitation, covenants not to impair such property,
maintain available tax exemption and provide for the conditions regarding substitution of
New Collateral (including, without limitation, the statutory lien thereon) as adequate
protection for the property rights conferred under the Plan and the Confirmation Order;

(viii)     New Bond Legislation has been enacted to amend (or repeal and replace)
the existing COFINA legislation to, among other things, (i) establish the independent
COFINA board of directors referred to in Section 28.3 hereof, (ii) permit the Sales Tax,
tax exemption, substitution of New Collateral and non-impairment provisions referred to
herein and (iii) grant such other authorizations, if any, which may be required to
implement the transactions contemplated herein, including, without limitation, (a) a
determination that COFINA is the owner of the COFINA Portion under applicable law,
(b) a grant of a statutory Lien on the COFINA Portion to secure the payment obligations
with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or
otherwise in accordance with the Additional Bonds Test, (c) enhanced financial
reporting, (d) events of default and imposition of certain measures upon an event of
default, (e) submission of any disputes under the New Bond Indenture to the jurisdiction
of the Title III Court, and (f) other customary terms, conditions, and covenants for
similarly structured and supported municipal bonds that are acceptable to the PSA
Creditors.  To the extent applicable, the foregoing terms and such other terms as may be
agreed upon shall be included in the New Bond Indenture;

(ix)     The transfer of the COFINA Portion (and any substitution of New
Collateral on the terms and conditions provided for herein) pursuant to the Plan is
appropriate and binding and specifically enforceable against Reorganized COFINA and
the Commonwealth, their respective creditors and all parties in interest in accordance
with the Plan, including, without limitation, because the transfer of the COFINA Portion
created in Reorganized COFINA an ownership interest in such property (and any
substitution of New Collateral on the terms and conditions provided for herein) and is a
valid provision made to pay or secure payment of the COFINA Bonds;

(x)     The deemed acceleration of the Existing Securities on the Effective Date
(i) in connection with  the treatment of Junior COFINA Bond Claims (Assured) and (ii) if
requested by Ambac and/or National prior to the commencement of the Disclosure

59

104749481v5

Statement Hearing, in connection with the Senior COFINA Bond Claims (Ambac) and the National Election, respectively; provided, however, that, such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date;

(xi)    The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) COFINA, (2) Reorganized COFINA, (3) the Commonwealth, (4) each Person or Entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including each holder of a Bond Claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan and, if impaired, whether or not such person or entity accepted the Plan, (5) any other Person or Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians; and

(xii)    The Plan is consistent with the COFINA Fiscal Plan and satisfied Section 314(b)(7) of PROMESA.

(d)    **No Injunction:**  The Confirmation Order shall be effective and not be stayed in any respect.

(e)    **Authorizations:**  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including, without limitation, the New Bond Legislation, have been obtained or enacted and not revoked, and (2) except to the extent expressly provided herein and not inconsistent with any other provision of the Plan, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a New Bond Indenture, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the Plan and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder.

(f)    **Execution of Documents; Other Actions:**  All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, are effected or executed and delivered, as applicable, in form and substance reasonably satisfactory to the Government Parties, the PSA Creditors and Bonistas, and are in full force and effect.

(g)   **Opinions:** Usual and customary legal opinions for issuances of the type similar to the COFINA Bonds by outside counsel to COFINA covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

25.2   **Waiver of Conditions Precedent:** Subject to the provisions of the Plan Support Agreement, the Oversight Board may waive any of the conditions to the Effective Date set forth in Section 25.1 hereof at any time without any notice to any other parties in interest, other than the PSA Creditors and Bonistas, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan.

25.3   **Effect of Non-Occurrence of Conditions to Effective Date:** If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of COFINA, the Oversight Board, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by COFINA, the Oversight Board, or any other Entity.

## ARTICLE XXVI

### PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY COFINA

26.1   **Prosecution of Claims:** Except as settled and released herein, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court.

## ARTICLE XXVII

### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

27.1   **Modification of Plan:** Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the Plan Support Agreement, the Oversight Board may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

61

27.2    **Revocation or Withdrawal:**

(a)     Subject to the terms and provisions of the Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.

(b)     If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by COFINA or any other Entity, or to prejudice in any manner the rights of COFINA or any other Entity in any further proceeding involving COFINA.

27.3    **Amendment of Plan Documents:**   From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

27.4    **No Admission of Liability:**

(a)     The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

(b)     None of this Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA, COFINA, or any other Person or Entity with respect to the validity of any Claim.  None of this Plan or any settlement entered, act performed or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE XXVIII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED COFINA

28.1    **Corporate Action:**   On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of

104749481v5

Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, and without further action by any Person or Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan involving the corporate structure of the Reorganized COFINA or corporate action by Reorganized COFINA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, and without requiring further action by any Person or Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, COFINA and Reorganized COFINA shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New Bond Legislation and the new corporate governance documents, as applicable.

28.2 **Amendment of By-Laws:** The by-laws of Reorganized COFINA shall be amended as of the Effective Date to provide substantially as set forth in the Reorganized COFINA By-Laws.

28.3 **Directors of the Reorganized COFINA:** On the Effective Date, and pursuant to the terms and provisions of Section 25.1(c) hereof, the Reorganized COFINA By-Laws shall provide that the board of directors of Reorganized COFINA shall consist of three (3) persons appointed by the Governor of the Commonwealth all of whom shall meet the independence and qualification standards set forth in the Definitive Documents, including, without limitation, that the independent director may not be an officer, employee, or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors. The initial directors shall be disclosed prior to the Confirmation Hearing. In the event that, during the period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of Reorganized COFINA, the Governor of the Commonwealth shall choose a substitute consistent with the independence and qualification standards set forth above and COFINA shall file a notice thereof with the Title III Court and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing. Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of Junior COFINA Bond Claims and Assured) may collectively submit up to three (3) recommendations for the Governor's consideration regarding the initial appointment of independent directors; provided, however, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing. COFINA's amended corporate governance documents shall provide that all board members shall owe a fiduciary duty to COFINA as consistent with Puerto Rico law and its Constitution.

28.4 **Officers of Reorganized COFINA:** To the extent applicable, the board of directors of Reorganized COFINA shall elect officers of Reorganized COFINA as of or after the Effective Date.

104749481v5

28.5 **Structure for Collection and Application of COFINA Pledged Taxes:** The
COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation
and the New Bond Indenture, which entity shall be a "bankruptcy remote," single purpose,
municipal agency, public corporation or entity to the fullest extent permitted under applicable
law, with no operations or liabilities other than as set forth in the Plan and as reflected in the
Term Sheet. Reorganized COFINA shall be authorized, but not required, to enter into one or
more agreements, including, without limitation, the New Banking Services Agreement,
providing for the collection and deposit of the COFINA Pledged Taxes, which agreement or
agreements may provide, among other things, that the COFINA Portion, net of COFINA
operating expenses, shall be (a) promptly after collection, kept in segregated bank accounts
maintained in one or more mainland U.S. banks and in the name of the trustee appointed under
the New Bond Indenture and (b) designed to ensure that COFINA is the unconditional owner of
the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable
law.

## ARTICLE XXIX

## RETENTION OF JURISDICTION

29.1 **Retention of Jurisdiction:** The Title III Court shall retain and have exclusive
jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Case
and the Plan, or that relates to the following:

(a) to allow, disallow, determine, liquidate, classify, estimate, or establish the
priority, secured or unsecured status, or amount of any Claim, including, without the limitation,
the resolution of any request for payment of any Claim and the resolution of any and all
objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b) to resolve any matters related to Executory Contracts or Unexpired
Leases, including, without limitation, (a) the assumption or assumption and assignment of any
Executory Contract or Unexpired Lease to which COFINA is party or with respect to which
COFINA may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising
therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential
contractual obligation under any Executory Contract or Unexpired Lease that is assumed or
assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was
executory or expired;

(c) to ensure that distributions to holders of Allowed Claims are accomplished
pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating
to distributions under the Plan;

(d) to adjudicate, decide, or resolve any motions, adversary proceedings,
contested or litigated matters, and any other matters, and grant or deny any applications
involving COFINA or Reorganized COFINA that may be pending on the Effective Date or
brought thereafter;

(e) to decide and resolve all matters related to the granting and denying, in
whole or in part, any applications for allowance of compensation or reimbursement of expenses

64

to Professionals authorized pursuant to PROMESA, the Plan or orders entered by the Title III Court;

(f)       to enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, including, without limitation, orders pertaining to the substitution of New Collateral for COFINA Pledged Taxes to secure repayment of the COFINA Bonds and COFINA Parity Bonds;

(g)       to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)       to approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

(i)       to adjudicate, decide or resolve any matters relating to COFINA's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)       to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)       to enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order;

(l)       to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the COFINA Bonds or COFINA Parity Bonds, and enter any necessary or appropriate orders or relief in connection with such adjudication; to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Settlement Agreement, or any contract, instrument, release, or other agreement or document created in connection with the Plan, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

65

104749481v5

I-414

(m)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     to enter an order or final decree concluding or closing the Title III Case pursuant to section 945(b) of the Bankruptcy Code;

(o)     to enforce and clarify any orders previously entered by the District Court in the Title III Case;

(p)     in connection with the Interpleader Action, to hear and determine any and all non-released and non-dismissed Claims and Causes of Action asserted or that could have been asserted by BNYM against Ambac or Whitebox in the Interpleader Action or the Ambac Action and the Whitebox Actions, respectively, and by Ambac and Whitebox against BNYM for gross negligence, willful misconduct or intentional fraud in the Interpleader Action or the Ambac Action and the Whitebox Actions, respectively; and

(q)     to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XXX

## MISCELLANEOUS PROVISIONS

30.1   **Title to Assets:** Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan.

30.2   **Discharge and Release of Claims and Causes of Action:**

(a)     Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against COFINA that arose, in whole or in part, prior to the Effective Date, relating to COFINA or Reorganized COFINA or any of its Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action.  Upon the Effective Date, COFINA and Reorganized COFINA shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan.

(b)     Except as provided in Section 30.11 of the Plan or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against COFINA and

66

104749481v5

I-415

Reorganized COFINA, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to COFINA or Reorganized COFINA or any of their respective Assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against COFINA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against COFINA or Reorganized COFINA and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  As of the Effective Date, and in consideration for the value provided under the Plan and the Settlement Agreement, each holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against COFINA and Reorganized COFINA, and their respective Assets and property and all such Claims.

(c)   Notwithstanding any other provisions of this Section 30.2, in accordance with the provisions of the Plan Support Agreement, each of the PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of COFINA, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 30.2(c) and (iii) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against BNYM and each of its Related Persons from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution; provided, however, that the release provided pursuant to clause (iii) above shall not extend to any and all Claims and Causes of Action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively.

(d)   On the Effective Date, and in consideration of the Commonwealth-COFINA Dispute Settlement and the compromise and settlement of Bond Claims pursuant to the terms and provisions of the Plan (including, without limitation, the distributions to be made on account of "Senior" and "First Subordinate" Existing Securities), the resolution of the Interpleader Action and the terms and provisions of Section 19.5 hereof regarding the Ambac Action and the Whitebox Actions, to the fullest extent permissible under applicable law, BNYM and each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns shall be released from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest; provided, however, that the foregoing release of BNYM shall not extend, nor shall it be construed to extend, to acts of gross negligence, intentional fraud, or willful misconduct of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions.

67

(e)     On the Effective Date, (i) the COFINA Agent and its agents, attorneys, affiliates, advisors, consultants and attorneys, solely in such capacities, and (ii) in the event that the Creditors' Committee and the Commonwealth Agent (1) do not object to approval of the Settlement Motion, approval of the Disclosure Statement and confirmation of the Plan and do not file the Motion to Enforce or (2) subject to the provisions of decretal paragraph 4 of the Abeyance Stipulation, file the Motion to Enforce or an objection to approval of the merits of the Settlement Motion, approval of the Disclosure Statement and confirmation of the Plan by the Title III Court, and unless the Title III Court determines that any such objection and the Motion to Enforce was filed in bad faith, the Commonwealth Agent and the Creditors' Committee, its members and each of their respective current and former officers, directors, agents, attorneys, employees, affiliates, advisors,  and consultants, solely in such capacities (collectively, the "Commonwealth Agent Releasees"), shall be released from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order.

(f)     On the Effective Date, and in consideration of the Commonwealth-COFINA Dispute Settlement and the resolution of the Interpleader Action, to the fullest extent permissible under applicable law, the Commonwealth shall be released from all liability from all Claims and Causes of Action held by any Creditor, solely in such capacity, arising from or relating to the relationship of the Commonwealth and COFINA, including, without limitation, any Claim or Cause of Action arising from or relating to the commencement of the Adversary Proceeding and pendency and the compromise and settlement of the Interpleader Action and the allocation of funds in accordance with Section 2.1 of the Plan.

30.3    **Injunction on Claims:** Except as otherwise expressly provided in Section 30.11 of the Plan, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 30.2 hereof or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 30.2 hereof are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

30.4    **Integral to Plan:** Each of the discharge, injunction, exculpation and release provisions provided in this Article XXX is an integral part of the Plan and is essential to its

68

implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XXX.

     30.5   **Releases by COFINA and Reorganized COFINA**:  Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Settlement Agreement, on the Effective Date, and for good and valuable consideration, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that COFINA, Reorganized COFINA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to COFINA taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Actions, the Related Actions, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees.

     30.6   **Injunction Related to Releases:**  As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Section 30.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims:  (i) commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 30.5 hereof; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the Plan or the Confirmation Order.

     30.7   **Exculpation:**

          (a)    **Government Parties**:  The Oversight Board, the Commonwealth, AAFAF, COFINA and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Settlement Agreement; provided, however, that the foregoing provisions of this Section 30.7 shall not affect the liability of any Entity that otherwise would result from any such act or

104749481v5

omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct. Nothing in the foregoing provisions of this Section 30.7(a) shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b)     **Monoline Insurers:** Each of Ambac, Assured and National and their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan, including, without limitation, in connection with the structure of the Trusts, commutation, the treatment of Senior COFINA Bond Claims (Ambac), the treatment of Junior COFINA Bond Claims (Assured), the National Election, the voting procedures, the election procedures, and any release of obligations under the applicable Insurance Policies; provided, however, that, notwithstanding anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall not be construed to, release or exculpate (1) with respect to any beneficial holder of the Ambac Insured Bonds that receives Ambac Certificates in accordance with the Plan, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy (which claim shall only be asserted by the trustee of the Ambac Trust), as adjusted to account for any distributions from the Ambac Trust (and any claims or defenses that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of National Insured Bonds that received National Certificates in accordance with the Plan, any claim against National with respect to National's obligations under the National Insurance Policies (which claim shall be asserted in accordance with the terms of the National Insurance Policies), as adjusted to account for any distributions from the National Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations to such beneficial holder under the National Insurance Policies); or (3) with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the applicable Acceleration Price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).

(c)     **PSA Creditors and Bonistas:** Each of the PSA Creditors and Bonistas, solely in its capacity as a party to the Plan Support Agreement and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the Settlement Agreement; provided, however, that the foregoing provisions of this Section 30.7(c) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

104749481v5

I-419

(d)   **Agents:**  Each of (i) the COFINA Agent and (ii) in the event that the Creditors' Committee and the Commonwealth Agent (1) do not object to approval of the Settlement Motion, approval of the Disclosure Statement and confirmation of the Plan and do not file the Motion to Enforce or (2) subject to the provisions of decretal paragraph 4 of the Abeyance Stipulation, file the Motion to Enforce or an objection to approval of the merits of the Settlement Motion, approval of the Disclosure Statement and confirmation of the Plan by the Title III Court, and unless the Title III Court determines that any such objection and the Motion to Enforce was filed in bad faith, the Commonwealth Agent, solely in its capacity as agent of the Oversight Board with respect to the Commonwealth, to litigate and/or settle the Commonwealth-COFINA Dispute, respectively, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the Commonwealth-COFINA Dispute, including, without limitation, the Commonwealth-COFINA Dispute Order, the Adversary Proceeding, the Commonwealth-COFINA Dispute Settlement, the Settlement Agreement, the Settlement Motion and the Settlement Order.

30.8   **Appointments Related Litigation:**  Notwithstanding anything contained herein to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation subsequent to entry of the Settlement Order and the Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the Plan and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan, the Settlement Agreement, the Confirmation Order and the Settlement Order, including, without limitation, the compromise and settlement of the Commonwealth-COFINA Dispute and the releases, exculpations and injunctions provided pursuant to Article XXX of the Plan.

30.9   **Bar Order:**  To the limited extent provided in the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related Actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

30.10   **No Waiver:**  Notwithstanding anything to the contrary contained in Sections 30.5 and 30.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF,

Reorganized COFINA or the PSA Creditors to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

30.11 **Supplemental Injunction:** Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against COFINA, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a) Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b) Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c) Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d) Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e) Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Confirmation Order, or the Settlement Agreement relating to such Released Claim; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

30.12 **Preservation of Certain Claims and Causes of Action:** Notwithstanding anything contained in the Plan to the contrary, including, without limitation, the provisions of this Article XXX, Ambac and Whitebox shall retain, and shall not be enjoined or otherwise barred from pursuing, any and all claims and causes of action, whether sounding in contract or tort, solely for gross negligence, willful misconduct or intentional fraud that were asserted, or could have been asserted, against BNYM in the Ambac Action, the Whitebox Actions or the Interpleader Action, and BNYM shall retain, and shall not be enjoined or otherwise barred from pursuing, any and all claims and causes of action and asserting any rights and defenses against Ambac and Whitebox arising from or related to the Bond Resolution.

72

104749481v5

I-421

30.13 **Post-Effective Date Fees and Expenses:** From and after the Effective Date, Reorganized COFINA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized COFINA related to implementation and consummation of the Plan without further approval from Title III Court.

30.14 **Securities Act Exemption:** Pursuant to section 1145 of the Bankruptcy Code (other than an underwriter as defined in section 1145(b) of the Bankruptcy Code) and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the COFINA Bonds, Ambac Certificates and National Certificates pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

30.15 **Severability:** Subject to the terms and provisions of the Plan Support Agreement, if, prior to the Confirmation Date, any term or provision of the Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall, with the consent of the Government Parties, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

30.16 **Governing Law:** Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

30.17 **Closing Case:** The Oversight Board shall, promptly upon the full administration of the Title III Case, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court. Notwithstanding the closing of the Title III Case, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XXIX of the Plan.

30.18 **Section Headings:** The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

30.19 **Inconsistencies:** To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern and (b) the terms and provisions of the Plan and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan; provided, however, that under no circumstances shall the Confirmation Order modify the economic terms set forth herein.

104749481v5

I-422

30.20   **Document Retention:**  From and after the Effective Date, COFINA may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by COFINA.

30.21   **Immediate Binding Effect:**  Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases, exculpations, and settlements effected under the Plan will be operative, and subject to enforcement by the Title III Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

30.22   **Additional Documents:**  On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  COFINA and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

30.23   **Reservation of Rights:**  Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by COFINA with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of COFINA with respect to the holders of Claims prior to the Effective Date.  Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Puerto Rico Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Puerto Rico Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

30.24   **Termination of the Oversight Board:**  Upon the termination or dissolution of the Oversight Board pursuant to Section 209 of PROMESA or otherwise, all rights, powers and authorities of the Oversight Board to implement and perform under the Plan shall vest in COFINA or Reorganized COFINA, as applicable, without the need for any notice to, or action by, the Title III Court, the Oversight Board, COFINA, Reorganized COFINA or any other Entity.  Neither COFINA nor Reorganized COFINA shall be, or be deemed to be, a successor to the Oversight Board by reason of any theory of law or equity, and neither COFINA nor Reorganized COFINA shall assume or be responsible for any liability or obligation of the Oversight Board of any kind or nature whatsoever.

30.25 **Successors and Assigns:** Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

30.26 **Notices:** All notices, requests to, demands or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, COFINA or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Oversight Board, to:   Financial Oversight and Management Board for Puerto Rico
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:   Natalie A. Jaresko, Executive Director

    – with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel:   (212) 969-3000
Fax:   (212) 969-2900

    – with a copy to –

If to COFINA, to:   Puerto Rico Sales Tax Financing Corporation
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn:   Christian Sobrino Vega, Executive Director

    – with a copy to –

75

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
        Suzzanne Uhland, Esq.
Tel:    (212) 326-2000
Fax:    (212) 326-2061

If to AAFAF, to:        Fiscal Agency and Financial Advisory Authority
                        Roberto Sánchez Vilella (Minillas) Government Center
                        De Diego Ave. Stop 22
                        San Juan, Puerto Rico 00907
                        Attn:   Christian Sobrino Vega, Executive Director

                        – with a copy to –

                        O'MELVENY & MYERS LLP
                        Seven Times Square
                        New York, NY 10036
                        Attn:   John Rapisardi, Esq.
                                Suzzanne Uhland, Esq.
                        Tel:    (212) 326-2000
                        Fax:    (212) 326-2061

30.27   **Term of Injunctions or Stays:**  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

30.28   **Entire Agreement:**  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

30.29   **Plan Supplement:**  All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from [https://cases.primeclerk.com/ puertorico/] or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control; provided, however, that, with respect to matters governed by the New Bond Indenture, to the extent that any provisions of the Plan are inconsistent with the New Bond Indenture, the New Bond Indenture shall control.

76

104749481v5

I-425

Dated: San Juan, Puerto Rico
      January 9, 2019

> PUERTO RICO SALES TAX FINANCING
> CORPORATION, by and through the Financial
> Oversight and Management Board for Puerto Rico
> as its representative
>
> By:      /s/ Natalie A. Jaresko
> Name:   Natalie A. Jaresko
> Title:    Executive Director

77

## **EXHIBIT A**

Schedule of Amortization of COFINA Bonds

A-1

## Exhibit A: Coupons and Maturity Dates

### Current Interest Bond Terms

| (7/1) Year | Par | Cpn/Yld |
|---|---|---|
| Total/Avg | $9,119,420,000.00 | 4.792% |
| 2034 | 375,090,000.00 | 4.500% |
| 2040** | 2,996,115,000.00 | 4.550% |
| 2053 | 1,451,135,000.00 | 4.750% |
| 2058 | 4,297,080,000.00 | 5.000% |

Call Provisions: 2034 Term - Par call commencing 2025 (7-year call)

Call Provisions: 2040, 2053 & 2058 Terms - Par call commencing 2028 (10-year call)

### Capital Appreciation Bond Terms

| (7/1) Year | Yield | Initial Price | Initial Value | Accreted Value | Future Value |
|---|---|---|---|---|---|
| Total/Avg | 5.048% | 27.010 | $2,901,901,817.35 | $9,638,250,976.35 | $10,743,910,000.00 |
| 2024 | 4.250% | 77.971 | 166,818,954.50 | 201,537,898.10 | 213,950,000.00 |
| 2027 | 4.375% | 67.983 | 246,346,597.95 | 348,676,228.60 | 362,365,000.00 |
| 2029 | 4.375% | 62.346 | 220,190,485.50 | 346,050,471.60 | 353,175,000.00 |
| 2031 | 4.500% | 56.281 | 256,162,971.50 | 445,599,082.70 | 455,150,000.00 |
| 2033 | 4.500% | 51.488 | 263,752,428.80 | 500,306,662.00 | 512,260,000.00 |
| 2046 | 5.375% | 22.747 | 1,108,991,315.10 | 4,252,407,026.55 | 4,875,330,000.00 |
| 2051 | 5.625% | 16.105 | 639,639,064.00 | 3,543,673,606.80 | 3,971,680,000.00 |

Call Provisions: 2024 & 2027 Term - non-call; 2029 Term - Callable 103% Accreted Value ("AV") 2028; 100% AV 2029

2031 Term - Callable at 105% AV 2028; 103% AV 2029-2030; 100% AV 2031

2033 Term - Callable at 107.5% AV 2028 2030; 105% AV 2031 103% AV 2032, 100% AV 2033

Call Provisions: 2046 & 2051 Terms - Callable at 107.5% AV 2028-32, 105% AV 2033-37, 103% AV 2038-42, 100% AV 2043-Final Maturity

All Capital Appreciation Bonds: Sinking Fund Redemptions would be 100% of AV

### Current Interest Bond Sinking Fund Schedule

| (7/1) Year | Yr# | CPN | Par | Term Par |
|---|---|---|---|---|
| Total | | | $9,119,420,000.00 | $9,119,420,000.00 |
| 2019 | 1 | - | - | - |
| 2020 | 2 | - | - | - |
| 2021 | 3 | - | - | - |
| 2022 | 4 | - | - | - |
| 2023 | 5 | - | - | - |
| 2024 | 6 | - | - | - |
| 2025 | 7 | - | - | - |
| 2026 | 8 | - | - | - |
| 2027 | 9 | - | - | - |
| 2028 | 10 | - | - | - |
| 2029 | 11 | - | - | - |
| 2030 | 12 | - | - | - |
| 2031 | 13 | - | - | - |
| 2032 | 14 | - | - | - |
| 2033 | 15 | 4.500% | 52,970,000.00 | - |
| 2034 | 16 | 4.500% | 322,120,000.00 | 375,090,000.00 |
| 2035 | 17 | 4.550% | 366,885,000.00 | - |
| 2036 | 18 | 4.550% | 415,060,000.00 | - |
| 2037 | 19 | 4.550% | 466,685,000.00 | - |
| 2038 | 20 | 4.550% | 521,965,000.00 | - |
| 2039 | 21 | 4.550% | 581,125,000.00 | - |
| 2040 | 22 | 4.550% | 644,395,000.00 | 2,996,115,000.00 |
| 2041 | 23 | - | - | - |
| 2042 | 24 | - | - | - |
| 2043 | 25 | - | - | - |
| 2044 | 26 | - | - | - |
| 2045 | 27 | - | - | - |
| 2046 | 28 | - | - | - |
| 2047 | 29 | - | - | - |
| 2048 | 30 | - | - | - |
| 2049 | 31 | - | - | - |
| 2050 | 32 | - | - | - |
| 2051 | 33 | - | - | - |
| 2052 | 34 | 4.750% | 708,735,000.00 | - |
| 2053 | 35 | 4.750% | 742,400,000.00 | 1,451,135,000.00 |
| 2054 | 36 | 5.000% | 777,665,000.00 | - |
| 2055 | 37 | 5.000% | 816,545,000.00 | - |
| 2056 | 38 | 5.000% | 857,375,000.00 | - |
| 2057 | 39 | 5.000% | 900,240,000.00 | - |
| 2058 | 40 | 5.000% | 945,255,000.00 | 4,297,080,000.00 |

### Capital Appreciation Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Yld. | Initial Price | Initial Value | Accreted Value | Future Value Redemption |
|---|---|---|---|---|---|---|
| Total | | | | $2,901,901,817.35 | $9,638,250,978.35 | $10,743,910,000.00 |
| 2019 | 1 | 4.250% | 77.971 | $18,865,083.45 | $19,606,660.20 | 24,195,000.00 |
| 2020 | 2 | | | | | |
| 2021 | 3 | 4.250% | 77.971 | 15,461,649.30 | 17,479,550.10 | 19,830,000.00 |
| 2022 | 4 | 4.250% | 77.971 | 30,244,950.90 | 35,660,810.70 | 38,790,000.00 |
| 2023 | 5 | 4.250% | 77.971 | 44,373,296.10 | 54,565,877.10 | 56,910,000.00 |
| 2024 | 6 | 4.250% | 77.971 | 57,873,974.75 | 74,225,000.00 | 74,225,000.00 |
| 2025 | 7 | 4.375% | 67.983 | 70,182,250.05 | 94,674,753.80 | 103,235,000.00 |
| 2026 | 8 | 4.375% | 67.983 | 82,307,018.10 | 115,941,474.80 | 121,070,000.00 |
| 2027 | 9 | 4.375% | 67.983 | 93,857,329.80 | 138,060,000.00 | 138,060,000.00 |
| 2028 | 10 | 4.375% | 62.346 | 104,859,737.40 | 161,065,471.60 | 168,190,000.00 |
| 2029 | 11 | 4.375% | 62.346 | 115,330,748.10 | 184,985,000.00 | 184,985,000.00 |
| 2030 | 12 | 4.500% | 56.281 | 123,486,142.10 | 209,859,082.70 | 219,410,000.00 |
| 2031 | 13 | 4.500% | 56.281 | 132,676,829.40 | 235,740,000.00 | 235,740,000.00 |
| 2032 | 14 | 4.500% | 51.488 | 141,386,048.00 | 262,646,662.00 | 274,600,000.00 |
| 2033 | 15 | 4.500% | 51.488 | 122,366,380.80 | 237,660,000.00 | 237,660,000.00 |
| 2034 | 16 | | | - | - | - |
| 2035 | 17 | | | - | - | - |
| 2036 | 18 | | | - | - | - |
| 2037 | 19 | | | - | - | - |
| 2038 | 20 | | | - | - | - |
| 2039 | 21 | | | - | - | - |
| 2040 | 22 | | | - | - | - |
| 2041 | 23 | 5.375% | 22.747 | 210,176,593.25 | 708,735,023.75 | 923,975,000.00 |
| 2042 | 24 | 5.375% | 22.747 | 199,320,587.50 | 708,737,287.50 | 876,250,000.00 |
| 2043 | 25 | 5.375% | 22.747 | 189,023,020.60 | 708,734,532.20 | 830,980,000.00 |
| 2044 | 26 | 5.375% | 22.747 | 179,257,733.50 | 708,732,767.50 | 788,050,000.00 |
| 2045 | 27 | 5.375% | 22.747 | 169,997,429.80 | 708,732,415.60 | 747,340,000.00 |
| 2046 | 28 | 5.375% | 22.747 | 161,215,950.45 | 708,735,000.00 | 708,735,000.00 |
| 2047 | 29 | 5.625% | 16.105 | 142,499,455.75 | 708,736,815.00 | 884,815,000.00 |
| 2048 | 30 | 5.625% | 16.105 | 134,809,318.25 | 708,734,564.85 | 837,065,000.00 |
| 2049 | 31 | 5.625% | 16.105 | 127,535,495.00 | 708,734,662.00 | 791,900,000.00 |
| 2050 | 32 | 5.625% | 16.105 | 120,653,023.25 | 708,732,564.95 | 749,165,000.00 |
| 2051 | 33 | 5.625% | 16.105 | 114,141,771.75 | 708,735,000.00 | 708,735,000.00 |
| 2052 | 34 | | | - | - | - |
| 2053 | 35 | | | - | - | - |
| 2054 | 36 | | | - | - | - |
| 2055 | 37 | | | - | - | - |
| 2056 | 38 | | | - | - | - |
| 2057 | 39 | | | - | - | - |
| 2058 | 40 | | | - | - | - |

*Due to rounding of bonds into $5,000 denominations per term, debt service on Bonds will be slightly below the 53.65% PSTBA.
**Current Interest Bonds may include both Tax-Exempt and Taxable Bonds.

2

## Exhibit B

**Form of Notice**

B-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>               Debtors.[7] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>               Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

**NOTICE OF (A) ENTRY OF ORDER CONFIRMING
THE THIRD AMENDED TITLE III PLAN OF ADJUSTMENT OF
PUERTO RICO SALES TAX FINANCING CORPORATION PURSUANT TO
TITLE III OF PROMESA AND (B) OCCURRENCE OF THE EFFECTIVE DATE**

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

---

[7] The Debtors in these Title III Cases, along with each Debtor's respective title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

PLEASE TAKE NOTICE that, pursuant to an order, dated February 5th, 2019 (the "Confirmation Order"), the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation Pursuant to Title III of PROMESA (as modified, the "Plan"), of the Puerto Rico Sales Tax Financing Corporation ("COFINA") was confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan and the Confirmation Order.

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on [____], 2019 and the Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the Plan, and related documents should contact Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records ("PACER") (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.6 and Article III of the Plan and decretal paragraph 26 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [____], 2019; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of COFINA; and, provided, further, that, in accordance with section 503(b)(1)(D) of the Bankruptcy Code, applicable herein pursuant to section 301 of PROMESA, no governmental unit, including, without limitation, the IRS, shall be required to file a proof of Administrative Expense Claim by such date; and, provided, further, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interest of COFINA and Reorganized COFINA, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof. All Administrative Expense Requests should be sent to the following:

[____]

Administrative Expense Requests will be deemed timely filed only if **actually received** by Prime Clerk by **5:00 p.m. (prevailing Atlantic Time)** on [____], 2019 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Section 1.6 and Article III of the Plan and decretal paragraph 26 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with**

2

respect to such Administrative Expense Claim) against COFINA and its property, and **COFINA and Reorganized COFINA will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.**

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 18.6 of the Plan and decretal paragraph 15 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtor results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against COFINA, or its properties or agents, successors, or assigns, including, without limitation, Reorganized COFINA, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order is full, final, and complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (i) COFINA, (ii) Reorganized COFINA, (iii) the Commonwealth, (iv) each person or entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that received or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan or this order and, if impaired, whether or not such person or entity accepted or rejected the Plan, (v) any other person, and (vi) each of the foregoing's respective heirs, successors assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians.

Dated: _____, 2019
San Juan, Puerto Rico

/s/ _____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Chris Theodoridis (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtor*

/s/ _____

3

I-432

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

4

## II.    CONSTITUTIONAL PROVISIONS

### A.    U.S. Constitution – Federal

#### Article I, Section 8, Clause 4 (Bankruptcy Clause)

The Congress shall have the power … To establish a uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States;

#### Article I, Section 9, Clause 3 (prohibition of Bills of Attainder and Ex Post Facto Laws)

No bill of attainder or ex post facto Law shall be passed.

#### Article I, Section 10, Clause 1 (Contracts Clause and prohibition of Bills of Attainder and Ex Post Facto Laws)

No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility.

#### Article II, Section 2, Clause 2 (Appointments Clause)

The President shall be commander in chief of the Army and Navy of the United States, and of the militia of the several states, when called into the actual service of the United States; he may require the opinion, in writing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices, and he shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment.

He shall have power, by and with the advice and consent of the Senate, to make treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the advice and consent of the Senate, shall appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments.

The President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.

### Article IV, Section 2, Clause 1 (Privileges and Immunities Clause)

The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

### Article IV, Section 3, Clause 2 (Territory Clause)

The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state.

### Amendment V (Due Process and Takings Clauses)

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### Amendment XIV, Section 1 (Privileges and Immunities, Due Process and Equal Protection Clauses)

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## B.    Constitution – Puerto Rico

### Article II, Section 7 (Due Process, Equal Protection and Contracts Clauses)

The right to life, liberty and the enjoyment of property is recognized as a fundamental right of man.  The death penalty shall not exist.  No person shall be deprived of his liberty or property without due process of law.  No person in Puerto Rico shall be denied the equal protection of the laws.  No laws impairing the obligation of contracts shall be enacted.  A minimum amount of property and possessions shall be exempt from attachment as provided by law.

### Article II, Section 9 (Takings Clause)

Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law.  No law shall be enacted authorizing condemnation of printing presses, machinery or material devoted to publications of any kind.  The buildings in which these objects are located may be condemned only after a judicial finding of public convenience and necessity pursuant to procedure that shall be provided by law, and may be taken before such a judicial finding only when there is placed at the disposition of the publication an adequate site in which it can be installed and continue to operate for a reasonable time.

### Article II, Section 12, Clause 2 (prohibition on Ex Post Facto laws and Bills of Attainder)

No *ex post facto* law or bill of attainder shall be passed.

### Article VI, Section 2

The power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended.  The power of the Commonwealth of Puerto Rico to 'contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly, but no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the

Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; and no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date; and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

The Legislative Assembly shall fix limitations for the issuance of direct obligations by any of the municipalities of Puerto Rico for money borrowed directly by such municipality evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of such municipality shall be pledged; provided, however, that no such bonds or notes shall be issued by any municipality in an amount which, together with the amount of all such bonds and notes theretofore issued by such municipality and then outstanding, shall exceed the percentage determined by the Legislative Assembly, which shall be not less than five per centum (5%) nor more than ten per centum (10%) of the aggregate tax valuation of the property within such municipality.

The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

### Article VI, Section 6

If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the Government and for the payment of interest on and amortization of the public debt for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and the Governor shall authorize the payments necessary for such purposes until corresponding appropriations are made.

### Article VI, Section 7

The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law.

### Article VI, Section 8

In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

## III. STATUTES AND RULES

### A. Statutes and Rules – Federal

### 11 U.S.C. §1123 Contents of Plan: §1123(a)(4)

**(a)** Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

. . .

**(4)** provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

### 11 U.S.C. §1125 (Post-petition disclosure and solicitation): §1125(a)-(e),(g)

**(a)** In this section—

**(1)** "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information; and

**(2)** "investor typical of holders of claims or interests of the relevant class" means investor having—

    **(A)** a claim or interest of the relevant class;

    **(B)** such a relationship with the debtor as the holders of other claims or interests of such class generally have; and

    **(C)** such ability to obtain such information from sources other than the disclosure required by this section as holders of claims or interests in such class generally have.

**(b)** An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

**(c)** The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

**(d)** Whether a disclosure statement required under subsection (b) of this section contains adequate information is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation, but an agency or official whose duty is to administer or enforce such a law, rule, or regulation may be heard on the issue of whether a disclosure statement contains adequate information. Such an agency or official may not appeal from, or otherwise seek review of, an order approving a disclosure statement.

**(e)** A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with

the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

\* \* \*

**(g)**  Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.

## 11 U.S.C. §1129 Confirmation of Plan:  §1129(a)(3), (a)(8),(b)(1),(b)(2)(A)

**(a)**  The court shall confirm a plan only if all of the following requirements are met:  …

**(3)**  The plan has been proposed in good faith and not by any means forbidden by law …

**(8)**  With respect to each class of claims or interests—

**(A)**  such class has accepted the plan; or

**(B)**  such class is not impaired under the plan.…

**(b)**

**(1)**  Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of

claims or interests that is impaired under, and has not accepted, the plan.

**(2)** For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

**(A)** With respect to a class of secured claims, the plan provides—

**(i)**

**(I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

**(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

**(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

**(iii)** for the realization by such holders of the indubitable equivalent of such claims. …

**48 U.S.C. §737 Privileges and immunities**

The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States.

**48 U.S.C. §2101 Effective Date**

**(a)     In General**

Except as provided in subsection (b), this chapter shall take effect on June 30, 2016.

**(b)     Subchapter III and Subchapter VI**

**(1)**     Subchapter III shall apply with respect to cases commenced under subchapter III on or after June 30, 2016.

**(2)**     Subchapters III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of title 11) created before, on, or after such date.

**48 U.S.C. §2141:  Approval of Fiscal Plans: §2141(b)(1)(N)**

**(b)     Requirements**

**(1)     In General** – A Fiscal Plan developed under this section shall, with respect to the territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets, and

**(N)**     respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016.

**48 U.S.C. §2161 – Applicability of other laws; definitions: §2161(a)**

**(a)**   **Sections applicable to cases under this subchapter**

Sections 101 (except as otherwise provided in this section), 102, 104, 105, 106, 107, 108, 112, 333, 344, 347(b), 349, 350(b), 351, 361, 362, 364(c), 364(d), 364(e), 364(f), 365, 366, 501, 502, 503, 504, 506, 507(a)(2), 509, 510, 524(a)(1), 524(a)(2), 544, 545, 546, 547, 548, 549(a), 549(c), 549(d), 550, 551, 552, 553, 555, 556, 557, 559, 560, 561, 562, 902 (except as otherwise provided in this section), 922, 923, 924, 925, 926, 927, 928, 942, 944, 945, 946, 1102, 1103, 1109, 1111(b), 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1123(d), 1124, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), 1129(b)(2)(B), 1142(b), 1143, 1144, 1145, and 1146(a) of title 11 apply in a case under this subchapter and section 930 of title 11 applies in a case under this subchapter; however, section 930 shall not apply in any case during the first 120 days after the date on which such case is commenced under this subchapter.

**48 U.S.C. §2163 – Reservation of territorial power to control territory and territorial instrumentalities**

Subject to the limitations set forth in subchapters I and II of this chapter, this subchapter does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality, including expenditures for such exercise, but whether or not a case has been or can be commenced under this subchapter—

**(1)**   a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of title 11, may not bind any creditor of a covered territory or any

covered territorial instrumentality thereof that does not consent to the composition or moratorium;

**(2)** a judgment entered under a law described in paragraph (1) may not bind a creditor that does not consent to the composition; and

**(3)** unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this chapter.

## 48 U.S.C. §2174:  Confirmation:  §2174(b)(1), (2), (3), (6), (7)

**(b)** **Confirmation –** The court shall confirm the plan if—

**(1)** the plan complies with the provisions of title 11, made applicable to a case under this subchapter by section 2161 of this title;

**(2)** the plan complies with the provision of this subchapter;

**(3)** the debtor is not prohibited by law from taking any action necessary to carry out the plan; …

**(6)** the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than in provided by such plan; and

**(7)** the plan is consistent with the applicable Fiscal Plan certified by the Oversight Board under subchapter II. …

## 48 U.S.C. §2194:  Automatic stay upon enactment

**(k)** **Effect**

This section does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation.  This section

does not impair or affect the implementation of any restructuring support agreement executed by the Government of Puerto Rico to be implemented pursuant to Puerto Rico law specifically enacted for that purpose prior to the enactment of this chapter or the obligation of the Government of Puerto Rico to proceed in good faith as set forth in any such agreement.

**(l)** **Payments on Liabilities**

Nothing in this section shall be construed to prohibit the Government of Puerto Rico from making any payment on any Liability when such payment becomes due during the term of the stay, and to the extent the Oversight Board, in its sole discretion, determines it is feasible, the Government of Puerto Rico shall make interest payments on outstanding indebtedness when such payments become due during the length of the stay.

**(m)** **Findings**

Congress finds the following: …..

**(5)** Additionally, an immediate—but temporary—stay is essential to stabilize the region for the purposes of resolving this territorial crisis.

**(A)** The stay advances the best interests common to all stakeholders, including but not limited to a functioning independent Oversight Board created pursuant to this chapter to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation that may have been commenced prior to the effectiveness or upon expiration of the stay.

**(B)** The stay is limited in nature and narrowly tailored to achieve the purposes of this chapter, including to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority or, at a minimum, receive a recovery from the Government of Puerto

Rico equal to their best possible outcome absent the provisions of this chapter.

**48 U.S.C. §2195 Protection from inter-debtor transfers**

**(a)    Protection of Creditors**

While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property.

**(b)    Enforceability**

A creditor may enforce rights under this section by bringing an action in the United States District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 2194 of this title, unless a stay under subchapter III is in effect.

**48 U.S.C. §2231 Creditor collective action:  §2231(d)**

**(d)    Determination of Pools for Voting**

The Administrative Supervisor, in consultation with the Issuer, shall establish Pools in accordance with the following:

**(1)**    Not less than one Pool shall be established for each Issuer.

**(2)**    A Pool that contains one or more Bonds that are secured by a lien on property shall be a Secured Pool.

**(3)**    The Administrative Supervisor shall establish Pools according to the following principles:

**(A)**    For each Issuer that has issued multiple Bonds that are distinguished by specific provisions governing priority or security arrangements, including Bonds

that have been issued as general obligations of the Territory Government Issuer to which the Territory Government Issuer pledged the full or good faith, credit, and taxing power of the Territory Government Issuer, separate Pools shall be established corresponding to the relative priority or security arrangements of each holder of Bonds against each Issuer, as applicable, provided, however, that the term "priority" as used in this section shall not be understood to mean differing payment or maturity dates.

**(B)** For each Issuer that has issued senior and subordinated Bonds, separate Pools shall be established for the senior and subordinated Bonds corresponding to the relative priority, or security arrangements.

**(C)** For each Issuer that has issued multiple Bonds, for at least some of which a guarantee of repayment has been provided by the Territory Government Issuer, separate Pools shall be established for such guaranteed and non-guaranteed Bonds.

**(D)** Subject to the other requirements contained in this section, for each Issuer that has issued multiple Bonds, for at least some of which a dedicated revenue stream has been pledged for repayment, separate Pools for such Issuer shall be established as follows—

    **(i)** for each dedicated revenue stream that has been pledged for repayment, not less than one Secured Pool for Bonds for which such revenue stream has been pledged, and separate Secured Pools shall be established for Bonds of different priority; and

    **(ii)** not less than one Pool for all other Bonds issued by the Issuer for which a dedicated

revenue stream has not been pledged for repayment.

**(E)** The Administrative Supervisor shall not place into separate Pools Bonds of the same Issuer that have identical rights in security or priority.

**(4)** Notwithstanding the preceding provisions of this subsection, solely with respect to a preexisting voluntary agreement as described in section 2124(i)(3) of this title, such voluntary agreement may classify Insured Bonds and uninsured bonds in different Pools and provide different treatment thereof so long as the preexisting voluntary agreement has been agreed to by—

**(A)** holders of a majority in amount of all uninsured bonds outstanding in the modified Pool; and

**(B)** holders (including insurers with power to vote) of a majority in amount of all Insured Bonds.

**Rule 7001.  Scope of Rules of Part VII**

An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings: …

> (2)    a proceeding to determine the validity, priority, or extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule 4003(d); …

**F.R. Evid. 408 Compromise Offers and Negotiations**

(a)    **Prohibited Uses**.  Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1)    furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and

> (2)    conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b)    **Exceptions**.  The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

**B.     Statutes – Puerto Rico**

(H. B. 2665)

**(No. 91)**

(Approved May 13, 2006)

# AN ACT

To    create the Urgent Interest Fund (UIF), to be attached to the Department of the Treasury, to provide for its capitalization, and to define the purpose and use thereof; and for other purposes.

## STATEMENT OF MOTIVES

During the past decades, the Government of Puerto Rico has been contracting debts to finance its operation without succeeding in identifying effective methods for their repayment. The current amounts of this extraconstitutional debt have substantially affected government credit. This situation turned more severe during fiscal year 2005-2006, when government expenses once again surpassed revenues, thus creating the government crisis that afflicts the Island at present and which led to layoffs for over 95,000 government employees.

In order to address said situation and as part of a number of legislative measures approved to dispel said crisis, the Urgent Interest Fund is hereby created as a special fund, the moneys of which shall be used to cover the deficit thus generated, as well as other government obligations and debts that seriously affect the credit of the Government of Puerto Rico.

***BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:***

Section 1.—Title.—

This Act shall be known as the "Urgent Interest Fund Act."

Section 2.—Creation.—

The Urgent Interest Fund (UIF) is hereby created, to be administered by the Government Development Bank for Puerto Rico and the Secretary of the Treasury and replenished monthly by the following sources:

(a)     A sum equal to the product of the monthly collection of the sales tax to be approved as part of the Tax Reform, multiplied by a fraction whose numerator shall be one percent (1%) and whose denominator shall be the tax rate of said tax.

(b)     The revenues generated by the sales tax provided by the Tax Reform to be approved pursuant to Joint Resolution No. 321 of November 21, 2005, which exceed the estimate of annual revenues to be generated by said tax in the Budget Resolution for each fiscal year.

Section 3.—Use.—

(a)     The moneys originating from the collections indicated in Section 2(a) shall be deposited into the Urgent Interest Fund and shall be used exclusively for the following purposes:

(1)     To pay the advances to be made by the Government Development Bank pursuant to the Act to Impose the Supertax of 2006.

(2)     To pay or refinance the extraconstitutional debt in existence as of June 30, 2006.

(b)     The moneys originating from the revenues indicated in Section 2(b) shall be deposited into the Urgent Interest Fund and shall be used exclusively for the following purposes:

(1)     To cover the costs of early retirement plans of the Retirement Systems of the Employees of the Commonwealth.

(2)    To service the debt in existence as of June 30, 2006, with the Teachers' Retirement System and the Retirement System of the Employees of the Commonwealth and the Judiciary, in said order of preference.

Section 4.—Disbursements.—

The disbursements to be made to cover the purposes described in Section 3(b) shall be distributed through a Joint Resolution approved by the Legislature. Any amount not used for the purposes established through said Resolution shall revert to the Urgent Interest Fund; provided, further, that any amount of the moneys budgeted for servicing the debt that are payable to the General Fund, shall be kept separate from the moneys originating from the Urgent Interest Fund and to be used for the payment of the extraconstitutional debt.

Any savings resulting from refinancing the constitutional debt may be transferred by the Government Development Bank to the Urgent Interest Fund to be used as additional resources in the payment of the extraconstitutional debt.

Section 5.—Additional Provisions.—

The Legislature hereby commits to approving an expenses budget for fiscal year 2006-2007 that will allow the government to keep public servants in regular employment at their jobs and that will ensure the nonimpairment of the continuity in the direct services provided to citizens. This includes the approval of legislation that shall provide recurring funds for an amount estimated to be not less than three hundred million (300,000,000) dollars and not more than four hundred million (400,000,000) dollars in addition to the revenues of the State under the current tax system, in order to tend to the structural budget deficit.

Periodically, the Legislature shall evaluate the effectiveness of the collections generated under the tax measures established to constitute the Urgent Interest Fund; provided, that once the structural budget deficit has been remedied, the use of said additional recurring funds for a purpose other than tending to the structural budget deficit, shall be transferred in its entirety to the two retirement systems, in proportion to the number of their participants.

Likewise, the Government shall generate annual savings in an amount of not less than three hundred fifty million (350,000,000) dollars during the next three (3) years.

Section 6.—Effectiveness.—

This Act shall take effect immediately after its approval.

**CERTIFICATION**


I hereby certify to the Secretary of State that the following Act <u>No. 91</u> (<u>H.B. 2665</u>) of the

<u>3</u><sup>rd</sup> Session of the <u>15</u><sup>th</sup> Legislature of Puerto Rico:


**AN ACT**  to create the Urgent Interest Fund (UIF), to be attached to the Department of the Treasury, to provide for its capitalization, and to define the purpose and use thereof; and for other purposes,


has been translated from Spanish to English and that the English version is correct.


In San Juan, Puerto Rico, today 22nd of May of 2006.


Francisco J. Domenech
Director

(H. B. 3163)
(Conference)

<strong>(No. 291)</strong>

(Approved December 26, 2006)

# AN ACT

To    amend Sections 2, 3, 4, and 5 of Act No. 91 of May 13, 2006, entitled "Urgent Interest Fund Act," in order to establish the annual fixed amount of revenues originating from the sales and use tax that shall be covered directly into said Fund; to establish the financial structure to pay or refinance the extraconstitutional debt through the issue of bonds and other debentures payable and secured by pledging a fixed amount from the first revenues generated by the sales and use tax deposited into the Urgent Interest Fund; to empower the Secretary of the Treasury, the Director of the Office of Management and Budget, and the Government Development Bank for Puerto Rico to carry out the duties and responsibilities imposed by this Act; to authorize the creation of a subsidiary of the Government Development bank for Puerto Rico, to be called the "Puerto Rico Urgent Interest Fund Corporation," with the power to issue bonds or use other mechanisms to pay or refinance the extraconstitutional debt; and for other purposes relative to the purposes of this Act.

<strong>STATEMENT OF MOTIVES</strong>

Act No. 91 of May 13, 2006, created the Urgent Interest Fund, with the purpose of having covered into the same a portion of the revenues generated by the sales and use tax authorized under Act No. 117 of July 4, 2006, called the "Taxpayers Justice Act of 2006." Said portion is to be used to pay the extraconstitutional debt of the government of the Commonwealth, including the sums advanced by the Government Development Bank for Puerto Rico.

The present Act sets forth the public policy of assigning priority to the payment of the extraconstitutional debt by guaranteeing that the initial revenues proceeding from the sales and use tax shall be covered into the Urgent Interest Fund. Likewise, this Act authorizes the creation of a financial structure which is necessary for the payment of the aforementioned debt and adds repayment sureties for bondholder repayment guarantees similar to those existing in State jurisdictions.

Furthermore, this Act strengthens the Urgent Interest Fund by providing the option of replenishing the same by means of fixed revenue or the existing source, whichever is greater. This Act also establishes as the base for the fixed revenue, the amount of one hundred and seventy (170) million dollars as of Fiscal Year 2007-08, which amount shall be annually increased by four percent (4%). Moreover, this Act provides for fiscal mechanisms to cover a possible insufficiency in the collection of the sales and use tax, if the revenue generated thereby were to be less than the fixed revenue established herein. These repayment guarantees shall allow for additional bond issues to be exclusively used for the payment of the extraconstitutional debt.

***BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:***

Section 1.—Section 2 of Act No. 91 of May 13, 2006, is hereby amended to read as follows:

"Section 2.—Creation.—

A special fund is hereby created, denominated the Urgent Interest Fund, hereinafter the 'UIA,' to be administered by the Government Development Bank for Puerto Rico, hereinafter the 'GDB,' and the Secretary of the Treasury of the Commonwealth of Puerto Rico, hereinafter the 'Secretary.' In consideration of the commitment to pay all or part of the

extraconstitutional debt in existence as of June 30, 2006, the 'UIA' is hereby transferred and shall be the property of the Puerto Rico Urgent Interest Fund Corporation, hereinafter the 'UIFC,' a subsidiary of the Government Development Bank for Puerto Rico created for the purpose of issuing bonds or using other financing mechanisms to pay or refinance the extraconstitutional debt of the Commonwealth of Puerto Rico in existence as of June 30, 2006.

The 'UIF' shall be replenished each year by the following sources, the proceeds of which shall be directly covered into the 'UIF' upon receipt and shall not be covered into the Treasury of Puerto Rico and shall neither constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary:

(a) The first moneys collected on account of the sales and use tax, hereinafter the 'Tax,' approved under the 'Taxpayers Justice Act of 2006,' Act No. 117 of July 4, 2006, corresponding to the Commonwealth of Puerto Rico, up to the following amount: (i) proceeds of the amounts in 'Tax' collected during said fiscal year, multiplied by a fraction of which the numerator shall be one percent (1%) and the denominator shall be the tax rate of said tax, being said fraction one percent (1%) of the 'Tax,' or (ii) the applicable Fixed Revenue, whichever is greater.

(b) The moneys collected on account of the Tax which surpass the annual estimate of moneys to be collected on account of said tax in the Budget Resolution for said fiscal year, after the amounts collected identified in the above clause (a) have been applied.

For purposes of Section 2(a), there shall be no Fixed Revenue for Fiscal Year 2006-2007. The applicable Fixed Revenue as of Fiscal Year 2007-2008 shall be one hundred seventy million (170,000,000) dollars. The

Fixed Revenue applicable to subsequent years shall be the Fixed Revenue applicable to the preceding fiscal year plus four percent (4%) or the percentage increase in the budget approved with that of the preceding year if greater than four percent (4%). For example, the Fixed Revenue applicable to Fiscal Year 2008-2009 shall be one hundred seventy-six million, eight hundred thousand (176,800,000) dollars, which is equal to the sum of the Fixed Revenue Applicable to Fiscal Year 2007-2008 plus four percent (4%) or the percentage increase in the budget approved with that of the preceding year if greater than four percent (4%) of said Fixed Revenue. The Fixed Revenue for any fiscal year shall proceed from the portion corresponding to the Commonwealth of Puerto Rico of the first moneys collected on account of the 'Tax.'"

Section 2.—Subsections (a) and (b) are hereby amended and subsections (c) and (d) added to Section 3 of Act No. 91 of may 13, 2006, to read as follows:

"Section 3.—Use.—

(a) The moneys originating from the collections indicated in Section 2(a) shall be directly deposited into the Urgent Interest Fund and shall be used exclusively for the following purposes:

(1) To pay the advances to be made by the 'GDB' pursuant to the Act to Impose the Supertax of 2006.

(2) To pay or refinance the extraconstitutional debt in existence as of June 30, 2006.

(b) The moneys originating from the collections indicated in Section 2(b) shall be directly deposited into the Urgent Interest Fund and shall be used exclusively for the following purposes:

(1)    To cover the costs of early retirement plans of the Retirement Systems of the Employees of the Commonwealth.

(2)    To service the debt in existence as of June 30, 2006, with the Teachers' Retirement System and the Retirement System of the Employees of the Commonwealth and the Judiciary, in said order of preference.

(c)    The moneys collected indicated in Section 2(a) and deposited in the 'UIF' shall be used by the 'UIFC' through financing or refinancing mechanisms, for the exclusive purpose of directly or indirectly paying or refinancing the extraconstitutional debt of the Commonwealth or Puerto Rico in existence as of June 30, 2006, including amounts owed to the 'GDB' and obligations assumed under any kind of financing contract, surety or interest rate swap contract executed in relation to bonds issued to finance or refinance said debt. The 'UIFC' is hereby authorized to pledge or otherwise encumber all or part of said collected moneys solely for the payment of the payment of the principal, interest and redemption premium of said bonds and other obligations of said instrumentality incurred in relation to said bonds to pay or finance the extraconstitutional debt of the Commonwealth of Puerto Rico and for the payment of obligations assumed under any kind of financing contract, surety or interest rate swap contract executed in relation to said bonds.

(d) 'UIFC' bonds and other obligations shall not constitute an obligation or debt of the Commonwealth of Puerto Rico or of its other instrumentalities. Furthermore, neither the Commonwealth of Puerto Rico nor its other instrumentalities shall be responsible for the payment of such bonds or obligations, which shall not enjoy neither the full faith and credit nor the power of the Government to levy taxes."

III-023

Section 3.—Section 4 of Act No. 91 of May 13, 2006, is hereby amended to read as follows:

"Section 4.—Deposits and Disbursements.—

(a)     During Fiscal Year 2006-2007, a biweekly (every 2 weeks) deposit shall be made into the 'UIF' in the amount established under Section 2(a)(i), as the moneys collected on account of the 'Tax' are received. During each subsequent fiscal year, the first moneys collected on account of the Tax, up to the amount of the Fixed Revenue, shall be covered upon receipt into the 'UIF' or into any other special fund (including a fund under the control of the trustee designated in the trust agreement whereby the bonds were issued or other obligations to pay or finance the extraconstitutional debt were assumed) designated by the 'UIFC.' In the event the moneys collected on account of the 'Tax' amount to less than the Fixed Revenue, the Secretary is hereby empowered to cover such deficiency with any available funds and is authorized, further, as a special measure to manage the cash flow when there is no other option, to take a loan with the 'GDB' to cover such a deficiency, and the Director of the Office of Management and Budget shall include in the recommended budget for the fiscal year in course or for the following fiscal year, the appropriations needed to cover such deficiencies.

(b)     Every month, during each fiscal year, the Secretary shall determine whether one percent (1%) of the Tax collected for the fiscal year in course is greater than the Fixed Revenue applicable to said fiscal year. Once the Secretary determines whether one percent (1) of the 'Tax' collected for said fiscal year surpasses the Fixed Revenue applicable to said fiscal year, all moneys collected on account of the 'Tax' which are received after said determination is made, up to an amount equal to the amount of one

percent (1%) of the Tax in excess of the Fixed Revenue, shall be deposited into the 'UIF.' Furthermore, on or before October 1 of each fiscal year, the Secretary shall determine whether one percent (1%) of the Tax collected for the preceding fiscal year is greater than the Fixed Revenue applicable to said preceding fiscal year. The moneys collected on account of the 'Tax' which represent the amount by which one percent (1%) of the 'Tax' collected corresponding to the preceding fiscal year exceeds the Fixed Revenue applicable to said fiscal year, shall belong to the 'UIF.'

(c)     The disbursements to be made to cover the purposes described in Section 3(b) shall be distributed through a Joint Resolution approved by the Legislature. Any amount not used for the purposes established through said Resolution shall revert to the Urgent Interest Fund; provided, further, that any amount of the moneys budgeted for servicing the debt that are payable to the General Fund, shall be kept separate from the moneys originating from the Urgent Interest Fund and to be used for the payment of the extraconstitutional debt.

Any savings resulting from refinancing the constitutional debt may be transferred by the GDB to the Urgent Interest Fund to be used as additional resources in the payment of the extraconstitutional debt and shall not be available for use by the Secretary for any other purpose.

(d)     The Commonwealth of Puerto Rico hereby agrees and assumes commitment to any person, firm or corporation, or to any agency of the United States of America or of any state or of the Commonwealth of Puerto Rico which underwrites or acquires UIFC bonds, not to limit nor restrict the rights or powers hereby conferred under this Act until said bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn.

(e)     In the event that the amount of the moneys collected on account of the Tax that are assigned to said instrumentality pursuant to Section 3(c) does not suffice at any time to pay the principal and interest or to make any other payment relative to the obligations on moneys taken on loan or bonds issued by said instrumentality for whose payment the proceeds of said 'Tax' have been pledged and the reserve funds, if any, of said instrumentality established for payment of the requirements of the debt are applied to cover the deficiency in the amounts as needed to meet such payments, the amounts of such a reserve fund used to cover the deficiency shall be reimbursed to said instrumentality from the first proceeds received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico originating from any remainder amounts of the 'Tax,' after making the deposits established under Section 2(a). In the event that the moneys collected on account of the Tax do not suffice to cover said reimbursement, the Secretary is hereby empowered to cover such a deficiency with any available funds and is further authorized, as a special measure for the management of cash flow when there is no other option, to take a loan with the 'GDB' to cover such a deficiency, and the Director of the Office of Management and Budget shall include in the budget recommended for the fiscal year in course or for the next fiscal year, the appropriations needed to cover said deficiencies.

(f)     The proceeds of the remainder amounts of the Tax that are to be used under the provisions of Section 4(e) to reimburse any fund of the reserve established for servicing the debt, shall not be covered into the General Fund of the Government of the Commonwealth of Puerto Rico upon collection, but they shall be rather covered into the 'UIF' for the benefit of the instrumentality and shall be used to reimburse said reserve fund for paying the requirements of the debt."

Section 4.—Section 5 of Act No. 91 of May 13, 2006, is hereby amended to read as follows:

"Section 5.—Additional Provisions.—

The Legislature hereby commits to approving an expenses budget for Fiscal Year 2006-2007 that will allow the Government to keep public servants in regular employment at their jobs and that will ensure the nonimpairment of the continuity in the direct services provided to citizens. This shall include the approval of legislation that shall provide additional recurring funds for an amount estimated to be not less than three hundred million (300,000,000) dollars and not more than four hundred million (400,000,000) dollars in addition to the revenues of the Commonwealth under the current tax system, in order to tend to the structural budget deficit.

Periodically, the Legislature shall evaluate the effectiveness of the collections generated under the tax measures referred to in the above paragraph; provided, that once the structural budget deficit has been remedied, the use of said additional recurring funds for a purpose other than tending to the structural budget deficit, shall be transferred in its entirety to the two retirement systems, in proportion to the number of their participants.

Likewise, the Government shall generate annual savings in an amount of not less than three hundred fifty million (350,000,000) dollars during the next three (3) years."

Section 5.—A new Section 6 is hereby added and Section 6 is renamed as Section 7 in Act No. 91 of May 13, 2006, to read as follows:

"Section 6.—Severability.—

If any provision of this Act or the application thereof should be found to be invalid, such a ruling shall not affect the remaining provisions nor the application of this Act which may stand in effect without the provisions thus

found to be invalid, and for this purpose, the provisions of this Act are severable.

Section 7.—Effectiveness.—

…"

Section 6.—If any provision of this Act or the application thereof should be found to be invalid, such a ruling shall not affect the remaining provisions nor the application of this Act which may stand in effect without the provisions thus found to be invalid, and for this purpose, the provisions of this Act are severable.

Section 7.—This Act shall take effect immediately after its approval.

# CERTIFICATION

I hereby certify to the Secretary of State that the following Act <u>No. 291</u> (<u>H.B. 3163</u>) (<u>Conference</u>) of the <u>4</u><sup>th</sup> Session of the <u>15</u><sup>th</sup> Legislature of Puerto Rico:

**AN ACT** to amend Sections 2, 3, 4, and 5 of Act No. 91 of May 13, 2006, entitled "Urgent Interest Fund Act," in order to establish the annual fixed amount of revenues originating from the sales and use tax that shall be covered directly into said Fund; to establish the financial structure to pay or refinance the extraconstitutional debt through the issue of bonds and other debentures payable and secured by pledging a fixed amount from the first revenues generated by the sales and use tax deposited into the Urgent Interest Fund; etc,

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, today 18th of June of 2007.

Francisco J. Domenech
Director

(H. B. 3660)

**(No. 56)**

(Approved July 5, 2007)

# AN ACT

To add a new Section 2, amend and renumber Section 2 as Section 3, renumber Section 3 as Section 4, amend and renumber Section 4 as Section 5, renumber Section 5 as Section 6, add a new Section 7, renumber Sections 6 and 7 as Sections 8 and 9, respectively, of Act 91 of May 13, 2006, as amended, also known as The Dedicated Sales Tax Fund Act, for the purpose of creating the Puerto Rico Sales Tax Financing Corporation as an independent corporation attached to Government Development Bank for Puerto Rico, with the power to issue bonds and use other financing mechanism to pay or refinance the extra-constitutional debt of the Commonwealth of Puerto Rico; to transfer the Dedicated Sales Tax Fund to such Corporation and clarify the scope of the protection enjoyed by the holders of the bonds issued by COFINA.

## STATEMENT OF MOTIVES

Act No. 91 of May 13, 2006 created the Dedicated Sales Tax Fund[*] for the purpose of depositing in the same a portion of the revenues generated by the sales and use tax (IVU, Spanish acronym), authorized by Act No. 117 of July 4, 2006, also known as the "Taxpayers Justice Act of 2006," and of using these revenues to pay the extraconstitutional debt of the government of the Commonwealth of Puerto Rico outstanding as of June 30, 2006.

Act No. 91 was recently amended by Act No. 291 of December 26, 2006, for the purpose of establishing the financial structure necessary to pay or refinance the extraconstitutional debt. Said amendment authorized the

---

[*]    The English name of this Fund, formerly known as the Urgent Interest Fund, is established in Section 3 of this Act.

creation, by means of a resolution of the Board of Directors of the Government Development Bank for Puerto Rico (GDB), of the Puerto Rico Sales Tax Financing Corporation (COFINA, Spanish acronym) as a subsidiary of GDB, for the purpose of enabling this Corporation to issue the bonds that would be used to pay or refinance all or part of the extraconstitutional debt. The source of repayment of these bonds would be a portion of the SUT that is deposited in the Dedicated Sales Tax Fund, which was transferred to COFINA pursuant to said amendment. COFINA was never created by GDB.

If COFINA had been created as a subsidiary of GDB, there would have been adverse financial results for GDB due to the consolidation of the financial statements of COFINA and GDB as required by the accounting standards. Therefore, it is necessary to amend Act No. 91 so that COFINA is created by law as an independent corporation attached to GDB, rather than as one of its subsidiaries. COFINA may only use its powers to achieve the purposes for which it was created.

It is the intention of this Legislature to increase the amount of funds that are deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Act No. 91 so that they be used to pay the extraconstitutional debt, that they be owned by COFINA until such time as the extraconstitutional debt outstanding as of June 30, 2006 has been paid, and that such funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose, including for purposes of Section 8 of Article VI of the Constitution.

**BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:**

Section 1.- A new Section 2 is hereby added to Act No 91 of May 13, 2006, as amended, to read as follows:

"Section 2.- Creation of the Public Corporation

A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the *Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA")*, whose name in English shall be Puerto Rico Sales Tax Financing Corporation ("PRSTFC"). COFINA is created for the purpose of issuing bonds and utilizing other financing mechanisms to pay or refinance, directly or indirectly, all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the accrued interest thereon, using as a source of repayment the portion of the tax deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Section 3(a) of this Act. Notwithstanding the provisions of Section 4, COFINA may use any necessary amount from the moneys received from the collections indicated in Sections 3(a) and 5(e) or the proceeds from the sale of the bonds issued pursuant to the provisions of this Act, to pay the expenses incurred in connection with the issuance and sale of such bonds, including those expenses related to insurance, letters of credit or other instruments, and to defray any operating expense. COFINA shall be attached to the Government Development Bank for Puerto Rico, hereinafter "GDB." The Board of Directors of COFINA shall be the Board of Directors of the GDB. COFINA shall have the same powers, rights and faculties granted to the GDB pursuant to the provisions of its Constitutional Charter, which powers shall only be exercised to carry out the purposes for which COFINA was created, but it shall not have the power to act as fiscal agent of the government. The revenues, operations and properties of the COFINA shall enjoy the same tax exemption enjoyed by the GDB and the bonds, notes and

other obligations of COFINA and the income derived therefrom shall enjoy the same tax exemption enjoyed by the bonds, notes and other obligations of the GDB."

Section 2.-  Section 2 is hereby amended and renumbered as Section 3 of Act No. 91 of May 13, 2006, as amended to read as follows:

"Section 3.—Creation of the Special Fund.—

A special fund is hereby created, to be known as the *Fondo de Interés Apremiante*, hereinafter "FIA" (Spanish acronym), whose name in English shall be Dedicated Sales Tax Fund, to be administered by GDB for Puerto Rico and the Secretary of the Treasury of the Commonwealth of Puerto Rico, hereinafter the 'Secretary.' The FIA and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the FIA pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006 and the accrued interest thereon, with the net proceeds of the bond issues or FIAs and resources available to COFINA.

The FIA shall be funded each fiscal year from the following sources, the product of which shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary:

> (a)  The first revenues of the sales and use tax, hereinafter "Tax," approved by the "Taxpayers Justice Act of 2006," Act No. 117 of July 4, 2006, corresponding to the Commonwealth of Puerto Rico up to the amount of: (i)

the product of the amount of the Tax collected during such fiscal year multiplied by a fraction whose numerator shall be one percent (1%) and whose denominator shall be the rate of such tax, such fraction being hereinafter denominated "the one percent (1%) of the Tax," or (ii) the applicable Fixed Income, whichever is greater.

(b)     The revenues generated by the Tax that exceed the annual estimate of revenues to be generated by such Tax in the Budget Resolution for such fiscal year after having deposited the revenues identified in clause (a) above.

For purposes of Section 3(a), there shall be no Fixed Income for Fiscal Year 2006-2007.  The Fixed Income applicable in Fiscal Year 2007-2008 shall be one hundred eighty-five million (185,000,000) dollars.  The Fixed Income applicable to subsequent fiscal years shall be the Fixed Income applicable to the prior fiscal year plus four percent (4%).  As example, the Fixed Income applicable to Fiscal Year 2008-2009 shall be equal to one hundred ninety-two million four hundred thousand (192,400,000) dollars, which is equal to the Fixed Income applicable to fiscal year 2007-2008 plus four percent (4%).  The Fixed Income for any fiscal year shall be funded from the first revenues of the Commonwealth of Puerto Rico's portion of the Tax."

Section 3.- Section 3 is hereby amended and renumbered as Section 4 of Act No. 91 of May 13, 2006, as amended, to read as follows:

"Section 4. – Use

(a)     The moneys originating from the revenues indicated in Section 3(a) shall be deposited directly in the Dedicated Sales Tax Fund and shall be used exclusively for the following purposes:

(1) Pay the advances to be made by GDB pursuant to the Act to Impose the Supertax of 2006.

(2) Pay or refinance the extraconstitutional debt outstanding as of June 30, 2006.

(b) The moneys derived from the revenues indicated in Section 3(b) shall be deposited directly in the Dedicated Sales Tax Fund and shall be used exclusively for the following purposes:

(1) To absorb the costs of the early retirement plans of the Commonwealth Employees Retirement System.

(2) To amortize the debt outstanding as of June 30, 2006 with the Teachers Retirement System and the Commonwealth of Puerto Rico Employees' Retirement System and the Judiciary, and in such preferential order.

(c) The revenues identified in Section 3(a) deposited in the FIA shall be used by COFINA, pursuant to financing or refinancing mechanisms, exclusively for the purpose of paying or refinancing, directly or indirectly, the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, including amounts owed to GDB and the obligations incurred under any type of financing or guaranty agreement or interest rate swap agreement executed with respect to bonds issued to finance or refinance such debt. COFINA is hereby authorized to pledge and otherwise encumber all or part of such revenues solely for the payment of principal, interest and redemption premium of such bonds and other obligations of such instrumentality that were incurred with respect to such bonds to pay or finance the extraconstitutional debt of the

Commonwealth of Puerto Rico and the payment of obligations incurred under any type of financing or guaranty agreement or interest rate swap agreement executed with respect to such bonds.

(d)     The bonds and other obligations of COFINA shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities.     Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

Section 4. – Section 4 is hereby amended and renumbered as Section 5 of Act No. 91 of May 13, 2006, as amended, to read as follows:

"Section 5. – Deposits and Disbursements

(a)     During Fiscal Year 2006-2007, the amount established in Section 3(a)(i) shall be deposited biweekly (2 weeks) in the FIA as they are received from the collections of the Tax.  During each subsequent fiscal year, the first revenues of the Tax, up to the amount of the Fixed Income, shall be deposited the moment they are received in FIA or in any other special fund (including a fund controlled by a trustee designated in the trust agreement under which bonds were issued or other obligations were incurred for the payment or financing of the extraconstitutional debt) designated by COFINA.  In case the revenues from the Tax are less than the Fixed Income, the Secretary shall be authorized to cover such shortfall from any available funds and

is also authorized, as a special cash flow management mechanism when no other alternative is available, to borrow from GDB to cover such shortfall and the Director of the Office of Management and Budget shall include in the recommended budget for the current fiscal year or the next fiscal year, the appropriations necessary to cover such shortfall.

(b)     Each month during each fiscal year, the Secretary shall determine if the one percent (1%) of the Tax for the current fiscal year is greater than the Fixed Income applicable to such fiscal year.  Once the Secretary determines that the one percent (1%) of the Tax for such fiscal year exceeds the Fixed Income applicable for such fiscal year, all revenues of the Tax received after such determination, up to an amount equal to the excess of such one percent (1%) of the Tax over the Fixed Income, shall be deposited in the FIA.  Furthermore, on or prior to October 1 of each fiscal year, the Secretary shall determine if the one percent (1%) of the Tax for the prior fiscal year is greater than the Fixed Income applicable to such prior fiscal year.  The revenues of the Tax that represent the excess amount of the one percent (1%) of the Tax for the prior fiscal year over the Fixed Income applicable to such fiscal year shall be the property of the FIA.

(c)     The disbursements to be made to cover the purposes described in Section 4(b) shall be distributed by means of a Joint Resolution approved by the Legislature.  Any amount that remains unused for the purposes established pursuant to such Joint Resolution shall revert to the Dedicated Sales Tax Fund;

provided, further that any amount of the moneys budgeted for the payment of debt service payable from the General Fund shall be kept separate from the moneys to be used for the payment of the extraconstitutional debt proceeding from the Dedicated Sales Tax Fund.

Any savings as a result of a refinancing of the extraconstitutional debt may be transferred by GDB to the Dedicated Sales Tax Fund to be used as additional resources for the payment of the extraconstitutional debt and shall not be available for use by the Secretary for any other purpose.

(d)     The Commonwealth of Puerto Rico hereby agrees and promises any person, firm or corporation or any agency of the United States of America or of any state or the Commonwealth of Puerto Rico that subscribe or acquire bonds issued by COFINA, to not limit nor restrain the rights or powers hereby conferred by this Act or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be completely paid and redeemed.  No amendment to Act No. 91 of May 13, 2006, as amended, shall undermine any obligation or commitment of COFINA.

(e)     In the event that the aggregate revenues of the Tax transferred to such instrumentality in conformity with Section 3(a)were to be , at any time, insufficient for the payment of principal and interest or to make any other payment related to other obligations incurred, including payments pursuant to interest rate swap agreements, in connection with borrowed moneys or

bonds issued by such instrumentality for the payment of which the product of such Tax has been pledged or in case the reserve funds of such instrumentality, if any, established for the payment of the debt service requirements or such obligations are applied to cover the shortfall in the amounts necessary to make such payments, such insufficiencies and the amount of such reserve fund used to cover the shortfall shall be paid or reimbursed to such instrumentality from the first amounts received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico from any remaining portion of the Tax after making the deposits established by Section 3(a). In case the revenues from the Tax were to be insufficient to cover such payment or reimbursement, the Secretary is hereby authorized to cover such shortfall from any funds available and is further authorized, as a special cash flow management mechanism when no other alternative is available, to borrow money from GDB to cover such shortfall, and the Director of the Office of Management and Budget shall include in the recommended budget for the current fiscal year or the next fiscal year, the appropriations necessary to cover such deficiencies.

(f)     The product of the remaining portion of the Tax that shall be used pursuant to the provisions of Section 5(e) to cover an insufficiency or reimburse any reserve fund established for debt service requirements, shall not be deposited in the General Fund of the Government of the Commonwealth of Puerto Rico when they are collected, but shall be deposited in the FIA for

the benefit of the instrumentality and shall be used to cover such insufficiency or reimburse such reserve fund for the payment of debt service requirements."

Section 5. – Section 5 is hereby renumbered as Section 6 of Act No. 91 of May 13, 2006, as amended.

Section 6. – A new Section 7 is hereby added to Act No. 91 of May 13, 2006, as amended, to read as follows:

"Section 7. – Scope

(a)     None of the provisions of this Act shall be interpreted or applied in such a manner as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

(b)     None of the provisions of this Act shall be interpreted or applied in such a manner as to undermine the rights of the holders of bonds or notes that constitute public debt of the Commonwealth of Puerto Rico pursuant to the provisions of Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico."

Section 7. –Sections 6 and 7 are hereby renumbered as Sections 8 and 9, respectively, of Act No. 91 of May 13, 2006, as amended.

Section 8. – If any provision of this Act or the application of such provision is declared invalid, such declaration shall not affect the other provisions or the application of this Act that may have effect without the need for the provisions that were declared invalid, and to this end the provisions of this Act are severable.

Section 9. – This Act shall take effect immediately after its approval.

# CERTIFICATION

I hereby certify to the Secretary of State that the following Act <u>No. 56</u> (<u>H.B. 3660</u>) of the 5th Session of the <u>15th</u> Legislature of Puerto Rico:

**AN ACT** to add a new Section 2, amend and renumber Section 2 as Section 3, renumber Section 3 as Section 4, amend and renumber Section 4 as Section 5, renumber Section 5 as Section 6, add a new Section 7, renumber Sections 6 and 7 as Sections 8 and 9, respectively, of Act 91 of May 13, 2006, as amended, also known as The Dedicated Sales Tax Fund Act, for the purpose of creating the Puerto Rico Sales Tax Financing Corporation as an independent corporation attached to Government Development Bank for Puerto Rico, with the power to issue bonds and use other financing mechanism to pay or refinance the extra-constitutional debt of the Commonwealth of Puerto Rico; to transfer the Dedicated Sales Tax Fund to such Corporation and clarify the scope of the protection enjoyed by the holders of the bonds issued by COFINA,

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, today 12th of July of 2007.


Enrique A. Del Cueto, Esq.
Deputy Director

(H. B. 598)

(No. 1)

(Approved January 14, 2009)

# AN ACT

To    amend Sections 2, 3, 4, and 5 of Act No. 91 of May 13, 2006, as amended, known as the "Dedicated Sales Tax Fund Act," in order to increase the amount of revenues from the sales and use tax to be deposited into the Dedicated Sales Tax Fund and to authorize the Puerto Rico Sales Tax Financing Corporation to use the proceeds of any bond issue whose repayment is backed by such revenues to cover operating expenses of the Commonwealth of Puerto Rico for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, which shall be included into the annual budget of the Government of Puerto Rico, to pay the debts of the Secretary of the Treasury with the Government Development Bank for Puerto Rico, to pay any extraconstitutional debt and outstanding accounts payable of the Commonwealth of Puerto Rico, to authorize and replenish a special fund in the Government Development Bank for Puerto Rico geared toward stimulating the economy of Puerto Rico and to replenish the Emergency Fund of the Commonwealth of Puerto Rico; and for other purposes.

## STATEMENT OF MOTIVES

The Commonwealth of Puerto Rico is undergoing one of the worst fiscal crises in its history, with a budgetary deficit for fiscal year 2008-2009 estimated to total around $ 3.2 billion. Under the present revenue and expense structure, the next three fiscal years would also experience budgetary deficits of approximately $ 3 billion a year. These deficits represent almost forty percent (40%) of recurrent revenues. This situation is the aftermath of eight years during which the Executive Branch failed to

take the necessary measures to establish a balanced budget. In view of the seriousness of the situation, the Governor signed an executive order declaring a state of fiscal emergency on January 8, 2009.

Due to the magnitude of the budgetary deficit for fiscal year 2008-2009 and the projected deficits for the subsequent three fiscal years, and in order to prevent Government operations from been adversely affected, it is necessary to resort to financing mechanisms so as to raise more resources that shall enable the Government to (i) defray and/or finance its operating expenses; (ii) meet obligations assumed by the Secretary of the Treasury with the Government Development Bank for Puerto Rico ("GDB"), including debts with no repayment sources or which are payable from budget appropriations, so as to prevent the GDB financial condition from deteriorating, since its financial solidity is crucial for the credit of Puerto Rico; (iii) pay in full the million-dollar sums owed by the Government to its goods and services providers, so as to boost the economy of Puerto Rico; (iv) establish an economic stimulus fund with the purpose of engaging in loans or investments geared toward rebuilding the economy of Puerto Rico; and (v) replenish the Emergency Fund of the Commonwealth of Puerto Rico. Any financing mechanism would be implemented jointly with a series of executive, legislative and administrative measures aimed at cutting back on expenses, restoring fiscal controls, increasing revenues, and preventing agencies, instrumentalities, departments, and entities of the Commonwealth of Puerto Rico from spending beyond their budgetary allotments and the revenues available, all of which aims to render recurrent expenses equal to or lesser than recurrent revenues by fiscal year 2011-2012. Once these measures have been implemented on a short, a medium, and a long-term basis, and a budgetary balance is stricken between recurrent

expenses and recurrent revenues, it shall no longer be necessary to resort to financing mechanisms in order to cover the recurrent expenses of the Government and its instrumentalities.

The most cost-effective financing source are the bonds issued by the Puerto Rico Sales Tax Financing Corporation (COFINA, Spanish acronym), since the payment thereof is backed by revenues from the sales and use tax—a consistent and reliable revenue source—these enjoy a credit rating which is higher than that of the general obligation bonds of the Commonwealth of Puerto Rico.

In order to accomplish the foregoing objectives, this Act hereby amends Act No. 91 of May 13, 2006, as amended ("Act No. 91"), so as to increase the amount of moneys from the sales and use tax to be deposited into the Dedicated Sales Tax Fund, created by Act No. 91. This shall enable COFINA to make new bond issues backed by the increase in the revenues appropriated to COFINA. Furthermore, Act No. 91 is amended so as to allow the proceeds from said bonds to be used also to: (i) pay the debt of the Secretary of the Treasury with the GDB for the amount of $ 1 billion, used to finance the budgetary deficit of fiscal year 2008-2009, (ii) pay financings granted to the Secretary of the Treasury until December 31, 2008, by the GDB, payable from future general obligation bond issues of the Commonwealth of Puerto Rico, (iii) pay accounts payable to providers and the entire debt that the Secretary of the Treasury has with the GDB, (iv) pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal years 2008-2009, 2009-2010, and 2010-2011, (v) pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal year 2011-2012, which shall be included in the annual budget of the Government of Puerto

Rico, (vi) generate funds to replenish the Puerto Rico Economic Stimulus Fund, established under Section 5 of this Act, and (vii) replenish the Emergency Fund of the Commonwealth of Puerto Rico to meet expenses arising as a result of a catastrophic event, such as hurricanes or floods.

When increasing the amount of moneys from the sales and use tax to be deposited into the Dedicated Sales Tax Fund under the amendment made by this Act, the Legislature is aware of the fact that the resources of the Commonwealth of Puerto Rico that are available after such an increase for the payment of the existing public debt surpass the margin established under Article VI, Section 2 of the Constitution of the Commonwealth of Puerto Rico. With the purpose of safeguarding the revenues of the General Fund to be available for servicing the public debt of the Commonwealth of Puerto Rico, a limitation is hereby imposed on the increase in the Fixed Income encumbered for the payment of COFINA bonds and on the amount of such bonds that may be issued.

This Legislature intends for the prohibition provided under Section 5 of Act No. 103 of May 25, 2006, known as the "Commonwealth of Puerto Rico Government Fiscal Reform Act of 2006," not to apply to the COFINA bond issues authorized by this Act.

***BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:***

Section 1.—Section 2 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 2.—Creation of the Public Corporation.—

(a)     A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the *Corporación del Fondo de Interés Apremiante de Puerto*

*Rico* ('COFINA,' Spanish acronym), whose name in English shall be Puerto Rico Sales Tax Financing Corporation.

(b)     COFINA is created for the purpose of issuing bonds and utilizing other financing mechanisms for the following ends: (i) to pay or refinance, directly or indirectly, all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the accrued interest thereon, (ii) to pay all or part of the debt of the Secretary of the Treasury with the Government Development Bank for Puerto Rico in the amount of $ 1 billion, used to finance the budgetary deficit of fiscal year 2008-2009, (iii) to pay all or part of the financings granted to the Secretary of the Treasury until December 31, 2008, by the Government Development Bank for Puerto Rico, payable from future general obligation bond issues of the Commonwealth of Puerto Rico, as well as any debt with no repayment source or which is payable from budget appropriations of the Commonwealth of Puerto Rico, existing on December 31, 2008, (iv) to pay all or part of the accounts payable to providers of the Commonwealth of Puerto Rico, (v) to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal years 2008-2009, 2009-2010, and 2010-2011, (vi) to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal year 2011-2012, which shall be included into the annual budget of the Government of Puerto Rico, (vii) to generate funds to replenish the Puerto Rico Economic Stimulus Fund established under Section 6 of this Act, and (viii) to replenish the Emergency Fund of the Commonwealth of Puerto Rico to meet expenses arising as a result of a catastrophic event, such as hurricanes or floods.

(c)     The source of repayment for COFINA bonds shall be the portion of the tax deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Section 3(a) of this Act. The Board of Directors of COFINA shall not authorize any COFINA bond issue unless the Chair or a COFINA officer designated by the Chair certifies that the principal of and interest on the COFINA bonds he/she intends to authorize, plus the principal of and interest on all outstanding COFINA bonds (except those to be paid with the proceeds of new bonds), payable each fiscal year (beginning with the current fiscal year), is equal to or lesser than the Fixed Income appropriated to COFINA corresponding to such fiscal year.

(d)     Notwithstanding the provisions of Section 4, COFINA may use any necessary amount from the moneys received from the revenues indicated in Sections 3(a) and 5(d) or the proceeds from the sale of the bonds issued pursuant to the provisions of this Act, to pay the expenses incurred in connection with the issuance and sale of such bonds, including those expenses related to insurance, letters of credit or other instruments, and to defray any operating expense.

(e)     COFINA shall be attached to the Government Development Bank for Puerto Rico (hereinafter, 'GDB').  The Board of Directors of COFINA shall be the Board of Directors of the GDB.  COFINA shall have the same powers, rights and faculties granted to the GDB pursuant to the provisions of its Constitutional Charter, which powers shall only be exercised to carry out the purposes for which COFINA was created, but it shall not have the power to act as fiscal agent of the government.  The revenues, operations and properties of the COFINA shall enjoy the same tax exemption enjoyed by the GDB and the bonds, notes and other obligations

of COFINA and the income derived therefrom shall enjoy the same tax exemption enjoyed by the bonds, notes and other obligations of the GDB.

(f)     The prohibitions of Section 5 of Act No. 103 of May 25, 2006, known as the 'Commonwealth of Puerto Rico Government Fiscal Reform Act of 2006,' shall not apply to the COFINA bond issues authorized by this Act."

Section 2.—Section 3 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 3.—Creation of the Special Fund.—

A special fund is hereby created, to be known as the *Fondo de Interés Apremiante* (hereinafter, 'FIA'), whose name in English shall be Dedicated Sales Tax Fund, to be administered by GDB. The FIA and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the FIA pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006, and the accrued interest thereon, and for the other purposes established in Section 2(b) of this Act, with the net proceeds of the bond issues or funds and resources available to COFINA.

The FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico (hereinafter, the 'Secretary'):

(a)     The first revenues of the sales and use tax (hereinafter, 'Tax') approved by the 'Taxpayers Justice Act of 2006,' Act No. 117 of July 4, 2006, corresponding to the Commonwealth of Puerto Rico up to the amount of:

(i)     the proceeds of the amount of the Tax collected during such fiscal year, multiplied by a fraction whose numerator shall be two percent (2%) and whose denominator shall be the rate of such tax, such fraction being hereinafter denominated 'the two percent (2%) of the Tax,' or (ii) the applicable Fixed Income, whichever is greater.

For purposes of Section 3(a) of this Act, there shall be no Fixed Income for Fiscal Year 2006-2007.  The Fixed Income for each fiscal year shall be equal to the sum of the Original Fixed Income and the Additional Fixed Income. The Original Fixed Income for Fiscal Year 2007-2008 shall be one hundred eighty-five million (185,000,000) dollars.  The Original Fixed Income for each subsequent fiscal year shall be equal to the Original Fixed Income for the prior fiscal year plus four percent (4%), up to a maximum of one billion, eight hundred and fifty million (1,850,000,000) dollars. The Additional Fixed Income for fiscal years 2006-2007, 2007-2008, and 2008-2009 shall be equal to zero (0) dollars. The Additional Fixed Income for fiscal year 2009-2010 shall be equal to two hundred million, ninety-six thousand (200,096,000) dollars. The Additional Fixed Income for each subsequent fiscal year shall be equal to the Additional Fixed Income for the prior fiscal year plus four percent (4%), up to the fiscal year in which the sum of Original Fixed Income and the Additional Fixed Income equals one billion, eight hundred and fifty million (1,850,000,000) dollars ('Peak Year'). The Additional Fixed Income for each fiscal year

following the Peak Year shall be reduced to the amount necessary for the sum of the Original Fixed Income and the Additional Fixed Income to equal one billion, eight hundred and fifty million (1,850,000,000) dollars. The Fixed Income for any fiscal year shall be funded from the first revenues of the Commonwealth of Puerto Rico's portion of the Tax."

Section 3.—Section 4 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 4.—Use.—

(a)     The moneys originating from the revenues indicated in Section 3(a) shall be deposited directly in the FIA and shall be used exclusively for any of the following purposes:

(1)     To pay the advances to be made by GDB pursuant to the Act to Impose the Supertax of 2006.

(2)     To directly or indirectly pay or refinance all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the accrued interest thereon.

(3)     To directly or indirectly pay the items established in Section 2(b) and the bonds issued by COFINA to meet the purposes established in said Section 2(b).

(b)     The revenues identified in Section 3(a) deposited in the FIA shall be used by COFINA, pursuant to financing or refinancing mechanisms, exclusively for the purpose of paying, financing or refinancing, directly or indirectly, the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and all other debts, accounts or items mentioned in Section 2(b), including amounts owed to GDB and the obligations incurred under any type of financing or guaranty agreement or interest rate swap agreement executed with respect to bonds issued to

finance or refinance such debt. COFINA is hereby authorized to pledge and otherwise encumber all or part of such revenues solely for the payment of principal, interest and redemption premium of such bonds and other obligations of such instrumentality that were incurred with respect to such bonds to meet the purposes set forth in this Act and the payment of obligations incurred under any type of financing or guaranty agreement or interest rate swap agreement executed with respect to such bonds.

(c)    Amounts deposited into the FIA in excess of the amounts necessary to pay the principal of and interest on COFINA bonds, to meet the obligations assumed under bond issue documents or to make any other payment relative to other obligations incurred by COFINA, including payments under interest rate swaps, in connection with money taken on loan or bonds issued by said instrumentality for the payment, of which the proceeds of such Tax has been pledged, may be transferred to the General Fund of the Commonwealth of Puerto Rico. In order to be able to make such transfer, the same shall be authorized by the COFINA Board of Directors, upon certification of the fact that the amounts to be transferred are not necessary to meet any obligation of COFINA. Any transfers to be made shall be provided for through a Joint Resolution of the Legislature.

(d)    The bonds and other obligations of COFINA shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities. Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

Section 4.—Section 5 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 5.—Deposits and Disbursements.—

(a)    During Fiscal Year 2006-2007, the amount established in Section 3(a)(i) shall be deposited biweekly (2 weeks) in the FIA as the same is received from the revenues from the Tax.  During each subsequent fiscal year, the first revenues from the Tax, up to the amount of the Fixed Income, shall be deposited the moment they are received in FIA or in any other special fund (including a fund controlled by a trustee designated in the trust agreement under which bonds were issued or other obligations were incurred to meet the purposes established in Section 2(b) of this Act) designated by COFINA.  In case the revenues from the Tax are less than the Fixed Income, the Secretary shall be authorized to cover such shortfall from any available funds and is also authorized, as a special cash flow management mechanism when no other alternative is available, to borrow from GDB to cover such shortfall and the Director of the Office of Management and Budget shall include in the recommended budget for the current fiscal year or the next fiscal year, the appropriations necessary to cover such shortfall.

(b)    Each month during each fiscal year, the Secretary shall determine if the two percent (2%) of the Tax for the current fiscal year is greater than the Fixed Income applicable to such fiscal year.  Once the Secretary determines that the two percent (2%) of the Tax for such fiscal year exceeds the Fixed Income applicable for such fiscal year, all revenues from the Tax received after such determination, up to an amount equal to the excess of such two percent (2%) of the Tax over the Fixed Income, shall be deposited in the FIA.  Furthermore, on or prior to October 1 of each fiscal year, the Secretary shall determine if the two percent (2%) of the Tax for the prior fiscal year is greater than the Fixed Income applicable to such prior fiscal year.  The revenues from the Tax that represent the excess amount of

the two percent (2%) of the Tax for the prior fiscal year over the Fixed Income applicable to such fiscal year shall be the property of the FIA.

(c)     The Commonwealth of Puerto Rico hereby agrees and promises any person, firm or corporation or any agency of the United States of America or of any state or the Commonwealth of Puerto Rico who underwrites or acquires bonds issued by COFINA, or who provides insurance, repayment or solvency sources for such bonds, that until such bonds, from any date, together with the interest thereon, entirely paid for and withdrawn, the Commonwealth shall not limit nor restrain the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the FIA pursuant to the provisions of this Act; provided, that the foregoing provisions do not limit the power of the Commonwealth of Puerto Rico, by means of a law amendment, to limit or hinder the nature or the amount of such taxes or other revenues or to substitute similar or comparable collateral by other taxes, fees, charges or other income to be deposited into the FIA if, for the following fiscal years, the revenues projected by the Secretary of the Treasury from such substitutive tax, income or collateral is equal to or greater than the service of the debt and other charges and any coverage requirement included in the COFINA bond authorizing documents, nor shall the Commonwealth limit or hinder the powers hereby conferred by this Act or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be completely paid and redeemed.  No amendment to Act No. 91 of May 13, 2006, as amended, shall undermine any obligation or commitment of COFINA.

(d)　　In the event that the aggregate revenues from the Tax transferred to COFINA in conformity with Section 3(a)were to be, at any time, insufficient for the payment of principal of and interest on its bonds or to make any other payment related to other obligations incurred, including payments pursuant to interest rate swap agreements, in connection with borrowed moneys or bonds issued by such instrumentality for the payment of which the proceed of such Tax has been pledged or in case the reserve funds of COFINA, if any, established for the payment of the debt service requirements or such obligations are applied to cover the shortfall in the amounts necessary to make such payments, such insufficiencies and the amount of such reserve fund used to cover the shortfall shall be paid or reimbursed to such instrumentality from the first amounts received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico from any remaining portion of the Tax after making the deposits established by Section 3(a). In case the revenues from the Tax were to be insufficient to cover such payment or reimbursement, the Secretary is hereby authorized to cover such shortfall from any funds available and is further authorized, as a special cash flow management mechanism when no other alternative is available, to borrow money from GDB to cover such shortfall, and the Director of the Office of Management and Budget shall include in the recommended budget for the current fiscal year or the next fiscal year, the appropriations necessary to cover such deficiencies.

(e)　　The proceeds of the remaining portion of the Tax that shall be used pursuant to the provisions of Section 5(d) to cover an insufficiency or reimburse any reserve fund established for debt service requirements, shall not be deposited in the General Fund of the Government of the Commonwealth of Puerto Rico when they are collected, but shall be

deposited in the FIA for the benefit of the instrumentality and shall be used to cover such insufficiency or reimburse such reserve fund for the payment of debt service requirements."

Section 5.—A new Section 6 is hereby added to Act No. 91 of May 13, 2006, as amended, and current Sections 6 and 7 are hereby renumbered as Sections 7 and 8, to read as follows:

"Section 6.—Puerto Rico Economic Stimulus Fund.—The Government Development Bank for Puerto Rico is hereby authorized to establish a fund under its control and custody, under the name "Puerto Rico Economic Stimulus Fund," which shall be replenished by the proceeds of the bond issues or other financing mechanisms employed by COFINA hereby assigned. The funds deposited into the Puerto Rico Economic Stimulus Fund may only be used for the following purposes: taxpayer relief, boosting businesses and industries, training programs, assistance for displaced employees, and any other purposes as provided for through legislation.

Section 7.—Additional Provisions.—…

Section 8.—Scope.—…"

Section 6.—If any provision of this Act or the application of such provision is declared invalid, such declaration shall not affect the other provisions or the application of this Act that may have effect without the need for the provisions that were declared invalid, and to this end the provisions of this Act are severable.

Section 7.—This Act shall take effect immediately after its approval.

**CERTIFICATION**


I hereby certify to the Secretary of State that the following Act <u>No. 1</u> (<u>H.B. 598</u>) of the <u>1</u>st

Session of the <u>16</u>th Legislature of Puerto Rico:


**AN ACT**  to amend Sections 2, 3, 4, and 5 of Act No. 91 of May 13, 2006, as amended, known as the "Dedicated Sales Tax Fund Act," in order to increase the amount of revenues from the sales and use tax to be deposited into the Dedicated Sales Tax Fund and to authorize the Puerto Rico Sales Tax Financing Corporation to use the proceeds of any bond issue whose repayment is backed by such revenues to cover operating expenses of the Commonwealth of Puerto Rico for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, etc,


has been translated from Spanish to English and that the English version is correct.


In San Juan, Puerto Rico, today 21st of January of 2009.



Kevin Miguel Rivera-Medina, Esq.
Deputy Director

(H. B. 1326)

**(No. 7)**

(Approved March 9, 2009)

**AN ACT**

To    create the "Special Act to Declare a State of Fiscal Emergency and to Establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico," in order to responsibly address from an integrative approach the fiscal crisis currently experienced by the Government of Puerto Rico, protect the credit of Puerto Rico pursuant to Article VI, Section 8 of the Constitution, provide for a fiscal stabilization plan, eliminate the structural deficit pursuant to the mandate under Article VI, Section 7 of the Constitution, restore the fiscal health of the Government and lay the groundwork for the Government to be able to boost the economic development of Puerto Rico by means of a comprehensive plan consisting of Revenue and Better Oversight Measures, Spending Cutback Measures, and Financial Measures; in the matter of revenues and better oversight, to amend clauses (1), (2), and (3) of subsection (b) and add a subclause (D) to clause (2) of subsection (c) of Section 1011, amend subsection (a) of Section 1018, add a new Section 1020A, amend Section 1040D, amend clause (5) of subsection (e) of Section 1040K, add a new Section 1040M, amend Section 2008, amend clause (1) of subsection (b) of Section 2011, repeal Section 2407, amend subsection (a), clauses (1) and (2) of subsection (c), and eliminate clause (3) of subsection (c) of Section 2502, amend subsections (a), (b), (c), and (d) of Section 2602, amend subsections (a) and (b) of Section 2606; subsection (e) of Section 2607; amend subsection (a) and add a new subsection (b) to Section 2704, add new Sections 3701, 3702, 3703, 3704, 3705, 3706, 3707, and 3708 to the new Subtitle CC, amend subsections (b) and (c) of Section 4002, amend subsection (a) of Section 4023, amend subsection (a) of Section 6001, amend subsection (f) of Section 6002, add a new subsection (g) to Section 6006, and amend subsection (a) of Section 6046A of Act No. 120 of October 31, 1994, as amended, better known as the "Puerto Rico

Internal Revenue Code of 1994"; to establish transitory provisions; Section 34.180 of Act No. 77 of June 19, 1957, as amended; Section 6.08 of Act No. 255 of October 28, 2002, as amended; Section 16 of Act No. 88 of June 21, 1966, as amended; Section 25 of Act No. 52 of August 11, 1989, as amended, Section 3 of Act No. 2 of January 20, 1966, as amended; subsection (c) of Section 16 of Act Number 80 of August 30, 1991, as amended; to establish the powers of the Governor, the jurisdiction of the Supreme Court of Puerto Rico, immunity as to lawsuits and forums; the severability and effectiveness; all of the foregoing, with the specific purpose, among other things, of modifying the basis to levy an Basic Minimum Tax on individual net income; to eliminate the ability to claim a Credit for Purchasing Products Manufactured in Puerto Rico to export against the credit on the sales and use tax; to increase excises on cigarettes; to include motorcycles as "automobiles" for purposes of excise tax on motor vehicles; to eliminate the resale certificate exempting vendors in relation to the sales and use tax by replacing the same with a credit for taxes paid and reschedule the deadline for paying taxes and filing monthly returns to an earlier date; to increase excise tax on certain alcoholic beverages; to modify the computation to assess alternative minimum tax on corporations; to levy a special surtax on individuals and corporations; to establish a special income tax at a rate of 5% to be levied on cooperative insurers; to establish a special income tax at a rate of 5% to be levied on cooperative savings and credit unions; to establish a special income tax at a rate of 5% to be levied on the Puerto Rico Cooperative Bank; to establish a special income tax at a rate of 5%, to be levied on International Insurers or International Insurer Holding Companies; to establish a special income tax at a rate of 5%, to be levied on international banking entities; to levy a special tax on residential real property; to establish a three (3)-year moratorium on claims over certain tax credits; exclude the UPR and the municipalities, the revenues, moneys collected, and income earned by virtue of the Special Act to Declare a State of Fiscal Emergency and to Establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico from the computation of the appropriation of funds; as to cutbacks on spending, to establish a three-phase plan to reduce the government payroll; and as to financial measures, throughout Puerto Rico as well as in its municipalities, to add a new Section 14 and renumber Section 14 as Section 15 of Act No. 2 of October 10, 1985; to amend Section 6B of Act No. 56 of June 19,

1958, as amended; amend Section 2, amend Section 3, amend Section 5, add a new Section 10, and renumber Section 10 as Section 11 of Act No. 91 of May 13, 2006, as amended; to provide on Savings Notes in Economic Cooperation with Puerto Rico; to amend Sections 2.01, 2.02, 2.04, 2.09, 2.10, 3.01, 3.02, 3.21, 3.27, 5.01, and 5.30 of Act No. 83 of August 30, 1991, as amended; Section 4 of Act No. 203 of December 14, 2007; to amend Section 4 and amend Section 16 of Act No. 64 of July 3, 1996, as amended; all of the foregoing, with the specific purpose of authorizing an additional 0.75%-increase in the portion of sales and use tax deposited into the Puerto Rico Dedicated Sales Tax Fund Corporation (*COFINA*); to authorize the Public Building Authority to issue refinancing bonds with the purpose of refinancing, in whole or in part, any payment of principal or interest on its outstanding bonds; to allow *COFINA* to issue bonds and use other financing mechanisms to generate funds to nourish the Economic Cooperation and Public Employee Options Fund; to provide that the 1%-increase on the share of the sales and use tax authorized recently, as well as the additional 0.75%-increase authorized by virtue of this Act shall take effect for Fiscal Year 2009-2010; to authorize the Government of Puerto Rico and the Public Building Authority to issue refinancing bonds to refinance any payment of principal and/or interest payable in a fiscal year; and to create the "Special Fund for Public Employee Options and Economic Construction"; authorize the Savings Notes in Economic Cooperation with Puerto Rico, authorize the issue of up to $20,000,000 in notes over a five-year term; to increase by a tenfold factor the appraisal value of any real property appraised by the Municipal Revenue Collection Center, and make proportional adjustments in tax rates and exemptions applicable, so that the resulting property tax does not change; to allow that, for a limited-term, the municipalities may be able to take money on loans with the Government Development Bank for Puerto Rico by means of general municipal obligation notes or bonds; and for other purposes.

## STATEMENT OF MOTIVES

### Introduction

Puerto Rico is experiencing the worst fiscal crisis in our entire history. This crisis is the result of irresponsible fiscal policies that have caused and

-3-

III-059

this Act, including the payment of any redemption premium with respect thereto, and any interest accrued or which is accrued as of the date of redemption or expiration of such bonds and, if the Authority deems it advisable, (iii) for any of the purposes for which it may issue bonds. The issue of such bonds, the maturity and other details with respect thereof, the rights of the bondholders of said bonds, and the rights, duties and obligations of the Authority with respect thereto, shall be governed by the provisions of this Act regarding to the issue of bonds, provided, said provisions are applicable.

Refinancing bonds issued pursuant to this Act may be sold or exchanged for bonds in effect issued under this Act, and if sold, the product of such a sale may be set aside, in addition to any authorized purpose, for the purchase, redemption or payment of such bonds in effect and outstanding, and may be invested pending such an application. Refinancing bonds may be issued at the discretion of the Authority, at any time on or before the date of payment or payments of the principal or interest of its bonds, the maturity thereof, or the date selected for the redemption of the bonds to be refinanced."

Section 49.- Section 2 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows

(a) …

(b) COFINA is created for the purpose of issuing bonds and utilizing other financing mechanisms for the following purposes: (i) to pay or refinance, directly or indirectly, all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the payable interest thereon, (ii) to pay all or part of the debt of the

Secretary of the Treasury with the Government Development Bank for Puerto Rico in the amount of $1 billion, used to finance the budgetary deficit of fiscal year 2008-2009, (iii) to pay all or part of the financings granted to the Secretary of the Treasury until December 31, 2008, by the Government Development Bank for Puerto Rico, payable from future general obligation bond issues of the Commonwealth of Puerto Rico, and any debt with no repayment source or which is payable from budget appropriations of the Commonwealth of Puerto Rico, existing on December 31, 2008, (iv) to pay all or part of the accounts payable to suppliers of the Commonwealth of Puerto Rico, (v) to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal years 2008-2009, 2009-2010, and 2010-2011, (vi) to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal year 2011-2012, which shall be included in the annual budget of the Government of Puerto Rico, (vii) to generate funds to nourish the Puerto Rico Economic Stimulus Fund established under Section 6 of this Act, and (viii) to nourish the Emergency Fund of the Commonwealth of Puerto Rico to meet expenses arising as a result of a catastrophic event, such as hurricanes or floods; and (ix) to generate funds to nourish the Economic Cooperation and Alternatives Fund for Public Employees.

(c)     …

…"

Section 50.- Section 3 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 3.—Creation of the Special Fund.—

A special fund is hereby created, to be known as the *Fondo de Interés Apremiante* (hereinafter, 'FIA'), whose name in English shall be the "Dedicated Sales Tax Fund," to be administered by GDB. The FIA and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in the FIA pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt existing as of June 30, 2006, and the payable interest thereon, and for the other purposes established in Section 2(b) of this Act, with the net proceeds of the bond issues or funds and resources available to COFINA.

The FIA shall be nourished each fiscal year from the following sources, the proceeds of which shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico (hereinafter, the 'Secretary'):

(a)     The first collections of the sales and use tax (hereinafter, 'Tax') approved by the "Taxpayers Justice Act of 2006," Act No. 117 of July 4, 2006, corresponding to the Commonwealth of Puerto Rico up to the amount of:

(i)     the proceeds of the amount of the tax collected during such fiscal year, multiplied by a fraction whose

numerator shall be two point seventy-five percent (2.75%) and whose denominator shall be the rate of such tax, such fraction being hereinafter denominated 'the two point seventy-five percent (2.75%) of the Tax,' or

(ii)     the applicable Fixed Income, whichever is greater.

(b)     For purposes of Section 3(a) of this Act, there shall be no Fixed Income for Fiscal Year 2006-2007. The Fixed Income for each fiscal year shall be equal to the sum of the Original Fixed Income and the Additional Fixed Income. The Original Fixed Income for Fiscal Year 2007-2008 shall be one hundred eighty-five million (185,000,000) dollars. The Original Fixed Income for each subsequent fiscal year shall be equal to the Original Fixed Income for the prior fiscal year plus four percent (4%), up to a maximum of one billion, eight hundred and fifty million (1,850,000,000) dollars. The Additional Fixed Income for fiscal years 2006-2007, 2007-2008, and 2008-2009 shall be equal to zero (0) dollars. The Additional Fixed Income for fiscal year 2009-2010 shall be equal to three hundred million, one hundred sixty-eight thousand (350,168,000)[sic] dollars. The Additional Fixed Income for each subsequent fiscal year shall be equal to the Additional Fixed Income for the preceding fiscal year plus four percent (4%), up to the fiscal year in which the sum of Original Fixed Income and the Additional Fixed Income equals one billion, eight hundred and fifty million (1,850,000,000) dollars ('Peak Year'). The Additional Fixed Income for each fiscal year following the Peak Year shall be reduced to the amount necessary so that the sum of the Original Fixed Income

and the Additional Fixed Income is equal one billion, eight hundred and fifty million (1,850,000,000) dollars. The Fixed Income for any fiscal year shall be funded from the first collections of the Tax corresponding to the Commonwealth of Puerto Rico."

Section 51.- Section 5 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 5.—Deposits and Disbursements.—

(a)     …

(b)     Each month during each fiscal year, the Secretary shall determine if the two point seventy-five percent (2.75%) of the Tax for the current fiscal year is greater than the Fixed Income applicable to such fiscal year.  Once the Secretary determines that the two point seventy-five percent (2.75%) for such fiscal year exceeds the Fixed Income applicable for such fiscal year, all revenues from the Tax received after such determination, up to an amount equal to the excess of said point seventy-five[sic] percent (2.75%) of the Tax over the Fixed Income, shall be deposited in the FIA.  Furthermore, on or prior to October 1 of each fiscal year, the Secretary shall determine if the two point seventy-five percent (2.75%) of the Tax for the prior fiscal year is greater than the Fixed Income applicable to such prior fiscal year.  The revenues from the Tax that represent the excess amount of the two point seventy-five percent (2.75%) of the Tax corresponding to the prior fiscal year over the Fixed Income applicable to such fiscal year shall be the property of the FIA.

(c)    …

…"

Section 52.- Section 10 is hereby renumbered as Section 11 and a new Section 10 is hereby added to Act No. 91 of May 13, 2006, as amended, to read as follows:

"Section 10.-    Transitory Provisions.  It is hereby provided that for fiscal year 2008-2009, ending on June 30, 2009, the fraction described in Section 3(a)(i) of this Act shall be a fraction whose numerator shall be one percent (1%) and whose denominator shall be the rate of such tax, and every reference in this Act to "two point seventy-five percent (2.75%) of the Tax, shall be considered as a reference to the "one percent (1%) of the Tax." This transitory provision shall be rendered ineffective for fiscal year 2009-2010, which begins on July 1, 2009, and for subsequent fiscal years.

"Section 11.-   …"

Section 53.-  Savings Notes in Economic Cooperation with Puerto Rico.

Section 53.1.-   The Secretary of the Treasury is hereby authorized to issue and sell, all at once or from time to time, through resolution to such effect and with the approval of the Governor, Savings Notes in Economic Cooperation with Puerto Rico, for a total sum of twenty million dollars ($20,000,000).

Section 53.2.-   Form and date of payment; maturity; denominations; negotiable instruments; price

The notes authorized to be issued under the provisions of this Act shall be payable to or in favor of the designated beneficiary, shall be dated at the time of their sale and shall mature on a date or dates that shall not exceed five (5) years from its date or dates of sale, shall accrue interest at an annual

(H. B. 1642)

(No. 18)

(Approved May 22, 2009)

# AN ACT

To  amend Sections 2, 3, 4, and 5 of Act No. 91 of May 13, 2006, as amended, known as the "Dedicated Sales Tax Fund Act," in order to make various technical amendments; to provide for the limits in the amount of bonds that COFINA may issue; to provide for the use of the subsidy to be received by COFINA under the Federal Program known as the "Build America Bonds"; authorize the issue of notes in advance of bond issues; and to provide for the creation and perfection of a lien on the revenues of the Sales and Use Tax that are deposited in the Dedicated Sales Tax Fund in favor of the bondholders.

## STATEMENT OF MOTIVES

The bonds issued by the Puerto Rico Dedicated Sales Tax Fund Corporation, "COFINA," (Spanish acronym) are the most cost-effective financing source of the Government of Puerto Rico today, since the payment thereof is backed by the collections of the Sales and Use Tax, a consistent and reliable source of revenues. These bonds enjoy a credit rating higher that that of the general obligation bonds of the Commonwealth of Puerto Rico. The Government of Puerto Rico Economic and Fiscal Reconstruction Plan includes a financing program that relies mainly on the issue of COFINA bonds.

In order to assure the success of the financing program contemplated in the Government of Puerto Rico Economic and Fiscal Reconstruction Plan, the Organic Act of COFINA, Act No. 91 of May 13, 2006, as amended, "Act No. 91," is hereby amended to (i) correct some errors in the numeric

reference of Act No. 91, as it was recently amended; (ii) clarify the provisions that limit the amount of bonds that COFINA may issue to: (a)

include as a source of repayment of their bonds those subsidies to be received by COFINA under the Federal Build America Bonds Program; and (b) exclude from the debt service that portion of the principal and interests for which payment COFINA has set aside sufficient funds; (iii) clarify that COFINA may issue notes in advance of the bond issue; and (iv) provide that the revenues from the Sales and Use Tax covered into the Dedicated Sales Tax Fund be encumbered in favor of COFINA bondholders.

Section 2(c) of Act No. 91 provides that the service of the debt of COFINA for each fiscal year cannot exceed the amount of the Fixed Income allocated for said fiscal year. It is foreseen that under the Federal Build America Bonds Program, COFINA could qualify to receive subsidies from the Federal Government for the payment of interest on its bonds. One of the amendments is directed to clarifying that said subsidy shall be treated as an additional income for COFINA, which shall be added to the Fixed Income for purposes of calculating the limit of the debt that COFINA can incur. Furthermore, it is the intention of this Legislature to amend Section 3 to provide that the subsidy to be received by COFINA under the Federal Build America Bonds Program shall be deposited in the FIA and that said funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purposes, including for the purposes of Section 2 and Section 8 of Article VI of the Constitution.

It is further anticipated that through the refinancing or capitalization of interest mechanism, COFINA could set aside in a special deposit, funds for the future payment of its debt service. One of the amendments is directed to clarifying that the debt service whose payment is set aside in a

special deposit shall not be taken into account for purposes of calculating the limit of the debt which COFINA may incur.

In order to increase the liquidity of COFINA, an amendment is included granting express authorization for the issue of notes in advance of the issue of bonds and clarifying that said notes do not affect the debt limit of COFINA, since those notes shall be paid in full with the proceeds of future bond issues.

Finally, an amendment is included which provides for creating and perfecting a lien on the revenues of COFINA in favor of its bondholders, which is directed to strengthening the COFINA Financing Program, by offering greater protection to the bondholders. This provision is identical to the provisions on liens in favor of bondholders incorporated to the organic acts of other public corporations.

***BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:***

Section 1.—Section 2 of Act No. 91 of May 13, 2006, is hereby amended to read as follows:

"(a)   …

(b)…

(c)    The source of repayment of COFINA bonds shall be the portion of the tax deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Section 3(a) of this Act and any subsidy that COFINA may receive under the Federal Program known as 'Build America Bonds.' The Board of Directors of COFINA shall not authorize any COFINA bond issue, unless the Chair or a COFINA officer designated by the Chair certifies that the principal of and interest on the COFINA bonds he/she intends to authorize, plus the principal of and interest on all outstanding COFINA bonds (except those bonds to be paid with the proceeds of the new bonds or

those payments of principal or interest for which sufficient funds have been set aside to cover the payment thereof,) payable each fiscal year (beginning with the current fiscal year) is equal to or lesser than the Fixed Income appropriated to COFINA, corresponding to said fiscal year, plus any subsidy expected to be received by COFINA during said fiscal year under the Federal Build America Bonds Program."

(d)     …

(e)     …

(f)     …

(g)     COFINA may issue notes in advance of bonds, 'notes,' and said notes: (i) may be issued in a maximum amount which shall not exceed such amount that, as determined by the Board of Directors of COFINA, may be used to repay the proceeds of the bond issue authorized under Section 2(b) of this Act and allowed under Section 2(c) of this Act; (ii) shall not be subject to the limitation of Section 2(c) of this Act, unless the documents authorizing COFINA bonds provide otherwise nor be considered in the calculation of outstanding bonds required by said Section; (iii) shall not be taken into account for purposes of the first sentence of Section 5(d) of this Act; and (iv) may be repaid from the proceeds of the bonds issued under this Act and any of its available funds."

Section 2.—Section 3 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 3.—Creation of the Special Fund.—

A special fund is hereby created, to be known as the *Fondo de Interés Apremiante* (hereinafter, 'FIA'), whose name in English shall be Dedicated Sales Tax Fund, to be administered by the GDB. The FIA and all the funds deposited therein on the effective date of this Act and all the future funds

that must be deposited in the FIA pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006, and the interest payable thereon, and for the other purposes established in Section 2(b) of this Act, with the net proceeds of the bond issues or funds and resources available to COFINA.

The FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico (hereinafter, the 'Secretary'):

(a)    The first revenues of the sales and use tax (hereinafter, 'Tax') approved by the 'Taxpayers Justice Act of 2006,' Act No. 117 of July 4, 2006, corresponding to the Commonwealth of Puerto Rico up to the amount of:

(i)    the proceeds of the amount of the Tax collected during such fiscal year, multiplied by a fraction whose numerator shall be two point seventy-five percent (2.75%) and whose denominator shall be the rate of such tax, such fraction being hereinafter denominated 'two point seventy-five percent (2.75%) of the Tax,' or (ii) the applicable Fixed Income, whichever is greater.

(b)    Any subsidy received by COFINA under the Federal Program known as 'Build America Bonds.'

For purposes of Section 3(a) of this Act, there shall be no Fixed Income for Fiscal Year 2006-2007. The Fixed Income for each fiscal year

shall be equal to the sum of the Original Fixed Income and the Additional Fixed Income. The Original Fixed Income for Fiscal Year 2007-2008 shall be one hundred eighty-five million (185,000,000) dollars. The Original Fixed Income for each subsequent fiscal year shall be equal to the Original Fixed Income for the prior fiscal year plus four percent (4%), up to a maximum of one billion, eight hundred and fifty million (1,850,000,000) dollars. The Additional Fixed Income for fiscal years 2006-2007, 2007-2008, and 2008-2009 shall be equal to zero (0) dollars. The Additional Fixed Income for fiscal year 2009-2010 shall be equal to three hundred and fifty million, one hundred sixty-eight thousand (350,168,000) dollars. The Additional Fixed Income for each subsequent fiscal year shall be equal to the Additional Fixed Income for the prior fiscal year plus four percent (4%), up to the fiscal year in which the sum of Original Fixed Income and the Additional Fixed Income equals one billion, eight hundred and fifty million (1,850,000,000) dollars, 'Peak Year'. The Additional Fixed Income for each fiscal year following the Peak Year shall be reduced to the amount necessary for the sum of the Original Fixed Income and the Additional Fixed Income to equal one billion, eight hundred and fifty million (1,850,000,000) dollars. The Fixed Income for any fiscal year shall be funded from the first revenues of the Commonwealth of Puerto Rico's portion of the Tax."

Section 3.—Section 4 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 4.— Use.—

(a)     …

(b)     The revenues indicated in Section 3(a) deposited in the FIA shall be used by COFINA, pursuant to financing or refinancing mechanisms, exclusively for the purpose of paying, financing or refinancing, directly or

indirectly, the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and all other debts, accounts or items mentioned in Section 2(b), including amounts owed to the GDB and the obligations incurred under any type of financing or surety agreement or interest rate swap agreement executed with respect to bonds issued to finance or refinance such debt. COFINA is hereby authorized to pledge and otherwise encumber all or part of such revenues solely for the payment of principal, interest and redemption premium of such bonds and other obligations of such instrumentality that were incurred with respect to such bonds to meet the purposes set forth in this Act and the payment of obligations incurred under any type of financing or surety agreement or interest rate swap agreement executed with respect to such bonds. Said pledge shall be valid and binding as of the time it is made without the need for a public or notarized document. The income or revenues thus encumbered, including those subsequently received by COFINA, shall be subject to said lien immediately, without the need of physically delivering the same or any other act, and said lien shall be valid and binding and shall prevail against any third party that has a claim of any kind for damages, breach of contract or any other grounds against COFINA, regardless of the fact that said third party has not been so notified. Neither the trust contract nor the resolution or any collateral contract, through which the rights of COFINA over any income or collection are pledged or assigned must be presented or registered for perfection of the lien over the same against any third party, except in the records of COFINA.

(c) …

(c) …"

Section 4.—Section 5 of Act No. 91 of May 13, 2006, as amended, is hereby amended to read as follows:

"Section 5.—Deposits and Disbursements.—

(a)      …

(b)      Each month during each fiscal year, the Secretary shall determine if two point seventy-five percent (2.75%) of the Tax for the current fiscal year is an amount greater than the Fixed Income applicable to such fiscal year.  Once the Secretary determines that two point seventy-five percent (2.75%) of the Tax for such fiscal year exceeds the Fixed Income applicable for such fiscal year, all revenues from the Tax received after such determination, up to an amount equal to the excess of such two point seventy-five percent (2.75%) of the Tax over the Fixed Income, shall be deposited in the FIA.  Furthermore, on or prior to October 1 of each fiscal year, the Secretary shall determine if two point seventy-five percent (2.75%)of the Tax for the prior fiscal year is greater than the Fixed Income applicable to such prior fiscal year.  The revenues from the Tax that represent the excess amount of two point seventy-five percent (2.75%) of the Tax for the prior fiscal year over the Fixed Income applicable to such fiscal year shall be the property of the FIA.

(c)      The Commonwealth of Puerto Rico hereby agrees and assures any person, firm or corporation or any agency of the United States of America or of any state or the Commonwealth of Puerto Rico who underwrites or acquires bonds issued by COFINA, or who provides insurance, repayment or solvency sources for such bonds, that until such bonds, from any date, together with the interest thereon, entirely paid for and withdrawn, the Commonwealth shall not: (i) limit nor restrain the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico

to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the FIA pursuant to the provisions of this Act; provided, that the foregoing provisions do not limit the power of the Commonwealth of Puerto Rico, by means of a law amendment, to limit or restrain the nature or the amount of such taxes or other revenues or to substitute similar or comparable collateral by other taxes, fees, charges or other income to be deposited into the FIA if, for the following fiscal years, the revenues projected by the Secretary of the Treasury from such substitutive tax, income or collateral is equal to or greater than the service of the debt and other charges and any coverage requirement included in the COFINA bond authorizing documents; or (ii) limit or restrain the powers hereby conferred by this Act or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be entirely paid for and withdrawn. No amendment to Act No. 91 of May 13, 2006, as amended, shall undermine any obligation or commitment of COFINA.

(d)    …

(e)    …"

Section 5.—If any provision of this Act or the application of such provision were to be found to be invalid, such finding shall not affect any other provisions or the application of this Act that may have effect without the need for the provisions that were found to be invalid, and to this end, the provisions of this Act are severable.

Section 6.—This Act shall take effect immediately after its approval.

**CERTIFICATION**


I hereby certify to the Secretary of State that the following Act <u>No. 18</u> (<u>H.B. 1642</u>) of the

<u>1</u><sup>st</sup> Session of the <u>16</u><sup>th</sup> Legislature of Puerto Rico:


**AN ACT**   amend Sections 2, 3, 4, and 5 of Act No. 91 of May 13, 2006, as amended, known as the "Dedicated Sales Tax Fund Act," in order to make various technical amendments; to provide for the limits in the amount of bonds that COFINA may issue; to provide for the use of the subsidy to be received by COFINA under the Federal Program known as the "Build America Bonds"; authorize the issue of notes in advance of bond issues; and to provide for the creation and perfection of a lien on the revenues of the Sales and Use Tax that are deposited in the Dedicated Sales Tax Fund in favor of the bondholders,


has been translated from Spanish to English and that the English version is correct.


In San Juan, Puerto Rico, today 12th of June of 2009.


Solange I. De Lahongrais
Director

**IV. OTHER ITEMS (not to exceed 25 pages)**

**Exhibit D**

**NEW ISSUE – BOOK-ENTRY ONLY**

**RATINGS (see RATINGS herein):** S&P: A+
Moody's: A1
Fitch: A+

$1,619,404,596.60

# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2010C

**Dated:** Date of Delivery

**Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), to refund certain outstanding bonds of the Corporation and provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied for various purposes, all as described herein. Concurrently with the issuance of the Series 2010C Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010C Bonds and the Series 2010D Bonds, the "Series 2010 Bonds"). The Series 2010D Bonds and Series 2010E Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2010C Bonds is not contingent upon the issuance of the Series 2010D Bonds or the Series 2010E Bonds.

**The Series 2010 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales tax imposed by the Commonwealth. The Series 2010 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The Series 2010 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution*.**

The Series 2010C Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2010C Bonds on the records of The Depository Trust Company and its participants. The Series 2010C Bonds are being issued as Current Interest Bonds and Capital Appreciation Bonds. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series 2010C Bonds. Prospective investors should consider the information set forth in RISK FACTORS before investing.

The scheduled payment of principal of and interest on the Series 2010C Bonds maturing on August 1, 2042 (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.), as indicated on the inside cover of this Official Statement.

**This cover page contains information for quick reference only. It is not a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.**

*In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth, interest on the Series 2010C Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that interest on the Series 2010C Bonds is exempt from state, Commonwealth and local income taxation. See Tax Matters herein.*

**The Series 2010C Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010C Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2010C Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Underwriters' Counsel. It is expected that the Series 2010C Bonds will be delivered through The Depository Trust Company on or about June 30, 2010.*

| Citi | BofA Merrill Lynch | J.P. Morgan | Wells Fargo Securities |
|---|---|---|---|
| Barclays Capital | | Goldman, Sachs & Co. | Jefferies & Company |
| Morgan Stanley | | Ramirez & Co. Inc. | Raymond James |
| RBC Capital Markets | | | UBS Financial Services Incorporated of Puerto Rico |

| BBVAPR MSD | FirstBank Puerto Rico Securities | Oriental Financial Services | Popular Securities | Santander Securities |
|---|---|---|---|---|

June 24, 2010

Exhibit D

## $1,619,404,596.60
## Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2010C

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $1,619,404,596.60 Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"). Concurrently with the issuance of the Series 2010C Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds") and Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds" and, together with the Series 2010C Bonds and the Series 2010D Bonds, the "Series 2010 Bonds"). The Series 2010D Bonds and the Series 2010E Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2010C Bonds is not contingent upon the issuance of the Series 2010D Bonds or the Series 2010E Bonds. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009 ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable solely from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

### Sales and Use Tax

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

IV.003

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See "*Dedicated Sales Tax Fund*" under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2009 is $550,264,000. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See "*Dedicated Sales Tax Fund*" and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

**The Resolution**

The Series 2010 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Fourteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010C Bonds (the "Fourteenth Supplemental Resolution"), a Fifteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010D Bonds (the "Fifteenth Supplemental Resolution"), and a Sixteenth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2010E Bonds (the "Sixteenth Supplemental Resolution") (the General Resolution, as amended by the Fourteenth Supplemental Resolution, the Fifteenth Supplemental Resolution, and the Sixteenth Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on June 24, 2010, pursuant to which The Bank of New York Mellon (formerly known as The Bank of New York) acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution*.

**Outstanding Bonds and Parity Obligations**

*General*

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of senior and first subordinate bonds. The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Senior Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds"). The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series

2

therewith (the "First Subordinate Obligations"), will be secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and will be payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Moreover, owners of the First Subordinate Bonds and obligees of First Subordinate obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See *"Subordination Provisions of the First Subordinate Bonds"* and *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

### Source of Payment and Security for the Bonds

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The Series 2010 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2010 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Series 2010C Bonds, the terms of the Series 2010C Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

### PLEDGED SALES TAX

### Commonwealth Sales Tax Revenues

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

4

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $13.1 billion in Fiscal Year 2008-2009, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past twelve years these transfers have not been affected by economic downturns. The amount of federal transfers to individuals is equal to about 23.6% of personal consumption expenditures in Fiscal Year 2008-2009 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *"The Economy – Personal Income"* in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2009-2010 is $550,264,000. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2009-2010 is $200,096,000 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2009-2010 is $350,168,000. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

IV.006

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE."

## SECURITY FOR THE BONDS

### General

Pursuant to the Resolution, the Series 2010C Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2010C Bonds are subordinate in payment priority to the Senior Bonds and Parity Obligations and on a parity in payment priority with the First Subordinate Bonds and First Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is senior to, or on a parity with, or subordinate to, the Series 2010C Bonds. Only Senior Bonds and the Parity Obligations will be senior to the Series 2010C Bonds.

### Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2010C Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2010C Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2010C Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2010C Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2010C Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

22

**Property Pledged for the Payment of the Series 2010C Bonds**

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Series 2010 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Outstanding Bonds and Parity Obligations**

Prior to the issuance of the Series 2010 Bonds, the Corporation had outstanding $12.5 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $383.5 million accreted on existing capital appreciation bonds as of June 1, 2010. The Corporation's outstanding bonds consist of Senior and First Subordinate Bonds.

The Corporation's Outstanding Senior Bonds, which represent $5.2 billion in aggregate initial principal amount, consist of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, and (v) the Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

IV.008

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Series 2010 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2010 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. On July 31, 2007, in connection with the issuance of the initial series of Outstanding Senior Bonds, a prior Secretary of Justice issued an opinion (the "2007 Opinion") reaching substantially the same conclusion. On June 18, 2009, in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A, the prior Secretary of Justice also issued an opinion (the "2009 Opinion") reaching substantially the same conclusion. On February 9, 2010, in connection with the issuance of the Series 2010A Bonds, the current Secretary of Justice issued an opinion (the "2010A Opinion") reaching substantially the same conclusion.

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2010 Opinion, the 2010A Opinion, the 2009 Opinion and the 2007 Opinion and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court

31

of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Series 2010 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Series 2010 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2010C Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2010C Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2010C Bonds is not a recommendation to purchase, hold or sell such Series 2010C Bonds and such rating will not address the marketability of such Series 2010C Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Series 2010C Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

**Limited Nature of Remedies**

The Series 2010C Bonds are subordinate to the Senior Bonds and the Parity Obligations and are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full. See "Subordination Provisions of the Bonds" under SECURITY FOR THE BONDS. In the event the owners of the Series 2010C Bonds shall be entitled to

IV.010

**PUERTO RICO SALES TAX FINANCING CORPORATION**

**AMENDED AND RESTATED
SALES TAX REVENUE BOND RESOLUTION**

Adopted on July 13, 2007
As amended on June 10, 2009

511470.30 032563 RES

Exhibit G

## ARTICLE X

## AMENDMENTS

### SECTION 1001. Mailing and Publication.

1. Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the Corporation, and (ii) to the Trustee.

2. In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by the Resolution, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

### SECTION 1002. Powers of Amendment. Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

-70-

Case:17-03283-LTS  Doc#:4006-7  Filed:01/02/19  Entered:01/02/19 16:23:28  Desc: H
- R to the Peter Hein Declaration  Page 1 of 447

Government Development Bank for Puerto Rico    Page 1 of 3

Exhibit H

Español



GDB

| Home | About GDB | Investor Resources | Economy | Banking | Municipalities | Communications |

# Investor Resources

**Investor Resources**

Home > Investor Resources > Tax-Exempt Securities by Issuer > Puerto Rico Sales Tax Financing Corporation          < go back

- ▶ Introduction
- ▶ Tax-Exempt Securities by Issuer
- ▼ Publications & Reports
  - ▶ GDB Annual Report
  - ▶ Commonwealth CAFR
  - ▶ Commonwealth Financial Information and Operating Data Report
  - ▶ Commonwealth Cash Flow Projection
  - ▶ General Fund Net Revenues
  - ▶ General Fund Cash Flow Projection
  - ▶ Sales And Use Tax Collections
  - ▶ Investor Presentations
  - ▶ Governor's Messages
  - ▶ Relevant Legislative Measures
  - ▶ Other Documents
- ▶ Puerto Rico Stock Index (PRSI)

## Puerto Rico Sales Tax Financing Corporation (COFINA)



### Credit Ratings

| | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| **Sales Tax Revenue Bonds:** | | | |
| - Senior Lien | Caa3 | CCC- | CC |
| - First Subordinate Lien | Ca | CCC- | CC |

### Credit Rating Reports on COFINA



Go to Commonwealth section to access other credit rating reports affecting COFINA debt

Standard & Poor's – October 1, 2013

View prior reports from Credit Rating Agencies

### Sales and Use Tax Data Center

Monthly Distribution of Total SUT Collections

### Security

COFINA issued Puerto Rico Sales Tax Revenue Bonds to provide funds for the Commonwealth of Puerto Rico to repay certain debt obligations to the GDB and PFC. The bonds, issued under resolutions adopted by COFINA's board of directors will be payable from and secured by a security interest created by the Resolution in a specified portion of the newly created sales tax ("Pledged Sales Tax"). Legislation enacted in 2006 approved for the first time in Puerto Rico a sales and use tax of 5.5% for the benefit of the central government and a separate 1.5% for the benefit of municipalities of Puerto Rico. Act 91 also created a Dedicated Sales Tax Fund, to be held and owned by COFINA separate and apart from the central government's General Fund, and provided, among other things, that each fiscal year the first receipts of the Commonwealth's Sales Tax, in the amount specified in the law, be deposited in this special Dedicated Fund and applied to the payment of the Sales Tax Revenue Bonds.

### Functions

The Puerto Rico Sales Tax Financing Corporation (by its Spanish acronym, COFINA) is an independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of May 13, 2006, as amended, for the specific purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, which were payable to the GDB and the Puerto Rico Public Finance Corporation (PFC) and were previously payable solely from government budgetary appropriation. COFINA provided a definite and secure repayment mechanism of some $6.8 billion in debt that previously lacked a source of repayment.

*Trustees Under the Trust Indenture:*

*Bank of New York*

***Financial Statements Audited by:***
*KPMG LLP*

Exhibit H

Exhibit J





COMMONWEALTH OF
PUERTO RICO
Government Development Bank
for Puerto Rico

## CONFERENCE CALL ABOUT COFINA LEGAL OPINIONS
Hosted by **Government Development Bank for Puerto Rico** through Telspan
Date and Time: 10/31/2013 2pm ET
Length of Call: 45mins
Transcript

*Operator:* Good morning, and welcome to the Government Development Bank for Puerto Rico conference call. My name is Kellen and I will be your conference operator today. A replay of the call will be available on the GDB website as soon as possible after the call ends. All lines have been placed on mute to prevent any background noise.

Once the presentation concludes there will be a Questions and Answers session. Questions that have been sent in advance will be answered.

If you are having technical problems with the audio, press *0 for technical support.

On behalf of all of us at the Government Development Bank for Puerto Rico, I would like to welcome everyone to this call. The participants for today's call will be: José Pagán, Interim President of the GDB, José Coleman-Tió, Executive Vice President and General Counsel of the GDB, Virginia Wong, Jim Montes, John Bove, Arthur McMahon, Ken Lind, all partners at Nixon Peabody, and Manuel Pietrantoni, Manuel Rodríguez Boissen, and Eduardo Arias, all partners at Pietrantoni Méndez & Álvarez.

I will now turn the call over to the Interim President of the GDB, José Pagán for the opening remarks.

*José Pagán:* Good afternoon. The Government Development Bank for Puerto Rico and the Puerto Rico Sales Tax Financing Corporation, which most of you know as COFINA, welcome you to this conference call. We truly appreciate the time everyone has taken to join.

As announced in the investor webcast held by the Commonwealth on October 16, 2013, GDB is taking affirmative actions to improve its disclosure practices and increase the amount of information available to investors. In particular, GDB will begin holding an investor webcast at least once per quarter and will update the Commonwealth Report on a quarterly basis. The Department of the Treasury and the Office of Management and Budget will also continue to provide revenue and expense updates at least once per month. The Commonwealth and GDB are committed to observing best disclosure practices and improving our relationship with our investor base. As a further step in this direction, in response to specific investor requests, GDB and COFINA made available last week the legal opinions delivered in connection with COFINA's last public transaction. These legal opinions, delivered by the Puerto Rico Secretary

Exhibit J

of Justice, Nixon Peabody as U.S.-based Bond Counsel and Pietrantoni Mendez & Alvarez LLC as P.R.-based Underwriters' Counsel, are now available at our website: bgfpr.com.

As a further testament to our commitment to transparency, today we take the unprecedented step of holding a conference call with the outside legal advisors that authored these legal opinions. We hope that you find this call informative.

As stated during our webcast, COFINA's credit is bolstered by strong legal protections for bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth. U.S.-based Bond Counsel, P.R.-based Underwriters' Counsel and the Puerto Rico Secretary of Justice have provided, for each COFINA transaction (and we count 13 in total), opinions concluding that the Sales and Use Tax allocated to COFINA is not subject to "claw back" by GO bondholders under the PR Constitution.

Importantly, the Secretary of Justice opinions enjoy broad bipartisan support, a rare thing in Puerto Rico: four Secretaries of Justice, serving three different administrations (of alternating political parties), have issued opinions that the SUT allocated to COFINA is not subject to "claw back".

While no new COFINA transaction has been announced, I want to emphasize that no such transaction would be completed unless opinions reaching the same legal conclusion as those being discussed today are again delivered at closing by the Secretary of Justice and each of the firms acting as Bond Counsel and Underwriters' Counsel in the particular transaction.

I now leave you with José Coleman, GDB's Executive Vice-President and General Counsel.

*José Coleman:* Thanks, José. I want to welcome you all to this conference call and provide you with additional information about the focus and purpose of the call.

As previously announced, this conference call is being held to discuss the COFINA legal opinions, dated December 13, 2011, provided by external legal counsel in connection with the issuance of the Senior Series 2011C and Senior Series 2011D Bonds. The opinions, which were provided by Nixon Peabody LLP, as Bond Counsel, and Pietrantoni Méndez & Álvarez LLC, as Underwriters' Counsel, were posted on GDB's website on October 23, 2013. We hope that everyone on the call has had an opportunity to review them.

We want to thank Nixon Peabody and PMA for making themselves available to answer questions related to their respective opinions. Nixon Peabody and PMA will each begin by providing a brief overview of the legal analysis underpinning their opinion. We will then proceed to answer questions submitted to GDB prior to this call.

As stated in GDB's press release, the purpose of this call is solely to address questions related to these legal opinions. As such, questions determined to be unrelated to the opinions will not be addressed. All participants are also advised that none of GDB, COFINA or the law firms participating in this call are providing legal advice of any nature whatsoever to the call

participants, that the information provided and discussed during the call is for informational purposes only, that only the parties to whom the opinions are addressed may rely thereon, and that participants should consult their own legal advisors with respect to any matter discussed in the opinions or this call. Furthermore, we emphasize that the COFINA legal opinions are subject to all of the qualifications and assumptions set forth therein. We strongly encourage all call participants to read the legal opinions in their entirety.

It is important to stress that an opinion of counsel is not a prediction of what a particular court [that reached] an issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, it is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law.

I want to add that a recording of this call will be made available as soon as possible on GDB's website. A notice will be posted on EMMA in order to provide notice to the market that the replay has been made available.

Finally, we want to make clear that the information provided in this call is not an offer to sell or the solicitation of an offer to buy any securities. I now leave you with Virginia Wong, partner at Nixon Peabody who acted as bond counsel for COFINA Senior Series 2011 C and Senior Series 2011 D bonds.

*Virginia Wong:* Thank you, José, and thank you for the opportunity to discuss our opinion.

The opinion that was posted on the GDB website as a note concludes that if the issues addressed by it are properly presented for judicial decision, a court would find that Act 91 validly transferred the Pledge Sales tax, including the right to receive the tax, to COFINA; the Pledge Sales tax does not constitute available resources for purposes of the Puerto Rico Constitutional Debt Priority Provision, and that Act 91 validly provides that the Pledge Sales Tax is not available for use by the Secretary of the Treasury. These conclusions were based on our analysis, review and consideration of several factors, including various cases decided by other jurisdictions, including those that are specifically referenced in our opinion and those cases that analyze legislative provision that divert revenues from State treasuries and dedicate them without annual appropriations to a specific purpose.

We also reviewed COFINA's act, as amended as of the date of the 2011 opinion, in our analysis of the structure of COFINA's act in light of what other courts typically considered in deciding whether similar legislation had violated a state's constitutional appropriation provision. We focused on the facts identified by those courts as important, including the fact that the legislation was designed specifically to comply with the well-recognized Special Fund Doctrine.

The Special Fund Doctrine holds that legislation that is enacted due to an urgent need impresses the revenues with a trust for a particular beneficiary, requires the revenues to be deposited into a special fund—and provides that that special fund be dedicated exclusively to certain purposes— provides that the revenues not be received on the account of the state but rather on the account of

the entity created to accomplish the specified purpose, that the legislation set forth limitations and conditions governing the disbursement of revenues, provides for a monetary cap on the amount of revenues that can be diverted from the state treasury, and finally provides that any debt secured by revenues shall not constitute a debt of the state. That is the Special Fund Doctrine and courts have held that entities that are created following the majority of those factors, those types of transaction will be upheld.

We reviewed the various opinions issued by the Secretary of Justice of Puerto Rico to COFINA, including the opinion relating to the 2011 C and D bonds. Those opinions conclude that the Pledge Sales Tax does not constitute available resources of the Commonwealth for purposes of the Constitution nor would they be available for use by the Secretary of the Treasury of the Commonwealth.

Finally, we reviewed the conclusions of PMA as to certain matters under Puerto Rico law on which we relied including the fact that there are no controlling precedents in Puerto Rico and that the Puerto Rico Supreme Court generally defers to acts of the legislature and opinions of the Secretary of Justice. I think that summarizes the factors that we analyzed and reached in our opinion.

*José Coleman:* I would like to thank Nixon Peabody for providing an overview of the opinion. We hope that you find that informative and I now leave you with Manuel Pietrantoni, a partner with PMA, who acted as underwriters' counsel for the COFINA Senior Series 2011 Cs and Ds.

*Manuel Pietrantoni:* Good afternoon everyone and thank you, José, for this opportunity to discuss our opinion.

I'd like to reiterate that the opinion for the Series 2011C and 2011D bonds, which are the opinions being discussed, was rendered to the COFINA and the underwriters' representative.

Let me review the elements of the analysis underlying the conclusion in our opinion that the Pledge Sales Tax would not constitute and I quote "available resources including surplus" for purposes of the priority provisions of the Commonwealth general obligation bonds and notes included in section 2 of article 6 of the Constitution or for purposes of section 8 of article 6 of the Constitution. Those elements are: as to the standard of review, first, the substantial deference provided to the Legislative Assembly's judgment, especially matters involving the use of public funds and regulation of the economy. Second, the presumption of constitutionality that attaches to every statute approved by the Legislative Assembly, and third, the persuasive weight afforded to the Secretary of Justice opinions as the highest executive of the Commonwealth charged with the administration of Justice. As mentioned before in this call, several Secretaries of Justice have provided favorable opinions as to "no claw back".

As to substantive matters, first, precedents from other jurisdictions that provide support to the legality of the COFINA structure in the face of no controlling precedent in Puerto Rico. Second, nothing in the Puerto Rico constitution provides that a specific source of revenues be available,

or creates a lien on any revenues for the payment of general obligation bonds, nor is there any evidence in the records of the Puerto Rico Constitutional Convention that this was considered. Third, nothing in the Puerto Rico Constitution restricts the Commonwealth authority to sell or transfer its assets. Fourth, Constitutions of other jurisdictions of the United Sates which were in effect at the time the Puerto Rico Constitution was approved included clauses that limited a state's ability to earmark or dedicate revenues for a specific purpose, and those provisions were not included in the Puerto Rico Constitution. Fifth, the safeguards included in the COFINA act to limit the amount of bonds that may be issued. And sixth and finally, the structure created in the COFINA act keeps the assigned revenues from becoming part of the Commonwealth General Fund. As I said at the outset, these are the elements that underlie our analysis.

*José Coleman:* Thank you, Manuel, for your remarks. I think that we can turn now to the questions we have received. The operator can provide those.

*Operator:* Thank you. We received various questions regarding the possibility of having the Puerto Rico Supreme Court address the "claw back" issue and thereby create controlling precedent in Puerto Rico. We chose the following question to address this matter: "The final official statement for the COFINA Senior Series 2011D Bonds indicates, under 'Risk Factors', that the Supreme Court of Puerto Rico has never ruled whether the sales tax pledged as payment for COFINA bonds constitutes 'available resources' of the Commonwealth for purposes of the Constitutional Debt Priority Provisions. Please address, and this question comes from Gregory A. Clark, why the Court has never been asked to address this issue and whether there are any plans to have it do so now."

*Manuel Pietrantoni:* The short answer for this question is that under Puerto Rico's jurisdictional requirement, parties cannot bring a test case or seek an advisory opinion from the courts. The leading case in this matter involved an instrumentality of the Commonwealth of Puerto Rico that provided assistance to the plaintiff in the creation of a case or controversy in order to provide certainty to certain federal agencies and bondholders as to the validity of a housing assistance program. In that case, the court held that it could not exercise jurisdiction with a claim because no real case or controversy existed. In light of this, COFINA has not sought a ruling of this nature because unless there was a real case or controversy, the court would not have jurisdiction to rule on this matter.

*Virginia Wong:* Manuel, it is fair to say, right, that that is not even a path that is available. Several of the questions that we received cited what other jurisdictions have done in terms of seeking declaratory judgment or having a court provide an advisory opinion with respect to certain legislative acts, but Puerto Rico law doesn't provide for that procedure, right? So, no such request can be made. Is that fair to say?

*Manuel Pietrantoni:* That's fair to say.

*Virginia Wong:* The next question?

COFINA Legal Opinions Conference Call – 10/31/2013                                    Page 5

# United States Court of Appeals

## *for the*

# First Circuit

Case No. 17-1241

LEX CLAIMS, LLC, JACANA HOLDINGS, LLC, JACANA HOLDINGS II,
LLC, JACANA HOLDINGS III, LLC, JACANA HOLDINGS IV, LLC,
JACANA HOLDINGS V, LLC, MPR INVESTORS, LLC, ROLSG, LLC,
RRW I LLC, SL PUERTO RICO FUND II, L.P.,

*Plaintiffs-Appellees,*

– against –

ALEJANDRO GARCIA PADILLA, JUAN C. ZARAGOZA-GOMEZ, LUIS G.
CRUZ-BATISTA, THE PUERTO RICO SALES TAX FINANCING
CORPORATON, a/k/a Cofina, JUAN VAQUER, BANK OF NEW YORK
MELLON CORP., THE COMMONWEALTH OF PUERTO RICO,

*Defendants-Appellees,*

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD,

*Intervenor-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

## BRIEF FOR INTERVENOR-APPELLANT FINANCIAL
## OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

MICHAEL LUSKIN
STEPHAN HORNUNG
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
(212) 597-8200

*Attorneys for Intervenor-Appellant
Financial Oversight and
Management Board*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-02374 Document 251 Filed:05/03/18 Page 159 of 185 ID: 6076220
R to the Peter Hein Declaration Page 75 of 44

invalidate the COFINA enabling act because it violates the Puerto Rico Constitution. This claim has nothing to do with PROMESA; it could have been brought years before and, accordingly, is stayed pursuant Section 405(b)(1) of PROMESA.

The Commonwealth Legislative Assembly established COFINA in 2006. The COFINA enabling act was designed to retire Commonwealth debt obligations payable solely from government budgetary appropriations. Among other things, it authorizes COFINA to "issu[e] bonds and utilize[e] other financing mechanisms." 13 L.P.R.A. § 11a(b). The COFINA enabling act dedicates a certain percentage of the Commonwealth's SUT revenue to COFINA to repay debts. 13 L.P.R.A. § 12. COFINA bonds are non-recourse bonds secured by a statutory lien against pledged SUT revenue. Importantly, the COFINA enabling act makes clear that SUT income does not constitute a resource "available" to the Commonwealth. 13 L.P.R.A. § 12. This "availability" of resources is a direct reference to Article VI, Section 8 of the Puerto Rico Constitution, which provides:

> In case the ***available revenues*** including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

IV.020

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv:02974-LASA Document 411 File 06/03/18 06:60 of E5 y ID: 6076220
R to the Peter Hein Declaration Page 75 of 444

P.R. Const. art. VI, § 8 (emphasis added). COFINA's bond offering documents
accordingly disclose that SUT revenue is not an "available resource" for purposes
of satisfying the public debt priority. *See* A49, Dkt. No. 50 at 9.

Plaintiffs insist that the second cause of action challenging the lawfulness of
Executive Order 30 is not stayed by PROMESA. More specifically, Plaintiffs
contend that SUT revenue is an available resource for purposes of Article VI,
Section 8 of the Puerto Rico Constitution. Plaintiffs argue that because Executive
Order 30 *did not* claw back SUT money from COFINA to service the
Commonwealth's GO Debt, it is "unlawful" and thus preempted by Section 303(3)
of PROMESA. A337–407, ¶¶ 2, 13, 20, 92, 95, 99, 107–10.

Plaintiffs' claim is a thinly-veiled attempt to pursue their constitutional
claims now, ahead of other creditors and without being required to establish cause
to lift the PROMESA stay. The fundamental fact, which Plaintiffs do not attempt
to – and indeed cannot – escape, is that their second cause of action depends on the
District Court's answer to one fundamental question: Are the SUT carve-outs
assigned to COFINA pursuant to the COFINA enabling act "available resources"
within the meaning of Article VI, Section 8 of the Puerto Rico Constitution? At
their core, Plaintiffs' constitutional challenges to Executive Order 30 are just that–
constitutional challenges.

IV.021

**ANNEX A**

Market Value as of December 3, 2018

| Account Name | Pre-July 1, 2018 Funds | Abeyance Period Funds |
|---|---|---|
| COFINA Series 2009C Tax Exempt Debt Service Account | 27,044,000.57 | 7,150,530.68 |
| RPF Debt Service Interest Sub Account Tax Exempt Senior Bonds | 71,455,808.16 | 19,747,159.38 |
| RPF Debt Service Interest Sub Account Taxable Senior Bonds | 263,460,522.63 | 86,449,341.09 |
| PF Debt Service Interest Tax Exempt 1st Sub Account | 344,875,840.64 | 247,054,428.98 |
| PF Debt Service Interest Taxable 1st Sub Account | 122,553,220.01 | 52,138,329.97 |
| PF First Subordinate 2010A Tax Exempt Interest FD | 121,951,019.46 | 73,561,753.87 |
| PF First Subordinate 2010C Tax Exempt Interest FD | 116,839,839.37 | 73,887,742.10 |
| PF First Subordinate 2010D Taxable Interest FD | 6,124,008.89 | 3,811,725.50 |
| PF First Subordinate 2010E Taxable Interest FD | 6,025,076.86 | 3,805,126.76 |
| COFINA 2011A 1 Debt Service Tax Exempt | 25,804,199.22 | 16,318,184.17 |
| COFINA 2011B Debt Service Tax Exempt | 3,251,919.94 | 1,940,561.84 |
| COFINA 2011C Senior Tax Exempt Debt Service Sub Account | 90,359,684.88 | 23,891,424.51 |
| COFINA 2011D Senior Tax Exempt Debt Service Sub Account | 6,777,628.88 | 2,700,571.12 |
| TOTAL | 1,206,522,769.51 | 612,456,879.97 |

IV.022

Exhibit S



# The Commonwealth of Puerto Rico
## Update on Fiscal and Economic Progress

*FY 2014 Q1 Investor Webcast - October 15, 2013*

Exhibit S

IV.023

# GDB believes that any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt

> If one factors in the federal debt load, PR would rank last in outstanding debt per capita amongst all US jurisdictions*

## Puerto Rico Debt Per Capita vs the USA Comparison Analysis as of June 30, 2011
### (in millions)

### State Level Debt(1)

| US Avg: | $2,390 per capita |
| PR: | $2,805 per capita |
| Rank: | #12 of 51 |

| State | | Rank (of 51) |
|---|---|---|
| HI | $5,376 | 3 |
| CT | $5,087 | 4 |
| NY | $4,976 | 5 |
| AK | $3,825 | 6 |
| RI | $3,787 | 7 |
| DE | $3,668 | 8 |
| CA | $3,122 | 9 |
| IL | $2,874 | 10 |
| NH | $2,847 | 11 |
| PR | $2,805 | 12 |

### State & Local Level Debt(2)

| US Avg: | $7,355 per capita |
| PR: | $15,956 per capita |
| Rank: | #1 of 51 |

| State | | Rank (of 51) |
|---|---|---|
| PR | $15,956 | 1 |
| NY | $13,552 | 2 |
| CA | $9,971 | 3 |
| NJ | $9,739 | 4 |
| NV | $9,500 | 5 |
| WA | $9,379 | 6 |
| HI | $9,340 | 7 |
| MA | $9,258 | 8 |
| IL | $8,991 | 9 |
| AK | $8,927 | 10 |

### State, Local, Federal Level Debt(3)

| US Avg: | $57,024 per capita |
| PR: | $15,956 per capita |
| Rank: | #51 of 51 |

| State | | Rank (of 51) |
|---|---|---|
| MS | $53,766 | 42 |
| OH | $53,690 | 43 |
| NC | $53,676 | 44 |
| SD | $53,042 | 45 |
| WV | $52,887 | 46 |
| AR | $52,819 | 47 |
| MT | $51,895 | 48 |
| ID | $51,698 | 49 |
| WY | $51,334 | 50 |
| PR | $15,956 | 51 |

*Source: US Bureau of the Census and the Government Development Bank for Puerto Rico
(1) For Puerto Rico State Debt includes GO debt.
(2) For Puerto Rico local debt includes debt of Municipalities and Public Corporations.
(3) US Federal Debt per capita is $49,669

57

IV.024

# New COFINA Legislation

- With the enactment of Act 116-2013, the Sales and Use Tax percentage allocated to COFINA is increased from 2.75 percent to 3.50 percent, increasing Puerto Rico's financing capacity.

## COFINA's credit is bolstered by strong legal protections for bondholders

## COFINA is secured by a stable stream of revenues that is not subject to "claw-back"

- Law 91-2006, which created COFINA, transferred ownership of a portion of the Sales Tax to COFINA and provided that any transferred portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

- COFINA will close, by resolution, its Senior and First Subordinate liens (except for refundings that generate savings).

- Law provides that no amendments to the law shall impair any obligation to COFINA bondholders.

- For a future legislature to exercise its constitutional power to limited or restrict the SUT, COFINA's bond documents require written confirmation of all outstanding ratings, taking the substitution into account, and opinions confirming that new revenue would not constitute "available resources".

- US-based Bond Counsel, PR-based Underwriter's Counsel and the PR Secretary of Justice have provided, for each COFINA transaction (13 in total), strong legal opinions that the SUT is not subject to "claw-back" by GO bondholders under the PR Constitution.

- "Claw-back" opinion enjoys broad bipartisan support: four different Secretaries of Justice, serving three different administrations (of alternating political parties), have issued official opinions that the SUT allocated to COFINA is not subject to "claw-back".

- Any new COFINA transaction would again receive "claw-back" opinions from Bond Counsel, Underwriter's Counsel and the PR Secretary of Justice.

- Legal opinions can be made available for review by existing and prospective bondholders

**COFINA is the best rated credit among Puerto Rico issuers and has historically been the most attractive source of financing for the Commonwealth.**

63

IV.025

**Table 2: Tax Collections as Percent of GDP -- Comparison of Puerto Rico to OECD Countries**

|  | Puerto Rico | Average | Range |
|---|---|---|---|
| Personal Income | 2.2% | 8.3% | 2.2 - 24.2% |
| Corporate Income | 2.7% | 3.0% | 1.2 - 10.70% |
| SS Contributions | 2.75% | 9.00% | 0.00 - 16.70% |
| Payroll/Workforce | 0.21% | 0.41% | 0.00 - 4.44% |
| Property | 0.75% | 1.76% | 0.29 - 4.16% |
| Goods/Services | 2.216% | 10.77% | 2.06 - 15.91% |
| Total | 10.66% | 33.19% | |

Table 3 presents data on the distribution of income and tax liability and shows that less than 10 percent of filers are responsible for almost 78 percent of income tax receipts.

**Table 3:  2013 Income Tax Liability by Income Class (In Millions of USD)[5]**

| Income Level | Filers | Tax Liability (Excluding SS & Medicare) | Share of Tax (Excluding SS & Medicare) | Tax Liability (Including Social Security and Medicare) | Share of Tax (Including Social Security and Medicare) |
|---|---|---|---|---|---|
| Less than $20,000 | 538,026 | $4 | .2% | $368 | 9.6% |
| Between $19,999 and $40,000 | 319,108 | $191 | 9.2% | $791 | 20.6% |
| Between $39,999 and $60,000 | 107,107 | $270 | 13.0% | $604 | 15.7% |
| Greater than $59,999 | 89,459 | $1,614 | 77.6% | $2,079 | 54.1% |
| **Total** | **1,053,700** | **$2,079** | **100.0%** | $3,842 | **100.0%** |

[5] Distributional analysis based on 2012 individual tax returns provided by Department of Treasury.