# United States Court of Appeals
## For the First Circuit

No. 19-1181

IN RE:  THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

Debtors

RENE PINTO-LUGO; MOVIMIENTO DE CONCERTACION CIUDADANA INC., (VAMOS); UNION DE EMPLEADOS DE OFICINA Y PROFESIONALES DE LA AUTORIDAD DE EDIFICIOS PUBLICOS, (UEOGAEP); UNION INSULAR DE TRABAJADORES INDUSTRIALES Y CONSTRUCCIONES ELECTRICAS INC., (UITICE); UNION INDEPENDIENTE DE EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, (UIA); UNION DE EMPLEADOS DE OFICINA COMERCIO Y RAMAS ANEXAS, PUERTOS, (UEOCRA); UNION DE EMPLEADOS PROFESIONALES INDEPENDIENTES, (UEPI); UNION NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACION, (UNETE); ASOCIACION DE INSPECTORES DE JUEGOS DE AZAR, (AIJA); MANUEL NATAL-ALBELO

[Caption continues on next page]

## REPLY BRIEF OF INDIVIDUAL BONDHOLDERS, MOVANTS-APPELLANTS IN 19-1182 AND 19-1960

Movants – Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors – Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant – Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors

—————————————

No. 19-1182

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER
AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO

Debtors

---

MARK ELLIOTT; LAWRENCE B. DVORES; PETER C. HEIN

Movants – Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors – Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant – Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors

---

No. 19-1960

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR

PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

Debtors

---

PETER C. HEIN

Movant – Appellant

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES FINANCING CORPORATION, a/k/a Cofina

Debtors – Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY

Movant – Appellee

# TABLE OF CONTENTS

**Page**

FUNDAMENTAL FLAWS IN APPELLEES' POSITION ......................................1

I. "EQUITABLE MOOTNESS" ..........................................................................3

    A.    *Mission Product* precludes dismissal. .....................................................4

    B.    Even if "equitable mootness" remains viable after *Mission Product*, First Circuit requirements for dismissal are not met. .............5

    C.    Appellants' requested relief is feasible and does not require wholesale revocation of the Plan or harm innocent third parties. .........6

    D.    Failure to seek or obtain stay does not forfeit right to review and there was no waiver. .......................................................................8

    E.    Other equitable considerations and Appellees' unclean hands militate against dismissal. ...................................................................11

    F.    Appellees'/Intervenors' cases. ...........................................................15

II. PROMESA DOES NOT PERMIT ABROGATION OF PRE-2016 COFINA STATUTORY LIEN AT PLAN CONFIRMATION. ...................18

III. UNCONSTITUTIONAL TAKING OF NONCONSENTING BONDHOLDERS' PROPERTY AND ABROGATION OF THEIR RIGHTS. ..................................................................................................21

    A.    Takings Clause. ...................................................................................21

        1.    Statutory lien, cash-held-in-trust and contract rights are property. ....................................................................................21

            Appellees misuse *Andalusian* ................................................21

            Original and new COFINA bonds have same statutory lien ....24

            Cash-held-in-trust ....................................................................29

            Contract rights .........................................................................29

        2.    Per se taking occurred. ............................................................30

3.      Taking occurred even under *Penn Central* "regulatory takings framework"....................................................32

4.      Just compensation. ...................................................34

5.      Estoppel........................................................................37

B.    Due Process, Ex Post Facto and Bankruptcy Clauses.........................38

Due Process; Ex Post-Facto ......................................38

Bankruptcy ................................................................38

IV.  "VOTING" CANNOT OVERRIDE CONSTITUTIONAL RIGHTS, AND ABUSES HERE WARRANT REVERSAL........................................39

V.  NEW BOND LEGISLATION, ABROGATING LIENS AND OTHER RIGHTS OF COFINA BONDHOLDERS, VIOLATES CONTRACTS CLAUSE. ..............................................................44

VI.  PLAN DISCRIMINATES AGAINST 50-STATES RESIDENTS IN VIOLATION OF LAW AND DUE PROCESS, EQUAL PROTECTION AND PRIVILEGES AND IMMUNITIES CLAUSES. ......49

VII.  PROCEDURES VIOLATED RIGHTS OF 50-STATES BONDHOLDERS.............................................................................53

A.    Reliance upon results and determinations of confidential mediation-settlement process was not appropriate. ...........................53

B.    Lack of notice of, and participation in, confidential process was not "cured" by notice and hearing on the Plan....................................59

C.    Appellants' objections, and appeal, were appropriately directed to the COFINA Plan. ................................................................60

D.    "Range of reasonableness" standard did not apply to COFINA Plan confirmation. ................................................................62

E.    Adversary proceeding was required....................................................62

F.    Hearing transcripts. ..........................................................................63

G.    Electronic filing..................................................................................64

VIII.  APPOINTMENTS CLAUSE. ....................................................................65

IX.  ADDITIONAL VIOLATIONS. ......................................................65

    A.  No Waiver. ........................................................................65

    B.  11 U.S.C. §1123(a)(4). ....................................................65

X.  APPEAL 19-1960 SPECIFIC ISSUES. ........................................66

    A.  Reversal in 19-1182 requires reversal in 19-1960. ............66

    B.  Additional grounds for reversal in 19-1960. .....................66

        1.  Jurisdiction. ...............................................................67

        2.  Hein's Claim cannot properly be disallowed as "duplicative". ...............................................................68

        3.  Hein's Claim was not properly released or discharged because PROMESA does not, and cannot constitutionally, retroactively abrogate Hein's property and other rights........................................................68

        4.  Motion to compel. .....................................................68

        5.  Withholding transcript of ruling incorporated into court's order from public access by electronic means for 90 days contravenes public right of access to court records. .................69

CONCLUSION – RELIEF REQUESTED ............................................69

SUPPLEMENTAL REPLY ADDENDUM (follows Certificate of Service)

    13 L.P.R.A. § 11a, 12, 13, 14, 14a, 15, 16 ...................... Supp.III-077-III-112

    4/13/2016 Legislative Hearing Serial No. 114-36 (Kirpalani-excerpts) (https://www.govinfo.gov/content/pkg/CHRG-114hhrg99800/ html/CHRG-114hhrg99800.htm)........... Supp.III-113-III-119

    Employees Retirement System ("ERS") Senior Pension Funding Bonds, Series B, May 28, 2008 Official Statement (excerpts) ........................................................ Supp.III-0120-0125

# TABLE OF CITATIONS

**Cases**

*American United Mut. Life Ins. Co.* v. *City of Avon Park*,
311 U.S. 138 (1940) .............................................................................43

*Andalusian*
(*see Financial Oversight and Management Board* v. *Andalusian Global
Designated Activity Co.*)

*Aurelius Investment LLC* v. *Commonwealth of Puerto Rico*,
915 F.3d 838 (1st Cir. 2019), *cert. granted*, 139 S.Ct. 2735-38 (June 20,
2019), *oral argument held*, Oct. 15, 2019 ............................................... 17, 38, 65

*Barnard* v. *Thorstenn*,
489 U.S. 546 (1989) .............................................................................52

*Begier* v. *IRS*,
496 U.S. 53 (1990) ...............................................................................29

*Bennett* v. *Jefferson Cty.*,
899 F.3d 1240 (11th Cir. 2018), *cert. denied*,
139 S. Ct. 1305 (2019) ................................................................. 16, 17

*Blake* v. *McClung*,
176 U.S. 59 (1900) ...............................................................................51

*Buffalo Teachers Fed'n* v. *Tobe*,
464 F.3d 362 (2d Cir. 2006) ................................................................48

*Commodities Trading Corporation*
(*see United States* v. *Commodities Trading Corp.*)

*City of Detroit*
(*see In re City of Detroit*)

*City of Stockton*
(*see In re City of Stockton*)

*Continental*
(*see In re Continental Airlines*)

*Cramer* v. *Skinner*,
931 F.2d 1020 (5th Cir. 1991).............................................................50

*Detroit*
(*see In re City of Detroit*)

*Dewsnup* v. *Timm*,
  502 U.S. 410 (1992) ........................................................................................18

*Efron*
  (*see In re Efron*)

*Energy Reserves Grp., Inc.* v. *Kan. Power & Light Co.*,
  459 U.S. 400 (1983) ........................................................................................48

*Espinosa*
  (*see United Students Aid Funds, Inc.*)

*Financial Oversight and Management Board* v. *Andalusian Global
  Designated Activity Co.*, 948 F.3d 457
  (1st Cir. Jan. 30, 2020)...............................................................2, 18-23

*Georgia* v. *Public.Resoure.Org, Inc.*,
  No. 18-1150, __ U.S. __ (April 27, 2020)...........................................64

*Granada Wines, Inc.* v. *New England Teamsters and Trucking Industry
  Pension Fund*, 748 F.2d 42 (1st Cir. 1984).........................................49

*Grella* v. *Salem Five Cent Savings Bank*,
  42 F.3d 26 (1st Cir. 1994) .................................................................37

*Hanish*
  (*see In re Hanish, LLC*)

*Harris* v. *Rosario*,
  446 U.S. 651 (1980) ........................................................................39

*Hawes* v. *Club Ecuestre El Comandante*,
  535 F.2d 140 (1st Cir. 1976)...........................................................50

*Healthco.* v. *Hicks*
  (*see In re Healthco Int'l, Inc.* v. *Hicks, Muse & Co.*)

*Hicks, Muse & Co.* v. *Brandt*
  (*see In re Healthco Int'l, Inc.*)

*Horne* v. *Department of Agriculture*,
  576 U.S. ___, 135 S.Ct. 2419 (2015) ..................................2, 30, 31

*Hunt*
  (*see Local Loan Co.* v. *Hunt*)

*In re City of Detroit*,
  838 F.3d 792 (6th Cir. 2016), *cert. denied*,
  137 S. Ct. 1584 and 137 S. Ct. 2270 (2017) ...........................4, 16, 17

*In re City of Stockton*,
909 F.3d 1256 (9th Cir. 2018) ...................................................................... 16, 17

*In re Continental Airlines*,
91 F.3d 553 (3d Cir. 1996) ................................................................................4, 8

*In re Efron*,
535 B.R. 516 (Bankr.D.P.R. 2014),
*aff'd*, 529 B.R. 396 (1ˢᵗ Cir. BAP 2015) ...............................................................8

*In re Hanish, LLC*,
570 B.R. 4 (Bankr. D.N.H. 2017) .......................................................................49

*In re Healthco Int'l, Inc.* v. *Hicks, Muse & Co.*,
136 F.3d 45 (1st Cir. 1998) ..................................................................................5

*In re Mansaray-Ruffin*,
530 F.3d 230 (3d Cir. 2008) ...............................................................................18

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019) ...............................................................................18

*In re Moya* v. *Administracion Sistemas de Retiro de los Empleados del
Gabierno y la Justicature*,
601 B.R. 845 (Bankr. D.P.R. 2019) ....................................................................21

*In re Public Service Co. of New Hamsphire* v. *Northeast
Utilities Service Group*,
963 F.2d 469 (1st Cir. 1992) ................................................................................6

*Jefferson Cty.*
(*see Bennett* v. *Jefferson Cty.*)

*Kimball Laundry Co.* v. *United States*,
338 U.S. 1 (1949) ...............................................................................................36

*Koontz* v. *St. Johns River Water Mgt. Dist.*,
570 U.S. 595, 133 S.Ct. 2586 (2013) ........................................................2, 30, 31

*Lingle* v. *Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ...........................................................................................31

*Local Loan Co.* v. *Hunt*,
292 U.S. 234 (1934) ...........................................................................................22

*Louisiana* v. *New Orleans*,
215 U.S. 170, 175-178 (1909) ............................................................................30

*Lynch* v. *United States*,
292 U.S. 571 (1934) ........................................................................... 29-30, 32, 46

*Mansaray-Ruffin*
  (*see In re Mansaray-Ruffin*)

*Mennonite Board of Missions* v. *Adams*,
  462 U.S. 791 (1983) ........................................................................57

*Millennium*
  (*see In re Millennium Lab Holdings II, LLC*)

*Miller*
  (*see United States* v. *Miller*)

*Mission Product Holdings, Inc.* v. *Tempnology, LLC*,
  139 S.Ct. 1652 (2019) ...................................................4, 5, 8, 15, 17

*Moya*
  (*see In re Moya v. Administracion Sistemas de Retiro*)

*Nevada* v. *Watkins*,
  914 F.2d 1545 (9th Cir. 1990)...........................................................50

*New Hampshire* v. *Maine*,
  532 U.S. 742 (2001) .........................................................................37

*New Haven Inclusion Cases*,
  399 U.S. 392 (1970) .........................................................................36

*Norwood*
  (*see United States* v. *Norwood*)

*Ochadleus* v. *City of Detroit*
  (*see In re City of Detroit*)

*Old Cold* v. *Old Cold*,
  558 B.R. 500 (B.A.P. 1st Cir. 2016),
  *aff'd*, 879 F.3d 376 (1st Cir. 2018)................................................4, 5

*Ordonez* v. *ABM Aviation, Inc.*,
  787 F. App'x 553 (10th Cir. 2019)....................................................18

*PBGC*
  (*see Pension Benefit Guaranty Corp.* v. *R.A. Gray & Co.*)

*Peaje* v. *FOMB*,
  899 F.3d 1 (1st Cir. 2018),
  *cert. denied*, 139 S.Ct. 1169 (2019) ................................................21

*Penn Central Transportation Co.* v. *New York City*,
  438 U.S. 104 (1978) ................................................................... 31, 32

*Pension Benefit Guaranty Corp.* v. *R.A. Gray & Co.*,
   467 U.S. 717 (1984) ................................................................ 45, 48

*PPUC Pennsylvania Public Utility Comm'n* v. *Gangi*,
   874 F.3d 33 (1st Cir. 2017) ...........................................4n.19, 6

*PruneYard Shopping Center* v. *Robins*,
   447 U.S. 74 (1980) .............................................................31

*Public Service*
   (*see In re Public Service of New Hamsphire*)

*Radford*
   (*see Louisville Joint Stock Land Bank* v. *Radford*)

*Saenz* v. *Roe*,
   526 U.S. 489 (1999) .........................................................50

*Shapiro* v. *Thompson*,
   394 U.S. 618 (1969) .........................................................50

*Southern Pacific Terminal Co.* v. *ICC*,
   219 U.S. 498 (1911) .........................................................13

*Stockton*
   (*see In re City of Stockton*)

*Sveen* v. *Melin*,
   138 S. Ct. 1815 (2018) .....................................................49

*SW Boston Hotel Venture, LLC*,
   748 F.3d 393 (1st Cir. 2014) ..............................................5

*Toomer* v. *Witsell*,
   334 U.S. 385 (1948) ..................................................... 50, 52

*Town of Coloma* v. *Eaves*,
   92 U.S. 484 (1875) ...........................................................28

*Tulsa Professional Collection Services, Inc.* v. *Pope*,
   485 U.S. 478 (1988) .........................................................57

*U.S. Bank National Ass'n* v. *Village at Lakeridge, LLC*,
   138 S.Ct. 960 (2018) ................................................. 34 n.128

*United Automobile, Aerospace, Agricultural
   Implement Workers* v. *Fortuño*,
   633 F.3d 37 (1st Cir. 2011) ..............................................48

*United States* v. *Commodities Trading Corp.*,
339 U.S. 121 (1950) ............................................................36

*United States* v. *Miller*,
317 U.S. 369 (1943) ............................................................36

*United States* v. *Norwood*,
602 F.3d 830 (7th Cir. 2010) ..............................................36

*United States* v. *Vaello-Madero*,
No. 19-1930 (1st Cir. Apr. 10, 2020) ...........................50, 52

*United States Trust Co.* v. *New Jersey*,
431 U.S. 1 (1977) ................................... 3, 29, 30, 46, 47

*United Steel Paper and Forestry Rubber Mfg. Allied Industrial and Service Workers Int'l Union AFL-CIO-CLC* v. *Government of the Virgin Islands*,
842 F.3d 201 (3d Cir. 2016) ...............................................48

*United Students Aid Funds, Inc.* v. *Espinosa*,
559 U.S. 260 (2010) ............................................................63

*UST*
(*see United States Trust Co.* v. *New Jersey*)

*Vaello-Madero*
(*see United States* v. *Vaello-Madero*)

*Village at Lakeridge*
(*see U.S. Bank National Ass'n* v. *Village at Lakeridge, LLC*)

*Von Hoffman* v. *City of Quincy*,
4 Wall. 535 (1867) ..............................................................30

*Wolff* v. *New Orleans*,
103 U.S. 358 (1881) ............................................................30

**Constitution – U.S.**

U.S. Const. Art. I, §8, cl. 4 (Bankruptcy clause) (Addendum-19-1182-II-001) ....................................................... 38-39, 51

U.S. Const. Art. I, §9, cl. 3 (prohibition of Bills of Attainder and Ex Post Facto laws) (Addendum-19-1182-II-001) ...........................38

U.S. Const. Art. I, §10, cl. 1 (Contracts clause and prohibition of Bills of Attainder and Ex Post Facto laws) (Addendum-19-1182-II-001) ........ 3, 44-49, 62

U.S. Const. Art. II, §2, cl. 2 (Appointments clause) (Addendum-19-1182-II-001) ....................................................................65

U.S. Const. Art. IV, §2, cl. 1 (Privileges and Immunities clause)
(Addendum-19-1182-II-002)...........................................................49-52

U.S. Const. Art. IV, §3, cl. 2 (Territory clause)
(Addendum-19-1182-II-002).................................................................38

U.S. Const. Amendment I
(Addendum-19-1960-II-002).................................................................63

U.S. Const. Amendment V (Due Process and Takings clauses)
(Addendum-19-1182-II-002)...............................2, 21-37, 38, 49-52, 62

U.S. Const. Amendment XIV, §1 (Privileges and Immunities, Due Process
and Equal Protection clauses) (Addendum-19-1182-II-002)...................38, 49-52

**Statutes and Rules – Federal**

11 U.S.C. §109(c)(3).................................................................39

11 U.S.C. §552(a) ...............................................................2, 21

11 U.S.C. §1123(a)(4) (Addendum-19-1182-III-001).......................49, 65

11 U.S.C. §1126(c) .........................................................41 n.163

48 U.S.C. §737 (Addendum-19-1182-III-005).............................51

48 U.S.C. §2101 (Addendum-19-1182-III-005).............................18

48 U.S.C. §2121(c)(1)..................................................52

48 U.S.C. §2126(e) ...................................................20

48 U.S.C. §2141 ......................................................20

48 U.S.C. §2141(b)(1)(N) (Addendum-19-1182-III-005)...................20

48 U.S.C. §2161 ......................................................49

48 U.S.C. §2161(a) (Addendum-19-1182-III-006) ....................41 n.163

48 U.S.C. §2163 (Addendum-19-1182-III-006)...........................20

48 U.S.C. §2166 ......................................................20

48 U.S.C. §2172 ......................................................52

48 U.S.C. §2174........................................................19, 20, 62

48 U.S.C. §2174(b)(3) (Addendum-19-1182-III-007) ...............18, 19, 44

48 U.S.C. §2174(b)(6) (Addendum-19-1182-III-007) .................18, 19

48 U.S.C. §2174(b)(7) (Addendum-19-1182-III-007) ...................19

48 U.S.C. §2195(a) (Addendum-19-1182-III-009) ......................20

48 U.S.C. §2231(d)(3)(E) (Addendum-19-1182-III-011) ........................................50

Bankruptcy Rule 3020(e) ................................................................................. 10-11

Bankruptcy Rule 7001(2) (Addendum-19-1182-III-012).........................................63

F.R. Civil P. 60(b)(4) ...........................................................................................63

PROMESA § (*see* 48 U.S.C. section number listed above)

**Legislative Reports**

H.R. Report 114-602, to accompany
   H.R. 5278, "Puerto Rico Oversight, Management and Economic
   Stability Act" (June 3, 2016) (Addendum-19-1960-III-022-III-025) ..........20 n.66

**Statutes – Puerto Rico**

Act. No. 18 (May 22, 2009), amending Act 91 of
   May 13, 2006 (Addendum-19-1182-III-066-075) .... 22, 23, 25, 26, 27, 30, 31, 32

Act No. 241 (Nov. 15, 2018), "New Bond Legislation"
   (Addendum-19-1182-page-I250-to-I292-Docket#5053-1)......3, 27, 32, 44, 45, 52

13 L.P.R.A. §11a-16 (codification/compilation of
   Act-91 and its amendments)
   (Supp.-Reply-Addendum-III-077-111-112)................... 22, 23, 25, 26, 27, 30, 31

**Abbreviations**

| | |
|---|---|
| "Act-91" | COFINA Enabling Act, 13 L.P.R.A. §11a-16 (Supp.-Reply-Addendum-III-077-111-112) |
| "Addendum" or "Addendum-19-1182" | Addendum of Individual Bondholders, Movants-Appellants in 19-1182 (accompanies "Opening-19-1182" brief) |
| "Addendum-19-1960" | Addendum of Individual Bondholder, Movant-Appellant in 19-1960 (accompanies "Opening-19-1960" brief) |
| "Appellees'" | Appellees' Brief |
| "COFINA" | Puerto Rico Sales Tax Financing Corporation |
| "Commonwealth" | Commonwealth of Puerto Rico |

| "FF/CL" | [Proposed] Findings of Fact and Conclusions of Law Regarding Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, Submitted by FOMB (dated Jan. 21, 2019, JA-13-1749-Docket #4846-1) |
|---------|---------|
| "FOMB" | Financial Oversight and Management Board for Puerto Rico, as Representative for the Commonwealth of Puerto Rico and as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a COFINA |
| "Intervenors" | Intervenors COFINA Senior Bondholders Coalition Brief |
| "JA" or "Appendix" | Joint Appendix (The first digit following "JA" identifies the volume number, to facilitate direct reference to the pertinent joint appendix volume to locate any particular joint appendix page.) |
| "NBL" or "New Bond Legislation" | Act 241-2018, Nov. 15, 2018, Exhibit A to Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (Addendum-19-1182-page-I250-to-I292-Docket#5053-1) |
| "Opening-19-1182" | Appellants' Opening Brief in 19-1182 |
| "Opening-19-1960" | Appellant Hein's Opening Brief in 19-1960 |
| "PSA" | Amended and Restated Plan Support Agreement dated 9/20/2018 (JA-5-763-to-816 and JA-21-3572-to-3580-Docket#4364-2) |
| "Supplemental-Reply-Addendum" or "Supp.-Reply-Addendum" | Supplemental Addendum accompanying this Reply Brief |

5/15/2019 Opposition

Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182, filed 5/15/2019 (Document-00117439790)

5/15/2019-App. I

Appendix I to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439791)

5/15/2019-App. II

Appendix II to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439792)

5/15/2019-App. III

Appendix III to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439793)

5/15/2019-App. IV

Appendix IV to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439794)

5/15/2019-App. V

Appendix V to accompany 5/15/19 Appellants' Opposition to Appellees' Motion to Dismiss Appeal No. 19-1182 (Document-00117439795)

## FUNDAMENTAL FLAWS IN APPELLEES' POSITION

Appellants' opening brief demonstrated:

- Multiple constitutional and statutory violations adversely affecting modest-sized COFINA subordinate bondholders, including abrogation of the lien securing their bonds.[1]

- A confidential mediation-settlement process was used by FOMB, Commonwealth, hedge funds and other institutions for their own benefit.[2]

  - Hedge funds profited from trading that continued after the confidential process began; they bought subordinated bonds to control the vote and ensure robust recoveries on senior bonds and hundreds of millions in special payments.

  - Commonwealth benefited from $17.5 billion in pledged revenues taken from COFINA bondholders.

  - Modest-sized 50-states bondholders—not represented in the confidential process—suffered devastating losses.

The "result" of the confidential process was viewed by the court as an "inextricably interwoven" plan.[3]  Individual investors were "jammed" (January 2 objection deadline; FOMB's supporting memorandum filed 4 business days before

---

[1] Opening-19-1182-Points-I-VIII.

[2] Opening-19-1182-Sections-B,D.

[3] Opening-19-1182-Point-VI-page-59,62-to-63;Addendum-19-1182-page-I-199-to-I-200,I-230-Docket#5053-page-38-to-39,69-of-88.

hearing, *after* FOMB's reply).[4]  Asserted concerns about "all-or-nothing" results if COFINA lien challenges were adjudicated were used to justify approval of a "nonseverable" Plan ("approval of all…is required").[5]

Many of Appellants' arguments remain unanswered.  What Appellees/Intervenors do argue suffers from fundamental flaws.  Examples:

- Appellees rely upon older cases, but ignore more recent on-point Supreme Court Takings cases:

  - *Horne* (2015)[6]

  - *Koontz* (2013)[7]

- Appellees misstate rulings in *Andalusian*,[8] which involved a very different "pension bond" framework, turned on §552(a)—applicable to liens resulting from a "security agreement", but *in*applicable to statutory liens—and did not involve plan confirmation.[9]

- Appellees depart from the record and Act-91 to argue original COFINA bonds had only an "unsecured" "expectancy".  Even FOMB's March

---

[4] Opening-19-1182-Sections-C.2-page-21-to-22,C.4-page-25,Point-VI-page-63-to-64.

[5] Opening-19-1182-Point-II.A-page-42-to-43,Point-VI-page-59;Addendum-19-1182-page-I-200-Docket#5053-page-39-of-88;Addendum-19-1182-page-I-334-Docket#5055-page-42-of-45-*tracking-word-for-word*-21-JA-3607-Docket#4846-2-page-43-of-142.

[6] Opening-19-1182-Point-II.A-page-37;Reply-Point-III.A.2.

[7] Opening-19-1182-Point-II.A-page-34,37;Reply-Point-III.A.2.

[8] Appellees-page-3-to-4.

[9] Reply-Point-II,III.A.1.

2017 brief in this Court and New Bond Legislation ("NBL") recognized original COFINA bonds were "secured by a statutory lien".[10]

- Appellees acknowledge the court's "factual finding" of "just compensation" relied upon the confidential settlement-mediation process to "discount[]" the consideration and "determine[]" the allocation of distributions.[11] Yet Appellees ignore that the court contravened its own "standing order regarding separation of mediation and litigation activities."[12]

- Appellees ignore the Supreme Court's *United States Trust* opinion applying the Contract Clause to impairment of obligations to bondholders.[13]

## I. "EQUITABLE MOOTNESS".

Appellants appealed well-before the deadline. Yet Appellees argue that—even if constitutional and statutory violations occurred—this appeal should be dismissed based on a theory the Supreme Court has never accepted, whose application here would be opposite of equitable.

This Court denied Appellees' motion to dismiss on equitable mootness, without prejudice to reconsideration by the merits panel.[14] The Court is referred to

---

[10] Opening-19-1182-page-3-4,34,42;Reply-Point-III.A.1,III.A.5.

[11] Appellees-page-67;Addendum-19-1182-page-I-216-Docket#5053-page-55-of-88.

[12] Docket#1841;Opening-19-1182-page-39;Reply-Point-III.A.4.

[13] Opening-19-1182-page-1,30,48-49,54;Reply-Point-V.

[14] 8/7/2019 Order-Document-00117473675.

Appellants' 5/15/2019 Opposition,[15] 5/28/2019 28j letter;[16] Opening-19-1182-Point-IX-page-69-to-71.[17]

Two other Appeals—19-1181 and 19-1391—present different issues, and seek different relief, than 19-1182/19-1960.

### A. *Mission Product* precludes dismissal.

*Mission Product* rejected a claim that an appeal arising from a Chapter 11 bankruptcy case was moot, ruling: "[u]nder settled law, we may dismiss" as moot "only if 'it is impossible for a court to grant any effectual relief whatever.'" 139 S.Ct. at 1660. "If there is any chance of money changing hands," the "suit remains alive." *Id*.

Appellees ignore *Mission*. Intervenors argue *Mission* only addressed "garden-variety" mootness without using the term "equitable mootness."[18]

"Equitable mootness"—never accepted by the Supreme Court—runs counter to the Court's jurisprudence. *Continental*, 91 F.3d at 567-573 (Alito dissent); *City of Detroit* dissent (838 F.3d at 805-810); *Old Cold*, 558 B.R. at 513&n.5.

- "Equitable mootness" presumes the appellate court has discretion to dismiss an appeal.[19]

---

[15] 5/15/2019-Document-00117439790;5/15/2019-Appendices-at-Document-00117439791,00117439792,00117439793,00117439794,00117439795.

[16] Document-00117444204.

[17] Document-00117513266.

[18] Intervenors-page-38.

[19] *PPUC* v. *Gangi* (Appellees-page-28), 874 F.3d at 37.

- But *Mission* ruled an appellate court may dismiss an appeal "only" if effectual relief is "impossible." 139 S.Ct. at 1660.

*Mission* specifically *rejected* the argument that petitioner (Mission) "will be unable to convert any judgment in its favor to hard cash" because "the bankruptcy estate has recently distributed all of its assets." *Id*. at 1661. "[C]ourts often adjudicate disputes whose 'practical impact' is unsure at best. . ." *Id*.

Under *Mission*, erroneous lower court rulings are not immunized from review.

**B.    Even if "equitable mootness" remains viable after *Mission Product*, First Circuit requirements for dismissal are not met.**

Irrespective of whether a stay was granted or sought, this Circuit's decisions have been reticent to apply "equitable mootness" to preclude appeals and have not dismissed unless *both* dismissal is "equitable" *and* the appeal is "moot" because appellate relief is not possible:

- *SW Boston Hotel* (Appellees-page-26), 748 F.3d at 402-03 (Chapter 11 plan confirmed and effective; affirmed B.A.P. refusal to dismiss appeals because if appellant prevailed court "could fashion some form of practical relief, even if only partial or alternative").

- *Healthco* v. *Hicks*, 136 F.3d 45, 48-49 (1st Cir. 1998) (appellant sought no stay, but appellee/trustee made no showing that settlement proceeds disbursed to appellee/trustee could not be recovered).

- *Old Cold*, 558 B.R. 500,513-14 (B.A.P. 1st Cir. 2016), *aff'd*, 879 F.3d 376 (1st Cir. 2018) ("Appellees have the burden of establishing the

appeal is equitably moot"; appellees had not met their burden—despite appellants neither seeking nor obtaining stay).

- *PPUC* v. *Gangi* (Appellees-page-28), 874 F.3d at 37 (appellee failed to show sale moved beyond practical annulment, and relief would harm innocent third parties).

Appellees/Intervenors rely upon an earlier corporate bankruptcy case (*Public Service*), but there debtor post-consummation received $1.4+ billion in new money from third-parties. 963 F.2d at 473-74&n.14. Here, Commonwealth improperly *took* property and can provide compensation for what it took.

### C. Appellants' requested relief is feasible and does not require wholesale revocation of the Plan or harm innocent third parties.

Appellees mischaracterize relief sought in 19-1182:[20]

- Relief sought in 19-1182[21] is feasible and would not adversely impact innocent third parties.

- No COFINA securities transactions would be unwound.

- Even Intervenors would be unaffected—they would retain their securities, hundreds of millions of cash and large trading profits.[22]

---

[20] *Cf.*Appellee-page-3.

[21] Opening-19-1182-page-72-to-73-"RELIEF REQUESTED".

[22] Document-00117439790-docket-page-25-to-27-internal-page-20-to-22;Document-00117439791-docket-page-5-to-7-internal-page-2-to-4-5/15/2019-App.I-003-to-005.

- 19-1182 presents different considerations bearing on equitable mootness than 19-1181 and 19-1391.

Effective relief would only modestly impact Commonwealth, which is not an "innocent third party": Commonwealth improperly benefited from disavowing its own statutes and taking pledged tax revenues securing the bonds.[23] Even after non-consenting bondholders are granted full relief, Commonwealth would still benefit from a $400+ million/year ($17+ billion over time) windfall.[24]

The modest amounts required to compensate non-consenting bondholders pose no threat to the provision of essential services:

- Commonwealth had $9+ billion in its TSA account at 2/28/2020.[25]

- Having paid *$332 million* consummation costs to favored parties, Appellees' argument that an estimated $316 million *one-time* payment to compensate non-consenting bondholders—which could alternatively be paid through added COFINA bonds amortized over time—would have draconian consequences[26] lacks credibility. Commonwealth would still keep $17+ billion. "[U]nravel", "reignite", "collapsing"[27] is just rhetoric.

---

[23] Opening-19-1182-Section-B.1-page-9-to-11,Point-II.A-page-34-to-36;Reply-Point-III.A.1;Document-00117439790-docket-page-11-to-12,14-internal-page-6-to-7,9;Document-00117439791-docket-page-19-internal-page-16-5/15/2019-App.I-017;JA-16-2536-to-2537-Docket#7211-1-page-25-to-26-of-146.

[24] Opening-19-1182-page-72-to-73;Document-00117439790-page-25-to-27-internal-page-20-22;Document-00117439791-docket-page-5-to-7-internal-page-5/15/2019-App.I-003-to-005.

[25] aafaf.pr.gov/reports-3-10-2020-TSA-report.

[26] Appellees-page-35.

[27] Appellees-page-35-to-38.

Simply declaring provisions of the settlement and plan "nonseverable"[28] cannot immunize constitutional and statutory violations from review.

### D. Failure to seek or obtain stay does not forfeit right to review and there was no waiver.

*Mission Product*, Justice Alito's dissent in *Continental* (91 F.3d at 572-73), and this Court's decisions[29] show failure to seek or obtain a stay does not forfeit appellate rights where the court-below erred and relief is feasible.

Furthermore, because monetary relief is feasible, a stay would not have been available. *Efron*, 535 B.R. 516, 519 (Bankr.D.P.R. 2014), *aff'd*, 529 B.R. 396,403n.8 (1st Cir. BAP 2015).

Appellees' choice to immediately consummate underscores Appellees' inequitable conduct and militates against dismissal:

- Appellees/Intervenors consummated the Plan one week after judgment issued[30]—long before the 30-day deadline for appeal.

- Appellees rushed to consummate even before obtaining IRS' determination of tax-exempt status (Appellees' previously undisclosed

---

[28] Appellees-page-35;*compare*-Addendum-19-1182-page-I-334-Docket#5055-page-42-of-45-*tracking-word-for-word*-21-JA-3607-Docket#4846-2-page-43-of-142.

[29] Reply-Points-I.A,I.B;Document-00117439790-docket-page-9-internal-page-4.

[30] JA-14-2178-to-2179-Docket#5104-page-2-of-4.

12/14/2018 request for an IRS private letter ruling was still pending).[31] The rush-to-consummate resulted in:

- a chaotic exchange process for retail investors,

- issuance of taxable bonds to individuals owning tax-exempt bonds,

- a second exchange transaction (after the IRS determination was received),

all further damaging individual investors.[32]

- Appellees/Intervenors could have waited to see if appeals were taken, and sought expedition of appeals, to resolve any uncertainty before consummating. Appellees' stated reason for immediate consummation *before* the appeal deadline was the desire to "consummate[] quickly so new bonds could be issued and traded in short order"[33]—trading now claimed as grounds for equitable mootness.[34] This hardly justifies the injury to individual investors from the rush-to-consummate.

---

[31] JA-15-2279-to-2283,2291,2294-to-2295-Docket#6283-page-3-to-7-of-13;#6283-1-page-2-of-3;#6283-2-page-3-to-4-of-24;JA-14-2203-to-2204-Docket#5123-page-5-to-6-of-26;JA-18-2809-Docket#8427-page-13-of-20.

[32] JA-15-2284-to-2288,2292,2353-to-2361,2363-to-2369,2372-to-2378-Docket#6283-page-8-to-12-of-13;#6283-1-page-3-of-3;#6283-8,#6283-9,#6283-10;#6283-11-page-2-to-8,11-to-17-of-18;JA-16-2494-to-2498,2502,2514-to-2515,2518-to-2526,2538-to-2554-#7211-page-5-to-9,13-of-24;#7211-1-page-3-to-4,7-to-15,27-to-43-of-146;JA-18-2809-to-2814,2819-to-2860,2884-to-2885-#8427-1-page-3-to-44,68-to-69-of-69.

[33] Appellees-page-14.

[34] Appellees-page-3,19,23,26-to-27.

- Appellees acknowledge every aspect of the plan was consummated on or about 2/12/2019.[35] Appellees do not explain what practical difference expedition would make thereafter. Appellants appealed on 2/19/2019[36]— well before the 30-day deadline—yet Appellees waited to 4/12/2019 to move to dismiss, delaying the appeal until the Court's 8/7/2019 denial of Appellees' motion. Appellees, as well as Appellants, requested modest and necessary extensions of time, which prejudiced no one.

- Precluding review because individual objectors did not seek and obtain a stay of consummation before Appellees/Intervenors effected their rushed consummation would reward aggressive tactics and disadvantage individual investors who lack Appellees'/Intervenors' litigation funding and resources.

Appellees/Intervenors argue Appellants did not object to waiver of the 3020(e) stay or the release and non-severability provisions.[37] However:

- Appellants objected to the Plan "in its entirety"/"in all material respects" and to the proposed order "in all material respects."[38]

---

[35] Appellees-page-31.

[36] JA-14-2246-Docket#5166.

[37] Appellees-page-14,29;Intervenors-page-14,15,31.

[38] JA-7-1124-Docket#4597-page-15-of-16;JA-7-1139-#4598-*including*-page-15-of-15;JA-13-2091-#4911-*including*-page-2-of-8;JA-14-2112,2115-#5041-*including*-page-3&6-of-10;JA-6-1017,1041,1052-Docket#4585-*including*-page-5,29,40-of-43;JA-7-1104-to-1105-Docket#4595-*including*-page-13-to-14-of-21.

- The Disclosure Statement does not mention waiver of 3020(e) stay or non-severability in the upfront Q&A section[39]—nor state that objectors must specifically object to the 3020(e) stay waiver or non-severability.

  - There was one reference to Rule 3020(e) buried in 30.21, a "Miscellaneous Provision" in Plan Article XXX,[40] and one reference to 3020(e) in "Miscellaneous Provisions" in the Disclosure Statement.[41]

  - Non-severability was likewise buried in the plan and Disclosure Statement.[42]

- Appellees/Intervenors cite no legal support for the proposition that those who object to a plan "in its entirety"/"in all material respects" forfeit appellate rights if they do not also specifically object to particular buried provisions.

- Intervenors'-page-31-32 assertion that objections to "entirety"/"all" result in waiver of appellate relief if no argument for "modification" was made is unsupported by Intervenors' authorities.

**E.  Other equitable considerations and Appellees' unclean hands militate against dismissal.**

- Appellees could have:

---

[39] JA-4-506-to-527-Docket#4364-page-7-to-28-of-263.

[40] Addendum-19-1182-page-I-423-Docket#5055-1-page-86-of-91.

[41] JA-4-655-Docket#4364-page-156-of-263.

[42] Addendum-19-1182-page-I-375,I-407-Docket#5055-1-page-38,70-of-91;JA-4-609,638-Docket#4364-page-110,139-of-263.

- proceeded to an adjudication of the validity of the COFINA lien; they chose not to.[43]

- given actual notice to individual bondholders that the mediation-settlement process could impair non-participating individuals' rights, and provided individuals a meaningful opportunity to participate; they chose not to.

- made provision for appointment of a committee or other fiduciary to represent interests of 50-states bondholders unrepresented in the confidential mediation-settlement; they chose not to.

- Appellees instead opted for a plan that skewed recoveries to hedge funds—who bought post-PROMESA at pennies on the dollar and were induced by large and rapid profits to join Appellees to push through a plan that treated individual 50-states bondholders unfairly and compounded the injury by splitting retail investors' single bonds into 14 fragments and consummating before tax status was determined.[44]

- Appellees do not "come[_] into equity…with clean hands".[45]  Examples:

  - Appellees used a confidential process to develop the plan in which hedge funds and other major institutions—but not 50-states individual

---

[43] Opening-19-1182-page-7,40-to-41,67-to-68.

[44] Opening-19-1182-page-18-to-19,23-to-24,57-58,65-to-66.

[45] Opening-19-1182-page-70.

bondholders—participated, received special benefits and enjoyed an information advantage over individuals.[46]

- Hedge funds participating in that confidential process bought billions of dollars of subordinate bonds (and votes) *after* the confidential process began.[47]

- PROMESA's voting process was abused.[48]

- Appellees withheld information from the district court and bondholders prior to confirmation.[49]

- Appellees "sand-bagged" objectors with voluminous eve-of-hearing papers to which objectors were not allowed a written response.[50]

- Even if hypothetically full relief is no longer feasible, Appellees should not be permitted to evade merits review.

  - Review permits reversal of the court's "just-compensation" determination.

  - Dismissal invites repetition of abuses—whereby debtors and institutions use contrived invalidity claims, followed by confidential

---

[46] Opening-19-1182-Section-B-page-8-to-19,Point-III-page-45-to-46,Point-VI-page-59-to-65;Reply-Point-IV,VII.A.

[47] Opening-19-1182-Section-B.3-page-12-to-13,Point-III-page-45-to-46;Reply-Point-IV.

[48] Opening-19-1182-Section-D-page-27-to-29,Point-III-page-45-to-46; Reply-Point-IV.

[49] Opening-19-1182-Section-C.3-page-22-to-25.

[50] Opening-19-1182-Section-C.4-page-25.

mediation-settlement, to take advantage of small investors—"yet evading review." *Southern Pacific Terminal*, 219 U.S. at 515.

○ Appellees' recently announced Commonwealth plan seeks to repeat the COFINA abuses—secret dealings with hedge funds who bought post-PROMESA at distressed prices to structure a deal disproportionately benefiting themselves:

○○ Appellees' proposed Commonwealth plan provides individuals with 16 splinter bonds for every bond position, worse than COFINA's 14 splinter bonds[51].

○○ "Consummation costs" and "PSA Restriction Fees" are made available to selected institutions; 50-states retail investors are segregated into separate retail classes and share limited "Retail Support Fees" only if retail classes vote "yes"[52] (thereby improperly coercing individuals and impacting the vote).

○○ Preference to Puerto Rico investors, who can elect high coupon (7.125%) taxable bonds—potentially convertible into high-coupon tax-exempt bonds.[53]

---

[51] JA-19-3164-Docket#11284-page-7-of-12;JA-19-3191-to-3194-Docket#11946-9;JA-19-3195-to-3198-Docket#11946-10;JA-19-3208-to-3209,3215,3216-Docket#11947-page-48-to-49,341,344-of-454.

[52] JA-19-3164-to-3166-Docket#11284-page-7-to-9-of-12;JA-19-3202-to-3203,3210-to-3211,3212-to-3214,3219-Docket#11947-page-36-to-37,50,52,287-to-289,365-of-454.

[53] JA-19-3201,3204-to-3207-Docket#11947-page-35,44-to-47-of-454;JA-19-3194-Docket#11946-9-page-4-of-4.

○○ Hedge funds involved in a confidential mediation-settlement process in Commonwealth's case—many also involved in COFINA's case—are repeating the COFINA pattern of making large purchases of securities that are the subject of the confidential process while individual bondholders lack equal information about what is transpiring.[54]

**F.    Appellees'/Intervenors' cases.**

• Appellees'/Intervenors' cases largely pre-date *Mission Product* and are discussed in Appellants' 5/15/2019 opposition.[55]  In brief:

○ Cases under Chapter 9/11 bankruptcy regimes *pre*-dating inception of creditors' rights cannot be extended to immunize from review Constitutional violations arising from *retroactive* application of the 2016 PROMESA statute to abrogate *pre*-PROMESA rights.  The Constitution trumps PROMESA and any equitable mootness doctrine.

○ COFINA was solvent, and (before 46.35% of pledged revenues were taken by Commonwealth) pledged SUT revenues were sufficient to

---

[54] JA-19-3160-to-3162,3170-to-3187-Docket#11284-page-3-to-5-of-12;#11284-3-page-1-to-18;JA-19-3154-to-3157-Docket#10821-page-2-to-5-of-5;JA-19-3224-to-3230-Docket#11951-page-2-to-8-of-8;JA-19-3231-to-3271-Docket#12216-page-1-to-37;#12216-3-page-1-to-4-of-4;JA-19-3272-to-3276-Docket#12252-page-2-to-6-of-6;JA-20-3277-to-3315-Docket#12296-page-1-to-37;Docket#12296-3-page-1-to-4-of-4;JA-20-3316-to-3317-Docket#12355-page-1,57-of-101.

[55] 5/15/2019-Document-00117439790-docket-page-27-to-29-internal-page-22-to-24.

fully pay its bonds.[56]  By contrast, Chapter 9 debtors were *in*solvent—a requirement to file under Chapter 9 (*Stockton*, 909 F.3d at 1259).

○ Chapter 9 debtors' plans raised taxes or brought in new revenues: *Stockton*, at 1260 (plan funded by sales tax increases); *Detroit*, 838 F.3d at 796 ("grand bargain" provided new outside funding for pension plan); *Jefferson*, 899 F.3d at 1252 ($1 billion new sewer warrants sold based on rate covenants).  By contrast, COFINA's plan gave property away—taken by Commonwealth, which *reduced* taxes by $2 billion, including *reducing* sales taxes.[57]  Relief can be fashioned by requiring Commonwealth to relinquish a small part of what it improperly took from nonconsenting bondholders.[58]

• Appellants are secured bondholders whose property—including cash—was taken.  By contrast:

---

[56] Opening-19-1182-Section-A-page-7&nn.18-19,Point-IV-page-49-to-50;JA-5-845-to-847-Docket#4379-Tr.44:line 20-to-Tr.46:line 20;JA-16-2526-to-2528-Docket#7211-1-page-15-to-17-of-146;Document-00117439791-docket-page-7-to-10-internal-page-4-to-7-5/15/2019-App.-I-005-008;JA-19-3146-to-3153-Docket#9647-page-1-to-2,5-to-9,19-of-19.

[57] JA-6-1049-Docket#4585-page-37-of-43;JA-11-1492-to-1495-Docket#4606-8-page-167-to-170-of-180;Document-00117439791-docket-page-19,47-to-56-internal page-16,Ex.G-5/15/2019-App.-I-017,045-054;JA-17-2689-to-2690,2696-to-2698,2731-to-2745-Docket#7961-page-13-to-14-of-19;#7961-1-page-1-to-3,37-to-51-of-71;JA-16-2536-to-2537,2592-to-2601-Docket#7211-1-page-25-to-26,81-to-90-of-146;Opening-19-1182-page-51-to-52.

[58] Opening-19-1182-page-72-to-73;Document-00117439790-document-page-25-to-27-internal page-20-to-22-5/15/2019-Document-00117439791-docket-page-5-to-7-internal page-2-to-4-5/15/2019-App.I-003-005;JA-6-1044-to-1051-Docket#4585-page-32-to-39-of-43.

- ○ Appellants in *Detroit*, participants in an underfunded pension plan, *benefited* from new, outside funding for the pension plan (*Detroit*, at 796),

- ○ Appellants-ratepayers in *Jefferson County* lost no property; they complained about sewer rate covenants in new sewer warrants sold to retire existing warrants (*Jefferson*, at 1252).

- ○ Appellant in *Stockton* had only an *un*secured, disputed, money damage claim (*Stockton*, at 1262).

- There was no dispute about the authority of the Chapter 9 debtors to file bankruptcy petitions.  COFINA's Title III petition and Plan were filed and proposed by an unconstitutionally constituted FOMB (*Aurelius*, 915 F.3d at 859-861).[59]

- *Detroit* and *Stockton* included cogent dissents.

- ○ *Detroit*'s dissent noted "equitable mootness" has not been accepted by the Supreme Court and runs counter to its jurisprudence (at 805-10).

- ○ *Stockton*'s dissent noted the doctrine is particularly inappropriate where objectors seek just compensation for takings (at 1269-80).

Intervenors reference two 2019 cases[60], but those cases do not address *Mission Product*.  Also:

---

[59] JA-6-1041-Docket#4585-page-29-of-43.

[60] Intervenors-page-27-28,30,31.

- Parties released in *Millennium paid* $325 million—unlike Commonwealth which *took*—and the ruling was limited (945 F.3d at 130-37,144n.20).

- The individual's claim had been settled by the Chapter 7 trustee in *Ordonez*.

## II. PROMESA DOES NOT PERMIT ABROGATION OF PRE-2016 COFINA STATUTORY LIEN AT PLAN CONFIRMATION.[61]

As *Appellants* acknowledged, 48 U.S.C. §2101 provides Title III "shall apply" to debts, claims and liens created before or after 6/30/2016.[62] But to say Title III *applies* does not mean PROMESA *abrogated* the pre-2016 COFINA statutory lien.

This Court's 1/30/2020 *Andalusian* opinion[63] did *not* involve statutory liens or consider the requirements for plan confirmation.

At Plan confirmation, the COFINA statutory lien must be respected:

- The long-settled rule is "that liens pass through bankruptcy unaffected." *Dewsnup* v. *Timm*, 502 U.S. 410, 418-19 (1992); *Mansaray-Ruffin*, 530 F.3d at 235. Appellees' position assumes PROMESA *sub silentio* reversed that rule.

- §2174(b)(3) precludes confirmation if debtor is "prohibited by law from taking any action necessary to carry out the plan," and §2174(b)(6)

---

[61] Opening-19-1182-Point-I-page-32-to-33.

[62] Opening-19-1182-page-32.

[63] Appellees-page-54-56.

requires, at Plan confirmation, the Court to consider whether available remedies under the non-bankruptcy laws of the territory would result in a greater recovery than the Plan provided. Neither provision was at issue in *Andalusian*.

- ○ Act-91 provided a statutory lien for the benefit of COFINA bondholders and concededly remained operative Commonwealth law prior to confirmation.[64]

- ○ Abrogation of the statutory lien contravened Act-91 and the Constitution.

- ○ Statutorily-pledged revenues were sufficient to pay the bonds in full.[65]

- ○ §2174(b)(3),(b)(6) precluded confirmation.

- §2174(b)(7)—not addressed in *Andalusian*—required, at confirmation, the plan be "consistent with the applicable Fiscal Plan," and §2141(b)(1)/2141(b)(1)(N) required that Fiscal Plans "shall … respect" pre-6/30/2016 "lawful liens."

  - ○ The House Report discussion of §2174 explains:

    "By incorporating consistency with the Fiscal Plan into the requirements of confirmation of a plan of adjustment, the Committee has *ensured lawful priorities and liens*, as provided

---

[64] Appellees-page-74.

[65] Opening-19-1182-Section-A-page-7&nn.18-19,Point-IV-page-49-to-50;Document-00117439791-docket-page-7-to-10-internal page-4-to-7-5/15/2019-App.I-005-to-008.

for by the territory's constitution, laws, and agreements, *will be respected* in any debt restructuring that occurs."[66]

○ Appellees' argument that §2126(e) divests the court of jurisdiction to determine whether §2141(b)(1)(N) has been complied with, even at plan confirmation,[67] ignores §2166's jurisdictional grant and §2174's requirement for judicial confirmation. The Report's explanation ("ensured lawful…liens…will be respected") underscores that at plan confirmation courts can remedy FOMB's disregard of §2141.

• Two other PROMESA provisions—neither at issue in *Andalusian*—underscore PROMESA did not abrogate pre-PROMESA liens:

○ §2163 (territory law—here, New Bond Legislation—prescribing method of composition of indebtedness can*not* bind nonconsenting creditors).

○ §2195(a) (holding liable transferee of a transfer "in violation of applicable law" under which creditor has valid pledge or lien).

Application of Title III to the COFINA statutory lien does not permit abrogation of that lien. If it did, that would be unconstitutional.[68]

---

[66] Addendum-19-1960-page-III-025-H.R.Rep.page-114-602-*regarding*-§314-p.63/115(emphasis added);Addendum-19-1960-page-III-024-H.R.Rep.114-602-*regarding*-§201-p.58/115.

[67] Appellees-page-56.

[68] Opening-19-1182-Points-II-to-VII;Reply Points-III-to-VIII.

### III. UNCONSTITUTIONAL TAKING OF NONCONSENTING BONDHOLDERS' PROPERTY AND ABROGATION OF THEIR RIGHTS.

#### A. Takings Clause.[69]

##### 1. Statutory lien, cash-held-in-trust and contract rights are property.

**Appellees misuse *Andalusian***. Appellees misuse *Andalusian* to argue Appellants had only an "expectancy," not a property right.[70] But:

- *Andalusian* involved a "security agreement" (948 F.3d at 463n.1) and applied 11 U.S.C. §552(a), governing liens resulting from a "security agreement". However, here there was a statutory lien—as FOMB told this Court.[71]

  - §552(a) does *not* apply to a statutory lien. *Peaje* v. *FOMB*, 899 F.3d 1, 7-8.

  - *Moya*, 601 B.R. 845, 857-858,860,862 (Bankr.D.P.R.2019), following *Peaje*, ruled a statutory lien attached to "contributions made and those subsequently accrued" post-petition, *i.e.*, "future" and "after-acquired" property. That the COFINA statutory lien on pledged SUT (with non-impairment covenant) was property follows *a fortiori* from *Moya* (lien on individual's retirement funds).

---

[69] Opening-19-1182-Point-II.A-page-33-to-44.

[70] Appellees-page-57-58.

[71] Opening-19-1182-Section-A-page-3.

- ○ Other Appellees-page-57 cases *not* involving statutory liens are inapposite; *Hunt* was expressly limited to assignment of future wages, 292 U.S. at 245.

- ERS' entitlement to receive post-petition employer contributions was subject to contingencies—including whether Commonwealth's legislature appropriated funds, and whether an employer obligation to contribute arose—and could be reduced (948 F.3d at 464,468-69,474). But *by statute*:

  - ○ Commonwealth "transferred" pledged revenues to COFINA.[72] And Commonwealth's statute provided such revenues "shall be the property of COFINA.[73]" Thus, there was no contingency regarding whether pledged revenues were "property" under "local law." *Cf.* 948 F.2d 468n.7. Whether the pledged revenue "property" would be sufficient to pay the bonds did not alter its status as "property of COFINA"; all transferred revenues were COFINA's property. Furthermore, statutorily-pledged revenues were sufficient to pay the bonds in full.[74]

---

[72] Addendum-19-1182-page-III-069-070-Act-18-2009-pp.4-5(§2)[*amending-*(§3)];Supp.-Reply-Addendum-19-1182-page-III-086(§12);Addendum-19-1182-page-IV-023,025-JA-11-1465,1474-Docket#4606-8-page-1,63-of-180.

[73] Addendum-19-1182-page-III-069-070-Act-18-2009-pp.4-5(§2)[*amending-*(§3)];Supp-Reply-Addendum-III-086(§12);Addendum-19-1182-page-IV-023,025-JA-11-1465,1474-Docket#4606-8-page-1,63-of-180.

[74] Opening-19-1182-Section-A-page-7&nn.18-19,Point-IV-page-49-to-50;JA-19-3146-to-3153-Docket#9647-page-1-to-2,5-to-9,19-of-19;JA-16-2526-to-2528-Docket#7211-1-page-15-to-17-of-146;JA-5-845-to-847-Docket#4379-Tr.44:line20-to-Tr.46:line20.

- Pledged revenues were designated the "source of repayment of COFINA bonds".[75]

- Pledged revenues were directly deposited into the Dedicated Sales Tax Fund and never available to Commonwealth.[76] There was no contingency over whether Commonwealth would appropriate funds.

- ERS' Official Statement stated the legislature could reduce employer contributions and there was *no* legislative covenant not to amend ERS Enabling Act-447 adverse to bondholders.[77] But Commonwealth *by statute* "agree[d] and assure[d]" COFINA bondholders that Commonwealth would not limit or restrain rights or powers to meet COFINA's agreements with bondholders, and "no amendment" to Act-91 "shall undermine any obligation or commitment of COFINA."[78]

- *Andalusian* was limited to the "specific facts" of the ERS claims and did not address whether plan provisions and confirmation processes violated the Constitution and other laws (948 F.3d at 465n.4,476n.17,477).

---

[75] Addendum-19-1182-III-068,069-070,071-072-Act-18-2009-pp.3-4(§1)[*amending*-(§2(c))],pp.4-5(§2)[*amending*-(§3)],pp.6-7(§3)[*amending*-(§4(b))];Supp.-Reply-Addendum-19-1182-page-III-078(§11(c),086(§12),094-095(§13(b)).

[76] Addendum-19-1182-III-070-Act-18-2009-p.5-§2[*amending*-(§3)];Supp-Reply-Addendum-19-1182-III-086(§12).

[77] 948 F.3d at 464,468-69;ERS-Series-B-5-28-2008 Offering Statement-at-1,25-Supp.-Reply-Addendum-page-III-0120,0124-¶3.

[78] Addendum-19-1182-page-III-073-074-Act-18-2009-pp.8-9-(§4)[*amending*-(§5(c))];JA-7-1169-Docket#4606-3-page-5-of-13;Addendum-19-1182-page-IV-007-JA-8-1228-Docket#4606-4-page-57-of-173;JA-9-1288-Docket#4606-5-page-30-of-155;Addendum-19-1182-page-IV-023,025;JA-11-01465,1474-Docket#4606-8-page-1,63-of-180;Opening-19-1182-page-3-to-8.

- Supreme Court case law (Opening-19-1182-Point-II.A and below) concerning what is "property" controls for purposes of the Takings Clause. PROMESA cannot retroactively alter the character of the COFINA lien as property.[79]

- Parenthetically, COFINA subordinate interest rates were modest. Comparisons to the discontinued Bond Buyer-GO-20 index (*cf.* 948 F.3d at 464n.2) are of limited relevance; one must consider maturity and market dynamics. Per EMMA and Federal Reserve data, COFINA CUSIP74529JHJ7 (maturity 2028) sold 6/11/2009 at 5.7% (84-basis-points above that index), a smaller spread than lower-rated California GO CUSIP1306BAR3 sold 10/9/2009 at 5% (94-basis-points above the index).

**Original and new COFINA bonds have same statutory lien**. Appellees—untethered from the factual record—argue "new bonds are more valuable than" "old bonds," which (supposedly) provided only an "expectancy" in SUT revenues, "akin to an unsecured contractual right" and "conveyed no property interest in the future revenue stream."[80] But:

---

[79] Opening-19-1182-Point-I-page-32-to-33,II.A-page-33-to-38;Reply-Point-III.A.1-below,III.A.2.

[80] Appellees-page-58-59,67-68.

- Appellees' claim of "novel" "expectancy"[81] is 180-degrees opposite what Commonwealth law provided[82] and what this Court and bondholders were told.[83]

- FOMB represented to this Court *original* COFINA bonds were "*secured by a statutory lien* against pledged SUT revenue."[84]

- Appellees-page-67 citations do *not* support Appellees' assertions about original bonds; the citations only relate to *new* bonds.

- The *original* bonds had the *same* statutory protections:[85]

  ○ COFINA Act-91 (for *original* bonds) provided:

    ○ "for creating...a lien" on "revenues" "in favor of" "bondholders."[86]

    ○ statutory commitment that "source of repayment of COFINA bonds shall be" "first revenues"[87] of SUT deposited in the Dedicated Sales Tax Fund."[88]

---

[81] Appellees-page-59,68,69.

[82] Addendum-19-1182-page-III-066-075-Act-18-2009;Supp.-Reply-Addendum-page-III-077-to-III-112(13-L.P.R.A.-§§11a-16).

[83] Opening-19-1182-Section-A-page-3-to-8.

[84] Addendum-IV-020;JA-6-1022-to-1023-Docket#4585-page-10-to-11-of-43;JA-11-1426,1428-to-1429-Docket#4606-7-page-33,78-to-79-of-447.

[85] Opening-19-1182-Section-A-page-3-to-8;Point-II.A-page-40-to-43.

[86] Addendum-19-1182-page-III-066,068-Act-18-2009-p.1-*preamble*,p.2-carryover-¶,p.3-¶2.

[87] Addendum-19-1182-page-III-068,070-Act-18-2009-pp.3,5-(§1(c))[*amending-*§2],(§2)[*amending-*§3];Supp.-Reply-Addendum-III-078(§11(c),086(§12(a)).

[88] Addendum-19-1182-page-III-068,074-Act-18-2009-p.3(§1)[*amending-*§2(c)], p.9(§6);Supp.-Reply-Addendum-page-III-078(§11a(c));Addendum-19-1182-page-

- "funds deposited," and "future funds" that must be deposited," in the Dedicated Sales Tax Fund were—by statute— "transferred to, and shall be the property of COFINA" and were *not* resources available to Commonwealth.[89]

- the statutory lien —"in favor of COFINA bondholders"— applied to "future funds" "subsequently received by COFINA," which "shall be subject to said lien immediately," "without the need" for "any other act".[90] Thus, the circumstance or condition of receipt of revenues triggered the statutory lien "immediately, without the need of…any other act."[91]

- Commonwealth by statute "agree[d] and assure[d]" "any person…who…acquires bonds" that, until bonds were paid with interest, Commonwealth would not limit COFINA's ability to meet COFINA's agreements with bondholders, and "no amendment" "shall undermine any obligation or commitment of COFINA."[92]

---

III-047,048-049-Act-1-2009-p.6-(§1)[amending§2(c)],pp.7-8 (§2)[amending§3],p.14(§7).

[89] Addendum-19-1182-page-III-069-070-Act-18-2009-pp.4-5(§2)[*amending-§3*];Supp.-Reply-Addendum-page-III-086(§12);Addendum-19-1182-page-IV-023,025-Docket#4606-8-page-1,63-of-180.

[90] Addendum-19-1182-page-III-066,067,068,069-070,071-072-Act-18-2009-p.1-*preamble*,p.2-carryover-¶,p.3-¶2,pp.4-5-(§2)[*amending*-§3],pp.6-7-(§3)[*amending*-(§4(b))];Supp.-Reply-Addendum-page-III-086(§12),095(§13);Addendum-19-1182-page-IV-023,025-JA-11-1465,1474-Docket#4606-8-page-1,63-of-180.

[91] Addendum-19-1182-page-III-071-072-Act-18-2009-p.6-7-(§3)[*amending*-§4(b)];Supp.-Reply-Addendum-page-III-094-095(§13).

[92] Addendum-19-1182-page-III-073-074-Act-18-2009-pp.8-9-(§4)[*amending* §5(c)];Supp.Addendum-page-III-100(§14(c));JA-7-1169-Docket#4606-3-page-5-of-13;Addendum-19-1182-page-IV-007-JA-8-1228-Docket#4606-4-page-57-of-

○ New Bond Legislation acknowledged *original* COFINA bondholders had a lien over *future* revenues: "*lien* that *holders of COFINA bonds currently have* over approximately *$17.5* billion of previously *pledged* SUT revenues".[93] NBL states it "make[s] clear the original legislative intent" of Act 91.[94]

○ Appellees admit pledged revenues were "transferred to COFINA" and it was intended pledged revenues be "property of COFINA."[95] The "risk" that SUT revenues would constitute "available revenues" under Commonwealth's Constitution is the same for original and new because that Constitution was not amended.[96]

• Appellees-page-58-to-59 cites to 13 L.P.R.A §12, but §12 is only *part* of the original COFINA Act;[97] furthermore:

○ §12 provided pledged taxes are deposited directly into the Dedicated Sales Tax Fund (not Commonwealth Treasury) and are *not* "resources available" or "available for use" by Commonwealth.[98]

---

173;JA-9-1288-Docket#4606-5-page-30-of-155;Addendum-19-1182-page-IV-023,025-JA-11-1465,1474-Docket#4606-8-page-1,63-of-180.

[93] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43(emphasis added);JA-6-1034-Docket#4585-page-22-of-43.

[94] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[95] Appellees-page-7.

[96] *Compare*-Opening-19-1182-page-40-to-43-*with*-Appellees-page-7.

[97] COFINA Act-91 sections as enacted appear in Addendum-19-1182-page-III-014-to-III-075; in particular, page-III-066-to-III-075. 13 L.P.R.A.§11a-16, a codification/compilation, is annexed as Supp.-Reply-Addendum-page-III-077-to-III-112.

[98] Supp.-Reply-Addendum-page-III-086.

- ○ §12 encompassed "future funds".[99]

- ○ §13 and §14(c) codified other Act-91 provisions applicable to original COFINA bonds described above.[100]

- Appellees' current assertions are contrary to Official Statements used to sell the bonds—attested to by multiple Commonwealth officials—which represented that, by statute, transferred pledged taxes included "all present and future collections,"[101] and that the "security for the bonds" included the Commonwealth's non-impairment covenants.[102] The Supreme Court has rebuked "dishonesty" (*Town of Coloma* v. *Eaves*, 92 U.S. 484, 485 (1875)) of government issuing bonds, taking money and then claiming bonds do not have to be repaid because what government told bondholders at the time of issuance was (assertedly) untrue.

Both new and original liens are materially identical,[103] yet in seeking Plan confirmation Appellees did not tell the court-below that a lien of this nature is only an "unsecured" "expectancy." Rather, FOMB told the court the statutory COFINA lien was "legal, valid, binding and enforceable."[104]

---

[99] Supp.-Reply-Addendum-page-III-086.

[100] Supp.-Reply-Addendum-page-III-094-095,100.

[101] Addendum-19-1182-page-IV-006;JA-8-1207,1219-¶2,1241-¶1-Docket#4606-4-page-30,46-¶2,73-¶1-of-173;JA-9-1264,1279-¶2,1305-¶1-Docket#4606-5-page-1,20-¶2,49-¶1-of-155.

[102] Addendum-19-1182-page-IV-007-JA-8-1207,1228-Docket#4606-4-page-30,57-of-173;JA-9-1264,1288-Docket#4606-5-page-1,30-of-155.

[103] Opening-19-1182-Point-II.A-page-40-to-43;Reply-Point-III.A.1-above.

[104] *Compare*-JA-13-1790-to-1791,1811-to-1815-FF/CL-Docket#4846-1-page-46(¶119)-to-page-47,67(¶171)-to-71-of-121-*with*-Addendum-19-1182-I-209-to-I-212,I-237-to-I-242-Docket#5053-page-48(¶120)-to-51,76(¶176)-to-81-of-

Now, FOMB proposes to use new "COFINA Junior Lien Bonds" to compensate General Obligation bondholders under FOMB's new proposed Commonwealth plan.[105] Commonwealth's proposed Disclosure Statement uses the phrase "Lien Bonds"; it does *not* state that COFINA's lien is an "unsecured expectancy."[106]

**Cash-held-in-trust**. Appellees' "expectancy" argument ignores:

- Appellees took cash held in trust for subordinated bondholders.[107]

- Supreme Court's decision in *Begier*.[108]

Appellees cannot justify taking Appellants' cash.

**Contract rights**. "Contract rights" "are a form of property" for purposes of Taking Clause, *United States Trust*, 431 U.S. at 19n.16.[109]

The Supreme Court applied this principle to sustain a Fifth Amendment claim in *Lynch* v. *United States*, 292 U.S. 571 (1934):

---

88;*compare*-JA-21-3587-to-3589-#4846-2-page-8-to-10-*with*-Addendum-19-1182-page-I-299-to-I-302-Docket#5055-page-8-to-10-of-45.

[105] JA-19-3200,3209-to-3210,3216-to-3218-Docket#11947-page-34,49-to-50,344-to-346-of-454;JA-19-3195-to-3198-Docket#11946-10.

[106] JA-19-3200,3209-to-3210,3216-to-3218,3220-to-3222-Docket#11947-page-34,49-to-50,344-to-346,401-to-403-of-454.

[107] Document-00117439791-docket-page-20-internal-page-17;5/15/2019-App.I-018;4/12/2019-Document-00117426005-page-40-internal-page-4(¶10)-Rifkind;Opening-19-1182-page-9-to-12,14,18,26,30,34-to-36,38,69;JA-16-2554-to-2555-Docket#7211-1-page-43-to-44-of-146;JA-11-1449-Docket#4606-7-page-398-of-447;*cf*.Appellees-page-19;Intervenors-page-17.

[108] Opening-19-1182-page-34-to-35.

[109] Opening-page-37-to-38.

The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States … (*id.* at 579)

*Lynch* is cited with approval in *UST*, 431 U.S. at 26n.25.

*United States Trust* stated "States are bound by their debt contracts" "notwithstanding" that "the taxing power may have to be exercised if debts are to be repaid," and cited with approval earlier decisions ruling that "a state may not authorize a municipality to borrow money and then restrict its taxing power so the debt cannot be repaid." 431 U.S. at 24&n.22, *citing*, *Louisiana* v. *New Orleans*, 215 U.S. 170, 175-178 (1909); *Wolff* v. *New Orleans*, 103 U.S. 358, 365-68 (1881); *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 554-55 (1867).

Notably, the statutory covenant whose repeal *UST* invalidated applied to *future* revenues ("which have been or shall be pledged", *id.* 10.)

That Commonwealth's statute providing lien "in favor of [COFINA's] bondholders" stated that "[n]o amendment…shall undermine any obligation or commitment of COFINA" underscores COFINA's covenants are property of bondholders.[110]

## 2. Per se taking occurred.

Appellees ignore *Horne* (2015), *Koontz* (2013), and other authorities[111] which show a *per se* taking occurred.

---

[110] Addendum-19-1182-page-III-066,068,073-074-Act-18-2009-p.1-*preamble*-p.3-¶2,pp.-8-9(§4)[*amending*-§5(c)];Supp.-Reply-Addendum-page-III-100-§14(c).

[111] Opening-Point-II.A-page-37-to-38.

*Horne*:  Takings Clause "protects 'private property' without any distinction between different types" (135 S.Ct. at 2426).

- "a physical *appropriation* of property"—including personal property— "[gives] rise to a *per se* taking without regard to other factors".  *Id.* at 2427.

- Partial takings of personal property (*e.g.*, 47% in *Horne*) are still *per se* takings.  *Id.* at 2428, 2430.

*Koontz*:

- when "government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account...a '*per se* (takings) approach' is the proper mode of analysis".  570 U.S. at 614.

- "we have repeatedly held that the government takes property when it seizes liens".  *Id.* at 616.

Appellees' cases pre-date *Horne*, and do not support application of *Penn Central*'s regulatory takings framework here.

- *Lingle*[112] (law limiting rents oil companies can charge dealers).

- *PruneYard*[113] (California protection of speech and petitioning on privately owned shopping center).

---

[112] Appellees-page-60.

[113] Appellees-page-61.

### 3. Taking occurred even under *Penn Central* "regulatory takings framework".

Appellees' *Penn Central* factors discussion[114] makes unsupported assertions:

- Appellees' argument that New Bond Legislation and Plan "had no economic impact on Appellants"[115] is cited to nothing and is contradicted by record evidence.[116]

- Appellees' argument there was no interference with investment-backed expectations because Appellants "were buying bonds from a public entity"[117] ignores Commonwealth's statutory non-impairment covenant[118] and Supreme Court's admonitions:

> …Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors… To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation (*Lynch*, 292 U.S. at 580).

  ○ COFINA subordinates were rated higher than Commonwealth GO bonds because COFINA bonds were "secured by a statutory lien".[119]

---

[114] Appellees-page-62-to-65.

[115] Appellees-page-62.

[116] Opening-19-1182-Section-B.7-page-18-to-19.

[117] Appelleees-page-63.

[118] Addendum-19-1182-page-III-073-074-Act-18-2009-pp.8-9-(§4)[amending §5(c)];Supp.-Reply-Addendum-page-III-100(§14(c));JA-7-1169-Docket#4606-3-page-5-of-13;Addendum-19-1182-page-IV-007-JA-8-1228-Docket#4606-4-page-57-of-173;JA-9-1288-Docket#4606-5-page-30-of-155;Addendum-19-1182-page-IV-023,025-JA-11-1465,1474-Docket#4606-8-page-1,63-of-180.

[119] Opening-19-1182-Section-A-page-3-to-8.

○ Individual bondholders who bought pre-PROMESA had no notice:

    ○○ A solvent COFINA would be permitted to file a bankruptcy-type proceeding.  (Prior to PROMESA there was *no* provision allowing COFINA to file for bankruptcy; even Chapter 9 requires a debtor be "insolvent".)

    ○○ Commonwealth instrumentalities and selected institutions would engage in a confidential mediation-settlement process whereby— even without an adjudication that the lien was invalid—COFINA would give up almost one-half of pledged revenues and losses would be imposed on individual investors.

○ Even if a shortfall of pledged SUT revenues was a "foreseeable risk"—that did *not* occur.

    ○○ SUT revenues exceeded debt service requirements.[120]

    ○○ COFINA—in its response to IRS' proof of claim—*admitted* that "COFINA made all post-petition interest payments under the bonds and was *never in payment default*."[121]

---

[120] Opening-19-1182-Section-A-page-7&nn.18-19,Point-IV-page-49-to-50.

[121] JA-19-3146-to-3147,3148-to-3152-Docket#9647-page-1-to-2,5-to-9-of-19(emphasis added).

- Appellees' assertion purchasers "were warned" is not supported by the citations,[122] and ignores repeated affirmations of the validity of COFINA's structure.[123]

- Appellees' "promote the common good"[124] argument rings hollow: Commonwealth took $17B+ pledged revenues, hedge funds buying *post*-PROMESA profited, likely by $1+ billion (plus hundreds of millions in "consummation costs"),[125] yet *pre*-PROMESA individual purchasers suffered huge losses.[126]

### 4. Just compensation.

Appellees characterize the court's assertion that mediation-settlement "determinations" are "sufficient proof" of just compensation as "factual finding."[127] But legal error, including on the constitutional Takings issues, "infect[ed]"[128] the court's decision.[129] Appellees cannot answer Appellants' showings:[130]

- Appellants: court's invocation of mediation-settlement "determinations" as "sufficient proof" of just compensation contravened both mediation

---

[122] Addendum-19-1182-page-I-215-Docket#5053-page-54-of-88(referencing post-2016 litigation);Appellees-page-7,64n.24.

[123] Opening-19-1182-Section-A-page-3-to-8.

[124] Appellees-page-64.

[125] Opening-19-1182-Section-B.1-to-B.6-page-9-to-18.

[126] Opening-19-1182-Section-B.7-page-18-to-19.

[127] Appellees-page-67;Addendum-19-1182-page-I-216-Docket#5053-page-55-of-88.

[128] *Village at Lakeridge*, 138 S.Ct. at 967&n.4,968&n.7;Opening-19-1182-page-31-to-32.

[129] Opening-19-1182-Point-II.A-page-33-to-44;Reply-Point-III.A.

[130] Opening-19-1182-page-38-to-43.

team's admonition that mediation and court proceedings "should not be conflated" and court's own order "regarding separation of mediation and litigation activities".[131]  Appellees:  No response.

- Appellants:  Results of a settlement process cannot properly be considered as evidence of validity, invalidity or amount in assessing whether "just compensation" was provided to *non*participants—much less "sufficient proof" of "just compensation".[132]  Appellees-page-71 cites no contrary authorities.  Appellees also ignore that whether the Commonwealth-COFINA settlement should be approved from a COFINA perspective was at issue.[133]

- Appellants:  No contemporaneous record of what transpired in the confidential process—thus no record to support "discounts" and "allocations" "determined".[134]  Why 46.35%?  Why (supposed) 56.414%? Appellees:  No response.

Appellees' cases do not refute the principles in Opening-19-1182-page-38-43 or present circumstances comparable to using a confidential mediation-settlement process to "determine" just compensation for *non*-participants:[135]

---

[131] Opening-19-1182-page-39;JA-2-188-to-189-Docket#1836;JA-2-190-to-191-Docket#1841.

[132] Opening-19-1182-page-39.

[133] Reply-Point-VII.C.

[134] Opening-19-1182-page-39;*cf.*-Addendum-19-1182-page-I-215-to-I-216-Docket#5053-page-54-to-55-of-88.

[135] Appellees-page-65-66,70.

- *Norwood* (convicted drug offender's application for restitution for value of personal property taken upon arrest).

- *Commodities Trading Corporation* (whether ceiling prices under war-time Emergency Price Control Act should be considered in deciding what is just compensation).

- *New Haven Inclusion Cases* (valuation date for debtor assets).

- *Miller* (restates rule that "compensation" means the full and perfect equivalent in money of the property taken, 317 U.S. at 373; issue in case was whether owner should receive incremental benefit of value added to property by prior government condemnation of adjacent lands).

- *Kimball* (measure of compensation for temporary taking of plant is rental value, plus lost going-concern value, 338 U.S. at 7, 16).

Appellees' argument that Appellants "received the full value of the settled amount of their collateral" and "SUT revenues" were not "used for anything other than paying the creditors secured by it"[136] is double-talk. The "settled amount" was not "full value"[137] and Commonwealth took "$17.5 billion of previously pledged SUT revenues."[138]

---

[136] Appellees-page-66.

[137] Opening-19-1182-Section-B.7-page-18-to-19.

[138] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

Appellees refer to "additional" covenants[139] but the cited opinion does *not* include the word "additional" before "covenants".[140]  Original and new COFINA bonds have the same statutory lien.[141]

Appellees ignore that "value" of reducing "litigation risks"[142] to the original lien is *not* the requisite "sure and certain" compensation.[143]  Appellees do not dispute that Commonwealth's Constitution was not amended, and new COFINA bonds can be challenged, including by persons not bound by the settlement.[144]

### 5. Estoppel.

The estoppel doctrine applied in Appellants' cases was judicial estoppel[145]— distinct from claim or issue preclusion as in *Grella*.[146]  Judicial estoppel seeks to prohibit parties from "playing 'fast and loose with the courts.'"  *New Hampshire*, 532 U.S. at 750.

There are disturbing inconsistencies:

---

[139] Appellees-page-67.

[140] Addendum-19-1982-page-I-210-Docket#5053-page-49-of-88.

[141] Reply-Point-III.A.1;Opening-19-1182-Section-A-page-3-to-8;Point-II.A-page-40-to-43.

[142] Addendum-19-1182-page-I-215-to-I-216-Docket#5053-page-54-to-55-of-88.

[143] *Compare*-Opening-19-1182-page-40,42-*with*-Appellees-page-65-to-67.

[144] JA-5-725-to-729-Docket#4365-page-226-to-229-of-263;*compare*-Opening-19-1182-page-40-to-43-*with*-Appellees-page-65-to-67.

[145] Opening-19-1182-page-43-to-44.

[146] Appellees-page-73.

- FOMB told this Court in 2017 that COFINA bonds were "*secured* by a *statutory lien* against pledged SUT revenue".[147]  Now FOMB says COFINA bondholders had only an "unsecured" "expectancy".[148]

- FOMB told this Court in 2017 "the COFINA enabling act *makes clear* that SUT income does not constitute a resource 'available' to the Commonwealth".[149]  Now FOMB says the "issue is sufficiently uncertain" to justify settlement.[150]

## B.     Due Process, Ex Post Facto and Bankruptcy Clauses.[151]

**Due Process; Ex Post-Facto**.  Opening-page-40 stated Kennedy and Thomas' opinions were concurrences, but urged their reasoning as additional grounds to preclude retroactive application of PROMESA.

**Bankruptcy**.  Despite the plain language of the Bankruptcy Clause,[152] Appellees argue the Territory Clause allows Congress to treat Puerto Rico differently.  But:

- The Territory Clause does not trump other specific provisions of the Constitution.  *Aurelius*, 915 F.3d at 851-52.

---

[147] Opening-19-1182-Section-A-page-3-to-8;Addendum-19-1182-IV-020-021;JA-6-1022-to-1023-Docket#4585-page-10-to-11-of-43;JA-11-1426-to-1432-Docket#4606-7-page-33,77-to-81,101-of-447(emphasis added).

[148] Appellees-page-57-to-59,67-to-69.

[149] *Id.*

[150] Appellees-page-73-74.

[151] Opening-19-1182-Point-II.B-page-44-to-45.

[152] Opening-19-1182-page-45.

- The Bankruptcy Clause is specific: "uniform" "throughout the United States." There was no specific constitutional provision providing for "uniform" AFDC reimbursements (the issue in *Harris*).

- COFINA bonds were sold to individuals "throughout the United States".[153] Those individuals (including Appellants) cannot be subject to non-uniform bankruptcy laws.

PROMESA Title III ("Adjustment of Debts") is a bankruptcy law and not "uniform". Example: Chapter 9 requires a debtor be "insolvent" (11 U.S.C. §109(c)(3)). COFINA was solvent,[154] and admittedly "never in payment default."[155] Yet PROMESA Title III—as applied by the court—allowed COFINA to use Title III to avoid lawful statutory liens. And funds realized by releasing the lien were not used to address some—nonexistent—insufficiency of funds at COFINA, but rather were dispersed to Commonwealth and (in the form of "consummation costs" and other cash) to hedge funds who purchased COFINA bonds at distressed prices after PROMESA was enacted.

## IV.  "VOTING" CANNOT OVERRIDE CONSTITUTIONAL RIGHTS, AND ABUSES HERE WARRANT REVERSAL.[156]

Appellees do not refute that:

---

[153] Opening-page-5&n.10;JA-8-1207,1244-to-1245-Docket#4606-4-page-30,77-to-78-of-173;JA-9-1264,1308-to-1310-Docket#4606-5-page-1,53-to-55-of-155.

[154] Opening-19-1182-page-7&nn.18-to-19,49-to-50;JA-16-2526-to-2528,2582-to-2586-Docket#7211-1-page-15-to-17,71-to-75-of-146;*compare*-JA-5-703,705-to-707-Docket#4364-page-204,206-to-208-of-263-*with*-JA-8-1220,1240-Docket#4606-4-page-47,71-of-173-*and*-JA-9-1280,1301,1303-Docket#4606-5-page-21,44,46-of-155;JA-5-845-to-847-Docket#4379-Tr.44:line20-to-Tr.46:line20.

[155] JA-19-3146-to-3147,3148-to-3152-Docket#9647-page-1-to-2,5-to-9-of-19.

[156] Opening-19-1182-Point-III-page-45-to-46.

- PROMESA's retroactively-imposed vote mechanism resulted in self-interested bondholders voting to "take[] *property* from A. and give[] it to B."[157] Notably, COFINA senior bondholders' counsel participated in the PROMESA legislative process and advocated for the adoption of the retroactively-imposed PROMESA "voting" mechanism – while asserting he did not know when his clients bought most of their bonds.[158]

- Plan proponents, who predominantly held COFINA senior or GO bonds and who participated in the confidential mediation-settlement process, depressed the price of COFINA subordinates by their actions, including by seeking to declare defaults and asserting seniors could "settle" subordinate bondholders' rights,[159] and then proceeded to purchase billions of dollars of *subordinates* at distressed prices and vote these bonds for a plan that specially benefited them.[160]

---

[157] Opening-19-1182-Point-III-page-45.

[158] https://www.govinfo.gov/content/pkg/CHRG-114hhrg99800/html/CHRG-114hhrg99800.htm(4/13/2016-Legislative-Hearing-Serial-No-114-36-(Kirpalani-excerpts))-Supp.-Reply-Addendum-page-III-117,118-119.

[159] JA-2-293-Docket#3680-page-26-of-30;JA-7-1134-Docket#4598-page-10-of-15;JA-20-3289-Docket#12296-page-15&n.11-of-40;JA-20-3324-to-3329-Case-17-03284-Docket#87-16;JA-20-3360-to-3362-Adv.Proc.17-133-Docket#431-page-2,37-to-38-of-44.

[160] Opening-Section-B.3-page-12-to-13;JA-4-462-Docket#4244-page-2-of-3;JA-7-1134-Docket#4598-page-10-of-15;JA-3-347-to-352-Docket#3859-page-32-to-37-of-37;JA-6-957-Docket#4564-page-11-of-22;JA-6-974-Docket#4564-1-page-6-of-7;JA-20-3289-Docket#12296-page-15&n.11-of-40;JA-20-3331-to-3332,3334-to-3338-Case-17-03284-Docket#212-page-2-to-3,6-to-10-of-11;JA-20-3341-to-3342,3344-to-3347-Case-17-03284-Docket#360-page-3-to-4,7-to-10-of-11;Document-00117439791-docket-page-10-to-12-internal-page-7-to-9-5/15/19-App.I-008-to-010.

○ In the period from when the mediation-settlement process began (June 2017)[161] and ended (fall 2018), major COFINA senior and GO bondholders who participated in the confidential process bought $2.136 billion of subordinates in order to control the subordinate class vote and benefit from trading profits.[162]

○ This presents the spectre of mediation-settlement participants purchasing with an information advantage over individual sellers not privy to the confidential process, and improper buying of votes to win the subordinate class vote, thereby furthering such major COFINA senior and GO bondholders' interests, as well as Appellees' interests, in obtaining plan approval.

○ If one reverses class 5 votes of over $2.136 billion bought after the mediation process began, there would not have been the required 2/3's in amount and likely not the required 50%+ in number of class 5.[163]

• Plan proponents "bought" support by offering preferential consideration to Puerto Rico investors, also altering the class-5 vote outcome.[164]

Appellees argue waiver[165], but the Disclosure Statement failed to disclose material information:

---

[161] JA-1-005-to-007-Docket#430-page-2-to-4-of-4.

[162] Opening-19-1182-Section-B.3-page-12-to-13;JA-6-974-Docket#4564-1-page-6-of-7.

[163] *Compare*-JA-12-1698-Docket#4794-page-9-of-28; 11 U.S.C. §1126(c); 48 U.S.C. §2161(a).

[164] Opening-19-1182-Section-B.6-page-16-to-18,Section-D-page-27-to-29,Point-V-page-57-to-59.

[165] Appellees-page-91.

- The post-PROMESA purchases of subordinate bonds by Plan proponents who held senior or GO bonds were not disclosed in the Disclosure Statement. Indeed, the PSA attached to the Disclosure Statement redacted even current holdings.[166] Although the court was alerted to the problem posed by the mediation-settlement participants' purchases,[167] and information pieced together from filings elsewhere in the record was referenced in objections,[168] the court failed to remedy problems posed by conflicted purchases and voting and inadequate disclosure.

- Appellees argue "Bonistas' decision to request payment … was fully disclosed"[169]. But Appellees cite Docket#5097-page-1-to-2—filed 2/11/2019-10:09-P.M., *after* the deadlines for objections and voting, *after* the hearing, *after* the confirmation order issued, and just hours before confirmation became effective on 2/12/2019. Appellees do not refute the showing[170] of misrepresentations and nondisclosure with respect to Bonistas.

- Appellees' attempt to defend their misrepresentations and nondisclosure of federal tax consequences[171] side-steps a key disclosure problem:

---

[166] JA-5-776-to-803-Docket#4364-2-page-42-to-69-of-110.

[167] JA-3-347-to-352-Docket#3859-page-32-to-37-of-37.

[168] JA-4-462-Docket#4244-page-2-of-3;JA-7-1134-Docket#4598-page-10-of-15;JA-6-936-to-937-Docket#4481-page-4-to-5-of-8-*attaching*-JA-3-347-to-352-Docket#3859-page-32-to-37-of-37-at-#4481-2-page-1-to-6-of-6;JA-6-957-Docket#4564-page-11-of-22;JA-6-974-Docket#4564-1-page-6-of-7-&-Ex.M(Docket#4564-14-page-1-*et.seq*.).

[169] Appellees-page-92n.32.

[170] Opening-19-1182-Section-C.3-page-24-to-25.

[171] *cf.*Appellees-page-91-92.

Appellees' Disclosure Statement said that "a private letter ruling has *not* been submitted to the Internal Revenue Service", but on *December 14, 2018*—while the notices for the confirmation hearing were in the mail—FOMB had (secretly) requested an IRS private letter ruling or closing agreement that would let *all* bonds be federally tax-exempt, including bonds distributable to recipients of the "on-island" preference.[172]

- Appellees ignore they affirmatively addressed tax treatment at the hearing and in proposed findings, but did not correct the Disclosure Statement misrepresentations—even for the court.[173]  Appellees cannot invoke the imprimatur of the court's findings[174] when Appellees left the court in the dark.

In *American United* the Supreme Court ruled:

> The responsibility of the court entails scrutiny of the circumstances surrounding the acceptances, the special or ulterior motives which may have induced them, the time of acquiring the claims so voting, the amount paid therefor, and the like.  (311 U.S. at 145).

As evident from the court's largely word-for-word adoption of FOMB's proposed FF/CL,[175] that scrutiny did not occur here.

---

[172] Opening-19-1182-Section-C.3-page-22-to-23.

[173] Opening-19-1182-Section-C.3-page-22-to-23.

[174] Appellees-page-91-92.

[175] Opening-19-1182-page-32&n.143.

## V.    NEW BOND LEGISLATION, ABROGATING LIENS AND OTHER RIGHTS OF COFINA BONDHOLDERS, VIOLATES CONTRACTS CLAUSE.[176]

Appellees contradict themselves in the same sentence. *Compare* Appellees-page-74 (New Bond Legislation "had no independent effect") *with* (NBL "was necessary to effectuate the Plan and obtain confirmation").

NBL was signed into law 11/15/2018,[177] thereby "authorizing the transactions contemplated by…Plan."[178]   NBL "amend[ed]" Act-91,[179] "allow[ed] for…restructuring…COFINA debt,"[180] and "establish[ed] the legal framework" for "restructuring" COFINA's "outstanding bonds".[181]   Enactment of NBL "to amend" Act-91 was a "condition precedent" to Plan's effective date.[182]

Because NBL violated the Contract Clause, confirmation was precluded. Furthermore, debtor was "prohibited by law" from taking actions "necessary to carry out the plan".  48 U.S.C. §2174(b)(3).  §2174(b)(3) would be meaningless if a plan could be conditioned on violations of law thereafter deemed excused by the court's confirmation order.

---

[176] Opening-19-1182-Point-IV-page-46-to-55.

[177] JA-4-534-Docket#4364-page-35-of-263.

[178] Addendum-19-1182-page-I-365-Docket#5055-1-page-28-of-91-§1.1132;JA-4-534-Docket#4364-page-35-of-263.

[179] JA-5-695-Docket#4364-page-196-of-263.

[180] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[181] JA-4-534,JA-5-695-Docket#4364-page-35,196-of-263;JA-13-1790-FF/CL-Docket#4846-1-page-46-¶119-of-121-*repeated*-Addendum-19-1182-page-I-209-Docket#5053-page-48-¶120-of-88.

[182] Addendum-19-1182-page-I-407-to-I-408,Docket#5055-1-page-70-to-71-of-91-§25.1(c)(viii).

The fact a federal bankruptcy court may *itself* be empowered to impair contracts does not mean it can sanction Commonwealth legislation that violates the Constitution. Appellees cite no case holding this is permissible.

Appellees argue impairment resulted from "non-legislative" acts. Appellees-page-76. But this is contradicted by the name ("New Bond Legislation"). Furthermore, Appellees admit NBL "canceled the old COFINA Bonds" (Appellees-page-15,76.) *PBGC* (Appellees-page-76) addressed federal, not state, legislation.

Appellees argue this is "not a typical case where a state impairs its own contracts for its own benefit" *and* "impairment was not substantial".[183] But NBL's "Statement of Motives" refutes this: "These amendments…release the lien…over…$17.5 billion of previously pledged SUT revenues…now…available for use by the Government."[184]

Appellees argue Appellants received "commensurate value" (Appellees-page-76). But:

- There was never an adjudication that the original COFINA lien was not valid.[185]

- COFINA admits that COFINA "was never in payment default".[186]

---

[183] Appellees-page-75n.27,16.

[184] Addendum-19-1182-page-I-274-Docket#5053-1-page-25-of-43.

[185] Opening-19-1182-page-7,40-to-43.

[186] JA-19-3146-to-3147,3148-to-3152-Docket#9647-page-1-to-2,5-to-9-of-19;Reply-Point-III.A.3.

- COFINA had *no* "debt crisis".[187]  There were sufficient pledged revenues to pay its debt.[188]

- The Disclosure Statement "estimated" "projected" recoveries for 50-states individual subordinate holders as 56.414%, but in reality recoveries were much lower, because of reduced coupon rates, lost liquidity, loss of tax-exempt interest post-Title III filing, and other factors.[189]

*United States Trust*, the controlling case regarding whether a municipal issuer can impair its own bond obligations,[190] cites *Lynch*[191] with approval for the proposition "need for money is no excuse for repudiating contractual obligations" (431 U.S. at 26n.25).  Furthermore, *Commonwealth*'s need for "extra money" cannot justify impairment of the *COFINA* lien—*COFINA* was the debtor on COFINA bonds.

Even if *Commonwealth*'s "need" is relevant, there is nothing "generic"[192] about the facts at Opening-19-1182-page-50-to-53—facts Appellees do not dispute.

---

[187] *Cf.*Appellees-page-79.

[188] Opening-19-1182-page-7&nn.18-19,49-to-50;JA-16-2526-to-2528,2582-to-2586-Docket#7211-1-page-15-to-17,71-to-75-of-146;*compare*-JA-5-703,705-to-707-Docket#4364-page-204,206-to-208-of-263-*with*-JA-8-1220,1240-Docket#4606-4-page-47,71-of-173-*and*-JA-9-1280,1301,1303-Docket#4606-5-page-21,44,46-of-155.

[189] Opening-19-1182-Section-B.7-page-18-to-19.

[190] Opening-19-1182-Point-IV-page-48-to-49.

[191] Reply-Point-III.A.1.

[192] *Cf.*Appellees-page-79.

In 14 months after objections were filed, Commonwealth's TSA cash balance grew to $9+ billion—a $5+ billion increase,[193] despite lack of meaningful financial control.[194]  If "need" of a government debtor with $9 billion cash justifies legislative abrogation of a separate debtor's obligation to pay bonds secured by a statutory lien, *United States Trust* will lose all meaning.  COFINA subordinate bonds were sold  as secured, investment grade A+/A1 bonds[195]—*not* "payment optional" bonds.

Commonwealth also cannot show "necessity" because Commonwealth has yet to issue audited financials for any post-6/30/2016, post-PROMESA, fiscal year.[196]  This despite PROMESA's emphasis on timely delivery of audited financials.  48 U.S.C. § 2146(a)(2).

Plus, impairment must be *both* reasonable *and* necessary (*UST*, 431 US at 25-26,29-32).  Even if Appellees showed "necessity," they must also show that impairment was "reasonable."  Impairment based on concerns of a type known at the time bonds were sold is not "reasonable".  431 US at 31-32.  It was known at the time COFINA bonds were issued that Puerto Rico was "experiencing the worst fiscal crisis in…history."[197]  COFINA's secured statutory lien mechanism was adopted to help Puerto Rico respond to the fiscal crisis by providing "cost-effective

---

[193] aafaf.pr.gov/reports-3-10-2020-TSA-report-at-2/28/2020.  *Compare*-JA-7-1174-Docket#4606-3-page-10-of-13;JA-11-1458-Docket#4606-7-page-425-of-447;JA-17-2687-to-2688,2720,2724-Docket#7961-page-11-to-12-of-19;Docket#7961-1-25,29-of-71.

[194] Opening-19-1182-page-50-to-53.

[195] Opening-19-1182-Section-A-page-3-8.

[196] JA-17-2688-to-2689-Docket#7961-page-12-to-13-of-19;*contrast*-JA-19-3223-Docket#11947-11-page-2-of-377.

[197] Addendum-19-1182-page-III-059-Act-No.7.

financing"[198] with modest interest rates. Having adopted the COFINA mechanism aware that a fiscal crisis existed, it is not "reasonable" to seize on "subsequent changes…of degree and not of kind" (431 U.S. at 32). The Contract Clause "prohibit[s]…self-serving, *post hoc* changes in contract obligations." *United Steel Union* v. *Virgin Islands*, 842 F.3d 201, 213-15 (3d Cir. 2016) (even if contract impairment was "necessary," it was not "reasonable").

Appellees' cases[199] do not override *United States Trust*:

- *Buffalo Teachers* addressed a "temporary and prospective" wage freeze. The court expressly distinguished *United States Trust*:

  > [T]he present facts are dissimilar to *U.S. Trust Co.*, a case that represents the paradigm of the type of protection that the Contracts Clause was designed to offer: protection "to those who invested money, time and effort against loss of their investment through explicit repudiation." (464 F.3d at 371-372).

- *United Automobile*, which repeatedly cites *Buffalo Teachers*, dealt with a Puerto Rico act seeking to reduce government payroll, including incentives to resign, potential layoffs and effectively freezing salaries and suspending other benefits.

- *Energy Reserves* concerned legislation imposing price controls on the intrastate gas market as permitted by then-new federal legislation.

- *PBGC* dealt with Multi-Employer Pension Plan Act requirements on withdrawing employers.

---

[198] Addendum-19-1182-page-III-066-Act-No.18.

[199] Appellees-page-74-80.

- *Sveen* dealt with Minnesota's revocation-on-divorce statute.

## VI. PLAN DISCRIMINATES AGAINST 50-STATES RESIDENTS IN VIOLATION OF LAW AND DUE PROCESS, EQUAL PROTECTION AND PRIVILEGES AND IMMUNITIES CLAUSES.[200]

Appellees argue discrimination based on residence is OK because the Plan (supposedly) "involves no state action"[201] and federal courts, acting pursuant to federal statutes, are (supposedly) free to discriminate based on residence if there is "substantial reason" or it is "reasonable" or "rational" to do so.[202]

1.     PROMESA does not, and cannot, authorize federal courts to discriminate against investors holding the same securities based on residence[203].

- Appellees do not identify any PROMESA authorization to discriminate against 50-states residents.

- PROMESA §2161 incorporates 11 U.S.C. §1123(a)(4), which requires "same treatment for each claim or interest of a particular class."[204]  Under this Court's "strict approach" to classification, "all creditors of equal rank with claims against the same property should be placed in the same class."  *Granada Wines*, 748 F.2d 42, 46-47 (1st Cir. 1984); *Hanish*, 570

---

[200] Opening-19-1182-Point-V-page-55-to-59.

[201] Appellees-page-85.

[202] Appellees-page-81,83,84-to-85.

[203] Opening-19-1182-page-55-to-59,65-to-66.

[204] Opening-19-1182-page-65-to-66;Reply-Point-IX.B.

B.R. 4, 15 (Bankr.D.N.H. 2017). PROMESA §2231(d)(3)(E) reinforces this requirement.[205]

- Appellees ignore *Saenz*' ruling that constitutional protection of privileges of citizens "is a limitation on the powers of the National Government as well as the States" and Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution…" (526 U.S. at 508). *Hawes*, *Cramer* and *Nevada*[206] pre-date *Saenz*

- Appellees ignore *Shapiro*'s rulings that "Congress may not authorize the States to violate the equal protection clause" and federal legislation discriminating based on residence violated Due Process because "the Fifth Amendment…forbid[s] discrimination that is 'so unjustifiable as to be violative of due process.'" 394 U.S. at 641-642.[207] *Accord U.S.* v. *Vaello-Madero*, No.19-1390-slip.op.3&n.1,10-11.

- Appellees' attempts to artificially limit *Saenz* and *Shapiro*[208] ignore *Toomer* and other cases ruling discrimination in economic and

---

[205] Opening-19-1182-page-57n.203,66;JA-7-1104-to-1105-page-Docket#4595-page-13-to-14-of-21.

[206] Appellees-page-81.

[207] Opening-19-1182-page-56.

[208] Appellees-page-81n.29,84.

commercial endeavors based on residence is prohibited.[209]  COFINA

bonds were tax-exempt by federal law[210] and sold nationwide.[211]

- *Blake* v. *McClung*, 176 U.S. 59, 67-68 (1900) ruled Tennessee's preference of Tennessee residents in distributions from an insolvent corporation violated Art. IV, §2, cl.1.

- Appellees argue §737 simply "extend[s]" Art. IV, §2, cl.1 "to residents of Puerto Rico".[212]  But §737 was prompted by concerns that 50-states citizens were discriminated against.[213]  The *text* of §737—"rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico"—protects 50-states residents and governs territorial government, FOMB (whether federal officers or part of territorial government) and federal courts alike.

- Article IV, §2, cl.1 ("citizens…shall be entitled") does not have a "Congress-and-federal-courts-can-discriminate" exception.

- Discrimination based on residence also contravenes the Bankruptcy Clause's requirement of "uniform" bankruptcy laws "throughout the United States."

---

[209] Opening-19-1182-page-Point-V-55-to-56.

[210] 48 U.S.C. §745.

[211] Opening-page-5&n.10;JA-8-1207,1244-to-1245-Docket#4606-4-page-30,77-to-78-of-173;JA-9-1264,1308-to-1310-Docket#4606-5-page-1,53-to-55-of-155.

[212] Appellees-page-81.

[213] Opening-19-1182-page-55;JA-11-1499-to-1505-Docket#4606-8-page-174-to-180-of-180.

Appellees cite no case where a plan discriminated between holders of the same securities based on state of residence.

2.  Furthermore, Commonwealth action was involved here.

- The Plan was conditioned on the New Bond Legislation, which states it was "implement[ing] the PSA agreement.[214]

- FOMB—which claims exclusive authority to file a plan—professes to be "an entity within the territorial government".
  48 U.S.C. §§2121(c)(1),2172.

3.  Appellees' proffered justifications largely repeat their proposed findings[215]—adopted word-for-word by the court[216]—but do not counter Appellants' showing[217] the rationales were contrived—thus not sufficient. *Barnard* v. *Thorstenn*, 489 U.S. 546, 552-559 (1989); *Toomer*, 334 U.S. at 398-399. Appellees' "justifications" do not even meet the rational basis standard applicable in government benefit cases. *Compare Vaello-Madero*, No.19-1930-slip.op.34&n.24 *with* JA-7-1100-Docket#4595-page-9-of-21;Opening-19-1182-page-57-to-59.

---

[214] Addendum-19-1182-page-I274-Docket #5053-1-page-25-of-43;Addendum-19-1182-page-I-407-to-I-408-Docket#5055-1-page-70-to-71-of-91-§25.1(c)(viii);Reply-Point-V.

[215] Appellees-page-80,85.

[216] Opening-19-1182-page-32&n.143,57&n.205.

[217] Opening-19-1182-page-57-to-59.

## VII. PROCEDURES VIOLATED RIGHTS OF 50-STATES BONDHOLDERS.[218]

This case combines retroactive abrogation of individual 50-states bondholders' substantive rights with multiple infringements of procedural rights.

### A. Reliance upon results and determinations of confidential mediation-settlement process was not appropriate.

Despite ordering confidentiality, including that "the Court will neither invite nor entertain" "information regarding events or actions in the mediation process"[219]—the court:

- relied upon the Plan being the "result" and "product" of the confidential mediation-settlement process in assessing whether the Plan met PROMESA requirements.[220]

- relied on distributions "determined" by the mediation-settlement process as "sufficient proof" that 50-states subordinate bondholders—not represented in the confidential process—received "just compensation".[221]

Appellees do not dispute the court's opinion contravened the court's own confidentiality orders.[222] The court should not have used results and determinations of the confidential process.

---

[218] Opening-19-1182-Point-VI-page-59-to-65.

[219] JA-2-190-to-191-Docket#1841-page-1-to-2-of-2;Opening-19-1182-page-39.

[220] Addendum-19-1182-page-I-203-Docket#5053-page-42-of-88;Opening-19-1182-page-8-to-9,59,62-to-63.

[221] Addendum-19-1182-page-I-216-Docket#5053-page-55-of-88.

[222] *Compare*-Opening-19-1182-page-39&n.157.

Furthermore, contrary to the court's assertion—repeating word-for-word FOMB's FF/CL—that Assured was "aligned with the economic interest" of COFINA subordinates:[223]

- Assured participated in naming one of *Commonwealth's* representatives in the Commonwealth COFINA dispute process.[224]

- Assured's GO and other Puerto Rico exposure was almost 20-fold greater than its COFINA subordinate exposure.[225]

The court created and "sanctioned" the confidential process,[226] yet did *not* provide for representation of individual bondholders by committee or other fiduciary mechanism. This was not appropriate for a case involving bonds sold, pre-PROMESA, to individual retail bondholders retroactively subjected to PROMESA. Appellees do not identify record facts to dispute:

- Bonds were sold based on a statutory lien and no ability to alter principal or interest payments without *each* bondholder's consent.[227]

---

[223] Addendum-19-1182-page-I-203(¶101)-to-I-204-Docket#5053-page-42-to-43-of-88-*repeating*-FF/CL-Docket#4846-1-page-41(¶100).

[224] JA-2-170-to-171-Docket;#996-page-4-to-5-of-12;JA-2-155-Docket#718-page-18-of-40.

[225] Opening-19-1182-Section-B.5-page-15-to-16.

[226] Addendum-19-1182-page-I-180,I-183-Docket#5053-page-19,22-of-88;JA-1-001-003-Docket#329;JA-1-004-to-007-#430;JA-2-188-to-189-#1836;JA-2-190-to-191-#1841.

[227] Opening-19-1182-Section-A-page-3-to-6.

- FOMB placed a solvent, not-in-default COFINA in Title III,[228] after which hedge funds bought bonds (and votes) at prices depressed in part by actions of FOMB and those funds[229]—buying billions of dollars of subordinate bonds (and votes) *after* mediation began.[230] Hedge funds who participated in selecting one of Commonwealth's representatives did *not* assume a duty to refrain from trading.[231]

- The "court-sanctioned" confidential process resulted in special benefits for institutions and Puerto Rico investors.[232]

- No 50-states individual bondholders participated in the confidential process.[233]

Appellees argue Appellants "had notice of the mediation," "could have participated," "but never asked to participate"[234]—cited to nothing.

---

[228] Opening-19-1182-Section-A-page-7nn,18-to-19,Point-IV-49-to-50;JA-19-3146-to-3147,3148-to-3152-Docket#9647-page-1-2,5-to-9-of-19;Reply-Point-III.B.

[229] Opening-19-1182-Section-B.3-page-12-to-13;Reply-Point-IV;JA-2-293-Docket#3680-page-26-of-30;JA-7-1134-Docket#4598-page-10-of-15;JA-20-3289-Docket#12296-page-1,15&n.11-of-40;JA-20-3324-to-3329-Case-17-03284-Docket#87-16;JA-20-3360-to-3362-Adv.Proc.17-133-Docket#431-page-2,37-to-38-of-44.

[230] Opening-19-1182-Section-B.3-page-12-13,46;Reply-Point-IV.

[231] JA-2-170-to-171-Docket;#996-page-4-to-5-of-12;JA-2-155-Docket#718-page-18&n.6-of-40.

[232] Opening-19-1182-section-B.1-to-B.6,page-8-to-18.

[233] Opening-19-1182-Section-C.1-page-19-to-21,Point-VI-page-59-to-62.

[234] Appellees-page-10n.2,87; *contrast*-Opening-19-1182-page-8-to-9,19-to-21,59-to-62.

Elsewhere Appellees assert "[n]otice of the proposed procedure was given to all claim-holders", *citing* Docket#719-at-2;#996-at-4.[235]  But:

- Docket#719/#996 do *not* evidence notice to all bondholders of the mediation-settlement process—much less notice that "determinations" in that process could affect non-participants and that provided individuals a practical means to participate.[236]

  - Neither Docket#719 nor Docket#996 evidence service on individual bondholders.

  - Appellees ignore Docket#718, showing notice was *not* given to individual bondholders—just selected parties.[237]

- The Bar Date Notice sent in Spring 2018 to individual bondholders made *no* reference to mediation-settlement or offer individual bondholders the opportunity to participate.[238]

  - Individual bondholders who responded by filing proofs of claim in Spring 2018 were still *not* notified of the confidential mediation-settlement process and invited to participate.[239]

---

[235] Appellees-page-8.

[236] Opening-19-1182-Section-C.1-page-19-to-21.

[237] JA-2-156-Docket#718-page-24-of-40.

[238] JA-2-207-to-230-Docket#2521-1;#2521-2;#2521-3.

[239] Opening-19-1182-Section-C.1-page-19-to-21&nn.85,86,Point-VI-page-60;JA-2-226-Docket#2521-3-page-3-of-9-Item-3;Addendum-19-1960-page-IV-003-Item-3-Document-00117527750-page-107.

- Appellees ignore *Tulsa* and *Mennonite*, which require "actual notice" to identifiable parties[240]—which those who were mailed bar date notices were.[241]

- Neither Judge Houser's appearance at the June 2017 hearing, nor the related orders, hearing agenda, minutes and transcript[242] (not publicly available for 90 days),[243] show the required "actual notice" to individual bondholders.[244]  Plus, mediation was said to be "voluntary"; "mediators will not attempt to force the parties to accept a resolution."[245]  No one was told:

  - mediation would "result" in a plan whose provisions would later be deemed "inextricably interwoven" such that "approval of all…settlements" was "required."[246]

  - the mediation-settlement process would be used as "proof" of "just compensation" to "determine" amounts for *non*participants.[247]

---

[240] Opening-19-1182-page-60;485 U.S. at 488-91;462 U.S. at 800.

[241] JA-2-192-224-Docket#2521;#2521-1;#2521-2;JA-2-231-to-234-Docket#2656-page-1-to-2-of-3155;#2656-4-page-3179-to-3180-of-3197;JA-2-226-Docket#2521-3-page-3-of-9-Item-3;Addendum-19-1960-page-IV-003-Item-3-Document-00117527750-page-107.

[242] Appellees-page-9.

[243] JA-1-021-Docket#558-Docket-entry.

[244] Opening-19-1182-page-60.

[245] JA-1-037-Docket#558-page-16:line13-18-of-162.

[246] Opening-19-1182-page-62-to-63;Addendum-19-1182-page-I-200,I-203-Docket#5053-page-39,42-of-88.

[247] Addendum-19-1182-page-I-216-Docket#5053-page-55-of-88.

- Since the process was "court-sanctioned"[248] the court had the responsibility to ensure individual 50-states bondholders were provided actual notice and a practical means to participate.

- Appellees do not cite record evidence of steps to ensure representation of 50-states individual bondholders in the mediation-settlement process.[249]

- Appellees do not cite record evidence to dispute that appellant Elliott sought to participate but was rebuffed.[250]

- When, later, notice was given in the GO case to GO bondholders, 1700+ individuals elected to participate.[251]

- That "[e]ach side armed itself with sophisticated professionals"[252]—directly or indirectly paid by debtors[253]—highlights the inappropriateness of failing to ensure 50-states individuals were also represented.

Compounding the absence of actual advance notice to all bondholders:

- The mediation-settlement process was subject to court-ordered confidentiality.[254]

---

[248] Addendum-19-1182-page-I-183-Docket#5053-page-22-of-88.

[249] *Compare*-Opening-19-1182-page-8-to-9,19-to-21,59-to-62.

[250] *Compare*-Opening-19-1182-page-21&n.91-*with*-Appellees-page-10n.2,87.

[251] Opening-19-1182-page-60&n.212;JA-15-2288-to-2289-Docket#6283-page-12-to-13-of-13;JA-16-2489-Docket#7154-page-3-of-14;JA-17-2648-to-2649-Docket#7540-page-7-to-8-of-19.

[252] Appellee-page-87.

[253] Opening-19-1182-page-11-to-12,24-to-25,26,64.

[254] Opening-19-1182-Section-C.1-page-20&n.88,Point-VI-page-59-to-62.

- No contemporaneous record exists of what occurred in mediation—thus, one cannot know what factors apart from the never-decided legal merits impacted "settlement".[255]

Even if individual bondholders had been given actual notice and a practical means to participate, "results" or "determinations" of a confidential, off-the-record process cannot appropriately be proffered against *non*-participants to justify plan distributions or compliance with confirmation requirements.[256]

### B.    Lack of notice of, and participation in, confidential process was not "cured" by notice and hearing on the Plan

First, Appellees ignore the court's inappropriate reliance on results of the confidential process.[257]

Second, the deck was stacked against 50-states individuals at Plan confirmation:

- Notice (with a flash drive, *not* copies of Plan documents) arrived on the eve of the holidays (*e.g.*, December 17, 2018),[258] with a January 2

---

[255] Opening-19-1182-Point-II.A-page-39,Point-VI-page-61.

[256] Opening-19-1182-page-38-to-43.

[257] Opening-19-1182-Point-II.A-page-38-to-39,Point-VI-page-59-to-63.

[258] JA-6-1039-to-1040-Docket#4585-page-27-to-28-of-43;JA-7-1165-to-1166-Docket#4606-3-page-1-to-2-of-13.

objection deadline.[259]  The "extension"[260] was only for Puerto Rico investors.[261]

- Dozens of individuals wrote letters that were docketed and distributed by CM/ECF, but the court refused to consider the letters as objections.[262]

- No committee or other fiduciary mechanism was set up to represent modest-sized 50-states bondholders.[263]

- Debtors had effectively unlimited funding to jam their plan through on a rushed timetable.[264]

- Major institutions received $332 million Consummation Costs paid pro-rata without regard to amounts of fees or expenses incurred.[265]

## C. Appellants' objections, and appeal, were appropriately directed to the COFINA Plan.

Appellees argue "Appellants could have objected to the Settlement…but they declined to"[266] and Appellants "have abandoned their appeal" of the

---

[259] Opening-19-1182-Section-C.2-page-21-to-22,Point-VI-page-63-to-64.

[260] Appellees-page-15.

[261] JA-6-1040-Docket#4585-page-28&n.12-of-43;JA-7-1165-to-1166-Docket#4606-3-page-1-to-2-of-13;JA-6-1002-to-1005-Docket#4569-page-5-to-6,8-to-9-of-14.

[262] Opening-19-1182-Section-C.6-page-27&n.127.

[263] Opening-19-1182-Section-C.5-page-26,Point-VI-page-64.

[264] Opening-19-1182-Section-C.5-page-26,Point-VI-page-64.

[265] Opening-19-1182-Section-B.2-page-11-to-12.

[266] Appellees-page-87.

Settlement Order.[267]  This misrepresents the procedure FOMB and the court followed.

- Appellees cite Docket#5053-page-43n.13 as support.[268].  But footnote 13 does not address the subject.

- The court was express that Commonwealth's 9019 motion sought approval "from the perspective of the Commonwealth" and the propriety of settlement "from the COFINA perspective" would be considered on "the separate motion to confirm the proposed COFINA Plan."[269]

- Commonwealth's 9019 Motion was filed in *Commonwealth's* Title III case.[270]

- Confirmation of the COFINA Plan was a condition precedent to approval of Commonwealth's 9019 motion.[271]

- The court and FOMB reiterated at the confirmation hearing that Commonwealth's 9019 motion addressed reasonableness from Commonwealth's perspective, not that of COFINA or COFINA bondholders, and that whether the settlement should be approved from a COFINA perspective would be addressed in connection with COFINA

---

[267] Appellees-page-20n.9.

[268] Appellees-page-87.

[269] Addendum-19-1182-I-122-Docket#5045-page-4-of-28.

[270] JA-4-534-Docket#4364-page-35-of-263.

[271] JA-3-379-to-380,382-Docket#4067-page-2,68,75(§4(iii))-of-98.

Plan confirmation.[272]  Appellant Dvores – listed as objecting to Commonwealth's 9019 motion[273] – was specifically told this.[274]

### D.    "Range of reasonableness" standard did not apply to COFINA Plan confirmation.

Whether settlement was in the "range of reasonableness"[275] is not the standard governing constitutional rights under Takings and Contract clauses.

Furthermore, COFINA's plan had to meet §2174's statutory criteria for confirmation.  If not, the settlement would fail since COFINA plan confirmation was a condition precedent to approval of Commonwealth's 9019 Motion.[276]

### E.    Adversary proceeding was required.

Appellees ignore that an adversary proceeding was required to be brought and served on each bondholder if a lien was to be affected.[277]  Appellees subsequently served adversary proceedings on hundreds of bondholders to challenge liens in Commonwealth's case, tacitly acknowledging this requirement.[278]

---

[272] JA-21-3592-3598-Docket#4848-Tr.23:line 22-to-Tr.24:line 13,Tr.30:line 25-to-Tr.34:line 22.

[273] JA-4-461-to-462-Docket#4244-page-1-to-2-of-3-*cited*-Addendum-19-1182-page-I-131-Docket#5045-page-13-of-28.

[274] JA-21-3597-to-3598-Docket#4848-Tr.33:14-to-Tr.34:22.

[275] Appellees-page-87-88.

[276] JA-3-379-to-380,382-Docket#4067-page-2,68,75-of-98.

[277] Opening-19-1182-page-63.

[278] JA-20-3526-to-3533-Adv.Proc.19-291-Docket#1-page-3-of-52;Adv.Proc.19-292-Docket#1-page-3-of-53,#12 page-3-of-54;Adv.Proc.19-293-Docket#1-page-3-of-52;19-294-Docket#1-page-3-of-53;Adv.Proc.19-295-Docket#1-page-3-of-41;Adv.Proc.19-296-Docket#1-page-2-of-37;Adv.Proc.19-297-Docket#1-page-3-of-39.

Appellees argue in 19-1181 that *United Students* abrogated the requirement of an adversary proceeding.[279]  However, that case addressed whether a Chapter 13 confirmation order could be set aside under Rule 60(b)(4) at the behest of a creditor who "received *actual* notice" of a plan, did not object and also did not appeal.  559 U.S. at 269-275.  It does not suggest violation of Rule 7001(2) is not reversible error in Appeal-19-1182/1960.

###### F.     Hearing transcripts.

Appellees' response—asserting no requirement to provide free electronic transcripts within any particular time frame[280]—fails to answer Appellants' points:

- Hearing transcripts include court bench-rulings (with explanations), information about status of mediation-settlement, and updates from FOMB/AFAAF.[281]  Withholding existing transcripts from public release by electronic means for 90 days delays the release of this information and compounds the information advantage large investors have over individuals throughout the country.

- Once transcripts are viewable at the courthouse, there is no legitimate confidentiality issue.  The courts' administrative transcript policy cannot limit First Amendment public rights of access to court rulings or preclude the court in PROMESA cases from taking steps to assure equal

---

[279] Appellee-page-50,52n.22.

[280] Appellees-page-93.

[281] JA-16-2403-to-2412-Docket#6538-page-7-to-16-of-301.

availability of information—as the Supreme Court, this Court and other courts supervising major bankruptcies do.[282]

- Individuals do not have Appellees effectively unlimited litigation funding.[283]  It is not appropriate to approve hundreds of millions to hedge funds,[284] and $500,000+ for UCC's "communications adviser,"[285] but refuse to make existing transcripts electronically accessible to individual bondholders.

"'[A]ll should have free access' to [the law's] contents."  *Georgia* v. *Public.Resource.Org*, No. 18-1150 (4/27/2020) (government edicts doctrine).

### G.    Electronic filing.

Even mainland attorneys cannot file electronically in Puerto Rico district court without retaining and paying Puerto Rico counsel.[286]  That cost does not make sense for individuals with modest bondholdings, and would compound injuries PROMESA-proceedings have already inflicted.  The court should have permitted pro se parties to file electronically—as the First Circuit does—or provided other means to facilitate individual objector filing (such as through FOMB's service agent Prime Clerk).[287]  (The court had refused to permit Hein to

---

[282] JA-19-3075-to-3078,3124-to-3145-Docket#9508-page-9-to-12-of-24;#9508-19,#9508-23-to-#9508-27.

[283] Opening-19-1182-Section-C.5.-page-26;Opening-19-1960-page-40-to-41.

[284] Opening-19-1182-Section-B.2.-page-11-to-12,Section-C.5.-page-26.

[285] Opening-19-1960-page-40-to-41;JA-20-3318-3319-Docket#12390-page-4-to-5-of-20.

[286] JA-17-2749-Docket#7961-1-page-55-of-71-H.1.a;JA-15-2388-to-2389-Docket#6487-page-5-to-6-of-16;JA-14-2258-to-2260-Docket#6128-1-page-3-to-5-of-11;D.P.R.-Local Rule-83A(f)-p.56-¶2.

[287] JA-14-2259-to-2260-Docket#6128-1-page-4-to-5-of-11.

file electronically,[288] despite repeated requests,[289] but on 2/28/2020 authorized Hein—only—to file electronically.[290])

## VIII.  APPOINTMENTS CLAUSE.[291]

The Supreme Court's ruling in *Aurelius* is pending.

## IX.  ADDITIONAL VIOLATIONS.[292]

### A.  No Waiver.

Appellants' arguments are appropriately presented concisely—given the court's word limits.  Many of the statutory provisions are new.  Thus, there is little case law to discuss.

Appellees do not answer the merits of much of what was argued, which will not be repeated.

### B.  11 U.S.C. §1123(a)(4).

Appellees' "justifications" for $332 million of Consummation Costs[293] cannot avoid §1123(a)(4)'s "same treatment" requirement:

---

[288] JA-15-2394-to-2395-Docket#6534.

[289] JA-19-3075-Docket#9508-page-9-of-24;JA-17-2693-Docket#7961-page-17-of-19;JA-15-2388-to-2389-Docket#6487-page-5-to-6-of-16;JA-14-2258-to-2260-Docket#6128-1-page-3-to-5-of-11.

[290] JA-19-3188-to-3189-Docket#11920.

[291] Opening-19-1182-Point-VII-page-65.

[292] Opening-19-1182-Point-VIII-page-66-to-69.

[293] Appellees-page-13,88-89.

- Plan support creditors are not entitled to added consideration for negotiating and signing a deal for their own benefit. They acted for themselves—not fiduciaries for bondholders generally.

- Asserted restrictions on PSA creditors' bond trading are not cited to record evidence. PSA §4.4(a) simply requires PSA creditors who *sell* to sell to someone who has or will join the PSA.[294] Buying more bonds is *not* restricted.[295]

- The mediation-settlement process began in June 2017.[296] Thereafter, through fall 2018, Consummation Cost parties *bought* over $2.136 billion COFINA subordinates.[297]

Recipients of Consummation Costs did not commit new money. Appellees' page-88 case law is inapposite.

## X.    APPEAL 19-1960 SPECIFIC ISSUES.

### A.    Reversal in 19-1182 requires reversal in 19-1960.

If 19-1182 is reversed, so must 19-1960.

### B.    Additional grounds for reversal in 19-1960.

Points made in Opening-19-1960 that Appellees fail to respond to will not be repeated.

---

[294] JA-5-769-to-770-Docket#4364-2-page-18-to-19-of-110;JA-21-3573-to-3580-Docket#4364-2-page-20-to-27-of-110.

[295] JA-5-770-Docket#-4364-2-page-19-of-110;JA-21-3573-to-3580-Docket#4364-2-page-20-to-27-of-110.

[296] JA-1-005-to-007-Docket#430.

[297] Opening-19-1182-Section-B.3-page-12-to-13;Reply-Point-IV.

### 1. Jurisdiction.[298]

Appellees address the merits of Appeal-19-1960 before they turn to the logically threshold issue of (supposed) non-waivable absence of subject matter jurisdiction. That suggests Appellees do not believe their own "no-jurisdiction" argument. Only several points warrant response:

- Appellees' characterization of what the court "held" deviates from what the bench opinion actually says: the statement at Appellees-page-100 ("right to payment independent of his rights under the COFINA bonds") does *not* appear on Tr.48.[299]

- Appellees were well-aware of Hein's assertion of constitutional and statutory claims prior to the 4/24/2019 hearing.[300] The court understood Hein was asserting such claims.[301] Appellees' position on 4/24/2019 was articulated with that awareness.

---

[298] Opening-19-1960-Point-II.A-page-18-to-23.

[299] *Compare*-Appellees-page-100-*with*-Addendum-19-1960-page-I-008-Tr.48-JA-18-2983;*compare*-Appellees-page-22-*with*-Addendum-19-1960-page-I-006-Tr.46-JA-18-2981.

[300] JA-6-1013,1033-to-1041,1044-to-1051-Docket#4585-page-1,21-to-29,32-to-39-of-43;JA-7-1092,1096-to-1105-Docket#4595-page-1,5-to-14-of-21;JA-14-2110,2112-to-2115-Docket#5041-page-1,3-to-6-of-10;JA-14-2131-to-2149-Docket#5041-2-page-4-to-22-of-22;JA-15-2279-Docket#6283-page-3-of-13.

[301] Opening-19-1960-Section-E-page-7,Point-II.B-page-24.

### 2. Hein's Claim cannot properly be disallowed as "duplicative".[302]

Appellees fail to answer Opening-19-1960-page-25-to-27. Since Hein's claim asserts non-dischargeable[303] grounds for recovering 100¢,[304] Hein has a right to additional payment.

### 3. Hein's Claim was not properly released or discharged because PROMESA does not, and cannot constitutionally, retroactively abrogate Hein's property and other rights.[305]

Appellees offer no specific response.

### 4. Motion to compel.[306]

If this Court reverses, the principle rationale for denying discovery fails.

Appellees do not meaningfully answer the showing that the discovery is relevant, including to whether distributions complied with plan terms.

---

[302] Opening-19-1960-Point-II.B-page-24-to-29.

[303] Opening-19-1960-page-25-27.

[304] *Cf.* Appellees-page-98.

[305] Opening-19-1960-Point-II.C-page-29-to-30.

[306] Opening-19-1960-Point-II.D-page-30-38.

**5. Withholding transcript of ruling incorporated into court's order from public access by electronic means for 90 days contravenes public right of access to court records.**[307]

Appellees do not dispute the court often announces bench-rulings (with explanations) at hearings, yet transcripts are withheld from public disclosure by electronic means for 90 days (or more).[308]

This is a repeated problem, which this Court should address.

## CONCLUSION – RELIEF REQUESTED[309]

Appellants' requested relief should be granted.

---

[307] Opening-19-1960-Point-II.E.-page-38-to-41.

[308] Reply-Point-VII.F;Opening-19-1960-Point-II.E-page-38-to-41.

[309] Opening-19-1182-page-72-to-73;Opening-19-1960-page-42.

/s/ Rafael A. González Valiente

Rafael A. González Valiente, Esq.
USDC-PR NO. 225209
Godreau & González Law, LLC
PO Box 9024176
San Juan, Puerto Rico  0092-4176
Tel:  (787) 726-0077
Email:  rgv@g-glawpr.com

/s/ Lawrence B. Dvores

Lawrence B. Dvores, *pro se*
28 Sherbrooke Parkway
Livingston, New Jersey  07039
Tel:  (973) 535-5000
Email:  LDvores@yahoo.com

/s/ Peter C. Hein

Peter C. Hein, *pro se*
101 Central Park West, Apt. 14E
New York, New York  10023
Tel:  (212) 403-1237
Email:  petercheinsr@gmail.com

Dated:  April 30, 2020

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Fed. R. App.P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App.P. 32(f), this document contains 9,927 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: April 30, 2020

/s/ Peter C. Hein

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing Reply Brief of Individual Bondholders, Movant-Appellants in 19-1182 and 19-1960 with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel and parties of record.


Dated:  April 30, 2020

/s/ Peter C. Hein

# United States Court of Appeals
## For the First Circuit

No. 19-1181

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

Debtors

RENE PINTO-LUGO; MOVIMIENTO DE CONCERTACION CIUDADANA INC., (VAMOS); UNION DE EMPLEADOS DE OFICINA Y PROFESIONALES DE LA AUTORIDAD DE EDIFICIOS PUBLICOS, (UEOGAEP); UNION INSULAR DE TRABAJADORES INDUSTRIALES Y CONSTRUCCIONES ELECTRICAS INC., (UITICE); UNION INDEPENDIENTE DE EMPLEADOS DE LA AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, (UIA); UNION DE EMPLEADOS DE OFICINA COMERCIO Y RAMAS ANEXAS, PUERTOS, (UEOCRA); UNION DE EMPLEADOS PROFESIONALES INDEPENDIENTES, (UEPI); UNION NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACION, (UNETE); ASOCIACION DE INSPECTORES DE JUEGOS DE AZAR, (AIJA); MANUEL NATAL-ALBELO

[Caption continues on next page]

**SUPPLEMENTAL REPLY ADDENDUM TO ACCOMPANY REPLY BRIEF OF INDIVIDUAL BONDHOLDERS, MOVANTS-APPELLANTS IN 19-1182 AND 19-1960**

_____

Movants – Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors – Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant – Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors

_____

No. 19-1182

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER
AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO

Debtors

MARK ELLIOTT; LAWRENCE B. DVORES; PETER C. HEIN

Movants – Appellants

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina

Debtors – Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY
AUTHORITY

Movant – Appellee

ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; GOLDEN
TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP;
SCOGGIN MANAGEMENT LP; TACONIC CAPITAL ADVISORS, L.P.;
TILDEN PARK CAPITAL MANAGEMENT LP; WHITEBOX ADVISORS LLC

Intervenors
_____

No. 19-1960

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC
POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR
THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina;
THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO

Debtors
_____

PETER C. HEIN

Movant – Appellant

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES FINANCING CORPORATION, a/k/a Cofina

Debtors – Appellees

PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY

Movant – Appellee

## SUPPLEMENTAL REPLY ADDENDUM TO ACCOMPANY REPLY BRIEF OF INDIVIDUAL BONDHOLDERS, MOVANTS-APPELLANTS IN 19-1182 AND 19-1960

## CONTENTS OF SUPPLEMENTAL REPLY ADDENDUM

13 L.P.R.A. § 11a, 12, 13, 14, 14a, 15, 16........          Supp.III-077-III-112

4/13/2016-Legislative-Hearing-Serial-No-114-
36-at-PDF-page-45,61-62 (Kirpalani)
(https://www.govinfo.gov/content/pkg/CHRG-
114hhrg99800/html/CHRG-
114hhrg99800.htm)...........................................          Supp.III-113-III-119

Employees Retirement System ("ERS")
Senior Pension Funding Bonds, Series B,
May 28, 2008 Official Statement.................          Supp.III-0120-III-0125

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 11a. Dedicated Sales Tax Fund—Creation of the public corporation

**(a)** A public corporation and instrumentality of the Commonwealth of Puerto Rico, is hereby created, which constitutes a corporate and political entity independent and separate from the Commonwealth of Puerto Rico to be known as the *Corporación del Fondo de Interés Apremiante* de Puerto Rico ("COFINA", Spanish acronym), whose name in English shall be Puerto Rico Sales Tax Financing Corporation.

**(b)** COFINA is created for the purpose of issuing bonds and utilizing other financing mechanisms for the following ends:

**(1)** To pay or refinance, directly or indirectly, all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the accrued interest thereon;

**(2)** to pay all or part of the debt of the Secretary of the Treasury with the Government Development Bank for Puerto Rico in the amount of one (1) billion dollars, used to finance the budget deficit of fiscal year 2008-2009;

**(3)** to pay all or part of (A) the financing granted or to be granted to the Commonwealth of Puerto Rico until June 30, 2014, by the Government Development Bank for Puerto Rico or other financial institutions, payable from future general obligation bond issues of the Commonwealth of Puerto Rico, including but not limited to bond

anticipation notes issued by the Commonwealth of Puerto Rico; (B) financing backed by bonds and notes of the Commonwealth of Puerto Rico with variable interests and obligations incurred under any type of financing, guarantee, or interest rate swap agreements entered into with respect to such variable-interest bonds or notes; and (C) any debt of the Commonwealth of Puerto Rico with no repayment source or which is payable from budget appropriations of the Commonwealth of Puerto Rico, existing as of June 30, 2013;

**(4)**to pay all or part of the accounts payable to suppliers of the Commonwealth of Puerto Rico;

**(5)**to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal years 2008-2009, 2009-2010, and 2010-2011;

**(6)**to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal year 2011-2012, which shall be included in the annual budget of the Government of Puerto Rico;

**(7)**to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal years 2012-2013, 2013-2014, and 2014-2015;

**(8)**to generate funds to nourish the Puerto Rico Economic Stimulus Fund established under § 14a of this title;

**(9)**to nourish the Emergency Fund of the Commonwealth of Puerto Rico to meet expenses arising as a result of a catastrophic event, such as hurricanes or floods;

**(10)**to generate funds to nourish the Economic Cooperation and Alternatives Fund for Public Employees;

**(11)**to nourish the Fiscal Reconstruction Fund created under Act No. 45-2013, or to pay or refinance, directly or indirectly, all or part of the debt authorized under Act No. 45-2013; and

**(12)**to pay, finance, or refinance any bonds, loans, bond anticipation notes issued by the Commonwealth of Puerto Rico under Act No. 242-2011 and Act No. 47-2013, or to cover the cost of necessary public improvements that may be financed by bonds authorized under Act No. 242-2011, and Act No. 47-2013.

**(c)**The source of repayment of COFINA bonds shall be the portion of the tax deposited in the Dedicated Sales Tax Fund pursuant to the provisions of § 12(a) of this title and any subsidy that COFINA may receive under the federal program known as "Build America Bonds". The Board of Directors

of COFINA shall not authorize any COFINA bond issue, unless the Chair or a COFINA officer designated by the Chair certifies that the principal of and interest on the COFINA bonds he/she intends to authorize, plus the principal of and interest on all outstanding COFINA bonds (except those bonds to be paid with the proceeds of the new bonds or those payments of principal or interest for which sufficient funds have been set aside to cover the payment thereof,) payable each fiscal year (beginning with the current fiscal year) is equal to or lesser than the fixed income appropriated to COFINA, corresponding to said fiscal year, plus any subsidy expected to be received by COFINA during said fiscal year under the federal Build America Bonds Program.

**(d)**Notwithstanding the provisions of § 13 of this title, COFINA may use any necessary amount from the moneys received from the revenues stated in §§ 12(a) and 14(d) of this title or the proceeds from the sale of the bonds issued pursuant to the provisions of §§ 11a—16 of this title, to pay any interest accrued on such bonds, to pay the expenses incurred in connection with the issue and sale of such bonds, including those expenses related to insurance, letters of credit or other instruments, and to defray any operating expense.

**(e)**COFINA shall be attached to the Government Development Bank for Puerto Rico (hereinafter, "GDB"). The Board of Directors of COFINA shall be the Board of Directors of the GDB. COFINA shall have the same powers, rights and faculties granted to the GDB pursuant to the provisions of its Constitutional Charter, which powers shall only be exercised to carry out the purposes for which COFINA was created, but it shall not have the power to act as fiscal agent of the government. The revenues, operations and properties of the COFINA shall enjoy the same tax exemption enjoyed by the GDB and the bonds, notes and other obligations of COFINA and the income derived therefrom shall enjoy the same tax exemption enjoyed by the bonds, notes and other obligations of the GDB.

**(f)**The prohibitions of § 8754 of Title 3, known as the "Commonwealth of Puerto Rico Government Fiscal Reform Act of 2006", shall not apply to the COFINA bond issues authorized by §§ 11a–16 of this title.

**(g)**COFINA may issue notes in advance of bonds, "notes", and said notes:

**(1)**May be issued in a maximum amount which shall not exceed such amount that, as determined by the Board of Directors of COFINA, may be used to repay the proceeds of the bond issue authorized under subsection (b) of this section and allowed under subsection (c) of this section;

**(2)**shall not be subject to the limitation of subsection (c) of this section, unless the documents authorizing COFINA bonds provide otherwise nor be considered in the calculation of outstanding bonds required by said subsection;

**(3)**shall not be taken into account for purposes of the first sentence of §  14(d) of this title, and

**(4)**may be repaid from the proceeds of the bonds issued under §§ 11a–16 of this title and any of its available funds.

## History

—May 13, 2006, No. 91, added as §  2 on July 5, 2007, No. 56, §  1; Jan. 14, 2009, No. 1, §  1; Mar. 9, 2009, No. 7, §  49; May 22, 2009, No. 18, §  1; July 2, 2012, No. 133, § 1; Oct. 10, 2013, No. 116, § 1.

Annotations

## Notes

### HISTORY

**Source.**

Section 3 of Act Mar. 9, 2009, No. 7, provides: "This Act is approved in the exercise of the police power of the State, and of the constitutional power of the Legislature, recognized in Article II, Sections 18 and 19 of our Constitution, to enact laws for the protection of the life, health and general welfare of the people, as well as to address serious emergencies that clearly imperil the public health, safety or essential public services, and pursuant to Section 7 and 8 of Article VI of the Constitution of Puerto Rico."

**Purpose.**

Section 2 of Act Mar. 9, 2009, No. 7, provides:

"An economic and fiscal state of emergency in the Government of the Commonwealth of Puerto Rico is hereby declared and an economic and fiscal stabilization plan is hereby adopted for the purpose of salvaging the credit of Puerto Rico.

"The economic analyses conducted by the Government of Puerto Rico are definite proof that the implementation of measures regarding revenues, spending reductions and financial issues, in an isolated manner, exclusive and independent from one another, shall achieve the purpose of eliminating the structural deficit of over $3.2 billion faced by Puerto Rico. As evidenced, this structural deficit is the result of incorrect public administration policies, transactions of dubious legality, among other factors, which caused the appropriations to exceed the resources of the state.

"The Legislature, in the exercise of the police power of the state, is empowered to adopt those measures directed to protecting the health, safety and welfare of the people. To such effect, it is the legal authority of the Legislature to pass bills in order to address social and economic interests, as well as emergencies. Section 19 of our Bill of Rights provides that the rights set forth in Article II 'shall not be construed restrictively of the power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people.' Likewise, Section 28 of the Bill of Rights confers on this Legislature the authority to enact laws to deal with serious emergencies that clearly imperil the public health, safety or essential public services. Furthermore, our Supreme Law authorizes the imposition of sufficient taxes when appropriations exceed resources without protecting our credit, as it happens in the present situation.

"This Act addresses in a comprehensive and responsible manner the need to achieve the fiscal stabilization of the Government of Puerto Rico and protect its credit through: (a) new measures for revenues and better oversight (b) measures for control and reduction of spending; (c) fiscal and financing measures to cover budgetary insufficiencies while the measures for control and reduction of expenditures take effect, the financing of costs associated with the implementation of the spending cutback measures, and prevent adverse impacts in the General Fund due to the precarious fiscal situation of some public corporations and municipalities.

"In view of the economic and fiscal situation and to safeguard the health of the credit of the Commonwealth of Puerto Rico, the urgent need to establish a comprehensive and coherent fiscal stabilization plan, the elimination of the structural deficit, the amortization of the public debt, the recovery of fiscal health and the basis for the Government to boost the economic development of Puerto Rico is hereby established as the public policy of the Government of the Commonwealth of Puerto Rico."

## Amendments

**—2013.**

Subsection (b): Act 2013 amended clause (3) generally, added clauses (11) and (12) and introduced minor lexical changes in the name of the Government of Puerto Rico.

Subsection (d): Act 2013 added "to pay any accrued interest on such bonds".

## —2012.

Subsection (b): Act 2012 introduced minor lexical and syntactical changes throughout.

## —2009.

Subsection (c): Act May 22, 2009, No 18 added "and any subsidy . . . 'Build America Bonds'" to the end of the first sentence, in the second sentence added "or those payments . . . cover the payment thereof" and "plus any subsidy . . . Build America Bonds Program", and made minor lexical changes throughout this subsection.

Subsection (g): Act May 22, 2009, No. 18 added this subsection.

Subsection (b): Act Mar. 9, 2009, No. 7 added clause (9) and made minor lexical changes throughout this subsection.

Act Jan. 14, 2009, No. 1 amended this section generally, dividing the former sole paragraph into subsections (a)—(f).

## Effectiveness.

Section 72 of Act Mar. 9, 2009, No. 7, as amended by Act Apr. 23, 2009, No. 15, § 1, and further amended by Act June 8, 2009, No. 30, § 1, retroactive to Mar. 31, 2009, provides: "This Act shall take effect immediately after its approval; provided, that the provisions of Section 4 [which amended § 8411 of this title] shall be in effect for the taxable years beginning after December 31, 2008; the provisions pertaining to Subtitles B and D of the Internal Revenue Code and Sections 6 and 16 [which amended § 9009 of this title, and special provisions note under §§ 9521 and 9574 of this title] shall take effect as of June 1, 2009; the provisions pertaining to Section 7 [which amended § 9014 of this title] shall take effect on July 1, 2009; the provisions pertaining to Subtitle BB of the Internal Revenue Code shall take effect as of November 1, 2009; the provisions of Sections 10, 11, and 12 [which amended §§ 9094a, 9094e and 9094f of this title] shall take effect on the tenth (10th) day of the month after the provisions in this Act that pertain to Subtitle BB of the Internal Revenue Code take effect; and the provisions of Sections 18 and 19 [which amended §§ 8418 and 8420a of this title] shall be in effect only for the taxable years beginning after December 31, 2008, and

before January 1, 2012; and the provisions of Section 22 [which added §§ 9401 and 9408 of Title 3] shall take effect on January 1, 2010."

**Statement of motives.**

July 5, 2007, No. 56.

Jan. 14, 2009, No. 1.

Mar. 9, 2009, No. 7.

May 22, 2009, No. 18.

July 2, 2012, No. 133.

Oct. 10, 2013, No. 116.

**Title.**

Section 1 of Act Mar. 9, 2009, No. 7, provides: "This Act shall be known as the 'Special Act Declaring a State of Fiscal Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico'."

**Separability.**

Section 5 of Act Oct. 10, 2013, No. 116, provides: "If any provision of this Act [which amended §§ 11a, 12, 13 and 14 of this title] or the application thereof were held to be null, such holding shall not affect the remaining provisions of this Act or the application thereof, which may continue in effect, notwithstanding the provisions held null. Therefore, the provisions of this Act are severable."

Section 3 of Act July 2, 2012, No. 133, provides: "If any provision of this Act [which amended §§ 11a and 14a of this title] or the application thereof were held to be invalid, such holding shall not affect the remaining provisions of this Act or the application thereof that may be in effect without the provisions held invalid. To such end, the provisions of this Act shall be severable."

Section 5 of Act May 22, 2009, No. 18, provides: "If any provision of this Act [which amended §§ 11a—14 of this title] or the application of such provision were to be found to be invalid, such finding shall not affect any other provisions or the application of this Act that may have effect without the need for the provisions that were found to be invalid, and to this end, the provisions of this Act are severable."

Section 71 of Act Mar. 9, 2009, No. 7, provides: "If any clause, paragraph, subparagraph, article, provision, section or part of this Act is annulled or

ruled unconstitutional, the ruling to such effect shall not affect, impair, nor invalidate the remainder thereof. The effect of said ruling shall be limited to the clause, paragraph, subparagraph, article, provision, section or part thereof that has thus been annulled or ruled unconstitutional."

Section 6 of Act Jan. 14, 2009, No. 1, provides: "If any provision of this Act [which amended §§ 11a—16 of this title] or the application of such provision is declared invalid, such declaration shall not affect the other provisions or the application of this Act that may have effect without the need for the provisions that were declared invalid, and to this end the provisions of this Act are severable."

Section 8 of Act July 5, 2007, No. 56, provides: "If any provision of this Act [which added this section and amended §§ 12—16 of this title] or the application of such provision is declared invalid, such declaration shall not affect the other provisions or the application of this Act that may have effect without the need for the provisions that were declared invalid, and to this end the provisions of this Act are severable."

**Temporary provisions.**

Section 10 of Act May 13, 2006, No. 91, added by § 52 of Act Mar. 9, 2009, No. 7, provides:

"It is hereby provided that for fiscal year 2008—2009, ending on June 30, 2009, the fraction described in Section 3(a)(i) of this Act shall be a fraction whose numerator shall be one percent (1%) and whose denominator shall be the rate of such tax, and every reference in this Act to 'two point seventy-five percent (2.75%) of the Tax,' shall be considered as a reference to the 'one percent (1%) of the Tax.' This transitory provision shall be rendered ineffective for fiscal year 2009—2010, which begins on July 1, 2009, and for subsequent fiscal years."

**Special provisions.**

Sections 68–70 of Act Mar. 9, 2009, No. 7, provide:

"Section 68.—Powers of the Governor.

"The Governor is hereby empowered to take all measures that are necessary and convenient, in addition to those provided by this Act, to cutback expenses through Executive Order; to promote economy in the Executive Branch to the maximum extent compatible with the efficient operation of the Government; to maintain efficiency in the operations of the Executive Branch to the greatest extent possible; and to group, coordinate and consolidate functions in all Agencies; all of this in accordance with the objectives of this

Act. Provided, however, that the Governor shall not create, consolidate nor reorganize executive departments, nor eliminate bodies created by law. Those reorganizations requiring legislation or amendments to statutes in effect shall be presented before the Legislature for consideration.

"The powers granted under this Act shall not limit all others that the Governor may have and take, if the objective set forth by Section 33(g) [§ 8791(g) of Title 3] is not achieved.

"Section 69.—Jurisdiction of the Supreme Court.

"The Supreme Court of the Commonwealth of Puerto Rico shall issue a writ of certification by petition to immediately bring before it and resolve any matter pending before the Court of First Instance or before the Court of Appeals when the issue is the validity or constitutionality of this special Act or any challenge thereof on any grounds.

"Section 70.—Immunity as to lawsuits and forums.

"This Act shall not affect the immunity of the State and its officers and officials regarding lawsuits and forums. Nothing of the herein provided authorizes actions for damages against the State, its officers or officials for actions or omissions of the latter resulting from compliance with this Act. Nothing of the herein provided shall be construed to constitute a waiver of the sovereign immunity of the Commonwealth of Puerto Rico. It is hereby reaffirmed that the JREF, the OMB, the GDB and all Agencies subject to this Act are and shall be considered agencies or branches of the State and as such, arms of the State."

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright
1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

---

**End of Document**

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 12. Dedicated Sales Tax Fund—Creation of the Special Fund

A special fund is hereby created, to be known as the Fondo de Interés Apremiante (hereinafter, "FIA"), whose name in English shall be "Dedicated Sales Tax Fund", to be administered by the GDB. FIA and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in FIA pursuant to the provisions of §§ 11a-16 of this title are hereby transferred to, and shall be the property of COFINA. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006, and the accrued interest thereon, and for the other purposes established in subsection (b) of § 11a of this title, with the net proceeds of the bond issues or funds and resources available to COFINA.

FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico (hereinafter, the "Secretary"):

**(a)** The first revenues of the sales and use tax (hereinafter, the "tax") established in §§ 32021 and 32022 of this title, known as the "Internal Revenue Code for a New Puerto Rico", (hereinafter,

the "Code") up to the following amount; Provided, That once the value-added tax provided in § 32211 of this title or the tax resulting from legislation recommended by the Commission created under Section 33 of Act No. 72-2015 takes effect, any reference made in §§ 11a-16 of this title to the sales and use tax, including the term defined as "tax", shall be deemed to be substituted for the value-added tax provided in § 32211 of this title or the tax resulting from legislation recommended by the Commission created under Section 33 of Act No. 72-2015, which shall constitute a collateral or a tax similar or comparable to the sales and use tax in accordance with § 14(c) of this title:

**(i)**The proceeds of the amount of the tax collected during such fiscal year, multiplied by a fraction whose numerator shall be three point fifty percent (3.50%) and whose denominator shall be the rate of such tax, such fraction being hereinafter denominated "the three point fifty percent (3.50%) of the tax," or

**(ii)**the applicable fixed income, whichever is greater.

**(b)**Any subsidy received by COFINA under the federal program known as "Build America Bonds".

For purposes of subsection (a) of this section, there shall be no fixed income for Fiscal Year 2006-2007. The fixed income for each fiscal year, between Fiscal Year 2007-2008 and Fiscal Year 2012-2013, shall be equal to the sum of the original fixed income and the additional fixed income. The original fixed income for Fiscal Year 2013-2014 and every subsequent fiscal year shall be the sum of the original fixed income, the additional fixed income, and the supplementary fixed income. The original fixed income for Fiscal Year 2007-2008 shall be one hundred eighty-five million dollars ($185,000,000). The original fixed income for each subsequent fiscal year shall be equal to the original fixed income for the previous fiscal year plus four percent (4%), up to a maximum of one billion, eight hundred and fifty million dollars ($1,850,000,000). The additional fixed income for fiscal years 2006-2007, 2007-2008, and 2008-2009 shall be equal to zero (0) dollars. The additional fixed income for fiscal year 2009-2010 shall be equal to three hundred and fifty million, one hundred sixty-eight thousand dollars ($350,168,000). The additional fixed income for each subsequent fiscal year shall be equal to the additional fixed income for the previous fiscal year plus four percent (4%), up to the fiscal year in which the sum of original

fixed income and the additional fixed income equals one billion, eight hundred and fifty million dollars ($1,850,000,000) ("peak year"). The additional fixed income for each fiscal year following the peak year shall be reduced to the amount necessary so that the sum of the original fixed income and the additional fixed income equals one billion, eight hundred and fifty million dollars ($1,850,000,000). The supplementary fixed income for Fiscal Year 2013-2014 shall be one hundred seventy-five million, five hundred sixty-three thousand fourteen dollars ($175,563,014). The supplementary fixed income for each subsequent fiscal year shall be equal to the supplementary fixed income for the previous fiscal year plus four percent (4%), up to the fiscal year in which the sum of original fixed income, the additional fixed income, and the supplementary fixed income equals two billion fifty-five million dollars ($2,055,000,000) ("peak supplementary year"). The supplementary fixed income for each fiscal year following the peak supplementary year shall be reduced to the amount necessary so that the sum of the original fixed income, the additional fixed income, and the supplementary fixed income equals two billion fifty-five million dollars ($2,055,000,000). The fixed income for any fiscal year shall be funded from the first revenues of the Commonwealth of Puerto Rico's portion of the tax.

## History

—May 13, 2006, No. 91, § 2; Dec. 26, 2006, No. 291, § 1; renumbered as § 3 and amended on July 5, 2007, No. 56, § 2; Jan. 14, 2009, No. 1, § 2; Mar. 9, 2009, No. 7, § 50; May 22, 2009, No. 18, § 2; Oct. 10, 2013, No. 116, § 2; July 1, 2015, No. 101, § 2.

Annotations

## Notes

**HISTORY**

**Source.**

See note under § 11a of this title.

**Purpose.**

See note under §  11a of this title.

**Text references.**

The reference to "this act" in the first paragraph is to Act July 5, 2007, No. 56, which amended this section.

**Codification.**

Clauses (i) and (ii) of subsection (a) have been redesignated as (1) and (2) pursuant to L.P.R.A. style.

**Amendments**

**—2015.**

Subsection (a): Act 2015, in the introductory paragraph updated the internal references to the Internal Revenue Code and added the Proviso.

Subsection (b): Act 2015 deleted "of the Commonwealth of Puerto Rico's portion" after "first revenues" in the last sentence of the second paragraph.

**—2013.**

Subsection (a): Act 2013 updated the internal reference in the introductory paragraph and raised the percentage from 2.75% to 3.50% in clause (1).

Subsection (b): Act 2013 amended the second paragraph generally.

**—2009.**

 Act May 22, 2009, No. 18 added the heading to subsection (b), fixed a numerical error in the fifth sentence, and made minor lexical changes throughout this subsection.

Subsection (a)(1): Act Mar. 9, 2009, No. 7 substituted "two percent (2%)" with "two point seventy-five percent (2.75%)" twice in this clause.

Subsection (b): Act Mar. 9, 2009 No. 7 substituted two hundred million, ninety-six thousand dollars ($200,096,000) with three hundred million, one hundred sixty-eight thousand dollars ($350,168,000) and made minor lexical changes in this subsection.

First paragraph: Act Jan. 14, 2009, No. 1 deleted "for Puerto Rico and the Secretary of the Treasury of the Commonwealth of Puerto Rico, hereinafter the Secretary" from the end of the first sentence, and in the third sentence

added "and for the . . . this title" after "accrued interest thereon" and substituted "FIAs" with "funds" before "and resources".

Second paragraph: Act Jan. 14, 2009, No. 1 added "of the Treasury of the Commonwealth of Puerto Rico (hereinafter the 'Secretary')" to the end of the second paragraph.

Subsection (a)(1): Act Jan. 14, 2009, No. 1 substituted "one percent (1%)" with "two percent (2%)" twice in this subsection.

Final paragraph: Act Jan. 14, 2009, No. 1 added the second sentence, added "original" before "fixed income" twice in the third sentence, substituted "the fixed income applicable to the prior fiscal year plus four percent (4%)" with "equal to the . . . 1,850,000,000" at the end of the fourth sentence, deleted the former third sentence, and added the fifth through eighth sentences.

## —2007.

 Act 2007 substituted "Urgent Interest Fund" with "Dedicated Sales Tax Fund" in the catchline and throughout the section; substituted "UIF" with the Spanish acronym "FIA" throughout; and made lexical and sytactical changes throughout.

First paragraph: Act 2007 added a new second sentence, redesignated accordingly and generally amended this paragraph.

Subsection (a)(1): Act 2007 substituted "being said fraction one percent (1%) of the tax" with "being hereinafter denominated 'the one percent (1%) of the tax' ".

Third paragraph: Act 2007 generally amended this paragraph, increasing the fixed income figures for 2007-2008 and 2008-2009.

## —2006.

 Act 2006 amended this section generally.

**Effectiveness.**

See note under §  11a of this title.

Section 6 of Act May 13, 2006, No. 91, renumbered as § 7 by § 5 of Act Dec. 26, 2006, No. 291, and subsequently renumbered as § 9 by § 7 of Act July 5, 2007, No. 56, provides: "This act shall take effect immediately after its approval."

## Statement of motives.

May 13, 2006, No. 91.

Dec. 26, 2006, No. 291.

July 5, 2007, No. 56.

Jan. 14, 2009, No. 1.

Mar. 9, 2009, No. 7.

May 22, 2009, No. 18.

Oct. 10, 2013, No. 116.

July 1, 2015, No. 101.

## Title.

See note under § 11a of this title.

Section 1 of Act May 13, 2006, No. 91, provides: "This Act [§§ 12—15 of this title] shall be known as the 'Urgent Interest Fund Act'."

## Separability.

Section 8 of Act July 1, 2015, No. 101, provides: "If any section, subsection, paragraph, subparagraph, clause and item or part of this Act were held to be null or unconstitutional by a competent court, said holding shall not affect, impair or invalidate the remaining provisions of this Act. For purposes of this Section, each Section of Subtitle DDD, as created by Section 6 of this Act, shall be deemed to be a separate Section."

Section 6 of Act Dec. 26, 2006, No. 291, provides: "If any provision of this Act [which amended this chapter] or the application thereof should be found to be invalid, such a ruling shall not affect the remaining provisions nor the application of this Act which may stand in effect without the provisions thus found to be invalid, and for this purpose, the provisions of this Act are severable."

Section 6 of Act May 13, 2006, No. 91, added by § 5 of Act Dec. 26, 2006, No. 291, renumbered as § 8 on July 5, 2007, No. 56, § 7, provides: "If any provision of this Act [this chapter] or the application thereof should be found to be invalid, such a ruling shall not affect the remaining provisions nor the application of this Act which may stand in effect without the provisions thus found to be invalid, and for this purpose, the provisions of this Act are severable."

See note under § 11a of this title.

**Special provisions.**

See notes under §  11a of this title.

Sections 1 and 2 of Act July 1, 2015, No. 101 proposed to amend § 3 of Act No. 91-2006 and § 2 of Act No. 116-2013, respectively, which both effect this section. The text of the amendment by  § 1 of Act No. 101 is provided as a special provisions note, while the text of the amendment by § 2 of Act No. 101 is incorporated as the current text of this section. The text introduced by § 1 of Act No. 101 provides as follows:

"Section 3.-  Creation of the Special Fund.-A special fund is hereby created, to be known as the Fondo de Interés Apremiante (hereinafter, 'FIA'), whose name in English shall be 'Dedicated Sales Tax Fund,' to be administered by the GDB. FIA and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in FIA pursuant to the provisions of this Act are hereby transferred to, and shall be the property of COFINA. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006, and the accrued interest thereon, and for the other purposes established in Section 2(b) of this Act, with the net proceeds of the bond issues or funds and resources available to COFINA.

"FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico (hereinafter, the 'Secretary'):

"(a)      The first revenues of the sales and use tax (hereinafter, the 'Tax') established in Sections 4020.01 and 4020.02 of Subtitle D of Act No. 1-2011, as amended, known as the 'Internal Revenue Code for a New Puerto Rico,' (hereinafter, the 'Code') up to the following amount; provided, that once the value-added tax provided in Section 4120.01 of Subtitle DD of the Code or the tax resulting from legislation recommended by the Commission created under Section 33 of Act No. 72-2015 takes effect, any reference made in this Act to the sales and use tax, including the term defined as 'tax,' shall be deemed to be substituted for the value-added tax provided in Section

4120.01 of Subtitle DD of the Code or the tax resulting from legislation recommended by the Commission created under Section 33 of Act No. 72-2015, which shall constitute a collateral or a tax similar or comparable to the sales and use tax in accordance with Section 5(c) of Act No. 91-2006, as amended:

    "(i)   …

    "(ii)  …

   "(b)    …

"For purposes of Section 3(a) of this Act, there shall be no Fixed Income for Fiscal Year 2006-2007. The Fixed Income for each fiscal year shall be equal to the sum of the Original Fixed Income and the Additional Fixed Income. The Original Fixed Income for Fiscal Year 2007-2008 shall be one hundred eighty-five million dollars ($185,000,000).  The Original Fixed Income for each subsequent fiscal year shall be equal to the Original Fixed Income for the previous fiscal year plus four percent (4%), up to a maximum of one billion, eight hundred and fifty million dollars ($1,850,000,000). The Additional Fixed Income for Fiscal Years 2006-2007, 2007-2008, and 2008-2009 shall be equal to zero (0) dollars. The Additional Fixed Income for fiscal year 2009-2010 shall be equal to three hundred and fifty million, one hundred sixty-eight thousand dollars ($350,168,000). The Additional Fixed Income for each subsequent fiscal year shall be equal to the Additional Fixed Income for the previous fiscal year plus four percent (4%), up to the fiscal year in which the sum of the Original Fixed Income and the Additional Fixed Income equals one billion, eight hundred and fifty million dollars ($1,850,000,000) ('Peak Year'). The Additional Fixed Income for each fiscal year following the Peak Year shall be reduced to the amount necessary so that the sum of the Original Fixed Income and the Additional Fixed Income equals one billion, eight hundred and fifty million dollars ($1,850,000,000). The Fixed Income for any fiscal year shall be funded from the first revenues of the Tax."

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright 1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

**End of Document**

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 13. Dedicated Sales Tax Fund—Use

**(a)**The moneys originating from the revenues indicated in §  12(a) of this title shall be deposited directly in the FIA and shall be used exclusively for any of the following purposes:

**(1)**To pay the advances to be made by GDB pursuant to the Act to Impose the Supertax of 2006.

**(2)**To directly or indirectly pay or refinance all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the accrued interest thereon.

**(3)**To directly or indirectly pay the items established in subsection (b) of §  11a of this title and the bonds issued by COFINA to meet the purposes established in said subsection (b) of §  11a of this title.

**(b)**The revenues indicated in §  12(a) of this title deposited in the FIA shall be used by COFINA, pursuant to financing or refinancing mechanisms, exclusively for the purpose of paying, financing or refinancing, directly or indirectly, the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and all other debts, accounts or items mentioned in subsection (b) of §  11a of this title, including amounts owed to the GDB and the obligations incurred under any type of financing or surety agreement or interest rate swap agreement executed with respect to bonds issued to finance or refinance such debt. COFINA is hereby authorized to pledge and otherwise encumber

all or part of such revenues solely for the payment of principal, interest and redemption premium of such bonds and other obligations of such instrumentality that were incurred with respect to such bonds to meet the purposes set forth in §§ 11a—16 of this title and the payment of obligations incurred under any type of financing or surety agreement or interest rate swap agreement executed with respect to such bonds. Said pledge shall be valid and binding as of the time it is made without the need for a public or notarized document. The income or revenues thus encumbered, including those subsequently received by COFINA, shall be subject to said lien immediately, without the need of physically delivering the same or any other act, and said lien shall be valid and binding and shall prevail against any third party that has a claim of any kind for damages, breach of contract or any other grounds against COFINA, regardless of the fact that said third party has not been so notified. Neither the trust contract nor the resolution or any collateral contract, through which the rights of COFINA over any income or collection are pledged or assigned must be presented or registered for perfection of the lien over the same against any third party, except in the records of COFINA.

**(c)**Amounts deposited into FIA in excess of the amounts necessary to pay the principal of and interest on COFINA bonds, to meet the obligations incurred under bond issue documents or to make any other payment related to other obligations incurred by COFINA, including payments under interest rate swaps agreements, in connection with money taken on loan or bonds issued by said instrumentality for the payment of which the proceeds of such tax has been pledged, may be transferred to the General Fund of the Commonwealth of Puerto Rico to be used as determined by the Secretary of the Treasury to cover any expenses included in the budget approved by the Legislative Assembly for the current year. In order to be able to make such transfer, the same shall be authorized by the COFINA Board of Directors, upon certification of the fact that the amounts to be transferred are not necessary to meet any obligation of COFINA.

**(d)**The bonds and other obligations of COFINA shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities. Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged.

# History

—May 13, 2006, No. 91, § 3; Dec. 26, 2006, No. 291, § 2; renumbered as § 4 and amended on July 5, 2007, No. 56, § 3; Jan. 14, 2009, No. 1, § 3; May 22, 2009, No. 18, § 3; June 30, 2013, No. 40, § 7; Oct. 10, 2013, No. 116, § 3.

Annotations

## Notes

**HISTORY**

**Amendments**

**—2013.**

Subsection (c): Act Oct. 10, 2013, No. 116 substituted "as determined by the Secretary of the Treasury and the Director of the Office of Management and Budget in accordance with the current budget" with "as determined by the Secretary of the Treasury...the current year" and deleted the former third sentence regarding the transfer of the amount through a joint resolution of the Legislature.

Subsection (c): Act June 30, 2013, No. 40 added "to be used...with the current budget" at the end of the first sentence.

**—2009.**

 Subsection (b): Act May 22, 2009, No. 18 added the third through fifth sentences, and substituted "guaranty" with "surety" twice.

Subsection (a): Act Jan. 14, 2009, No. 1 substituted "Dedicated Sales Tax Fund" with "FIA" in the introductory paragraph; in clause (2) added "of the Commonwealth of Puerto Rico" after "extraconstitutional debt", added "and the accrued interest thereon" at the end of this clause; added clause (3); and made minor lexical changes throughout.

Subsection (b): Act Jan. 14, 2009, No. 1 deleted former subsection (b), redesignating former subsection (c) as (b); in the first sentence added "financing or" before "refinancing" and added "and all other debts, accounts or items mentioned in § 11b" after "June 30, 2006"; and substituted "pay or

finance the extraconstitutional debt of the Commonwealth of Puerto Rico" with "meet the purposes set forth in this chapter" in the third sentence.

Subsection (c): Act Jan. 14, 2009, No. 1 added this subsection.

## —2007.

Act 2007 substituted "Urgent Interest Fund", "UIF", and "UIFC" with "Dedicated Sales Tax Fund", "FIA", and "COFINA", respectively, and made lexical and syntactical changes throughout this section.

## —2006.

Subsection (a): Act 2006 inserted "directly" before "deposited" and in clause (1), substituted "Government Development Bank" with "GDB".

Subsection (b): Act 2006 inserted "directly" before "deposited" and substituted "revenues" with "collections".

Subsections (c) and (d): Act 2006 added these subsections.

## Effectiveness.

Section 59 of Act June 30, 2013, No. 40, provides: "This Act [which amended this section] shall take effect immediately after its approval with respect to Sections 21, 22, and 23; provided, that Sections 8 through 15, 17 through 20, 24 through 33, 51, and 52 shall be effective for taxable years beginning after December 31, 2012; and the provisions of Sections 2 through 18, 16, 34 through 50, and 53 through 57 shall take effect on July 1, 2013."

## Statement of motives.

May 13, 2006, No. 91.

Dec. 26, 2006, No. 291.

July 5, 2007, No. 56.

Jan. 14, 2009, No. 1.

May 22, 2009, No. 18.

June 30, 2013, No. 40.

Oct. 10, 2013, No. 116.

## Short title.

Section 1 of Act June 30, 2013, No. 40, provides: "This Act [which amended this section] shall be known as the 'Tax Burden Redistribution and Adjustment Act'."

## Separability.

See notes under §§ 11a and 12 of this title.

Section 58 of Act June 30, 2013, No. 40, provides: "If any section, subsection, paragraph, subpagraph, clause or subclause, or part of this Act [which amended this section] were held to be void or unconstitutional by a competent court, such holding shall not affect, impair, or invalidate the remaining provisions and parts of this Act."

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright
1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

---

**End of Document**

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 14. Dedicated Sales Tax Fund—Deposits and disbursements

**(a)** During Fiscal Year 2006—2007, the amount established in §  12(a)(1) of this title shall be deposited biweekly (2 weeks) in the FIA as the same is received from the revenues from the tax. During each subsequent fiscal year, the first revenues from the tax, up to the amount of the fixed income, shall be deposited the moment they are received in FIA or in any other special fund (including a fund controlled by a trustee designated in the trust agreement under which bonds were issued or other obligations were incurred to meet the purposes established in subsection (b) of §  11a of this title) designated by COFINA. In case the revenues from the tax are less than the fixed income, the Secretary shall be authorized to cover such shortfall from any available funds and is also authorized, as a special cash flow management mechanism when no other alternative is available, to borrow from GDB to cover such shortfall and the Director of the Office of Management and Budget shall include in the recommended budget for the current fiscal year or the next fiscal year, the appropriations necessary to cover such shortfall.

**(b)** Each month during each fiscal year, the Secretary shall determine whether three point fifty percent (3.50%) of the tax for the current fiscal year is an amount greater than the fixed income applicable to such fiscal year. Once the Secretary determines that three point fifty percent (3.50%) of the tax for such fiscal year exceeds the fixed income applicable to such fiscal year, all revenues from the tax received after such determination, up

to an amount equal to the excess of such three point fifty percent (3.50%) of the tax over the fixed income, shall be deposited in FIA. Furthermore, on or before October 1 of each fiscal year, the Secretary shall determine whether the three point fifty percent (3.50%) of the tax for the previous fiscal year is greater than the fixed income applicable to such previous fiscal year. The revenues from the tax that represent the excess amount of three point fifty percent (3.50%) of the tax for the previous fiscal year over the fixed income applicable to such fiscal year shall belong to FIA.

**(c)** The Commonwealth of Puerto Rico hereby agrees and assures any person, firm or corporation or any agency of the United States of America or of any state or the Commonwealth of Puerto Rico who underwrites or acquires bonds issued by COFINA, or who provides insurance, repayment or solvency sources for such bonds, that until such bonds, from any date, together with the interest thereon, entirely paid for and withdrawn, the Commonwealth shall not: (i) limit nor restrain the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the FIA pursuant to the provisions of §§ 11a—16 of this title; Provided, That the foregoing provisions do not limit the power of the Commonwealth of Puerto Rico, by means of a law amendment, to limit or restrain the nature or the amount of such taxes or other revenues or to substitute similar or comparable collateral by other taxes, fees, charges or other income to be deposited into the FIA if, for the following fiscal years, the revenues projected by the Secretary of the Treasury from such substitutive tax, income or collateral is equal to or greater than the service of the debt and other charges and any coverage requirement included in the COFINA bond authorizing documents; or (ii) limit or restrain the powers hereby conferred by §§ 11a—16 of this title or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be entirely paid for and withdrawn. No amendment to §§ 11a—16 of this title, shall undermine any obligation or commitment of COFINA.

**(d)** In the event that the aggregate revenues from the tax transferred to COFINA in conformity with § 12(a) of this title were to be, at any time, insufficient for the payment of principal of and interest on its bonds or to make any other payment related to other obligations incurred, including payments pursuant to interest rate swap agreements, in connection with borrowed moneys or bonds issued by such instrumentality for the payment of which the proceed of such tax has been pledged or in case the reserve funds of COFINA, if any, established for the payment of the debt service requirements or such obligations are applied to cover the shortfall in the

amounts necessary to make such payments, such insufficiencies and the amount of such reserve fund used to cover the shortfall shall be paid or reimbursed to such instrumentality from the first amounts received in the next fiscal year or subsequent fiscal years by the Commonwealth of Puerto Rico from any remaining portion of the tax after making the deposits established by § 12(a) of this title. In case the revenues from the tax were to be insufficient to cover such payment or reimbursement, the Secretary is hereby authorized to cover such shortfall from any funds available and is further authorized, as a special cash flow management mechanism when no other alternative is available, to borrow money from GDB to cover such shortfall, and the Director of the Office of Management and Budget shall include in the recommended budget for the current fiscal year or the next fiscal year, the appropriations necessary to cover such deficiencies.

**(e)** The proceeds of the remaining portion of the tax that shall be used pursuant to the provisions of subsection (d) of this section to cover an insufficiency or reimburse any reserve fund established for debt service requirements, shall not be deposited in the General Fund of the Government of the Commonwealth of Puerto Rico when they are collected, but shall be deposited in the FIA for the benefit of the instrumentality and shall be used to cover such insufficiency or reimburse such reserve fund for the payment of debt service requirements.

## History

—May 13, 2006, No. 91, § 4; Dec. 26, 2006, No. 291, § 3; renumbered as § 5 and amended on July 5, 2007, No. 56, § 4; Jan. 14, 2009, No. 1, § 4; Mar. 9, 2009, No. 7, § 51; May 22, 2009, No. 18, § 4; Oct. 10, 2013, No. 116, § 4.

Annotations

## Notes

## HISTORY

**Source.**

See note under § 11a of this title.

**Purpose.**

See note under § 11a of this title.

**Amendments**

**—2013.**

Subsection (b): Act 2013 raised the percentage from 2.75% to 3.50%.

**—2009.**

Subsection (b): Act May 22, 2009, No. 18 fixed a numerical error in the second sentence and made minor lexical changes throughout this subsection.

Subsection (c): Act May 22, 2009, No. 18 amended this subsection generally, dividing it into the introductory paragraph and clauses (1) and (2).

Subsection (b): Act Mar. 9, 2009, No. 7 substituted two percent (2%) with two point seventy-five percent (2.75%) throughout this subsection.

Subsection (a): Act Jan. 14, 2009, No. 1 substituted "for the payment or financing of the extraconstitutional debt" with "to meet the purposes established in section 11a(b) of this title" and made minor lexical changes in this subsection.

Subsection (b): Act Jan. 14, 2009, No. 1 substituted "one percent (1%)" with "two percent (2%)" throughout this subsection and made minor lexical changes.

Act Jan. 14, 2009, No. 1 deleted former subsection (c), redesignating the subsequent subsections, in subsection (c) added "or who provides insurance . . . bond authorizing documents" after "issued by COFINA", and substituted "to not limit nor restrain the rights or powers hereby conferred by §§ 11a—16 of this title" with "nor shall the Commonwealth . . . by this title", and made minor lexical changes in subsection (d).

**—2007.**

Act 2007 substituted "Urgent Interest Fund", "UIF", and "UIFC" with "Dedicated Sales Tax Fund", "FIA", and "COFINA", respectively, and made lexical and syntactical changes throughout this section.

Subsection (d): Act 2007 added "or the rights of COFINA to meet its agreements with bondholders" in the first sentence and added the second sentence.

Subsection (e): Act 2007 generally amended this subsection.

Subsection (f): Act 2007 inserted "cover an insufficiency or" and "cover such insufficiency or" before the first and second occurences of "reimburse", respectively.

**—2006.**

Act Dec. 26, 2006, No. 291 added "Deposits and" to the section catchline, redesignated the former text as subsection (c), and added new subsections (a), (b), (d), (e) and (f).

Subsection (c): Act Dec. 26, 2006, No. 291 in the second paragraph substituted "Government Development Bank" with "GDB" and added "and shall not . . . any other purpose" after "extraconstitutional debt".

**Effectiveness.**

See note under §  11a of this title.

**Statement of motives.**

May 13, 2006, No. 91.

Dec. 26, 2006, No. 291.

July 5, 2007, No. 56.

Jan. 14, 2009, No. 1.

Mar. 9, 2009, No. 7.

May 22, 2009, No. 18.

Oct. 10, 2013, No. 116.

**Title.**

See note under §  11a of this title.

**Separability.**

See notes under §§  11a and 12 of this title.

**Special provisions.**

See note under §  11a of this title.

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright
1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

---

**End of Document**

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 14a. Dedicated Sales Tax Fund—Puerto Rico Economic Stimulus Fund

The Government Development Bank for Puerto Rico is hereby authorized to establish a fund under its control and custody, to be called the "Puerto Rico Economic Stimulus Fund", and be funded with the proceeds of the bond issues or other financing mechanisms employed and assigned by COFINA. The funds deposited into the Puerto Rico Economic Stimulus Fund may only be used for the following purposes: taxpayer relief, boosting businesses and trades, training programs, assistance for displaced employees, and any other purposes as provided through legislation. The Puerto Rico Economic Stimulus Fund, also known as the "Stabilization Fund", may also be funded with the proceeds of the bond issues or other financing mechanisms used by COFINA, from any other funds deposited therein; and all funds deposited therein, may be used for the purposes listed in this section and in §11a of this title.

## History

—May 13, 2006, No. 91, added as §  6 on Jan. 14, 2009, No. 1, §  5; July 2, 2012, No. 133, § 2.

Annotations

## Notes

### HISTORY

### Amendments—2012.

Act 2012 added the third sentence and introduced minor lexical changes throughout.

### Statement of motives.

Jan. 14, 2009, No. 1.

July 2, 2012, No. 133.

### Separability.

See note under § 11a of this title.

### Special provisions.

Sections 1—5 of Act June 30, 2009, No. 33, provide:

"Section 1.—The Office of Management and Budget is hereby authorized to use the amount of two billion, five hundred million (2,500,000,000) dollars from the Puerto Rico Economic Stimulus Fund created by virtue of Act No. 1 of January 14, 2009, as amended, in order to appropriate the sum of one billion five hundred million (1,500,000,000) dollars to defray operating expenses, including the payroll of public agencies and instrumentalities; and the sum of one billion (1,000,000,000) dollars under the custody of the Office of Management and Budget to defray the cost of the Payroll Cutback Plan and the Public Employee Alternatives Plan, established by Act No. 7 of March 9, 2009; provided, that if there is any surplus from the sum of one billion (1,000,000,000) dollars, the same may be used to defray operating expenses, including the payroll of public agencies and instrumentalities, and for any other use as provided in Act No. 1 of January 14, 2009, as amended.

"Section 2.—The Office of Management and Budget shall file a report with the Office of the Secretary of the Senate and the Clerk of the House of Representatives on a quarterly basis, which shall include an itemization of the transfers made from this Fund.

"Section 3.—The public agencies and instrumentalities receiving appropriations from this Fund must comply with the provisions of Act No. 103 of May 25, 2006, as amended, known as the 'Fiscal Reform Act.'

"Section 4.—The Puerto Rico Economic Stimulus Fund shall also be known as the Stabilization Fund.

"Section 5.—This Act shall take effect immediately after its approval."

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright
1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

---

**End of Document**

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 15. Dedicated Sales Tax Fund—Additional provisions

The Legislature hereby commits to approving an expenses budget for Fiscal Year 2006—2007 that will allow the Government to keep public servants in regular employment at their jobs and that will ensure the nonimpairment of the continuity in the direct services provided to citizens. This shall include the approval of legislation that shall provide additional recurring funds for an amount estimated to be not less than three hundred million (300,000,000) dollars and not more than four hundred million (400,000,000) dollars in addition to the revenues of the Commonwealth under the current tax system, in order to tend to the structural budget deficit.

Periodically, the Legislature shall evaluate the effectiveness of the collections generated under the tax measures referred to in the above paragraph; Provided, That once the structural budget deficit has been remedied, the use of said additional recurring funds for a purpose other than tending to the structural budget deficit, shall be transferred in its entirety to the two (2) retirement systems, in proportion to the number of their participants.

Likewise, the Government shall generate annual savings in an amount of not less than three hundred fifty million (350,000,000) dollars during the next three (3) years.

## History

—May 13, 2006, No. 91, §  5; Dec. 26, 2006, No. 291, §  4; renumbered as §  6 on July 5, 2007, No. 56, §  5; renumbered again as §  7 on Jan. 14, 2009, No. 1, §  5.

Annotations

## Notes

**HISTORY**

**Editor's notes.**

The editor substituted "Urgent Interest Fund" with "Dedicated Sales Tax Fund" in the section catchline pursuant to the amendments of Act July 5, 2007, No. 56.

**Amendments**

**—2006.**

 Act Dec. 26, 2006, No. 291 substituted "State" with "Commonwealth" in the first paragraph, and in the second paragraph substituted "established to constitute the Urgent Interest Fund" with "referred to in the above paragraph" after "tax measures".

**Statement of motives.**

May 13, 2006, No. 91.

Dec. 26, 2006, No. 291.

**Separability.**

See note under §  12 of this title.

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright
1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved.

**End of Document**

Current through all acts translated by the Translation Office of the Puerto Rico Government through the 2011 Legislative Session and various acts from 2012 to the present. Appendices III (Rules of Civil Procedure) and IV (Rules of Evidence) of Title 32 have been replaced by Appendices V (Rules of Civil Procedure) and VI (Rules of Evidence) of Title 32 by Order of the Supreme Court dated Sept. 4, 2009, but the official translations are not yet available. Also, the official translations of Appendices XII through XXII of Title 3, which encompass various reorganization plans of the Puerto Rico Government and promulgated in 2010 through 2012, have not yet been received. For all missing translations, please consult the Spanish version

*Laws of Puerto Rico Annotated  >  TITLE THIRTEEN Taxation and Finance (Subts. 1 — 17)  >  Subtitle 1 Governmental Finances (Chs. 1 — 12)  >  Chapter 1. Treasury Funds and Accounts (§§ 1 — 18)*

## § 16. Dedicated Sales Tax Fund—Scope

**(a)**None of the provisions of §§  11a—16 of this title shall be interpreted or applied in such a manner as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

**(b)**None of the provisions of §§  11a—16 of this title shall be interpreted or applied in such a manner as to undermine the rights of the holders of bonds or notes that constitute public debt of the Commonwealth of Puerto Rico pursuant to the provisions of Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

## History

—May 13, 2006, No. 91, added as §  7 on July 5, 2007, No. 56, §  6; renumbered as §  8 on Jan. 14, 2009, No. 1, §  5.

Annotations

## Notes

## HISTORY

## Statement of motives.

July 5, 2007, No. 56.

## Separability.

See note under §  11a of this title.

Laws of Puerto Rico Annotated
Copyright © 2020 LAWS OF PUERTO RICO ANNOTATED, Copyright
1955-2014 by the Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All
rights reserved.

---

**End of Document**

[House Hearing, 114 Congress]
[From the U.S. Government Publishing Office]

DISCUSSION DRAFT, H.R. _____, ``PUERTO RICO OVERSIGHT, MANAGEMENT,
            AND ECONOMIC STABILITY ACT (PROMESA)''

=======================================================================

                        LEGISLATIVE HEARING

                           BEFORE THE

                 COMMITTEE ON NATURAL RESOURCES
                 U.S. HOUSE OF REPRESENTATIVES

                 ONE HUNDRED FOURTEENTH CONGRESS

                        SECOND SESSION

                        _____

                  Wednesday, April 13, 2016

                        _____

                     Serial No. 114-36

                        _____

         Printed for the use of the Committee on Natural Resources

[GRAPHIC NOT AVAILABLE IN TIFF FORMAT]

          Available via the World Wide Web: http://www.fdsys.gov
                             or
            Committee address: http://naturalresources.house.gov

                        _____

                 U.S. GOVERNMENT PUBLISHING OFFICE
99-800 PDF                 WASHINGTON : 2016
_____
For sale by the Superintendent of Documents, U.S. Government Publishing Office,
http://bookstore.gpo.gov. For more information, contact the GPO Customer Contact Center,
U.S. Government Publishing Office. Phone 202-512-1800, or 866-512-1800 (toll-free).
E-mail, gpo@custhelp.com.

                 COMMITTEE ON NATURAL RESOURCES

                   ROB BISHOP, UT, Chairman
            RAUL M. GRIJALVA, AZ, Ranking Democratic Member

Don Young, AK                      Grace F. Napolitano, CA
Louie Gohmert, TX                  Madeleine Z. Bordallo, GU
Doug Lamborn, CO                   Jim Costa, CA
Robert J. Wittman, VA              Gregorio Kilili Camacho Sablan,
John Fleming, LA                       CNMI
Tom McClintock, CA                 Niki Tsongas, MA
Glenn Thompson, PA                 Pedro R. Pierluisi, PR
Cynthia M. Lummis, WY              Jared Huffman, CA
Dan Benishek, MI                   Raul Ruiz, CA
Jeff Duncan, SC                    Alan S. Lowenthal, CA
Paul A. Gosar, AZ                  Matt Cartwright, PA
Raul R. Labrador, ID               Donald S. Beyer, Jr., VA
Doug LaMalfa, CA                   Norma J. Torres, CA
Jeff Denham, CA                    Debbie Dingell, MI
Paul Cook, CA                      Ruben Gallego, AZ
Bruce Westerman, AR                Lois Capps, CA
Garret Graves, LA                  Jared Polis, CO

```
Dan Newhouse, WA                    Wm. Lacy Clay, MO
Ryan K. Zinke, MT
Jody B. Hice, GA
Aumua Amata Coleman Radewagen, AS
Thomas MacArthur, NJ
Alexander X. Mooney, WV
Cresent Hardy, NV
Darin LaHood, IL

                Jason Knox, Chief of Staff
                Lisa Pittman, Chief Counsel
           David Watkins, Democratic Staff Director
             Sarah Lim, Democratic Chief Counsel


                    ----------

                    CONTENTS

                    ----------
```

```
                                                          Page

Hearing held on Wednesday, April 13, 2016.......................    1

Statement of Members:
    Bishop, Hon. Rob, a Representative in Congress from the State
        of Utah...............................................      1
            Prepared statement of.............................      3
    Grijalva, Hon. Raul M., a Representative in Congress from the
        State of Arizona......................................      3
            Prepared statement of.............................      5
    Pierluisi, Hon. Pedro R., a Representative in Congress from
        the Territory of Puerto Rico..........................      6
            Prepared statement of.............................      7

Statement of Witnesses:
    Johnson, Simon, Professor of Global Economics and Management,
        MIT Sloan School of Management, Cambridge, Massachusetts...  45
            Prepared statement of.............................     46
    Kent, Andrew, Professor of Law, Fordham University School of
        Law, New York, New York...............................     28
            Prepared statement of.............................     29
            Letter to Chairman Bishop with Supplementary Testimony...  34
    Kirpalani, Susheel, Partner, Quinn Emanuel Urquhart &
        Sullivan, New York, New York..........................     37
            Prepared statement of.............................     39
    Miller, John V., CFA, Managing Director, Co-Head of Fixed
        Income, Nuveen Asset Management, Chicago, Illinois.........  15
            Prepared statement of.............................     17
            White Paper submitted for the record.............     18
    Weiss, Antonio, Counselor to the Secretary, U.S. Department
        of the Treasury, Washington, DC.......................      9
            Prepared statement of.............................     11
    Williams, Hon. Anthony A., Senior Strategic Advisor, Dentons,
        U.S. LLP, Washington, DC; Former Mayor of Washington, DC...  12
            Prepared statement of.............................     13

Additional Materials Submitted for the Record:
    Associated General Contractors of America--Puerto Rico
        Chapter, April 11, 2016, Letter submitted for the record...  83
    CCAGW, April 19, 2016, Letter submitted for the record.......  91
    Jubilee USA Network, April 13, 2016, Letter submitted for the
        record................................................     89
    List of documents submitted for the record retained in the
        Committee's official files............................     93
    National Assoc. of Counties, National League of Cities, U.S.
        Conference of Mayors, Government Finance Officers Assoc.,
        International City/County Management Assoc., April 14,
        2016, Letter submitted for the record.................     90
    Olmos, Jose O., Leader within the Veteran and Military
        community in Puerto Rico, April 12, 2016, Letter submitted
        for the record........................................     85
    Outdoor Alliance, April 12, 2016, Letter submitted for the
        record................................................     87
    PIMCO Blog, Congress Needs to Act on Puerto Rico's Debt
        Crisis, and `PROMESA' Could Work, April 26, 2016......     93
    Plaskett. Hon. Stacey E., a Delegate in Congress from the
        U.S. Virgin Islands, Prepared Statement of............     82
    Puerto Rico Builder's Association, April 12, 2016, Letter
        submitted for the record..............................     88
    SIFMA Asset Management Group, April 21, 2016, Letter
```

LEGISLATIVE HEARING ON DISCUSSION DRAFT, H.R. _____, ``PUERTO RICO
    OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT (PROMESA)''

----------

Wednesday, April 13, 2016

U.S. House of Representatives

Committee on Natural Resources

Washington, DC

----------

The committee met, pursuant to call, at 10:09 a.m., in room
1324, Longworth House Office Building, Hon. Rob Bishop
[Chairman of the Committee] presiding.
    Present: Representatives Bishop, Gohmert, Lamborn, Wittman,
Fleming, McClintock, Benishek, Duncan, Gosar, Labrador,
LaMalfa, Denham, Cook, Wasterman, Graves, Newhouse, Hice,
Radewagen, MacArthur, Mooney, Hardy, LaHood, Grijalva,
Bordallo, Costa, Tsongas, Pierluisi, Huffman, Ruiz, Lowenthal,
Cartwright, Beyer, Torres, Dingell, Gallego, Polis, and Clay.
    Also Present: Representatives Velazquez, Serrano, and
Gutierrez.
    The Chairman. The committee is going to be in order. We are
meeting today to hear testimony on the discussion draft of the
Puerto Rico Oversight, Management, and Economic Stability Act.
    Under Committee Rule 4(f), oral opening statements are
limited to the Chair, the Ranking Member, the Vice Chair, and
the designee of the Ranking Member. I am going to ask unanimous
consent that other Members' opening statements be made part of
the hearing record if they are submitted to the Clerk by 5 p.m.
today.
    Hearing no objection, so ordered.
    I also ask unanimous consent that Mr. Serrano, Ms.
Velazquez, and Mr. Gutierrez, if they appear, be allowed to sit
on the dais, and also Mr. Duffy as well.
    Hearing no objection, so ordered.
    I will also now excuse Mr. Duffy, who is a key player in
this, obviously--he is going to be the sponsor of the
legislation--who wished to be here, but he is also chairing
another subcommittee at this very moment. So, because of that
conflict, he is not going to be able to join us here now.
    I now recognize myself, if I could, for a brief opening
statement.

STATEMENT OF THE HON. ROB BISHOP, A REPRESENTATIVE IN CONGRESS
            FROM THE STATE OF UTAH

    The Chairman. In the past couple of months, this committee
has held multiple oversight hearings on this particular issue.
This will be the fourth committee meeting we have had on
testimony related to the situation in Puerto Rico, which is a
whole lot of hearings. If you add them end to end, we would
have enough video of just these hearings for a good daytime
soap opera. We would give ``Days of Our Lives'' a run for the
money on the longest running daytime soap. And it would be just
as riveting as those shows are, as well.
    But the issue that is facing us has been basically decades
in the making. There is over $118 billion in debt from bonds
and pension liabilities that are there. Puerto Rico has not had
an audited financial statement for 2 years. They are already in
default on portions of their debt. We have to do something
different.
    Without the tools to ensure implementation of extensive
government and economic reforms, Puerto Rico will continue to
be on the cusp of default and run the risk of future calls for
financial assistance or bailouts.
    This bill includes reforms that can begin transitioning the
island away from elements of cronyism, allow for privatization
of an energy sector, and boost domestic activity that will be
not only a short-term solution to the situation but also
provide the island the tools to revitalize their economy in the

bankruptcy process impose significant ``haircuts'' on the principal owed to bondholders, or did it merely extend the payment period by a reasonably short amount of time. The former would be more likely unconstitutional than the latter.

The Supreme Court's case law under the Fifth Amendment also protects against impairment of contract rights. ``The Supreme Court has made clear that retroactive legislation that affects valid property interests raises problems under both'' the Takings Clause and the Due Process Clause of the Fifth Amendment. Johnson & Young, supra, at 144 (discussing Eastern Enterprises v. Apfel, 524 U.S. 498 (1998)). As with the Contracts Clause, it is uncertain how a hypothetical congressional statute for state bankruptcy would fare under the Fifth Amendment, and the outcome of judicial review would depend significantly on the particular details of the legislation and any challenged court orders issued pursuant to it.

In sum, a congressional statute allowing state government bankruptcy would raise a number of serious constitutional issues, implicating unsettled areas of Supreme Court doctrine. In my judgment, there is a real risk that either the legislation itself or particular applications of it by bankruptcy courts would be found unconstitutional. By contrast, as my April 13 testimony indicated, I believe that PROMESA rests on a firm constitutional foundation.

Sincerely,

Andrew Kent, Professor of Law
Fordham University School of Law.

———

The Chairman. Thank you.
Next, Mr. Kirpalani.

STATEMENT OF SUSHEEL KIRPALANI, PARTNER, QUINN EMANUEL
URQUHART & SULLIVAN, NEW YORK, NEW YORK

Mr. Kirpalani. Thank you, Chairman Bishop, Ranking Member Grijalva, and members of the committee, as well as your dedicated staff, who have worked many nights and weekends to get us to this place. Thank you for having me participate in this important issue for our country. It is truly an honor to be here.

My name is Susheel Kirpalani. I am a partner at Quinn Emanuel in New York, and I am a creditors' rights lawyer. I am here to testify about fair restructuring laws and principles and whether the bill for Puerto Rico has the hallmarks of fairness and upholding the rule of law consistent with U.S. precedent.

I have been practicing creditors' advocacy for over 20 years. I represented creditors in the two largest municipal bankruptcy cases in the United States--Jefferson County, Alabama, and Detroit, Michigan. I have also represented the largest statutory creditors committees in Chapter 11 cases in the Lehman and Enron bankruptcies. I also served as a court-appointed mediator trying to solve myriad disputes among stakeholders in a multi-billion-dollar case.

Here, I represent COFINA creditors. COFINA is the largest bond issuer in Puerto Rico. When you think about Puerto Rico and you hear numbers like $70 billion of borrowed-money debt and $40 billion of pension debt, out of the $70 billion, COFINA is $17 billion. If you take out the utilities, you are left with $40 billion of borrowed-money debt apart from the utilities, the electric power, and the water system. So, $17 billion out of $40 billion is COFINA. It is the largest issuer of bonds in Puerto Rico, and they are secured creditors protected by property rights under both the U.S. Constitution and the Puerto Rico Constitution.

My clients include individuals who are retired or semi-retired as well as asset managers that invested in these safest, most secure bonds. This is how we are different from other bondholders: we are backed by the sales taxes of Puerto Rico. So, although creditors like the ones I represent certainly want to see their debts repaid, our interests are aligned with the people of Puerto Rico, because if they cannot afford to go out every day and buy things they need for their families, we can never get repaid. And if they leave home and move to the mainland states, we can never get repaid. So, our interests are truly aligned.

There are universal principles of any fair restructuring law: stay litigation, uphold creditor expectations, uphold the

Mr. Weiss. I can start. Thank you, Congressman.

The oversight board does respect, in fact, the principles that the Administration laid out at the beginning of this process, which is that it preserves the Commonwealth's self-governance, while putting in place safeguards that ensure that the plans that are agreed and that the budgets that are agreed will be carried out.

And I think as other witnesses have testified, it is also the case uniquely in this bill that access to restructuring authorities or, indeed, access to a collective-action clause under the voluntary path can only be obtained through a process which is certified and put forward by the oversight board.

So, the oversight board respects the self-governance but is a gateway to further the voluntary negotiations that have a chance of success or restructuring authorities.

Mr. Lamborn. What if the board and the Governor and/or legislature are at loggerheads on what the way forward is on an important part of the economy of Puerto Rico?

Mr. Weiss. The Governor and the legislature are to put forward a long-term fiscal plan and an annual budget. These are to be approved by the legislature, as is the case presently. In the event that subsequent budgets deviate from the initial fiscal plan, which is revised annually as well, or performance falls short, there is an iterative process back and forth with the oversight board to correct those shortfalls, and, ultimately, there is assurance that the plans will be carried out as initially forecast.

Mr. Lamborn. OK. Thank you very much. That, to me, is critical.

Another critical item--there are so many here, but in my remaining short time--is the rights of creditors who feel like they are not getting a good deal, the holdout creditors, let's say.

And, sir, you have been intimately involved with this in the past. What about holdout creditors, even if they are in the minority, how will they be treated?

Mr. Kirpalani. Sure. Thank you, Congressman Lamborn.

There are two types of holdouts. And the first type to think about is the dissenting minority when the majority of a pool or a class wants to go along with the deal and get a voluntary restructuring. You may have people who just do not want to participate. They don't want to even open their mail. They don't want to be involved in any kind of restructuring discussion or they are not sophisticated or they don't want to hire professionals to focus on their rights. So they may vote against or they may not vote at all.

The bill allows in the debt-restructuring section that the majority--it is majority in number, so more than 50 percent in number of people voting--and more than two-thirds in dollar amount of the particular class voting should be able to bind everyone in that class of similarly situated creditors.

So, the most important thing to take away, you have to make sure the bill protects similarly situated creditors to work together and not lump people with different contract rights, different property rights together.

The one issue I have with collective-action clauses is----

The Chairman. You have 3 seconds to say your issue.

Mr. Kirpalani [continuing]. It is a eurozone concept. It has no classification rules. Just be careful.

The Chairman. OK. Thank you.

Mr. Lamborn. Thank you.

The Chairman. Mr. Grijalva.

Mr. Grijalva. Thank you, Mr. Chairman.

Mr. Weiss, we know who loses if something pragmatic and humanitarian is not done in terms of legislation from this Congress. We know who loses. But if something is not done, who wins?

Mr. Weiss. Congressman, my answer is simple: no one wins, everyone loses. The people of Puerto Rico lose. The creditors ultimately lose. As has been noted, the moratorium, which has been enacted in Puerto Rico to preserve essential services, has led credit prices to deteriorate. And the mainland loses, in the sense that the alternative to this legislation, which is not a bailout, will, in fact, become a bailout over time.

And, as has been stated by many Members of Congress in both parties, this legislation costs taxpayers nothing. In fact, what it does is it precludes the likelihood that over time taxpayers would have to step in, as they always do when the safety and economic prosperity of Americans are at stake.

Mr. Grijalva. Thank you.

Professor Johnson, categorize for me the level of austerity

And I came in in the fall of 1995. There was downsizing that had taken place. We had taken control, under the oversight board, of the financial operations of the District, so I was able to establish credit. It seemed harsh and it seemed severe, but we established faith and credit. We were able to access the markets.

One lesson I think is, in my humble opinion, I don't think you are really helping anyone by trying to be, ``too nice.'' I think it is better to provide the medicine, provide the therapy, and get underway as quickly as possible to establish the expectations, get the economic growth program underway, get access to the markets underway. That is one lesson.

The second lesson that I think is very important and should not be underestimated is, when people talk about budgets, they often talk about conception of the budget, formulation of the budget. But as we have seen in many different levels of government from this level on down, budget execution is crucially important. So, the execution of a budget and a financial plan is just as important as its conception, and I would pay attention to that in the program here.

Mr. Costa. All right. I want to get to my other questions. But think more about that, and I think if you provided that in the form of a letter to the committee, that would be helpful. By your comments, I assume that the 14-year example in Argentina is not an option in terms of how we go forward.

Mr. Weiss, the legislation has changed. There are modifications that have been made. What additional changes would you like to see in either the jurisdiction of the oversight board or the makeup of the board, all these miscellaneous issues, and please be quick?

Mr. Weiss. We are getting close to a point where there is a potential for a bipartisan solution.

Mr. Costa. Well, there has to be. Without a bipartisan agreement, there is no agreement.

Mr. Weiss. And without an agreement, there is a collapse in Puerto Rico.

Mr. Costa. So, for the timelines for that purpose, how quickly do you think we need to get there on this bipartisan agreement?

Mr. Weiss. As soon as this hearing ends, we are going to sit with the Chairman and his staff. We will work through all of our technical edits on this draft, the substantive issues I enumerated in my testimony, and we have to get this done.

Mr. Costa. We have passed one deadline on April 6. Isn't that correct? Then we have another deadline approaching on May 1, on the $2 billion payment. Then is July 1. So we have several deadlines that are looming.

Mr. Weiss. The time to act is now. We are past every deadline.

Mr. Costa. OK.

And, Mr. Miller, do you care to confirm, aye or nay.

Mr. Miller. I agree. The May 1 payment is significant and the July 1 payment is even more significant.

Mr. Costa. So are those the three buckets, roughly, that we have to find this consensus here sooner rather than later?

Mr. Weiss. Technical items, restructuring workability, and the other items you mentioned. We can get there if there is a will.

Mr. Costa. Clearly. And without a bipartisan agreement, we have no bill.

Mr. Weiss. Yes.

Mr. Costa. So it seems like we know where the challenges are as it relates to the jurisdiction, as it relates to the makeup. There are a host of miscellaneous issues that the Representative from Puerto Rico has outlined, and I think we have to come to an agreement sooner than later. We are not going to get everything we want.

Thank you. My time has expired.

Mr. Graves [presiding]. The gentleman from California, Mr. LaMalfa, is recognized for 5 minutes.

Mr. LaMalfa. Thank you, Chairman Graves.

Mr. Kirpalani, your clients, my understanding, are GoldenTree Asset Management, Merced Capital, Tilden Park Capital Management, and the Whitebox Advisors. Is that correct?

Mr. Kirpalani. That is correct, Congressman, in addition to some individuals, yes, sir.

Mr. LaMalfa. When did your clients buy most of their COFINA bonds? Was it before or after 2014?

Mr. Kirpalani. Congressman, unfortunately, I don't know when they acquired debt. We have represented original owners of COFINA debt, and we continue to do so. And we represent some

that have acquired them in the secondary market from people who could not afford to hold onto them.

Mr. LaMalfa. So it is fair to say most of those bonds were bought after it was well known that Puerto Rico was distressed and bought them for less than original investors had paid for them?

Mr. Kirpalani. I honestly cannot comment as to when exactly they bought them. I would assume that it is a mix: it is probably some who bought initially; some who bought when the debt was at 90, 80, 70. I honestly don't know.

Mr. LaMalfa. So you think it is a mixture. Not all recent purchases----

Mr. Kirpalani. That is correct. Absolutely right.

Mr. LaMalfa. OK. So these are hedge funds. They regularly seek out situations where, especially post-2014, they are looking to invest in a situation where there is trouble?

Mr. Kirpalani. These particular clients that I am representing I have actually not seen very active in the hedge fund space. I have never represented them before. There are certain hedge funds, some who have bought up GO bonds in particular, who are looking to try to have an event-driven strategy to capitalize on returns.

Your colleague earlier talked about Argentina. Argentina was held up for 15 years, and the hedge funds that bought Argentine debt actually made 38 percent return for over an 8-year period of time. And some of those funds are actively campaigning now here so that Congress does not act, and they are just hoping that there is no progress, and they will use their litigation tools to try to achieve a result like that.

My clients actually are supportive of responsible legislation. We think that the key point here is that there is a good control board in place and that it respects the rule of law. If we could change anything, we would actually give greater deference to the judicial system in Puerto Rico. For issues of property rights and constitutional rights, to Ms. Velazquez' point earlier, we should defer to the autonomy and sovereignty of Puerto Rico and uphold their laws too.

Mr. LaMalfa. OK. That sounds good.

Now, some of these bonds are not due for quite a few years, a decade or maybe even two decades. But my understanding is that you have been asking the Commonwealth of Puerto Rico to start repaying sooner than they would have under the original agreement. So, with Puerto Rico being in such a cash-stressed situation, why would these particular investments, especially the more late-arriving investments, go to the head of the line for repayment with that much stress?

Mr. Kirpalani. That is a terrific question, Congressman. Let me try to explain in a very short period of time here. Investors who bought COFINA senior bonds, this was the original safe bond that was introduced when the economy actually collapsed in 2006 in Puerto Rico. There were long-term investors, as you said, for 40 years, 30-something or 40 years, and the protection they had was if there is a default, they would get paid ahead of any bonds that came later. So there is a big swath of subordinated bonds, contractually junior bonds, somewhat called junkier bonds, that came later. So, the only thing that we were saying is: We will reduce the overall payment requirements. We will give back $19.5 billion over the next 35 years to the people of Puerto Rico, and the only thing we ask is respect our contract rights--that is all--and that we get paid before the juniors. But some of them actually will get paid later than maturity, absolutely.

Mr. LaMalfa. For those that would go ahead of their contracted time, though, isn't that kind of stepping out of line? Wouldn't that be kind of a windfall for those?

Mr. Kirpalani. No, sir, because contractually upon a default, everything is accelerated and it is due immediately. So what we would do is actually forbear, take no payments at all for a year, and then have payments for the next 5 years and slowly inch back up to what the government of Puerto Rico has said they could actually afford. So the only issue, really, between us and the Commonwealth of Puerto Rico are the holdup creditors, who are the junior bondholders who will not go along. That is the problem.

Mr. LaMalfa. OK. Thank you for your answers. I will yield back, Mr. Chairman.

Mr. Graves. Mr. Clay is recognized for 5 minutes.

Mr. Clay. Thank you, Mr. Chairman.

Professor Johnson, one of the areas of concern for me is: How do we best protect pensioners and retirees who, no fault of their own, stand to be hurt by severe reductions in pension

# $1,058,634,613.05
# Employees Retirement System
# of the Government of the Commonwealth of Puerto Rico
# Senior Pension Funding Bonds, Series B

The Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") is a trust created by law in 1951 by the Legislature of the Commonwealth of Puerto Rico to provide pension and other benefits to retired employees of the government of the Commonwealth and its instrumentalities. These benefits are funded by contributions made monthly or twice a month to the System by the government of the Commonwealth and its instrumentalities ("Employer Contributions") and their employees, and by investment earnings. Government employers are currently required by law to make Employer Contributions to the System of at least 9.275% of their covered payroll.

The System has authorized the issuance of one or more series of bonds (the "Bonds") in order to increase the funds currently available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability. On January 31, 2008, the System issued the first such series of Bonds, which consisted of $1,588,810,799.60 aggregate principal amount of Senior Pension Funding Bonds, Series A (the "Series A Bonds"). The System is now offering its Senior Pension Funding Bonds, Series B (the "Series B Bonds"). The System has pledged all Employer Contributions made after the date of issuance of the Series A Bonds to the payment of the Bonds. The System will invest the proceeds of the Bonds and use these investments and the earnings thereon to provide pension benefits to its beneficiaries.

**The Bonds are limited, non-recourse obligations of the System payable solely from and secured solely by a pledge of Employer Contributions made after the date of issuance of the Bonds. The Bonds are not payable from the investments made by the System with the proceeds of the Bonds or from any other assets of the System, or from employee contributions to the System. The Bonds are not an obligation of the Commonwealth of Puerto Rico or any of its other instrumentalities or political subdivisions.**

The Series B Bonds will be registered under the Depository Trust Company's book-entry only system, and will be issued without coupons, in denominations of $5,000 principal amount (maturity amount in the case of the Capital Appreciation Bonds) and integral multiples thereof. Purchasers of the Series B Bonds will not receive bond certificates.

The Series B Bonds will be offered as Term Bonds and Capital Appreciation Bonds. Interest on the Term Bonds will be payable monthly on the first day of each month, commencing on July 1, 2008. Interest on the Capital Appreciation Bonds will compound semiannually on each January 1 and July 1, commencing on July 1, 2008 and will be payable at maturity or redemption. The inside cover page of this Official Statement contains information on the maturities, interest rates and prices or yields of the Series B Bonds. The Series B Bonds may be redeemed by the System, commencing on July 1, 2018, as described herein.

Interest on the Series B Bonds is not excludable from the gross income of the recipients thereof under Section 103(a) of the United States Internal Revenue Code of 1986, as amended. Interest on the Series B Bonds is exempt from Puerto Rico income and property taxes. See "Tax Matters" beginning on page 45.

The System expects that the Series B Bonds will be available for delivery to DTC on or about June 2, 2008.

**Investing in the Series B Bonds involves risks. See "Investment Considerations" beginning on page 22 of this Official Statement for a discussion of certain factors that should be considered by prospective purchasers in evaluating an investment in the Series B Bonds.**

## UBS Financial Services Incorporated of Puerto Rico

**Santander Securities**                                    **Popular Securities**

May 28, 2008

**Alternative significant government downsizing scenario**

Under the third alternative scenario, the government undergoes a major downsizing (without the benefit of higher economic growth). Employment in the public sector as a percentage of total employment in the Commonwealth is reduced more rapidly, decreasing from its current level to a level similar to that of the 50 states of the United States (14% of total employment) within the next ten years. In this alternative scenario, covered payroll reaches $32.0 billion by 2059.

**Alternative employment in the ERS participating sector as a percentage of government employment remains constant scenario**

Finally, under the fourth alternative scenario, employment in the ERS participating sector as a percentage of total government employment in the Commonwealth remains constant at its current level of approximately 58%, instead of increasing to 69% by year 2059 as in the base case scenario. In this alternative scenario, covered payroll reaches $33.1 billion by 2059.

## INVESTMENT CONSIDERATIONS

*Investors should carefully consider the following factors and other information in this Official Statement before deciding to invest in the Series B Bonds.*

**The Bonds are limited, non-recourse obligations of the System**

The Bonds are limited, non-recourse obligations of the System payable solely from and secured solely by Employer Contributions made after the date of issuance of the Bonds. The Bonds are not payable from or secured by any other assets of the System. The Bonds are not an obligation of the Commonwealth or any of its instrumentalities or political subdivisions, other than the System. In the event that Employer Contributions are less than the amounts required to pay debt service on the Bonds, the System will not be required to pay such debt service from its other assets, and bondholders may not receive the full amount due on the Bonds. The maturity of the Bonds is not subject to acceleration for any reason including non-payment of debt service of the Bonds.

The Act requires Government Employers to make the Employer Contributions that are the source of payment for the Bonds. If Government Employers fail to make their required Employer Contributions on time, or contribute less than the amount required, the Resolution requires the System to pursue all available legal remedies to collect such Employer Contributions as soon as possible. The System may, however, be unable to collect the full amount due or may not collect it in time to avoid a shortfall in the amount available to pay the Bonds. This may cause delays in the payment of interest on or principal of the Bonds, or ultimately result in the inability of the System to pay the Bonds.

Supp.III-0121

**Employer Contributions may not increase as projected, in which case the System may not have sufficient funds to pay the Bonds**

The projected debt service coverage ratio of the Bonds shown above in the tables under the heading "Projected Debt Service Coverage of the Bonds" is based on a model prepared by Global Insight, the System's consultant. The model projects the amount of government payroll for the next 50 years, which when multiplied by the current contribution rate of 9.275% (which the System assumes will remain in effect during the 50-year term of the Bonds), produces a projected level of Employer Contributions. The ratio between this projected level of Employer Contributions and the debt service requirements of the Bonds is the projected debt service coverage ratio of the Bonds. This means that projected Employer Contributions are expected to exceed debt service on the Bonds by at least the margin reflected by this ratio in each year.

The System may issue additional Senior Bonds payable from Employer Contributions, provided that the projected debt service coverage ratio for all Senior Bonds payable from Employer Contributions (including the Bonds proposed to be issued) is equal to or greater than 140% in each Bond Year. The System may also issue additional Subordinated Bonds payable from Employer Contributions, provided that the projected debt service coverage ratio for all Bonds payable from Employer Contributions (including the Bonds proposed to be issued) is equal to or greater than 125% in each Bond Year.

If future Employer Contributions are less than projected by an amount greater than the margin provided by the projected debt service coverage ratio at the time of issuance of any Bonds, the System will not receive sufficient funds to pay debt service on the Bonds. Employer Contributions could be less than projected for several reasons, some of which affect the projected number of participating employees, others that affect the projected level of wages, and others that affect both. Some of these reasons relate to demographic trends. Others relate to broad macroeconomic factors, some of which are specific to Puerto Rico, and some of which relate to the U.S. economy and the global economy. Still others relate to the attitudes of the population of Puerto Rico, the results of political elections, and public policy decisions. Many of these factors are interrelated. Some of these factors are discussed below.

*The economy of Puerto Rico may not grow as contemplated in the Global Insight projections.* The growth rate of Puerto Rico's gross national product is one of the measures of economic performance. The economic activity has an impact on both: total employment and the average wages. The Global Insight model projects that the Puerto Rico economy will grow at an average rate of 2.0% per year in real terms (i.e., after adjusting for inflation), over the next 50 years. The Puerto Rico economy has grown at an average rate of 2.5% per year in real terms during the past 25 years. During this period, the annual growth rate has been as high as 4.4% (in 1988) and as low as a contraction of 2.6% (in 1983). During the prior six years, the average annual compound growth rate has been 0.9%. Many factors can affect the performance of the economy in Puerto Rico, some of which relate specifically to Puerto Rico, and some of which are external in nature. These include the price of oil, which has adversely affected the Puerto Rico economy in recent years (Puerto Rico is highly dependent on oil for its energy needs), the availability of local and foreign capital, competition from other jurisdictions, the level of interest rates, the performance of the United States economy, tax rates, the level of government regulation, currency exchange rates, and the occurrence of natural disasters such as earthquakes or hurricanes. If the growth rate of the Puerto Rico economy is less than projected, government revenues could be lower than projected, which could adversely affect government payroll. This would reduce the amount of funds available to pay debt service on the Bonds.

Supp.III-0122

*Government employment as a percentage of total employment may be less than projected.* In Global Insight's base case scenario, government employment as a percentage of total employment decreases from the current level of approximately 24% of total employment to approximately 19.2% by the year 2059. However, a number of factors could result in a smaller government sector as a percentage of the total economy, which could have an impact on the total number of employees in the ERS participating sector. In an alternative scenario of the Global Insight model, which involves a significant government downsizing without the benefit of higher economic growth, employment in the public sector as a percentage of total employment in the Commonwealth is reduced more rapidly than in the base case scenario. In this alternative scenario, government employment as a percentage of total employment decreases from its current level to a level similar to that of the 50 states of the United States (14% of total employment) within the next ten years. In this alternative scenario, covered payroll reaches only $32.0 billion by 2059, instead of the $39.5 billion projected by the base case scenario.

One factor that may have an impact on the size of the government sector is Puerto Rico's current fiscal situation. Puerto Rico has had budget deficits for the last several years. The two principal political parties have publicly stated their commitment to remedy this situation. Among the measures that are contemplated is a reduction in the number of central government employees, primarily through attrition. The current government administration has stated its commitment to this policy, and total government employment has declined by 0.5% over the last two fiscal years. Act No. 103 of May 25, 2006, also known as the "Fiscal Reform Act," sets forth as the public policy of the Commonwealth, among other goals, the reduction of central government spending and the reduction of the number of central government jobs without causing the layoff of regular employees or increasing the actuarial liability of the retirement systems.

Several other factors, including factors that cannot be predicted at this time, could affect the size of the government sector as a percentage of the total economy.

A reduction in government employment as a percentage of total employment would not necessarily result in lower covered payroll if the reduction in employment is offset by higher wages (as in Global Insight's alternative "take-off" scenario). However, unless higher economic growth produces such higher wages, a smaller government sector would result in lower Employer Contributions.

*The percentage of government employees that are participating in the System may not increase as projected*. In Global Insight's base case scenario, employment in the ERS participating sector as a percentage of total government employment in the Commonwealth continues its historical upward trend, increasing from its current level of 58% to 69% by year 2059. But this may not happen. In an alternative scenario of the Global Insight model, employment in the ERS participating sector as a percentage of total government employment in the Commonwealth remains constant at its current level. In this alternative scenario, covered payroll reaches only $33.1 billion by 2059, instead of the $39.5 billion projected by the base case scenario.

*Inflation could be lower than projected by the Global Insight base case scenario*. The base case scenario of the Global Insight model projects that inflation in Puerto Rico will remain high in the near term, will trend down gradually over the medium term as global oil prices stabilize, and will converge to the United States level in the long term. (United States and Puerto Rico inflation rates were similar during the periods from 1980 – 1989 and 1991 – 1993, at which time they started to diverge, with the Puerto Rico inflation level higher than that of the United States.) But inflation in Puerto Rico may converge to the U.S. level more quickly than projected. In one alternative scenario projected by Global Insight, inflation in Puerto Rico converges more rapidly to United States levels and the inflation

differential is eliminated over the next ten years. In this scenario, covered payroll reaches only $33.6 billion in fiscal year 2059, instead of the $39.5 billion projected by the base case scenario.

*The population of Puerto Rico may not increase as projected.* One of the components of the projected growth of employment in the ERS participating sector is population growth. The Global Insight model assumes in its projections that the population of Puerto Rico will increase from approximately 3.9 million in 2007 to approximately 4.3 million by 2059, an increase of 0.2% per year. If the population of Puerto Rico does not grow as projected, the number of government employees, and as a result covered payroll, may not grow as projected. Puerto Rico already has over 1,000 inhabitants per square mile, one of the highest population densities in the world. Most residents of Puerto Rico are United States citizens by birth and hence have unrestricted access to the United States mainland. As a result, the population of Puerto Rico may not grow as projected or may decrease, which could result in lower government employment and hence in lower Employer Contributions.

*Government revenues may decrease, resulting in forced reductions in payroll; there may be a reduction in the demand for government services, or in the number of people required to provide these services.* The tax and other revenues of the government of Puerto Rico may decrease for a number of reasons, including a reduction in tax rates as a result of taxpayer pressure leading to legislative action or otherwise, other reasons related to the factors discussed above, and other reasons that may not be anticipated, particularly considering the 50-year term of the Bonds. Any such reduction could eventually require a reduction in government expenses, including payroll expenses, which represent a significant percentage of government expenses in Puerto Rico. In addition, the demand for many of the services currently provided by the government may decrease, or an increase in employee productivity may make it possible to provide the same services with fewer employees. If any of these things happen, government employment and government payroll may be lower than projected, and hence there could be lower Employer Contributions than projected to pay debt service on the Bonds.

*The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.* The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders. In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act. Therefore, the Legislature could make changes to the Act that are adverse to the Bondholders, including reducing the rate at which participating Government Employers are required to contribute to the System. If any such change is made, the ability of the System to pay debt service on Bonds when due could be adversely affected. It is impossible to predict at this time the conditions that could cause the Legislature of Puerto Rico to reduce the Employer Contribution rate, but those conditions could include situations (i) where the System's unfunded accrued liability has been reduced or eliminated, which could lead the Legislature to the conclusion (if it did not take into consideration the need to pay the Bonds) that additional Employer Contributions are not required, or (ii) where there is severe financial stress affecting one or more of the Government Employers.

Supp.III-0124

**Public Debt of the Commonwealth Must be Paid Before Employer Contributions of Central Government Agencies and Departments**

The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used to pay public debt before being used for other purposes. Public debt, which as of May 7, 2008 amounted to $49.4 billion, includes $10.9 billion in bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth with respect to bonds and notes guaranteed by the Commonwealth, and bonds and notes issued by its public corporations. The $49.4 billion excludes certain bonds and notes payable from available moneys of GDB. The Bonds do not constitute public debt. This Constitutional restriction does not apply to Employer Contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not "available resources" of the Commonwealth.

**The Remedies that the Fiscal Agent May Pursue May be Limited**

The remedies available to the Fiscal Agent and the holders of the Bonds upon an Event of Default do not include the right to declare all amounts immediately due and payable and are in many respects dependent upon regulatory and judicial actions which are often subject to discretion and delay. Such remedies may also not be readily available or may be limited, and the legal opinions rendered in connection with this financing will be qualified to the extent that enforceability of provisions of the Bonds and the Resolution are affected by such limitations, including as such enforceability may be limited by insolvency or other laws generally affecting creditors' rights.

**A redemption may adversely affect the return of bondholders on the Bonds**

The System may choose to redeem some or all of the Series B Bonds, at times when prevailing interest rates are lower than when the Series B Bonds were issued. If this happens, Bondholders may not be able to reinvest the proceeds received in a comparable security at an effective interest rate as high as that of the Bonds.

**The market value of the Bonds may be affected by a negative change in the ratings of the Bonds**

The ratings initially assigned to the Series B Bonds may be lowered or withdrawn. Such rating changes could adversely affect the value of and market for the Bonds.

**Absence of secondary market for the Bonds**

There is currently no secondary market for the Series B Bonds, and there can be no assurances that a secondary market will develop, or if it does develop, that it will provide Bondholders with liquidity for their investment or that it will continue for the life of the Series B Bonds. The Underwriters do not have a legal obligation to maintain a market for the Series B Bonds.

**Risks related to hedging transactions**

The System may enter into interest rate swap agreements and other derivative transactions to hedge its exposure to interest rate changes and may enter into currency swap agreements in the event it issues Bonds denominated in other currencies. If the counterparties to these agreements fail to perform

Supp.III-0125